# Exhibit C

Ex. C-129

WILLIAM J. GENEGO, SBN 103224
E-Mail: bill@genegolaw.com
LAW OFFICE OF WILLIAM GENEGO
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259

Counsel for GERARD SMITH

MATTHEW J. LOMBARD, SBN 239910
E-Mail: matt@lombardlaw.net
LAW OFFICES OF MATTHEW LOMBARD
2115 Main Street
Santa Monica, California 90405
Telephone:  310-399-3259

Counsel for MICKEY MANZO

THOMAS P. O'BRIEN, SBN 166369
E-Mail: thomasobrien@paulhastings.com
PAUL HASTINGS LLP
515 S. Flower Street, 25th Floor
Los Angeles, California 90071
Telephone:  213-683-6000

Counsel for JAMES SEXTON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GREGORY THOMPSON, et al.,<br><br>Defendants. | CASE NO CR 13-819-PA<br><br>NOTICE OF MOTION AND MOTION OF SMITH, MANZO AND SEXTON TO DISMISS CHARGES ON QUALIFIED IMMUNITY AND FAIR NOTICE; MEMORANDUM IN SUPPORT OF MOTION<br><br>Date:        March 31, 2014<br>Time:        3:30 P.M.<br>Courtroom: 15 |

Ex. C-130

To the Clerk of the Court, and all parties and their counsel of record, PLEASE TAKE NOTICE THAT on March 31, 2014,[1] at 3:30 p.m. or as soon thereafter as counsel may be heard, in Courtroom 15 of the United States District Court at 312 North Spring Street, Los Angeles, California, Defendants Gerard Smith, Mickey Manzo, and James Sexton ("Moving Defendants"), by counsel, will and hereby do move the Court for an order dismissing the charges against them.

The motion is made pursuant to Fed. R. Crim. P. 12(b). The grounds for the motion are that (1) the conduct that is alleged to constitute the charged crimes occurred in the scope and course of Moving Defendants' authorized duties and was objectively reasonable, requiring dismissal because Moving Defendants are entitled to immunity; and (2) pre-existing law does not make it apparent that the conduct that is the basis for the charges is unlawful under 18 U.S.C. § 1503(a), requiring dismissal on grounds that Moving Defendants did not have fair notice that their conduct was prohibited by the statute.

//
//
//
//
//
//
//
//
//
//

---

[1] As the Court is aware, there is currently a status conference set in this matter on April 1, 214 at 3:00 p.m.; the moving parties are, of course, amenable to the hearing on this Motion being set concurrently therewith in the interest of judicial economy if the Court so desires.

Ex. C-131

The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto, the exhibits submitted with the Motion, the files and records of the case and such further and additional evidence and argument as may be presented at the hearing on the Motion. An evidentiary hearing is requested if the Court finds that there are disputed facts material to the resolution of the Motion.

Dated: March 4, 2014                    Respectfully submitted,

LAW OFFICE OF WILLIAM J. GENEGO

By: */s/ William J. Genego*

Counsel for GERARD SMITH

LAW OFFICES OF MATTHEW LOMBARD

By: */s/ Matthew J. Lombard*

Counsel for MICKEY MANZO

PAUL HASTINGS LLP

By: */s/ Thomas P. O'Brien*

Counsel for JAMES SEXTON

Ex. C-132

## TABLE OF CONTENTS

I.     Introduction .................................................................................................1

II.    Statement Of Facts ......................................................................................5

III.   The Charges Against Smith, Manzo and Sexton Should Be Dismissed Because Their Conduct Occurred In The Scope and Course Of Their Duties And Was Objectively Reasonable.................................................................17

IV.   The Fair Warning Doctrine Separately Requires Dismissal ........................24

V.    Conclusion.................................................................................................25

Ex. C-133

**TABLE OF AUTHORITIES**

Federal Cases

*Anderson v. Creighton*,
  483 U.S. 635, 107 S. Ct. 3034 (1987)....................................................................25

*Bouie v. City of Columbia*,
  378 U.S. 347, 84 S. Ct. 1697 (1964)......................................................................24

*California v. Dotson*,
  2012 WL 1904467 (S.D. Cal. May 25, 2012) .........................................17, 18, 24

*Clifton v. Cox*,
  549 F.2d 722 (9th Cir.1977) ..................................................................................18

*Com. of Ky. v. Long*,
  837 F.2d 727 (6th Cir. 1988) .................................................................................23

*Harris v. Roderick*,
  126 F.3d 1189 (9th Cir. 1997) ...............................................................................19

*Idaho v. Horiuchi*,
  253 F.3d 359 (9th Cir. 2001) ( ..........................................................................passim

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819).........................................................1

*Mesa v. California*,
  489 U.S. 121 (1989)...........................................................................................passim

*Messerschmidt v. Millender*,
  132 S. Ct. 1235 (2012)......................................................................................passim

*Scheuer v. Rhodes*,
  416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed.2d 90 (1974).........................................19

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779, 115 S. Ct. 1842 (1995)......................................................1, 17, 19

*U.S. v. Aguilar*,
  515 U.S. 593...........................................................................................................25

ii

Ex. C-134

*U.S. v. Lanier,*

   520 U.S. 259 (1997)................................................................................................passim

*U.S. v. Lopez,*

   514 U.S. 549 (1995)..................................................................................................1, 17

     Federal Statutes

18 U.S.C. § 1503(a) ...........................................................................................- 2 -, 25

18 U.S.C. § 242.........................................................................................................19

28 U.S.C. § 1442(a) ...............................................................................................4, 23

42 U.S.C. § 1983.............................................................................................4, 5, 17, 20

     State Statutes

California Penal Code Sections 4575 and 4573 ....................................................2, 23

     Federal Rules

Fed. R. Crim. P. 12(b)......................................................................................... 2, 17

Fed. R. Crim. P. 12(b)(2).........................................................................................17

Rule 12 ......................................................................................................................18

     Other Authorities

*See Seth P. Waxman & Trevor W. Morrison, What Kind of Immunity? Federal*

   *Officers, State Criminal Law and the Supremacy Clause,,*

   11 Yale L.J. 2195, (2003) ...................................................................................4

Ex. C-135

## I.      Introduction

Los Angeles County Sheriff's ("LASD") Deputies Gerard Smith, Mickey Manzo and James Sexton (the "Moving Defendants") cannot be criminally tried for assisting a law enforcement investigation into what they reasonably thought was potential criminal activity involving the smuggling of contraband into the Men's Central Jail "MCJ"), including a cell phone with photos of drugs and cash and possibly narcotics. This is particularly true given that the Moving Defendants' investigation was conducted in accordance with state law and local procedure and duly authorized and supervised by LASD Sheriff Leroy D. Baca, Undersheriff Paul Tanaka, and numerous other high ranking Sheriff's Department officials.

The "genius of the Founding Fathers to 'split the atom of sovereignty' … means in practical terms … that within the territory of every state, two sovereigns – the state government and the federal government – reign cheek to jowl. From the dawn of the Republic, this unusual arrangement has led to a fair degree of conflict, as the actions of one sovereign have encroached on the prerogatives of the other." *Idaho v. Horiuchi*, 253 F.3d 359, 361 (9th Cir. 2001) (en banc), *vacated as moot*, 266 F.3d 979, *quoting, U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838, 115 S. Ct. 1842 (1995) (Kennedy, J., concurring), *citing McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819). In striking this delicate balance, the state, and not the federal government, has "historically been sovereign" in the area of "criminal law enforcement." *U.S. v. Lopez*, 514 U.S. 549, 564 (1995).

This case is a product of that unusual arrangement, and an example of the conflict resulting from local law enforcement officers investigating what they reasonably believed to be criminal activity undertaken by federal agents. The Moving Defendants, all LASD deputy level employees, were indicted following their participation in an LASD investigation into the alleged smuggling of contraband including cell phones and narcotics into the MCJ. The Moving Defendants were charged because targets of their investigation included, by

Ex. C-136

unfortunate happenstance, a federal agent. There is no dispute that the federal agent did, in fact, facilitate the smuggling of illegal contraband into MCJ.

The investigation into the smuggling was duly conducted in accordance with LASD policies and procedures and authorized by the Moving Defendants' superior officers (most of whom have not been charged with any crime). In fact, in a letter dated September 26, 2011, no less than Los Angeles County Sheriff Leroy D. Baca advised United States Attorney André Birotte that the LASD investigation at issue here had been commenced with his knowledge and that the Sheriff believed that federal agents committed multiple crimes by smuggling contraband into MCJ. Exhibit BB, p. 248. The Sheriff made it clear that the investigation was well founded and objectively reasonable based on state law:

> I am extremely displeased with the conduct of the FBI in causing the introduction of a cell phone into the jail system as illegal, unethical and irresponsible . . . The Sheriff's Department's investigation of this matter will encompass possible violations of California Penal Code Sections 4575 and 4573, conspiracy, entrapment, coercion and civil rights violations.

*Id.*

The bizarre circumstances giving rise to the LASD investigation reveal that the Sheriff's belief was not without support. In July 2011, agents of the Federal Bureau of Investigation ("FBI") smuggled a cell phone into the MCJ through a corrupt deputy sheriff to an inmate who had just been sentenced to 423 years to life. The LASD found the FBI phone in the inmate's possession a short time later. The phone contained photos of what appeared to be illicit narcotics and a large amount of cash. As FBI remained silent, the inmate began to spin tales to LASD investigators about wide-scale smuggling of drugs and other contraband into MCJ by LASD deputies. The inmate's allegations gained credence from the photos of

Ex. C-137

2

drugs and cash on the cell phone, and resulted, not surprisingly, in an explosion of investigative activity by LASD.

After the LASD discovered that two of the numbers on the cell phone traced back to the FBI, the inmate then claimed he was an FBI informant. He also claimed that his contact outside the jail was a "fed" and that this alleged federal agent participated in the smuggling of cell phones and drugs to the inmate. LASD officials believed the actions had to be that of a rogue FBI agent, finding it unfathomable that a fellow law enforcement officer would put lives at risk by giving an inmate a cell phone and allowing him to distribute methamphetamines, cocaine and other drugs in the jail.

The FBI and the prosecutors overseeing them sought to gain custody of the inmate by employing the authority of the Court. To do so, they filed an application for a writ of *habeas corpus* on August 25, purportedly for the inmate to testify before a federal grand jury on September 7. In filing the application, they misrepresented to the Court that the release of the inmate had been cleared with the State, as they simultaneously emailed the Marshal's Service with "a heads-up," alerting the Marshals that "whether he [the inmate] should be released to federal custody may be somewhat of a sensitive issue for the Sheriff's Department." Exh. S, p. 191.

Meanwhile, LASD officials took efforts to isolate the inmate, both as a means to protect him from possible retaliation by deputies he had implicated in civil rights violations (a concern independently expressed by the inmate), and to continue their investigation without losing control over a critical witness.

LASD Deputies Gerard Smith, Mickey Manzo and James Sexton find themselves in this case because they had the unfortunate distinction of being serious, hardworking, and trustworthy deputies, who treated inmates with respect and were respected in return. They were given orders to see that the inmate was

protected at all times, that his medical needs were met, and that no one make contact with him or know his whereabouts unless it was authorized in advance.

That is what they did; nothing more, or less, than fulfill their right and obligation as sworn peace officers to investigate a violation of state law at the direction of, and in accordance with, the orders of their commanding officers. The mere fact that the target of their investigation was a federal agent does not make their investigation a federal crime. While federal agents are protected by qualified immunity from having to stand trial for a violation of state law, they do not have immunity from investigation, nor arrest and prosecution, for a violation of state law. *See e.g. Mesa v. California*, 489 U.S. 121 (1989) (denying removal under the federal officer statute, 28 U.S.C. § 1442(a), where defendants alleged no colorable federal defense to the state charges of reckless driving and related offenses).

Moreover, just as federal officers enjoy Supremacy Clause immunity from state prosecution for authorized investigative activity that is objectively reasonable, state officers should likewise be entitled to sovereign immunity from federal prosecution under similar circumstances. Just as Supremacy Clause immunity has been posited to be coextensive with qualified immunity in the civil rights context, so too should state officers enjoy sovereign immunity coextensive with the immunity they are entitled to in connection with claims brought under 42 U.S.C. § 1983. *See* Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law and the Supremacy Clause*, 11 Yale L.J. 2195, (2003) (noting that Supremacy Clause immunity is coextensive with qualified immunity under § 1983); *see also U.S. v. Lanier*, 520 U.S. 259 (1997) (holding that under the fair warning doctrine state officers are immune from prosecution for acts they could not reasonably understand to be proscribed).

The Supreme Court has held that, in a civil context, LASD deputies are entitled to qualified immunity when conducting reasonable investigations with the approval of their supervisors. *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012)

(finding that LASD deputies were entitled to qualified immunity in Section 1983 action alleging lack of probable cause for a search warrant in part because their supervisors had approved the warrant). Such immunity logically extends to the instant criminal prosecution. This inter-governmental skirmish regarding dueling investigations into alleged criminal activity has no place before this Court and the charges against Smith, Manzo and Sexton should be dismissed as a result.

## II.     Statement Of Facts

### A.     Brown Is Found With A Cell Phone With Photos of Drugs

On Monday, August 8, 2011, Los Angeles County Sheriff deputies at the MCJ found a cell phone in the personal belongings of inmate Anthony Brown as he was being transported to a nearby hospital for a medical procedure.[2] Exh. A, p. 3 (Incident Report). Brown was advised of his rights and refused to make a statement about the phone and was sent to the hospital. Exh. A, p. 3. The phone was examined and was found to include two picture messages, one of a large amount of cash and several bags of what appeared to be marijuana, and the other of a white substance resembling cocaine. Exh. D, p. 40 (Manzo Statement of Probable

---

[2] Brown had been in custody since August 5, 2009, when he was arrested by LAPD officers after they recognized him as the suspect in an armed robbery of an El Pollo Loco restaurant and a series of other recent armed robberies. Brown had a revolver in his waistband, affixed with a 6" barrel and six live cartridges in the cylinder. Exh. B, p. 7 (Arrest Report). Brown was on parole at the time and was arrested for being a felon in possession of a firearm. He waived his rights and admitted to committing multiple armed robberies and attempted robberies of banks, a pharmacy, retail stores and fast food restaurants in the preceding month. He also admitted that during one of the robberies he had fired at two people, explaining that he believed they were attempting to stop him, but said he did not want to hurt anyone and that "the drugs made him not think straight." Exh. B, p. 9.

Brown was charged in a 13 count information with multiple robberies, attempted robberies and enhancements. Exh. C, pp. 19-37 (Commitment, Abstract of Judgment and Minutes of Sentencing). He was sentenced on June 27, 2011 to 423 years to life. *Id*.

Ex. C-140

5

Case 2:15-cr-00255-PA    Document 31-4    Filed 05/19/15    Page 13 of 33    Page ID
Case 2:15-cr-00815-PA    Document 107    Filed 03/04/14    Page 12 of 32    Page ID #:315
#:245

Cause). A third text message requesting a charger, extra battery and earphones was also discovered.[3] *Id.*

### B.    The LASD Investigation Begins

Deputy Mickey Manzo, a member of the Operation Safe Jails ("OSJ") Unit,[4] sent the cell phone number and the two numbers that were in the call log to an analyst. The numbers came back with no identifying information. Exh. E, p. 42 (JIU/OSJ Cell Phone Invest. Timeline). Brown's visiting records, current inmate account and criminal history were all subject of inquiries. *Id.* pp. 42-43.

Deputy Manzo applied for a court order revoking Brown's telephone privileges, and had him reclassified as "K-10," or "keep-away" status.[5] Exh. E, p. 43. Detective Bayes of the Jail Investigation Unit ("JIU")[6] was initially assigned the case, and on August 9 he applied for an order for the call records and subscriber information. Exh. E, p. 43.

---

[3] In contrast to state prison, where it is not uncommon for inmates to possess cell phones, it is very rare at the MCJ. Presumably this is because inmates at MCJ have access to telephones in the facility, and thus the only reason to risk smuggling of a cell phone would be to use it to accomplish some illicit purpose.

[4] The Operation Safe Jails Unit deputies are responsible for maintaining the safety of the jails by gathering intelligence from gang members and other inmates about criminal activity inside the jail as well as related crime in the community.

[5] A K-10 (High Jail Security Risk) classification "shall be utilized for inmates who, based on confirmed information, require administrative segregation from the general population at all times. K-10 inmates shall be housed in single man cells and be waist chained while being transported." *See*, LASD Custody Division Policy 5-01/030.00.

[6] The Jails Investigation Unit is responsible for investigating crimes committed inside the MCJ and other jail facilities operated by the LASD.

Ex. C-141

C.     The LASD Investigate Brown's Allegations of Widespread Smuggling of Narcotics and Other Contraband

      1.     *August 12 – August 16*

Brown was returned from the hospital on Friday, August 12 and placed in the 7100 restricted housing area. He offered to provide the deputies escorting him with information about an MCJ staff member bringing in cell phones, tobacco products and narcotics, if the deputies brought him his personal property from his prior housing location. Exh. F, p. 46 (Buckle & Jarvis Memorandum). After the deputies brought Brown his property, he told them a nurse had approached him offering to bring in contraband, that he put her in touch with his contact on the outside and made an arrangement where the nurse brought him a cell phone, multiple bags of narcotics, multiple packs of cigarettes and lighters. Brown said there were other nurses involved but he only had contact with one of them. Exh. F.

That same evening, Brown was interviewed by Sgt. Conley and told him that a nurse by the name of Chung brought him the phone, and had smuggled in contraband on three other occasions, including methamphetamine which he sold in the jail. Brown said his contact on the outside who paid the nurse was "CJ," but would not elaborate further. Exh. G, p. 48 (Conley Memorandum).

On Monday August 15, Brown was interviewed by OSJ Deputy Colon. Exh. H, p. 49. In his interview with Colon, Brown for the first time implicated an LASD deputy in the smuggling of contraband. Brown said the same deputy assisted him in narcotics transactions involving methamphetamine, cocaine, marijuana and ecstasy and that several other deputies were involved in the smuggling. Brown's partner in the street, whom he referred to as "CJ," would provide the drugs to the deputies and Brown would sell the drugs within MCJ. Brown said he currently owed the deputy $20,000 and that he had phone numbers and addresses for the corrupt deputies. Exh. H, p. 49. Brown also provided Deputy Colon with a handwritten list of the drugs he distributed in the MCJ, with the cost and selling

Ex. C-142

price. Exh. H, p. 51. Brown said he felt like his life was in danger, and believed the corrupt deputy he was working with might be thinking he was cooperating and discussing their business. Exh. H, p. 49.

The following day, Deputy Colon and Sgt. Bayes interviewed Brown together, and were joined by Det. Villagomez. Exh H, pp. 49-50; Exh. I, p. 52 (Bayes, Office Correspondence). Brown repeated what he had told Colon, and said "his boy" goes by the name "CJ" and lives in the City of Lomita. He did not want to provide any further information unless he was removed from K-10, allowed to make contact with CJ, get his phone back and continue business as usual, and be monitorred so the corrupt deputy or deputies could be caught in the act. Exh. I. Because Brown's allegations implicated a deputy in misconduct, Det. Bayes notified the Internal Criminal Investigations Bureau ("ICIB"). Exh. I, p. 53.

> 2.      August 17 – August 19

At the direction of Lt. Gregory Thompson (the head of Custody Services and in charge of JIU and OSJ), Deputies Smith and Manzo, as well as other OSJ Deputies and Sgt. Bayes, pursued the investigative leads based on the information available.[7]

On August 18, OSJ Deputy Kirk, who was assigned to the San Fernando Valley Gang ("SFVG") Task Force, asked the FBI analyst on the Task Force to run the numbers Brown had called from the cell phone. The analyst recognized the numbers as being assigned to the FBI West Los Angeles office. Exh. J, p. 55 (302

---

[7] Among other things, they pulled all the records for medical and professional staff in response to Brown's claim that the person bringing him contraband was a nurse named Chung, used the Cal Gangs data base to attempt to identify a "CJ" from Lomita, Brown's outside connection, obtained Brown's inmate account records, obtained Brown's visiting records and sent them to the Crime Analysis Center and conducted follow-up analysis, and investigated the calls made on the cell phone by Brown's cellmate. Exh. E, pp. 43-44.

Ex. C-143

8

Case 2:13-cr-00815-PA   Document 107   Filed 03/04/14   Page 16 of 32   Page ID #:318

Interview Report). The analyst and Kirk agreed that they should not discuss the matter further, and Kirk gave the analyst Lt. Thompson's name and number for her supervisor to contact. Exh. J, p. 56; Exh. K, p. 68. This was the first piece of information provided to any LASD investigator that connected the cell phone containing photos of drugs and money with an FBI agent.[8]

At 1:31 p.m., Lt. Thompson sent an email to Det. Bayes telling him that until Brown was shipped to the Department of Corrections, he would have "no phones, no visits, especially from outside LE [law enforcement] without my approval." Exh. K, p. 59; Dkt. 1, p. 9, par. 1. At 8:06 p.m., an FBI official sent an email to the Sheriff asking him to call about an important and sensitive matter. Exh. K, p. 66.



[8]

Ex. C-144

9

Case 2:15-cr-00255-PA   Document 31-4   Filed 05/19/15   Page 17 of 33   Page ID
#:249
Case 2:15-cr-00815-FA   Document 107   Filed 03/04/14   Page 16 of 32   Page ID #:329

On August 19, Deputies Smith and Manzo interviewed Brown at the MCJ and recorded the interview. Exh. M, p. 93. Brown initially repeated the story that the nurse had smuggled in the phone and drugs. *Id.*, p. 99-100. He then said it was a deputy, and that everything he had said about the nurse was true for the deputy. Exh. M, p. 105. He continued to maintain that his contact on the outside that provided the contraband was CJ. *Id.*, pp. 101, 103, 110-11. When asked about the phones calls to the FBI number, Brown indicated the FBI was conducting an investigation of the jail and deputies. Brown implied but did not state explicitly that the FBI was involved in smuggling in contraband, but when asked whether the FBI "watched or set up transactions with whoever CJ is on the outside, watched them go down with a deputy and then got it brought to him," Brown responded, "[y]ou could say something like that." Exh. M, p. 118.

The Sheriff called the FBI official late that afternoon. Exh. K, p. 69. When they spoke, the FBI official reportedly told the Sheriff it was an FBI phone and he wanted the phone returned, but did not disclose any details. Exh. O, p. 132.

D.    The LASD Investigation Expands

    1.    *August 20 – August 24*

On Saturday, August 20, a meeting was held at LASD Headquarters attended by, among others, Sheriff Baca, Undersheriff Tanaka, ICIB Captain Carey, ICIB Lt. Leavins, Lt. Thompson and Deputies Smith and Manzo.

Sheriff Baca ordered a criminal investigation into how the cell phone was smuggled into the jail. There was a discussion as to whether they were dealing with the actions of a rogue FBI agent, as Captain Carey and others could not believe the FBI would give a cell phone to an inmate who had been sentenced to over 400 years in prison. Exh. N, p. 121; Exh. O, p. 133. (FBI interview of Carey). There was also a discussion about quarantining Brown. Exh. N, p. 122.

On Sunday, August 21, ICIB Lt. Leavins interviewed Brown, with Deputies Smith and Manzo. Brown repeated his allegations that deputies were smuggling in

Ex. C-145

10

contraband, including drugs, and said that CJ was the source of the drugs. Exh. P, pp. 153-54 ("He would go and see CJ…[t]o pick up stuff for me and bring it in. … Notes. Drugs. Cigarettes.") The drugs included "[w]eed. A little bit of meth. Coke." Exh. P, pp. 153, 157. He said CJ was "a . Fed,… an agent,… [h]e's part of the FBI." Exh. P, p. 161-62. Later in the interview Brown reported that the agents in charge of the investigation told him they couldn't bring in drugs, but would allow the deputy to do so. Exh. P, p. 169. ("So I know one of the problems were the drugs, they was like, we can't take drugs in. Now if he does it, that's on him. What they wanted to bring in was fake pills…"). Brown said the FBI had smuggled in a phone to him previously through another deputy in 2010, and that he had disposed of it without being discovered. Exh. P, p. 174. Brown also told Leavins about the frequent use of excessive force, explaining that "you've got a lot of good cops like Smith and Manzo … who ain't with the bullshit but then you got more." Exh. P, p. 170. Leavins repeatedly told Brown that they did not want to interfere "with whatever it is you have going on with the FBI … We're all on the same thing here, which is to rule out anybody that is basically doing criminal activity in our Department." Exh. P, p. 181. Brown also continued to express fear that for his safety due to retaliation by deputies. Exh. P, pp. 171-72, 182 (Brown: "I don't want to get fucked up. I already know…" Leavins: "That is not gonna happen.")

On August 23 three FBI Agents appeared at MCJ to visit Brown. The interview commenced in the first floor visiting room at 10:40 a.m., and was terminated at 11:54 a.m. when deputies removed Brown from the room. Exh. Q, p. 188 (FBI 302 of agents). The agents were questioned as to whether they had received approval from Lt. Thompson for the visit, and were advised that Brown was not to be interviewed by any law enforcement personnel, including members of the LASD. Exh. Q, pp. 188-89. The agents were advised that Captain Carey was en route to speak with them, but the agents left before he arrived. Captain Carey's calls to one of the agents were reportedly not returned. Exh. O, p. 134.

Ex. C-146

11

At 5:02 p.m. a Supervisor Assistant U.S. Attorney ("AUSA") sent an email to a Senior Officer at the U.S. Marshal's Service ("USMS") inquiring as to the "absolute minimum amount of time it would take to get a prisoner from the Jail to federal custody?" Exh. R, p. 190. The USMS Senior Officer replied, "Maybe a week, if county will let us have the inmate." Exh. R, p. 190. The Supervisor AUSA forwarded the response to the AUSAs in charge of the investigation, adding "Here is the response from the Marshal Service. I suppose the State could refuse to turn him over, which I'm sure has happened before." Exh. R, p. 190.

The following day, the Supervisor AUSA emailed the Senior Officer at the USMS advising her that the USAO would be applying for a writ that same day to have Brown testify on September 7. The Supervisor AUSA added, "[a]s a heads-up, whether he should be released to federal custody may be somewhat of a sensitive issue for the Sheriff's Department. Assuming the County will release him, I understand if you cannot get him here by that date, but would appreciate anything you can do to expedite the process." Exh. S, p. 191. The application was signed and filed that same day.[9]

Following the breach in security that allowed Brown to be moved from the 7100 restricted K-10 area, Lt. Thompson directed that Brown be moved to a cell in the back of the medical ward and that his cell be guarded by two deputies around the clock. *See*, Indictment, p. 9, pars. 3–5. Deputies Smith and Manzo moved Brown to the medical ward, and stood guard outside his cell. *Id.*

On August 23 Brown was interviewed by Lt. Leavins, Captain Carey, and Deputies Smith and Manzo. Exh. U, p. 196. Brown confirmed that Michel brought

---

[9] In signing the Application, the Supervisor AUSA represented that "I have contacted the institution (if detainee is not in federal custody) and have been advised that said detainee is free and able to be present during the entire duration of this matter." Exh. T, p. 194 (Application and Writ).

Ex. C-147

12

him drugs on several occasions, that it happened after Michel and CJ would "hook up," and that CJ was a "fed." Exh. U, pp. 200-06. He also repeated that another deputy provided him with a phone previously. Exh. U, pp. 198-99, 207.

Brown continued to express fear for his safety, and suspected deputies were already retaliating against him. Exh. U, p. 205. ("Damn. Why do they keep fuckin' with me for me for? . . . Why they going in my cell?"). Lt. Leavins told Brown they were worried about his safety due to possible retaliation by deputies, and they were going to move him to a station jail "and nobody's gonna know where you are, so you don't have to worry about any deputies, any retribution...." Id., p. 205.[10]

ICIB Captain Carey advised Undersheriff Tanaka that Brown was going to be moved to a substation jail and have his name changed. Exh. P, p. 138. The reason was concern for Brown's safety, given the possibility of retaliation by deputies who Brown may have implicated. *Id.*

Brown was interviewed again on August 24, by ICIB Dets. Craig and Long at the Temple St. Station with Deputies Smith and Manzo. Exh. V, p. 212. Craig and Long conducted an exhaustive interview of Brown, from his personal background and history, to the recent events since he was arrested in 2009. Brown maintained the FBI knew about, and allowed, and even facilitated the smuggling of drugs by having CJ pay Michel additional money, but said he did not know if CJ supplied the drugs. Exh. V, pp. 216-19 ("I don't know if he got [the drugs] from

---

[10] *See also*, Exh. U, p. 209 ("So I want to make sure that you're comfortable that we are safeguarding you from any retribution whatsoever. The easiest way for us to do that is to move you out of here, put you in a station jail where nobody knows where you are, nobody knows who you are and nobody will know when we're coming to talk to you …"); *Id*., p. 211 (Leavins Let's do what we gotta do. Let's do…fill out the paperwork and make the notifications we need to do and you're gone. You do not exist anymore. … Brown: they gonna kill me or what? Smith: No, you're gonna disappear. You're not gonna be here no more.").

Ex. C-148

13

CJ….").[11] When asked directly, "Did the FBI ever give you any narcotics?" Brown answered: "Yes." Exh. V, pp. 229-30; *Id.*, p. 230 (Craig: "And you believe that they knew that you were having narcotics brought into the jail?" Brown: "Yeah, I believe they knew and I told them. If they didn't, I told them. … Every time it happened I, I would text, tell them what I got and they didn't say nothing.").

Brown provided Craig several pages of handwritten documents, which included a chronological list of excessive force incidents and a "business plan," which listed drugs, quantities and profits. Exh. V, pp. 222-28.

Lt. Thompson held a meeting on the 24th with the deputies who were assigned to guard Brown's cell. *See*, Indictment, p. 9, par. 6. Deputies Smith and Manzo were assigned responsibility for overseeing the security detail. Deputy Smith sent an email to the assigned deputies, including Deputy Sexton who was assigned to guard the cell, with a schedule, and referred to "the inmate we are tasked with protecting." Exh. W, p. 238. The email stated there was to be no movement of Brown except for medical reasons without the presence of "US Tanaka, ICIB Cpt. Tom Carey, ICIB Lt. Leavins, Lt. G. Thompson, Dep. G. Smith or Dep. M. Manzo." Exh. W, p. 238. That same day, Lt. Thompson directed a deputy to obtain Brown's "jacket." from the Records Center. Indment, p. 9, par. 7.

    2.    *August 25 – August 26*

Brown was transferred from the MCJ to the jail at the LASD substation in San Dimas on August 25th. Indictment, p. 10, par. 1.[12] Lt. Thompson and Deputies

---

[11] Exh. V, p. 220-A (Brown: "Like they were saying once the deputy, get a deputy to bring them in, I said what do I do with them? And he's like you're gonna use 'em dude. And I was like no. He said just do what you do with them, just document and let us know." *Id.*, p. 220-A (Long: "And when you let CJ and/or LM and her partner know what was going on, that you were actually getting the drugs in? Brown: "Yes.").

[12] It was at this point that Deputy Sexton, who had been out of state, returned to California and became involved in the LASD investigation.

Ex. C-149

14

Smith, Manzo and Sexton booked Brown under the name John Rodriguez, with fictitious personal information and did not "Live Scan" him (fingerprint him electronically). Live Scanning Brown would have resulted in his fingerprints being recognized, and making his location known to anyone with access to the LASD's computer system. Although Brown's location could not be discovered through the computer system, Captain Carey and ICIB knew where Brown was being held "at all times." Exh. O, p. 138. If Carey needed to know Brown's location at any given time, he could have asked anyone who was involved in booking him under a different name. *Id.*, p. 138.

That same day, August 25, Lt. Thompson sent an email to MCJ officers advising that "[e]ffective immediately, all FBI requests for inmate interviews will be approved by MCJ Liason," adding that "[o]nce approved the inmate will be transported to MCJ and made available to the FBI." Exh. W, p. 240.

The Application for a writ that was signed on August 24, was filed and issued on the 25th and reportedly served on the LASD. Exh. T, pp. 194-95; Indictment, p. 5, par. 15.

On August 26, MCJ Captain Ornelas sent an email at 10:53 a.m. to all MCJ lieutenants and sergeants with a subject line of "Court Order presented By Federal Officers." Exh. X, p. 242. The email instructed that if anyone was presented with an "inmate removal order . . . or ANY OTHER order of the court" by a federal law enforcement agency, they were to "[r]eceive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review. DO NOT RELEASE THE INMATE OR ALLOW CONTACT." Exh. X, p. 242. Captain Ornelas' email was preceded by an email exchange between ICIB Captain Carey and Lt. Thompson in which Carey advised Lt. Thompson that if a writ were served it should be accepted, but that it "has to be very clear he is not [to be] released without approval." Exh. X, p. 241.

Brown continued to be held at the San Dimas substation, where two deputies were present at all times to guard his cell, including at times, Deputies Smith, Manzo and Sexton. Deputies Smith, Manzo and Sexton periodically changed the name under which Brown was booked, and as before, did not Live Scan him when he rebooked. *See,* Indictment, p. 11, par. 19.

E.    The Writ Is Withdrawn

On August 29, Lt. Leavins drafted a memo for Captain Carey directed to Sheriff Baca summarizing the status of the LASD investigation. The memorandum noted that Brown had alleged on several occasions that in addition to providing him with a cell phone, "agents of the FBI facilitated the smuggling of methamphetamine and cocaine to him, and that he . . . then sold the drugs to other inmates." Exh. Y, p. 243. The memo stated that "[w]e are currently investigating if in fact F.B.I. agents either directly or indirectly conspired to provide Brown will illegal drugs and cellular telephones," and that if it occurred, it would be a violation of 4573 of the California State Penal Code, a felony, as well as a violation of 4575 (a), a misdemeanor." *Id.*, p. 243.

The following day, August 30, Sheriff Baca, other LASD and ICIB officials, and attorney Michael Genaco of the Office of Independent Review, met with U.S. Attorney Birotte and other federal officers regarding the issues that had arisen since discovery of the cell phone. During the course of the meeting, Sheriff Baca advised that Brown had been debriefed by LASD deputies. After the meeting, the writ for Brown was withdrawn. Exh. Z, p. 244 ("Since the meeting . .. the Writ for the CHS [Confidential Human Source] has been withdrawn with objection from the PC SSA [Public Corruption Supervising Special Agent].").

F.    **Brown Is Transferred To State Prison**

On September 2, Brown was temporarily brought to the MCJ for medical reasons. While at the MCJ, Brown wrote a 28 page letter in which he stated that a deputy brought him drugs, cigarettes, lighters, and notes with the phone. Exh. AA,

Ex. C-151

16

p. 246. Brown also expressed fear for his safety and asked to be returned to San Dimas, writing, "[a]nd so you know, I am scared to death back here in CJ 8225 . . . The deputies who work here give me dirty looks as if I killed somebody they know. . . . Anyway if I make it over this weekend without being found dead I ask that when I am brought back to where I was housed last week …" Exh. AA, pp. 246-47.

Brown was returned to San Dimas after he received the required medical assistance. On September 12, he was booked under his own name, was transferred to the CDCR and transported to Lancaster State Prison.

## III. The Charges Against Smith, Manzo and Sexton Should Be Dismissed Because Their Conduct Occurred In The Scope and Course Of Their Duties And Was Objectively Reasonable

The charges should be dismissed because Smith, Manzo and Sexton are immune from being tried for their participation in an objectively reasonable local law enforcement investigation into potential criminal violations by federal agents. Indeed, the state, and not the federal government, has "historically been sovereign" in the area of "criminal law enforcement." *U.S. v. Lopez*, 514 U.S. 549, 564 (1995). Smith, Manzo and Sexton enjoy immunity coextensive with the qualified immunity to which they would be entitled in connection with a Section 1983 claim. Waxman, *supra*, at 2239–40. That is, Deputies Smith, Manzo and Sexton should be entitled to immunity so long as they were not "plainly incompetent," or "knowingly violating the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244–45; *see also Lanier*, 520 U.S. at 270–71 (applying a similar standard in relation to state official immunity from criminal prosecution under the fair warning doctrine).

### A. Immunity Is Properly Decided On A Motion To Dismiss

A motion to dismiss on immunity grounds is properly made pretrial under Fed. R. Crim. R. 12(b). *See, Idaho v. Horiuchi,* 253 F.3d 359, 367 (9th Cir.) (en banc), *vacated as moot*, 266 F.3d 979 (9th Cir.2001); *California v. Dotson*, 2012

WL 1904467 (S.D. Cal. May 25, 2012), *citing and quoting*, Advisory Comm. Note (1944), Fed. R. Crim. P. 12(b)(2) (identifying "immunity" as a matter that is properly raised by a pretrial motion).

While the *Horiuchi* opinion has since been vacated as moot, it presents sound reasoning supporting a pretrial determination of the issue of immunity. The *Horiuchi* Court ruled that a district court may grant such a motion without an evidentiary hearing "if the facts supporting the immunity claim are not in dispute." *Id*. 253 F.3d at 367 (citation omitted). Where there are material facts in dispute as to the claim of immunity, the district court is to conduct an evidentiary hearing to resolve them, and then rule on the motion. *Id*. at 376–77. The Southern District of California recently adopted the reasoning of the *Horiuchi* Court in granting a motion to dismiss on grounds of immunity. *California v. Dotson*, No. 12cr0917, 2012 WL 1904467 at *2 (S.D. Cal. May 25, 2012). That court found that, where the undisputed facts were that the defendant was involved in a high speed collision pursuing a suspected methamphetamine trafficker, the issue of immunity was appropriately resolved on a Rule 12 motion. *Id.* The court relied upon the reasoning set forth in *Horiuchi*. *Id.* Likewise, the vacated *Horiuchi* opinion, despite its lack of precedential effect, offers valid reasons for adopting this procedure here. The issue of Smith, Manzo and Sexton's immunity is therefore appropriately resolved on this Motion to Dismiss.

    B.    <u>Smith, Manzo and Sexton Are Immune From Conviction For Objectively Reasonable Conduct In The Course And Scope Of Their Duties</u>

Smith, Manzo and Sexton cannot be tried for participating in an objectively reasonable local law enforcement criminal investigation. Just as a federal agent

Ex. C-153

18

would enjoy Supremacy Clause immunity[13] for conducting such an investigation, so too should local law enforcement officers. While not explicitly set forth in existing case law, it follows from well settled principles of sovereign immunity, qualified immunity in the civil rights context, and the Fair Warning Doctrine, that a state official cannot be criminally prosecuted for conducting a lawful investigation.

Immunity law is the "product of constitutional provision as well as legislative and judicial processes." *Scheuer v. Rhodes*, 416 U.S. 232, 240, 94 S. Ct. 1683, 40 L. Ed.2d 90 (1974) (holding that Governor and other state executive officials had qualified immunity that varied with "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action. . . .").

The Supreme Court has explained that "[t]he concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine—that the 'King can do no wrong'—did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability." *Scheuer*, 416 U.S. at 239.

In *Horiuchi*, the United States argued that the scope of Supremacy Clause immunity is coextensive with qualified immunity in the civil context. *See Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997); *Horiuchi*, 253 F.3d at 359 (vacated as moot). Commentators have similarly opined that Supremacy Clause immunity should be evaluated as coextensive with qualified immunity. *See*, Waxman, *supra*, at 2239.

---

[13] Federal agents who are prosecuted for violations of state law are entitled to pretrial dismissal under Supremacy Clause immunity for acts undertaken during the course and scope of their duties as federal agents that are objectively reasonable. *See Clifton v. Cox,* 549 F.2d 722 (9th Cir.1977)

Ex. C-154

19

Supreme Court jurisprudence under the Fair Warning Doctrine supports extension of this concept to local and state law enforcement officers. In *United States v. Lanier*, 520 U.S. 259, 261 (1997), the court evaluated a state judge's claim of immunity from prosecution under 18 U.S.C. § 242 for "violating the constitutional rights of five women by assaulting them sexually while Lanier served as a state judge." At issue was whether the judge had "fair warning" that his actions could be prosecuted under a vague criminal statute. *Id.* In holding that the contours of the criminal statute had to be "clearly established" in order to prosecute the judge, the Court held that the bounds of the Fair Warning Doctrine were coextensive with qualified immunity in the civil context noting that:

> the object of the "clearly established" immunity standard is not different from that of "fair warning" as it relates to law "made specific" for the purpose of validly applying [a criminal statute]. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than "clearly established" would, then, call for something beyond "fair warning."

*Id.* at 270–72. Under *Lanier*, it follows that principles of qualified immunity can be applied equally in the criminal context.

*Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012), a case in which the Supreme Court considered the qualified immunity of an LASD deputy in the civil context is instructive here. The plaintiff in *Meserschmidt* alleged a Section 1983 claim based on an unreasonable search in violation of the Fourth Amendment,

contending that LASD deputies lacked probable cause to obtain the search warrants at issue. *Id.* at 1241. The underlying facts commenced with a domestic dispute that began when a woman enlisted the LASD to assist her in moving out of her boyfriend's apartment. *Id.* During the course of the move (and while the deputies were not present) the boyfriend assaulted her with a sawed off shotgun. *Id.* She contacted the LASD and reported the assault and further advised the detective that the boyfriend was a known gang member. *Id.* The LASD subsequently obtained warrants from a magistrate to search the residence for all firearms and gang paraphernalia. *Id.* at 1242. Upon executing the warrants, the LASD recovered a firearm that belonged to the plaintiff (not the boyfriend). *Id.* The plaintiff filed suit alleging that the warrants were overbroad and invalid on the grounds that the alleged domestic disturbance involved a specific firearm, thereby making an "all firearms warrant overbroad," and further that the domestic disturbance did not involve gang activity, thereby invalidating the warrant as it related to gang paraphernalia. *Id.* at 1243. The deputy and the LASD asserted a defense of qualified immunity. *Id.*

After both the district court and an *en banc* panel of the Ninth Circuit denied qualified immunity, the Court reversed, holding that the deputies acted reasonably in requesting and executing the search warrant. *Id.* at 1246. Specifically, the Court held that qualified immunity allowed the LASD to make "reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1244 (citations omitted). The Court found that it was reasonable, based on the nature of the assault and the criminal history of the defendant, for the deputy to believe that there was probable cause to search for any and all firearms and gang paraphernalia. *Id.* Important to this case, the Court further noted that "the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could

Ex. C-156

21

reasonably have believed that the scope of the warrant was supported by probable cause." *Id.* at 1249.

While *Messerschmidt* was decided in the civil context, as set forth above, the reasoning applies equally here under the common law doctrine of sovereign immunity and/or the Fair Warning Doctrine enunciated in *Lanier*. In the instant case, the Moving Defendants were involved in what they perceived to be a reasonable local law enforcement criminal investigation. Their conduct in this regard was objectively reasonable in three separate respects.

First, as sworn peace officers, they have a right and duty to investigate state crimes, both as to Brown specifically and his allegations of criminal conduct by others, and to ensure his safety and the safety of other inmates. The crimes alleged included smuggling of a cell phone, facilitating the distribution of drugs, assault and battery of inmates, and corruption by other deputies. Their actions in interviewing Brown, moving him to the medical ward and then San Dimas, keeping him quarantined, booking him under false names, and making sure no one knew where Brown was or could find him, was not only reasonable but necessary to insure that he was not subject to retaliation.

The Moving Defendants' conduct did not become unreasonable simply because Brown was an informant for the FBI. The FBI does not have a monopoly on law enforcement. As state officers, the Moving Defendants still had the right to investigate state crimes and the obligation to protect Brown as a witness such that it was also reasonable to keep him quarantined to ensure the integrity of investigation. While booking the inmate under a different name meant that others could not find him, it did not make the conduct unreasonable. Here, it was necessary to protect Brown from possible retaliation. Moreover, the command level officers knew where Brown was at all times, and federal agents never bothered to look for Brown.

Ex. C-157

Second, the Moving Defendants had the right to investigate the actions of the FBI agents to determine whether they were involved with Brown's crimes, whether their conduct was authorized, and even if it was authorized, whether it was objectively reasonable. The deputies' conduct was especially reasonable in that regard, given that the phone contained pictures of drugs and cash, and given Brown's statements that the FBI was facilitating the distribution of drugs.

Third, the deputies' conduct was objectively reasonable because they were acting at the specific direction of their superiors. Moreover, the investigation was not only approved by their immediate supervisors, but by the Sheriff himself who expressed the reasonable belief that the FBI agent or agents had engaged in various crimes including violations of "California Penal Code Sections 4575 and 4573, conspiracy, entrapment, coercion and civil rights violations." Exh. BB, p. 248 (Letter of Sheriff Lee Baca).

The Government may argue that the LASD and the Moving Defendants were without jurisdiction to conduct such an investigation. Such an argument fails as a matter of law. Just as "the national government cannot be made to tolerate undue interference from the states in the enforcement of federal law … neither should any state be made to tolerate unwarranted interference with its duty to protect the health and welfare of its citizens." *Com. of Ky. v. Long*, 837 F.2d 727, 748–49 (6th Cir. 1988). The states, as separate sovereigns, have the right and duty to enforce their law and protect their citizens. *See Mesa*, 489 U.S. at 121 (denying removal under the federal officer statute, 28 U.S.C. § 1442(a), where the federal defendants alleged no colorable federal defense to the state charges of reckless driving and related offenses).

Given that the state has the right as a separate sovereign to investigate and prosecute violations of state law, the same reasons that justify granting federal officers qualified immunity for alleged violations of state law, should apply with respect to state officers' alleged violation of federal law. At the very least, state

Ex. C-158

23

officers must have qualified immunity for investigation of possible violations of state crime committed by federal agents. Otherwise, the federal government could effectively render the state powerless to investigate and enforce its own laws against federal agents, as a good faith attempt to investigate a violation of state laws could be a federal crime. As this case unfortunately shows, the protection of qualified immunity for state officers in that circumstance is justified because it is needed to "act as a substantial safeguard" against vindictive criminal charges by federal agents against state officers. *Cf., Horiuchi*, 253 F.3d at 376 (recognizing that adjudicating qualified immunity pretrial "will act as a substantial safeguard against frivolous or vindictive criminal charges by states against federal officers.").

The above undisputed facts establish that LASD Deputies Smith, Manzo, and Sexton are entitled to qualified immunity. If the government offers any contrary material proof, the Court must conduct an evidentiary hearing to resolve those disputes. *See*, *Dotson*, 2012 WL 1904467 at \*3; *see also, Horiuchi*, 253 F.3d at 367–68.

## IV.   The Fair Warning Doctrine Separately Requires Dismissal

In the event the Court is disinclined to extend immunity to the Moving Defendants, the Fair Warning Doctrine expressed in *Lanier* nonetheless requires dismissal. As noted above, the Court in Lanier held that due process requires fair warning before conduct may be punished as criminal. *Lanier*, 520 U.S. 259, 265. "The principle," as the Court stated in *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697 (1964), "is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.*, at 351 (internal quotations omitted). The Fair Warning Doctrine encompasses three distinct concepts or doctrines: the vagueness doctrine; the rule of lenity; and the principle of "due process [which] bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (citations

Ex. C-159

24

omitted). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 266. As noted above, the test under the Fair Warning Doctrine is coextensive with the test for qualified immunity in the civil context.

The Supreme Court has recognized the expansive scope of 18 U.S.C. § 1503(a), which makes criminal conduct that "impedes" the "fair administration of justice," and has imposed limitations on it because of its expansive scope. *See, U.S. v. Aguilar*, 515 U.S. 593, 600 ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute both out of deference to the prerogatives of Congress . . . and out of concern that 'a fair warning' should be given to the world.") (citations omitted). There is nothing in the statute that satisfied the fair notice requirement as to the conduct in this case. Accordingly, criminal liability may be imposed under the statute "if, but only if, 'in the light of pre-existing law the unlawfulness of [the conduct under the statute is] … apparent.'" *Lanier*, 520 U.S. at 271–72, *quoting, Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

There is nothing in pre-existing law that makes the unlawfulness of the conduct by the Moving Defendants in this case "apparent." To the contrary, Congress' adoption of a statute that allows federal agents to be prosecuted for violations of state law, suggests the exact opposite, that the deputies' conduct is not unlawful. In any event, there is nothing in pre-existing law to provide fair notice that the conduct the government in this case seeks to punish is unlawful, and the charges must be dismissed as to Deputies Smith, Manzo and Sexton.

**V.     Conclusion**

For the foregoing reasons the Moving Defendants respectfully request that all charges be dismissed, with prejudice.

Dated: March 3, 2014        Respectfully submitted,

LAW OFFICE OF WILLIAM GENEGO

By: */s/ William J. Genego*
Counsel for GERARD SMITH

LAW OFFICES OF MATTHEW LOMBARD

By: */s/ Matthew J. Lombard*
Counsel for MICKEY MANZO

PAUL HASTINGS LLP

By: */s/ Thomas P. O'Brien*
Counsel for JAMES SEXTON

Ex. C-161

26