INTERVIEW

OF

LEROY BACA

Conducted by Special Agent Jason Dalton

Friday, April 12, 2013

1:57 p.m.


Law Offices of Jones Day

Los Angeles, California


Case No. DJ No. 144-12C-4079

EXHIBIT "A"

A118359

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

27

agent about being arrested?

Q    And I want to get into that at some point, but I'm trying to focus on your knowledge of the fact that an FBI agent couldn't be arrested by a local law enforcement agency until --

A    I --

Q    I'm understanding you to say --

A    I mean, it's a non sequitur.  I don't have a knowledge that we have an interest in arresting an FBI agent.  That to me strikes me as extreme.  What I believe is important is if we were to decide to make that type of a decision, we ought to know whether or not it can be done.  But if we are not intending to do such a thing, we don't really have an interest to decide whether or not it's proper or improper, legal or illegal.

Q    When did you first hear that somebody within your department had threatened to arrest an FBI agent?

A    When I got the second call from Mr. Martinez.

Q    Okay.  And was this -- I assume it was soon after that agent was approached by someone within your department; is that correct?

A118385

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

28

A     Yes.

Q     We'll get into the substance of the call.  So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?

A     When I received that call, that's correct.  I was -- I received that call within perhaps an hour or so after that alleged act occurred.

Q     So the call from Mr. Martinez was the first time that you were aware that somebody was going out to Leah Marx's house to threaten to charge and arrest her; is that correct?

A     Yes.

Q     Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?

A     I wasn't aware of any of the investigative particulars.  But once Mr. Martinez made the call to me, I was aware something occurred.

Q     Were you aware that anybody within LASD was

A118386

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

35

you've got a lot of cases within LASD, a lot of investigations, and there are some investigations that have your attention more than others, I'm sure, as a leader of the Department.  Is this one that had your attention during the times August and September of 2011, where you were monitoring it and you were getting briefed on it frequently?

A    Well, I was wanting to know that, one -- and this is -- in the meeting it was important in the one area, as to the safety of this particular inmate has got to be our highest priority here.  If anything happens to this man, if you think we have some questions that we don't have answers to, we're going to have more questions as to what happened and why did this person who is a high-profile inmate -- why was he hurt?  Why was he not properly cared for?  And on and on and on.

So the methods under which this person's safety was going to be cared for is not something I said, "I want you to do this.  I want you to do that. I want you to do this.  I want you to" -- I mean, I believe that the people that are closer to the

A118393

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

36

investigative process, in the leading investigative process, should handle those decisions.

Q    So you were operating at a macro level, is that right?

A    That's correct.

Q    Okay.  And you generally told people to do what, though, other than to keep him safe?  Did you tell -- for example, did you tell people to interview this inmate?

A    Well, I think -- I assumed that, because, you know, that's what our Internal Criminals Bureau does.  I mean, you know, I didn't have to tell them.  They pretty well knew that we wanted an investigation, we wanted to know the various pieces of it, as you must be aware, that it did involve a deputy as part of the entry team in terms of the phone.  And that posed another part of the investigative strategy that I left it up to them to decide.

Q    In terms of the safety of this inmate, at that Saturday meeting, did you discuss how Mr. Brown would be kept safe?

A    No.

A118394

134

during this time, in September, 2011?

A    I don't have any advisers.  What's amazing about that question -- I'm glad you asked it.  I don't have any friends in the Sheriff's Department.  Okay?  I don't operate based on advisers in the department, in an unprecedented area.  All I know is that we have to investigate the facts and come to some purposeful judgment, and not make any assumptions one way or the other.  So we didn't have everything on the table.

Q    When you're making your decisions though, whose advice would you go to?  If you said, "This is a tough issue.  I want to go -- I want to speak this department, or this person about it."  Who is it there, that you would go to, in order to discuss a very difficult issue?

A    No one.

Q    So you would just, on your own, make the decisions?

A    Do you know why?  A simple yes.  The answer to the question is "yes."  Do you know why?  Because I don't trust the bureaucracy.

Q    Okay.  And would you ultimately --

A118492

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

53

Q    -- is correct, is that -- so we can move on, what you're saying is that you didn't know the level of detail.  Again, you were micromanaging -- macro managing this instead of micromanaging this.

A    Uh-huh.

Q    So you were not aware that OSJ deputies had taken Anthony Brown to a station to watch over him, is that correct?

A    Right.  The only place of discussion in my presence was the hospital that was at the USC Medical Center, which would be a more appropriate place, because Mr. Brown, as it was reported to me, was very stressed about everything.

Q    Were you aware that he had heart issues and --

A    Things of that nature.

Q    -- diabetic issues?

A    Yeah.  Things of that nature.  I don't know if I am that specific, but --

Q    Right.

A    But I said, you know, this man cannot be a victim in any of this.

A118411

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

136

had some discussions with him, of course.

Q    What did you and Mr. Tanaka discuss?

A    The points that were relayed.  Nothing more than the points that were relayed.

Q    What do you mean "the points that were relayed"? Meaning Anthony Brown is reporting this, and you would talk to him about that?   What points?

A    "Well, we found a phone.  The Internal Criminal Investigations Bureau will handle it all.  Let's only keep this within that framework.  They have the lead." Then circumstances of, "All right.  I'm going to meet with the U.S. Attorney's Office.  We'll go over there, and I'll see what I can accomplish."  The general story, at the time, as it emerged.

Q    So you were macromanaging this.  Who would be the person that was, in your opinion, the closest thing to being the leader that is micromanaging what is happening with the Anthony Brown, Gilbert Michel?

A    That would be Captain Carey.

Q    Captain Carey?  And Captain Carey, at the time, was not housed in same building that you were in. Correct?  He's not at Headquarters?

A118494

Capital Reporting Company
Interview of Leroy Baca  04-12-2013

169

still trying to justify the fact that --  Within the LASD, we have this internal review process that works and they should have just allowed that to work.  Is that what you're saying there?

A    To a degree.  Because, you see, Mr. Janokco has put people in jail for the very thing that the Civil Rights Unit is attempting to do --

Q    Well, he would --

A    -- with the Deputies in the jail.

Q    Well, the U.S. Attorney's Office.

A    It's not that he doesn't know what to do.

Q    Right.

A    Even if he did come to me, and he went to him and asked him to hold this a big secret, it would have been a little more palatable, in terms of process.  You know, I don't want to interfere with the FBI investigation.  I have enough knuckleheads of my own that I've been able to discover, that should be out of the system.  As soon I get to them, they're out.  Okay?  So the nature of this mission is not inconsistent with what I want.

Q    Okay.  But what you're resentful of, though,

A118527