EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, CA 90012
    Telephone: (213) 894-0284/3541/4849
    E-mail:   Brandon.Fox@usdoj.gov
             Lizabeth.Rhodes@usdoj.gov
             Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | |
| PAUL TANAKA, | Trial Date:  March 23, 2016<br>Trial Time:  8:30 p.m.<br>Location:  Courtroom of the |
| Defendant. | Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox,

Lizabeth A. Rhodes, and Eddie A. Jauregui, hereby files its Trial Memorandum.

Dated: March 16, 2016                Respectfully submitted,

                                     EILEEN M. DECKER
                                     United States Attorney

                                     LAWRENCE S. MIDDLETON
                                     Assistant United States Attorney
                                     Chief, Criminal Division


                                          /s/
                                     _____
                                     BRANDON D. FOX
                                     LIZABETH A. RHODES
                                     EDDIE A. JAUREGUI
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE


TABLE OF AUTHORITIES................................................iii

I.    INTRODUCTION...................................................1

II.   SCHEDULING MATTERS............................................2

      A.    The Government's Witnesses and Case-in-Chief............2

      B.    Stipulations...........................................4

      C.    Potential Defenses.....................................4

III.  The Indictment................................................4

IV.   STATEMENT OF FACTS............................................5

      A.    Defendant Had Knowledge Of the Culture of Brutality
            Within LASD Jails......................................5

            1.    Defendant learned about problems others in the
                  Department.......................................5

            2.    Outside Entities Make Concerns Public............6

      B.    The Federal Grand Jury Investigation....................7

      C.    An Undercover Investigation Is Initiated To Compliment
            the Grand Jury Investigation...........................7

      D.    The FBI's Undercover Investigation is Compromised.......8

      E.    The Co-conspirators Embark on a Plan to Obstruct the
            FBI...................................................10

      F.    The LASD Learns About Deputy Michel...................10

      G.    The FBI Gets Through to Brown.........................11

            1.    Brown is Moved Within MCJ; Deputies Are Placed
                  Outside His Cell................................12

            2.    The Policy to Keep the FBI away from Brown.......12

            3.    A Writ and Further Grand Jury Subpoenas Are
                  Issued..........................................14

      H.    LASD Tampers With Witnesses...........................16

      I.    Brown No Longer Wishes to Cooperate with the FBI......18

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

     J.    LASD Seeks a Superior Court Order to Obtain FBI
          Records and Information...................................18

     K.    LASD Threatens to Arrest FBI Special Agent Leah Marx.....19

V.   LEGAL AND EVIDENTIARY ISSUES..................................21

     A.    Elements of Offenses.....................................21

          1.   Conspiracy – 18 U.S.C. § 371.........................21

          2.   Obstruction of the Due Administration of
              Justice –   18 U.S.C. § 1503(a).....................21

     B.    Proof of Intent – Dual Purposes..........................22

     C.    Proof of Grand Jury Investigation........................22

     D.    Defendant's Statements...................................23

     E.    Statements Made by Defendant's Co-Conspirators...........23

          1.   Recorded Statements..................................24

          2.   Emails and Other LASD Documents......................25

     F.    Authentication and Identification........................25

          1.   Authentication Generally.............................25

          2.   Originals and Duplicates.............................26

          3.   Charts and Summaries.................................26

     G.    Defendant's Expert Disclosure............................27

VI.  CONCLUSION....................................................27

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**FEDERAL CASES**

Anderson v. United States,
      417 U.S. 211 (1974)..........................................22

Bourjaily v. United States,
      483 U.S. 171 (1987)..........................................24

Ingram v. United States,
      360 U.S. 672 (1959)..........................................22

Rutherford v. Baca,
      CV 75-4111-DDP................................................4

United States v. Arias-Villanueva,
      998 F.2d 1491 (9th Cir. 1993)...............................24

United States v. Barfield,
      999 F.2d 1520 (11th Cir. 1993)..............................22

United States v. Black,
      767 F.2d 1334 (9th Cir. 1985)...............................26

United States v. Bridgeforth,
      441 F.3d 864 (9th Cir. 2006)................................24

United States v. Castaneda,
      16 F.3d 1504 (9th Cir. 1994)................................24

United States v. Chu Kong Yin,
      935 F.2d 990 (9th Cir. 1991)................................26

United States v. Coyne,
      4 F.3d 100 (2d Cir. 1993)...................................22

United States v. Gardner,
      611 F.2d 770 (9th Cir. 1980)................................26

United States v. Giese,
      597 F.2d 1170 (9th Cir. 1979)...............................22

United States v. Houlihan,
      92 F.3d 1271 (1st Cir. 1996)................................22

United States v. LaRouche Campaign,
      695 F. Supp. 1265 (D. Mass. 1988)...........................22

United States v. Macari,
      453 F.3d 926 (7th Cir. 2006)................................23

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Machi,
    811 F.2d 991 (7th Cir. 1987)..................................22

United States v. Meyers,
    847 F.2d 1408 (9th Cir. 1988)................................26

United States v. Pang,
    362 F.3d 1187 (9th Cir. 2004)................................26

United States v. Smith,
    893 F.2d 1573 (9th Cir. 1990)................................26

United States v. Thomas,
    916 F.2d 647 (11th Cir. 1990)................................22

United States v. Williams,
    989 F.2d 1061 (9th Cir. 1993)................................23

United States v. Woodward,
    149 F.3d 46 (1st Cir. 1998)..................................22

**FEDERAL STATUTES**

18 U.S.C. § 1503(a).......................................1, 4, 21

18 U.S.C. § 371...........................................1, 4, 21

**FEDERAL RULES**

Fed. R. Evid. 1003...........................................26

Fed. R. Evid. 801(d)(2)(E)................................23, 24

**I.    INTRODUCTION**

In approximately January 2005, defendant Paul Tanaka was promoted to the rank of Assistant Sheriff of the Los Angeles County Sheriff's Department ("LASD" or "Department"), becoming a member of the executive team of the largest sheriff's departments in the nation.  He would later rise to become the Undersheriff, the number two person in the organization, before retiring in 2013.  Throughout his tenure in the upper echelons of the LASD, reports of abuse and brutality by "problem deputies" proliferated.  When concerns about illegal acts by deputies were brought to his attention, Tanaka largely ignored them and he rebuffed and rebuked whistleblowers. Tanaka went out of his way to disparage the internal bodies charged with rooting out corruption in his ranks, and ignored outside entities warning that the brutality in the jails had become institutionalized.  Instead, he fostered a corrupt culture within the jails and the Department.

Given this background, it sadly is not surprising that, after learning of a federal grand jury investigation into excessive use of force and public corruption in the LASD, Tanaka closed ranks and conspired to obstruct the investigation.  The conspiracy included hiding an informant from the federal government and grand jury, falsifying records related to the informant, tampering with witnesses, and even threatening to arrest a federal agent who had been carrying out her lawful duties.  As a result, defendant is charged with conspiring to obstruct justice, in violation of 18 U.S.C. § 371, and endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503(a).  Defendant is on bond and is the only defendant named in the indictment proceeding to trial.

**II.   SCHEDULING MATTERS**

    **A.   The Government's Witnesses and Case-in-Chief**

Jury trial is set for March 23, 2016 at 8:30 a.m.  The government estimates that its case-in chief will last ten court days. The following individuals are all potential witnesses:

    1.   Robert Olmsted, formerly with the Los Angeles County Sheriff's Department;

    2.   John Clark, formerly with the Los Angeles County Sheriff's Department;

    3.   Al Gonzales, formerly with the Los Angeles County Sheriff's Department;

    4.   Dennis Conte, formerly with the Los Angeles County Sheriff's Department;

    5.   Peter Eliasberg, American Civil Liberties Union ("ACLU");

    6.   Pat Maxwell, Los Angeles County Sheriff's Department;

    7.   Steve Roller, formerly with the Los Angeles County Sheriff's Department;

    8.   Steve Martinez, formerly with the Federal Bureau of Investigation;

    9.   Robert Bayes, Los Angeles County Sheriff's Department;

    10.  Mickey Manzo, formerly with the Los Angeles County Sheriff's Department;

    11.  Connie Cervantes, formerly with the Sheriff's Youth Foundation;

    12.  David Dahle, Federal Bureau of Investigation;

    13.  Bobby Lyons, Los Angeles County Sheriff's Department;

    14.  Judy Gerhardt, Los Angeles County Sheriff's Department;

15.    Linda Farrar, former contractor with the United States Marshal's Service;

16.    Michelle Miller, Los Angeles County Sheriff's Department;

17.    Gus Academia, Los Angeles County Sheriff's Department;

18.    Tara Adams, formerly with the Los Angeles County Sheriff's Department;

19.    Kathy Voyer, formerly with the Los Angeles County Sheriff's Department;

20.    Ralph Ornelas, formerly with the Los Angeles County Sheriff's Department;

21.    Michael Bornman, formerly with the Los Angeles County Sheriff's Department;

22.    Gilbert Michel, formerly with the Los Angeles County Sheriff's Department;

23.    William David Courson, Los Angeles County Sheriff's Department;

24.    John Powell, Los Angeles County Sheriff's Department;

25.    David Betkey, formerly with the Los Angeles County Sheriff's Department;

26.    William "Tom" Carey, formerly with the Los Angeles County Sheriff's Department;

27.    John Torribio, Los Angeles County Superior Court;

28.    Leah Tanner, Federal Bureau of Investigation; and

29.    Ruben Martinez, formerly of the Los Angeles County Sheriff's Department.[1]

---

[1] Although not finalized, Assistant United States Attorney ("AUSA") Mark Childs may be the witness who reads the prior sworn testimony of the defendant to the jury.  Should AUSA Childs be
*(footnote cont'd on next page)*

3

**B.      Stipulations**

The parties have entered into the following stipulations:

1.      The authenticity of various recordings made by co-conspirators, as well as transcripts of those recordings.

2.      The authenticity of emails obtained from the Los Angeles County Sheriff's Department.

3.      The authenticity of defendant's previously sworn testimony, as captured in various transcripts.

4.      The authenticity of phone records for facsimile machines assigned to the United States Marshal's Service in Los Angeles and the facsimile machine used by the Los Angeles County Sheriff's Department's Inmate Reception Center.

5.      The authenticity of certain publicly filed documents in Rutherford v. Baca, CV 75-4111-DDP as well as certain correspondence between the ACLU and the LASD.

**C.      Potential Defenses**

Defendant has not provided the government with notice of any defense he intends to use at trial.  Defendant has, however submitted a jury instruction regarding an advice of counsel defense.

**III. The Indictment**

Defendant is charged in two counts.  Count One charges defendant with conspiring to obstruct justice, in violation of 18 U.S.C. § 371. Count Two charges defendant with obstruction of justice, in violation of 18 U.S.C. § 1503(a).  The parties have agreed to a redacted copy of the indictment, which is attached as Exhibit A.

---

unavailable, the government will use another AUSA or an FBI Special Agent.

4

## IV.   STATEMENT OF FACTS

### A.   Defendant Had Knowledge Of the Culture of Brutality Within LASD Jails

#### 1.   Defendant learned about problems others in the Department

In 2005, after becoming Assistant Sheriff, defendant was put in charge of LASD's Custody Division, which included Men's Central Jail ("MCJ").  During this time, a lieutenant at MCJ, Al Gonzales, reported to the MCJ Captain, John Clark, that there were deputy "cliques" and that deputies were writing cookie-cutter force reports, which made it difficult to determine what really happened and whether the force used was justified.  Clark, himself, had noticed an increase in the use of force within MCJ.  Clark found that trying to deal solely with individual problem deputies was ineffective, so he decided to implement a rotation policy designed to break up the cliques and reduce force.  Clark wrote a memorandum outlining his plan and began briefing the deputies.

Clark's supervisor, Commander Dennis Conte, presented Clark's memorandum to defendant Tanaka, who looked over it and immediately rejected it.  Tanaka called for a meeting of all supervisors at MCJ. Instead of addressing the issues raised in Clark's memorandum, Tanaka announced that he had concerns about the leadership of MCJ and stated that he was going to bring in his own hand-picked Lieutenants (including Christopher Nee, who would later become Tanaka's aide during the grand jury investigation).  Tanaka berated the supervisors for accusing deputies of acting like gang members and told them that the current deputies were part of the "Y" generation that needed to be "coddled."  Tanaka told the supervisors to "stay off the floors

and let the deputies do what they need to do and the job would get done."

Defendant Tanaka decided to transfer Clark from MCJ.  In telling then-Captain Robert Olmsted that he would taking over for Clark at MCJ, defendant told Olmsted that deputy force was an issue at the jail.  Nonetheless, in 2010, when then-Commander Olmsted tried to bring matters of deputy cliques and force issues to Tanaka's attention, Tanaka rebuffed Olmsted's requests for a change.

Tanaka's outbursts and desire not to discipline deputies was not limited to this one event or even to the jails.  For example, in 2007 the Captain of the Century Station attended a meeting called by Tanaka where Tanaka talked about deputies' need to work in the gray area and how supervisors should not seek to open disciplinary investigations on deputies.  Tanaka went so far as to say that if a Captain was found to be "putting cases" on deputies, Tanaka would "put a case" on that Captain.

### 2.    Outside Entities Make Concerns Public

In addition to insiders informing the Department that there were problem deputies and excessive force concerns going on within the Los Angeles County jails, outside agencies such as the ACLU were publishing findings regarding the culture of violence that was growing within the jails.  The ACLU wrote that some of the most troubling complaints it received from inmates "involved allegations of pervasive physical abuse and violence."  The reports were similar to what the supervisors had reported earlier: certain deputies acted like their own "gang."  Rather than seek to change things, the LASD publicly dismissed the inmate allegations as stretched and strained.

In 2011, when an ACLU monitor witnessed deputies assault an inmate, the Department's spokesperson publicly attacked the monitor's credibility.

### B.    The Federal Grand Jury Investigation

It was against this backdrop that in July 2010, the Federal Bureau of Investigation ("FBI") began an investigation into alleged civil rights abuses by members of the LASD within the county jails. As part of its investigation, the FBI interviewed many inmates who reported widespread civil rights abuses.  However, other than speaking with other inmates, federal investigators had no way of verifying the alleged abuses, as they did not have access to either LASD deputies or documents.  In the summer of 2011, the federal investigators began to utilize the grand jury as a way to investigate the conduct and acquire this evidence.  Between June 24, 2011 and August 5, 2011, the FBI served four grand jury subpoenas on LASD.

### C.    An Undercover Investigation Is Initiated To Compliment the Grand Jury Investigation

One of the inmates the FBI had interviewed, Anthony Brown, told agents that not only were LASD deputies committing civil rights violations, they were also smuggling, or offering to smuggle, contraband into the jails in exchange for bribes.  Brown also told the FBI that he had identified a deputy who was willing to give him a cell phone in exchange for a bribe.  Thereafter, the FBI conducted an undercover investigation into those allegations.

The FBI undercover operation ultimately led agents to LASD Deputy Gilbert Michel, who agreed to take a bribe from an undercover agent posing as a friend of Anthony Brown.  In exchange for the

7

bribe, Michel agreed to give Brown a cell phone and ultimately did smuggle a phone into Brown at MCJ.

### D.    The FBI's Undercover Investigation is Compromised

On August 8, 2011, shortly after Deputy Michel gave Brown the phone, members of the LASD found the phone in Brown's possession.  A detective, Robert Bayes, was assigned to investigate the incident, focusing Brown's crime: possession of a cell phone while in custody, a misdemeanor.  On August 16, 2011, Bayes interviewed Brown.  Brown told Bayes that he had received the cell phone from a deputy, but refused to give Bayes the deputy's name.

Meanwhile, deputies in LASD's Operation Safe Jail Unit ("OSJ") learned that, prior to obtaining the phone, Brown had used LASD's recorded inmate phone system to communicate with an unidentified woman about when he would receive his phone.  These deputies asked an FBI analyst to research the telephone number Brown had called.  The analyst informed an OSJ deputy that the number belonged to an FBI civil rights investigator.

In this way, the FBI also learned that its undercover investigation had been compromised.  Steven Martinez, the Assistant Director in Charge ("ADIC") of the FBI, contacted then-Sheriff Leroy Baca to inform him that the phone found inside Men's Central Jail was part of an FBI undercover investigation into civil rights violations and corruption in the county jails.[2]  Immediately after Martinez's

---

[2] Martinez and Baca would speak again on August 20, 2011, after the co-conspirators met, and then on August 25, 2011, when Martinez called to inform Baca that the FBI had interviewed Michel.  However, when Martinez attempted to reach Baca on August 25 by email, Baca's aide forwarded Martinez's e-mail to Tanaka's aide with the message: "Ester told me to refer all FBI inquires to Mr. Tanaka, so here you go."  Tanaka never reached out to Martinez.

call to Baca, Baca phoned defendant Tanaka.  After that call, numerous late night emails were exchanged between Christopher Nee (Tanaka's aide), Greg Thompson (an OSJ lieutenant), Captain Tom Carey (head of LASD's Internal Criminal Investigations Bureau ("ICIB")), and an Internal Affairs Bureau ("IAB") lieutenant to coordinate a meeting for the next day.[3]  From that point on, what had been treated as an ordinary matter suddenly became urgent.

On August 19, 2011, before 8:00 a.m., Thompson ordered two deputies, Mickey Manzo and Gerard Smith, to record and interview Brown so that Thompson could brief the LASD executives.  Smith and Manzo began their interview of Brown just after 8:00 a.m.  During the interview, Smith asked Brown if he had ever had any run-ins with the deputies or had experienced any civil rights violations.  Smith informed Brown that he knew Brown was "working with the Feds."  Smith told Brown that the "Feds" walked around the jails like they owned "us."  Smith stated, "We cleaned our house the last time," and "[T]his is my house . . . I want to know how long they've been here."  Near the end of the interview, Manzo revealed the reason for the interview:  he just needed to know about the phone calls because of a "meeting with very influential people in our Department . . . ."  Smith then filled Manzo in on what the interview had yielded.  Smith said "the Feds are here, they're doing investigations.  I'm assuming that they've either watched or set up transactions [bribes] . . . on the outside, watched them go down with a deputy and then it [the cellular phone] got brought to him [Brown]."  Brown confirmed that this was accurate.

---

[3] Both ICIB and IAB were under the Office of the Undersheriff.

9

**E.    The Co-conspirators Embark on a Plan to Obstruct the FBI**

That afternoon, August 19, 2011, the co-conspirators met: Smith, Manzo, Thompson, Carey, Baca, and Tanaka.  Thompson briefed the group about what Brown had told Smith and Manzo, specifically that Brown was an informant for the FBI in a civil rights investigation.  Baca and Tanaka already knew that, based on Steve Martinez's call the night before.  Neither Baca nor defendant Tanaka was happy, and Baca stated that Brown was not going anywhere.

On August 20, 2011, the co-conspirators met again and were joined by others, including Stephen Leavins, an ICIB lieutenant. Baca told the assembled group that ADIC Martinez had called and acknowledged that the phone found on Anthony Brown was an FBI phone and stated that the FBI wanted it back.  The phone calls between Brown and the FBI were played at this meeting and defendant had an outburst: Tanaka stood up abruptly causing his chair to slide away, slammed his hands on the table, and said numerous times "fuck the FBI."  Baca then put Tanaka in charge of everything having to do with the phone or the FBI.

Thereafter, Baca and defendant left the meeting.  Tanaka returned alone, reiterated that he was in control, and told the others that the FBI was not to be given access to Anthony Brown. Tanaka then emphasized that this was one of the most important investigations in the Department's 160 year history.

**F.    The LASD Learns About Deputy Michel**

On August 21, 2011, co-conspirators Leavins, Smith, and Manzo interviewed Brown again, and Brown disclosed that Michel had smuggled him the phone.  While Brown exaggerated his relationship with the FBI, and lied about obtaining a previous phone, he did say that he

10

had the phone so he could report what he saw regarding beatings (or civil rights violations) in the jails.  Leavins evaluated the situation and told Brown, "the FBI is doing an investigation using you into corruption and other things that are going on in Central Jail.  That's not a secret."

### G.    The FBI Gets Through to Brown

On August 23, 2011, at about 10:40 a.m., FBI agents went to visit Brown at Men's Central Jail.  Leavins, Smith, and Manzo were not there.  When Leavins arrived at MCJ and was informed that an FBI interview was taking place, he immediately called Carey and had the interview terminated.  An LASD sergeant, Wayne Waterman, abruptly entered the room, told the FBI agents that the interview was "over," and stated that Brown was not to be interviewed.  The FBI, in front of the sergeant, informed Brown that the agents would be coming back to get him.

Just after 1:00 p.m., Carey, Leavins, Smith, and Manzo, began interviewing Brown.  They feigned surprise when Brown told them that the FBI had just been there.  Leavins proceeded to ask Brown whether the FBI was going to call Brown testify.  After Brown said the FBI had not mentioned Brown needing to testify, Leavins told Brown that his "primary concern" was to keep Brown safe from "all parties involved."  Leavins stated that he did not want Brown to "be misled by anybody."  Leavins informed Brown that Brown would be moved to a station jail that day so that he could have more privileges and so that he would be safe.  While Carey, Leavins, Manzo, and Smith were conducting the interview, Thompson tried to find out how someone let the FBI have access to Brown.  Thompson learned that a note had been

posted that no one was to see Brown without approval of Thompson or another supervisor, but the note apparently did not suffice.

After the interview, Smith, Manzo, Thompson, and Carey reported to defendant Tanaka's office where a furious Tanaka berated them for letting the FBI meet with Brown contrary to his orders and Thompson's guarantee that it would not happen.  It was in this meeting that the co-conspirators, specifically Carey and Tanaka discussed moving Brown in order to keep him away from the FBI.  Brown's safety was not discussed.  Defendant Tanaka reiterated that this was one of the most important investigations in the history of the LASD.

       1.   <u>Brown is Moved Within MCJ; Deputies Are Placed Outside His Cell</u>

Manzo and Carey returned to MCJ to see where they could move Brown.  They decided to move Brown to a medical ward where the LASD treated inmates with infectious diseases.  From August 23, 2011 on, OSJ deputies, including Smith and Manzo, would stand guard outside of Brown's cell.

       2.   <u>The Policy to Keep the FBI away from Brown</u>

Also on August 24th, while the undercover officers were talking to Brown and another OSJ deputy guarded Brown's door, Manzo drafted a policy codifying Tanaka's August 20th orders to keep the FBI out.

Two hours later, Thompson sent an email to Tanaka's assistant. The email asked for "the boss' approval to put this out custody wide. Verbal notification isn't working as well as I thought it would." The email then detailed the policy that in large parroted what Manzo had written:

Effective immediately and until further notice, all FBI requests for interviews will be approved by Under-Sheriff

Tanaka.  If the FBI requests access for any reason to your facility, get the following information:

- Name and Badge or ID Number
- Place of Assignment - i.e. Special Problems, Robbery Detail, etc.
- Contact Phone Number and email address.
- Inmate name and booking number for who they want to interview.
- Case Number or type of case being investigated.
- Future date and time they are available to interview

The above information will be documented by the Facility's Mail Control and verified by the Facility's Watch Sergeant and/or Watch Commander.  The information will be forwarded, via email, to Lieutenant Greg Thompson, of Custody Investigative Services Unit, for review.

Lieutenant Thompson will be responsible for notifying the Undersheriff's office and obtaining approval.  Once approved, Lieutenant Thompson will notify the facility and agent of the approved date and time for the interview.

Tanaka's assistant responded by asking Thompson to give him a call.  A few hours later, Thompson sent an email asking if "Mr. Tanaka [was] going to make the changes on the FBI notice to facility commanders, or will he be satisfied if I remove all reference to him or the executives?"  Tanaka's assistant responded that Tanaka "said that you were going to make changes to it."

Meanwhile, Thompson, Smith, and Manzo held a meeting with the OSJ deputies who would stand guard outside of Brown's cell.  During that meeting, Smith and Manzo explained that the need to guard Brown was a direct result of finding the cell phone and noted that the executives were unhappy.  To emphasize how unhappy the executives were, and to convey the antagonistic way in which the executives viewed the FBI, Manzo Tanaka's as saying "fuck the FBI."  After the meeting, those present received a "Confidential" email from Smith, who informed the recipients that they were assigned to a "very important detail" that was "one of the most important investigations"

13

in the history of the LASD.  These were words that co-conspirators Manzo and Smith heard from Tanaka on August 20th and 23rd.

3.    A Writ and Further Grand Jury Subpoenas Are Issued

On August 25, 2011, the District Court issued a writ for the testimony of Brown before the federal grand jury on September 7, 2011.  Phone records reflect that the U.S. Marshals Service had two different facsimile transmissions to LASD that morning.

After receiving the writ and additional subpoenas, the co-conspirators took further measures to hide Brown from the federal government.  To truly hide Brown in a way that the federal government could not find him, the LASD had to make Brown disappear from the jail.  Additionally, the LASD's electronic files had to reflect that Brown was not in custody and there could be no physical record (called a "records jacket") showing that Brown was in LASD's custody.

At Thompson's request, a lieutenant and three deputies approached employees at LASD's MCJ's Inmate Records Center ("IRC") at approximately 1:45 p.m. and asked to have Brown "released" from the jail's computer system.  The deputy and head records clerk assigned to IRC informed the deputies that they needed a court order to do so.  They also explained that even if Brown were released, he would need to be rebooked under an alias, and be electronically fingerprinted using a system called Livescan.  The deputies insisted that Brown be removed from the system.  The lieutenant informed the clerk that the Captain, the Commander and the Undersheriff (defendant Tanaka) all knew what was happening.  When the deputy still balked at the idea, one of the other deputies said to her: "Are you going to say no to Tanaka?"  The deputy's answer was yes.

14

Ultimately, the head clerk signed out Brown's records jacket and decided to make the computer system reflect that Brown was released. The IRC deputy again explained to the OSJ deputies that they would need to Livescan Brown under an alias.  Despite her protests, the deputies took Brown's physical records jacket and left the inmate records center.  Despite multiple subpoenas and an exhaustive search, the original records jacket and its full contents have never been turned over to the United States.

According to LASD's databases, Brown's release occurred at 1:58 p.m. on August 25, 2011.  At 4:30 p.m., Brown was booked under the name "John Rodriguez."  The paperwork contained false information about Brown and reflected that Brown had refused to give his social security number or be fingerprinted.  This was important because if they had fingerprinted Brown or provided his true SSN, the federal government could have tracked Brown's new aliases.

Over the next several days, the members of the conspiracy continued to change Brown's name on a regular basis, input false information, and claim that that Brown refused to provide fingerprints and his social security number.  Brown's aliases included "John Rodriguez," "Kevin King," and "Chris Johnson."

The LASD took additional measures to interfere with the federal investigation.  On August 25, 2011, Thompson emailed LASD captains and operations lieutenants to inform them of a new policy that "all FBI requests for inmate interviews" would have to be approved. Thompson also wrote that all the interviews would have to take place at Men's Central Jail – there could be no interviews at any other locations.

On August 26, Thompson communicated with others about what to do if the FBI showed up at Men's Central Jail with a "possible Court Order" demanding Brown's production to the federal government. Thompson and the others decided that they would accept the court order "if forced," but would not release the inmate.  Instead, they would have a county attorney "who is on vacation for a month" review the court order before releasing Brown.  Thompson agreed to put a note on Brown's cell door.  The captain at Men's Central Jail emailed his lieutenants and sergeants:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall:
>
> - Receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review.  DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

(emphasis in original).

The co-conspirators decided that, regardless of Brown's medical condition, they would remove him from Men's Central Jail and take him to a station jail (one that would not have the authority to allow the federal government to interview Brown, based on Thompson's August 25 policy).  On August 26, 2011, after moving Brown to LASD's San Dimas station jail, LASD sergeants Scott Craig and Maricela Long interviewed Brown again.  When Brown informed Craig and Long that the FBI told him they would come back for him the day they were kicked out of MCJ, Long told Brown that the FBI had not come back for him yet.

**H.   LASD Tampers With Witnesses**

While deputies guarded Brown outside of MCJ, on August 30, 2011, Leavins, Craig and Long spoke to Gilbert Michel, the deputy who was

16

the target of the FBI undercover operation regarding the phone at MCJ, and several other MCJ deputies.  Tanaka was present at MCJ and receiving briefings about these interviews.

After Michel said that the FBI had already contacted him and attempted to have Michel cooperate in the federal investigation, Leavins left the room briefly.  After coming back to the room, Leavins told Michel that "it just seems as though you've been to a degree manipulated."  Despite the fact that Michel told Leavins, Craig, and Long that the FBI was trying to get information from him about brutality inside the jails, the LASD officers ordered Michel not to talk to the FBI.  Craig told Michel that the FBI was threatening and manipulating him:

> it pisses me off . . . we're all part of this Department and we're one big happy dysfunctional family, and fuckin' FBI is gonna come to your house and surprise you at your home and invade the sanctity of your home and come here and talk a gang load of shit to you and threaten you. . . . And then they are gonna fuckin' manipulate you like you're a puppet?  I don't think so.

After about 90 minutes, Leavins asked whether Michel would mind waiting while he, Craig, and Long went to "discuss some things and figure out what we are going to do next."  The interview of Michel resumed at approximately 10:00 a.m.  When they returned and Michel said that the FBI was planning on charging Michel, Craig responded, "I call it bullshit . . . . I call it threats and they're blackmail and they're . . . it's all bullshit, okay?  I think that's exactly what it is."

That same day, at 1:25 p.m., co-conspirators Leavins, Craig and Long interviewed a deputy, William David Courson, who had given FBI Special Agent Marx some information on abuse at Men's Central Jail.

17

Craig showed his complete and total disregard for any legal process when he said to Courson:

> If someone starts threatening you with a subpoena or any other nonsense, I want you to call me right away.

> * * *

> [a] Federal Grand Jury Subpoena . . . Some nonsense like that starts, you feel they are trying to intimidate you, bully you, blackmail you, coerce you, you call me and I'll call him [Leavins] and we will go from there.

### I.    Brown No Longer Wishes to Cooperate with the FBI

Smith was brought back to Men's Central Jail on September 2, 2011, for medical reasons.  Because he thought the FBI had taken no steps to find him, Brown felt abandoned.  He informed Smith and others that he no longer wanted to cooperate with the FBI.  A week later, on September 9, 2011, Brown asked for a lawyer.  On September 12th, Deputy James Sexton re-booked Brown in LASD's systems under his real name.  The same day, the LASD transported Brown to state prison.

### J.    LASD Seeks a Superior Court Order to Obtain FBI Records and Information

On September 8, 2011, Craig sought a Superior Court order that would have purportedly compelled the FBI to turn over its records related to the FBI's investigation of the LASD.  The order sought FBI investigation records, agents' true identities, locations of additional cellular telephones in the Los Angeles County Jail System, and disclosure of all contraband given to any inmate.  When Craig asked Superior Court Judge John Torribio to sign the order, Judge Torribio informed Craig that he would not grant such an order.  Judge

18

Torribio wrote on the proposed order "Denied - Court has no jurisdiction over any federal agency."

### K.    LASD Threatens to Arrest FBI Special Agent Leah Marx

Undeterred, the very next day, September 9, 2011, Craig left a voicemail message on an FBI phone he believed belonged to the FBI case agent, Leah Marx.[4]  Craig stated on the message that Special Agent Marx was "named as a suspect" and offered to meet her "as a professional courtesy . . . prior to me signing a declaration in support of an arrest warrant."

Meanwhile, LASD began learning more about the extent of the abuse problems at Men's Central Jail.  On September 12, 2011, Craig, Long, and Leavins received an email from Carey that attached a "List of ACLU complaints out of CJ [Men's Central Jail]."  Carey stated that this would "[p]robably lead us, in part, to where/what the Feds are looking at."  Additionally, on September 13, 2011, in an interview with Sergeants Craig and Long, Michel confessed to beating inmates with other deputies.  Leavins emailed Carey, "That idiot michel (sic) is confessing to beating handcuffed inmates with other deputies.......not looking good....they are still interviewing him...will advise."  Carey took this information to Tanaka.

On September 25, 2011, the Los Angeles Times published an article stating that "[f]ederal authorities are investigating allegations of inmate beatings and other misconduct by deputies in Los Angeles County jails, with FBI agents going so far as to sneak a cellphone to an inmate to get reports from inside."  Tanaka forwarded a link to this article and another from the Washington Post to Carey

---

[4]  In providing Craig with the telephone number for Special Agent Marx, Brown switched the last two digits of her phone number.

and Leavins.  The Washington Post article stated that the U.S. Department of Justice was "boost[ing] activity to police the police." Leavins responded, "I figured that was the motivation."  Tanaka replied that the article showed the orders to investigate the LASD was coming "from the top" of the Department of Justice.

The next evening, September 26, 2011, Craig and Long approached Special Agent Marx outside her home and recorded the encounter. Special Agent Marx told them that she was "not going to make any statements."  Craig then informed Special Agent Marx that she was a "named suspect in a felony complaint" and asked whether she had received his message.  Special Agent Marx said that she had not received his message, but she would pass the information along to the Assistant Director in Charge of the FBI.  Craig then stated the he was "in the process of swearing out a declaration for an arrest warrant" for her.

Shortly thereafter, then-Supervisory Special Agent Carlos Narro and Special Agent Teresa Tambubolon, called Long.  Long recorded the call.  Narro stated that Special Agent Marx, "indicated to me that you guys indicated to her that there's going to be a warrant for her arrest?"  Long responded, "There's going to be."  Narro asked Long, "Does the Sheriff know this?"  Long replied, "The Sheriff knows this, sir."  When Narro asked what the charges would be, Long told him he would "have to speak to the Undersheriff, and that's Mr. Paul Tanaka."  Narro asked, "Do you have any idea when the warrant's going to come out?"  Long responded, "It could be tomorrow, sir.  You're going to have to talk to the Undersheriff."  After the call ended, the recording device captured laughter and Long telling Craig, "They're scared.  They're like, do you know when . . . the

20

warrant . . ." Craig informed Long, "You're still rolling." Long then stopped the recording device.

**V.   LEGAL AND EVIDENTIARY ISSUES**

    **A.   Elements of Offenses**

        1.   <u>Conspiracy – 18 U.S.C. § 371</u>

In order for the defendant to be found guilty of conspiracy, the government must prove beyond a reasonable doubt that: (1) from on or about August 18, 2011 to September 26, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice; (2) the defendant became a member of the conspiracy knowing its object and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

        2.   <u>Obstruction of the Due Administration of Justice – 18 U.S.C. § 1503(a)</u>

In order for the defendant to be found guilty of obstruction of justice, the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant influenced, obstructed, or impeded, or tried to influence, obstruct, or impede a federal grand jury investigation; and (2) the defendant acted corruptly, with knowledge of a pending federal grand jury investigation.

As used in Section 1503, "corruptly" means that the act must be done with the purpose of obstructing the due administration of justice. The government does not need to prove that defendant's conduct had the actual effect of obstruction; however, the government must prove that the defendant's actions would have had the natural and probable effect of interfering with the pending grand jury investigation.

21

**B.    Proof of Intent – Dual Purposes**

With both the conspiracy and obstruction of justice charges, the government need not prove that a defendant's sole purpose was to obstruct justice, so long as it proves beyond a reasonable doubt that defendant acted even in part to obstruct justice.  Anderson v. United States, 417 U.S. 211, 226 (1974) (If one purpose of conspiracy "whether primary or secondary – be the violation of a federal law, the conspiracy is unlawful under federal law"); Ingram v. United States, 360 U.S. 672, 680 (1959); United States v. Giese, 597 F.2d 1170, 1179 (9th Cir. 1979); United States v. Machi, 811 F.2d 991, 1005 (7th Cir. 1987);  United States v. LaRouche Campaign, 695 F. Supp. 1265, 1274 (D. Mass. 1988) (no need to prove "sole purpose was to obstruct justice."); United States v. Woodward, 149 F.3d 46, 70-71 (1st Cir. 1998) (rejecting argument that "conduct must have an exclusively illegal intent" because "conduct may not be subject to the criminal laws if the intent underlying it is exclusively legal") (emphasis in original); United States v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993) (affirming jury instruction that defendant could be convicted if he acted "in part" corruptly).  Section 1503 requires proof only that the defendant's conduct was "prompted, at least in part," by the requisite corrupt intent.  United States v. Thomas, 916 F.2d 647, 651 (11th Cir. 1990); United States v. Barfield, 999 F.2d 1520, 1524 (11th Cir. 1993); United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996) (citing Thomas for this proposition).

**C.    Proof of Grand Jury Investigation**

The government must establish that the investigation being obstructed was a grand jury investigation.  The government will prove that defendant had knowledge of the grand jury subpoenas being served

on the LASD for records related to deputies under investigation.  The government also intends on establishing that the FBI was acting as an arm of the grand jury and, therefore, any obstruction of the FBI's activities was an obstruction of the grand jury investigation.  To prove that this was a grand jury investigation, Special Agent David Dahle is expected to testify about the subpoenas that were served in the case, his involvement in the grand jury investigation, how the FBI was gathering records with the intention of presenting the relevant records to the grand jury, and how the FBI was conducting interviews for the purposes of determining who would testify before the grand jury and relating the information learned from these interviews to the grand jury.  See United States v. Macari, 453 F.3d 926 (7th Cir. 2006).  If needed, Special Agent Leah Tanner may also address the same issues.

### D.   Defendant's Statements

Defendant Tanaka testified before the Grand Jury and at trials of his co-conspirators.  These statements are admissible under Rule 801(d)(2).  The government proposes to have a Trial AUSA read the questions and a "witness" AUSA or FBI agent, with no connection to the case, read the answers from the witness stand.

### E.   Statements Made by Defendant's Co-Conspirators

Statements made in recorded conversations, emails, and other documents, by defendant's co-conspirators are admissible against defendant if in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E).  The defendant need not be present at the time of the statement for the statement to be admissible.  United States v. Williams, 989 F.2d 1061, 1067 (9th Cir. 1993).  For a statement to be admissible under Rule 801(d)(2)(E), the government must establish by

a preponderance of the evidence that (1) there was a conspiracy, (2) defendant and the declarant were participants in the conspiracy, and (3) the statement was made by the declarant during and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); United States v. Bridgeforth, 441 F.3d 864, 868-69 & n.1 (9th Cir. 2006) (admission of co-conspirator statements does not violate the Confrontation Clause).

The contents of a statement itself may be considered, along with independent evidence, in determining whether there is sufficient proof of the existence of the conspiracy and the involvement of the defendant and the declarant in it. See Fed. R. Evid. 801(d)(2)(E); Bourjaily, 483 U.S. at 181; United States v. Castaneda, 16 F.3d 1504, 1509 (9th Cir. 1994). Courts have adopted a broad reading of the "in furtherance of" requirement for admission of co-conspirator statements, and have considered the following categories of statements (among others) as having been made "in furtherance of" a conspiracy: (1) statements to induce enlistment or further participation in the conspiracy, (2) statements to keep a coconspirator abreast of a co-conspirator's activity, (3) statements to prompt further action by co-conspirators, (4) statements related to concealment of the conspiracy, (5) statements seeking to control damage to an ongoing conspiracy, and (6) statements to allay fears of a co-conspirator or to reassure members of the conspiracy's continued existence. See United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993).

### 1.    Recorded Statements

Some of defendant Tanaka's co-conspirators, including Leavins, Craig, Long, Smith, and Manzo, made recordings of their interviews of

Anthony Brown and others on various dates. In the recordings with Brown, the co-conspirators attempted to further the conspiracy, including by: (a) gathering information from Brown about the federal investigation, including whether defendant would be testifying for the federal government, who the case agents were, and what abuse incidents the federal government was investigating; (b) informing Brown that they would be moving him out of Men's Central Jail; and (c) attempting to convince Brown to cooperate with them and not with the federal government.

Defendant Tanaka's co-conspirators also recorded their encounters with Deputies Michel, Courson, and others. In those recorded interviews the co-conspirators attempted to further the conspiracy by tampering with the witnesses and attempting to convince them not to cooperate with the federal investigation. Additionally, Craig and Long recorded their threatened arrest of Special Agent Leah Marx. Finally, Craig and Long also recorded their telephone conversations with Special Agent Marx's supervisor in which they again threatened her arrest.

### 2. Emails and Other LASD Documents

The parties have reached a stipulation on LASD emails. Once in evidence, the government plans on having other witnesses read portions of the emails and other documents to the jury so that they may be seen in more of a chronological fashion and therefore may be understood better.

### F. Authentication and Identification

#### 1. Authentication Generally

The government will seek to introduce documents and other tangible exhibits at trial. The proponent of evidence need not

25

establish a proper foundation through personal knowledge; a proper foundation "can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902."  See United States v. Pang, 362 F.3d 1187, 1193 (9th Cir. 2004).

The government need make only a prima facie showing of authenticity.  See United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991).  In passing on the authentication of evidence, the trial judge is simply called to decide whether "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  Id.  The credibility or probative force of the evidence offered is, ultimately, an issue for the jury. See United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985) (citing 5 J. Weinstein & M. Berger, Weinstein's Evidence, § 901(a)(1), at 901-17 (1983)).

### 2.    Originals and Duplicates

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original.  See Fed. R. Evid. 1003; United States v. Smith, 893 F.2d 1573, 1579 (9th Cir. 1990).

### 3.    Charts and Summaries

A chart or summary may be admitted as evidence where the proponent establishes that the underlying documents are voluminous, admissible and available for inspection.  See United States v. Meyers, 847 F.2d 1408, 1411-12 (9th Cir. 1988); see also United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (chart used as testimonial aid admitted).

**G.   Defendant's Expert Disclosure**

Defendant has provided the government with notice that he intends to call a witness, LASD Detective Mark Lillienfeld, to testify regarding: (1) cell phones being more dangerous than guns inside county jails; (2) inmate movement at MCJ and other topics covered in Thompson.  The government has no objection to Lillienfeld testifying as an expert in these subject matters.

**VI.   CONCLUSION**

The government expects to prove beyond a reasonable doubt that defendant conspired to obstruct justice and obstructed justice.  It will file other briefing at the Court's request.

Dated: March 16, 2016                    Respectfully submitted,

                                         EILEEN M. DECKER
                                         United States Attorney

                                         LAWRENCE S. MIDDLETON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                           /s/ Brandon D. Fox
                                         BRANDON D. FOX
                                         LIZABETH A. RHODES
                                         EDDIE A. JAUREGUI
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

27