UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 15-255 |
| | ) | |
| Plaintiff, | ) | I N D I C T M E N T |
| | ) | |
| v. | ) | [18 U.S.C. § 371: Conspiracy; |
| | ) | 18 U.S.C. § 1503(a): Obstruction |
| PAUL TANAKA, | ) | of Justice] |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

The Los Angeles County Sheriff's Department

1.    The Los Angeles County Sheriff's Department ("LASD") was a local law enforcement agency within the Central District of California.  Among other things, the LASD was responsible for managing the Los Angeles County Jails, including the Los Angeles County Men's Central Jail ("MCJ") and the Los Angeles County Twin Towers Correctional Facility ("TTCF"), both of which were located in the City of Los Angeles.

**EXHIBIT A**

2.    The LASD operated computer databases that, among other things, tracked the location of inmates housed in the Los Angeles County Jails (the "LASD computer databases").

The Defendant and Certain Co-Conspirators

3.    Defendant PAUL TANAKA ("TANAKA") was an executive with the LASD, ultimately becoming Undersheriff in approximately 2011.  As Undersheriff, defendant TANAKA was the LASD's second highest ranking officer.

4.    Co-conspirator William Thomas Carey ("Carey"), also known as "Tom Carey," was an LASD deputy.  In April 2010, Carey became the Captain of the LASD's Internal Criminal Investigations Bureau ("ICIB"), which was tasked with investigating allegations of state crimes committed by the LASD's personnel.  As Captain of ICIB, Carey oversaw ICIB and reported directly to defendant TANAKA.

5.    Co-conspirator Stephen Leavins ("Leavins") was a lieutenant assigned to ICIB.  Co-conspirators Scott Craig ("Craig") and Maricela Long ("Long") were sergeants assigned to ICIB.

6.    Co-conspirator Greg Thompson ("Thompson") was a lieutenant who oversaw the LASD's Operation Safe Jails Program and its Jail Investigations Unit, which was tasked with conducting investigations of inmates' activities within the Los Angeles County Jails.  Co-conspirators Gerard Smith ("Smith"), Mickey Manzo ("Manzo"), and James Sexton ("Sexton") were LASD deputies assigned to the Operation Safe Jails Program.

7.    Along with ICIB, the LASD had an Internal Affairs Bureau ("IAB") that conducted administrative (rather than

2

criminal) investigations of misconduct by LASD employees to determine whether the employees should be disciplined or fired. In many instances, investigations of incidents in which LASD deputies used force against inmates were conducted by the deputies' supervisors instead of by ICIB or IAB.

Allegations of Abuse at MCJ and TTCF and Criticism of Internal Investigations by the LASD

8.    Defendant TANAKA was well aware of allegations of rampant abuse of inmates at MCJ and TTCF and of allegations of insufficient internal investigations and enforcement of deputy misconduct by the LASD.  By no later than September 2011, the following had occurred:

a.    In approximately February 2006, an LASD captain at MCJ informed defendant TANAKA that there were "problem deputies" assigned to MCJ;

b.    In approximately June 2007, defendant TANAKA informed deputies that defendant TANAKA would be checking to see which LASD captains were putting the most cases on deputies so he could put a case on those captains;

c.    In approximately 2009, defendant TANAKA informed LASD supervisors: (a) they should allow deputies to work in the "gray area"; (b) defendant TANAKA wanted the Internal Affairs Bureau to have approximately 44 fewer investigators than the approximate 45 investigators it then had.

d.    In approximately November 2009, a lieutenant working in LASD's Custody Operations Division wrote a memorandum expressing concerns about, among other things, insufficiencies

in supervisory investigations of force incidents taking place in the MCJ.

e.    Between at least sometime in 2009 and September 2011, the American Civil Liberties Union (the "ACLU") informed the LASD of and published reports about allegations of pervasive physical abuse, violence, and retaliation by LASD deputies against inmates.  The LASD generally responded to these allegations with internal investigations that would nearly invariably conclude that the allegations were "unfounded."

f.    In approximately early 2010, an LASD Commander informed defendant TANAKA of an increase of incidents of significant force against inmates at MCJ;

g.    From no later than December 2010 and continuing to at least July 2011, allegations surfaced that LASD deputies working on the 3000 floor of MCJ, who called themselves the "3000 Boys," exhibited gang-like and violent behavior, used excessive force against inmates, and falsified reports to cover up wrongdoing;

h.    By no later than February 2011, the ACLU alleged that one of its employees had personally witnessed deputy abuse of an inmate at TTCF;

i.    Beginning no later than May 2011, individuals seeking to visit inmates at MCJ alleged they were beaten by LASD deputies; and

Federal Agencies and Federal Grand Juries

9.    The United States Department of Justice ("DOJ") was a department within the Executive Branch of the United States government that was responsible for enforcing federal law.    The

4

DOJ had several components to assist it in enforcing federal criminal law, including the Federal Bureau of Investigation (the "FBI"), which investigated allegations of federal crimes through its various field offices, and the U.S. Attorney's Office for the Central District of California (the "USAO"), which prosecuted allegations of federal crimes committed in Los Angeles County and elsewhere.

10.   Investigations involving the DOJ, FBI, and USAO often included the use of federal grand juries, which investigated allegations of violations of federal criminal law in secret proceedings.  Federal grand juries issued grand jury subpoenas to obtain documents and testimony from witnesses.  The FBI often acted as an arm of federal grand juries by, among other things, serving grand jury subpoenas, obtaining evidence to be presented to the grand jury, and interviewing witnesses to alleged crimes being investigated by the grand jury.

11.   Some of the criminal investigations conducted by the DOJ, FBI, USAO, and federal grand juries included allegations of: (a) civil rights abuses, such as deputies using excessive force on inmates in jails; and (b) public corruption offenses, such as deputies smuggling contraband into jails in exchange for bribes.

12.   The DOJ, FBI, USAO, and federal grand juries were often called upon to investigate civil rights abuses and corruption within local law enforcement agencies when there were allegations that the local agencies' internal investigations were incomplete or biased.

5

13. Federal grand juries obtained the testimony of inmates held in local jails through Writs of Habeas Corpus ("Writs"), which were federal court orders signed by United States District Judges.

14. The United States Marshals Service ("USMS") was a federal law enforcement agency that, among other duties, helped federal grand juries obtain the testimony of inmates located at local jails. The USMS served Writs on entities operating local jails, including the LASD, and arranged for the transportation of inmates in LASD custody scheduled to testify before federal grand juries. The USMS served Writs on the LASD at the LASD's Inmate Reception Center.

The Federal Investigation of the LASD

15. Inmate AB was an inmate in the custody of the LASD at the MCJ who was a cooperating witness in a federal investigation of alleged federal civil rights and public corruption violations committed and being committed by employees of the LASD working at the Los Angeles County Jails (the "Federal Investigation"). The Federal Investigation concerned the alleged use of excessive force by LASD deputies against inmates within the MCJ and TTCF and the alleged smuggling of contraband by LASD deputies into the MCJ and TTCF in exchange for bribes. Specifically, Inmate AB was assisting in a covert public corruption investigation of LASD Deputy Gilbert Michel ("Deputy Michel"), who worked at the MCJ. Additionally, Inmate AB was providing information about alleged federal civil rights offenses being committed by employees of the LASD working at the MCJ who were allegedly abusing inmates.

6

16.  Special Agent LM and Special Agent DL were Special Agents with the FBI.  Special Agent LM and Special Agent DL were among the FBI agents participating in the Federal Investigation probing civil rights abuses and public corruption offenses occurring within the Los Angeles County Jails.

17.  As part of the Federal Investigation, the FBI conducted an undercover operation to determine whether Deputy Michel would accept a bribe to provide Inmate AB with a cellular phone.  In approximately late July 2011, Deputy Michel accepted a bribe and provided Inmate AB with a cellular phone by smuggling into the MCJ.  On or about August 8, 2011, the LASD discovered that Inmate AB had in Inmate AB's possession the cellular phone that Deputy Michel had smuggled into the MCJ in return for a bribe.

18.  By no later than in or about August 2011, defendant TANAKA was aware that the USAO, FBI, and a federal grand jury were conducting an investigation of abuse and corruption by LASD's employees working within the Los Angeles County Jails.

19.  By no later than approximately August 20, 2011, defendant TANAKA knew that the Assistant Director in Charge of the FBI had contacted the LASD to inform it that the LASD had seized from an inmate a phone that belonged to the FBI that had been smuggled into the MCJ by an LASD deputy and to request that the LASD return the phone to the FBI.

20.  On or about August 25, 2011, a federal judge ordered Inmate AB's appearance as a witness before a federal grand jury. The USMS served this order on the LASD on or about August 25, 2011.

21.  These Introductory Allegations are hereby incorporated into each count of this Indictment as though set forth fully therein.

COUNT ONE

[18 U.S.C. § 371]

A.    OBJECT OF THE CONSPIRACY

Beginning no later than on or about August 19, 2011, and continuing through on or about September 26, 2011, in Los Angeles County, within the Central District of California, defendant PAUL TANAKA, together with co-conspirators William Thomas Carey, aka "Tom Carey," Stephen Leavins, Scott Craig, Maricela Long, Greg Thompson, Gerard Smith, Mickey Manzo, James Sexton, and others known and unknown to the Grand Jury, knowingly conspired to corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice and a federal grand jury investigation, in violation of Title 18, United States Code, Section 1503(a).

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.    Defendant TANAKA, and his co-conspirators would attempt to prevent the FBI and a federal grand jury from conducting an investigation that would uncover the culture of deputy abuse of inmates and corruption within the MCJ and TTCF.

2.    Defendant TANAKA and his co-conspirators would attempt to prevent the FBI from interviewing or contacting Inmate AB, because they knew that Inmate AB was being utilized by the FBI to investigate illegal acts allegedly being committed by LASD personnel at the MCJ.

9

3.    Defendant TANAKA and his co-conspirators would impede any attempt by the FBI and the USMS to find Inmate AB, including by:

a.    Causing Inmate AB's physical file, called a "records jacket," to be removed from the LASD's records center so the records center would have no physical record showing that Inmate AB was in the LASD's custody;

b.    Causing false entries to be made in the LASD computer databases so that it appeared as though Inmate AB had been released from the LASD's custody when, in fact, Inmate AB remained hidden in the LASD's custody;

c.    Causing inmate AB to be re-booked in the LASD computer databases under false names, with fictitious booking information, and without fingerprinting Inmate AB, so that Inmate AB's true name would not be connected to this fictitious booking information;

d.    Causing Inmate AB to be moved from a cell in a high-security area to a medical floor within MCJ; and

e.    Causing Inmate AB to be moved from the medical floor within MCJ to an LASD station jail to hide him from the FBI, the USMS, and the federal grand jury.

4.    Defendant TANAKA would attempt to learn the manner and extent of the Federal Investigation, including by:

a.    Directing co-conspirators Leavins, Smith, Craig, and Long to conduct interviews of Inmate AB, including one interview at which Carey was present, about the abuses and corruption he had reported to the FBI;

10

b.     Directing LASD deputies to conduct an undercover operation in which they posed as Inmate AB's cellmates who had received injuries at the hands of deputies, in an attempt to learn about the abuses and corruption Inmate AB had reported to the FBI;

c.     Reviewing old complaints by inmates that the LASD had investigated and closed as unfounded; and

d.     Determining which inmates the FBI was in contact with regarding civil rights abuses.

5.     Co-conspirator Long would inform Inmate AB that the FBI had not come back for him in an attempt to convince Inmate AB that the FBI had abandoned him so that Inmate AB would not cooperate with the Federal Investigation.

6.     Defendant TANAKA would oversee co-conspirators Leavins, Craig, and Long as they conducted interviews of LASD deputies who they believed were connected to the Federal Investigation.  In those interviews, Leavins, Craig, and Long would tamper with the LASD deputies as potential witnesses by:

a.     Attempting to convince them not to cooperate with the Federal Investigation;

b.     Informing and suggesting to them that the FBI was and would be lying to them, manipulating them, blackmailing them, and threatening them; and

c.     Ordering them not to speak to the FBI and to report all contact by the FBI in the future to the co-conspirators.

7.     Co-conspirators Leavins, Craig, and Long would attempt to compel the FBI to disclose the manner and extent of the

Federal Investigation, including by attempting to obtain a court order from a California Superior Court in the County of Los Angeles seeking to compel the FBI to provide the LASD with, among other things:

a.    Investigative records, reports, and notes of all investigations involving the Los Angeles County Jail system since August 5, 2009; and

b.    The true identity of any agents and the current assignment of those involved in any investigation involving the Los Angeles County Jail system since August 5, 2009.

8.    After the California Superior Court in the County of Los Angeles denied this proposed court order, co-conspirators Craig and Long would attempt to intimidate Special Agent LM by confronting her outside of her home and informing her that co-conspirator Craig was in the process of swearing out a declaration for a warrant for her arrest.

9.    Co-conspirator Long would inform Special Agent LM's supervisor that there was going to be a warrant issued for Special Agent LM's arrest.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendant TANAKA, along with co-conspirators Carey, Thompson, Leavins, Smith, Manzo, Craig, Long, and Sexton, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, including but not limited to the following:

1.     On or about August 19, 2011, defendant TANAKA met co-conspirators Thompson, Smith, and Manzo to discuss information Smith and Manzo learned from Inmate AB about the Federal Investigation.

2.     On or about August 20, 2011, LASD Official A, defendant TANAKA, co-conspirator Carey, co-conspirator Thompson, co-conspirator Smith, co-conspirator Manzo, and others met and discussed that the cell phone found in the possession of Inmate AB belonged to the FBI;

3.     On or about August 23, 2011, defendant TANAKA met with co-conspirators Carey, Thompson, Smith, and Manzo to discuss the fact that the FBI had interviewed Inmate AB at the MCJ that day. In the meeting, defendant TANAKA and Carey decided to move Inmate AB from the MCJ.

4.     On or about August 23, 2011, co-conspirators Carey and Leavins asked Inmate AB whether the FBI had informed him whether he would be testifying about Inmate AB's allegations and told Inmate AB that he would be moved from the MCJ.

5.     On or about August 23, 2011, after co-conspirator Carey learned that, based on health issues, Inmate AB could not be moved to a station jail, Carey caused Inmate AB to be housed in a cell on a medical floor at MCJ, where deputies stood guard outside of his cell.

6.     On or about August 24, 2011, defendant TANAKA met in a parking lot with LASD deputies who were assigned to pose as cellmates of Inmate AB so they could obtain information about Inmate AB's allegations of deputy abuse within the MCJ.

7.    On or about August 24, 2011, co-conspirator Manzo drafted a new policy at the direction of defendant TANAKA that required the FBI to receive approval from defendant TANAKA before interviewing any inmate in the LASD's custody.

8.    On or about August 24, 2011, co-conspirator Thompson sent the draft policy to defendant TANAKA's assistant for defendant TANAKA's approval.

9.    On or about August 24, 2011, defendant TANAKA caused co-conspirator Thompson to remove defendant TANAKA's name from the draft policy.

10.    On or about August 24, 2011, co-conspirators Thompson, Smith, and Manzo met with deputies who would be standing guard outside of Inmate AB's cell, including co-conspirator James Sexton, and explained that defendant TANAKA had disparaged the FBI and had characterized their duty as one of the most important investigations in the history of the LASD.

11.    On or about August 25, 2011, co-conspirator Thompson sent an email to LASD employees explaining that the FBI would need approval from Thompson's unit before interviewing any inmate in LASD custody.

12.    On or about August 25, 2011, co-conspirator deputies informed employees working in the LASD's records center that they were operating under defendant TANAKA's authority and that these employees needed to create false entries in the LASD computer databases to show that Inmate AB had been released from the custody of the LASD when, in fact, Inmate AB remained in the LASD's custody.

13.  On or about August 25, 2011, co-conspirator deputies caused Inmate AB to be booked in the LASD computer databases under the name "John Rodriguez" and with fictitious information, including a false race, a fake date of birth, and with false statements asserting that Inmate AB had refused to provide his social security number and fingerprints to the LASD.

14.  On or about August 26, 2011, co-conspirator CAREY and co-conspirator Thompson caused a high ranking employee of the LASD's MCJ to instruct MCJ lieutenants and sergeants that:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review. DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

15.  On or about August 26, 2011, a co-conspirator lieutenant told another lieutenant at the LASD's Inmate Reception Center:

a.   If a federal agent came to the Inmate Reception Center with a writ for Inmate AB, the lieutenant was to call defendant TANAKA's phone;

b.   The lieutenant was not to allow Inmate AB to be turned over to the federal government; and

c.   No one was allowed to visit Inmate AB.

16.  On or about August 26, 2011, defendant TANAKA, co-conspirator Carey, and co-conspirator Thompson met to discuss moving Inmate AB out of MCJ and to a station jail despite his health issues.

17.  On or about August 26, 2011, co-conspirators Thompson, Smith, and Manzo caused the LASD computer databases to falsely

15

show that "John Rodriguez" had been released pursuant to a court order.

18.  On or about August 26, 2011, co-conspirators Thompson, Smith, and Manzo caused Inmate AB to be moved from the MCJ to the LASD's San Dimas station and booked under the name "Kevin King" and with fictitious information, including false statements asserting that Inmate AB refused to provide his social security number and fingerprints to the LASD.

19.  On or about August 26, 2011, co-conspirator Long informed Inmate AB that the FBI had not "come back for" Inmate AB.

20.  On or about August 30, 2011, defendant TANAKA and co-conspirator Carey went to the MCJ to oversee interviews, conducted by co-conspirators Leavins, Craig, and Long, of deputies who they believed were connected to the Federal Investigation and to obtain briefings of those interviews. During those interviews:

a.    Co-conspirators Leavins and Craig informed Deputy Michel that the FBI was manipulating, blackmailing, and threatening him in an attempt to convince Michel to be a witness in the Federal Investigation; and

b.    Co-conspirators Leavins and Craig asked Deputy WDC not to speak to anyone and to inform Craig of any future contact by the FBI.

21.  On or about September 2, 2011, co-conspirators Thompson, Smith, and Manzo caused Inmate AB to be booked under the name "Chris Johnson."

16

22. On or about September 2, 2011, defendant TANAKA and co-conspirator Leavins directed LASD personnel to conduct searches for listening devices in:

a. defendant TANAKA's office and conference room;

b. LASD Official A's office and conference room; and

c. ICIB's Task Force office.

23. On or about September 7, 2011, defendant TANAKA and co-conspirator Carey authorized co-conspirator Craig to present a proposed court order to a California Superior Court judge in Los Angeles County in an attempt to compel the FBI to disclose information related to the Federal Investigation.

24. On or about September 8, 2011, co-conspirator Craig presented a proposed court order to a California Superior Court judge in Los Angeles County in an attempt to compel the FBI to disclose information related to the Federal Investigation.

25. On or about September 9, 2011, after a California Superior Court judge in Los Angeles County denied the proposed court order on the basis that it had no jurisdiction over a federal agency, co-conspirator Craig left a voicemail message on a number he believed belonged to Special Agent LM threatening to obtain a warrant for her arrest.

26. On or about September 13, 2011, co-conspirator Leavins informed co-conspirator Carey that Deputy Michel was confessing to beating handcuffed inmates in an interview being conducted by co-conspirators Craig and Long.

27. On or about September 13, 2011, after the interview of Deputy Michel ended, co-conspirator Carey called defendant TANAKA.

17

28.    Co-conspirator Carey caused the LASD to conduct surveillance of FBI Special Agents, which occurred on the following approximate dates:

a.    September 13, 2011 - Special Agent LM;

b.    September 14, 2011 - Special Agent LM;

c.    September 23, 2011 - Special Agent LM;

d.    September 26, 2011 – Special Agent LM;

e.    September 28, 2011 – Special Agent LM;

f.    September 28, 2011 – Special Agent DL; and

g.    September 29, 2011 – Special Agent DL.

29.    On or about September 14, 2011, co-conspirator CAREY informed defendant TANAKA about a Department of Justice tour planned for the MCJ.

30.    On or about September 26, 2011, co-conspirators Craig and Long confronted Special Agent LM outside of her residence and informed her that:

a.    Special Agent LM was a named suspect in a felony complaint being pursued by the LASD; and

b.    Co-conspirator Craig was in the process of swearing out a declaration for a warrant for the arrest of Special Agent LM.

31.    On or about September 26, 2011, after co-conspirators Craig and Long confronted Special Agent LM, co-conspirator Carey spoke with co-conspirator Craig on the phone.

32.    On or about September 26, 2011, co-conspirator Long informed Special Agent LM's supervisor at the FBI that there was going to be a warrant issued for Special Agent LM's arrest, the arrest warrant could be issued as soon as the next day, and the

18

supervisor would have to speak to defendant TANAKA about the charges.

33.  On or about September 26, 2011, approximately less than an hour after co-conspirator Long's phone call with the FBI supervisor, defendant TANAKA and co-conspirator Carey spoke on the phone.

COUNT TWO

[18 U.S.C. § 1503(a)]

From on or about August 19, 2011, to on or about September 26, 2011, defendant PAUL TANAKA corruptly endeavored to influence, obstruct, and impede the due administration of justice, namely, a federal grand jury investigation into abuse and corruption by LASD's employees working within the Los Angeles County Jails.