EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, CA 90012
    Telephone: (213) 894-0284/3541/4849
    E-mail:    Brandon.Fox@usdoj.gov
                Lizabeth.Rhodes@usdoj.gov
                Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S BRIEF RE CROSS-EXAMIANTION OF DEFENDANT PAUL TANAKA AS TO HIS MEMBERSHIP IN THE VIKINGS ORGANIZATION; [PROPOSED] ORDER |
| v. | |
| PAUL TANAKA, | |
| Defendant. | Trial Date:  April 4, 2016<br>Trial Time:  8:00 A.M.<br>Location:    Courtroom of the<br>              Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes, and Eddie A. Jauregui, hereby files its brief regarding cross-examination of defendant Paul Tanaka as to his membership in the Lynwood Vikings organization.

The government's position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 3, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                                /s/
                                        BRANDON D. FOX
                                        LIZABETH A. RHODES
                                        EDDIE A. JAUREGUI
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant Paul Tanaka ("defendant") is currently on trial facing charges of obstruction of justice, in violation of 18 U.S.C. § 1503(a), and conspiracy to obstruct justice, in violation of 18 U.S.C. § 371.  Defendant decided to testify, and began doing so on Friday, April 1, 2016.  In the final minutes of the day, the government started its cross-examination.  Defense counsel objected when the government began questioning defendant about the "Vikings" organization that operated at the Lynwood Station of the Los Angeles County Sheriff's Department ("LASD").  The government intends to continue questioning defendant about the Vikings and establish that defendant is a member of that organization, which a federal district court judge has found to be a "neo-nazi, white supremacist gang . . . ."  See Thomas v. County of Los Angeles, 978 F.2d 504, 511 (9th Cir. 1993).  To be clear, the government does not intend to use the terms "neo-nazi" or "white supremacist" during cross-examination, nor will it elicit any racial aspect of the Vikings organization in the presence of the jury; however, the government does plan to describe the Vikings as a deputy "clique" or "gang" that has violated the "civil rights" of citizens and operated in a lawless fashion, in line with Judge Terry Hatter's description of the Vikings in Thomas.  The purpose of this questioning is to impeach defendant's testimony on direct examination, and to show his motive and intent to obstruct the grand jury's investigation into civil rights abuses in Los Angeles County jails.

## II.   BACKGROUND

### A.   The Lynwood Vikings

In 1992, Special Counsel to the County of Los Angeles James G. Kolts issued a report describing a deputy "clique" at Lynwood Station known as the "Lynwood Vikings."  The report found that the Vikings were "an inner group of deputies with peculiar and unique hard attitudes" that "manifested themselves in the form of excessive force and disciplinary problems between deputies and their supervisors." See REPORT OF THE CITIZENS' COMMISSION ON JAIL VIOLENCE, at 101 (2012) ("CCJV Report") (quoting "Los Angeles County Sheriff's Department: Report by Special Counsel James G. Kolts and Staff," July 1992).  The report recommended that the Sheriff's Department take action to break up groups like the Vikings, which demonstrated "gang-like behavior." Id.

Around the same time, black and Hispanic residents of the City of Lynwood filed a civil rights action against the Sheriff's Department in federal district court.  The residents alleged that they had been subject to racially motivated violence and destruction of property by Sheriff's deputies.  As part of that lawsuit, the district court granted a preliminary injunction against the LASD and made the following findings about Lynwood station deputies, among others:

7. The actions of many deputies working in the Lynwood sub-
station are motivated by racial hostility; these deputies
regularly disregard the civil rights of individuals they
have sworn to protect.  Many of the incidents which brought
about this motion involved a group of Lynwood area deputies

2

who are members of a neo-nazi, white supremacist gang – the Vikings – which exists with the knowledge of departmental policy makers. . . .

9. There is a direct link between departmental policy makers, who tacitly authorize deputies' unconstitutional behavior, and the injuries suffered by the plaintiffs.

10. As a result of the terrorist-type tactics of deputies working in Lynwood, and the policy makers' tolerance of such tactics, plaintiffs are being irreparably injured – both physically and mentally – and their civil rights are being violated.

Thomas, 978 F.2d at 511.

In 2012, the Citizens' Commission on Jail Violence ("CCJV"), whose members included federal and state judges, as well as law enforcement officials, noted that Paul Tanaka was himself a member of the Vikings and that, in 2006, defendant Tanaka, who was then Assistant Sheriff of the LASD, took steps to "embolden" deputy cliques.  CCJV Report at 103.

**B.    Cross-Examination of Defendant Regarding the Vikings**

On cross-examination of the defendant on Friday, April 1st, the prosecutor asked defendant the following questions:

Q: Mr. Tanaka, on direct examination, Mr. Haig took you through your career going back to actually your high school education in 1976; is that correct?

A: Yes.

3

Q: And then he took you through your experience with a CPA firm for 20 years; correct?

A: I said it was approximately 20 years that I had worked in the CPA firm.

Q: And Mr. Haig took you through your experience with another department working in El Segundo; correct?

A: I don't believe we discussed the experience there.

Q: Well, just the fact that you worked there; correct?

A: Yes.

Q: And then we glossed over a whole bunch of time, and we went to -- I believe it was -- was it 1991—

MR. HAIG: Objection, Your Honor, argumentative to the form of the question.

MR. FOX: Your Honor, I'll --

THE COURT: Sustained.

MR. FOX: I'll reask the question.

Q: (BY MR. FOX): Mr. Haig didn't you ask about your experience as a supervisor at the Lynwood Station; correct?

A: He did not.

Q: And when you were a sergeant at the Lynwood Station, you learned that there was a deputy clique at the Lynwood Station; correct?

A: Yeah.

Q: And that deputy clique was known as the Vikings; correct?

MR. HAIG: Objection, Your Honor.

THE COURT: Let's go to sidebar.

Trial Tr. 95:5-96:9, April 1, 2016.

4

At sidebar, defense counsel objected to the prosecution's question regarding the Vikings on grounds of relevance and scope. Defense counsel noted that "the fact that [defendant] was in the Vikings is not relevant to anything that he's testified to today. I didn't gloss over it. I just didn't think it was important because it happened so long ago." Id. at 96:21-22. The government responded that it had made clear to the defense it would not raise defendant's membership in the Vikings in its case-in-chief, but had not provided such assurances with respect to cross-examination of defense witnesses or its rebuttal case. Id. at 97:7-8. Additionally, the government argued at sidebar that defendant's membership in the Vikings is relevant to defendant's testimony that he "would never stand for any of this deputy misconduct . . . and he wasn't aware of these issues that were going on." Id. at 97:16-20.

The Court reserved ruling and ordered the parties to brief the issue.

**III. ARGUMENT**

From the outset of this trial, beginning with the defense's opening statement, defendant has claimed that as a leader in the Sheriff's Department, he stood against evil deeds and "never look[ed] the other way" in the face of deputy misconduct. If there were "problem deputies," defense counsel asserted, defendant wanted to "take care of these guys." On direct examination, defendant doubled-down. He testified at length about his policing philosophies and values. He discussed having an "unwavering sense of right or wrong" and his personal agreement with LASD's "Core Values," which, as defendant testified, include "respect for the dignity of all people,

integrity to do right and fight wrongs, . . . fairness in all I do" and "stand[ing] against racism, sexism, anti-Semitism, homophobia and bigotry." Id. at 24:17-23. Defendant further testified that, while he was "supervising patrol," he "had no tolerance for deputies who wore a badge and violated the law," id. at 59:11-12, and acknowledged that "discipline was necessary to ensure proper behavior of deputy sheriffs." Id. at 59:7-8. Not surprisingly, defendant painted a picture of himself as a supervisor with zero tolerance for misconduct or unethical behavior by deputies, essentially serving as his own character witness. But in so doing, the defense flung open the door to questioning about defendant's membership in the Vikings. As explained below, such testimony is relevant and within the scope of direct examination, and as the government plans to proceed, it will not unfairly prejudice the defendant.

**A.    Testimony Regarding the Vikings is Relevant**

On direct examination, defense counsel walked defendant through his early career history, taking defendant from his participation in the police academy in 1979 through his tenure in the El Segundo Police Department in 1982. Counsel then asked defendant about his educational background, starting with his graduation from Gardena High School in 1976, and his work at "a small CPA firm" in Gardena for approximately 20 years. Id. at 8:3-9:15. After establishing that defendant was certified by the State as a CPA, defense counsel brought defendant back to his law enforcement career by asking defendant whether "[i]n 1993," defendant was "employed as a Los Angeles County sheriff's deputy." Id. at 10:5-6. Defendant replied: "In 1993 I was, yes." Id. at 10:7. Defendant then explained that he

6

held the rank of lieutenant at that time, but that he believed he became a lieutenant in 1991.  Id. at 10:10-12.

At no point in direct examination was defendant asked to explain, nor did he explain, his tenure as a Los Angeles County Sheriff's deputy in the 11 year period between 1982 and 1993.  By his line of questioning, defense counsel created the impression that defendant was hired into the Sheriff's Department in the early 1990s as a lieutenant and had been working solely as a CPA for an accounting firm before then.  In fact, defendant was employed by the LASD the entire time, including serving as a sergeant at the Lynwood Sheriff's station from 1987 to 1991.

Defense counsel also elicited testimony from defendant about his philosophy on law enforcement and his embrace of the Sheriff's "Core Values."  Defendant testified that he agreed with the Sheriff's Core Values, which, as defendant read into the record, include:

"commit[ting] myself to honorably perform my duties with respect for the dignity of all people, the integrity to do right and fight wrongs, wisdom to apply common sense and fairness in all I do and courage to stand against racism, sexism, anti-Semitism, homophobia and bigotry in all of its forms."

Trial Tr. 24:17-23; id. at 25:2-7 (noting defendant's agreement with Core Values).

Similarly, defendant testified that as Assistant Sheriff in charge of patrol, he visited the LASD Norwalk Station in 2007 to, among other things, express his "philosophy on what I expected."  Id. at 47:6-11.  When asked to explain his philosophy, defendant

responded that his expectations were simple: "make sure that you're as smart as you can be, know all the laws, know the lines of right and wrong, and do your job . . . in the right way because that's our obligation as peace officers." Id. at 47:13-18. Moreover, defendant testified on direct examination that "at every command I visited" and "probably hundreds of times," defendant expressed to deputies that they should operate in the "gray area," which he described as "inside of the[] lines" of the law, on one end, and "right or wrong," on the other. Id. at 48-49.

This line of questioning opened the door to cross-examination pertaining to the Vikings because defendant's membership in that organization, including while serving as a sergeant at Lynwood station, undermines his testimony that he agreed with and adhered to the LASD's Core Values, and that, as a supervisor, he had no tolerance for deputies who violated the law.[1] See United States v. Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002) (evidence of "general good character opened the door to the government's evidence of prior bad acts to demonstrate bad character"); id. ("Had the government's evidence been excluded, the jury might have been misled into believing that Defendant was merely a hard-working, upstanding citizen who was bewildered by crime and badgered into the drug deals in question."). On cross-examination, the government intends to ask defendant about his membership in the Vikings while serving as a sergeant at Lynwood Station, about the characterization of the

---

[1] Defendant has admitted to having a Vikings tattoo. See NBCNews.com, "LA Sheriff Candidate Asked About 'Gang' Tattoo at Debate," April 7, 2014, available at http://www.nbcnews.com/news/investigations/la-sheriff-candidate-asked-about-gang-tattoo-debate-n74096.

8

Vikings as a deputy "gang," and about defendant's Vikings tattoo, which he still has to this day.  In addition, the government intends to question defendant about other members of the Vikings who are relevant to the charges and his defense.[2]

In order to avoid undue prejudice to the defendant, however, the government will not refer to any racial aspect of the Vikings organization (i.e., it will not invoke Judge Hatter's description of the Vikings as a "neo-nazi, white supremacist" organization), nor will it note that a federal judge found that the Vikings employed "terrorist-type tactics."  Thomas, 978 F.2d at 511.  The government does plan to ask defendant about the fact that the Vikings have been found to have engaged in "civil rights violations" and other acts of lawlessness.  Such testimony is clearly relevant because it goes to defendant's credibility, and as explained below, his motive and intent.

**B.    The Probative Value of Testimony Regarding the Vikings is Not Substantially Outweighed by Risk of Unfair Prejudice**

Although defendant's objection is based on relevance and scope, the government expects the defense to argue in its papers that such testimony is also prohibited by Rule 403.  The standard for excluding evidence under Rule 403 is familiar and set out in the Rule itself: evidence may only be excluded if the probative value of the evidence is "substantially outweighed by a danger of . . . unfair prejudice" or other considerations, such as "confusing the issues, misleading

---

[2] The government will provide the Court with a proffer of its good faith basis to believe that these individuals were members of the Vikings upon the Court's request.

the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The fact that a defendant's case will be harmed by the admission of certain evidence does not constitute unfair prejudice. See United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977) ("Evidence relevant to a defendant's motive 'is not rendered inadmissible because it is of a highly prejudicial nature. . . . The best evidence often is.'") (quoting United States v. Mahler, 452 F.2d 547 (9th Cir. 1971)). "So long as the evidence is offered for a proper purpose . . . the district court is accorded wide discretion in deciding whether to admit the evidence, and the test for admissibility is one of relevance." United States v. Johnson, 132 F.3d 1279, 1282 (9th Cir. 1997).

Here, the proffered evidence is highly probative of defendant's intent. To establish defendant's crimes, the government bears the burden to prove defendant's intent to obstruct justice. See Ninth Cir. Model Jury Instr. 8.131. As defendant's direct examination (and his opening statement) reflects, defendant suggests that he lacked such criminal intent because (a) he was foundationally committed to "know[ing] all the laws, know[ing] the lines of right and wrong, and do[ing] your job . . . in the right way" and (b) he had no tolerance for the types of deputy abuses at the core of the FBI's own investigation and, instead, was committed to "honorably perform[ing] [his] duties with respect to the dignity of all people[.]" Defendant's membership in the Vikings undermines these assertions. Indeed, that defendant belonged to a deputy clique at the time he was a sergeant--continuing all the way through his time as Undersheriff

10

and still today--evidences his intent to <u>protect</u> deputies who, like defendant, belonged to "cliques" that were known to cross the line and violate the civil rights of others.  <u>Cf.</u> <u>United States v. Santiago</u>, 46 F.3d 885, 889 (9th Cir. 1995) ("This court specifically has admitted evidence relating to gangs and other organizations when relevant to the issue of motive.")  Indeed, other LASD deputies who played a role in this case were also Vikings, further evidencing defendant's conspiracy with those individuals to obstruct justice.

Evidence of defendant's membership in the Vikings also, as referenced above, is relevant to impeach him -- directly calling into question defendant's asserted commitments to following the law and doing things the "right way."  <u>See generally</u> <u>United States v. Ramirez-Robles</u>, 386 F.3d 1234, 1245 (9th Cir 2004) (analyzing impeachment value of evidence under Rule 403).  Indeed, by repeatedly so testifying, defendant opened the door to evidence demonstrating his non-law-abiding character.  <u>Mendoza-Prado</u>, 314 F.3d at 1105. Evidence of Vikings membership conservatively--and accurately--so demonstrates.  <u>See generally</u> <u>United States v. Whitworth</u>, 856 F.2d 1268, 1285 (9th Cir. 1988).

Moreover, the probative value of the evidence is not substantially outweighed by risk of "unfair prejudice[.]"  Fed. R. Evid. 403.  Prejudicial evidence is unfair when it "not only has a significant impact on the defendant's case (as opposed to evidence that is essentially harmless) but [it] . . . results in some unfairness to the defendant because of its <u>non</u>-probative aspect"-- that is, its tendency to "affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or

innocence of the crime charged." United States v. Bailleaux, 685 F.2d 1105, 1111 & n.2 (9th Cir. 1982) (emphasis added). "All evidence which tends to establish the guilt of a defendant is, in one sense, prejudicial . . . but that does not mean that such evidence should be excluded." Id. at 1111. Here, the government seeks only to elicit limited testimony regarding defendant's membership in the Vikings (including defendant's tattoo reflecting such membership); findings about civil-rights violations committed by the Vikings; and other members of the charged conspiracy who are alleged to be members of the Vikings, including Greg Thompson, Chris Nee, and others. As noted above, however, the government will hold back: it will refer to the Vikings as a deputy clique or gang, but will not refer to the organization as a "neo-nazi, white supremacist gang." It will refer generally to "civil rights violations" and acts of "lawlessness," but not to "terrorist-type tactics." It will make the point that defendant belonged to an organization that goes against defendant's professed values, but it will not belabor it.

Finally, to extinguish any residual risk of unfair prejudice (though there is none), the government respectfully requests that the Court issue a limiting instruction--akin to the Ninth Circuit model instruction regarding evidence admitted under Rule 404(b)-- instructing the jury that it should consider Vikings-related testimony "for its bearing, if any, on the question of the defendant's intent, motive, and credibility, and for no other purpose." See Ninth Cir. Model Crim. Jury Instr. 4.3 (2010).

**IV.    CONCLUSION**

Defendant's intent to obstruct justice is an essential element of the crimes charged in the indictment.  In testifying about his policing philosophy and values--and essentially his own good and law-abiding character--defendant has invited testimony about his membership in an organization that, according to a federal judge and a citizens' commission on jail violence, stands against everything he professes to believe in.  Such evidence is, therefore, relevant to his credibility, as well as motive and intent, and can be limited such that it does not unfairly prejudice the defendant.  The evidence should be admitted.

13