EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No.290409)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
 1500/1200 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-0284/3541/4849
 Facsimile: (213) 894-7631
 E-mail: Brandon.Fox@usdoj.gov
   Lizabeth.Rhodes@usdoj.gov
   Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
|---|---|
|    Plaintiff, | GOVERNMENT'S POSITION RE: SENTENCING OF DEFENDANT PAUL TANAKA |
|      v. | |
| PAUL TANAKA, | Hearing Date: June 27, 2016 Hearing Time: 8:30 a.m. |
|    Defendant. | Location: Courtroom of the     Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes and Eddie A. Jauregui, hereby files its sentencing position pursuant to Federal Rules of Criminal Procedure Rule 32(b)(6)(B) with regard to defendant Paul Tanaka.

1

This sentencing position paper is based upon the attached memorandum of points and authorities, the trial testimony and exhibits, files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 6, 2016

Respectfully submitted,

Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____

Brandon D. Fox
Lizabeth A. Rhodes
Eddie A. Jauregui
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                  PAGE

I.   INTRODUCTION...............................................1

II.  HISTORY....................................................1

III. STATEMENT OF FACTS.........................................1

     A.  Defendant Promoted the Culture that Led to Deputy
         Abuse..................................................1

     B.  Defendant Learns of Federal Investigation..............2

     C.  Defendant Erupts After the FBI Interviews Brown........3

         1.  Defendant's Policy to Keep the FBI away from
             Men's Central Jail is Implemented..................4

         2.  Further Concealment of Brown after Writ is Issued....5

     D.  Conspirators Tamper with Witnesses.....................6

     E.  The Sheriff's Department Seeks a Superior Court Order
         to Obtain FBI Records and Information...................8

     F.  The Sheriff's Department Threatens to Arrest FBI
         Special Agent Leah Marx.................................8

IV.  ARGUMENT..................................................10

     A.  Defendant's Offense Level.............................10

         1.  The Base Offense Level Is Appropriate.............10

         2.  The Altering or Fabricating Records Enhancement
             Is Appropriate....................................11

         3.  The Four Level Adjustment for Role Is Appropriate
             for Defendant.....................................12

         4.  Defendant Abused a Position of Trust..............12

         5.  In Addition to the Enhancements and Adjustments
             Articulated in the PSR, the Court Should Impose a
             Two-Level Adjustment for Defendant's Further
             Obstruction.......................................12

     B.  Section 3553 Factors..................................14

         1.  The Nature and Circumstances of the Offense, the
             Seriousness of the Offense, and Just Punishment.....14

         2.  History and Characteristics of the Defendant........15

i

        3.    Promote Respect for the Law and Afford Adequate
              Deterrence.........................................15

        4.    Avoiding Unwanted Disparity........................16

V.    CONCLUSION..................................................18

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**FEDERAL CASES**

United States v. Arias-Villanueva,
     998 F.2d 1491, 1512-13 (9th Cir.),
     cert. denied, 114 S.Ct. 573 (1993).............................13

United States v. Bakhtiari,
     714 F.3d 1057, 1059-62 (8th Cir. 2013)........................11

United States v. Dunnigan,
     507 U.S. 87, 95 (1993)........................................12

United States v. Rodriguez,
     499 Fed. Appx. 904, 908-09 (11th Cir. 2012)...............11, 12

**FEDERAL STATUTES**

18 U.S.C. § 1503...................................................1

18 U.S.C. § 1621..................................................13

18 U.S.C. § 371....................................................1

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2A2.2..................................................11

U.S.S.G. § 2J1.2..............................................10, 11, 12

U.S.S.G. § 2X3.1..............................................10, 11

U.S.S.G. § 3B1.1..................................................12

U.S.S.G. § 3B1.3..................................................12

U.S.S.G. § 3C1.1..................................................12

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

After several trials and tens of convictions of Los Angeles County Sheriff's officials, one thing is abundantly clear: Defendant Paul Tanaka is responsible not only for obstructing justice, but also for fostering the culture that led to the significant problems in the Los Angeles County jails.[1]  This Court should sentence him to 60 months' imprisonment.

While defendant claimed at his and three previous trials that he had only limited involvement in the conspiracy, the evidence showed instead that he was the ringleader from the beginning.

**II.   HISTORY**

On April 6, 2016, a jury found defendant guilty of both charges against him in the indictment.  Specifically, it convicted defendant of: (1) conspiring to obstruct justice, in violation of 18 U.S.C. § 371 (Count One); and (2) obstruction of justice, in violation of 18 U.S.C. § 1503 (Count Two).  Sentencing is set for June 27, 2016, at 8:30 a.m.

**III. STATEMENT OF FACTS**

**A.   Defendant Promoted the Culture that Led to Deputy Abuse**

Defendant was an executive with the Los Angeles County Sheriff's Department for several years, starting in 2005 as Assistant Sheriff. In June 2011, defendant became Undersheriff, a role that allowed him

---

[1] Defendant is the ninth person convicted of criminal conduct based on the hiding of Anthony Brown, the witness tampering, and the threatened arrest of an FBI Special Agent.  (Should this Court accept the Federal Rule of Criminal Procedure 11(c)(1)(C) plea of Leroy Baca, the former Sheriff will be the tenth.)  Nine other deputies have been convicted of offenses related to the abuse of inmates and a visitor to the jails.  Another deputy, Gilbert Michel, pled guilty to accepting bribes and has admitted that he abused inmates.

to oversee the day-to-day operations of the Sheriff's Department. During his time as an executive, defendant threatened to discipline supervisors who frequently referred deputies to Internal Affairs, transferred Captains who tried to reduce deputy abuse and break up cliques, instructed deputies to work in the "gray area" of law enforcement, and expressed his desire to gut Internal Affairs. Defendant's actions caused deputies to believe that they could act with impunity, which, unfortunately, they did much too frequently.

**B.    Defendant Learns of Federal Investigation**

Beginning in 2010, the federal government began investigating the Sheriff's Department based on allegations of widespread deputy abuse of inmates in the Los Angeles County jails.  As defendant knew, for years there had been allegations of rampant civil rights violations in the jails.

In August 2011, the Sheriff's Department recovered a phone from Anthony Brown, an inmate at Men's Central Jail.  On August 18, 2011, defendant spoke to then-Sheriff Leroy Baca on the telephone.  Baca told defendant that the head of the Federal Bureau of Investigation in Los Angeles had informed Baca that the phone was part of a federal civil rights investigation.  Defendant then had his aide set up meetings for the very next day to discuss the situation.

On Friday, August 19, 2011, defendant held a meeting with Lieutenant Greg Thompson, Deputy Gerard Smith, and Deputy Mickey Manzo.  On Saturday, August 20, 2011, defendant participated in a meeting with Baca, Thompson, Smith, Manzo, Captain William "Tom" Carey, Lieutenant Steve Leavins, and others.  During these two meetings, defendant was told that inmate Anthony Brown had admitted

2

to being an informant in a federal investigation concerning deputy abuse and corruption within the jails.

Defendant's reaction was immediate, and unfortunately was not surprising given his past actions: he blamed the entity investigating the Sheriff's Department. Defendant exclaimed, "F**k the FBI," which set the tone for the Sheriff's Department actions – which he would control – over the next six weeks. Baca, meanwhile, stated that he wanted the Sheriff's Department to investigate how the phone was brought into the jail and for the Sheriff's Department to keep the inmate secure and in its custody.

Baca and defendant left the room for a few minutes. Only defendant returned, stating that Baca had put him in charge of the operation. Defendant told the others that the FBI was not to be given access to Anthony Brown, the inmate-informant. Defendant stated that this was one of the most important investigations involving the Sheriff's Department in its 160 year history.

### C.    Defendant Erupts After the FBI Interviews Brown

On August 23, 2011, the FBI visited Men's Central Jail to interview Brown. A deputy, who was unaware of defendant's order to keep the FBI away from Brown, allowed the agents to interview him. Later, Thompson, Carey, Smith and Manzo reported to defendant's office, where defendant berated them for letting the FBI meet with Brown contrary to his orders and to Thompson's guarantee that it would not happen. It was in this meeting that the co-conspirators, including defendant, discussed moving Brown out of Men's Central Jail in order to keep him away from the FBI. Defendant reiterated that this was one of the most important investigations involving the Sheriff's Department in its history.

Manzo and Carey returned to MCJ to see where they could move Brown.  They decided to take Brown to a medical ward where the Sheriff's Department treated inmates with infectious diseases. Beginning August 23, 2011, OSJ deputies, including Smith and Manzo, stood guard outside of Brown's cell.

        1.   <u>Defendant's Policy to Keep the FBI away from Men's Central Jail is Implemented</u>

On August 24, 2011, Manzo drafted a policy based on defendant's August 20th orders to keep the FBI out of the jails.  Manzo forwarded this policy to Thompson, who emailed a similar version to defendant's assistant.  Thompson's email asked for defendant's "approval to put this out custody wide.  Verbal notification isn't working as well as I thought it would."  The email then detailed the draft policy:

> Effective immediately and until further notice, all FBI requests for interviews will be <u>approved by Under-Sheriff Tanaka</u>.  If the FBI requests access for any reason to your facility, get the following information:
>
> - Name and Badge or ID Number
> - Place of Assignment - i.e. Special Problems, Robbery Detail, etc.
> - Contact Phone Number and email address.
> - Inmate name and booking number for who they want to interview.
> - Case Number or type of case being investigated.
> - Future date and time they are available to interview
>
> The above information will be documented by the Facility's Mail Control and verified by the Facility's Watch Sergeant and/or Watch Commander.  The information will be forwarded, via email, to Lieutenant Greg Thompson, of Custody Investigative Services Unit, for review.
>
> Lieutenant Thompson will be responsible for <u>notifying the Undersheriff's office</u> and obtaining approval.  Once approved, Lieutenant Thompson will notify the facility and agent of the approved date and time for the interview.

(emphasis added.)

Defendant's assistant responded by asking Thompson to give him a call.  A few hours later, Thompson sent an email asking if "Mr.

Tanaka [was] going to make the changes on the FBI notice to facility commanders, or will he be satisfied if I remove all reference to him or the executives?"  Defendant's assistant responded that defendant "said that you were going to make changes to it."

            2.    Further Concealment of Brown after Writ is Issued

On August 25, 2011, the District Court issued a writ for the testimony of Brown before the federal grand jury on September 7, 2011.  After receiving the writ, a lieutenant and three deputies approached employees at the Inmate Records Center and asked to have Brown "released" from the jail's computer system.  The deputy and head records clerk assigned to IRC informed the deputies that they needed a court order to do so.  The lieutenant informed the clerk that the Captain, the Commander and the Undersheriff (defendant Tanaka) all knew what was happening.  When the deputy still balked at the idea, one of the other deputies ominously asked, "Are you going to say no to Tanaka?"  The deputy answered, "Yes."  Ultimately, the head clerk signed out Brown's records jacket and made the computer system reflect that Brown was released.

Over the next several days, the conspirators changed Brown's name on a regular basis, input false information in the Sheriff's Department's records, and claimed that that Brown refused to provide his fingerprints and social security number.  Brown's aliases included "John Rodriguez," "Kevin King," and "Chris Johnson."

The conspirators took additional measures to interfere with the federal investigation.  On August 25, 2011, Thompson emailed captains and operations lieutenants to inform them of the new policy that "all FBI requests for inmate interviews" would have to be approved and

would have to take place at Men's Central Jail – there could be no interviews at any other locations.

On August 26, Thompson communicated with others about what to do if the FBI showed up at Men's Central Jail with a "possible Court Order" demanding Brown's production to the federal government. Thompson and the others decided that they would accept the court order "if forced," but would not release the inmate.  Instead, they would have a county attorney "on vacation for a month" review the court order before releasing Brown.  Thompson agreed to put a note on Brown's cell door to that effect.  The captain at Men's Central Jail emailed his lieutenants and sergeants:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall:
>
> - Receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review.  DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

(emphasis in original).

The co-conspirators informed defendant that they were going to move Brown out of Men's Central Jail and take him to a station jail (one that would not have the authority to allow the federal government to interview Brown, based on the August 25 policy). Indeed, on August 26, 2011, the co-conspirators moved Brown to the Sheriff's Department's San Dimas station jail.

**D.    Conspirators Tamper with Witnesses**

On August 30, 2011, defendant made a rare appearance at Men's Central Jail, where Leavins, Craig and Long were speaking to deputies who may have been in contact with the FBI.  First, they spoke to

6

Gilbert Michel, the deputy who was the target of the FBI undercover operation regarding the phone.  While present at Men's Central Jail, defendant received briefings about these interviews.

Leavins, Craig, and Long told Michel he had been "manipulated" by the FBI.  After Michel told Leavins, Craig, and Long that the FBI was trying to get information from him about brutality inside the jails, the conspirators ordered Michel not to talk to the FBI.  Craig reiterated that the FBI was threatening and manipulating him:

> it pisses me off . . . we're all part of this Department and we're one big happy dysfunctional family, and fuckin' FBI is gonna come to your house and surprise you at your home and invade the sanctity of your home and come here and talk a gang load of shit to you and threaten you. . . . And then they are gonna fuckin' manipulate you like you're a puppet?  I don't think so.

That same day, Leavins, Craig and Long interviewed Deputy William David Courson, who had unknowingly provided the FBI with information on abuse at Men's Central Jail.  The co-conspirators once again ordered Courson not to talk to the FBI.  Craig showed their total disregard for any legal process when he said to Courson:

> If someone starts threatening you with a subpoena or any other nonsense, I want you to call me right away.
>
> * * *
>
> [a] Federal Grand Jury Subpoena . . . Some nonsense like that starts, you feel they are trying to intimidate you, bully you, blackmail you, coerce you, you call me and I'll call him [Leavins] and we will go from there.

Earlier in the day, Leavins told Lieutenant Michael Bornman, who was stationed at MCJ, to leave because Tanaka was going to be there that day (as Leavins knew, Tanaka did not like Bornman).  When Bornman returned, Leavins informed him that Tanaka was in charge of

7

the operation and that Tanaka was going to make sure that the federal government would not get its hands on Brown.

**E.    The Sheriff's Department Seeks a Superior Court Order to Obtain FBI Records and Information**

On September 8, 2011, Craig sought a Superior Court order that would have purportedly compelled the FBI to turn over its records related to the FBI's investigation of the Sheriff's Department. Defendant's aide asked Leavins, "After the document gets signed . . . , would you please make a copy for Mr. Tanaka?"  Leavins responded, "You got it."  The proposed order sought information about the FBI investigations, investigative reports and the agents' true identities.  Judge John Torribio denied the order and wrote, "Denied – Court has no jurisdiction over any federal agency."

**F.    The Sheriff's Department Threatens to Arrest FBI Special Agent Leah Marx**

Undeterred, the very next day, September 9, 2011, Craig left a voicemail message on an FBI phone he believed belonged to the FBI case agent, Leah Marx.[2]  Craig stated on the message that Special Agent Marx was "named as a suspect" and offered to meet her "as a professional courtesy . . . prior to me signing a declaration in support of an arrest warrant."

On September 25, 2011, the Los Angeles Times published an article stating that "[f]ederal authorities are investigating allegations of inmate beatings and other misconduct by deputies in Los Angeles County jails, with FBI agents going so far as to sneak a cellphone to an inmate to get reports from inside."  Defendant

---

[2]  In providing Craig with the telephone number for Special Agent Marx, Brown switched the last two digits of her phone number.

8

forwarded a link to this article and another one from the Washington Post to Carey and Leavins.  The Washington Post article stated that the U.S. Department of Justice was "boost[ing] activity to police the police."  Leavins responded, "I figured that was the motivation."  Defendant replied that the article showed the orders to investigate the Sheriff's Department were coming "from the top" of the Department of Justice.

The next evening, September 26, 2011, Craig and Long approached Special Agent Marx outside her home.  Special Agent Marx told them that she was "not going to make any statements."  Craig then informed Special Agent Marx that she was a "named suspect in a felony complaint" and asked whether she had received his message.  Special Agent Marx said she would pass the information along to the Assistant Director in Charge of the FBI.  Craig then stated the he was "in the process of swearing out a declaration for an arrest warrant" for her.

Shortly thereafter, then-Supervisory Special Agent Carlos Narro and Special Agent Teresa Tambubolon, called Long.  Narro stated that Special Agent Marx, "indicated to me that you guys indicated to her that there's going to be a warrant for her arrest?"  Long responded, "There's going to be."  Narro asked Long, "Does the Sheriff know this?"  Long replied, "The Sheriff knows this, sir."  When Narro asked what the charges would be, Long told him he would "have to speak to the Undersheriff, and that's Mr. Paul Tanaka."  Narro asked, "Do you have any idea when the warrant's going to come out?"  Long responded, "It could be tomorrow, sir.  You're going to have to talk to the Undersheriff."  After the call ended, the recording device captured laughter and Long telling Craig, "They're scared.  They're

like, do you know when . . . the warrant . . ."  Craig informed Long, "You're still rolling."  Long then stopped the recording device.

**IV.   ARGUMENT**

The pre-sentence report ("PSR") accurately described the offense and the Sentencing Guidelines application, leaving one enhancement for the discretion of the Court.  As shown below, that enhancement – an additional two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice – is appropriate as defendant committed a significant further obstruction through his false testimony at trial. Accordingly, defendant has a total offense level of 24 and a resulting guideline range of 51 to 63 months.  For the reasons set forth below, a sentence of 60 months is appropriate.

**A.   Defendant's Offense Level**

Defendant's offense level is 24:

| | |
|---|---|
| Base offense level (§ 2J1.2(a)) | 14 |
| Alteration or fabrication of records or otherwise extensive in scope (§ 2J1.2(b)(3)) | +2 |
| Organizer/ Leader (§ 3B1.1(a)) | +4 |
| Abuse of position of trust (§ 3B1.3) | +2 |
| Obstruction of justice (§ 3C1.1) | +2 |
| Total Offense Level | 24 |

**1.   The Base Offense Level Is Appropriate**

The PSR appropriately found the base offense level to be 14 pursuant to § 2J1.2(a). (See PSR ¶¶ 64.)  Ordinarily, § 2J1.2(a) should be used if it results in a greater offense level than would an application of § 2X3.1 (accessory after the fact).  The accessory after the fact calculation would be based on the underlying offense

10

guideline of § 2A2.2.  The government believes, however, that the PSR appropriately applied only § 2J1.2 without respect to § 2X3.1 because the defendant was obstructing a civil rights investigation generally, and not an investigation into one particular incident.  As a result, the application of § 2X3.1 and § 2A2.2 is not straightforward since those guidelines provisions are incident-specific.  This results in no prejudice to defendant because the Court is to use the greater offense level between § 2J1.2 and § 2X3.1.

> 2. The Altering or Fabricating Records Enhancement Is Appropriate

A two-level enhancement is appropriate under § 2J1.2(b)(3) for two reasons.  First, under § 2J1.2(b)(3)(A), the conspiracy involved the alteration and fabrication of a substantial number of records and documents in hiding Brown from the federal government.  Specifically, the conspiracy included: (1) causing the Sheriff's Department's computer system to falsely show that Brown was in protective custody in cell block 1751 when, in fact, he was on the 8000 floor; (2) causing the computer system to falsely show that Brown had been released from its custody; and (3) causing the creation of computer records, booking records, and records jackets for Brown under fake names, including John Rodriguez, Kevin King, and Chris Johnson.

Second, under § 2J1.2(b)(3)(C), the offense was extensive in scope since it involved not only hiding an inmate, but also tampering with witnesses and threatening the arrest of an FBI agent on what would have been bogus charges.[3]  Further, there were many

---

[3]   An enhancement under § 2J1.2(b)(3)(C) is consistent with the few cases that have addressed that provision of the guidelines.  See United States v. Bakhtiari, 714 F.3d 1057, 1059-62 (8th Cir. 2013)

*(footnote cont'd on next page)*

participants in the obstruction and it lasted six weeks, which makes the offense unlike the normal discrete nature of obstruction of justice offenses.

### 3. The Four Level Adjustment for Role Is Appropriate for Defendant

A four level enhancement under § 3B1.1(a) is appropriate because defendant was a leader of the criminal activity that involved five or more participants.  Defendant directed others to commit the crime, dictated how it would be done (e.g., keeping the FBI out of the jails and away from Brown), and had co-conspirators reporting back to him.

### 4. Defendant Abused a Position of Trust

Defendant's offense level should be enhanced by two levels because he abused a position of public trust under § 3B1.3.  As a law enforcement officer generally, and an executive within the Sheriff's Department specifically, defendant had substantial discretionary judgment that was ordinarily given considerable deference.  He ran the day-to-day operations of the Sheriff's Department and used that position to facilitate the obstruction.

### 5. In Addition to the Enhancements and Adjustments Articulated in the PSR, the Court Should Impose a Two-Level Adjustment for Defendant's Further Obstruction

Finally, defendant's offense level should be increased by two levels under § 3C1.1.  Pursuant to Application Note 7, the adjustment is only warranted when a defendant is convicted of an offense covered by § 2J1.2 if the defendant committed "a significant further obstruction."  In United States v. Dunnigan, 507 U.S. 87, 95 (1993), the Supreme Court held that where a defendant objects to an

and United States v. Rodriguez, 499 Fed. Appx. 904, 908-09 (11th Cir. 2012).

12

enhancement for obstruction of justice, the district court must review the evidence and make independent findings necessary to establish a willful impediment to the administration of justice, or obstruction of justice, or an attempt to do the same, under the perjury definition set out at 18 U.S.C. § 1621. By that definition, a witness testifying under oath commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. See also United States v. Arias-Villanueva, 998 F.2d 1491, 1512-13 (9th Cir. 1993).

The Ninth Circuit Model Jury Instructions provide that in order for a defendant to be found guilty of perjury, the government must prove that: (1) the defendant testified under oath; (2) the testimony was false; (3) the false testimony was material to the matters before the court; and (4) the defendant acted willfully, that is deliberately and with knowledge that the testimony was false. See Ninth Cir. Model Jury Instruction 8.135.

That certainly occurred during the trial, when defendant committed perjury during his testimony. (See, e.g., PSR ¶ 78.) As shown below, the Court should hold that this enhancement applies by specifically finding that defendant committed perjury by falsely testifying that: (1) he could not provide updates to Baca about the operation because defendant "wasn't handling the investigation or involved in a way that I could provide him the answers that he needed"; and (2) as a result, he would "have the investigator call" Baca to provide Baca with updates. (Ex. A at 80:04-8, 81:09-17.)

As the evidence showed at trial, defendant was in charge of the Sheriff's Department's operation and was receiving frequent

13

briefings.  He ordered the FBI to be kept away from Brown while at MCJ.  When that failed to work, he was involved in the decision to move Brown to a station jail and to have deputies stand guard over Brown.  During the witness tampering of deputies at MCJ, defendant was receiving briefings on what his co-conspirators had learned from those deputies.  Defendant was aware that the Sheriff's Department was attempting to obtain the FBI investigative records through a proposed court order.  Defendant was also aware that his co-conspirators were going to threaten to arrest Special Agent Marx, despite understanding that there was no probable cause to arrest her.

Further, as the phone records introduced at trial showed, while there were numerous calls between defendant and his co-conspirators, there was only <u>one</u> call between Baca and any of these co-conspirators.  Defendant did not have the co-conspirators call Baca because defendant was in charge and could provide Baca with any answers he needed.

**B.     Section 3553 Factors**

      1.     <u>The Nature and Circumstances of the Offense, the Seriousness of the Offense, and Just Punishment</u>

The harm defendant caused to the Sheriff's Department, law enforcement generally, and those who were subjected to deputy abuse is immeasurable.  Defendant obstructed a serious and wide-ranging investigation into a pattern of civil rights abuses and corruption within the Los Angeles County jails.  He chose as his co-conspirators those who were ordinarily supposed to investigate the same type of crimes that they began covering up.

As this Court is aware, there was a pattern of abuse in the jails.  But the investigation into each incident is difficult, even

14

in the absence of any obstruction, because the victims are inmates whose credibility can easily be called into question. Defendant's obstruction created a great risk of harm to important societal interests because the obstruction was designed to frustrate a federal investigation into many serious civil rights offenses.

Defendant attempted to assist his co-conspirators, while at the same time concealing his conduct, by minimizing his knowledge and conduct in three trials that occurred in 2014. He then attempted to further obstruct justice by testifying falsely at his own trial.

### 2. History and Characteristics of the Defendant

Defendant was an employee of the Sheriff's Department for approximately 21 years. (PSR ¶ 116.) He received many promotions over the years. (Id.) But as shown at trial, defendant helped foster the culture that led to the federal investigation. As such, defendant's conduct offsets any of the good service he provided to the public as a law enforcement officer.

### 3. Promote Respect for the Law and Afford Adequate Deterrence

A sentence that provides for specific and general deterrence is necessary. Instead of upholding the law, defendant used his position of authority as a leader to obstruct an investigation into wrongdoing by deputies. Defendant's actions showed that he believed that he and others in the Sheriff's Department were above the law. His belief was manifested not only in his obstructive acts in 2011, but also at trial, during which he committed perjury.

In terms of general deterrence, this case has received the attention of the public and of the law enforcement community. It presents an opportunity to show that no one is above the law and that

efforts to obstruct federal investigations will be taken seriously, and perjury will not be tolerated.

### 4.    Avoiding Unwanted Disparity

To date, the Court has imposed the following sentences on defendant's co-conspirators:

- Deputy James Sexton – 18 months (PSR ¶ 18.)
- Deputy Gerard Smith – 21 months (PSR ¶ 16.)
- Deputy Mickey Manzo – 24 months (PSR ¶ 17.)
- Sergeant Maricela Long – 24 months (PSR ¶ 20.)
- Sergeant Scott Craig – 33 months (PSR ¶ 19.)
- Lieutenant Gregory Thompson – 37 months (PSR ¶ 14.)
- Lieutenant Stephen Leavins – 41 months (PSR ¶ 15.)

Defendant was the most culpable of any co-conspirator, given that he: (a) helped foster the culture that led to these civil rights problems in the jails; (b) was in charge of the obstructive operation; (c) set the tone of the operation early and repeatedly with his "F**k the FBI" statements; and (d) was involved in all aspects of the obstruction.

There is no doubt that defendant will ask this Court to take former Sheriff Baca's potential sentence of zero-to-six months into account.  The plea agreement negotiated between the government and Baca is not a reason to reduce the sentence the Court might otherwise impose on defendant for several reasons.

First, having presided over four trials regarding this conduct, this Court is aware that there are major differences in the quantity and quality of evidence against Baca as compared to defendant.  Some examples:

16

- Defendant's conduct as an executive fostered the culture of abuse and misconduct.  Baca did not make statements similar to defendant's instructions to work in the "gray area" or his threat to "make cases" on captains who reported deputies to Internal Affairs.

- During the obstructive conduct, phone records show the co-conspirators were in touch with defendant much more frequently than they were with Baca.

- Emails show the co-conspirators corresponded with defendant and defendant's aide, and not with Baca or Baca's aide.

- Defendant was extremely angry when the FBI was able to interview Anthony Brown.  When Baca was told this occurred, he did not act concerned.

- Defendant was present at Men's Central Jail when his co-conspirators tampered with witnesses; Baca was not there and there has been no evidence that shows Baca was told what happened.

Defendant directed this operation and is the most culpable.

Second, the Court is aware of the issues raised in Baca's PSR. These issues place him in a very different position than the others involved in this offense.

Third, Baca pled guilty to lying to the federal government, which was the most readily provable offense against him, and the range set forth in his plea agreement reflects a sentence within the Sentencing Guidelines range for that offense.  Meanwhile, defendant was convicted of conspiring to obstruct justice and obstruction of justice.  His Sentencing Guidelines range is much greater as a result

of his offenses of conviction: 51-63 months.  The disparity between defendant and Baca is warranted.

**V.    CONCLUSION**

There are plenty of aggravating circumstances in this case: Defendant's responsibility for the culture in the jails, the nature of the offense, defendant's additional obstruction at trial, and his role in the offense as its director.  In this light, and as the most culpable, defendant should receive a sentence of 60 months' imprisonment.

June 6, 2016                          Respectfully submitted,

                                      EILEEN M. DECKER
                                      United States Attorney

                                      LAWRENCE S. MIDDLETON
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                        _/s/ Brandon D. Fox_____
                                      BRANDON D. FOX
                                      LIZABETH A. RHODES
                                      EDDIE A. JAUREGUI
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

18