EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
  1500/1200 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-0284/3541/4849
  Facsimile: (213) 894-7631
  E-mail: Brandon.Fox@usdoj.gov
    Lizabeth.Rhodes@usdoj.gov
    Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
|---|---|
|    Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING BRIEF AND OBJECTIONS TO THE PSR |
|      v. | |
| PAUL TANAKA, | Hearing Date: June 27, 2016 |
|    Defendant. | Hearing Time: 8:30 a.m. |
| | Location: Courtroom of the Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes and Eddie A. Jauregui, hereby files its response to defendant Paul Tanaka's sentencing position and objections to the Presentence Investigation Report ("PSR").

This response is based upon the attached memorandum of points and authorities, trial testimony and exhibits, files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 22, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                              /s/
                                        Brandon D. Fox
                                        Lizabeth A. Rhodes
                                        Eddie A. Jauregui
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                           PAGE

I. INTRODUCTION...........................................................1

II. SIXTY MONTHS' IMPRISONMENT IS A FAIR AND JUST SENTENCE...........1

   A. Defendant is to Blame for his Obstruction and Conviction.......1

   B. A Sentence of 60 Months Would Avoid Unwarranted Disparity......2

   C. Defendant's Attempts at Redefining Himself Fail................3

III. THE PSR...............................................................4

   A. Government's Corrections to the PSR and Supplemental
      Information...........................................................4

   B. Government's Response to Defendant's Objections to the PSR.....5

IV. CONCLUSION............................................................11

**TABLE OF AUTHORITIES**

CASES                                                                    PAGE

United States v. Duran, 15 F.3d 131 (9th Cir. 1994)................10

United States v. Foreman, 926 F.2d 792 (9th Cir. 1990).............10

United States v. Vrdolyak, 593 F.3d 676 (7th Cir. 2010).............3


SENTENCING GUIDELINES

U.S.S.G. § 2J1.2...................................................11

U.S.S.G. § 3C1.1...................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Paul Tanaka's defiance is on full display in his sentencing brief.  Rather than accept the judgment of the jury based on the mountain of evidence against him, defendant attempts to shift the blame, minimize his role, and redefine himself.  He takes no responsibility for his actions and shows no remorse.

Despite his claims in his sentencing memorandum, defendant is the same person who: (a) led the conspiracy that sought to obstruct an investigation into deputies physically abusing inmates; (b) protected rogue deputies who trampled on the rights of those they encountered inside the jail and on the streets; and (c) encouraged deputies everywhere to operate in the "gray area" of the law.

Defendant's request for probation meets none of the goals of sentencing.  It ignores the seriousness of the offense and undermines the message that no one is above the law.  The Court should sentence defendant to sixty months' imprisonment.

**II.    SIXTY MONTHS' IMPRISONMENT IS A FAIR AND JUST SENTENCE**

**A.    Defendant is to Blame for his Obstruction and Conviction**

Defendant blames his superior and those below him for the obstruction of justice.  In defendant's version, he played no part of the operation, yet everyone else did.  To accept defendant's version of the facts, the Court would have to ignore the trail of government witnesses who placed defendant at the center of the conspiracy, the internal LASD emails that showed that he called the shots in the obstruction effort, the phone records that tied defendant (not Baca) closely to the co-conspirators, and the recordings in which his co-conspirators told FBI agents to speak to the defendant if they wanted

to know why Special Agent Leah Marx would be arrested. Moreover, the Court would have to ignore the judgment of the jury, which, after sitting through a ten-day trial, quickly found the defendant guilty.

**B.    A Sentence of 60 Months Would Avoid Unwarranted Disparity**

Defendant is not taking the "fall" for Leroy Baca, who has pleaded guilty to a separate crime. He is being held to answer for his own crimes. Although defendant makes much of the alleged unfair disparity between Baca's potential sentence and his own, he does not own up to the fact that he, not Baca, ran the day-to-day operations of the Sheriff's Department and the Department's efforts to keep the FBI out of the jails; that he chose the principal members of the conspiracy; that he encouraged officers to work in the "gray area" of the law; that he was the one who wanted to put "cases on captains" who referred problem deputies to internal affairs; and that he was the one who told his underlings, "F*** the FBI . . . Who do they think they are?" Defendant is positioned differently from Baca.[1] And unlike Baca, defendant has never accepted responsibility for his crimes.

Moreover, defendant ignores the sentences of the seven other members of the conspiracy who have been sentenced by this Court. As outlined in the government's initial sentencing brief, those sentences range from a low of 18 months (Sexton) to a high of 41 (Leavins). Given his role within the organization and in the

---

[1] The government filed its sentencing position in United States v. Baca, CR No. 16-666-PA, on June 20, 2016. In its brief, the government explains the important differences between Baca and defendant, highlighting, among other issues, Tanaka's role in fostering a corrupt culture within the Sheriff's Department and the county jails.

conspiracy, defendant's sentence should be well above the 41 month sentence imposed on Leavins.

### C.    Defendant's Attempts at Redefining Himself Fail

Defendant argues that he coddled no one, that he promoted a culture of "excellence" within the Sheriff's Department, and that he was a "fearless executive" who fought to "weed out problem deputies." (Id. at 5.)  The Court heard credible testimony from many who had first-hand knowledge of defendant as a leader.  Their testimony direct rebuts defendant's unattributed assertions in his sentencing memorandum.

The government acknowledges that defendant has some support in the community and that certain community members have come forward to urge leniency on his behalf.  While the government does not doubt the sincerity of these supporters, it notes that defendant has had a long career as a public figure and politician.  He was therefore in the business of making friends.  Cf. United States v. Vrdolyak, 593 F.3d 676, 683 (7th Cir. 2010) ("Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh in sentencing.").  Thus, it is not surprising that defendant has people to call upon in his time of need.  But these letters – some written by individuals who, by their own admission do not know defendant well (Hicks), and others by individuals who have in the past have questioned defendant's integrity (Gomez)[2] – do not

---

[2] Beatriz Valenzuela, Christina Villacorte, and Thomas Himes, *Candidates for Los Angeles County Sheriff Spar in First Debate*, LOS ANGELES DAILY NEWS, March 12, 2014, *available at* http://www.dailynews.com/government-and-politics/20140312/candidates-for-los-angeles-county-sheriff-spar-in-first-debate.

change the seriousness of the offense here, nor do they alter the need for the sentence to promote respect for the law and provide just punishment.

**III. THE PSR**

    **A.    Government's Corrections to the PSR and Supplemental Information**

The government submits the following corrections to the PSR and supplemental information:[3]

    1.    **Paragraphs 7 and 8.** Since the PSR was completed, defendants Brunsting and Branum were convicted of conspiring to violate an inmate's civil rights, using excessive force, and falsifying reports; their sentencing hearings are set for August 22, 2016.

    2.    **Paragraph 30.** The PSR states that former Sheriff Leroy Baca called Tanaka on August 18, 2011.  This was based on defendant's testimony.  Telephone records introduced at trial, however, show that defendant called Baca, not the other way around. (Trial Ex. 170.)

    3.    **Paragraph 40**. Paragraph 40 of the PSR states that Mickey Manzo emailed the draft interview policy to Tanaka's assistant (Christopher Nee), but, in fact, it was Greg Thompson who e-mailed Nee.  (Trial Ex. 30.)  Manzo initially sent a draft of the policy to Thompson, who then forwarded an edited version of the draft to Nee. (Trial Ex. 26, 30.)

---

[3] The government informed the probation officer and the defense of these minor issues on May 24, 2016.  On June 7, 2016, the government emailed defense counsel to determine whether the defense would agree to these changes to the PSR.  The defense has not informed the government of its position, but stated on June 11, 2016 that the government should file its suggested to changes to the PSR as objections.

**B.    Government's Response to Defendant's Objections to the PSR**

Defendant objects to a number of facts laid out in the PSR, although he does so without support in the record and often contrary to evidence.  The government responds to defendant's objections and his "amplifications" as follows:

1.    **Paragraphs 7-13 and 21-23.** Defendant asserts the cases cited in paragraphs 7-13 and 21-23 not related to the instant case. But as laid out in the PSR and at trial (specifically, in the testimony of Special Agent Leah Tanner), the FBI began investigating allegations of civil rights abuses and public corruption violations within the Los Angeles County jails by members of the Sheriff's Department in 2010.  At the center of this case is defendant's attempt to impede and obstruct that investigation.  Each of the cases cited in paragraphs 7-13 and 21-23 are cases resulting from the FBI's investigation into the jails and, thus, are directly related to the instant case.  The probation officer correctly included these paragraphs in the PSR.

2.    **Paragraph 30.** Defendant claims that ADIC Martinez did not reveal the FBI investigation during his phone call to Baca on August 18, 2011.  However, ADIC Martinez has stated that he told then-Sheriff Baca that day that the cellular phone given to Anthony Brown was brought into the jail during the course of an FBI undercover civil rights investigation.  (Ex. 1, Excerpt of FBI report of Steve Martinez interview, conducted July 8, 2013.).  By their initial interview of Brown on August 19, 2011, Gerard Smith and Mickey Manzo were already aware of Brown's role in the investigation based on phone calls Brown had made to the FBI civil rights squad.  At the

5

conclusion of the interview, Smith summarized what Brown had explained to them in that interview:

> if you got a dirty backyard or a dirty house, do you want someone else cleaning your house or do you want to clean it yourself. And I said "yeah, someone's already here. They've been here for at least a month" and he said, "longer than that."  So the Feds are here, they're doing investigations. I'm assuming that they've either watched or set up transactions with whoever CJ is on the outside, watched them go down with a deputy and then it got brought to him

(Trial Ex. 82 at 22.)  Smith said he was going to take this to "my boss."  (Id. at 23.)  Smith and Manzo met with Tanaka later that day. It is also clear from Mickey Manzo's testimony that by August 19, 2011, the Sheriff's Department knew that the phone was linked to the FBI's civil rights squad.  (See also Trial Ex. 19, E-mail dated Aug. 18, 2011, from Noah Kirk to Gerard Smith confirming that phone belonged to FBI "civil rights investigator.")

3.    **Paragraph 32.** Defendant claims that "at this point" (meaning August 19, 2011), "no one knew . . . about Brown being an FBI informant."  This is false.  Manzo testified that on August 19, 2011, he briefed Thompson about the Brown interview.  Manzo specifically testified that Brown said he was working with the FBI on inmate abuses inside Men's Central Jail.  Manzo further testified that he was present at a meeting on August 19th during which Thompson briefed defendant and others, including Baca, on the Brown interview and conveyed that Brown was working with the FBI to identify inmate abuses at MCJ.  (Manzo Trial Testimony, March 29, 2016, Tr. at 21:11-24 and 24:16-21; Trial Ex. 82.)

4.    **Paragraph 33.** Defendant's assertion that there is "no evidence that Tanaka stood up and slammed [the] table, nor did he say anything," is plainly untrue.  Manzo testified that, at the August

6

20, 2011 meeting, Tanaka "stood up, slammed his hands on the table, and . . . said, you know, 'Those motherf***, who do they think they are?  F*** them,' . . . ."  When asked who Manzo understood "them" to be, Manzo answered:  "[Tanaka] was referring to the FBI."  (Manzo Testimony, March 29, 2016, Trial Tr. at 30:2-8.)

5.    **Paragraph 35.** The government agrees that the call to Carey was not to "have the interview terminated."

6.    **Paragraph 38.** Defendant alleges there is "no evidence" that, on August 23, 2011, Carey and defendant discussed moving Brown "in order to keep him away from the FBI."  But the PSR fairly characterizes the evidence.  Manzo testified that defendant was furious that the FBI had managed to interview Brown notwithstanding his orders, said that the deputies had failed him, and exclaimed "F***" the FBI.  There was no discussion of Brown's safety at the meeting.  Manzo testified that either during the August 23rd meeting "or right after," the Sheriff's Department decided that Brown would be "moved."  (Manzo Testimony, March 29, 2016, Trial Tr. at 43:23 to 44:4.)

7.    **Paragraph 40.**  Defendant objects to paragraph 40, stating that the policy it refers to "was already in place and had to do with law enforcement visits generally."  It is clear from the policy itself that defendant's position is wrong.  First, the policy was new.  The policy begins, "Effective immediately" – showing that it is a new policy.  (Trial Exs. 30, 34.)  That the policy was new is further shown by Manzo's testimony in which he said he drafted the policy at Tanaka's instruction.  Further proof of this fact is Thompson's email exchange with Tanaka's assistant.  Thompson wrote asking if "Mr. Tanaka" was going to make changes to the draft policy,

including by eliminating references "to him [Tanaka] or the executives." (Trial Ex. 30) Nee responded, "He said that you were going to make changes to it." (Id.) Second, the policy refers only to "FBI requests," and does not discuss any other law enforcement agency. (Trial Exs. 30, 34)

8. **Paragraph 42.** Defendant disputes that "a writ via fax was sent to the Sheriff's" Department from the Marshal's Service. Telephone records admitted at trial reflect that two faxes were sent to the Sheriff's Department from the Marshal's Service on August 25, 2011. Deputy Linda Farrar, a supervisor in the Marshal's office, testified that the LASD fax number reflected in the phone records was the number used by Marshal's Service to transmit writs to LASD (the "warrants and detainers" fax number). Although Deputy Farrar herself did not transmit the fax (the person who did is no longer employed by the Marshal's Service and was unavailable for trial), Deputy Farrar testified that she would have ensured that the federal writ discussed in paragraph 42 was served on the Sheriff's Department by her staff. Defendant himself has testified that he saw the writ at some point. As the Court is aware, deputies at the Inmate Reception Center have also testified to having heard about the writ.

9. **Paragraph 43.** Defendant claims that Paragraph 43 is inaccurate because "Mandatory MCJ interviews were not required" by the policy referenced in the paragraph. Defendant is wrong. The policy set forth in trial exhibit 34 states that all FBI requests for interviews should be referred to the MCJ Jail Liaison and approved by the MCJ Jail Liaison. "Once approved, the inmate will be transported to MCJ and made available to the FBI. MCJ Jail Liaison shall be the

8

only entity to facilitate FBI interviews inside of our custody facilities."  (Emphases added.)

10.   **Paragraph 47.** Defendant does not appear to be challenging any of the factual assertions in paragraph 47 of the PSR.  Instead, defendant again alleges that the FBI took "no steps to locate Brown" after August 23, 2011.  Defendant ignores the fact that a writ demanding that Anthony Brown be produced to the grand jury was served on the Sheriff's Department on August 25, 2011, for Brown to be turned over to testify in the grand jury on September 7, 2011.  On or about September 9, the federal government made an "[o]fficial request" to interview Brown.  (Tr. Ex. 57.)

11.   **Paragraph 51.** Defendant argues that there is "no evidence that 'Carey took this information [regarding Deputy Michel's confessions] to Tanaka.'"  Again, this is false.  LASD emails show that Carey "made contact" with defendant just after Carey learned that Michel was admitting to abusing inmates.  (See Tr. Exs. 65 (Leavins informing Carey that Michel was admitting to beating handcuffed inmates), 66 (Carey email to Nee asking, "The Boss in?"), 67 (Carey email to Nee stating he "Made contact").

12.   **Paragraph 72.**  Defendant asserts that there is no evidence "Tanaka made changes to a draft policy," but that is incorrect.  On August 24, 2011, Thompson emailed defendant's assistant, asking for the "boss's approval" to put the FBI policy out "custody-wide."  (Tr. Ex. 30)  In response, Nee asked Thompson to call him.  (Id.) Thompson later wrote to Nee asking if "Mr. Tanaka [was] going to make the changes on the FBI notice . . . or will he be satisfied if I remove all reference to him or the executives?"  (Id.)  Nee responded that Tanaka "said that you were going to make changes to it."  The

final version of the policy did not contain any references to defendant or executives specifically.  (Tr. Ex. 34.)  These emails reflect that defendant did, in fact, make changes to the policy.

13.  **Paragraphs 75 and 76.**  Without citation or analysis, defendant objects to the abuse of trust enhancement, claiming only that the analysis is "unbalanced."  The PSR's conclusion that the abuse of trust enhancement applies is not "pro-government," as defendant claims.  Instead, it is a correct analysis of the law. This Court has recognized time and again that members of the Los Angeles County Sheriff's Department are duty-bound to protect the public and serve the community.  In sentencing the Thompson defendants, the Court referred to the "vow" that peace officers make to do exactly that.  As the second highest ranking officer in the Sheriff's Department and the top non-elected elected official in the LASD, defendant clearly is in a position of public trust and he broke that trust.  The Probation Office's determination that defendant "abused his position" and violated the "reasonable expectations of the public that as a highly-ranked sworn peace officer, he would uphold the laws . . . and not conspire to violate them," is not "pro-government" and "unbalanced," it is common sense and rooted in the law of this Circuit.  See United States v. Foreman, 926 F.2d 792, 796 (9th Cir. 1990) (noting, among other things, that law enforcement officers hold positions of public trust and that the public expect that police "will not violate the laws they are charged with enforcing"); see also United States v. Duran, 15 F.3d 131, 133-34 (9th Cir. 1994) (upholding abuse of trust enhancement for LASD deputy who conspired to steal money seized during investigations).

10

14.    **Paragraphs 57 and 77**. Defendant argues that the government is "double-counting" by seeking an obstruction enhancement due to his perjury at trial.  As stated in the government's initial sentencing brief, the Sentencing Guidelines and the case law provide that a two-level enhancement under Section 3C1.1 of the Guidelines may be warranted where, as here, the defendant committed a "significant further obstruction" of justice, such as by willfully and falsely testifying under oath.  (See Gov't Sentencing Position at 12-13.) The evidence is clear that, contrary to his testimony, defendant was in charge of the operation to hide Brown and to tamper with and intimidate witnesses.  He was kept apprised of these efforts by his underlings.

15.    **Paragraph 65.** Defendant does not challenge any of the factual recitations in paragraph 65, but instead seeks to add a "materiality" requirement to U.S.S.G. § 2J1.2(b)(3)(A).  Defendant cites no authority for this requirement and the Court should reject it.  Moreover, defendant ignores the fact that after deputies shut down the FBI's interview of Brown on August 23, 2011, the government did make efforts to find Brown, namely by obtaining a writ for the production of Brown to the grand jury.

**IV.    CONCLUSION**

The government does not take "glee" in requesting a sixty-month sentence for defendant.  Defendant's conviction, and those of his co-conspirators, represents a low point in the history of the Los Angeles County Sheriff's Department.  The Court's sentence should

//

//

//

reflect the seriousness of the offense and send a clear message that the law holds accountable the public servants who abuse their positions of trust and violate the laws they are sworn to uphold.

Dated: June 22, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                          */s/ Brandon D. Fox*
                                        BRANDON D. FOX
                                        LIZABETH A. RHODES
                                        EDDIE A. JAUREGUI
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

12