EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No.290409)
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorneys
General Crimes Section
    1300/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0284/3541/4849
    Facsimile: (213) 894-6436
    E-mail:   Brandon.Fox@usdoj.gov
              Lizabeth.Rhodes@usdoj.gov
              Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
| Plaintiff, | GOVERNMENT'S REPONSE TO DEFENDANT'S MOTION FOR BAIL PENDING APPEAL |
| v. | |
| PAUL TANAKA, | Hearing Date:  Not Calendared |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes and Eddie A. Jauregui, hereby responds to defendant Paul Tanaka's Motion for Bail Pending Appeal.  While the government does not believe that defendant has raised a substantial question that may result in reversal on appeal, it recognizes some overlap with the issues raised in the appellant's brief in United States v. Gerard Smith, 14-50440.  Because the Ninth Circuit granted bail pending

appeal to those defendants, the government believes the best course to preserve judicial and governmental resources is for the Court to grant defendant bail pending appeal while the Ninth Circuit considers United States v. Gerard Smith, No 14-50440, and the related appeals. The government asks the Court to order a status hearing as soon as the Ninth Circuit issues its opinion.  To assist the Court in its own analysis, the government briefly addresses each of the issues raised by defendant in the attachment Memorandum.

Dated: July 20, 2016                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/_____
                                        BRANDON D. FOX
                                        LIZABETH A. RHODES
                                        EDDIE A. JAUREGUI
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES...............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   HISTORY OF CASE...............................................1

II.  ISSUES RAISED BY DEFENDANT....................................1

     A.   The Court Did Not Abuse its Discretion in Refusing to
          Admit Statements or Compel the Testimony of Leroy Baca....2

          1.   Defendant Has Never Made a Showing that the
               Government was Obligated to Immunize Baca...........3

          2.   Defendant Could Not Have Baca's Statements
               Admitted Under the Hearsay Rules...................3

     B.   Defendant Was Not Entitled to Have His Case Dismissed
          Pre-Trial Based on the Qualified Immunity Doctrine.......6

     C.   Defendant Was Not Entitled to Have His Fair-Notice
          Motion Granted Pre-Trial.................................8

     D.   The Court Did Not Err in Admitting Evidence of
          Defendant's Prior Acts At Trial..........................9

          1.   Evidence of Defendant's Knowledge, Motive, and
               Intent Was Admissible in the Government's Case-
               in-Chief...........................................9

          2.   The Court Properly Allowed Limited Impeachment of
               Defendant Regarding his Vikings' Affiliation.......11

     E.   The Jury Instructions Were Not Defective................15

          1.   The Dual Purpose Instruction was Correct...........15

          2.   Defendant's Proposed Instruction Regarding
               Obstructing FBI Investigation was an Incorrect
               Statement of the Law and Not Necessary.............17

     F.   There Was No Cumulative Error...........................18

III. CONCLUSION...................................................18

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                          <u>PAGE</u>

**<u>CASES</u>**

<u>Anderson v. United States</u>,
    417 U.S. 211 (1974)........................................16

<u>Carson v. United States</u>,
    310 F.2d 558 (9th Cir. 19620)............................7

<u>Gravel v. United States</u>,
    408 U.S. 606 (1972)......................................7

<u>Imbler v. Pachtman</u>,
    424 U.S. 409 (1976)......................................7

<u>Lilley</u>,
581 F.2d at 188........................................ .. 5

<u>O'Shea v. Littleton</u>,
    414 U.S. 488 (1974)......................................7

<u>Old Chief v. United States</u>,
    519 U.S. 172 (1997).....................................11

<u>Smith</u>,
424 F.3d at 1010-11 .................................... 17

<u>United States v. Aguilar</u>,
    515 U.S. 593 (1995).....................................17

<u>United States v. Barfield</u>,
    999 F.2d 1520 (11th Cir. 1993).......................16, 17

<u>United States v. Coyne</u>,
    4 F.3d 100 (2d Cir. 1993)...............................16

<u>United States v. Dwyer</u>,
    238 Fed. Appx. 631 (1st Cir. 2007)......................17

<u>United States v. Gillock</u>,
    445 U.S. 360 (1980)......................................7

<u>United States v. Hankey</u>,
    203 F.3d 1160 (9th Cir. 2000)...........................11

<u>United States v. Houlihan</u>,
    92 F.3d 1271 (1st Cir. 1996)............................16

<u>United States v. Lanier</u>,
    520 U.S. 259 (1997)......................................8

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. LaRouche Campaign,
    695 F. Supp. 1265 (D. Mass. 1988)..............................16

United States v. Laurins,
    857 F.2d 529 (9th Cir. 1988)...................................16

United States v. Lewis,
    368 F.3d 1102, 1105-06 (9th Cir. 2004).......................8, 9

United States v. Macari,
    453 F.3d 926 (7th Cir. 2006)...................................18

United States v. Machi,
    811 F.2d 991 (7th Cir. 1987)...................................16

United States v. Mende,
    43 F.3d 1298 (9th Cir. 1995)...................................10

United States v. Mendoza-Prado,
    314 F.3d 1099 (9th Cir. 2002)..................................14

United States v. Monaca,
    735 F.2d 1173 (9th Cir. 1984)...................................4

United States v. Paguio,
    114 F.3d 928 (9th Cir. 1997)....................................4

United States v. Ramirez-Robles,
    386 F.3d 1234 (9th Cir 2004)...................................14

United States v. Santiago,
    46 F.3d 885 (9th Cir. 1995)....................................13

United States v. Straub,
    538 F.3d 1147 (9th Cir. 2008)...................................3

United States v. Thomas,
    916 F.2d 647 (11th Cir. 1990)..............................16, 17

United States v. Woodward,
    149 F.3d 46 (1st Cir. 1998)................................16, 17

Williamson v. United States,
    512 U.S. 594 (1994)............................................4

**STATUTES**

42 U.S.C. § 1983................................................7

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

**RULES**

Fed. R. Evid. 403.........................................................10, 11

Fed. R. Evid. 804(b)(3)(B)....................................................5

Rule 804(b)(3).............................................................3, 5, 6

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   HISTORY OF CASE

Defendant Paul Tanaka, who was the Undersheriff of the Los Angeles County Sheriff's Department, was convicted of conspiring to obstruct justice and obstruction of justice at trial.  The evidence showed that Sheriff Leroy Baca put defendant in charge of an operation in response to the Sheriff's Department learning that the federal government and a federal grand jury were investigating deputies for alleged civil rights and corruption offenses.  While leading the operation, defendant and his co-conspirators took steps to: (a) hide inmate Anthony Brown, a federal informant, from the FBI, U.S. Marshal's Service, and a federal grand jury; (b) tamper with witnesses, including Sheriff's Department deputies, so that they would not cooperate with the federal government; and (c) threaten to arrest the lead FBI agent investigating the Sheriff's Department outside of the agent's home.

Defendant testified at trial and claimed, in contrast to the evidence in the government's case-in-chief, to have had little involvement in or knowledge of the operation.  He claimed that Baca directed the operation and that he told those involved to contact Baca directly with updates.

The jury rejected defendant's claims and convicted him.  The Court sentenced defendant to 60 months' imprisonment.

## II.   ISSUES RAISED BY DEFENDANT

Defendant raises six issues he claims amount to substantial questions on appeal: (1) whether the Court abused its discretion in refusing to admit prior statements or compel the testimony of Baca, who indicated he would invoke his Fifth Amendment right against self-

incrimination; (2) whether the Court erred in refusing to dismiss the indictment before trial based on defendant's claim he was entitled to qualified immunity for his conduct under the Tenth Amendment; (3) whether the Court erred in refusing to dismiss the indictment before trial based on defendant's claim that he was not provided with fair notice that his conduct amounted to a crime; (4) whether the Court abused its discretion in admitting evidence alleged in paragraph eight of the indictment and in cross-examination of defendant; (5) whether the Court erred in providing the jury with a dual purpose instruction and in rejecting defendant's proposed "Obstruction of an FBI investigation" instruction; and (6) whether there was a cumulative error.[1]  Because none of his arguments has any merit, defendant will be unable to establish that the Court committed error, let alone reversible error, on appeal.  Nonetheless, in light of the Ninth Circuit granting bail pending appeal to the others convicted in related cases, and to conserve judicial and governmental resources, the government suggests that this Court grant defendant's motion for bond pending appeal and set a status date once the Ninth Circuit has ruled on the merits of the other appeals.

> **A.**   **The Court Did Not Abuse its Discretion in Refusing to Admit Statements or Compel the Testimony of Leroy Baca**

Before trial, defendant sought to force the government to immunize Baca to testify and to have certain statements made by Baca in April 2013 admitted at trial.  The Court did not abuse its discretion in refusing to admit this evidence as none of it was admissible.

---

[1] The defendant also asked the Court to stay any restitution order.  The Court did not order restitution.

1.   <u>Defendant Has Never Made a Showing that the Government was Obligated to Immunize Baca</u>

Even assuming Baca's testimony was relevant, to this day the defendant has not met his obligation of showing that the prosecution either: (a) intentionally caused Baca to invoke his Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) granted immunity to a government witness whom Baca would have directly contradicted, which so distorted the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial.  <u>United States v. Straub</u>, 538 F.3d 1147, 1162 (9th Cir. 2008).  The government did nothing to cause Baca to invoke his Fifth Amendment right against self-incrimination.  Further, the defendant has never explained how Baca's testimony would directly contradict a witness immunized by the government.  Mickey Manzo was the only witness who received immunity from the government.  Defendant has never detailed any statement by Manzo that would be directly contradicted by Baca, let alone shown that the failure to immunize Baca distorted the fact-finding process and denied defendant his due process right to a fair trial.  This is not a "fairly debatable" issue given defendant's inability to develop this issue at any stage.

2.   <u>Defendant Could Not Have Baca's Statements Admitted Under the Hearsay Rules</u>

The Court did not abuse its discretion in refusing to admit out-of-court statements Baca made in April 2013.  Rule 804(b)(3) provides for admissibility of hearsay from an absent declarant only where the statement "so far tended to subject the declarant to . . . criminal liability" that a "reasonable person in the declarant's position"

would not have made the statement unless that person "believed it to be true."  See United States v. Paguio, 114 F.3d 928, 932 (9th Cir. 1997).  The Ninth Circuit has held that such statements must "solidly inculpate" the declarant, United States v. Monaca, 735 F.2d 1173, 1176 (9th Cir. 1984); that is, they must be "truly self-inculpatory," Williamson v. United States, 512 U.S. 594, 595 (1994).

None of Baca's statements offered by the defense was "truly self-inculpatory," nor could any be deemed so trustworthy that it should have been admitted at trial.  The first of the four statements ("That would be Captain Carey"), was offered in response to the following question from the government:

> So you were macromanaging this.  Who would be the person
> that was, in your opinion, the closest thing to being the
> leader that is micromanaging what is happening with the
> [sic] Anthony Brown, Gilbert Michel?

Defendant argues that Baca's statement, together with the government's question, constituted an admission that Baca macro-managed the "obstruction of justice charged in the instant indictment" and that Captain William Thomas Carey micro-managed the obstruction.  Baca's answer did not "solidly inculpate" Baca in any crime (much less, specifically, the crime of obstruction of justice).  The context in which the statement was made does not support defendant's assertion that the statement was "clearly" against Baca's penal interest.  There were two other points in the interview where the government discussed "macro-management" with Baca.  In the first instance, Baca acknowledged that he "operat[ed] at a macro level" with regards to the methods used to keep inmate Anthony Brown safe.  In the second

4

instance, Baca represented that he did not know the details
regarding the level of security surrounding Brown, and agreed
with the government's assessment that he macro-managed "instead
of micromanag[ed] this."  In this context, neither the
government's question, nor Baca's answer, "truly" inculpated
him.  Indeed, to the contrary, Baca likely intended this
statement to be exculpatory.

Similarly, Baca's statement that he first learned about the
approach of FBI Special Agent Leah Marx after she was approached
by sheriff's deputies was not admissible under Rule 804(b)(3).
On its face, Baca's statement was exculpatory, as he was trying
to claim that he was unaware deputies were going to approach
Special Agent Marx.

Moreover, Baca has admitted that he lied when he made that
statement, which further establishes that the statement is
inadmissible under Rule 804(b)(3).  The rule explicitly requires
that, to be admissible, a statement must be "supported by
corroborating circumstances that clearly indicate [the
statement's] trustworthiness."  Fed. R. Evid. 804(b)(3)(B).
Accordingly, the Court correctly did not allow the statement to
come in as an exception to the hearsay rule, as it did not carry
"guarantees of trustworthiness."  See Lilley, 581 F.2d at 188.[2]

Next, Baca's statement that he sought advice from "no one"
when making decisions on "tough issues" was not against his

---

[2] The statement should also be excluded on the ground that it
was a statement designed to deflect blame.  See Gadson, 763 F.3d at
1200 ("Statements that curry favor or deflect (or share) blame do not
fall within the scope of Rule 804(b)(3)(A).") (internal quotations
and citation omitted).

penal interest.  Defendant asserts that in so responding, Baca
in essence conceded that the cell phone investigation was his
doing alone, unadvised by defendant Tanaka or anyone else.  The
Court correctly declined his invitation to read into this
statement something that was not there.  Baca never said
explicitly or implicitly that this was the case.  Moreover,
Baca's statement was not inculpatory, nor would it tend to
subject him to criminal liability.

Finally, Baca's statement that he did not want to
"interfere with the FBI investigation" was inadmissible.
Defendant suggested that given Baca's plea, this statement was a
lie and constitutes a statement against Baca's penal interest.
Again, the statement on its face does not inculpate Baca in
obstruction of justice, as defendant suggests.  It is yet
another exculpatory statement by Baca.  But even so, the
statement was unsupported by circumstances corroborating its
trustworthiness.  Accordingly, it is not admissible under Rule
804(b)(3).

**B.   Defendant Was Not Entitled to Have His Case Dismissed Pre-Trial Based on the Qualified Immunity Doctrine**

Defendant claims the case against him should have been dismissed
pre-trial because "the orders given by Leroy Baca . . . were not
unreasonable" and he was therefore entitled to qualified immunity for
his crimes.  Defendant's assertion rests on no case law and, indeed,
none supports him.

Contrary to defendant's assertion, the Court should not have
dismissed the indictment against defendant before trial.  The Ninth
Circuit has forbidden these very challenges in pretrial filings

6

because "[c]onstitutional questions are not entertained in federal court in advance of the strictest necessity." Carson v. United States, 310 F.2d 558, 561 (9th Cir. 19620). In Carson, the Ninth Circuit reversed a defendant's conviction and remanded the case based on faulty jury instructions. During his appeal, defendant asked the Court to consider his Tenth Amendment challenge to his prosecution as applied to the evidence introduced at his first trial. The Court refused to consider the issue because the facts relevant to the Tenth Amendment challenge depended on the evidence at trial, which might have been substantially different on retrial than it was during the initial trial. Id.

Here, defendant did not file a motion to dismiss during or post-trial based on the Tenth Amendment or the doctrine of qualified immunity. Consequently, he has waived that issue. Regardless, defendant was not entitled to qualified immunity in a criminal case similar to in a civil case under 42 U.S.C. § 1983. The Supreme Court "has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law." Imbler v. Pachtman, 424 U.S. 409, 429 (1976). "[T]he judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" O'Shea v. Littleton, 414 U.S. 488, 503 (1974) (quoting Gravel v. United States, 408 U.S. 606, 627 (1972)).

Defendant argues that, under the Tenth Amendment, he, as a state officer, should have been shielded from federal prosecution. However, defendant's Tenth Amendment immunity argument is foreclosed by United States v. Gillock, 445 U.S. 360 (1980). In Gillock, a

state senator charged with bribery claimed the Tenth Amendment compelled the court to provide him a privilege granted members of Congress under the Speech and Debate Clause.  Id. at 362, 371.  The Court concluded that Congress had chosen not to create a parallel privilege for state legislators, and that "in those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power."  Id. at 370.  Because Congress was empowered to make state legislators, like all other individuals, subject to federal criminal statutes, there was no Tenth Amendment violation.  Id. at 370-71, 374.

## C.   Defendant Was Not Entitled to Have His Fair-Notice Motion Granted Pre-Trial

The Court correctly denied defendant's motion to dismiss the indictment based on fair-notice grounds.  A fair warning defense or claim of immunity that is based on "the same evidence that the Government will introduce at trial to support the underlying charge" is not "entirely segregable."  United States v. Lewis, 368 F.3d 1102, 1106 (9th Cir. 2004) (citation omitted) (dismissing a state correctional officer's interlocutory appeal of an order denying a pre-trial motion to dismiss on fair warning grounds).  Accordingly, a pretrial ruling on the merits is inappropriate.  Id.  Relying on the Supreme Court's decision in United States v. Lanier, 520 U.S. 259 (1997), the Ninth Circuit explained in Lewis that the criminal doctrine of fair warning, while analogous in other respects to civil qualified immunity, does not entitle a defendant to dismissal of charges pre-trial:

1
2
3
4
5
6
7

> [T]he Court in <u>Lanier</u> did not hold that the fair warning requirement insulates a criminal defendant from standing trial, as qualified immunity does for a civil defendant. Rather, the Court held that qualified immunity provides officials "the same protection form civil <u>liability</u> that individuals have traditionally possessed in the face of vague criminal statutes." Without express authority, we will not expand the scope of immunity to criminal <u>prosecution</u>, "regardless of whether in some circumstance [that immunity] may provide a bar to conviction." Lewis cites no case, nor can we find any, that has extended fair warning to include a protection from standing trial.

8  <u>Lewis</u>, 368 F.3d at 1105 (citations omitted) (emphasis in original).

9  Thus, where, as here, an asserted fair warning defense was not

10  "entirely segregable from the evidence to be presented at trial,"

11  "the motion falls within the province of the ultimate finder of fact

12  and must be deferred [to the jury]." <u>Id.</u> at 1106 (citations and

13  internal quotation marks omitted). As a result, it would have been

14  inappropriate for the Court to dismiss the indictment based on

15  defendant's fair warning or immunity claim. Because defendant did

16  not renew the motion during trial or post-trial, he has waived this

17  issue as well.

18  **D.   The Court Did Not Err in Admitting Evidence of Defendant's**
      **Prior Acts At Trial**

19

20        1.   <u>Evidence of Defendant's Knowledge, Motive, and Intent</u>
             <u>Was Admissible in the Government's Case-in-Chief</u>

21  Defendant asserts that evidence detailing his knowledge of

22  allegations of inmate abuse at Los Angeles County jails and of

23  insufficient internal investigations and enforcement of deputy

24  misconduct by the LASD should have been excluded from evidence.

25  Defendant is wrong. The evidence's probative value was not

26  substantially outweighed by the risk of unfair prejudice under Rule

27  403.

28

9

1    This evidence was directly relevant to the charges because they

2    showed defendant's knowledge of a culture of abuse and corruption

3    within the LASD, intent to keep that culture of abuse and corruption

4    from coming to light, and motive to obstruct the federal

5    investigation.  The fact that defendant expressed his desire that

6    deputies be allowed to operate in a "gray area;" to bring down to 1

7    from 45 the number of investigators looking into police abuse; and to

8    "put a case" on any captain seeking to police deputy misconduct, at

9    the very least, tends to show defendant's knowledge, intent, and

10   motive for obstructing and impeding the federal investigation into

11   LASD abuse and corruption.  Similarly, the fact that defendant had

12   long ago been apprised of allegations of inmate abuse, "problem

13   deputies," and insufficient and inadequate internal investigations,

14   and that defendant wished to gut the very unit that conducted such

15   investigations within the LASD, provided a motive for defendant to

16   obstruct the FBI's investigation.  Given defendant's high rank within

17   the LASD, and his role in overseeing internal investigations, he knew

18   he could be viewed as responsible if the allegations came to light

19   (in fact, a citizen's commission investigation into jail violence

20   found him culpable for the widespread problems within the jails).

21   Accordingly, the evidence was far from being irrelevant; it was

22   directly relevant and material to the charges against defendant.

23       The probative value of the evidence was high was not

24   substantially outweighed by the risk of unfair prejudice.  <u>See</u> Fed.

25   R. Evid. 403; <u>see also</u> <u>United States v. Mende</u>, 43 F.3d 1298, 1302

26   (9th Cir. 1995).  "Relevant evidence is inherently prejudicial; but

27   it is only unfair prejudice, substantially outweighing probative

28   value, which permits exclusion of relevant matter under Rule 403."

1    United States v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000)

2    (internal quotations and citation omitted).

3         The term "unfair prejudice" "speaks to the capacity of some

4    concededly relevant evidence to lure the fact finder into declaring

5    guilt on a ground different from proof specific to the offense

6    charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). In

7    other words, it "means an undue tendency to suggest decision on an

8    improper basis, commonly, though not necessarily, an emotional one."

9    Id. (quoting Advisory Committee Notes to Fed. R. Evid. 403). Here,

10   although this evidence "damaged" defendant's case, in that it tended

11   to show defendant's knowledge of inmate abuse and misconduct within

12   the jails and improper motive and intent to obstruct the federal

13   investigation (making the evidence relevant and highly probative), it

14   was not unfairly prejudicial because it did not "lure the factfinder

15   from declaring guilt on a ground different from proof specific to the

16   offense charged." Id.

17              2.   The Court Properly Allowed Limited Impeachment of
                     Defendant Regarding his Vikings' Affiliation

18

19        Defendant claims that the Court erred in allowing the government

20   to cross-examine him about his affiliation with a deputy clique

21   called the "Vikings" that was involved in deputy abuse and

22   misconduct.[3] From the outset of the trial, defendant claimed that as

23   a leader in the Sheriff's Department, he stood against evil deeds and

24   "never look[ed] the other way" in the face of deputy misconduct. If

25

26   _____

27        [3] Defendant claims that "[t]he jury heard that Judge Hatter made
     comments . . . that the group was a 'neo-Nazi' gang." This is not
     true. The government informed the Court and defense – and adhered to
28   its promise – that it was not going to mention the judge or his
     characterization of the Vikings as a "neo-Nazi" gang.

                                   11

there were "problem deputies," defense counsel asserted in opening statement, defendant wanted to "take care of these guys." On direct examination, defendant doubled-down. He testified at length about his policing philosophies and values. He discussed having an "unwavering sense of right or wrong" and his personal agreement with LASD's "Core Values," which, as defendant testified, included "respect for the dignity of all people, integrity to do right and fight wrongs, . . . fairness in all I do" and "stand[ing] against racism, sexism, anti-Semitism, homophobia and bigotry." Defendant further testified that, while he was "supervising patrol," he "had no tolerance for deputies who wore a badge and violated the law," and acknowledged that "discipline was necessary to ensure proper behavior of deputy sheriffs." Defense counsel also elicited testimony from defendant about his philosophy on law enforcement and his embrace of the Sheriff's "Core Values." Defendant testified that he agreed with the Sheriff's Core Values, which, as defendant read into the record, included:

> commit[ting] myself to honorably perform my duties with respect for the dignity of all people, the integrity to do right and fight wrongs, wisdom to apply common sense and fairness in all I do and courage to stand against racism, sexism, anti-Semitism, homophobia and bigotry in all of its forms.

Similarly, defendant testified that as Assistant Sheriff in charge of patrol, he visited the LASD Norwalk Station in 2007 to, among other things, express his "philosophy on what I expected." When asked to explain his philosophy, defendant responded that his expectations were simple: "[M]ake sure that you're as smart as you can be, know all the laws, know the lines of right and wrong, and do your job . . . in the right way because that's our obligation as

1  peace officers." Moreover, defendant testified on direct examination
2  that "at every command I visited" and "probably hundreds of times,"
3  he expressed to deputies that they should operate in the "gray area,"
4  which he described as "inside of the[] lines" of the law, on one end,
5  and "right or wrong," on the other.

6      As seen above and not surprisingly, defendant painted a picture
7  of himself as a supervisor with zero tolerance for misconduct or
8  unethical behavior by deputies, essentially serving as his own
9  character witness. But in so doing, the defense flung open the door
10  to questioning about his membership in the Vikings.

11      The evidence of defendant's affiliation with the Vikings was
12  highly probative of defendant's intent. To establish defendant's
13  crimes, the government bore the burden to prove defendant's intent to
14  obstruct justice. See Ninth Cir. Model Jury Instr. 8.131. Defendant
15  suggested both in direct examination and his opening statement that
16  (a) he was foundationally committed to "know[ing] all the laws,
17  know[ing] the lines of right and wrong, and do[ing] your job . . . in
18  the right way," and (b) he had no tolerance for the types of deputy
19  abuses at the core of the FBI's own investigation and, instead, was
20  committed to "honorably perform[ing] [his] duties with respect to the
21  dignity of all people[.]" Defendant's membership in the Vikings,
22  however, undermined these assertions. Indeed, that defendant
23  belonged to a deputy clique at the time he was a sergeant –
24  continuing through his time as Undersheriff and while he testified –
25  evidenced his intent to protect deputies who, like defendant,
26  belonged to "cliques" that were known to cross the line and violate
27  the civil rights of others. Cf. United States v. Santiago, 46 F.3d
28  885, 889 (9th Cir. 1995) ("This court specifically has admitted

evidence relating to gangs and other organizations when relevant to the issue of motive.")  Indeed, other LASD deputies who played a role in this case were also Vikings, further evidencing defendant's conspiracy with those individuals to obstruct justice.

Defendant became a member of the Vikings while serving as a sergeant at Lynwood station.  This undermined his testimony that he agreed with and adhered to the LASD's Core Values, and that, as a supervisor, he had no tolerance for deputies who violated the law.  See United States v. Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002) (evidence of "general good character opened the door to the government's evidence of prior bad acts to demonstrate bad character"); id. ("Had the government's evidence been excluded, the jury might have been misled into believing that Defendant was merely a hard-working, upstanding citizen who was bewildered by crime and badgered into the drug deals in question.").  Defendant admitted in cross-examination that he still bears the tattoo marking his affiliation with the Vikings.

Evidence of defendant's membership in the Vikings also, as referenced above, was relevant to impeach him – directly calling into question defendant's stated commitments to following the law and doing things the "right way."  See generally United States v. Ramirez-Robles, 386 F.3d 1234, 1245 (9th Cir 2004) (analyzing impeachment value of evidence under Rule 403).  Indeed, by repeatedly so testifying, defendant opened the door to evidence demonstrating his non-law-abiding character.  Mendoza-Prado, 314 F.3d at 1105.

Moreover, the government and the Court ensured that there was no unfair prejudice.  The government only elicited limited testimony regarding defendant's membership in the Vikings; findings about

14

1    civil-rights violations committed by the Vikings; and other members

2    of the charged conspiracy who are alleged to be members of the

3    Vikings, including Greg Thompson, Chris Nee, and others.  The

4    government held back: it did not refer to the organization as a "neo-

5    nazi, white supremacist gang."  It referred generally to "civil

6    rights violations" and acts of "lawlessness," but not to "terrorist-

7    type tactics."  It made the point that defendant belonged to an

8    organization that went against defendant's professed values, but did

9    not belabor it.

10        Finally, the government's recollection is that to extinguish any

11   residual risk of unfair prejudice (though there was none), the Court

12   instructed the jury that it should consider Vikings-related testimony

13   "for its bearing, if any, on the question of the defendant's intent,

14   motive, and credibility, and for no other purpose."  See Ninth Cir.

15   Model Crim. Jury Instr. 4.3 (2010).  The Court did not abuse its

16   discretion in allowing the questioning.  This is not a fairly

17   debatable issue that could lead to the Ninth Circuit overturning

18   defendant's convictions.

19        **E.   The Jury Instructions Were Not Defective**

20        Defendant argues that the Court committed error in providing the

21   jury with a dual-purpose instruction and in not providing an

22   instruction regarding the legality of obstructing an FBI

23   investigation.  Neither was error.

24             1.   The Dual Purpose Instruction was Correct

25        The Court was correct in instructing the jury that the

26   government "need not prove that the defendant's sole or even primary

27   purpose was to obstruct justice, so long as it proves beyond a

28   reasonable doubt that one of the defendant's purposes was to obstruct

                                    15

justice.  The defendant's purpose of obstructing justice must be more than merely incidental."  This is a correct statement of the law. Anderson v. United States, 417 U.S. 211, 226 (1974) (if "primary or secondary" purpose of conspiracy is a "violation of a federal law, the conspiracy is unlawful"); United States v. Laurins, 857 F.2d 529, 537 (9th Cir. 1988) ("That part of [defendant's] motive may have been" permissible "does not negate the evidence of corrupt motive."). Indeed, in United States v. Machi, 811 F.2d 991, 996 (7th Cir. 1987), the Seventh Circuit explicitly approved of a § 1503 jury instruction stating that "[t]he United States is not required to prove that the defendant's only or even main purpose was to obstruct the due administration of justice[.]"  See also United States v. LaRouche Campaign, 695 F. Supp. 1265, 1274 (D. Mass. 1988) ("government need not prove that a defendant's sole purpose was to obstruct justice"); United States v. Woodward, 149 F.3d 46, 70-71 (1st Cir. 1998) (rejecting argument that "conduct must have an exclusively illegal intent" because "conduct may not be subject to the criminal laws if the intent underlying it is exclusively legal") (emphasis in original); United States v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993) (defendant could be convicted if he acted "in part" corruptly). Other courts agree that Section 1503 is violated if defendant's conduct was "prompted, at least in part" by corrupt intent.  United States v. Thomas, 916 F.2d 647, 651 (11th Cir. 1990); United States v. Barfield, 999 F.2d 1520, 1524 (11th Cir. 1993); United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996).

Defendant argues an intent to obstruct justice and an intent to follow orders are mutually exclusive.  But such purposes are not binary.  Just as an action can be motivated by both friendship and a

16

desire to bribe, Coyne, 4 F.3d 100, or both a desire to steal from clients and to evade taxes, Smith, 424 F.3d at 1010-11, so too may an action be motivated by both a desire to follow a lawful order and a desire to obstruct a grand jury investigation.  The existence of such an order (e.g., to investigate the cell-phone found in Brown's possession or to keep Brown safe) does not extinguish criminal liability if defendant took actions both to carry out that order and also to obstruct a grand jury investigation.  See Woodward, 149 F.3d at 70 (rejecting the theory that "the formation of a friendship between a lobbyist and a legislator somehow insulates both from prosecution for honest services fraud"); Thomas, 916 F.2d at 651.

> 2.   Defendant's Proposed Instruction Regarding Obstructing FBI Investigation was an Incorrect Statement of the Law and Not Necessary

The Court instructed the jury that it was required to find that defendant intended to obstruct a grand jury investigation in order to convict him.  The defendant's proposed instruction, which the Court refused to give, would have excluded a jury from finding obstruction even if the federal agents were acting as arms of the grand jury. Section 1503 criminalizes obstructive conduct toward federal agents acting as arms of the grand jury.  See, e.g., United States v. Dwyer, 238 Fed. Appx. 631, 651 (1st Cir. 2007) (FBI was working as arm of the grand jury "by collecting evidence that was presented to the grand jury," "gathering information, conducting interviews, and reviewing documents.").  Indeed, United States v. Aguilar, 515 U.S. 593 (1995), distinguishes the case from instances where agents are acting as an "arm of the grand jury." 515 U.S. at 594.  An FBI investigation is a judicial proceeding under § 1503 if the FBI "was acting as an aid to and as an 'arm of the grand jury' when it

1   conducted its investigation." United States v. Macari, 453 F.3d 926,

2   936 (7th Cir. 2006).  This can be established by showing that the

3   FBI: (1) "undertook the investigation to supply information to the

4   grand jury . . . in direct support of a grand jury investigation;"

5   (2) that the FBI agents were "integrally involved in the

6   investigation;" and (3) that the FBI investigation was "undertaken

7   with the intention of presenting evidence before [the] grand jury."

8   Id. at 936-37 (citations and internal quotations omitted).

9        Further, even if the Court refused to give this instruction,

10  this was not the theory of defendant's case.  Indeed, defendant

11  claimed not to have been involved in any effort to obstruct –

12  regardless of whether it was an FBI or grand jury investigation – and

13  claimed not to have knowledge of his co-conspirators' conduct.

14  Accordingly, any error would have been harmless.  It is not "fairly

15  debatable" whether this could result in the Ninth Circuit reversing

16  the convictions.

17       **F.   There Was No Cumulative Error**

18       As the Court did not err in any of these issues, there can be no

19  cumulative error.

20  **III. CONCLUSION**

21       Because the Ninth Circuit granted bail pending appeal to the

22  defendants convicted in 2014, the government believes the best course

23  to preserve judicial and governmental resources is for the Court to

24  grant defendant bail pending appeal while the opinion in United

25  States v. Gerard Smith is pending.  The government asks the Court,

26  however, to order a status hearing as soon as the Ninth Circuit

27  issues that opinion.

28