UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )      CASE NO. CR 15-255-PA
                                    )
PAUL TANAKA,                        )
                                    )
                Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF

JURY TRIAL PROCEEDINGS - DAY 1

WEDNESDAY, MARCH 23, 2016

8:39 A.M.

LOS ANGELES, CALIFORNIA

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

EILEEN DECKER
United States Attorney
BY:  BRANDON D. FOX
     LIZABETH A. RHODES
     EDDIE A. JAUREGUI
     Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012


**FOR THE DEFENDANT PAUL TANAKA:**

H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
BY:  H. DEAN STEWARD
     Attorney at Law
107 Avenida Miramar, Suite C
San Clemente, California 92672
(949) 481-4900


**FOR THE DEFENDANT PAUL TANAKA:**

LAW OFFICE OF JEROME J. HAIG
BY:  JEROME HAIG
     Attorney at Law
21143 Hawthorne Boulevard, Suite 454
Torrance, California 90503
(424) 488-0686


**ALSO PRESENT:**

Leah Tanner, FBI Special Agent


**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

<u>WITNESSES</u>                                                                                              <u>PAGE</u>

(None.)


**INDEX OF EXHIBITS**

                                                    FOR
<u>NUMBER</u>   <u>DESCRIPTION</u>                           <u>IDENTIFICATION</u>   <u>RECEIVED</u>

(None.)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 23, 2016**

**8:39 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes, Eddie Jauregui, and also sitting at counsel table is Leah Tanner on behalf of the FBI.  We're, of course, on behalf of the United States.

THE COURT:  Good morning.

MS. RHODES:  Good morning.

MR. STEWARD:  And, Your Honor, Dean Steward and Jerome Haig on behalf of Mr. Tanaka who's present this morning.

THE COURT:  Good morning.

MR. STEWARD:  Good morning, sir.

THE COURT:  All right.  We're going to have a panel brought down, and I think the last time we were here we had agreed, I believe, that we were going to time-qualify the panel.  I was going to tell the jury that we expect trial to last roughly three weeks, plus their deliberations, and we'll then inquire as to how many people in the panel would be available for that time period.

For those people that are available, we'll excuse those individuals to go back up to the jury assembly room.  For the

**UNITED STATES DISTRICT COURT**

remaining people in the panel, we'll have them fill out a questionnaire describing any hardships that they might have that would prevent them from serving on the jury. Then counsel and the Court will review the questionnaires, and for those people that we can excuse, we'll let them go about their business.

For the remaining individuals who we have some questions about, we can either have the magistrate make further inquiries of those people as to their hardships or we can do it. If at that point we have something in the neighborhood of 45 to 50 jurors, my preference would be to have the magistrate conduct the rest of the hardship questionnaires and go ahead and start trying to seat a jury if we've got 50 or so -- 45 to 50 people that are available.

Do you have any feelings about whether or not we want to conduct -- or you want the Court to conduct questions of jurors who have hardships or whether we could leave that to the magistrates -- the magistrate judge?

MR. FOX: The government has no objection over your plan, Your Honor.

MR. STEWARD: We have no objection to the magistrate judge participating as well, Your Honor.

THE COURT: Okay. And if we can get 45 to 50 people that are available, to go ahead and start trying to seat a jury?

MR. STEWARD:  Yes, Your Honor, that's fine with the defense.

MR. FOX:  Yes, Your Honor, thank you.

THE COURT:  And with the people that have hardships and the magistrate determines that they can serve, they'll come back in and, as you know, there's a list of potential jurors that'll be called.  And I would assume we put 12 in the box, and as those people come in, we'll just plug them in wherever they fall at in the randomized list.

MR. FOX:  Fine with the government, Your Honor.

MR. STEWARD:  That's fine, Your Honor.

THE COURT:  I assume now we have a potential witness list from each side?

MR. FOX:  Yes, Your Honor.  The government provided to Mr. Montes-Kerr the government's three copies of the government's witness list today.  It's substantially similar to what's in our trial memo.  I believe we took off two names from what was in the trial memo.

MR. STEWARD:  And the Court has ours as well.

THE COURT:  All right.

MR. FOX:  Your Honor, may I have one moment with counsel?

THE COURT:  Yes.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, may we see a copy of what the

UNITED STATES DISTRICT COURT

defense provided to you for the witness list, please?

THE COURT: Do you have any problem with them --

MR. HAIG: Of course not, no. I think we've let them know informally already.

MR. FOX: My understanding from Mr. Steward is that there are more names on that list than we received.

THE COURT: That's fine.

MR. FOX: Thank you.

THE COURT: Okay. Any objections to use of badge numbers as opposed to the names of the jurors?

MR. FOX: Not from the government, Your Honor.

MR. STEWARD: Yes, Your Honor. We continue to object to that. It's our understanding that in the previous trial, the supposed threat was from inside the jury room, not anybody externally. My fear is that the jury's going to start thinking, wow, we're using numbers here --

THE COURT: Let me just cut you off. It's fine, we'll use names.

MR. STEWARD: Thank you, Your Honor.

THE COURT: Okay. Have you had a chance to look at the background questionnaire?

MR. FOX: We have, Your Honor.

THE COURT: Any objections to the background questionnaire?

MR. FOX: It looks fine to us.

MR. STEWARD:  Fine to us as well, Your Honor.

THE COURT:  There is a one-page hardship questionnaire that we pass out, which I believe counsel has had a previous chance to look at.  Any objections?

MR. FOX:  None, Your Honor.

MR. STEWARD:  None, Your Honor.

THE COURT:  There's a juror information sheet and questionnaire.  Any objections?

MR. FOX:  Your Honor, just as I'm looking at it -- and I'm just looking at it now -- it looks like the first two questions are somewhat duplicative of Question 15.  If you think we might receive more information by asking them again, I'm all for it but --

THE COURT:  They're just going to take a look at this when they first come down, and we'll, at that point, start asking --

MR. FOX:  Whether it's anything that they haven't told us before, that's fine, Your Honor.  Thank you.

MR. STEWARD:  No objection.

THE COURT:  And you should have a copy of the criminal case questionnaire?

MR. FOX:  No objection, Your Honor.

MR. STEWARD:  No objection from the defense.

THE COURT:  All right.  Again, at some point, we're going to put 12 jurors in the jury box.  We're going to have

four alternates.  Juror Number 1 will be on the first row in the seat closest to me, and Juror Number 7 will be on the second row in the seat closest to me.  Before you announce a peremptory challenge, please meet and confer so that if there is going to be an objection to the exercise of that peremptory challenge, we'll take that up at sidebar before it's announced in open court.  If you pass on a peremptory, you lose that peremptory.  If you challenge or exercise a peremptory and a juror is replaced and, at that point, if there's another -- well, there is a challenge, a juror is replaced and you haven't announced any peremptory, you can challenge anybody in the box.

Just a couple of ground rules.  No water bottles.  If you want your own water, let the clerk know.  We'll give you a pitcher.  You can pour your own water.

MR. FOX:  Your Honor, very minor thing on that. There is one witness who has a medical issue which requires her to bring water with her.

THE COURT:  That's fine.  Please instruct your witnesses they're to remain outside the courtroom.  They're not to discuss their testimony with other witnesses.  Please do not thank witnesses for answers and don't thank the Court for ruling.  No speaking objections in front of the jury, just announce the evidentiary basis for the objection.  If there's something you want to take up, we'll take it up at sidebar, and those, hopefully, will be infrequent, or we'll take it up at

the next break.  No food.  No coffee in the courtroom, and do not address the jurors and do not address the witnesses.  I'll address the witnesses if they need addressing.

All right.  Anything else that we need to take up before we have the panel come down?

MR. FOX:  I just want to make sure that if when the jury comes in and you ask us to introduce ourselves, if we say good morning, that that's okay with the Court.

THE COURT:  That's fine.  When the jury first comes down and we attempt to time-qualify, I'm not going to ask you to introduce yourselves.  Once we start jury selection, I'll do that.

Okay.  Anything else?

MR. FOX:  If we have time before the jury comes down or at some break today, there are just a couple of issues that we could deal with.  I don't want to have the jury wait on these issues.  I think we could deal with it at other times, but just so Your Honor is aware, the two issues are the defense request for judicial notice that they filed I think last week and --

THE COURT:  I was going to ask about that.  We'll get to that.  Go ahead.

MR. FOX:  Okay.  And the second part is -- and depending how long jury selection takes, it probably doesn't have to be today, but the defense has told us that they have

objections to exhibits, and those exhibits are likely to come into play very early on in the government's case, probably the second day of our testimony.  And I don't want it to be a situation where the jury comes out, we try to get into those exhibits, and then we have to send them back for a while.  So to the extent we can get to those objections either before court, potentially the second day of trial, that would be very good, I think, so we can have this be a speedy process.

THE COURT:  Okay.  Do you happen to know which exhibits those are, the numbers?

MR. FOX:  The defense just said they have a number of them, and we tried to have a conference on it, and Mr. Steward informed me that he'd rather wait until trial to discuss his objections.  And to be fair, part of it's to see what our theories are for admissibility, but we're happy to engage in more of a process on that.

THE COURT:  Well, I'm going to ask counsel to meet and confer at the -- sometime today to go over these objections, and if you can't resolve them, then I will, but I think it would probably speed the process up if you met and conferred and discussed the objections.

Anything else?

MR. FOX:  No, Your Honor.

MR. STEWARD:  No, Your Honor.

THE COURT:  Okay.  Let's go to sidebar for a moment.

(Discussion held at sidebar.)

THE COURT:  You need to get to the mic.  Speak close to the microphone so the reporter can hear you.

One witness, one lawyer.  In other words, if it's your witness, you do the objections and you speak at sidebar.

Okay.  Now, what's -- I must be missing something.  Judicial notice of the sentences that I've imposed?

MR. HAIG:  This is Jerome Haig speaking.

Your Honor, the reason that we are asking the Court to take judicial notice refers basically to my prospective government witness Tom Carey, who will be testifying.  We think that his knowledge of the sentences that were imposed on the other trial are important in assessing his credibility, especially because there will be --

THE COURT:  You -- are you saying you want me to tell someone as to what those sentences were?

MR. HAIG:  Well, Your Honor, I think that in absence of the Court agreeing to take judicial notice, that'll be something that we certainly will bring up during cross-examination.  We just want the jury to know what the potential sentences could be in this case and, based upon that, what Mr. Carey --

THE COURT:  What I am going to tell the jury about punishment is not -- it's an issue for the Court and not the jury.

MR. HAIG:  I see the problem because we don't want the jury to think what Mr. Tanaka could get if he was convicted, I understand that, Your Honor.  It's just we think it's relevant to the state of mind of at least one of the witnesses who will be testifying, and that's why.

THE COURT:  The individual sentences as to what people received in this case?  Is that what you're saying?

MR. HAIG:  Yes.

THE COURT:  Okay.  What's the government's view?

MR. FOX:  I think we should, obviously, wait until Mr. Carey testifies.  I think the proper way to do this is for Mr. Haig to ask him questions about what sort of sentence he's facing and his motivations for cooperating with the government. I think the more specificity we get into, the less relevant it is and the more 403 issues we see.

THE COURT:  I think if you want to ask him "You're looking at 20 years" or whatever it is, I think that's probably fine.  If you want to talk about "Well, this guy got 18 months or 23 months," I'm not so sure.

MR. HAIG:  Well, the reason -- and I don't want to beat a dead horse here, Your Honor.  This is Jerome Haig again. The reason that we think it's relevant is because instead of the just kind of theoretical maximum of what could happen or the guideline sentence of what could happen, Mr. Carey knows precisely what happened to people that were under his command

and that were subservient to him in the chain of command in the Sheriff's Department, and he knows what kind of sentence they received, and he would presume that that sentence, if he'd go to trial, would be slightly greater based upon his increased role in the conspiracy and the alleged obstruction.  That's why we think that the specific sentences handed down to the other individuals would be more important than just a generalized maximum possible sentence.

MR. FOX:  And, Your Honor, I think, again, this is -- now that I hear their theory -- this is Brandon Fox -- this is premature because anything that they want to introduce should come in their case-in-chief.  We need to see how Mr. Carey testifies.  He may -- who knows.  I don't know if we've questioned him about if he's aware of the individual sentences people received, but they can certainly question him generally on the issue.  And if there's something that is relevant that should come in, then they can do it in their case-in-chief.

MR. HAIG:  And I -- this is Jerome Haig again.  I agree with what counsel is saying to the extent that that is -- would be proper cross-examination if it's deemed to be relevant by the Court.  The only thing -- the only reason I really filed the document, Your Honor, was in case he, you know, claimed that he was -- that he was mistaken about the other sentence or that he didn't know or that he thought something that was

different than actually -- would have actually happened in the prior trial, but I'm not going to ask the Court to make any kind of ruling right now. I think it could be really dispensed with by way of what happens when he testifies.

THE COURT: Okay.

MR. FOX: Thank you.

(End of sidebar discussions.)

THE COURT: All right. We'll have the panel come down.

Let me just tell the spectators here, we're going to have probably over 100 prospective jurors, and they're going to take probably most of the seats in the courtroom. There is going to be a video available in the courtroom next door. The preference is, is that the jurors -- prospective jurors will take seats over in the adjacent courtroom as well, but there should be some seats available, and we'll try to keep one row here in this courtroom available.

So once the panel comes down, you're free -- if there isn't available seating, you're free to take whatever available seats are in the courtroom next door, and there will be a video feed of what's going on in here in the courtroom next door.

MR. HAIG: Your Honor, if I could just inquire, we've got -- on behalf of Mr. Tanaka, there's a couple family members -- a spouse, a friend and his brother -- I think maybe five people. Would that be all right if they sat in the front

row over there?

THE COURT:  Yeah, if -- that's -- that's fine. We'll -- yeah, we'll try to -- we'll try to keep at least one row here that's available.

But the family members shouldn't have any contact with the prospective jurors; in other words, no conversations at all with any prospective jurors.  And needless to say, there shouldn't be any introductions of anyone in the audience to the prospective jurors during the course of the trial.

MR. HAIG:  Your Honor, I just want to alert the Court to the fact that something happened this morning.  There was somebody outside the courtroom that mentioned something to me as my client walked in, and it was something that I took to be disparaging.  So if the Court could also inform the people that are in the audience not to have any contact with my client or with me, that would be, I think, something that I would request.

THE COURT:  All right.  Ladies and gentlemen, there really is no need to have any contact with any participants in the trial, either counsel or the defendant.  So please refrain from having any contact with the defendant or any counsel or any witnesses in the case or any prospective jurors.

All right.  Thank you very much.  We'll get the jury down here.  It probably is going to take 15 minutes or so to get them down here.

(Off the record at 9:00 a.m.)

(On the record at 9:46 a.m.)

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also present at counsel table is Leah Tanner, a special agent with the FBI.

THE COURT:  Good morning.

MR. STEWARD:  And, Your Honor, Dean Steward for Paul Tanaka.

MR. HAIG:  And Jerome Haig for Paul Tanaka.

THE COURT:  Good morning.

MR. HAIG:  Morning.

THE COURT:  Members of the panel, good morning.

I'm Judge Percy Anderson, and I would like to welcome those of you seated in this courtroom and to those of you seated in the adjacent courtroom next door.  We are here this morning for the important task of trying to select a jury to try a criminal case.  We rely on juries in this country to decide cases tried in our courts.  Thus, jury service is an important duty of citizenship.

Jurors must conduct themselves with honesty, integrity and fairness.  Under our system of justice, the role of the jury is

to find the facts of the case based on the evidence presented in the trial.  That is, from the evidence seen and heard in court, the jury decides what the facts are and then applies to those facts the law that I will give in my instructions to the jury.  My role as the trial judge is to make whatever legal decisions must be made during the trial and to explain to the jury the legal principles that will guide its decisions.

This is a criminal case entitled the United States of America vs. Paul Tanaka.  To begin this process, I would like to give you a brief summary of what this case is about.  The charges in this case involve conduct that allegedly occurred from August 18th, 2011 to September 26, 2011.  The defendant, Paul Tanaka, was the undersheriff or second in command of the Los Angeles County Sheriff's Department during this period. The government alleges that the defendant knew that the federal government was conducting a federal grand jury investigation of whether certain deputies were using excessive force and accepting bribes at the Sheriff's Department jails.

The government contends that the defendant and other members of the Sheriff's Department conspired to obstruct the investigation.  The government also alleges that the defendant and others took actions to obstruct the investigation, including hiding an inmate, Anthony Brown, who was acting as a federal informant from the Federal Bureau of Investigation and a federal grand jury, tampered with potential witnesses by

attempting to convince them not to cooperate with the federal investigation and threatened to arrest an FBI agent.

Defendant Tanaka is charged with two crimes, conspiring to obstruct justice and obstruction of justice. The defendant denies that he was part of the conspiracy and denies that he obstructed justice. The defendant has pleaded not guilty to each of the charges and is presumed innocent. The charges against the defendant are contained in an indictment. The indictment is simply the description of the charges made by the government against the defendant. It is not evidence of anything. To these charges, the defendant has pled not guilty, and it will be the question of his guilt or innocence to the charges that you will be asked to decide if you're selected as a juror in this case.

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, tweeting or any Internet chat room, blog, website or any other means. This applies to communicating with your fellow jurors until I give you the case for your deliberations, and it applies to communicating with everyone else, including your family members, your employer, the media or press, and people involved in the trial, although you may notify your family and your employer that you're a

member of a panel of prospective jurors.  But if you're asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter, and you must report that contact to the court.

Because you will receive all of the evidence and legal instructions you may properly consider to return a verdict, do not read any newspapers, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the court immediately.  And most importantly, ladies and gentlemen, keep an open mind.  Do not make up your mind about what your verdict should be until after you've gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence.

**UNITED STATES DISTRICT COURT**

Ladies and gentlemen, I recognize that jury service is probably an inconvenience for you, taking you away from your jobs and families and disrupting your daily routine.  It is, however, one of the most important duties that citizens of this country are called upon to perform.  Our Constitution's framers recognize that trial by jury is the essence of a free government.  Jury service is a right that our forefathers fought for and men and women are fighting for today because of its importance in the governing of a democratic society.

Now, I know that there's a temptation to let the other guy do his civic duty, and I probably have heard every excuse you can think of to try to get out of jury duty, but recently the importance of trial by jury was brought home to me.  There was a gentleman seated as a potential juror, and he was relatively small in stature, self-employed and married.  As is my custom, I began asking questions about his self and his family, and he told me that he immigrated to this country and that he had three children.  I asked him about their ages, and he told me the youngest was 18 and that his middle child was 20, and that the oldest son was 22 and that he had recently lost his life in a fire fight in Afghanistan.

Now, that really brought home to me the ultimate sacrifices and contributions that men and women today are making to ensure our way of life, including the right of our citizens to have a trial by jury.  For the jury to perform its

**UNITED STATES DISTRICT COURT**

historic and beneficial role in our democracy, it must be
constituted with people like yourselves who are willing to
serve to give back and thus to make a small contribution to
this great country of ours.

Now, we expect the presentation of all phases of this
case, including the opening statements, the evidence, the
arguments and the jury instructions, will last approximately
three weeks plus deliberations.  Now, our daily schedule will
normally be from 8:00 a.m. to 1:30, and we'll have two short
breaks.  Now, today we're going to meet until noon.  We're
going to resume at 1:30, and we'll probably continue until
around five o'clock.  So we would expect all aspects of this
case would conclude by the week of April 12th with the case
then being submitted to the jury for its deliberations.  During
deliberations, the jury's hours will change.  They'll
deliberate from 8:00 until 3:30, and lunch will be brought in.
Now, every day we're going to stop at 1:30.  So we're going to
start at 8:00, and we're going to stop at 1:30, and then you'll
have the rest of the day.

Now, I want to advise you that a juror may be excused from
jury service only upon a showing of specific facts which
constitute an undue hardship for the juror and not the juror's
employer.  An undue hardship includes the following:  The
prospective juror has a personal obligation to care for the
sick, the age or infirm dependents or to care for children

where no comparable substitute care is either available or practical without exposing an undue financial hardship to the prospective juror or the person cared for.  The prospective juror has a physical or mental disability or impairment, not affecting the person's ability to serve on the jury, but that would expose the juror to an undue risk of mental or physical harm.  Participation in the trial would expose the prospective juror to an extreme financial burden taking into account the following factors:  the length of the trial, whether the prospective juror is the sole support for his or her family and the availability of employer reimbursement.

Please keep in mind that jury service is not only a duty and a responsibility, but it's also a right that our forefathers fought to secure because of its importance.  As a society, we've given the people the power to decide disputes between their fellow citizens in civil cases and the power to make the ultimate determination of whether or not to deprive a fellow citizen of life, liberty or property in criminal cases. Jury service is a duty that is not to be shirked and a right that should not be lightly relinquished.

Now, first of all, I would like the potential jurors who believe that they can be with us for the next three weeks to raise their hands.

Okay.  Now I'm going to ask the deputy clerk -- let's start with the panel over here.  I'm going to ask the deputy

clerk to go among you.  He's going to take your names, and then I'm going to ask you to return to the jury assembly room on the third floor and to await further instructions.

So, Mr. Clerk, if you would start on the left side of the courtroom here.  And, ladies and gentlemen, if you'd raise your hands if you can be with us for the next three weeks for those of you sitting on my left.

(Pause in proceedings.)

THE COURT:  Okay.  Now if we could have the people in the center row, and why don't we start with the back row, if you could raise your hands if you can be with us for the next three weeks.

(Pause in proceedings.)

THE COURT:  Anybody else in the center section who can be with us?

(Pause in proceedings.)

THE COURT:  Okay.  Anybody on the first row in the center section?

(Pause in proceedings.)

THE COURT:  And finally, anybody over in the section to my right if you can be with us, if you would raise your hands.

(Pause in proceedings.)

THE COURT:  Okay.  Anybody else on the first row that can still be with us?

(Pause in proceedings.)

THE COURT: All right. I'm going to ask all the prospective jurors seated here on the right if you'd take the remaining seats in the center section, please.

Okay. I assume the balance of the remainder of the prospective jurors that are seated here feel that they may have a reason why they cannot be with us for the next three weeks that constitutes a hardship. We have a questionnaire that we'd like you to fill out, and I'm going to ask the clerk to pass out those questionnaires now. It's one page; it's pretty brief. Please fill it out, and once you've done that, once you've filled out that questionnaire, you may return to the jury assembly room on the third floor to await further instructions.

And what's going to happen is we're going to take a look at your questionnaire. You may then either be excused and we'll notify somebody in the jury assembly room that you've been excused or we may have some further questions for you. And if we do, you're either going to come back here or you will go to another judicial officer who will ask you some additional questions.

Now, some of you, I believe -- is there anybody here seated in either courtroom that went before a judicial officer this morning? I think there may have been a few of you. If you did, please indicate in the top left-hand corner of the

questionnaire that you previously saw a judge this morning about your hardship. You can just put an asterisk on the top right-hand corner of the questionnaire.

All right. I'm going to ask the clerk to circulate those questionnaires, and if you don't have something to write with, I think he'll have a pen for you as well.

THE PROSPECTIVE JUROR: Your Honor, if we filled out a questionnaire online about a hardship, does that count?

THE COURT: You still need to fill this one out.

(Pause in proceedings.)

THE COURT: Once you've finished filling out the questionnaires, just raise your hand and we'll come by and pick it up.

(Pause in proceedings.)

THE COURT: For those of you who have finished, you can return to the jury assembly room on the third floor to await further instructions.

(Pause in proceedings.)

THE COURT: Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT: Okay. We have a total of 42 people who can be with us. There are another five people -- apparently what happens is I guess they --some people will, as soon as they come in, say I can't serve, and there might have been 10 or 15 of those. There are another five people who went to the

magistrate this morning, which the magistrate now has denied their excuses. I can have those people either come down here now and do my spiel, or we can add those to the 42, which would give us roughly 47. Do you have any preference?

MR. STEWARD: Dean Steward for Mr. Tanaka. I think I'd suggest that they be added into the 40-something, and we just take a run with them at this point.

MR. FOX: That's fine, Your Honor.

THE COURT: Okay. Now, as to the questionnaires that we have, do you want to look at those -- do you want to start looking at those?

MR. STEWARD: Yes, please.

THE COURT: Okay. Now, I can have the clerk -- you can either divide them up -- why don't we do that. We'll divide them up in half, and then we'll switch them back and then see if you can agree on people that you can excuse, and for those that you don't, then see whether we want to talk to them or have the magistrates talk to them.

MR. FOX: Will we be able to see the -- I guess they filled out hardships. Even if they saw the magistrate judge they said they would fill out hardships, is that right, the five that were rejected?

THE COURT: I think the magistrate may have excused some, very few, and these other people would have filled these questionnaires out as well. The only people who you haven't --

don't have a questionnaire for are those five that are up in the jury assembly room now.

MR. HAIG:  Your Honor, this is Jerome Haig.  I have a question.  So the people that were sent down earlier to fill out the larger questionnaires, are we going to be getting those after we look at the hardship questionnaires from the people that just filled them out?

THE COURT:  There is no large --

MR. HAIG:  Well, they were sent downstairs -- the ones that said they could be here for the entire trial, were they asked to fill anything out?

THE COURT:  No.

MR. HAIG:  No, okay.  All right.  So what were they given?  Just a --

THE COURT:  The only thing they were given is that two-page hardship -- that generally describes what a hardship is.

MR. HAIG:  All right.  Okay.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  I'm going to permit counsel to review these questionnaires, and if you could just let the clerk know when you've concluded your review, and then I'll come back out and proceed.

(Off the record at 10:26 a.m.)

UNITED STATES DISTRICT COURT

(On the record at 11:12 a.m.)

THE COURT:  All right.  I understand that the parties have reviewed the questionnaires and the parties are in agreement that there are a number of individuals that can now be excused by the jury commissioner, is that correct?

MR. FOX:  That's correct, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  All right.  I think my plan would be is to notify the jury commissioner of those jurors who we've -- the parties have agreed can be excused, and with respect to the people that have indicated that they can be with us -- and I believe that number is roughly at 42 -- excuse those people until 1:30 and let them go to lunch.  And then I would have the -- I want to take a look at the people who you would ask -- who you want to be further questioned, and we'll start bringing some of those down and talking to them between now and 1:30.

Now, I'd like you to keep in mind that I believe if we got another 10 to 15 people, that's probably going to be enough to get the jury selected.  At the end of the day, I've got another panel of 50 to 60 people coming in at eight o'clock or 8:30 tomorrow morning.  I imagine that we could probably get another 10 people who would be available to serve from that group, which probably would be a sufficient number to get a jury selected.

I don't know if -- in looking at these people that have

hardships that you want me to talk to, if you've ranked these in any particular order, but it seems to me maybe we ought to rank them at -- put a priority on the people who we think have the best chance of being able to serve and start talking with them.  If you want to go through all 38 of them, or whatever that number is, that's fine, but it may not be necessary.  But I'm certainly willing to go over as many as you -- as we can between now and 1:30 to see if we can -- see if we can get however many numbers we want.  And maybe as we get closer to 1:00 or 1:30, maybe we ought to take a look at what our numbers look like at that point and then decide whether we want to continue with this process of going -- talking with these people or actually starting with the jury selection or having the magistrate go through the rest of them for those that we can't finish by, say, 1:00 or 1:30.

Any preference?

MR. FOX:  If the defense is willing to do it, we're happy to sit down, meet and confer with them and try to have maybe a top 15 people that we think could have follow-up questions that we think might make them eligible for jury service.

MR. HAIG:  That's fine.  We didn't really rank them, Your Honor.  We just kind of gave you what we gave you.

THE COURT:  Okay.  Why don't you see if you can rank the -- rank these in some sort of order that would be most

likely to be able to serve.  We'll go ahead and talk with them, and if nobody -- we'll talk with them, start out with them at least, and by about one o'clock we'll see what our numbers look like.  And it would be my proposal at that point to bring down at 1:30 the people who can serve, start the jury selection. And if we can get a jury, fine.  If not, then we'll -- the magistrates should have finished with whatever we weren't able to get through on this list, and plus we have a new jury panel coming in in the morning, and we ought to be able to get enough people to get a jury selected.

Okay.  Anybody have any objection to having the people who can serve excused until 1:30?

MR. FOX:  No, Your Honor.

MR. STEWARD:  None, Your Honor.

THE COURT:  Okay.  And I'm going to go ahead and have the jury commissioner excuse those people who you've agreed on have a hardship.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.  So if you could rank those as soon as you can, and then we'll have those people come down.

(Off the record at 11:17 a.m.)

(On the record at 11:37 a.m.)

THE COURT:  All right.  I understand you have a top 20.

Okay.  So I'm going to ask the jury commissioner to send

all of the people who we have not excused back down here, and we'll start making inquiries of them.  And we'll probably do that at sidebar, unless -- yeah, we'll probably do that at sidebar, unless there's an objection.

MR. FOX:  No objection from the government.

MR. STEWARD:  No objection, Your Honor.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, we tried to do it in some semblance of an order.  So Number 1 is -- I think had no issues and Number 20 had a few issues, and then obviously there's something in between.

THE COURT:  Okay.  I understood -- go ahead and call them and ask them to send those people down.

As to the people, the -- I think there were 38, you still want to have somebody at some point talk to those people as well?

MR. HAIG:  I think that the top 20, that Your Honor could probably deal with that and then -- and probably very quickly, I think.

THE COURT:  It won't be quick.

MR. FOX:  Your Honor, you're saying other than those 20 --

THE COURT:  Other than those 20.

MR. FOX:  And the government has no objection if nobody questions them, but if the defense obviously wants them

**UNITED STATES DISTRICT COURT**

questioned, we're fine with that.

MR. HAIG:  That's fine.  That's pretty much what I meant.

MR. FOX:  I'm not sure whether that means that --

THE COURT:  I don't know what that means.

MR. HAIG:  Well, what Mr. Fox said is fine with us, Your Honor.

THE COURT:  Do you want to excuse them, or do you want them questioned either by this Court or by a magistrate judge?

MR. HAIG:  We're talking other than the 20.

THE COURT:  Yes.

MR. HAIG:  I'm okay excusing them.

MR. FOX:  That's fine, Your Honor.

THE COURT:  Okay.

(Pause in proceedings.)

MR. FOX:  Your Honor, I just noted that I had one on my desk still that would fall in the lower end of the 20, so maybe 21st.  This is, for the record, Alan Tang that I'm providing to you.

(Pause in proceedings.)

(The prospective jurors entered the courtroom.)

THE COURT:  Is Mr. Belsterling here?  Norman?

THE PROSPECTIVE JUROR:  Who?

THE COURT:  Norman Belsterling?

All right.  Sir, I'm going to ask if you would come up here, and if you'd walk over here and join us over at sidebar.

If you're prospective jurors, if you could sit on that side of the courtroom.

(Discussion held at sidebar.)

THE COURT:  Okay.  Is there a reason why you couldn't be with us for the next two or three weeks?

THE PROSPECTIVE JUROR:  I can't.

THE COURT:  You can't.

THE PROSPECTIVE JUROR:  I can't.  I mean, it's difficult because I live 362 miles roundtrip, but I do think I can do it.

THE COURT:  Okay.  Where do you live?  What city do you live in?

THE PROSPECTIVE JUROR:  I live in Nipomo, which is just south of San Luis Obispo.

THE COURT:  Okay.  I think if -- if you want, I think the jury commissioner can put you up in a hotel if that's preferable for you.

THE PROSPECTIVE JUROR:  Oh, yeah.  I can't drive that.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I slept in my car last night.

THE COURT:  Oh, no.  We don't want you to do that.

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Because that's the only way I can make it.

THE COURT:  Okay, that's fine.  Yeah, we'll -- and, sir, in what city do you live in?

THE PROSPECTIVE JUROR:  It's just south of San Luis Obispo.

THE COURT:  Okay.  Yeah, we'll --

THE PROSPECTIVE JUROR:  It's 162 miles from here.

THE COURT:  Okay.  I'll find out the details -- are you able to advance the cost of the hotel, or would you need that paid for in advance?

THE PROSPECTIVE JUROR:  I'd like it paid for in advance.

THE COURT:  All right.  Let me see if that's possible.  And I'm going to let you go to lunch, and you can come back at 1:30, and we'll --

THE PROSPECTIVE JUROR:  I could be -- how long does it take to get reimbursed?

THE COURT:  I'll find out.  I'll have all those answers for you when you come back.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  All right.

THE COURT:  So we'll see you at 1:30.

THE PROSPECTIVE JUROR:  1:30.

THE COURT: Thank you.

THE PROSPECTIVE JUROR: Thank you.

THE COURT: Find out what the details are about that he lives in San Luis Obispo and he wants to stay in hotel and how he gets reimbursed, do they pay it up front.

THE DEPUTY CLERK: Okay.

THE COURT: If not, how long it takes to get his money.

(End of sidebar discussions.)

THE COURT: Donald, I think it's Germann.

(Discussion held at sidebar.)

THE COURT: How are you?

THE PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: Is there a reason you can't be with us for the next three weeks?

THE PROSPECTIVE JUROR: I'm sorry. Speak up, I apologize, I'm hard of hearing.

THE COURT: Okay. Is there a reason you can't be with us for the next three weeks?

THE PROSPECTIVE JUROR: My brother passed away recently. My sister and I had made plans to go back to Indiana with our whole family and dispense with real estate, get that squared away, and the personal -- and collectible property at this time. That involves her coming up with a number of contacts during that period of time that have already been set.

THE COURT:  Okay.  When are you planning on going?

THE PROSPECTIVE JUROR:  We're talking about the middle part of April, which right now my plan is leaving here the 10th, drive back the 12th and returning back on the weekend following that, which I think would be about the 18th.

THE COURT:  Okay.  Do you have appointments already arranged back there for that time period?

THE PROSPECTIVE JUROR:  Pardon?

THE COURT:  Do you have any deadlines that have already been established?

THE PROSPECTIVE JUROR:  No.  It would basically mean I would have to make my sister change appointments with realtors and some attorneys and such we've been talking to to get that squared away.

THE COURT:  Okay.  And how long are you planning on being back there?

THE PROSPECTIVE JUROR:  This would be a multiple set of trips.  The first trip would be here a planning trip to get everything coordinated, and the sales, auctions and such would take place in the fall, which would be probably August to September.

THE COURT:  Okay.  If you left in April, around April 12th sometime, if you left in April 12th, how long -- how many days would you be back there?

THE PROSPECTIVE JUROR:  I would be back there about

a week and a -- well, two weeks since I'll be driving, so I'll be back on the 10th -- probably be about 23rd, 24th of April I'd be back.

THE COURT:  Okay.  If you could just have a seat on the bench there.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

MR. HAIG:  Jerome Haig said we're willing to stipulate on behalf of the defense.

THE COURT:  Sir.

MR. FOX:  And so is the government.

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  I'm sorry?

THE COURT:  Okay.  You can go back up to the jury assembly room and tell them that you've been excused.

THE PROSPECTIVE JUROR:  Okay.  Appreciate that very much.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  As well as my sister.  Thank you.

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  Okay.  Kang Chan.

(Discussion held at sidebar.)

THE COURT:  Is there a reason why you couldn't be

with us for the next three weeks?

THE PROSPECTIVE JUROR:  No reason.

THE COURT:  Okay.  I'm going to ask -- I'm going to excuse you to go to lunch, and if you could be back here at 1:30?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you very much.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

(End of sidebar discussions.)

THE COURT:  Juanita Lopez.

(Discussion held at sidebar.)

THE COURT:  Hi.  I understand you have a prepaid vacation?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Have you already bought your tickets?

THE PROSPECTIVE JUROR:  Yes, it's a European --

THE COURT:  Where are you going?

THE PROSPECTIVE JUROR:  Paris.

THE COURT:  You're brave.

THE PROSPECTIVE JUROR:  We can't be --

THE COURT:  Yeah, I know.

THE PROSPECTIVE JUROR:  -- fearful.

THE COURT:  And when are you scheduled to leave?

THE PROSPECTIVE JUROR:  The 17th.  It's on a Sunday, and it's within the four weeks.  I'm just afraid that if we

**UNITED STATES DISTRICT COURT**

went over, we wouldn't be able to --

THE COURT:  Okay.  Hold on one second.

(Pause in proceedings.)

THE COURT:  Just have a seat right on that bench -- excuse me, I'm sorry.  So you bought your airline -- how long are you going to be -- and you're going to be there until May 6th?

THE PROSPECTIVE JUROR:  Uh-huh.  And they're not refundable, and I have all my -- everything's paid for.

THE COURT:  Okay.  Have a seat.

I'd either -- if she can show us that she has the ticket, I'd let her go.

MR. HAIG:  We agree.

MR. FOX:  That's fine, Your Honor.

THE COURT:  Do you have your ticket?

THE PROSPECTIVE JUROR:  Yes.  Do I have it on me?

THE COURT:  Not on you, but you do have it?

THE PROSPECTIVE JUROR:  Yes, I do have it.

THE COURT:  Just send a copy of the ticket --

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  -- that you've purchased to the jury commissioner.

THE PROSPECTIVE JUROR:  Okay, no problem.

THE COURT:  So I'm going to let you go.

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Tell them that you need to just show them the jury [sic] ticket, and you're excused.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Okay, great.  Thank you.

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  Holly, I think it's Cindell.

THE PROSPECTIVE JUROR:  Cindell.

THE COURT:  Cindell.

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  How do you spell your last name?

THE PROSPECTIVE JUROR:  C-I-N-D-E-L-L.

THE COURT:  Okay.  You must be in the medical profession.

THE PROSPECTIVE JUROR:  No, engineer.

THE COURT:  Oh, I can't read your writing.  Okay.  You have a vacation between April 13th and --

THE PROSPECTIVE JUROR:  18th, right.

THE COURT:  -- 18th.  Where are you going?

THE PROSPECTIVE JUROR:  Hawaii.

THE COURT:  That's nice.  Can I go?  How long are you going to be -- you're going to be there

from the 13th through the 18th?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Have you already bought your tickets?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Okay.  Do you have something like --

THE PROSPECTIVE JUROR:  Like an app?

THE COURT:  Huh?

THE PROSPECTIVE JUROR:  My app that shows I have my ticket, you want that?

THE COURT:  If you can just show that to the jury commissioner, and you're excused.

THE PROSPECTIVE JUROR:  Upstairs in the room?

THE COURT:  Upstairs.

THE PROSPECTIVE JUROR:  Okay.  I take that with me?

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  I think it's -- is it Cynthia Lara?

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Would serving on the jury for three weeks be a hardship for you?  If you could just come closer to this microphone.

THE PROSPECTIVE JUROR:  Oh, okay.  No, not really.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  But I kind of know about the case --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- being on the news and friends and things.

THE COURT:  Okay.  Okay.  Well, what I'd like you to do is come back at 1:30, and we'll go through all those -- all that information about what you've heard or know, and then we'll make a decision.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  So be back at 1:30 here?

THE COURT:  1:30 here, thank you.

(End of sidebar discussions.)

THE COURT:  Priscilla Boyd.

(Discussion held at sidebar.)

THE COURT:  Hi.  Could you come a little closer so you can talk to this microphone.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Is there a reason you couldn't be with us for the next three weeks?

THE PROSPECTIVE JUROR:  Okay.  If you're desperate, I could.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  However --

THE COURT:  I'm pretty desperate.

THE PROSPECTIVE JUROR:  However, I have a problem walking.  It took me 40 minutes to get here instead of the 20 minutes, and I spent another half hour to drive here, and I'm thinking can I do this for four weeks?  You know, I probably could, I mean, if I'm determined, but I just want you to know that.

THE COURT:  I understand.

THE PROSPECTIVE JUROR:  You're testing me a little bit, but I'll do it.

THE COURT:  Okay.  Where do you live?

THE PROSPECTIVE JUROR:  West Hollywood.

THE COURT:  Okay.  And what do you do for a living?

THE PROSPECTIVE JUROR:  I'm retired.

THE COURT:  What did you do before you retired?

THE PROSPECTIVE JUROR:  I worked in food service.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  No, I'm not.

THE COURT:  Okay.  And how are you spending your retirement?

THE PROSPECTIVE JUROR:  I keep very busy doing nothing and many things.

THE COURT:  Where did you park at today?

THE PROSPECTIVE JUROR:  I didn't make it to the parking lot that they said, so I went -- I landed down a little

UNITED STATES DISTRICT COURT

bit at Joe's Parking, I think it is.

THE COURT: Okay.

THE PROSPECTIVE JUROR: So anyway, if you're going to put me into this, I have -- it would be nice if I had Uber just take me to the door, but I can't afford that, so I'm going to have to find a parking place cheaper and closer.

THE COURT: Okay. Have a seat right there for just one minute.

THE PROSPECTIVE JUROR: Okay.

THE COURT: Okay?

MR. FOX: The government would agree to remove this juror if the defense would.

MR. HAIG: This is Jerome Haig. Yes, we would stipulate.

THE COURT: You walk a lot faster than I do.

THE PROSPECTIVE JUROR: I'm trying to. I don't want to take up your time.

THE COURT: That's okay.

All right. Why don't you go up to the jury commissioner and tell them you've been excused. You can go back up to the third floor and tell them you've been excused.

THE PROSPECTIVE JUROR: I thank you for understanding.

THE COURT: Okay. She walks better than I do.

(End of sidebar discussions.)

46

THE COURT:  Peggy Lim.

(Discussion held at sidebar.)

THE COURT:  Hi, how are you?

THE PROSPECTIVE JUROR:  Good, thank you.

THE COURT:  Is there a reason you couldn't be with us for the next three weeks?

THE PROSPECTIVE JUROR:  Well, I have my company only pays up to two weeks of jury duty.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And then on top of that, I have two children, and their caretakers, my -- they come to watch the kids when I leave for work.  If they don't come -- I wouldn't be here -- I wouldn't be able to get here by 8:00 a.m.

THE COURT:  Where do you live?

THE PROSPECTIVE JUROR:  Monterey Park.

THE COURT:  And what time do the caretakers --

THE PROSPECTIVE JUROR:  Between -- about 7:30, 7:45.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  I am.

THE COURT:  What's your husband do?

THE PROSPECTIVE JUROR:  He's an engineer for the City.

THE COURT:  Okay.  And what do you do for a living?

THE PROSPECTIVE JUROR:  I'm a bank manager.

THE COURT:  For which bank?

THE PROSPECTIVE JUROR:  First Republic Bank.

THE COURT:  Okay.  And they pay for --

THE PROSPECTIVE JUROR:  I believe they pay up to two weeks.

THE COURT:  Okay.  And how many children do you have?

THE PROSPECTIVE JUROR:  Two.

THE COURT:  And what are their ages?

THE PROSPECTIVE JUROR:  Almost 2 and 4.

THE COURT:  Okay.  And what time does your husband go to work?

THE PROSPECTIVE JUROR:  He usually leaves for work at 6:30.

THE COURT:  So it takes you -- how long did it take you to get here this morning?

THE PROSPECTIVE JUROR:  About 30 minutes to get to parking, and then about another -- I don't know how long it took me to get here, but it takes about 30 to 40 minutes.

THE COURT:  Okay.  Over the lunch hour, would you call the bank and ask them how long they would pay for.

THE PROSPECTIVE JUROR:  Sure, I can do that.

THE COURT:  Okay.  And let me know that after lunch.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  1:30.

THE PROSPECTIVE JUROR:  Okay.  And I'm excused?

THE COURT:  Until 1:30.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

MR. FOX:  This is Brandon Fox.  May I ask Ms. Lim also, she didn't say why her caretaker didn't come earlier.

THE COURT:  Are you paying the caretakers?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Family members?

THE PROSPECTIVE JUROR:  They are family members.

THE COURT:  And what's the relationship?

THE PROSPECTIVE JUROR:  My in-laws.

THE COURT:  Okay.  They always make good babysitters.  Any reason they couldn't come earlier?

THE PROSPECTIVE JUROR:  Traffic.

THE COURT:  Okay.  Find out what your employer will pay.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  And let me know at 1:30.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Nice try.

(End of sidebar discussions.)

THE COURT:  I believe it's Jonathan Sanchez.

(Discussion held at sidebar.)

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm just a cashier.

THE COURT:  A cashier.  And where do you work?

THE PROSPECTIVE JUROR:  At El Pollo Loco in Pomona.

THE COURT:  Okay.  And do they pay for your jury service?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Are there any other people in your household?

THE PROSPECTIVE JUROR:  Just my mom, dad and my brothers.

THE COURT:  Okay.  When do you work?

THE PROSPECTIVE JUROR:  Usually morning, 8:00 to 4:00.

THE COURT:  And how many days a week do you work?

THE PROSPECTIVE JUROR:  Well, I'm here on my days off, that's why.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Like, so it would be Thursday to Sunday.

THE COURT:  Okay.  Starting at 8:00 in the morning until around?

THE PROSPECTIVE JUROR:  4:00.

THE COURT:  4:00.  Did you ask your employer whether they paid for jury service?

THE PROSPECTIVE JUROR:  No, I didn't ask, no.  She only said she'd give me the day if I needed it.

THE COURT:  What do you do for them?

THE PROSPECTIVE JUROR:  For them, just wherever, whatever position they put me in.

THE COURT:  Okay.  And how old are you?

THE PROSPECTIVE JUROR:  I'm 19.

THE COURT:  Are you going to school?

THE PROSPECTIVE JUROR:  Not now.

THE COURT:  Okay.  So you work about 30 hours a week.  Are they able to change your -- do you work -- is that a set -- are those set days that you work, or do they change?

THE PROSPECTIVE JUROR:  Well, depends.  You have to run them by her before anything.

THE COURT:  Okay.  But you always work Thursday through Sunday?

THE PROSPECTIVE JUROR:  Well, this week they did change.  It's like a day forward.  Instead of being off Monday, I work Monday and I was off Tuesday and Wednesday.

THE COURT:  Okay.  Just have a seat right there for one second.

MR. HAIG:  Your Honor, our thoughts are if he's living at home, which sounds like he is, I think he should stay.  The only thing would be the fear that he may potentially lose his job, but he didn't say that, and it sounded like he

has a flexible schedule.  So we'd ask that he remain.

MR. FOX:  It's fine with the government, Your Honor.

THE COURT:  So you work Thursday, Friday, Saturday, Sunday, four days a week; right?  El Pollo Loco, they stay open until what, 10:00 --

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  -- on the weekends?  Is it possible for you to work -- let's say you got selected as a juror in this case.  Is it possible for you to come to work, say, at two o'clock?

THE PROSPECTIVE JUROR:  At two o'clock in the evening?

THE COURT:  Uh-huh, two o'clock in the afternoon and work.

THE PROSPECTIVE JUROR:  No.  Usually there aren't hours that way or a position to fill at that time.

THE COURT:  What are the shifts?

THE PROSPECTIVE JUROR:  There's shifts, like I said, like basically 8:00 to 4:00, and then the other shift comes from 4:00 to 12:00.

THE COURT:  Okay.  How long have you worked there?

THE PROSPECTIVE JUROR:  It's got to be two years in June.

THE COURT:  Uh-huh.  Have you -- you told them that you might be selected as a -- that you had jury duty?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Have you talked to them about -- why don't you do this.  Over the lunch hour why don't you call your employer and tell them there's a chance that you might be selected for a jury that would last three weeks and see if there's any flexibility where you could come in, say, at four o'clock and work until -- work that other shift.  Okay?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  And ask them what would happen if you were selected for this jury, if that's going to have any effect on your job.

THE PROSPECTIVE JUROR:  Okay, yeah.

THE COURT:  Okay?  And why don't you come back at 1:30 and let me know.

THE PROSPECTIVE JUROR:  Okay, thank you.

THE COURT:  Thanks.

MR. FOX:  Your Honor, have you told the jurors at this point it's going to be Tuesday through Friday?  Because I wonder also if that would affect people like him, if he's working four days a week, it's really three days.

THE COURT:  Well, what I'm going to do is that first Monday we'll probably be dark, unless one of the jurors has a problem with that.  What I'd normally do then is meet those -- I would probably -- after that Monday, if we aren't finished, then I'd probably go on those Mondays.  But if a juror has a

problem -- but let's see what his employer says.

The other thing you might want to consider though, you know, if you're getting up at 8:00 and you're working from 4:00 to midnight and then you got to come here at 8:00, you may not be --

MR. HAIG:  Paying attention.  This is Jerome Haig.

(End of sidebar discussions.)

THE COURT:  Paulina Q-U-I-O-Z [sic].

(Discussion held at sidebar.)

THE COURT:  How do you pronounce your last name?

THE PROSPECTIVE JUROR:  Quiroz.

THE COURT:  Okay.  Why couldn't you be here for with us for three weeks?

THE PROSPECTIVE JUROR:  Because financial-wise I won't be able to because my mom just passed away, and me and my sister have to help my dad because my dad doesn't have that income of my mom anymore and my work doesn't pay me as well.

THE COURT:  Okay.  Where do you work?

THE PROSPECTIVE JUROR:  A fast food place called Juan Pollo.

THE COURT:  Called?

THE PROSPECTIVE JUROR:  Juan Pollo.

THE COURT:  And how many -- do you work full-time?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And what days do you work?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  It varies.  Mondays are usually my days off because my family goes to therapy for the last Monday.

THE COURT:  And so what days do you actually work?

THE PROSPECTIVE JUROR:  Well, the days I usually work --

THE COURT:  You work five days a week or six days a week or four days a week?

THE PROSPECTIVE JUROR:  It just varies.  It's mostly five days to six days a week.

THE COURT:  Okay.  And what do you do?

THE PROSPECTIVE JUROR:  Cashier and putting like the food in the containers and stuff.

THE COURT:  Okay.  And how many people are in your household?

THE PROSPECTIVE JUROR:  Right now, three.

THE COURT:  Okay.  So it's you --

THE PROSPECTIVE JUROR:  Me, my dad and my sister.

THE COURT:  Okay.  And is your father working?

THE PROSPECTIVE JUROR:  Yes.  He actually went back to work not that long ago.

THE COURT:  What does he do?

THE PROSPECTIVE JUROR:  He's a meat cutter at Costco.

THE COURT:  At Costco?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And your sister, what does she do?

THE PROSPECTIVE JUROR:  She's a hairstylist.

THE COURT:  Okay.  And is she working?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Does your employer pay for any jury service?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Have a seat right there.

(Court reporter clarification.)

THE COURT:  Yes, I believe -- it's Juan?

THE PROSPECTIVE JUROR:  Juan Pollo.

THE COURT:  J-U-A-N, P-O-L-L-O.

Okay.  You're excused.  You can go up to the jury assembly room and tell them you're excused.

(End of sidebar discussions.)

THE COURT:  Is Dayle Campbell...

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Good morning, everybody.

THE COURT:  Hi.  Is there a reason you couldn't be with us for the next three weeks?

THE PROSPECTIVE JUROR:  Okay.  Well, I missed a baseball game today.  What I do is I coach.  I got to -- I'm sorry.  I got drafted four times.  I was the Angels's

first-round draft pick in '68.  I played A ball, AA, got to AAA and tore my medial meniscus.  I got released, so I taught high school for over 31 years.  So we used to -- we train kids for baseball, softball, life skills and stuff like that.

So this is what I enjoy doing, but as far as my family is concerned, my first wife -- I was married for, okay, 41 years.  She died of breast cancer in 2010, but she worked for L.A. County Probation, okay.  I have two daughters that work for law enforcement.  One is a probation officer; one works for the juvenile courts.  I have a son-in-law, he works for L.A. County Sheriff.  He used to do surveillance, and he was on the task force.  He used to fly and, I guess, pick up films, bring them back --

THE COURT:  Okay, all that's fine.  All I really want to focus on, though, is if there's anything from a financial standpoint that would prevent you from being here for the next three weeks.

THE PROSPECTIVE JUROR:  Well, the thing about it, I do get paid for coaching, but like I said, other than that, then that would be it.

THE COURT:  Okay.  See you at 1:30.

THE PROSPECTIVE JUROR:  See me at 1:30?

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  Okay.

(End of sidebar discussions.)

THE COURT:  Okay.  All right.  I'm going to have to take -- well, let's try one more.  No?  We're going to take about a two-minute recess so I can go find my voice, and then we'll resume.  Be about two minutes.

(Off the record at 12:18 p.m.)

(On the record at 12:20 p.m.)

THE COURT:  I think it's Marissa Baylon.

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Your employer pays for ten days?

THE PROSPECTIVE JUROR:  That's correct.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what does your husband do for a living?

THE PROSPECTIVE JUROR:  He's an IT guy.  He's an IT analyst.

THE COURT:  Okay.  And do you have any children?

THE PROSPECTIVE JUROR:  Yes, we have two.

THE COURT:  And how old are they?

THE PROSPECTIVE JUROR:  They are 22 and 24.

THE COURT:  Okay.  And are they living at home?

THE PROSPECTIVE JUROR:  One is living at home.

THE COURT:  Okay.  Which one is that?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  The 22-year-old.

THE COURT:  And does the 22-year-old work?

THE PROSPECTIVE JUROR:  Part-time.

THE COURT:  Okay.  You work for Lionsgate?

THE PROSPECTIVE JUROR:  Yes, I do sir.

THE COURT:  And are you working full-time?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And what days a week do you work?

THE PROSPECTIVE JUROR:  Monday through Friday.

THE COURT:  So your employer would pay for ten days. Okay.

THE PROSPECTIVE JUROR:  Including this one.

THE COURT:  Huh?

THE PROSPECTIVE JUROR:  Including this one.

THE COURT:  Including today?

THE PROSPECTIVE JUROR:  Yes.  Yes, sir.

THE COURT:  Okay.  Can you give him, the clerk, the name of your supervisor, and we'll give him a call and see if they're willing to pay you for the time you're here.

THE PROSPECTIVE JUROR:  Yes, sure.

THE COURT:  Okay.  And we'll try and call them over the noon hour.

THE PROSPECTIVE JUROR:  She's out this week for spring break.

THE COURT:  Lucky her.  What do you do?

THE PROSPECTIVE JUROR:  I'm an IT manager.

THE COURT:  Okay.  And the person whose name you're going to give us, is there a --

THE PROSPECTIVE JUROR:  I can give you the CIO.

THE COURT:  The CIO?

THE PROSPECTIVE JUROR:  Chief information officer.

THE COURT:  Do they have a personnel department?

THE PROSPECTIVE JUROR:  Yes, they do.

THE COURT:  Can you give us the name of the HR person?

THE PROSPECTIVE JUROR:  I don't know the last name, but I can give you the first.

THE COURT:  Okay.  And we need a phone number.  How about, do you have a general number for them?

THE PROSPECTIVE JUROR:  I don't have one.

THE COURT:  Okay.  Do you have your number?

THE PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Okay.  Well, why don't you give us the IT manager's number.

THE PROSPECTIVE JUROR:  Let me see.  I can grab it from my cell phone.  Is that okay?  Then I can give it to you.  Would that be okay?

THE COURT:  Then if you could come back at 1:30.

THE PROSPECTIVE JUROR:  Sure.

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  Scott Sander.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Hi.  Are you married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Does your wife work?

THE PROSPECTIVE JUROR:  She works as a -- part-time as a teacher's aide.

THE COURT:  Okay.  And who do you work for?

THE PROSPECTIVE JUROR:  I work for FedEx as a delivery courier.

THE COURT:  And what days do you work a week -- or what days do you work?

THE PROSPECTIVE JUROR:  My regular Monday through Friday, and usually I'll volunteer on Saturday.

THE COURT:  Okay.  And Monday through Friday, what are your hours?

THE PROSPECTIVE JUROR:  It all depends.  It depends on what's coming in, how busy we are.  I'm a swing driver, so what I do is if someone calls out sick or is on vacation, I take over their route.  So I never know in the day what's going to happen.  Mondays are usually our lightest day.

THE COURT:  Okay.  And what are your usual hours?

THE PROSPECTIVE JUROR:  I usually go in 7:00 a.m.

UNITED STATES DISTRICT COURT

and sometimes I'll leave at 7:00 p.m.

THE COURT:  Okay.  And do they reimburse you for jury service?

THE PROSPECTIVE JUROR:  I believe it's unlimited, so I'm not sure.  Yeah, I've only been there like a year and a half, so I believe it's unlimited days.  I think they do all that.

THE COURT:  Okay.  And you had put here that you need to pick up your son.

THE PROSPECTIVE JUROR:  Yeah, usually I pick him up from pre-K.  Mondays the one day I know it's usually a light day, so I'll pick him up because my wife doesn't get out of school until 2:30, three o'clock because she does the after-school tutoring and parent/teacher conferences like a translator.

THE COURT:  And what time do you pick up your son?

THE PROSPECTIVE JUROR:  Well, he goes to school -- he goes from 1:00 to 4:30.  He goes to pre-K.  So usually I'll pick him up -- I'll usually take my lunch around -- worst-case scenario I'll take my lunch at 12:00 and then come back at 1:30, two o'clock to work because my wife doesn't get out of work until 2:30, three o'clock.

THE COURT:  Okay.  And where's the preschool?

THE PROSPECTIVE JUROR:  In Reseda, and we live in Canoga Park.

THE COURT:  So you actually pick him up from home?

THE PROSPECTIVE JUROR:  Home or my mom's -- my brother-in-law's house because she doesn't drive.

THE COURT:  And then drop him --

THE PROSPECTIVE JUROR:  At school.

THE COURT:  At school.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And he's in school from?

THE PROSPECTIVE JUROR:  1:00 to 4:30.  He does the pre-K, like a head-start program.

THE COURT:  Uh-huh.  And your wife works?

THE PROSPECTIVE JUROR:  At a school, differently. Next year it will be nice because next year he'll be going to the same school as she is.

THE COURT:  Okay.  And what are her hours?

THE PROSPECTIVE JUROR:  Usually 8:00 to 2:30 on a normal day if she doesn't stay after school to do the tutoring or any parent/teacher conferences.

THE COURT:  And where's the school that she works at?

THE PROSPECTIVE JUROR:  She's in Canoga Park.

THE COURT:  Okay.  And how many days a week does she work?

THE PROSPECTIVE JUROR:  Monday through Friday.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  That's why I even scheduled jury duty for spring break, hoping that it wouldn't be too bad.

THE COURT:  Here you said you're going to pick your son up from school twice a week at 2:00.

THE PROSPECTIVE JUROR:  Well, he goes to school, so I was just guessing going back to work by two o'clock because I figured I would pick him up 1:30 to take him to school, so I was putting that trying to say, you know, I usually have to be back by 2:00.  Sorry, I just wrote it wrong.

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  I figured for like an eight-day trial I could kind of move things around, but a three- to four-week trial would be hard.

THE COURT:  Okay.  Just have a seat right there for a moment.

MR. STEWARD:  This is Dean Steward.  While we're sympathetic to his situation, it sounds to me like he could make the arrangements.  It may be a little bit difficult, but we'd ask the Court to keep him with us.

MR. FOX:  We agree.  He just said that he could move things around, and if we're not going to use him Monday.

THE COURT:  Other than -- well, I know Monday's a day.  What's the other day?

THE PROSPECTIVE JUROR:  Tuesday's usually the other day.  It's not every single time.  It's just worst-case

**UNITED STATES DISTRICT COURT**

scenario.  I know Monday's usually the one day I can because that's our lightest day on the whole week on freight for work.

THE COURT:  Okay.  If we're not in session on Mondays, can you make arrangements to have somebody else drop him --

THE PROSPECTIVE JUROR:  Yeah, if I have to.  Like I said, if I have to jump through hoops I'll do it.  I just -- for four weeks, I was kind of getting a little like worried.

THE COURT:  Okay.  If you're selected as a juror, we'll be dark on Mondays.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  So can you come back at 1:30?

THE PROSPECTIVE JUROR:  Yeah, that's not a problem.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Okay.  Thank you very much.

THE COURT:  All right.  Oh, one other thing.  Could you check with your employer and make sure that it's unlimited?

THE PROSPECTIVE JUROR:  Yeah, I'll call my boss right now and find out.  And then come back here at 1:30, this room?

THE COURT:  Yes.

THE PROSPECTIVE JUROR:  Okay.  Thank you, Your Honor.

THE COURT:  Thanks.

(End of sidebar discussions.)

THE COURT:  I think it's Gabriela Martinez.

(Discussion held at sidebar.)

THE COURT:  Hi.  Where do you work?

THE PROSPECTIVE JUROR:  K-Mart.

THE COURT:  Okay.  And do they reimburse you for jury service?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  What hours do you work?

THE PROSPECTIVE JUROR:  I mostly have close, but they always like have me in mid-shift or closing.

THE COURT:  Okay.  And when does that start?

THE PROSPECTIVE JUROR:  From 2:00 to 11:00.

THE COURT:  And where -- which K-Mart?  Where?

THE PROSPECTIVE JUROR:  Oh, it's Cudahy.

THE COURT:  Cudahy.  It said here I probably can if I talk to your boss.  I don't get paid much, paid every two weeks.

THE PROSPECTIVE JUROR:  Three weeks, sorry for my writing.

THE COURT:  You live at home?

THE PROSPECTIVE JUROR:  What?

THE COURT:  Do you live at home?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And how many people are in your household?

THE PROSPECTIVE JUROR:  Like seven.

THE COURT:  Okay.  So it's mother, father?

THE PROSPECTIVE JUROR:  Well, stepfather.

THE COURT:  Okay.  Brothers, sisters?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Do you want to talk to your boss and find out if you could be here for --

THE PROSPECTIVE JUROR:  Yeah, I guess.

THE COURT:  Financially, could you afford to be here?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  How many hours do you work a week?

THE PROSPECTIVE JUROR:  I'm thinking like --

(End of sidebar discussions.)

THE COURT:  Please turn that phone off because the next time it goes off, I'm going to get a new phone.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  It's like mostly from like 25 hours to 12:00.

THE COURT:  Okay.  And what days do you work normally?

THE PROSPECTIVE JUROR:  It's mostly Tuesdays, Thursdays, sometimes Wednesdays -- Saturdays and Sundays, sometimes Wednesdays.

THE COURT:  Okay.  So is it Saturday, Sundays, and

then sometime during the week?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  And you usually start around 2:00?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Have a seat right there on that bench.

MR. STEWARD:  Your Honor, Dean Steward.  Our thought is that she should probably stay.  Living at home may be a financial issue for her, but all in all, we think she should probably stay.

MR. FOX:  That's fine, Your Honor.

THE COURT:  Okay.  Why don't you check with your boss, see what they say, and then come back at 1:30.

THE PROSPECTIVE JUROR:  Today?

THE COURT:  Huh?

THE PROSPECTIVE JUROR:  Today?

THE COURT:  Today.

THE PROSPECTIVE JUROR:  I don't -- I'm kind of taking the bus.

THE COURT:  Do you have a cell --

THE PROSPECTIVE JUROR:  Oh, call -- yeah, I do.

THE COURT:  Okay.  So can you just call?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And then we'll see you at 1:30.

(End of sidebar discussions.)

THE COURT:  Okay.  L-E-H-T-I-H-A-L-M-E.

THE PROSPECTIVE JUROR:  It's Lauri, right, Your Honor?

THE COURT:  I'm sorry?

THE WITNESS:  Is it Lauri Lehtihalme?  L-E-H?

THE COURT:  That's it.

THE PROSPECTIVE JUROR:  Yeah, I'm hard of hearing.

THE COURT:  Okay.  You have a vacation from April 26th to May 12th?

THE PROSPECTIVE JUROR:  Yeah, it's taking a cruise from Boston up to Maine --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- up to Canada and Quebec City and Montreal.

THE COURT:  Keep your voice down just a little bit.

THE PROSPECTIVE JUROR:  Beg your pardon?

THE COURT:  If you could keep your voice down just a little bit.

THE PROSPECTIVE JUROR:  Yeah, I know.  I'm hard of hearing.

THE COURT:  Okay.  When do you leave to go on vacation?

THE PROSPECTIVE JUROR:  I leave -- fly out the 27th of April.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  It's a redeye.

THE COURT:  Okay.  Have a seat right there for a moment.

THE PROSPECTIVE JUROR:  Back here?

THE COURT:  Uh-huh.

I reckon we'll be done by the 27th.

MR. STEWARD:  Agreed.

MR. FOX:  Fingers crossed.

THE COURT:  Okay.  If you could come back at 1:30.

THE PROSPECTIVE JUROR:  Come back at 1:30 here?

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  Okay, Your Honor.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Mario Munoz.

(Discussion held at sidebar.)

THE COURT:  Okay.  You have a graduation that you'd like to attend?

THE PROSPECTIVE JUROR:  Correct, for the Marine Corps.

THE COURT:  Okay.  On April 14th and 15th?

THE PROSPECTIVE JUROR:  Well, it's -- April 14th is family day, so all the families participate in events inside the base, then the 15th is the actual graduation.

THE COURT:  Okay.  Do you know what day of the week

UNITED STATES DISTRICT COURT

that is?

THE PROSPECTIVE JUROR:  It's a Thursday and a Friday.

THE COURT:  Thursday, Friday.  Okay.  Just have a seat right there for a second.

My view is that if he's ultimately selected we just go dark those two days.

MR. FOX:  I agree, Your Honor.

MR. STEWARD:  We agree as well.

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm a materials manager -- materials manager in charge of purchasing --

THE COURT:  Who do you work for?

THE PROSPECTIVE JUROR:  Amitech Corporation, which...

THE COURT:  And they pay you for your jury service?

THE PROSPECTIVE JUROR:  They'll pay me for partial jury service, and then everything else comes out of my sick/vacation days.

THE COURT:  Okay.  You can be here for three weeks?

THE PROSPECTIVE JUROR:  Can I be here for three weeks?  As long as it finishes before that date, I think I could --

THE COURT:  We'll let you -- if you're ultimately selected and the 14th and 15th, we'll take off those days to

allow you to go.

THE PROSPECTIVE JUROR:  Okay.  Then I would be okay.

THE COURT:  Okay.  Thank you.

MR. JAUREGUI:  Your Honor, did the Court tell this gentleman he can come back at 1:30?

THE COURT:  Sir.  Okay.  So I forgot to tell you, so if you'd come back at 1:30 today.

THE PROSPECTIVE JUROR:  1:30.

THE COURT:  Okay.  Thanks.

THE PROSPECTIVE JUROR:  No problem.

(End of sidebar discussions.)

THE COURT:  Kadosh?

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  How do you pronounce your first name?

THE PROSPECTIVE JUROR:  Gilad.

THE COURT:  Okay.  You have a vacation from April 13th through the 19th?

THE PROSPECTIVE JUROR:  That's correct.

THE COURT:  Where are you going?

THE PROSPECTIVE JUROR:  Miami.

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR:  I work at a mortgage company as a loan review analyst.

THE COURT:  Do they pay for you jury service?

THE PROSPECTIVE JUROR:  They don't.

THE COURT:  And how many people are in your household?

THE PROSPECTIVE JUROR:  Well, I'm currently -- well, I live with my parents, but I'm currently living with my girlfriend, her son.  It's temporary, you know, to help her out with her son because her mom is in Miami right now.  So as I mentioned, I'm helping, taking him to day care and stuff like that in the morning before work.

THE COURT:  Okay.  Do you work full-time?

THE PROSPECTIVE JUROR:  I do.

THE COURT:  And what are your hours?

THE PROSPECTIVE JUROR:  Monday through Friday, 8:15 to 5:15.

THE COURT:  Okay.  Does your girlfriend work?

THE PROSPECTIVE JUROR:  She does.

THE COURT:  And what does she do?

THE PROSPECTIVE JUROR:  She's a veterinarian technician.

THE COURT:  Is she working full-time?

THE PROSPECTIVE JUROR:  She does, but her hours vary.  So sometimes she works really early in the morning, sometimes -- because it's around the clock, it's 24-hours.

THE COURT:  And what do your parents do?

THE PROSPECTIVE JUROR:  My dad's a social worker, and my mom has a child care, ironically.

THE COURT:  Do you have -- have you already purchased your ticket for this vacation?

THE PROSPECTIVE JUROR:  I have.

THE COURT:  Do you have something that you can show me?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Okay.  Have a seat right there for just a second.

Based on the fact that I let other people off for their prepaid vacations, I'd probably let him go too.

MR. STEWARD:  We agree.

MR. FOX:  Thanks, Your Honor.

THE COURT:  Okay.  If you have a copy of the ticket or something, just show it to the jury commissioner and tell them you've been excused.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

(End of sidebar discussions.)

THE COURT:  I think it's Lauren Wilton.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Hi, how are you?

THE PROSPECTIVE JUROR:  Good, thanks.

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR: I'm a human resources manager with Nestle USA in Glendale.

THE COURT: I'm sorry. For who?

THE PROSPECTIVE JUROR: Nestle USA in Glendale.

THE COURT: Okay. And are you married?

THE PROSPECTIVE JUROR: Yes.

THE COURT: And what does your husband do?

THE PROSPECTIVE JUROR: He's an attorney.

THE COURT: Okay. And who does he work for?

THE PROSPECTIVE JUROR: He works for a small company called Mechanical Concepts.

THE COURT: Okay. And does he work full-time?

THE PROSPECTIVE JUROR: Yes.

THE COURT: And are you working full-time?

THE PROSPECTIVE JUROR: Uh-huh.

THE COURT: Do you have any children?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay.

THE PROSPECTIVE JUROR: We have a dog. That's our child.

THE COURT: That is a child. It usually gets, well, taken care of a lot better than I do.

What are your hours?

THE PROSPECTIVE JUROR: Regular 8:00 to 5:00.

THE COURT: So you'll get paid for ten days?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Can you give him the number of somebody at -- what do you do for them?

THE PROSPECTIVE JUROR:  I work in HR.

THE COURT:  Oh, you're the person I need to talk to.

THE PROSPECTIVE JUROR:  I know for a fact we get paid for ten days.  I've also served on a jury before that went three weeks, and I got paid for ten days.

THE COURT:  They wouldn't pay you for --

THE PROSPECTIVE JUROR:  No.  My job involves me being in an office supporting employees, so if I'm not there...

THE COURT:  Tell you what.  Why don't you give us the number of your supervisor in HR.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  We'll give them a call, and we'll see if they'll pay you for the extra week.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  Will do.

THE COURT:  Okay.  So if you give him the number and a name --

THE PROSPECTIVE JUROR:  I'll get my phone and -- oh, I have it on me.

THE COURT:  Okay.  Which one of you is going to make these calls?

(End of sidebar discussions.)

THE COURT:  Michael Hooks.

(Discussion held at sidebar.)

THE COURT:  Okay.  Who do you work for?

THE PROSPECTIVE JUROR:  LAUSD, Foshay Learning Center, high school counselor.

THE COURT:  Okay.  So LAUSD only pays for eight days?

THE PROSPECTIVE JUROR:  My understanding -- I asked our office clerk.  She said they would pay up to eight days, and we have to start during our own time, which is my spring break which is this week.  And basically, I was, you know, hoping that within the last two weeks if I got called on a jury trial that it would take place during that time, but there's also secondary issue.

You know, I'm responsible for graduating 200 12th graders in May.  I have about 35 highly-at-risk 12th graders who I'm almost sure 100 percent sure will not graduate if I'm gone for that long.  They're really dependent on me being there, but my primary issue would be the eight days that they pay for, which would be a hardship.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Does your wife work?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what does she do?

THE PROSPECTIVE JUROR:  She's a coordinator.  She's like an assistant with the L.A. County Office of Education.

THE COURT:  Okay.  And how many people are in your household?

THE PROSPECTIVE JUROR:  Four, my wife and my two children.

THE COURT:  How old are your children?

THE PROSPECTIVE JUROR:  14, twins.

THE COURT:  Okay.  Tell you what.  Why don't I do this.  Can you give me the -- I take it that LAUSD -- well, why don't you give me the number for HR and let me confirm that they only pay eight days.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  And then you need to come back at 1:30.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  Do you have that number handy?

THE PROSPECTIVE JUROR:  I don't know what their -- even -- this is spring break, so there's no one around.

THE COURT:  Oh, there's always somebody at the Board of Education.

THE PROSPECTIVE JUROR:  I'll have to try to -- I'll Google the number --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- and get it for you.

**UNITED STATES DISTRICT COURT**

THE COURT:  Yeah, if you could get us that and -- yeah, if you can get us that before 1:30, and then we'll call.  Okay.

MR. HAIG:  This is Jerome Haig.  Just so the Court knows, we're willing to stipulate based upon the answers he gave, not just regarding his work but regarding the other issues that he talked about.

MR. FOX:  Your Honor, I'd rather confirm that they only pay eight days and determine what his financial hardship is, if it's a financial hardship.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Arellano, Hermila.  Going once, twice.  I think it's A-R-E-L-L-A-N-O.

THE PROSPECTIVE JUROR:  Arellano.

THE COURT:  I'm sorry.

THE PROSPECTIVE JUROR:  Arellano.

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Who are you employed by?

THE PROSPECTIVE JUROR:  It's a contractor for the airport.

THE COURT:  Okay.  And what do you do for them?

THE PROSPECTIVE JUROR:  Take handicap passengers and

UNITED STATES DISTRICT COURT

elderly to their flights on a wheelchair.

THE COURT:  Okay.  And do they pay you for your jury service?

THE PROSPECTIVE JUROR:  I don't.  They didn't tell me anything about it.  I talked to them, but they didn't tell me anything about it.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  No, I'm a widow.

THE COURT:  Okay.  Are you the only one in your household?

THE PROSPECTIVE JUROR:  I'm not.  I have three kids; two of them are in college; the youngest is not.  He doesn't want to go.  He got depression, and he still -- he went into depression about a year or two, and then he go back to depression since my husband passed away.

THE COURT:  Okay.  And how --

THE PROSPECTIVE JUROR:  He doesn't want to do anything.

THE COURT:  How old is the youngest?

THE PROSPECTIVE JUROR:  18.

THE COURT:  Okay.  And the two other children, how old are they?

THE PROSPECTIVE JUROR:  22 and 24.

THE COURT:  Okay.  And they're living at home?

THE PROSPECTIVE JUROR:  Yeah.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  Are they working?

THE PROSPECTIVE JUROR:  Part-time.

THE COURT:  Okay.  Can you have a seat right there just on that bench.

MR. HAIG:  We'll stipulate, Your Honor.  This is Jerome Haig.

MR. FOX:  That's fine, Your Honor.

THE COURT:  Okay.  You can return to the third floor and tell them you've been excused.

THE PROSPECTIVE JUROR:  Third floor?

THE COURT:  Uh-huh.  Thank you.

(End of sidebar discussions.)

THE COURT:  Alan Tang.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Hi.  Who do you work for?

THE PROSPECTIVE JUROR:  For Ralphs Grocery Company.

THE COURT:  And what do you do for them?

THE PROSPECTIVE JUROR:  Clerk.

THE COURT:  You work full-time?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And which Ralphs do you work at?

THE PROSPECTIVE JUROR:  The one in Pasadena, South Pas.

THE COURT:  Okay.  And what are your hours?

THE PROSPECTIVE JUROR:  Every day is difference [sic].

THE COURT:  Every day is different?

THE PROSPECTIVE JUROR:  Yeah, some days 12:00 to 9:00, some days 1:00 to 10:00.  Like today I scheduled 5:00 in the morning.  Sorry about the voice.

THE COURT:  That's okay.

How many people are in your household?

THE PROSPECTIVE JUROR:  Including my family, six people.

THE COURT:  How many of those people are working?

THE PROSPECTIVE JUROR:  Two.

THE COURT:  And they only pay for ten days?

THE PROSPECTIVE JUROR:  Uh-huh.  I've used two already.  They only pay ten per contract, which is every three years.  So two years ago I was on a -- they called me in for two days already, so I only got eight days left, actually.

THE COURT:  Okay.  How many -- I'm sorry, how many adults are in the household?

THE PROSPECTIVE JUROR:  Four.

THE COURT:  And they're all working?

THE PROSPECTIVE JUROR:  No, two -- only two working.

THE COURT:  Okay.  You --

THE PROSPECTIVE JUROR:  And my wife.

THE COURT:  And your wife.

UNITED STATES DISTRICT COURT

Do you have any children?

THE PROSPECTIVE JUROR:  Two.

THE COURT:  How old are they?

THE PROSPECTIVE JUROR:  17 and 16.

THE COURT:  Okay.  Have a seat right there for just one second.

I think by contract, I think they only pay for certain -- I'd be more than happy to call, but I don't think it's going to make any difference with Ralphs.

MR. STEWARD:  Your Honor, we'll stipulate to his dismissal.

MR. FOX:  Yes, Your Honor.

THE COURT:  Okay.  You can return to the jury assembly room and tell them you've been excused.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Okay.  Thank you.

MR. FOX:  Your Honor, in addition -- although there are people that owe you information, there's 13 that so far we've not stricken.  So we're up to 55 plus your other five, so 60 plus.

THE COURT:  So my plan is to excuse these people, and then we'll start with the others.

MR. JAUREGUI:  Your Honor, there are some people who came back to the room before 1:30, so you might want to make clear that those people should come back.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  Do we have any prospective jurors in the room who we've either told to come back at 1:30 or have told us they can be with us for the next three weeks?  Okay.  Anybody else?

Now, the rest of the prospective jurors -- okay, so the three gentlemen -- except for the three gentlemen on the back row, the rest of you all filled out questionnaires saying that you couldn't be with us for the next three weeks; correct?

(The prospective jurors responded yes.)

THE COURT:  Okay.  So except for the three gentlemen on the back row, you can go back to the jury assembly room on the third floor and tell them that you've been excused.  Yes, move quickly before I change my mind.

Okay.  The gentlemen seated in the back, we're going to resume at 1:30.

Counsel, is there anything else we need to take up between now and then?

MR. FOX:  No, Your Honor.

MR. STEWARD:  No, Your Honor, thank you.

THE COURT:  All right.  We'll see everybody at 1:30.

(Off the record at 12:54 p.m.)

(On the record at 1:50 p.m.)

THE COURT:  All right.  Let's call the case.

THE DEPUTY CLERK:  Recalling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good afternoon, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Leah Tanner, who's a special agent with the FBI.

MR. STEWARD:  And, Your Honor, Dean Steward for Mr. Tanaka.

MR. HAIG:  And Jerome Haig for Mr. Tanaka.

THE COURT:  Good afternoon to you-all.

I'm going to see counsel at sidebar for two minutes, and then we'll get started with jury selection.

(Discussion held at sidebar.)

THE COURT:  There were some people, I think probably four or five, who we asked them to give us the names of their employers.

We called for Ms. Baylon, and her employer will only pay for ten days.

Ms. Wilton is another one.  They're waiting -- they're going to get back to us, but it doesn't look good.

Now --

THE DEPUTY CLERK:  Mr. Hooks.

THE COURT:  Mr. Hooks, apparently they pay for 15 days, so I'm going to leave him out.

THE DEPUTY CLERK:  And Ms. Gabriela Martinez -- Ramirez.  She said --

THE COURT:  Yeah, Martinez.

THE DEPUTY CLERK:  Yes, Martinez.  Her employer doesn't have a problem with paying jury duty.

THE COURT:  Okay.  She'd what?

THE DEPUTY CLERK:  We called her employer, and they do not have a problem with her being selected as a juror, paying jury duty.

THE COURT:  Okay.  Let me go back and get another cough drop.  Now -- well, stay right here.

(Pause in proceedings.)

MR. FOX:  Your Honor, may I have a word with you?  Mr. Montes Kerr has been great about segregating who are watching the trial from the jurors, and there's somebody who's sitting with one of the jurors.  Do you mind if I mention it to him?

(Pause in proceedings.)

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.  I believe it's Ms. Wilton who worked for Nestle, and they will pay.

MR. FOX:  They will pay.

THE COURT:  Okay.  Now, is there anybody -- I'm not sure if there's anybody else who's left standing at this point.

Now, what do you want to do about --

**UNITED STATES DISTRICT COURT**

MR. FOX:  Ms. Baylon.

THE COURT:  Ms. Baylon.

MR. FOX:  Your Honor, I think the government would like to keep her.  We're hopeful this trial is right around ten days total, so I hope it wouldn't be a hardship for her.

MR. STEWARD:  We agree.

THE COURT:  Okay.  I'll start calling these names. I'll ask again at some point whether there are any hardships and go on.  Okay?

MS. RHODES:  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  Hopefully my voice is back for a while.

Ladies and gentlemen, as you probably know, at the beginning of any court case the first step involves a selection of jurors who are going to hear the case.  During this process, I will be asking you questions.  It provides the Court and the lawyers with an opportunity to inquire into your background, experience and state of mind to determine whether you're qualified to be a juror in this case.  Now, "qualified" simply means that you can be fair and impartial, that you can decide this case based on the evidence presented here in the courtroom and on nothing else.

Please keep in mind that during this process there is no such thing as a right or wrong answer, only answers that are

complete or incomplete.  Err on the side of giving too much information.

In this case, you'll be sitting as judges of the facts. All parties have a right to expect that you will perform your role fairly and impartially and not because of any bias or prejudice you bring into this courtroom.  If there is any reason why any of you might be biassed or prejudiced in any way, you must disclose such reasons when you're asked to do so. It's your duty to make this disclosure.

Now, in giving you these admonitions I want to make it clear that I have no intention of trying to embarrass anyone or to invade your privacy or the privacy of any of your family members or close personal friends.  If you have something that you think that the lawyers or I should know but you do not wish to discuss it in the presence of the entire panel here in open court, please let me know and we can discuss that matter at sidebar outside the presence of the other jurors.

This is a criminal case.  It's entitled the United States of America vs. Paul Tanaka.

To begin this process, I'd like to introduce you to the parties and counsel in this matter.  I'm going to ask government counsel to stand and introduce himself and anyone seated at counsel table to the prospective jurors.

MR. FOX:  Good afternoon.  My name is Brandon Fox. I'm a federal prosecutor, also known as an Assistant United

States Attorney.  Sitting two people away from me, now standing, is Lizabeth Rhodes.  She is also an Assistant United States Attorney, and sitting one over to my right is Eddie Jauregui.  He is also an Assistant United States Attorney.  Sitting directly to my right will be Leah Tanner.  She's a special agent with the FBI, and you will also hear her referred to as her previous name Leah Marx.

THE COURT:  All right.  Thank you.

Is there any member of the jury panel who is acquainted with or has seen counsel, the agent or who may have heard their names prior to today?  If your answer is yes, please raise your hand.

All right.  Will counsel stipulate that I do not have to note for the record that there were no hands raised in response to my future questions?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  I'm going to ask defense counsel to stand and introduce himself, the defendant and as well as anyone else seated at counsel table to the prospective jurors.

MR. STEWARD:  My name is Dean Steward.  I'm a lawyer from Orange County.  This is our client Paul Tanaka.  And with me is Jerome Haig, who is my co-counsel, another lawyer representing Mr. Tanaka.

THE COURT:  Thank you.

Is there any member of the jury panel who is acquainted with or has seen counsel or the defendant or who may have heard their names prior to today?  If your answer is yes, please raise your hand.

All right.  I'd just like you to keep that in mind, and we'll -- keep that question in mind, and if you're brought into the jury box, we'll take it up with you.

Do any of you or any members of your family know or have any kind of relations with me?  Just raise your hand.

During the trial of this case, the following persons may be called as witnesses:  I'm going to have the clerk read the names of the prospective witnesses.

THE DEPUTY CLERK:  Robert Olmsted; John Clark; Al Gonzales; Denise Conte -- no, it's Dennis Conte; Peter Eliasberg; Pat Maxwell; Steve Roller; Steve Martinez; Robert Bayes; Mickey Manzo; Connie Cervantes; David Dahle; Bobby Lyons; Judy Gerhardt; Linda Farrar; Michelle Miller; Gus Academia; Tara Adams; Kathy Voyer; Ralph Ornelas; Michael Bornman; Gilbert Michel -- actually, I think it's Gilbert Michel; William David Courson; John Powell; David Betkey; William "Tom" Carey; John Torribio; Leah Tanner; Ruben Martinez; Sue Bissman; Mark Lilianfeld; Larry Waldie; Cecil Rhambo; Duane Harris; Paul Yoshinaga; Ed Medrano; Rodney Lyons; Helen Hayase; Carlos Lifesjoe; Victor Cockrell; Carlos Narro; David Lam; Leroy Baca.

THE COURT:  Have any of you heard of or otherwise been acquainted with any of the witnesses just named that you believe would affect your ability to be a fair and impartial juror in this case or make it difficult for you to be fair and impartial in this case?

All right.  You should note that the parties are not required and might not wish to call all of these witnesses, and they may find it necessary later to call other witnesses.

Again, this is a case in which the defendant is charged with conspiring to obstruct justice and endeavoring to obstruct a grand jury investigation of civil rights violations in the Los Angeles County jails.  The government alleges that the defendant was the undersheriff with the Los Angeles County Sheriff's Department at a time when the federal government was conducting a federal grand jury investigation of whether certain deputies were using excessive force and accepting bribes at the Los Angeles County Department's jails.

The government alleges that it was utilizing an inmate, Anthony Brown, as an informant in that investigation.  The charges allege that after the defendant and other members of the Los Angeles County Sheriff's Department became aware that inmate Brown was a federal informant, they conspired to hide inmate Brown from a federal grand jury by changing inmate Brown's name, by altering the Sheriff's Department's computer records, moving inmate Brown to other facilities operated by

the Los Angeles County Sheriff's Department, that they tampered with witnesses and allegedly threatened the arrest of an FBI agent.

To these charges the defendant has pled not guilty, and it will be the question of his guilt or innocence to the charges that you'll be asked to decide if you're selected as a trial juror in this case.

I'm going to ask the clerk to call the names of 12 prospective jurors.  As your name is called, please come forward and take your seat in the jury box as the clerk directs.  Prospective Juror Number 1 should take the seat on the first row closest to me, and the next prospective juror takes the next seat until the first six seats on the first row are filled.  Prospective Juror Number 7 takes the first seat on the second row closest to me, and the next prospective juror takes the next seat until the six seats on the second row are filled.

All right.  Sir, if you'd call the name of the 12 prospective jurors.

THE DEPUTY CLERK:  Mario Munoz.

THE COURT:  All right.  Sir, are you a prospective juror?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  If you could -- there's a seat here on the right.

THE DEPUTY CLERK:  Michael Hooks, Belinda Becerra, Disha Patel, Ryan Darling, James Lam, Lorena Herrera, Julio Hernandez Espinosa.

THE COURT:  You're going to take that first seat on the second row closest to me.

THE DEPUTY CLERK:  Isabel Lague.

THE COURT:  You're going to take the next seat right next to her.

THE PROSPECTIVE JUROR:  Lague.

THE DEPUTY CLERK:  Lague.

Lijun Wang Pan, Nancy Burns, Gabriela Martinez.

THE COURT:  Ladies and gentlemen, I'm going to continue asking questions of the prospective jurors seated in the jury box.  These questions are directed to all of the jurors in the courtroom, because if any of the prospective jurors seated in the jury box are excused, a replacement will be called and I will ask that person, without repeating all of the prior questions, whether any of those questions pertain to him or her.

Therefore, it's important that each of you listen carefully to the questions that I will be asking and keep in mind any of which call for an affirmative answer or other explanation on your part.  In that way, if you're called into the jury box, I won't have to repeat each of the questions to you.

Now, it's important that all of you remain in the courtroom during the questioning of jurors in the jury box so that if you're called to replace a juror, you will have heard all of the Court's questions.  Now, we will take a break sometime this afternoon, but until we take our break, all of you are to remain in the courtroom.

When we do take our break this afternoon, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  This admonition also includes communicating by e-mail with anyone about the case.  Do not use any social networking sites such as blogs, Myspace, Facebook, Twitter.

If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.  Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk.  And most importantly, do not make up your mind about the verdict until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed

the evidence.  Keep an open mind until then.

Now, to the people seated in the jury box, having heard the charges which have been filed against the defendant, is there any member of the jury panel seated in the jury box who feels that he or she cannot give the defendant or the government a fair trial because of the nature of the charges?

Okay.  We're going to take you one at a time.  So I'm going to start with the gentleman seated on the first row, and you're going to come over here to sidebar.

(Discussion held at sidebar.)

THE COURT:  Okay.  Is there a reason why you feel you can't be fair to both sides in this -- or either side in this case because of the nature of these charges?

THE PROSPECTIVE JUROR:  Here's my concern.  My concern is growing up, all my cousins have been through the system, and you hear stories of the incidents and what happened.  Even my father who, when he was arrested, he even told me the incidents again that would happen.  So it's a lot of stuff growing up and hearing it.  You try to be impartial and not to, obviously, have it affect you, but there's no guarantee on that.

THE COURT:  Well, I don't know what stories you may have heard, but really what we're trying to do is decide this case based on just the evidence that you hear here in the courtroom.  And, you know, we all grew up with different life

experiences and -- but what we try to do is compartmentalize it so that we can put those things, those outside influences, leave them outside and just decide this case based on the evidence and render a fair and impartial verdict to both sides in this case.

So do you feel that you can put aside what you may have heard or stories that you heard?

THE PROSPECTIVE JUROR:  I can definitely try.

THE COURT:  Okay.  Well, what I need is I need a commitment that you're going to be able to put aside those things and decide this case based solely on what you hear here in the courtroom.  And if you can do that, we'd love to have you, but it's important to both sides that they get a trial that's based just on the evidence that's here, that's admitted here in the courtroom.

THE PROSPECTIVE JUROR:  I can say yes, right?

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  And I'll definitely give it my all for you, yes.  I want to say yes, and I want to believe that I can do that.

THE COURT:  Okay.  Well, you know what -- what I want to know -- what I really need to hear from you is a commitment that you can do that, that I can put aside what I may have heard, stories people may have told me or what I may have read and decide this case based on the testimony of the

witnesses who are going to be there in the witness box and based on the evidence that's actually admitted into evidence here in this case, and you can decide the guilt or innocence of the defendant based just on that.

THE PROSPECTIVE JUROR:  Based on facts, yes.

THE COURT:  Okay.  Can you commit to both sides that you're going to do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Just have a seat right there for a moment, right there on the bench there.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Does either side have any additional questions you want me to ask?

MR. FOX:  Not from the government, Your Honor.

MR. STEWARD:  No.

THE COURT:  Okay.

All right.  Sir, if you'd resume your seat in the jury box, please.

(End of sidebar discussions.)

THE COURT:  And we'll take the next person -- who's the next person that had their hand raised?

Sir, if you'd come over here, please, and please walk all the way around because there's a trapdoor there in the center, and I don't want any of you to fall in there.  There's some lawyers down there.

(Discussion held at sidebar.)

THE COURT:  All right.  If you'd come a little closer to the microphone.

Okay.  Is there a reason why you think you can't be fair and impartial?

THE PROSPECTIVE JUROR:  Well, I can give you the long story or short.  Basically, I've been very distrustful of police officers and law enforcement since I was ten years old.  My father, he was in construction.  He took my brother and I to a site that he was working on, you know, all white area.

We were standing in front of the house.  Two police officers passed by.  They passed by again, passed by again, and they stopped us.  Just started asking a bunch of questions.  They roughened up my dad and it kind of traumatized me, and they ended up telling us they just pulled us over because we were black in a white area.

My dad went to the commander and complained about it.  Well, my dad told me that the officers said that they never said it.  Ever since then, I have not believed -- I just question the credibility of any police officer.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Every time someone even pulls me over, you know, I'm wondering, you know, did they pull me over because I'm black or what.  And, I mean, I just -- you know, if I see, you know, or hear testimony from someone

saying -- and I kind of know what the case is about just watching the news, and in the back of my mind I might be a little distrustful of what the person is saying only because of my personal experience with it.

Also, I have students that I work with who -- I have some students who have told me in the past that police officers planted things in their home and things like that. I don't have any evidence of that, but it just kind of led into my own suspicion for years of just, you know, distrust and -- of law enforcement.

THE COURT: Uh-huh.

THE PROSPECTIVE JUROR: Now, I would try my best to be impartial. Would I succeed? I -- I don't know, but I'll try.

THE COURT: Let me ask you. What do you do for a living?

THE PROSPECTIVE JUROR: I'm a high school counselor.

THE COURT: You're a high school -- what school?

THE PROSPECTIVE JUROR: Foshay Learning Center. It's a K through 12 school.

THE COURT: Yeah, Foshay is a -- it's on Exposition; right?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And you're a counselor -- guidance counselor?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  You know, I --

THE COURT:  Let me say this.  You know, I think everybody here has had a number of different life experiences, and that makes up who we are.  And one of the most important things that we have to do here in trying to resolve this case is to put aside outside influences and our own personal likes or prejudices and decide this case based solely on the evidence we hear here in court.

Now, this case involves law enforcement officers on both sides, okay?  FBI agents, you're going to hear from deputy sheriffs, and it's important that you judge their credibility based on the way that they act on the witness stand.  And what's important is we want everybody in this case to have a fair trial, an impartial trial and a fair and impartial juror. And if you can put aside the experiences that you've had and judge the case based solely on the evidence, then we'd love to have you.  If you can't do that, we just need to know that.

THE PROSPECTIVE JUROR:  I would -- I mean, I would give you my word I would try.  I don't -- I don't -- I just have strong feelings and --

THE COURT:  Well, everybody --

THE PROSPECTIVE JUROR:  You know, and I know -- you know, I know about the case and everything, but I just -- I

**UNITED STATES DISTRICT COURT**

don't -- I would not --

THE COURT:  What do you mean that you know about the case?

THE PROSPECTIVE JUROR:  I'm sorry, I don't know the details.  What I'm saying is I don't want him to get an unfair trial because of somebody like me.

THE COURT:  Well, we don't want either side to get an unfair trial.

THE PROSPECTIVE JUROR:  And I think he deserves that, and I don't mind serving.  I would love -- I mean, it's no problem, but, I mean, just the principal of it -- I just know my own personal biases, and if I do hear testimony from a police officer, that's going to come back up, just what happened, what, 36 years ago.  I'm going to be wondering is this person --

THE COURT:  You're the same guy who told me that you have 200 kids who were graduating and that you didn't think they could get through if you weren't there for a while.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  You know what I really think is going on here?  I think you're trying to get out of this jury service, and, you know, for you to be doing that and you're affecting those young minds down there at Foshay, I don't think that's right.  Because you have a civic duty just like they do, and this is not the example that you want to be setting for those

UNITED STATES DISTRICT COURT

kids.  Have a seat.

Anybody want to say anything?  You want me to ask any further questions?

MR. STEWARD:  Dean Steward.  I can't think of any other questions.  He's made his position crystal clear.

MR. FOX:  No questions, Your Honor.

(End of sidebar discussions.)

THE COURT:  Okay.  All right.  If you could join us, please.

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Is there a reason because of these charges you think you couldn't be fair and impartial?

THE PROSPECTIVE JUROR:  Well, I think it really stems from the fact that, you know, I've always had respect for the law enforcement community since I was very young.  I did the ride-along, so I did answer yes to some of these questions.

I think my perception of that has changed over time, especially with what happened in 9-1-1, and specifically with -- not necessarily -- I guess you could consider TSA law enforcement from an airplane perspective, but being pulled aside multiple times in random checks and seeing my family also get pulled consecutively three or four times, all of us getting pulled aside, so I think that has changed my perception about

**UNITED STATES DISTRICT COURT**

law enforcement to some extent.

And then seeing on the media -- which I would say I'm a pretty fairly objective person for the most part, but seeing like how police officers sometimes use their authority in certain situations and seeing him recently on TV with Los Angeles police and you see it on the news, is it racially influenced?  Is it not?

So that's what I would say would be some reasons why.

THE COURT:  Okay.  Well, this case -- what do you do for a living?

THE PROSPECTIVE JUROR:  I'm an -- I work for a healthcare biotech company.

THE COURT:  Okay.  This is not your typical case because you're going to have law enforcement officers on each side of this case, and it involves FBI.  It involves the Los Angeles County Sheriff's Department, involves some inmates, and it really involves the government's investigation into certain civil rights, allegations of civil rights abuses in Los Angeles County jails.

And the only thing the jury's going to have to do is sit down and assess the credibility of law enforcement officers as they testify in this case from both sides.  It's not really a case that involves allegations of police actions that are based on race, for example.  It's really what internally was going on in the Los Angeles County jails.

What we'd like to have is the jurors -- because everybody brings a different perspective to this task, a different background, different life experience.  I think what we'd like to do is to get jurors who can compartmentalize their own experiences, set their beliefs aside and judge the case based solely on what they hear here in the courtroom and give both sides a fair trial, both the government and the defense.

So can you put aside the feelings that you've experienced in being stopped or seeing people in your family stopped at the airport and asked to undergo a further search and decide this case based solely on the evidence?

THE PROSPECTIVE JUROR:  Uh-huh.  I'm pretty objective.  I mean, in my job I do pros and cons analyses all the time, and I mean, I'm just being honest here.

THE COURT:  Sure.

THE PROSPECTIVE JUROR:  Yes, I can, but to say how much of your personal life and your personal experiences can play into that -- and I would wholeheartedly try, yes.  Can I say that I would?

THE COURT:  Okay.  Well, everybody's personal experiences, every juror's personal experiences and life experiences, they draw on that to decide how they view certain evidence.  But the -- really, the important factor is that you bring that task a certain amount of objectivity and you -- the scales are balanced, and you decide it just based on what you

hear here and the evidence that you see.

THE PROSPECTIVE JUROR:  I'm a scientist by training, computer science, so we understand that.  So yes.

THE COURT:  Okay.  So can you make a commitment to both sides that you're going to be fair and impartial?

THE PROSPECTIVE JUROR:  Yes, I guess I can as best as I can.  I don't know if that answers the question.  I'm being honest here, so...

THE COURT:  Well, I think what we'd like to make sure is that both sides are comfortable with the idea that you're going to take, if you will, your scientific background and you're going to decide this case objectively and not based on stories that you may have heard or experiences that you may have had, but just based on here's the evidence, here are the witnesses, I'm deciding how much weight to give any witness and here's my decision, and it's based on what you heard here and what you saw.  Can you do that?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Okay.  So can you commit to all these people that you're going to be fair and impartial?

THE PROSPECTIVE JUROR:  It depends on the situation. I -- so no, I can't 100 percent commit.

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  So --

THE COURT:  I'm sorry.  What do you do for a living?

THE PROSPECTIVE JUROR:  I work for a biotech, healthcare industry.

THE COURT:  Uh-huh.  Okay.  Just have a seat there on that bench.

THE PROSPECTIVE JUROR:  Sure.

MR. STEWARD:  Dean Steward.  I'd say once again she's made herself clear, I think she can, so we don't have any follow-up questions.

MR. FOX:  No follow-up questions, Your Honor.

THE COURT:  Okay.  Well, I'm going to excuse her unless somebody has something else they want to add.

MR. STEWARD:  No objection.

MR. FOX:  No objection, Your Honor.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Who's the next person?  All right.

(Discussion held at sidebar.)

THE COURT:  Hi.  If you can stand right here next to this microphone, okay, if you could keep your voice down.

Can you tell us why you think you couldn't be fair and impartial to both sides in this case.

THE PROSPECTIVE JUROR:  Last year my son -- my oldest son was arrested back in May, and he was beaten in jail. And I was in and out to visit him after that happened, and I was never told what happened.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And he's currently at L.A. County jail.

THE COURT:  Okay.  Did that incident happen at the L.A. County jail?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And I'm sorry, when was that?

THE PROSPECTIVE JUROR:  In May last year.

THE COURT:  Okay.  Do you feel that incident -- you can't -- do you feel it would be difficult for you to put that incident aside in deciding this case?

THE PROSPECTIVE JUROR:  I believe so.  It was really difficult for me to -- it was just really difficult at the moment where, you know, I wasn't getting any answers and he wasn't allowed to talk.

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm an aerobics instructor.

THE COURT:  Okay.  And who do you work for?  Are you self-employed?

THE PROSPECTIVE JUROR:  I work for City of Commerce.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what does your husband do?

THE PROSPECTIVE JUROR:  He's a butcher.

THE COURT:  Okay.  This case involves allegations of

abuse over at the L.A. County jails, and what we'd like to know is if you can put aside the experience that happened with your son and decide this case based solely on the evidence you hear here in the courtroom.  And if you can do that, we'd love to have you.  If you can't do it, we understand.  If you can commit to being fair and impartial to both sides, we'd love to have you.  If you can't, let us know.

THE PROSPECTIVE JUROR:  I believe I cannot.

THE COURT:  Okay.  Just have a seat right there on that bench next to the lady in black.  Okay?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  All right.

MR. STEWARD:  No follow-up from the defense.

MR. FOX:  No follow-up from the government.

THE COURT:  We'll excuse her.

(End of sidebar discussions.)

THE COURT:  Okay.  Anybody else seated in the jury box?  Okay.

(Discussion held at sidebar.)

THE COURT:  And I'm also going to excuse Juror -- Prospective Juror Number 2 unless someone has an objection.

MR. FOX:  I was just wondering, now that you've given him the speech, if maybe he's changed his mind at all. But if you feel like he cannot be saved or --

THE COURT:  We'll have him come back over.

(End of sidebar discussions.)

THE COURT:  All right.  Prospective Juror Number 2, if you'd join us over here, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  Now I'll just ask you, do you think you can put aside whatever experiences that you may have had and be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  I would try.

THE COURT:  Well, everybody's got to try, but what we need, just like if -- well, what we need is a commitment that you can look everybody in the eye and say I'll put aside my own experiences, what I may have heard, what kids may have told me and I'll be fair and impartial to both sides and I'll decide this case based solely just on the evidence that is presented here in court.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Well, you sound a little reluctant, and I want you to be sure.  Okay, if you can, we'd love to have you.  If you can't, okay, but you need to maybe look everybody in the eye and tell them, "I'm going to be fair. I'm going to be fair and I'm going to be impartial.  I'm going to decide this case based on the evidence."

THE PROSPECTIVE JUROR:  Yeah.  Well, yeah, based on the evidence, I would try.  I would --

THE COURT:  Okay.  Can you look them in the eye and

commit, "I'm going to be fair and impartial and whatever happened 30 years ago, I'm going to put that aside and I'm going to judge this case based just on what I hear in this courtroom and the evidence that's presented to me."

THE PROSPECTIVE JUROR:  Yeah.  Yeah.

THE COURT:  Okay.  Just have a seat on that bench next to the lady in the green for just a second.

Any additional questions?

MR. STEWARD:  Not from the defense.

MR. FOX:  Not from the government.

THE COURT:  Okay.  So I'm going to leave them in the box.

(End of sidebar discussions.)

THE COURT:  All right.  Sir, if you'd resume your seat, and the lady in black, if you'd join me here, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  Just have a seat in the audience, and we'll let you know.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  Can I get my stuff from the box?

THE COURT:  Uh-huh.

Ms. -- okay.  And do you have anything in that jury box?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  If you can get your things and then take a seat in the audience.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  I'm going to ask the clerk to call the name of a prospective juror, and as your name is called, if you would come to the lectern, please.

THE DEPUTY CLERK:  Theresa Cisneros.

THE COURT:  Just one second.

Is there anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  If you could take that empty chair on the first row, please.

And if you could call the name of another prospective juror.

THE DEPUTY CLERK:  Corinne Zemliak.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  If you could take that empty chair on the second row, first seat on the second row.

All right.  Sir, if you'd join us over here, please.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  I just want to follow-up. Your Honor, I'm not trying to get out of the case.  I have no -- that was the statement you made, and I just -- I'm really not.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And I just -- I just kind of question if I can -- if I would be impartial.  I would judge it on the evidence, but I mean, I'm just a little hesitant on what still can happen with impartiality.  I did want to just address that, that I'm not trying to get out of the case.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  That's not the issue.

THE COURT:  Well, here's the bottom line.  It's not that -- and here's the bottom line.  We need 12 men and women, okay, that can decide this case based on the evidence that's presented here in this courtroom.  Okay?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Who can put aside whatever feelings, opinions they might have, and, you know, I'm not asking you to throw away your life experiences, because everybody has different life experiences, okay?  And that's part of the

UNITED STATES DISTRICT COURT

essence of the jury because everybody gets to share their feelings and, you know, they look at evidence from a different perspective. Okay?

But the bottom line is, is that when they're trying to decide the case, they decide the case based just on what's presented here in court. You know, it's like you got a scale, and you don't put your thumb on the scale to make it tip, okay, one way or the other. You're going to listen to the evidence, listen to the witnesses, look at the documents and decide, okay, the scale of justice tips one way or the other.

That's all we're looking for. We're just looking for somebody who can be fair and impartial, who can decide the case based just on the evidence. And if you can do that, we'd love to have you.

THE PROSPECTIVE JUROR: Is it possible to be on a different trial than this one?

THE COURT: Sure.

THE PROSPECTIVE JUROR: I mean, if I can be a part of jury selection for a different trial. It's not -- the trial is just -- I just don't know if I can be impartial.

THE COURT: Okay. Have a seat on the bench right there.

Okay.

MR. FOX: I think that you've got to do what you've got to do. I think at this point we would not oppose him being

stricken from the jury.

            MR. STEWARD:  Reluctantly, we agree.

            THE COURT:  What -- how old are those kids at
Foshay?

            THE PROSPECTIVE JUROR:  High school or --

            THE COURT:  I thought there was a Foshay Middle
School right on Exposition and --

            THE PROSPECTIVE JUROR:  Yeah, it's now a K through
12.

            THE COURT:  Okay, so it's a K through 12.

            THE PROSPECTIVE JUROR:  Yes, uh-huh.

            THE COURT:  So you've got 6th through -- 6 years
through 10, 11?

            THE PROSPECTIVE JUROR:  Through 17, 18.

            THE COURT:  Oh, okay.  So it's K through -- it's all
the way through high school.

            THE PROSPECTIVE JUROR:  Yes.  Uh-huh.

            THE COURT:  Okay.

            THE PROSPECTIVE JUROR:  Yeah, and I -- when I said
the 12th graders, that's what I meant, the seniors.

            THE COURT:  Okay.  Well, have a seat in the
audience, and then I'm going to contact you when this case is
over.  You may see if you can bring some of those kids out
here.

            THE PROSPECTIVE JUROR:  Okay.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  Have a seat in the audience.

(End of sidebar discussions.)

THE COURT:  All right.  Let's call the name of another prospective juror, please.

THE DEPUTY CLERK:  Na Hyun Seo.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Anything about the nature of these charges that causes you to question your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Okay.  If you could take that empty chair on the first row.

(Discussion held at sidebar.)

THE COURT:  Anything else?

MR. STEWARD:  No, Your Honor.

MR. FOX:  No, Your Honor.

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, the fact that the defendant is in court for this trial or that charges have been brought against him is no evidence whatsoever of the defendant's guilt.  Jurors are to consider only the evidence properly received in the courtroom in determining the guilt or innocence of the defendant.  Unless and until this is done, the

presumption of innocence prevails.

Have any of you seated in the jury box seen, read, listened to or heard anything about this case or have you heard anyone express an opinion about the case or about anyone who has anything to do with it such that you believe it would make it difficult for you to act fairly and impartially both as to the government and as to the defendant?

Have you read, listened to or seen any stories, editorials, blogs about allegations of civil rights violations in the Los Angeles County jails that you believe would make it difficult for you to act fairly and impartially both as to the government and the defendant?

Do any of you have any personal, philosophical or idealogical views about the laws of the United States, the government, law enforcement, the Federal Bureau of Investigation or the Los Angeles County Sheriff's Department that would make it difficult for you to act fairly and impartially in this case?

Do any of you have any beliefs or feelings toward any of the parties, attorneys or witnesses that would make it impossible for -- difficult for you to act fairly and impartially both as to the defendant and the government?

Have any of you had any dealings with the Los Angeles County Sheriff's Department, the Federal Bureau of Investigation, the United States Marshal service, the

Los Angeles County Men's Central Jail or the Los Angeles County Twin Towers Correctional Facility?

    Have any of you seen --

            MR. STEWARD:  I'm sorry, Your Honor.  I think you had a hand.

            THE PROSPECTIVE JUROR:  I just got a ticket, a driving ticket from the Sheriff.

            THE COURT:  Okay.  Anything about that experience that causes you to question your ability to be fair and impartial?

            THE PROSPECTIVE JUROR:  I was wrong.

            THE COURT:  Okay.

            THE PROSPECTIVE JUROR:  I also paid a visit to the Twin Towers.

            THE COURT:  Okay.  Anything about that visit that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

            THE PROSPECTIVE JUROR:  Not at all.

            THE COURT:  Okay.  Have any of you seen, heard or read anything about any of those entities or any current or former members of the Los Angeles County Sheriff's Department that you believe would affect your ability to be a fair and impartial juror?

    Do any of you have any beliefs or feelings toward the law in general that would make it impossible for -- difficult for

you to act fairly and impartially both as to the defendant and the government?

Let me also ask if any of you have any special disabilities, medical problems, difficulties with language that you believe would impair your ability to devote your full attention to this case?

THE COURT:  Okay.  If you could step down, please, and join us over here.

(Discussion held at sidebar.)

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I hear what you guys are saying, but I can't process it.  I don't know what's -- I feel like I don't know.

THE COURT:  Were you able to -- have you had a chance to look at these questions?

THE PROSPECTIVE JUROR:  Yeah, some of them I don't get.

THE COURT:  Okay.  I'm sorry, what do you do for a living?

THE PROSPECTIVE JUROR:  I work at K-Mart.

THE COURT:  At K-Mart?

THE PROSPECTIVE JUROR:  At K-Mart, yeah.

THE COURT:  Okay.  And where are you from originally?

THE PROSPECTIVE JUROR:  Lynwood.

THE COURT:  Lynwood.

Did you go to school there?

THE PROSPECTIVE JUROR:  Yeah.

(Court reporter clarification.)

THE COURT:  Okay.  And what's the highest grade level you achieved?

THE PROSPECTIVE JUROR:  I graduated.

THE COURT:  So you graduated from high school?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Is it a -- are you having a hard time comprehending what we're talking about --

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  -- or is it the language or --

THE PROSPECTIVE JUROR:  It's like -- because I was a special ed student, and I always had trouble with even like speaking, and even if I see something like written down, it's -- I won't understand, you see, it's like --

THE COURT:  Okay.  All right.  Why don't you do me a favor and just have a seat on that bench.

MR. STEWARD:  Your Honor, Dean Steward.  We don't have any follow-up on that.  We would not object to excusing her given her competence.

MR. FOX:  Same with the government.

THE COURT:  Okay.  Thank you very much for being so open and telling us about this.  I'm going to let you go back

UNITED STATES DISTRICT COURT

up to the jury assembly room on the third floor, and you can tell them you've been excused.  Do you have any belongings in the jury box?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Can I get this back?

THE PROSPECTIVE JUROR:  Both of them or --

THE COURT:  I'll take them.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.

(End of sidebar proceedings.)

THE COURT:  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Marissa Baylon.

THE COURT:  Could you join us over here for a moment?

(Discussion held at sidebar.)

THE COURT:  Okay.  You'd indicated that Lionsgate would only pay for ten days, I believe.

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.  And I think we've confirmed that they will pay for ten days.

Now, do you have -- I'm sorry, how many people are in your household?

THE PROSPECTIVE JUROR:  I'm paying for a duplex with -- my mother is in one area and my husband and my son is one area.  My brother also is with my mom.

THE COURT:  Okay.  Is your brother working?

THE PROSPECTIVE JUROR:  No, he's not.

THE COURT:  Okay.  Is your mother working?

THE PROSPECTIVE JUROR:  She's retired.

THE COURT:  She's retired.  And your husband works?

THE PROSPECTIVE JUROR:  My husband's working, and he's retiring this January.

THE COURT:  Okay.  What does he do?

THE PROSPECTIVE JUROR:  He's in IT.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  He's an analyst.

THE COURT:  And you're in IT?

THE PROSPECTIVE JUROR:  I'm in IT, yes.

THE COURT:  Okay.  If this case were to end in ten days --

THE PROSPECTIVE JUROR:  I won't have any problem.

THE COURT:  Then you don't have any problems.

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  If it went 13 days --

THE PROSPECTIVE JUROR:  I don't know.  I've served on juries before, and I never had an issue.  This is the first time that I've been asked to serve beyond the ten days, so I'm not really sure.  I am paying for mortgage and insurance for the house, and that is where my salary's going, so my husband is paying for all the incidentals.

THE COURT:  Uh-huh.  And I'm sorry, how old is your child?

THE PROSPECTIVE JUROR:  My son is 22.  My daughter is not living with me.  She's 24.

THE COURT:  Okay.  And your son's living at home, he's not working?

THE PROSPECTIVE JUROR:  He is working part-time.

THE COURT:  Okay.  Okay.  Just have a seat on that bench for one second.

MR. STEWARD:  We would stip to excuse her.

MR. FOX:  We agree, Your Honor.

THE COURT:  Okay.  Okay.  You can go up to the third floor and tell them you've been excused.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

THE COURT:  Okay.

(End of sidebar proceedings.)

THE COURT:  All right.  Let's call the name of another prospective juror, please.

THE DEPUTY CLERK:  Nancy Servin.

THE COURT:  Anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No, none.

THE COURT:  If you could take the empty chair on the last -- on the second row.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Yes, sir.

THE PROSPECTIVE JUROR:  I need to also approach.

THE COURT:  Okay.  All right.  Counsel, if you could join us at sidebar, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  If you could just stand close to this microphone.  All right.

THE PROSPECTIVE JUROR:  It's a concern regarding a medical condition.  I'm a diabetic, type 1, and from time to time I have to check my blood sugar.  If for some reason it goes low, I may need to take something, obviously, to bring it up.  When it's low, I cannot sometimes, you know, understand clearly or speaking-wise, so just to let the Court know.

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  As long as they let me check my temperature.

THE COURT:  Any time you need to check your blood sugar or whatever, just raise your hand, we'll let you do that.  Okay?

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Okay.  Thank you.

(End of sidebar discussions.)

THE COURT:  Any of you seated in the jury box taking any medication that would make it difficult for you to give

your full attention to the evidence presented at trial?

As a juror, you're obligated to follow the law given to you by the Court.  If there's anyone who would be unwilling or unable to follow the law as given in my instructions, disregarding your own notions or ideas as to what the law is or ought to be, anybody who feels they can't follow the Court's instructions?

One important task of the jury is to listen to the testimony of the various witnesses and decide how much or how little weight the testimony should be given.  Would any of you be unable or unwilling to perform this task?

All right.  I'd like everybody to look at each other in the jury box.  Is there any juror who knows anyone else seated in the jury box?

Okay.  So we got 12 strangers.

Now, again, we expect that the presentation of all phases of the case including the opening statements, the evidence, the argument and the instructions of counsel will last approximately three weeks plus deliberations.  Our daily schedule is going to be from 8:00 a.m. to 1:30 with two short breaks.  And during deliberations, your hours will change, and you'll deliberate from 8:00 to 3:30.

Now, is there anyone who feels that they can't be with us during that time period that I've just mentioned?

Okay.  As jurors -- yes, ma'am.

THE PROSPECTIVE JUROR:  Could I speak?  I'm kind of conflicted whether --

THE COURT:  Okay.  Why don't you come over here for just a second.

(Discussion held at sidebar.)

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm kind of conflicted, because I teach for a college and I have like over 100 students, for three weeks I'm not -- I can't stop thinking about the impact on them.  And also, I make a donation to a local POA annually.

THE COURT:  Okay.  Well, we'll talk about that. Now, where do you teach?

THE PROSPECTIVE JUROR:  Math.

THE COURT:  Where?

THE PROSPECTIVE JUROR:  El Camino.

THE COURT:  Okay.  And --

THE PROSPECTIVE JUROR:  I'm happy to serve, don't get me wrong, yeah.

THE COURT:  That's okay. And what are your -- how many days a week do you teach?

THE PROSPECTIVE JUROR:  Four days.

THE COURT:  Okay.  And what time?

THE PROSPECTIVE JUROR:  From 8:00 to 1:00.

THE COURT:  Morning?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Morning only, yeah.

THE COURT:  Okay.  And is school in session right now?

THE PROSPECTIVE JUROR:  Right.  Yeah, spring break just passed.  I have two weeks, you know, on call.  So last week I could do it any time, but this week it's just -- no, but I'd love to serve.  It's just that's my confliction.

THE COURT:  Okay.  Do you have a class that you're teaching right now?

THE PROSPECTIVE JUROR:  It just finished.  My class finished today at one o'clock.  Every day Monday through Thursday.

THE COURT:  Okay.  Are you in the midst of a quarter or semester?

THE PROSPECTIVE JUROR:  Semester.  So ninth week.

THE COURT:  Okay.  So next week, when will the -- the class will be meeting?

THE PROSPECTIVE JUROR:  On Monday.

THE COURT:  On Monday.

THE PROSPECTIVE JUROR:  Monday, yeah.

THE COURT:  Okay.  And if you're not there -- let's say this case was going to last a week.

THE PROSPECTIVE JUROR:  Right.

THE COURT:  If you're not there, what would happen?

THE PROSPECTIVE JUROR:  The department would have to

try to find substitute.

THE COURT:  They'd find a substitute teacher.

THE PROSPECTIVE JUROR:  They didn't find anybody for the first class today.  They found someone for the second class tomorrow.

THE COURT:  And what do --

THE PROSPECTIVE JUROR:  I don't know if they'd find one tomorrow.

THE COURT:  Okay.  What do you teach?

THE PROSPECTIVE JUROR:  Mathematics.

THE COURT:  Okay.  One of my favorite subjects.  How many students do you have in your class?

THE PROSPECTIVE JUROR:  I have three classes.  One class has like 50 plus, and the other two classes have like 35 each.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  They can live without me though, but it's just --

THE COURT:  You're thinking about the students.

THE PROSPECTIVE JUROR:  I do.  I always do and certainly answered questions when I was waiting upstairs, but I'm happy to serve too, you know, I'm okay.  But I agree that I have -- I make annual donation to POA, so that might...

THE COURT:  All right.  Just have a seat right there on the bench for just one second.

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  No follow-up questions from us.

MR. HAIG:  I do have a comment.  This is Jerome Haig.  I think it's problematic that they can't find any substitute professors, especially of mathematics, and I don't think she's teaching -- even though it's a community college, it doesn't sound like it's entry-level mathematics.  Perhaps the Court could ask some follow-up questions in that regard if it desires.

MR. FOX:  We don't have any follow-up questions, Your Honor.  She seems like a very conscientious person, and I think she would be a good juror.  If the defense wanted to strike her, we would have no objection to striking her.

THE COURT:  You want to keep her, or you want to strike her?

MR. STEWARD:  Let's keep her.  We agree with Mr. Fox's assessment and --

THE COURT:  Okay.  Is there a particular course you're teaching now?

THE PROSPECTIVE JUROR:  I actually teach three algebra classes.

THE COURT:  Okay.  Beginning algebra?

THE PROSPECTIVE JUROR:  Intermediate.

THE COURT:  Okay.  If you're going to stay with us, can you commit to devoting your full attention to this case?

THE PROSPECTIVE JUROR:  Of course, sir, yeah.

THE COURT:  Okay.  All right.  Thank you for sharing this with us, and why don't you resume your seat in the jury box.

THE PROSPECTIVE JUROR:  So the donation issue --

THE COURT:  We'll talk about that.

THE PROSPECTIVE JUROR:  Not yet.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Okay.  As jurors, you're going to be the finders of fact in this case.  You're required to base your decision solely on the evidence that's presented here in court.  You may not consider any facts or information that you learn outside of court, and you may not rely on your own prejudices or biases in judging this case.

Do any of you believe you'd not be able to do this?

Okay.  Sir, if you could join us over here, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  Is there a particular reason that you think you shouldn't be selected as a juror in this case?

THE PROSPECTIVE JUROR:  Maybe I should have brought it up.  My father worked with the Monterrey County Sheriff's Department for 33 years, so I've grown up with law enforcement. So it's very close.

THE COURT:  Okay.  In this case, there are going to be law enforcement officers on both sides.  Do you think you

can put aside the fact that your father worked in law enforcement for over 30 years and decide this case based solely on the evidence?

THE PROSPECTIVE JUROR:  It would be a struggle.  It would be hard.

THE COURT:  Okay.  Do you think it would be difficult for you to do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Your father worked in Monterrey?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Okay.  What do you do for a living now?

THE PROSPECTIVE JUROR:  I work in education at UCLA.

THE COURT:  Okay.  And what do you do?

THE PROSPECTIVE JUROR:  I work with orientation there.

THE COURT:  They have a department just on orientation?

THE PROSPECTIVE JUROR:  Yes, we see about 13,000 people during summer.

THE COURT:  They didn't have that when I was there. They just threw me out in the middle of Spaulding Field and told me to fend for myself.

THE PROSPECTIVE JUROR:  Much better now.

THE COURT:  Yeah.  You know, this case really doesn't have anything to do with Monterrey Police Department,

and what we need is -- are jurors who can decide this case based solely on what they hear here in court, who can determine the credibility of witnesses based on what they see and hear here in court.  And if you can put aside the fact that your father was in law enforcement and decide this case based solely on the evidence, we'd love to have you.  And what we really need is a commitment that you can do that.  And if you can, that's fine.  If you can't, we need to know that.

THE PROSPECTIVE JUROR:  I'm concerned I wouldn't be able to do that.

THE COURT:  Okay.  Have a seat on that bench for just one second.

THE PROSPECTIVE JUROR:  Sure.

THE COURT:  Okay.  Does anybody desire to have any additional questions asked?

MR. STEWARD:  No, Your Honor.

MR. FOX:  No, Your Honor.

THE COURT:  Okay.  You're not going to Bridgeport to see the women play in the Sweet 16?

THE PROSPECTIVE JUROR:  I wish I was.

THE COURT:  Okay.  Why don't you have a seat in the audience.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  And if you could give me that, please.  Thank you.  I'll take them both.  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Leanne Montoya.

THE PROSPECTIVE JUROR:  Can I join you over there?

THE COURT:  Sure.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Based on the list, I actually work for the State of California for the Board of Appeals Branch of the Unemployment.  And also, I live in a gated community and about five families in the area have officers -- their husband, children -- and I also have my neighbor next door, it's her son is an officer, so we're always in a friendship.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  So I love them very much.  I don't think I could be fair.  I honestly, from my heart, I -- you know, I have a heart for them, and I don't think I could render a fair judgment.

THE COURT:  Okay.  What police agency do they work for?

THE PROSPECTIVE JUROR:  I believe my closest neighbor is for the Los Angeles Police Department.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  The others I'm not really

sure, but it's in a close community and that's -- you know, that's why.

THE COURT:  Okay.  Well, you understand that this case doesn't have anything to do with the Los Angeles Police Department.

THE PROSPECTIVE JUROR:  Yes, I do, but I did -- yes, I did think about that.

THE COURT:  Okay.  So you would find it difficult to judge this case fairly and impartially because of the people that you --

THE PROSPECTIVE JUROR:  I believe it has to do with the fact that they work for an agency that represent the uniform, you know, the badges, you know, regardless of whether they're for the Sheriff or the L.A.P.D.  I just think that they work really, really hard and their jobs are difficult.  I know that they're very difficult and they put their lives on the line every single time that they show up to work, so that's irregardless to what branch of the department they work for.

THE COURT:  Okay.  And you feel that you'd have difficulty judging the credibility of a law enforcement officer determining this case?

THE PROSPECTIVE JUROR:  It would just be very difficult for me to defer between the guilt and not guilty and --

THE COURT:  Okay.  Just have a seat right there on

that bench for a second.  Keep that for a moment.

MR. STEWARD:  Dean Steward.  My sense is this lady just doesn't want to serve as a juror.  Regardless of that, I think her comments indicate that she can't be fair.  She's probably got to go.

MR. FOX:  I agree with every single part of that statement.

THE COURT:  Ms.

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  What do you do for a living?

THE PROSPECTIVE JUROR:  I work for the State of California, the appeals board.

THE COURT:  The appeals board.  What do you do for them?

THE PROSPECTIVE JUROR:  I am interpreter and also staff member, clerical staff.

THE COURT:  Uh-huh.  And how much -- do they pay for all your jury service?

THE PROSPECTIVE JUROR:  They do.

THE COURT:  So if this was a civil case, you could serve?

THE PROSPECTIVE JUROR:  I would.

THE COURT:  Correct?

THE PROSPECTIVE JUROR:  I would.

THE COURT:  And you wouldn't have any problem doing

that?

THE PROSPECTIVE JUROR:  Conscience-wise, I probably would.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Conscience-wise, I would still have to think about civil, the merits of the civil.

THE COURT:  Well, what would that have to do with --

THE PROSPECTIVE JUROR:  You know, because --

THE COURT:  Because it's starting to sound like you just want to get out of jury service.

THE PROSPECTIVE JUROR:  No, sir.  What it is -- because I'm involved in the extra hearings, sometimes it's difficult for me to separate myself from what the claimants are saying versus the judge.  I mean, I just get too involved in it.  So I -- you know, at the end of the hearings, sometimes I get an opportunity to speak to the judges about the hearings, and it's like I need to voice my opinion.  And I feel like, you know, I shouldn't be doing so, but because the judges are also my coworkers --

THE COURT:  Okay.  Have a seat in the audience. We'll let you know.

(End of sidebar discussions.)

THE COURT:  Call another name.

THE DEPUTY CLERK:  Norman Belsterling.

THE COURT:  All right.  I think my voice has left me

again.  We'll take about a two-minute break.  I'll be right back.

(Off the record at 3:16 p.m.)

(On the record at 3:18 p.m.)

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  Again, I want to remind you you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else.  And do not let anybody approach you and try to talk to you about this case.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or articles about the trial or about anyone who has anything to do with it.  If you need to speak with me, simply give a note to the clerk.  Please remember where you're seated, and, sir, we'll have you back, and let's -- let's take ten minutes.  Let's try and be back -- we can't start until all of you are back.  Let's try and be back at 3:30.  And thank you.

(Off the record at 3:19 p.m.)

(On the record at 3:32 p.m.)

THE COURT:  All right.  Sir, if you could join us over here, and I'll ask counsel to join us.

(Discussion held at sidebar.)

THE COURT:  Here's some information about hotels in

the area that you could stay at, and they will -- you'd have to front the cost, and they say it takes about a week to get you reimbursed.  Okay?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  So you can have that.

Now, is there anything that I've inquired about that would you think you should disclose to us?

THE PROSPECTIVE JUROR:  The only problem that would be relevant --

THE DEPUTY CLERK:  Your Honor, the microphone.

THE COURT:  You're going to -- let's get you right this way.

THE PROSPECTIVE JUROR:  Oh, sorry.  The only item that would be relevant to maybe you but it's not to me is that I'm retired law enforcement.

THE COURT:  Okay.  Well, we'll get into that.

Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Anything about the nature of these charges that causes you to have any difficulty rendering a fair and impartial verdict?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And you can be with us for the three weeks -- two or three weeks?

THE PROSPECTIVE JUROR:  I can.

THE COURT:  Okay.  All right.  I'm going to ask if you take that seat on the first row.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  We have six jurors who fell through the cracks and they didn't get back here this afternoon.  So my view is rather than putting them in the pool at this point would be, if we don't get a jury today and I don't think we will, is to have them come back in the morning, and they can come down.  They can start, and I'll give them the whole spiel.  And if we have any additional jurors, we'll have them come down first and then bring back these people today.

MR. FOX:  No objection from the government.

MR. STEWARD:  No objection from the defense.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, as the judge it's my job to instruct you on the law that is applicable to this case.  You're required to find the facts and then apply the law as I give it to you to those facts.

Do any of you feel that you'd have any difficulty

accepting and following my instructions concerning the law that governs this case?

As you may know, a defendant is presumed innocent until proven guilty.  This presumption of innocence continues until the jury concludes, if it does, that the defendant is guilty beyond a reasonable doubt.  If the jury finds that the government has not proved the defendant's guilt beyond a reasonable doubt, it must return a not guilty verdict, and you cannot return a guilty verdict unless you find that the government has established the defendant's guilt beyond a reasonable doubt.

This is a different standard than is used in civil cases. There, the jury merely has to find that a party has established that its version of the facts is more probably true than not.

Is there anything in the criminal standard of proof beyond a reasonable doubt that you believe would make it difficult for you to be a fair and impartial juror in this case?

Unlike the government, the defendant has no burden and does not have to present any evidence if he chooses not to do so.  You must wait until all of the evidence has been presented before making up your mind.

Are there any of you who believe that you could not withhold judgment until all of the evidence has been presented?

The potential punishment for the crimes charged is a matter for the Court to decide.

UNITED STATES DISTRICT COURT

Are there any of you who have concerns about the level of punishment that might be imposed if the defendant is found guilty and feel that those concerns would make it difficult for you to fairly judge this case?

Are there any of you who believe your views about jails, prisons, undercover agents, informants, prison reform or the law in general would make it difficult for you to act fairly and impartially as a juror in this case?

Is there anything that you've heard about --

MR. JAUREGUI:  Your Honor.

MR. STEWARD:  Your Honor, we had a hand.

THE COURT:  Okay.  If you could join us over here, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  If you could stand a little closer to this microphone.

THE PROSPECTIVE JUROR:  Okay.  Well, I was just concerned because I've recently seen a documentary about undercover police officers going to schools and targeting kids who were of the minority, and I was wondering if that could be a factor here or anything like that.

THE COURT:  No, not really.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  I think as we mentioned earlier, the FBI had an informant that was in the jails that was acting as an

UNITED STATES DISTRICT COURT

informant in the jails, but it doesn't involve kids.

Do you think you'd have any difficulty putting aside the documentary you saw and judging this case based just on the evidence?

THE PROSPECTIVE JUROR:  I would base it just on the evidence.  I have another question then.  So then like the informant, was he there like because you guys already knew like...

THE COURT:  Well, you'll have to listen to the evidence.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  But this informant was an inmate at the jails to start with.  Okay?

THE PROSPECTIVE JUROR:  Okay.  But you guys have like a suspicion it wasn't just going in, going in first to catch somebody or anything like that?

THE COURT:  Well, you're going to have to see how the evidence unfolds, but what I can tell you is is that the informant had been an inmate at that jail.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Okay.  Let me just ask you one other question.  Knowing what you know, do you have any doubts about your ability to be fair and impartial to both sides in this

case?

THE PROSPECTIVE JUROR:  I don't know.  Like the thing that -- to Mr. Tanaka accusation, of course, that made me think about the documentary because it was talking about how -- you know, targeting minorities, and that's what I was most concerned about.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Well, do you think you'd have any difficulty in being fair and impartial to both sides in this case because Mr. Tanaka is of Asian descent?

THE PROSPECTIVE JUROR:  No, I would look at the evidence.

THE COURT:  You're going to look at the evidence?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  And be fair and impartial to both the government and the defendant?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Thank you.

    (End of sidebar discussions.)

THE COURT:  Is there anything that you've heard about this case that you believe would make it difficult for you to consider the evidence fairly and impartially?

    Based on what you've heard today, does anyone have any reservations about their ability to hear the evidence, to

deliberate and return a fair and impartial verdict?

Is there anyone seated in the jury box who for any reason feels that he or she should not be selected as a juror in this case?

Okay.  If you could join us over here, please.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  I was just going through all those questions, and I kind of don't feel comfortable with me being -- like the decision would be kind of on me, like that would be part of it.  And, I mean, I just don't feel comfortable.

THE COURT:  What do you do for a living?

THE PROSPECTIVE JUROR:  Well, right now I'm just doing maintenance.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  Just cleaning, maintenance.

THE COURT:  Okay.  Where are you from originally?

THE PROSPECTIVE JUROR:  I was born here.

THE COURT:  Okay.  California?

THE PROSPECTIVE JUROR:  California.

THE COURT:  Okay.  In Los Angeles?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And what school did you go to?

THE PROSPECTIVE JUROR:  John Mayor High School.

THE COURT:  Okay.  In Pasadena?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Are you currently living with your parents?

THE PROSPECTIVE JUROR:  I live with my boyfriend.

THE COURT:  Okay.  Okay.  Well, the jury -- as a whole, the jury -- everybody on the jury is going to share their views about how they see the evidence, and then they're going to -- the jury's going to make a collective decision about the guilt or innocence of the defendant.  It's not going to be focused on any one juror or any one person and what you're going -- what the jury's going to do is share -- each are going to share their views about how they saw the evidence in this case.  Okay?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  So it's not going to be directed toward any single person.

THE PROSPECTIVE JUROR:  Okay.  So when you guys tell him if he's guilty or not, we're not going to hear?

THE COURT:  You're not going to?

THE PROSPECTIVE JUROR:  We're not going to hear what you guys are sentencing him for?

THE COURT:  No.  Punishment is solely something for the Court, and that's not going to happen --

THE PROSPECTIVE JUROR:  In front of us.

THE COURT:  -- in front of you.

THE PROSPECTIVE JUROR: Okay.

THE COURT: Okay?

THE PROSPECTIVE JUROR: Yeah, I just didn't feel comfortable me hearing -- like if he were to be guilty and I heard, Oh, he's getting this many years, you know, like I wouldn't want to hear that.

THE COURT: No. Okay?

THE PROSPECTIVE JUROR: Okay.

THE COURT: So you think you can be fair and impartial to both sides?

THE PROSPECTIVE JUROR: Yeah, I think I can.

THE COURT: Okay. And you think you're now comfortable with serving as a juror?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: Okay. Why don't you resume your seat.

THE PROSPECTIVE JUROR: Okay. Thank you.

MR. FOX: I may have misheard it. I thought she said that you would be the one deciding guilt and not her.

THE COURT: I don't think she said that.

Miss.

Okay. Now, one of the things that the jury has to decide is the guilt or innocence of the defendant. You understand; right?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: Okay. And I think what your concern was

UNITED STATES DISTRICT COURT

is with the punishment or sentencing.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Right?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  And that's not something that the jury's going to do.  That's for the Court to decide.

THE PROSPECTIVE JUROR:  Yeah, no, it was just like my concern was that I don't want to like -- I don't want to -- I'm not getting ahead of myself, but let's say that, you know, we find like -- I don't know how to put it into words.

THE COURT:  Let's say you find that the -- let's say the jury finds that the defendant was not guilty.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay?  And the most that would happen is that somebody might say, Okay, I want the jury -- I want each individual juror to say that that's their verdict, because their verdict has to be unanimous.  And so we'd say, Juror Number 1, is that your verdict?  And you'd say yes or no.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  But that's it.  And anything about punishment will be handled later, and it won't be in front of the jury.

THE PROSPECTIVE JUROR:  Oh, okay.  Yeah, that's what I wanted to make sure.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, you'll now be asked a number of questions about yourselves.  Again, they're not designed to pry unnecessarily into your personal lives or affairs.  They're asked to discover if you have any knowledge about the case, if you have any preconceived opinions that you might find difficult to lay aside, if you have any personal or family experiences that might cause you to identify yourself with any of the parties and to assure each party that the jury can be fair and impartial.

Please do not withhold information in order to be seated on this jury.  Be straightforward in your answers rather than answering in a way that you feel the lawyers or I expect you to answer.  If your answer to a question is yes, please raise your hand so that additional questions may be asked.  If your answer to a question is no, you need do nothing.  Again, if at any time you prefer to approach the bench to answer a question rather than answering in front of the entire panel, please feel free to so indicate.

All right.  We're going to begin with Prospective Juror Number 1.  Do you have the microphone?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  We will get it for you.  And if

you could take the background questionnaire, do you have that? And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Okay.  To begin, my name is Mario Munoz.  Where do I live?  I live in Azusa.  How long I've lived there?  About eight years.  Where did I live before moving there?  I lived in Glendora and Montebello.  My marital status is I'm married, and children, I have three children, a daughter who's nine and twin boys who are eight.  My education, I have a BS in business.  No military service.

My occupation now, I am a materials manager.  Before, I was a purchasing manager.  Present employer is Amitech Corporation.  Present and past occupation of my spouse, she was a librarian before.  She's currently a stay-at-home mom.  And have you or any member of your family taken any of those courses, the answer is no.  Prior jury duty --

THE COURT:  You ever been on a jury before?

THE PROSPECTIVE JUROR:  I was on the jury like this, but I was dismissed on a criminal case.

THE COURT:  Okay.  Ever been a party or witness in a criminal or civil case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  I reviewed it, yes.

THE COURT:  Okay.  Do you have any yes answers to

any of those questions?

THE PROSPECTIVE JUROR:  I did not feel I had any yes answers.

THE COURT:  Okay.  Thank you very much.  If you could pass the microphone to the next prospective juror.

And if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Hi.  My name is Na Seo.  I live in L.A.  I've lived in L.A. since 1998.  Where you lived, I lived in Korea before moving to Los Angeles.  I'm not married.  I don't have any children.  I graduated from UCLA with a BA.  No military service.  Occupation, I'm helping with my family's wholesale business.  I've interned at legal -- at the legal service at UCLA.

THE COURT:  What did you do there?

THE PROSPECTIVE JUROR:  I helped with the paperwork, like the research because I'm interested in becoming a lawyer. Yeah, present employer, it's my dad because I'm working in the family business.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  No spouse.  No spouse.

THE COURT:  Ever taken any classes in criminal law, prison law or criminal justice?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever served on a jury before?

**UNITED STATES DISTRICT COURT**

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  Let's see.  With number two, my mom has been a victim of a burglary and robbery.

THE COURT:  Okay.  When was that?

THE PROSPECTIVE JUROR:  This was -- let me see -- like four -- four years ago -- four or five years ago when I was still in college.

THE COURT:  Were the police called?

THE PROSPECTIVE JUROR:  The police was called, but they came like an hour later.

THE COURT:  Okay.  Anything about the way that that case was handled that caused you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  At the moment, no.

THE COURT:  Okay.  Can you put aside the experience suffered by your mother and decide this case fairly and impartially as to both the government and the defendant?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Any other yes answers?

THE PROSPECTIVE JUROR:  I mean, with number four, I've done internship at the superior court at the family center.  And what else?  And with 21, I already asked you about my concerns.  So that's it.

THE COURT:  Okay.  Any other yes or affirmative answers?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Okay.  Thank you so much.  If you could pass the microphone to the next prospective juror.

And if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Belinda Becerra. I live in East Los Angeles.  Prior to that, I have lived in Baldwin Park.  I have lived in my current residence for 14 years.  I'm married, have two boys; one who's 9; one who's 21. 21-year-old works as a -- loading boxes at UPS.  Education, in college changed my degree, so I have not completed a degree yet.  No military service.  I'm unemployed.  Previous occupation is facilities engineer at UPS.  My spouse is a plant manager for a candy company Morris National.  His past employer was Continental Culture in Glendale, and I have not attended any seminars or courses related to prison law, criminal law or criminal justice.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Yes, I have.  Criminal.

THE COURT:  Okay.  Do you recall generally what the case was about?

THE PROSPECTIVE JUROR:  Prostitution.

THE COURT:  Okay.  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  Yes to Number 1.  I have a brother who was incarcerated.  I don't know what the criminal offense was for because I don't have a relationship with him.  And Number 10, I have a cousin who works for the L.A.P.D., supervisor, and those are my two yeses.

THE COURT:  Okay.  Do you have any concerns about your brother's situation that would cause you to have difficulties about being fair and impartial in both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  You can put that aside and judge this case based solely on the evidence?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And I believe you indicated that -- was it a friend or a family member that worked with L.A.P.D.?

THE PROSPECTIVE JUROR:  Yes.  Cousin.

THE COURT:  Okay.  You ever talk to that person about their job at L.A.P.D.?

THE PROSPECTIVE JUROR:  No, he doesn't talk -- he doesn't speak about his job.

THE COURT:  And you can put aside that experience and be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.

And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Sure.  My name is Theresa Cisneros.  I live in Sherman Oaks.  I have lived there for three and a half years.  Prior to that, I lived in Van Nuys.  I am single.  I have two boys.  They're both 14, twins.  My education, I have a bachelor's degree in sociology and philosophy, a paralegal certificate, and I'm currently working on my master's degree in guidance and counseling.

No military service.  My occupation now and in the past

has been higher education, specifically alumni relations and student affairs.  My present employer is UCLA.  11 and 12 are not applicable.  I do have a background in -- a little bit of a background in criminal law being that I have my paralegal certificate.  I have served on a jury before.  It was a criminal DUI case.

THE COURT:  Okay.  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.  Oh, actually I take that back.  We did not deliberate because the judge handed down the verdict.

THE COURT:  Okay.  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I do have a couple yeses for the questionnaire.  Number 2, I had an aunt, my mom's sister, taken hostage and held at knifepoint a few years ago, about six years ago I think.

THE COURT:  Okay.  Were the police called?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what police agency handled that matter?

THE PROSPECTIVE JUROR:  I don't -- I don't remember.  It was in L.A. County.  I'm just not sure if it was P.D. or

UNITED STATES DISTRICT COURT

Sheriffs.

THE COURT:  Okay.  Anything about the way that that case was handled that caused you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Any other yes responses?

THE PROSPECTIVE JUROR:  I'm sorry.  Yes to Number 4. My undergrad internship was at the criminal courts building across the street in the family violence division.  That was about 11 years ago.

THE COURT:  Anything about that experience that causes you to have concerns about your ability to be fair and impartial?

THE PROSPECTIVE JUROR:  No.  And then last one is Number 10.  I have a cousin who's a Culver City police officer.

THE COURT:  Okay.  Do you ever talk to that person about their work?

THE PROSPECTIVE JUROR:  No.

THE COURT:  You can put that aside and judge the credibility of law enforcement officers the same way that you would for any other witness?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Any other yes or affirmative responses?

THE PROSPECTIVE JUROR:  No, that was it.

THE COURT: All right. Thank you. If you could pass the microphone to the next prospective juror.

And, sir, if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR: My name is Norman Belsterling, and I live in Nipomo, California, which is about 10 miles south of San Luis Obispo. I've lived there for two years. Before that, I lived in Hawaii. I'm married. I have two children; one's 38; one's 40.

THE COURT: And what do your children do for a living?

THE PROSPECTIVE JUROR: I'm sorry, Your Honor?

THE COURT: What do your children do for a living?

THE PROSPECTIVE JUROR: One is a respiratory therapist, and the other one's a schoolteacher.

THE COURT: Okay. And your educational background.

THE PROSPECTIVE JUROR: Education, I have a bachelor of arts degree with a major in English literature. I was in the United States Navy for four years, and my rank was E-5. I was an air traffic controller. My occupation in the past was a police officer, I'm retired.

THE COURT: And what police agency?

THE PROSPECTIVE JUROR: That was with Oceanside Police Department, and prior to that, San Diego Sheriff's Department.

THE COURT:  And did you work patrol?

THE PROSPECTIVE JUROR:  I'm sorry, Your Honor?

THE COURT:  Did you work patrol for the Oceanside Police Department?

THE PROSPECTIVE JUROR:  I did, yes, Your Honor.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And with the San Diego Sheriff's Department, I worked in the jail system and also spent some time in the academy as an instructor.

THE COURT:  Anything about your experience either with the Oceanside Police Department or the San Diego Sheriff's Department that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Ever taken any courses or attended any seminars in criminal law, prison law or criminal justice?

THE PROSPECTIVE JUROR:  Yes, Your Honor.  60 hours of criminal law in the police department academy, and I have one graduate course in constitutional law.

THE COURT:  Any concerns that you have as a result of taking those classes about your ability to follow the Court's instructions on the law that applies to this case?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  And what does your spouse do for a living?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  She's a retired schoolteacher.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Ever been a party or a witness in a criminal or civil case?

THE PROSPECTIVE JUROR:  I was a party in a civil case involving some theft by a moving and storage company.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  And when was that?

THE PROSPECTIVE JUROR:  That was -- it was adjudicated about seven years ago.

THE COURT:  And you were a witness?

THE PROSPECTIVE JUROR:  Sorry?

THE COURT:  You were a witness or a party?

THE PROSPECTIVE JUROR:  No, I was a party.

THE COURT:  Okay.  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  No, Your Honor, I have not.

THE COURT:  Okay.  Do you have a copy there in front of you?

THE PROSPECTIVE JUROR:  Of the criminal case?

**UNITED STATES DISTRICT COURT**

THE COURT:  The criminal case questionnaire.

THE PROSPECTIVE JUROR:  Oh, yes, Your Honor.  I'm sorry, I have looked at that.

THE COURT:  Do you have any yes or affirmative responses to any of those questions?

THE PROSPECTIVE JUROR:  Just a yes of have you been a victim of a crime.  I was a victim in a burglary about 20 years ago.

THE COURT:  Okay.  Was the -- were the police called in that burglary?

THE PROSPECTIVE JUROR:  Yes, it was.

THE COURT:  And which agency responded?

THE PROSPECTIVE JUROR:  What?

THE COURT:  What agency, what police agency responded?

THE PROSPECTIVE JUROR:  It was the Pittsburg Police Department.

THE COURT:  Anything about the case, the way that that case was handled that causes you to have any concerns about your ability to be fair and impartial?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  All right.  Thank you.

Sir, if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is James Lam, L-A-M. I am living in City of La Crescenta for 27 years.  Before I moved to La Crescenta, I was residing in the City of Los Angeles.  My marriage status is married, two children; one is 27, boy.  He's in the Air Force.  The 27 -- the 24-year-old girl is now in -- is still in Stanford.  My education is two years college.  Have no military service.  My occupation in the past is in the post office.  I'm now retired.  I am right now working part-time for my own business as accounting services. My wife, she used to work for LAUSD as a care -- a -- I think it's care -- cafeteria worker.

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  Yes.  She's no longer works there.  She's a house -- she's a homemaker right now.  And --

THE COURT:  Ever taken any classes or done any seminars in criminal law, criminal justice?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Okay.  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Yes, twice.

THE COURT:  Okay.  When was the first time?

THE PROSPECTIVE JUROR:  One in the civil service, and one is in criminal -- one in the criminal case.

THE COURT:  Okay.  Do you recall what the criminal case was about?

**UNITED STATES DISTRICT COURT**

THE PROSPECTIVE JUROR:  The criminal case is hit and run.

THE COURT:  Okay.  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And when was that case?

THE PROSPECTIVE JUROR:  That was about 20 years ago in the city of Hollywood.

THE COURT:  Okay.  And the civil case, when did you serve on a jury?

THE PROSPECTIVE JUROR:  It was in city of Montebello about 20 years ago.

THE COURT:  Okay.  Do you recall what that case was about?

THE PROSPECTIVE JUROR:  Yes.  The employee suing employer because she got fired, and she suing over the discrimination and harassment.

THE COURT:  Okay.  Was the jury able to reach a verdict in that case?

THE PROSPECTIVE JUROR:  Yes.  Yes, Your Honor.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  No.  There's no yes in that juror questionnaire.  There's no yes in there.

THE COURT:  Let me try that again.  Have you answered yes to any of those questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm sorry.

THE COURT:  All right.  If you could pass the microphone all the way back down to Prospective Juror Number 7.

And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Corinne Zemliak.  I live in Agoura Hills.  I've lived there for about eight years.  Before that, I was in Calabasas.  I'm divorced.  I have two children, 14 and 17.  I have some college.  I have no military.  I'm an LVN.  I actually have two jobs.  I work for Kaiser Permanente, and I work for La Ventana.  No spouse and no courses, and I served on a civil jury.

THE COURT:  And when was that?

THE PROSPECTIVE JUROR:  That was 14 and a half, 15 years ago.

THE COURT:  Do you recall what the case was about?

THE PROSPECTIVE JUROR:  Medical malpractice.

THE COURT:  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ever been a party or witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  For Workers' Compensation.

THE COURT:  Okay.  And were you a party or a witness?

THE PROSPECTIVE JUROR:  I was a party.

THE COURT:  Okay.  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  I have, and I have a yes answer to Number 4.  So I've been divorced for four years, and my ex-husband's sister is a judge, and her husband works for the Sheriff's Department.

THE COURT:  Is that the Los Angeles County Sheriff's Department?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you ever talk to either your sister or her husband about the work they do?

THE PROSPECTIVE JUROR:  No, and I actually haven't spoken to them in three years.

THE COURT:  Anything about that relationship that causes you to have any concerns about your ability to be fair and impartial to both the defendant and the government in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes or affirmative answers to any of the other cases any of the other questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  When you were speaking to your sister and her husband, did you ever talk about the work that he did?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And I'm sorry, what does your sister do for a living?

THE PROSPECTIVE JUROR:  My sister-in-law -- ex-sister-in-law, she's a judge.  I'm not sure which court system she works for.  I know it's in L.A. somewhere.  I just don't know which one.

THE COURT:  All right.  Any other yes or affirmative answers to any of the questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you very much.  If you could pass the microphone to the next prospective juror.

And, sir, if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Julio Hernandez.

UNITED STATES DISTRICT COURT

I live in Newbury Park.  That's in Ventura County.  I lived there for three years now.  I move or relocated from Puerto Rico before that.  I'm married, and I have two girls, 13 and 10.  I have a BS in chemical engineering.  Never serve in military service.  My occupation, I'm a principal and a factory engineer for Medtronic up in Northridge.  My spouse, my wife, her occupation, she's a regional manager -- materials manager for Amgen in Thousand Oaks.

THE COURT:  Ever taken any courses or attended any seminars in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes to Number 4.  I have a sister who worked with appeals court in Puerto Rico several years ago.  She doesn't work there anymore.  She was a lawyer.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Or she's a lawyer.

THE COURT:  Okay.  Do you know what kind of law she practices?

THE PROSPECTIVE JUROR:  Right now just she works for the municipality and also for one of the university, University of Puerto Rico.

THE COURT:  Anything about your experience with her that causes you to have any concerns about your ability to be fair and impartial or to follow the Court's instructions?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  If you could pass the microphone to the next prospective juror.

THE PROSPECTIVE JUROR:  My name is Isabel Lague.  I currently reside in Monrovia.  I've lived there for 29 years.  Before that, I resided in Arcadia.  I'm married.  I have four children.  The first one is a male, 45.  I'm not sure what he does.  He was working in construction before.  My second one -- my second one is a female, she's 41, and she's currently unemployed.  My third is a male, he's 29, and he works in an engineering company.  And my youngest is 35, and he works at Lowe's.  I have a master's degree.  I've not had any military service.  I'm currently semi-retired.  I just started my private practice as a marriage and family therapist yesterday officially, so I'm self-employed.

THE COURT:  What did you do prior to your

retirement?

THE PROSPECTIVE JUROR:  I'm sorry?

THE COURT:  What did you do prior to retiring?

THE PROSPECTIVE JUROR:  I've always been in marriage and family for 25 years, and before that I was in real estate.

THE COURT:  Okay.  Did you work for a firm or a company?

THE PROSPECTIVE JUROR:  I worked for most agencies and mostly in Los Angeles area, and then the last two agencies in Pasadena.  My husband, he's a psychologist.  He currently works at Charter Oak, a director of clinical services.  And before that, he was in the -- well, he's -- before that, he was in the banking.

THE COURT:  Ever attended any seminars or taken any classes in law, criminal law, criminal justice?

THE PROSPECTIVE JUROR:  Only as it relates to my position as a therapist, but never -- I don't recall ever taking any classes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I have counseled kids in juvenile -- in the juvenile system.

THE COURT:  Okay.  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

**UNITED STATES DISTRICT COURT**

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  I've never actually served on a jury.

THE COURT:  Ever been a party or a witness in a criminal or civil case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  I believe I have about four that stand out.  Number 1, one of my cousins was incarcerated. I'm not sure where, but the last time he was incarcerated was at the Twin Towers.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And I think that would relate to Number 2.  I have a cousin that works in superior court here in L.A.

THE COURT:  And what does that person do for the superior court?

THE PROSPECTIVE JUROR:  I actually don't know what he does.

THE COURT:  Anything about that relationship or your experience that causes you to have any concerns about your

ability to be fair and impartial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  The cousin that was incarcerated in Twin Towers, do you know when that was?

THE PROSPECTIVE JUROR:  It was probably around 15 years ago, somewhere around that time.  And he was sent somewhere else after that, but I -- I think it was Corona, or I'm not too sure.

THE COURT:  Okay.  Did you ever visit your cousin at the Twin Towers?

THE PROSPECTIVE JUROR:  Yes, I did.  That's the visit I made.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes or affirmative answers?

THE PROSPECTIVE JUROR:  Yes.  I was actually -- it was related to my -- a college course.  I was on a ride-along.

THE COURT:  Okay.  When was that?

THE PROSPECTIVE JUROR:  That was probably 22 -- when I first started, 22, 23 years ago.

THE COURT:  Okay.  Do you recall what agency was involved?

THE PROSPECTIVE JUROR:  It was Los Angeles because

UNITED STATES DISTRICT COURT

it was at the -- well, the actual assignment was to go down to the hotline, and a call resulted in us going out.

THE COURT:  Okay.  Was that the Los Angeles Police Department or Los Angeles Sheriffs, or do you recall?

THE PROSPECTIVE JUROR:  I can't actually -- I don't remember.

THE COURT:  Okay.  Any other yes or affirmative answers?

THE PROSPECTIVE JUROR:  I think 22 also relates to my cousin that was incarcerated.  He was detained in the jail.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  I think that's it.

THE COURT:  All right.  Thank you.

THE PROSPECTIVE JUROR:  My name's Lijun Pan Wang. Wang is my last name.  The name was kind of messed up, it was a middle/last name.  But anyway, I live in Manhattan Beach.  I've been living there for 20 -- no, for 22 years.  Prior to that, I lived in Alhambra for a year.  I'm married with two children, both are in college.  I have a master of science in mathematics from USC.

THE COURT:  Finally a Trojan.  That's okay.  I like them despite...

THE PROSPECTIVE JUROR:  Okay, so I'm selected.

THE COURT:  Yeah.

THE PROSPECTIVE JUROR:  No military service.  My -- I've been teaching for El Camino College for the past 20 years teaching mathematics.  My -- yeah, El Camino College.  My husband teaches for USC, another one.

THE COURT:  Perfect.

THE PROSPECTIVE JUROR:  No criminal justice courses ever.  I wish.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Almost.  Went through this process and dismissed.

THE COURT:  Okay.  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have, Your Honor.

THE COURT:  Okay.  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  Yes, I actually do have a couple yeses.  The first yes is related to Number 2.  About three, four years ago one of my children reported to the law enforcement about a possible sexual assault case.  And as a result of his assault -- his report, maybe as a result, the son of our friend was being, you know, on trial, and he was on probation right now.  So I have some kind of, you know,

conflicted feelings because we know the young man, and my son was also involved in that reported case. So that was the situation.

THE COURT: Okay. Anything about that experience that causes you to have any concerns about your ability to serve as a juror in this case?

THE PROSPECTIVE JUROR: I certainly feel sympathy for the young man who's being committed -- being convicted, but it's not going to, you know, make me impartial or anything, I don't think so.

THE COURT: So you can put that aside and judge this case based solely on the evidence you hear in this courtroom?

THE PROSPECTIVE JUROR: I -- yes.

THE COURT: Okay.

THE PROSPECTIVE JUROR: And the next one is Number 11. I give donation to our local police officer association annually.

THE COURT: Okay. And which police agency is that?

THE PROSPECTIVE JUROR: Manhattan Beach.

THE COURT: Okay. Now, there are going to be a number of law enforcement officers who are going to be testifying in this case. Are you going to be able to judge their credibility the same way that you would that of any other witness?

THE PROSPECTIVE JUROR: Of course.

THE COURT:  And you can put aside any feelings you might have or opinions about law enforcement and just judge their testimony the same way you would that of any other witness?

THE PROSPECTIVE JUROR:  I think I will, but in general I think I'm more positive about the officers and their -- whether they're -- you know, they've been through, you know, the pressure and the pressure under which they work and, yeah, I can't hide that.  You know, I give them money every year.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Could you join us over here for just a moment, please.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  I'm nervous.  Am I in trouble?

THE COURT:  No.

THE PROSPECTIVE JUROR:  I don't think I will be impartial -- I don't think I would be partial.  I just speak up, and I understand.

THE COURT:  Well, one of the things that we have to -- we have to treat all the witnesses alike, and there are going to be law enforcement witnesses who are going to be

called on both sides of this case.  Okay?  And so everybody starts out -- hopefully everybody starts out even, and so when you say that you're -- you know, you might look more favorably on a law enforcement officer, we have to make sure that the jurors are going to start out -- everybody starts out on an even plane, okay?

THE PROSPECTIVE JUROR:  I understand that.

THE COURT:  Okay.  And if you can put aside that empathy that you feel for law enforcement or the bias that you may have in favor of law enforcement, we'd love to have you as a juror in this case.  If you're going -- if it's going to be difficult for you to do that, we need to know that as well.

THE PROSPECTIVE JUROR:  It might be a little bit difficult.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I certainly believe I'm unbiased, but I don't think that's not an-- that's not absolute, because sometime I'm not the best person to judge myself.  I feel that way, so that's why I told you how exactly I feel.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  So I might be judged as partial by other people's opinion, you know what I mean?

THE COURT:  Uh-huh.  Okay.  Well, in this case you may have the government call a law enforcement officer, you may

have the defense call a law enforcement officer.  Is it going to be difficult for you to judge the credibility?

THE PROSPECTIVE JUROR:  Could you say that again?

THE COURT:  Sure.  You may have both sides in this case calling law enforcement officers whose views may be very different, okay?  So is it going to be extremely difficult for you -- is it going to be difficult for you to assess the credibility of each of those law enforcement officers as witnesses?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  Well, let's say you have a law enforcement officer testifying in one way and you have a citizen witness testifying in another way.  Are you going to give more credit to law enforcement officer's version of the facts merely because he's a law enforcement officer?

THE PROSPECTIVE JUROR:  I don't think so, but the credibility needs to be proved to me both ways, I think.  I mean, the citizen or officer, their credibility needs to be proved, right?

THE COURT:  Okay.  Are you going to weigh -- are you going to put a higher burden on the citizen witness as opposed to the law enforcement officer?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  Can you commit to both sides that you're going to judge the credibility of all witnesses the

same?

THE PROSPECTIVE JUROR:  I will.

THE COURT:  Okay.  And you're going to be able to put aside the fact that one person is a law enforcement officer and judge his credibility the same way that you would that of any other witness?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And all the witnesses are going to start out on an equal footing?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you commit to doing that?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Just have a seat on the bench there for just one second.

MR. FOX:  Your Honor, I don't have any problems with her credibility assessments.  The only thing I'd like to know is if she's going to have trouble deciding, because of her favoritism towards law enforcement, whether a defendant, if we prove our case beyond a reasonable doubt, will she have trouble finding him guilty?  If we don't prove our case beyond a reasonable doubt, will she have a problem cutting him loose even if law enforcement officers testify that, in a way, the defendant is guilty?

MR. STEWARD:  Along those same lines, not that you know whether this is going to happen or not, but if the

defendant testified, would she judge his credibility under a

different standard because he is a former law enforcement

officer?

THE COURT:  Okay.  The defendant in this case was a

law enforcement officer.  Okay?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Are you going to have any difficulty in

finding a defendant who was a law enforcement officer guilty of

these charges if the government proves its case beyond a

reasonable doubt?

THE PROSPECTIVE JUROR:  Of course.

THE COURT:  You'd have difficulty doing that?

THE PROSPECTIVE JUROR:  I don't have difficulty

doing it.

THE COURT:  You don't have any difficulty?

THE PROSPECTIVE JUROR:  I do not have difficulty

doing that.

THE COURT:  Okay.  Now, the defendant doesn't have

to testify in this case, but he may testify as a witness in

this case, and he was a former law enforcement officer.  Are

you going to be able to put aside the fact that he was a law

enforcement officer and judge his credibility the same way you

would any other witness?

THE PROSPECTIVE JUROR:  Yes, I will, Your Honor.

THE COURT:  Okay.  In other words, can you put aside

whatever favoritism that you might feel for law enforcement and judge their testimony the same way you would anybody else?

THE PROSPECTIVE JUROR:  I would, Your Honor.

THE COURT:  Okay.  Why don't you just have a seat for one moment.

MR. FOX:  No follow-up questions from the government.

MR. STEWARD:  None from the defense.

THE COURT:  Okay.  If you could resume your seat, please.

(End of sidebar discussions.)

THE COURT:  All right.  Have we now covered all the affirmative answers you have to the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you very much.  If you could pass the microphone to the next prospective juror.

And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Nancy Burns.  I live in Lakewood.  I've lived there for 64 years.  I've always lived in Lakewood.  My marital status is divorced.  I have two daughters.  The oldest one is 51, and she works for a construction firm.  My second daughter is 49, and she's an insurance broker.  I have two years of college.

No military service.  I'm retired.  In the past, I worked

for Verizon directories.  And let's see, I gave you the occupations of my daughters already.  I've never taken a criminal law -- any kind of criminal law classes, and I have been on a criminal jury service twice.

THE COURT:  Okay.  When was your most recent jury service?

THE PROSPECTIVE JUROR:  Ten years ago.

THE COURT:  Okay.  Do you recall generally what the case was about?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  What kind of case was it?

THE PROSPECTIVE JUROR:  Armed robbery.

THE COURT:  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And prior to that, you served on a jury?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Do you recall what that case was about?

THE PROSPECTIVE JUROR:  Murder.

THE COURT:  And when was that?

THE PROSPECTIVE JUROR:  Probably 20 years ago.

THE COURT:  Okay.  And was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Did you go to school in Lakewood?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Lakewood High?

THE PROSPECTIVE JUROR:  No, St. Anthony's girls school.

THE COURT:  Oh, okay.

THE PROSPECTIVE JUROR:  It wasn't exciting.

THE COURT:  In Long Beach?

THE PROSPECTIVE JUROR:  The only thing I have on the --

THE COURT:  Wait, wait, we have a much more important matter here to decide.  Was that St. Anthony's in Long Beach?

THE PROSPECTIVE JUROR:  That's it.

THE COURT:  It was a girls school then?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  The girls school was on one side of campus, the boys was on the other, and the only time you could go to the boys was if you took physics.  I didn't take physics.

THE COURT:  That explains a lot about Judge Carney.

All right.  Criminal case questionnaire, do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  22.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  My grandson had a DUI, and I'm not sure if it was in Los Angeles or Orange County.  They only tell grandmothers when they need money, so...

THE COURT:  When was that?

THE PROSPECTIVE JUROR:  Three years ago.

THE COURT:  Anything about the way that that was handled that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No, it was the best thing that ever happened to him.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you very much.

THE PROSPECTIVE JUROR:  Thank you.

THE PROSPECTIVE JUROR:  My name is Nancy Servin.  I live in Covina.  I've lived there for six months.  I used to live in Pasadena.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  Single.  No, I'm single, no kids.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm currently trying to get

my GED.  No military service.  My occupation for right now is maintenance service and doing makeup.  In the past, my occupation was waitress.

THE COURT:  Ever taken any courses or attended any seminars in criminal justice or criminal law?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever been a witness or a party in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yeah, just Number 2 I had a yes.

THE COURT:  Okay.  Could you tell us a little bit about that.

THE PROSPECTIVE JUROR:  I was a victim of a sexual assault and kidnap.

THE COURT:  When was that?

THE PROSPECTIVE JUROR:  That was like about five years ago.

THE COURT:  Okay.  What police agency handled it?

THE PROSPECTIVE JUROR:  That was Pasadena.

THE COURT:  Okay.  Was there anything about that

experience that causes you to have any concerns about your ability to be fair and impartial?

THE PROSPECTIVE JUROR:  At the beginning, yes.  I believe now I'm okay, I have no issues.

THE COURT:  Are you able to put aside that experience and --

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  -- be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Did you have concerns about the way the case was handled?

THE PROSPECTIVE JUROR:  Yeah, I did.

THE COURT:  And have you resolved those concerns such that now you can put it aside?

THE PROSPECTIVE JUROR:  I could put them aside.

THE COURT:  Okay.  All right.  May I see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Okay.  Does the government have any follow-up questions for any of the prospective jurors seated in the box?

MR. FOX:  Your Honor, I didn't hear Number 5 talk about his lawsuits.  Did he talk about his lawsuits?  That was resolved seven years ago, adjudicated seven years ago.

THE COURT:  Okay.

MR. FOX:  I just wonder if it relates to his duties as a police officer.  And the other question I have for him, as long as we're bringing him over, he said that he was an instructor at the academy, and I'd like to know what he taught at the academy.

THE COURT:  Okay.

MS. RHODES:  I think he worked in the jail system.

MR. FOX:  Maybe a little more detail on his job in the jail system as well.

THE COURT:  Okay.

MR. HAIG:  This is Jerome Haig.  Along those same lines, what his final rank was in the Sheriff's Department.

THE COURT:  Okay.  Other than Number 5, anybody -- any additional follow-up questions?

MR. FOX:  Nothing from the government.

MR. HAIG:  Your Honor, on Number 5 as well, if the Court wouldn't mind asking if he ever was involved working for Internal Affairs.

THE COURT:  Okay.  Do you have any other follow-up questions of the jurors?

MR. STEWARD:  No.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  Prospective Juror Number 5,

if you could join us over here, please.

(Discussion held at sidebar.)

THE COURT:  Hi.  Did you say that you taught at the academy?

THE PROSPECTIVE JUROR:  At the police academy, yes.

THE COURT:  What courses did you teach?

THE PROSPECTIVE JUROR:  I taught defensive tactics, firearms, pretty much was it.

THE COURT:  Okay.  And how long did you teach at the academy?

THE PROSPECTIVE JUROR:  I taught there for six months in the regular academy.  That was in the sheriff's academy, and also department instructor for the City of Oceanside.  And then I was -- I taught for about ten years in the reserve academy at Palomar College.

THE COURT:  Okay.  When were you employed by the -- was it the Oceanside --

THE PROSPECTIVE JUROR:  Yes.  Oceanside from -- well, I actually started with San Diego Police Department as a reserve, and that was in '81.  And they put me through the academy, and then the San Diego Sheriff's Department picked me up in '80 -- oh, I'm sorry, yeah, in 80 -- '82, and I worked there until '85.  And then I worked for the Oceanside Police Department from '85 to '93, and then I retired out.

THE COURT:  Okay.  When you were -- at some point,

**UNITED STATES DISTRICT COURT**

you worked in jails?

THE PROSPECTIVE JUROR:  I did.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  '85 -- '82 to '85 with the exception of the stint in the academy for six months.

THE COURT:  Okay.  And what were your duties in the jail?

THE PROSPECTIVE JUROR:  In the jail, I worked all the functions of the jail of receiving, shake print, housing, just about all the -- control, just about all the functions in the jail.

THE COURT:  Okay.  Did you ever work for Internal Affairs either in Oceanside or the Sheriff's Department?

THE PROSPECTIVE JUROR:  No, never.

THE COURT:  Were you ever the subject of an Internal Affairs investigation?

THE PROSPECTIVE JUROR:  Yes, once -- once in the jail, and I was exonerated in that.  And once for possible theft.  They really didn't know who did the theft, but I was exonerated in that.

THE COURT:  Okay.  The instance involving the jail, what was the nature of the complaint?

THE PROSPECTIVE JUROR:  The -- it was a use of force complaint.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  In receiving, one of the inmates went off and went off on me, and I banged him into the wall.

THE COURT:  Okay.  Anything about the way that that was handled that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Able to put that aside and judge this case --

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  -- based solely on the evidence?

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  Okay.  You'd also mentioned that there was a lawsuit that you were involved in.  What was the nature of the lawsuit?

THE PROSPECTIVE JUROR:  We were moving to Hawaii, and the Coast Valley Moving & Storage basically stole all our home goods that were in storage, supposedly under the guise that I hadn't paid the storage fee, which I asked them four times to pay the storage fee and they said no, they wanted to total one up at the end.  And basically what they did was they stole what they liked.  They auctioned off what they could get money for, and they threw the rest in the city dumpster.

THE COURT:  Okay.  When was that lawsuit?

THE PROSPECTIVE JUROR:  That lawsuit began in 2004

UNITED STATES DISTRICT COURT

and was settled without court procedures in -- I think about 2009 I believe it was.

THE COURT:  Okay.  So it never went to trial?

THE PROSPECTIVE JUROR:  Never went to trial, no.

THE COURT:  Okay.  And did you have a ranking in the Sheriff's Department?

THE PROSPECTIVE JUROR:  I did.  Well, not in the Sheriff's Department, I was just a regular deputy.  I had rank in Oceanside Police Department.  I was a senior police officer.

THE COURT:  Okay.  If you could just have a seat on that bench for one second.

THE PROSPECTIVE JUROR:  Yeah.

MR. FOX:  Your Honor, the only follow-up I think I'd like for him is he says he's going to be familiar with some of the procedures regarding the jails, and he mentioned he did some reception -- we're going to hear some testimony about the Inmate Reception Center -- whether he can put aside what he learned in the procedures that he learned and just listen to the evidence in this case about the Sheriff's Department -- L.A. Sheriff's Department's procedures.

THE COURT:  Okay.  I assume that when you were working for the San Diego Sheriff's Department, they had certain procedures about how they handled inmates?

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  Okay.  And this case is going to involve

procedures involving the Los Angeles County Sheriff's Department.  Can you put aside whatever you learned in serving as a member of the San Diego Police Department's Sheriff's Department and judge these -- the procedures you're going to hear about in this case without regard to what you may have learned in San Diego?

THE PROSPECTIVE JUROR:  I believe I can, yes.

THE COURT:  Can --

THE PROSPECTIVE JUROR:  The basics -- the basics of use of force policy is the same for all of California departments.  You know, there may be a little difference between the San Diego Sheriff's Department and San Diego -- and L.A. Sheriff's Department, but, you know, it's -- the bases are the same.  I can certainly, you know, put aside the little specific things that are --

THE COURT:  Uh-huh.  Were you involved in -- when you were with the Sheriff's Department, were you ever involved in contraband smuggling?

THE PROSPECTIVE JUROR:  No, never.

THE COURT:  Okay.  Was the San Diego Sheriff's Department ever the subject of an inquiry by the federal government while you were there?

THE PROSPECTIVE JUROR:  Not to my knowledge, no.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  No, I'm sure they weren't.

I'm sure I would have known about it if they had been.

THE COURT:  Okay.  So you can put aside how things worked in the Sheriff's Department in San Diego and judge this case based on solely on the evidence you hear here --

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  -- in this courtroom?

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  And that applies equally with respect to the procedures and the way things are done here, the way they were done in Los Angeles County jails?

THE PROSPECTIVE JUROR:  I believe I can.  You know, it's -- I feel if the procedure is -- if the procedure does not include the fundamentals on the use of force and it's so out there and different, then I probably can't, but if the procedure follows the basic use of force rules that are common to every department in California, then I -- you know, I certainly can.

THE COURT:  Well, I guess what I'm really -- you know, everybody brings their own different life experiences and backgrounds to this task, but I just need you to be able to commit to having an open mind as to the evidence you hear in this case.

THE PROSPECTIVE JUROR:  Oh, yes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Certainly.

**UNITED STATES DISTRICT COURT**

THE COURT:  And not approach it with any bias --

THE PROSPECTIVE JUROR:  No.

THE COURT:  -- based on what happened --

THE PROSPECTIVE JUROR:  Oh, certainly not.

THE COURT:  -- in San Diego.

THE PROSPECTIVE JUROR:  Certainly not.

THE COURT:  Okay.  Thank you.  If you could resume your seat.  Okay.  I think --

(Reporter admonition.)

THE COURT:  I think she's like a wife.

THE COURT REPORTER:  Hey.

THE COURT:  I think we've probably done all the damage we can do today.  What I'm planning on doing -- do we have a --

MS. RHODES:  Go ahead.

THE COURT:  Do we have a current count on what our numbers look like?

THE DEPUTY CLERK:  I'm sorry?

THE COURT:  I'd like to know how many jurors do we currently have that can be -- that are still waiting to be brought into the box.

THE DEPUTY CLERK:  I could find out.

THE COURT:  Okay.  Jonathan may be able to help you with that.  My present plan would be -- well, I want to see what the numbers are.  If there's a doubt about the numbers,

what we could probably do is call the panel in early tomorrow, say, at 8:30 get them in here, go through the introduction, see if there are people who can be with us and have these people come back at 9:30.

THE DEPUTY CLERK:  I have 38.  Jonathan has 36.

THE COURT:  And we need 16 jurors, and you have a total of about 20 peremptories, so that might be a little tight.  So why don't we have the jury commissioner summons down another panel of about 50 or 60 and time-qualify those individuals.  Assuming we can get 10 or 15 of those people -- if you want we can do -- hand out a questionnaire, but I assume if we get 15 of those people, then I can do an orientation to them as to the charges and blah, blah, blah, and then we could pick up with jury service at around 9:30, ten o'clock.

MR. STEWARD:  Makes sense.

MR. HAIG:  Your Honor, you want us here earlier to discuss any issues?

THE COURT:  Right.

MR. FOX:  Your Honor, if I could suggest, if we can give them the criminal background questionnaire to take home with them tonight so the ones that are still in the crowd that might make -- they might be able to read them and move things quicker tomorrow.  Up to you, but I thought that might be --

THE COURT:  The background questionnaire to --

MR. FOX:  Not the people who are in the box right

now, but the potential jurors that are out there, that way they don't have to go through it tomorrow and look at each question.

THE COURT:  Are you talking about the criminal case questionnaire?

MR. FOX:  I think that's the right one, yes.

THE COURT:  Okay.  The multipage --

MR. FOX:  Yes.

THE COURT:  -- they already have.

MR. FOX:  They already have it.

MR. HAIG:  Your Honor, what is the schedule --

(Reporter admonition.)

MR. HAIG:  This is Jerome Haig.  I just asked what the schedule was for tomorrow just for planning purposes.

THE COURT:  We'll probably go all day, just take a lunch break at noon.  Okay?

MR. HAIG:  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  Ladies and gentlemen, I think we have done about all the damage we can do today, so we're going to resume tomorrow with jury selection.  I think we'll probably be able to select a jury, get a jury picked tomorrow, but what we're going to do is we're going to bring down some additional people tomorrow, and so I'm going to have you come in at -- why don't we make it 9:45, okay?

Please remember where you're seated at in the jury box.

So for those of you who haven't come up to see me and whose names haven't been called, you're excused, and those in the jury box, you're excused, and you're to report to this courtroom tomorrow morning at 9:45.  Is that clear?

If you have come up and your name was called, please remain, and we'll resolve your issues today.

Okay.  Any -- you can take your criminal case questionnaires with you or you can leave them here.

THE PROSPECTIVE JUROR:  I have a question.  So if our name wasn't brought up today, be back here at 9:45 tomorrow?

THE COURT:  9:45 tomorrow.  Okay?  We're going to have some additional jurors in earlier in the morning, get them oriented, and then we'll resume jury selection at about 9:45.

THE PROSPECTIVE JUROR:  Our parking was on South Hill Street today.  Where are we still to park?

THE COURT:  Same lot.  Okay.  Thank you very much.

For those of you who had your names called, remain in the courtroom.

(Some of the prospective jury left the courtroom.)

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  So they're going to call down a panel of about 70, and hopefully we can get about 10 or so.  And I think -- at that point, I don't think it would be necessary to

do a hardship for the remainder of those people, unless you want to do that.

MR. FOX:  We agree.

MR. STEWARD:  Yeah, we agree as well.

MR. FOX:  Your Honor, I notice that in the courtroom some of the people who we called up just for the time qualification questions are still behind.  I think those are the ones that are still okay.  The one who worked for Nestle I see here and you pointed out that her employer will pay for her, so she needs to come back at 9:45.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ms. Wilton.  Okay.

THE PROSPECTIVE JUROR:  Should I go up there?

THE COURT:  Yes, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  Your employer will pay you for the entire time you're here.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

THE PROSPECTIVE JUROR:  Our policy is ten days.

THE COURT:  I know, but I called them, and they told me, No problem, we will pay.  And I know they wouldn't lie to a federal judge.

THE PROSPECTIVE JUROR:  Of course they don't want me

to be on the jury either.

THE COURT:  Well --

THE PROSPECTIVE JUROR:  They'd rather have me there.

THE COURT:  You'd be surprised.

Anyway, so we need to have you back tomorrow morning at 9:30, okay?

THE PROSPECTIVE JUROR:  9:30 or 9:45?

THE COURT:  9:45, I'm sorry.

THE PROSPECTIVE JUROR:  Is that it?

THE COURT:  That's it.

THE PROSPECTIVE JUROR:  Thank you very much.

THE COURT:  Thank you.

Okay.  Now --

MR. FOX:  Back row middle, Mr. Sanchez, he works for El Pollo Loco.

THE COURT:  I'm going to let him go, unless you feel strongly --

MR. FOX:  Fine with the government.

MR. STEWARD:  Fine with us as well.

THE COURT:  Okay.  And normally, some of these people wanted to get out, like the lady in the green and Mr. Hooks.  I'd probably put them in the penalty box and tell them to stay here for a while, but I'm inclined to let them go as well.

MR. STEWARD:  We agree.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Fine with us.

(End of sidebar discussions.)

THE COURT:  All right.  For the rest of you who've -- sir, was your name called today?

THE PROSPECTIVE JUROR:  No, it wasn't.  I have a question about something.  I'd like to wait.

THE COURT:  I'm going to have the clerk come and talk to you, and for the rest of you whose names were called, you're excused.  You may go up to the jury assembly room and tell them that you've been excused.

(Discussion held at sidebar.)

THE COURT:  Okay.  And --

MR. FOX:  Your Honor, we were just talking.  There was one woman who we had not agreed to strike who left.  She was the one with the small children, who her in-laws could have come possibly early, but we just let her go.  And the parties have spoken, we're fine with that.

MS. RHODES:  Peggy Lim.

MR. STEWARD:  Agreed.

THE COURT:  Okay.  Okay.  Anything -- let's just find out what this is, and then we'll call it a day.  You sure -- if you want her back, we'll --

MR. FOX:  We have plenty of good jurors it seems.

THE COURT:  Okay.

THE DEPUTY CLERK:  Mr. Sencer is one that previously

said he was okay.  His employer only will pay for one week of jury duty.

THE COURT:  Uh-huh.  Okay.  Who's his employer?

THE DEPUTY CLERK:  I'll find out.

THE COURT:  Why don't you have him come over here. Why don't you come over here.

Hi.  If you could talk into this microphone.

THE PROSPECTIVE JUROR:  Yeah, sure.

THE COURT:  I understand your employer will only pay for a limited number of days.

THE PROSPECTIVE JUROR:  Correct, that's what he confirmed for me at lunch.

THE COURT:  Okay.  And who do you work for?

THE PROSPECTIVE JUROR:  Hidden Villa Ranch.  We're an agricultural company.  We produce and distribute eggs mainly.

THE COURT:  Okay.  And how many employees do they have?

THE PROSPECTIVE JUROR:  Approximately 300.

THE COURT:  And where are they located?

THE PROSPECTIVE JUROR:  All over the country.

THE COURT:  And where are they located within the Central District?

THE PROSPECTIVE JUROR:  Within California, my main office I work out of is in Fullerton.

**UNITED STATES DISTRICT COURT**

THE COURT:  And how many employees do they have in Fullerton?

THE PROSPECTIVE JUROR:  I believe approximately 60.

THE COURT:  Okay.  And what do you do for them?

THE PROSPECTIVE JUROR:  I'm an IT manager.

THE COURT:  Okay.  How many people are in the IT department?

THE PROSPECTIVE JUROR:  There are five of us right now.

THE COURT:  Okay.  And you work full-time?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  And what are your hours?

THE PROSPECTIVE JUROR:  Right now, 6:00 a.m. until 4:00 or 5:00 p.m. most days.

THE COURT:  Okay.  You married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And does your wife work?

THE PROSPECTIVE JUROR:  No, she's home with our kids.

THE COURT:  Do you have any children?

THE PROSPECTIVE JUROR:  Yeah, 2 and 6.

THE COURT:  Okay.  So you're the sole support --

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  -- in the family?

Okay.  Just have a seat right there for just one second.

MR. FOX:  We can let him go.  I think that the defense said the same thing.

THE COURT:  Okay.  Sir.

Okay, you're excused.  You can return to the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Thank you.  Okay.

MR. FOX:  Thank you.

(End of sidebar discussions.)

THE COURT:  We have one other issue to take up.  Okay.  And that -- well, couple things.  First, there was an ex parte application to compel the testimony of Mickey Manzo.  Does the defense wish to be heard on the application?

MR. STEWARD:  Only, Your Honor, that it struck us that we'd asked for similar treatment for Leroy Baca, and that was denied.  And now the government is doing the same thing with one of their witnesses, and I don't know what the Court's going to rule on this, but our position is good for the goose, good for the gander.  If Manzo's forced to testify, Baca should be as well.

THE COURT:  If -- well, there are a couple -- they're kind of in different positions but --

MS. RHODES:  The government's position is that they are different.  Mr. Manzo has been convicted and sentenced.  He is just out on bail pending appeal and has testified in front

of the grand jury.  Of course, Mr. Baca has not been sentenced.

THE COURT:  Okay.  All right.  I'm going to probably sign that order, and I'll sign it tonight.

Now, the other issue concerns the objection to certain exhibits.  You have the -- well, never mind.

Okay.  I'm going to ask the parties to meet and confer concerning those exhibits, and I want -- I'll send out a minute order tonight, but I want -- if you can't resolve the issue, I'd like the government to give me a short statement as to why they believe the exhibits should be admitted and the defense to give me a short statement to why they believe it should not.  And I'll send out that minute order tonight.

Let's see.  Since I'm going to be up most of the night, I should make it so that you're up most of the night too.

Let's see.  We'll start taking -- we should be starting to take testimony tomorrow afternoon.

MR. FOX:  Your Honor, I don't expect the objections to relate to the witnesses we plan on calling tomorrow, and to the extent there are any, I think they will be very limited exhibits.  The majority of our exhibits that they relate to I think would be our second day of testimony.

THE COURT:  Okay.  So -- so you want to file one joint document and would probably need that by the close of business tomorrow.  I assume these are some of the same exhibits that were offered during the other three trials?

**UNITED STATES DISTRICT COURT**

MR. FOX:  Yes, Your Honor.  And I mean, just generally, I think that the -- obviously, the government's view is a lot of these are coconspirator statements, and there are others that we think put Mr. Tanaka on notice of the abuse and corruption going on within the jails.  I think that the objections that I heard from Mr. Steward -- and of course he can speak to himself -- relate to whether -- if we don't call a witness who is a party to that e-mail, whether that can be admitted.  They have stipulated to authenticity.  I think that that's generally the issue, although, again, Mr. Steward can speak for himself.

MR. STEWARD:  That's specifically the issue.  We object to the admission or offered admission of e-mails where the witness is not anywhere on the e-mail string and then the witness is called to comment upon this particular exhibit, and the heart of our objection is confrontation.  We're unable to confront anybody on the e-mail string and cross-examine them about the circumstances and anything else.

If the person is in the string somewhere, then I think that's fair game for the government.  But just to put up a series of e-mails that no one on the witness stand I assume even knows anything about or was not part of, we can't cross-examine them, and that's our objection.

MR. FOX:  Your Honor, brief response if I may.  It's no different than a coconspirator on the street making a

statement compared to a coconspirator sitting down at a
computer and writing an e-mail.  It's a coconspirator
statement, one way or the other, and courts have routinely
rejected a confrontation clause challenge to coconspirator
statements because they are statements by an agent, a
coconspirator of the party opponent.

THE COURT:  So just as an example, so if it's an
e-mail between Thompson and Sexton or Manzo, and Mr. Tanaka is
not on the e-mail and they put it up in front of, oh, let's say
Carey for example, that's your objection?

MR. STEWARD:  Precisely.

THE COURT:  Okay.  All right.  And assuming they can
show -- they've got evidence that shows that there was --
they're able to prove up there was a conspiracy, your objection
was that it's a confrontation issue?

MR. STEWARD:  Yes.

THE COURT:  Okay.  All right.

All right.  We'll see everybody tomorrow morning.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Thank you.  Yeah, let's make it 8:30
tomorrow morning and -- all right.  Thank you again.

(The proceedings adjourned at 5:08 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


         I, SHAYNA MONTGOMERY, Former Federal Official

Realtime Court Reporter, in and for the United States District

Court for the Central District of California, do hereby certify

that pursuant to Section 753, Title 28, United States Code that

the foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter and that the transcript page format is in

conformance with the regulations of the judicial conference of

the United States.


Date:  *August 24, 2016*



                         /s/ SHAYNA MONTGOMERY

                         _____
                         SHAYNA MONTGOMERY, CSR, RPR, CRR
                         Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**