UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )    CASE NO. CR 15-255-PA
                                 )
PAUL TANAKA,                     )
                                 )
                Defendant.       )
_____)

REPORTER'S TRANSCRIPT OF

PARTIAL JURY TRIAL PROCEEDINGS (UNSEALED) - DAY 2

THURSDAY, MARCH 24, 2016

8:34 A.M.

LOS ANGELES, CALIFORNIA

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
        LIZABETH A. RHODES
        EDDIE A. JAUREGUI
        Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686

**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent

**UNITED STATES DISTRICT COURT**

INDEX

**OPENING STATEMENTS**                                                    **PAGE**

Plaintiff's Opening Statement                                          178

Defendant's Opening Statement                                          203

**INDEX OF WITNESSES**

**WITNESSES**                                                            **PAGE**

(None.)

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
| --- | --- | --- | --- |
| (None.) | | | |

**UNITED STATES DISTRICT COURT**

4

**LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 24, 2016**

**8:34 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes, Eddie Jauregui on behalf of the United States. Also sitting at counsel table is FBI Special Agent Leah Tanner.

THE COURT:  Good morning.

MS. RHODES:  Good morning.

MR. STEWARD:  And, Your Honor, Harry Dean Steward on behalf of Mr. Tanaka, and also Jerome Haig.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

THE COURT:  All right.  I believe we're ready to proceed.  We'll have another panel come down this morning.  We should be able to fit all of them in this courtroom.  We'll give them a brief orientation as to the nature of the case and its expected length and determine how many of them can be with us for the next three weeks, and we'll get that number.  And then we'll see if we need any additional jurors by going through the -- having them fill out the questionnaire and evaluating the hardship questionnaires.

Assuming we can get enough, then we'll have -- yesterday's

**UNITED STATES DISTRICT COURT**

panel I think is going to be here about 9:45, and then we'd resume with jury selection and just integrate the new people into the prospective jurors.

All right.  Anything else anybody wishes to bring up at this point?

MR. FOX:  Your Honor, I just wonder if -- you're going to -- I just want to understand the procedure that you're going to have here.  You're going to bring in the 50 or 60 or 70, you're going to ask how many people can stay.  People will raise their hands if they can stay for the three, four weeks, and you're going to excuse the rest of them?  Or what was your procedure?

THE COURT:  Well, assuming -- if we got 10, 15 people, I think that's probably enough at that point to get a jury, and then I would -- then I would excuse the remainder of those people.  If we don't get enough people, we'll take the ones we get, we'll have them go upstairs.  We'll then circulate additional -- the hardship questionnaire, and we'll evaluate the hardship questionnaire and start talking to people.

MR. FOX:  If I may suggest, Your Honor -- I think that procedure sounds great -- when you send up the people who say that they have a hardship, if maybe we could have them fill out the questionnaire while they're upstairs.  Just in case we do need them and we want to look at their questionnaires, at that point they would be filled out and we can evaluate them.

**UNITED STATES DISTRICT COURT**

THE COURT:  That's fine.

MR. FOX:  Thank you.

MR. HAIG:  Your Honor, we did have one other issue, and it relates to the Mickey Manzo matter that we were talking about yesterday.

THE COURT:  Uh-huh.

MR. HAIG:  Just to perfect the record, just in case something needs to be looked at again, the government yesterday talked about the status of Mr. Manzo being different than the status of Mr. Baca because Mr. Manzo has been convicted and also sentenced.  And Mr. Baca's only pled, he's awaiting sentencing.  The sentencing's coming up, I believe in May.

Our view is that the government certainly had the control of the calendar in this situation, and they certainly knew of the allegations set forth in the information that Mr. Baca pled to, specifically pleading to lying to FBI agents back in April of 2013.  They may not have known at that specific time, I'm talking about the government, that he had lied, although I suspect that they probably did.

Certainly they would have known those facts by the time the Thompson indictment was unsealed later that year because many of the allegations in Thompson indictment and many of the things that came out in the Thompson trial were completely at odds with what Mr. Baca told to the agents and told to the U.S. attorney on that date in April of 2013.

**UNITED STATES DISTRICT COURT**

So our view, Your Honor, is that the government certainly could have done a couple things to make Mr. Baca available. They could have conditioned a plea upon him agreeing to testify for the defense or the prosecution, and in this --

THE COURT:  One second.

MR. HAIG:  Those are not jurors, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. HAIG:  They could have conditioned a plea upon him testifying for the defense or the prosecution.  They could have granted him immunity.

So we believe that the motion that was made by the Court last fall -- or made to the Court last fall that was denied by this Court, I believe in September, asking for the Court to order the government to grant immunity to Mr. Baca so he could deliver relevant testimony in this case, I think that that should be revisited based upon the new facts that we now have, specifically that Mr. Baca has now pled guilty, that the government has the power to grant him immunity, that they also had the power to charge him at an earlier time so that by the time this trial actually occurred, Mr. Baca would have been sentenced already and his Fifth Amendment right, arguably, would not be there.  And if it still was there because his sentence wasn't final for some reason, then he would be in the exact same position that Mr. Manzo is in.

MR. FOX:  Your Honor, I'm a little confused by what

Mr. Haig is suggesting. I think he's suggesting that the government did not charge Mr. Baca at the same time as the other seven defendants in the Thompson and Sexton trials because we were trying to game play and wait until the time that we charged Mr. Tanaka in order to have Mr. Baca plead and not have his sentence occur until after Mr. Tanaka's trial -- that's pretty convoluted, and I think that's what he's getting at. Of course, there's nothing in the record to suggest that.

Mr. Haig is trying to shift the burden as well on this. As we briefed this before, Your Honor, it is their obligation to point out to the Court testimony that Mr. Baca might give and would give that is directly at odds with somebody that the government sought to compel and Your Honor grant us to compel the testimony of, and the defense still after several months has not stated one thing that Mr. Baca would say that is directly at odds with anything that Mr. Manzo will say.

So I think that this motion -- or this issue is just not, first of all, right because Mr. Manzo has not testified, but also it's a very convoluted argument that Mr. Haig is making.

THE COURT: All right. Let's -- well, I'll -- the Court will have something to say about that at a later time, but at least at this point, I'd like to get the jury down here. So let's...

All right. I think it's going to be another ten minutes or so for the panel to be brought down, so I'll come back out

in about ten minutes and see if we can get some additional jurors to serve.

All right.  Anything else?

MR. FOX:  No, Your Honor.

MR. HAIG:  No.

THE COURT:  All right.  Thank you.

(Off the record at 8:42 a.m.)

(On the record at 9:41 a.m.)

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Special Agent Leah Tanner with the FBI.

THE COURT:  Good morning.

MR. STEWARD:  And, Your Honor, Dean Steward representing Paul Tanaka.

MR. HAIG:  And Jerome Haig representing Paul Tanaka.

THE COURT:  Good morning.

MR. STEWARD:  Good morning.

MR. HAIG:  Good morning.

THE COURT:  Members of the panel, good morning.

THE PROSPECTIVE JURY PANEL:  Good morning.

THE COURT:  I'm Judge Percy Anderson.  I would like

**UNITED STATES DISTRICT COURT**

to welcome you to this courtroom.  We're here this morning for the important task of selecting a jury to try a criminal case. We rely on juries in this country to decide cases of trials in our courts.  Thus, jury service is an important duty of citizenship.  Jurors must be -- jurors must conduct themselves with honesty, integrity and fairness.

Under our system of justice, the role of the jury is to find the facts of the case based on the evidence presented in the trial; that is, from the evidence seen and heard in court, the jury decides what the facts are and then applies to those facts the law I will give in my instructions to the jury.  My role as the trial judge is to make whatever legal decisions must be made during the trial and to explain to the jury the legal principles that will guide its decisions.

This is a criminal case entitled United States of America vs. Paul Tanaka.  To begin this process, I would like to give you a brief summary of what this case is about.  The charges in this case involve conduct that allegedly occurred from August 18th, 2011 to September 26, 2011.  The defendant, Paul Tanaka, was the undersheriff, or second in command, of the Los Angeles County Sheriff's Department during this period.

The government alleges that the defendant knew that the federal government was conducting a federal grand jury investigation of whether certain deputies were using excessive force and accepting bribes at the Sheriff's Department's jails.

The government contends that the defendant and other members of the Sheriff's Department conspired to obstruct the investigation.  The government also alleges that the defendant and others took actions to obstruct the investigation, including hiding an inmate Anthony Brown who was acting as a federal informant from the Federal Bureau of Investigation and a federal grand jury, tampered with potential witnesses by attempting to convince them not to cooperate with the federal investigation and threatened to arrest an FBI agent.

Defendant Paul Tanaka is charged with two crimes, conspiring to obstruct justice and obstruction of justice.  The defendant denies that he was part of the conspiracy and denies that he obstructed justice.  The defendant has pleaded not guilty to each of the charges and is presumed innocent.

The charges against the defendant are contained in an indictment.  The indictment is simply the description of the charges made by the government against the defendant.  It is not evidence of anything.  To these charges, the defendant has pled not guilty, and it will be the question of his guilt or innocence to the charges that you will be asked to decide if you're selected as a juror in this case.

Now, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or

electronic means via e-mail, text messaging, tweeting, using an Internet chat room, blog, website or other feature.  This applies to communicating with your fellow jurors until I give you the case for your deliberations, and it applies to communicating with anyone else, including your family members, your employer, the media or press and the people involved in the trial, although you may notify your family or your employer that you've been -- or that you're a member of a panel of prospective jurors.  But if you're asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and to report that contact to the court.

Because you will receive all the evidence and legal instructions you properly may consider to return a verdict, do not read any newspapers, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation or in any other way to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial

process to start over.  If any juror is exposed to any outside information, please notify the court.

And most importantly --

THE PROSPECTIVE JUROR:  Excuse me, sir.  I'm William Lindsay Smith, and I believe my wife was on the grand jury --

THE COURT:  Sir.  Sir.

THE PROSPECTIVE JUROR:  -- relating to this.

THE COURT:  Sir, have a seat.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  And most importantly, ladies and gentlemen, keep an open mind.  Do not make up your mind about what your verdict should be until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed the evidence.

Ladies and gentlemen, I recognize that jury service is probably an inconvenience to you, taking you away from your jobs and families and disrupting your daily routine.  It is, however, one of the most important duties that citizens of this country are called upon to perform.  Our Constitution framers recognized that trial by jury is the essence of a free government.  Jury service is a right that our forefathers fought for and men and women are fighting for today because of its importance in the governing of a democratic society.

Now, I know there's a temptation to let the other guy do his civic duty, and I've probably heard every excuse you can

think of trying to get out of jury duty. But recently, the importance of jury duty was brought home to me. I had a gentleman seated as a potential juror, and he was relatively small in stature, self-employed and married. And as is my custom, I began asking questions about himself and his family, and he told me that he immigrated to this country and that he had three children. And I then asked him how old his children were, and he told me that his youngest was 18 and that his middle child was 20 and his oldest son was 22, but he had recently lost his life in a fire fight in Afghanistan.

And that really brought home to me the ultimate sacrifices and contributions that men and women today are making to ensure our way of life, including the right of our citizens to have a trial by jury. For the jury to perform this historic and beneficial role in our democracy, it must be constituted with people like yourselves who are willing to serve to give back and thus to make a small contribution to this great country of ours.

Now, we expect the presentation of all phases of this case including the opening statements, the evidence, the arguments and instruction will last approximately three weeks plus deliberations. Our daily schedule will be normally from 8:00 to 1:30 with two short breaks. Today we're going to meet until noon, and we'll take a lunch break and come back at 1:30, and we'll continue until about 5:00. So we would expect all

aspects of this case would conclude probably by the week of April 12th with the case then being submitted to the jury for its deliberations. During deliberations, your hours will change. It will start at 8:00 and end at 3:30, and lunch will be brought in to you.

Now, I want to advise you that a juror may be excused from jury service only upon a showing of specific facts which constitute an undue hardship for the juror and not for the juror's employer. An undue hardship includes the following: The prospective juror has a personal obligation to care for the sick, the aged or infirmed dependence or to care for children where no comparable substitute care is either available or practical without exposing -- or without imposing an undue financial hardship on the prospective juror or the person cared for; the prospective juror has a physical or mental disability or impairment, not affecting the person's ability to serve on a jury, but that would expose the juror to an undue risk of mental or physical harm; participation in the trial would expose the prospective juror to an extreme financial burden taking into account the following factors: The length of the trial, whether the prospective juror is the sole support for his or her family and the availability of employer reimbursement.

Please keep in mind that jury service is not only a duty and a responsibility, but it's also a right because of its

importance in the governing of a democratic society.  As a society, we've given to the people the power to decide disputes between their fellow citizens in civil cases and the power to make the ultimate determination of whether or not to deprive a fellow citizen of life, liberty or property in criminal cases. Jury service is a duty that should not be shirked and a right that should not be lightly relinquished.

May I see counsel at sidebar for just a moment.

(Discussion held at sidebar.)

THE COURT:  Okay.  Is there anything that anybody wants me to say as a result of these statements made by this prospective juror?

MR. STEWARD:  I think it's better not to.

MR. HAIG:  I agree.

MR. FOX:  And, Your Honor, just so you're aware, it is likely that his wife did sit at the grand jury, I believe is the one who returned this indictment, in his last statement.

MR. STEWARD:  One other thing we would ask -- this is Jerome Haig -- that the Court make some inquiry as to if they've seen any articles today.

THE COURT:  We'll do that later.

MR. HAIG:  Very well.  Okay.  Thank you.

MR. FOX:  Thank you, Your Honor.

(End of sidebar discussions.)

THE COURT:  All right.  I would like the potential

UNITED STATES DISTRICT COURT

jurors who believe that they could be with us for the next three weeks to please raise your hand.

Okay.  What we're going to do is we're going to start with the people in the box.  I'm going to have the clerk come down and make a note of your name, and then for those people, you may be -- return to the jury assembly room on the third floor to await further instructions.

So for the people in the box, could you please raise your hand if you could be with us for the next three weeks.

(Pause in proceedings.)

THE COURT:  Okay.  And for the people on my left, if you could raise your hands if you could be with us for the next three weeks.

(Pause in proceedings.)

THE COURT:  All right.  Now, for those in the center, if you could raise your hands and let us know if you can be with us for the next three weeks.

(Pause in proceedings.)

THE COURT:  Okay.  Now, for the people -- the prospective jurors seated on the right, if you could raise your hands if you can be with us for the next three weeks.

(Pause in proceedings.)

THE COURT:  All right.  May I see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  We have approximately 29, so I would think that should be sufficient.  Out of an abundance of caution though, I think what I'm going to do is have these people fill out a hardship questionnaire.  I'm going to have them fill it out up on the third floor, and they'll be collected up there.  And then if we need them -- and we'll just keep those people up there until about noon or so until we figure out how things are going.  I'd also suggest that we ask Mr. Smith to take his leave --

MR. FOX:  Yes, Your Honor.

THE COURT:  -- from jury service.

MR. FOX:  I was going to suggest that, yes.

MR. STEWARD:  Quietly.

THE COURT:  Okay.

MR. FOX:  Thank you.

THE COURT:  All right.

(End of sidebar discussions.)

THE COURT:  All right.  Ladies and gentlemen, what we're going to do is we're going to pass out a questionnaire for those of you who believe you cannot be with us for the next three weeks.  I want you to take the questionnaires, return to the jury assembly room on the third floor and fill out that questionnaire and give it to one of the officials in the jury assembly room.  Once you've completed that questionnaire, then we will contact you probably within the next hour or so to let

you know whether or not you're going to be needed or whether or not we have some additional questions based on the questionnaire that you filled out.  All right?

So -- all right.  So these gentlemen are going to distribute these questionnaires.  Steve will start with the people in the jury box.  If any of the papers were left on the chairs, if you could just leave those on the chairs.  And again, take the questionnaires up to the third floor, fill them out, and then we'll take a look at them and we'll be back in touch with you -- probably be at least an hour, 20 minutes.  If you need something to write with, I think we've got some pens here.

(Pause in proceedings.)

THE COURT:  What I'd like to do now is to take the 29 people that agreed that they could serve, bring them back down here along with the five people -- five to seven people from yesterday, bring them in and give them our second phase of orientation.  And then once we've done that, then we'll combine those groups with the people that were here yesterday, and we'll resume with jury selection.

I take it we have no prospective jurors in the courtroom now?

MR. FOX:  Your Honor, if you'd like, I know who our first peremptory strike is, so I'll share that with the defense right now so that we can speed us this process once -- I don't

think anything's going to change in the next half hour.

THE COURT:  You never know.  That's fine.

(Counsel conferred off the record.)

(Pause in proceedings.)

THE COURT:  All right.  If you're a prospective juror, please sit in the center section or on the seats to my left.

Ladies and gentlemen, we'll be ready to start in just a few minutes.  We're waiting for a couple more prospective jurors.

(Pause in proceedings.)

THE COURT:  I take it, all of you, this is your first morning here.

We've got about five to seven more people that we're waiting for.  It should just be a couple of minutes, and then we can get started.

(Pause in proceedings.)

THE COURT:  Do we have anybody in the courtroom that was here yesterday?  We have six more people.  They're going to join us shortly.  It'll be just a couple minutes.

(Pause in proceedings.)

THE COURT:  Ladies and gentlemen, as you probably know, at the beginning of any court case the first step involves a selection of jurors who are going to hear the case. During this process, I'm going to be asking you questions.  It

provides the Court and the lawyers with an opportunity to inquire into your background, experience and state of mind to determine whether you're qualified to be a juror in this case.

Now, qualified simply means that you can be fair and impartial, that you can decide this case based on the evidence presented here in the courtroom and on nothing else.  Please keep in mind that during this process there is no such thing as a right or wrong answer, only answers that are complete or incomplete.  Err on the side of giving too much information.

In this case, you'll be sitting as judges of the facts. All parties have a right to expect that you will perform your role fairly and impartially and not because of any bias or prejudice you bring into this courtroom.  If there is any reason why any of you might be biased or prejudiced in any way, you must disclose such reasons when you're asked to do so. It's your duty to make this disclosure.

In giving you these admonitions, I want to make it clear that I have no intention of trying to embarrass anyone or to invade your privacy or the privacy of any of your family members or close personal friends.  If you have something that you think the lawyers or I should know but you do not wish to discuss it in the presence of the entire panel in open court, please let me know and we can discuss that matter at sidebar outside the presence of the other jurors.

As I mentioned earlier, this is a criminal case entitled

**UNITED STATES DISTRICT COURT**

the United States of America vs. Paul Tanaka.  To begin this process, I'd like to introduce you to the parties and counsel in this matter.  I'm going to ask the government counsel to stand and introduce himself and anyone seated at counsel table to the prospective jurors.

MR. FOX:  Good morning.

THE PROSPECTIVE JURORS:  Good morning.

MR. FOX:  My name's Brandon Fox.  I'm an Assistant United States Attorney, also known as a federal prosecutor.  Sitting two people away from me, now standing, is Lizabeth Rhodes.  She is also an Assistant United States Attorney, and sitting behind her will be Eddie Jauregui who is also an Assistant United States Attorney.  Sitting directly to my right will be Leah Tanner.  She'll also be known to you as Leah Marx, her previous name.  She's an FBI special agent.

THE COURT:  Thank you.

Is there any member of the jury panel who is acquainted with or has seen counsel or the agent or who may have heard their names prior to today?  Just raise your hand.

MR. JAUREGUI:  Your Honor, I think there's one potential juror who didn't hear the question.  He'd like the Court to --

THE PROSPECTIVE JUROR:  I didn't understand.

THE COURT:  Okay.  What I really want to know is whether or not you've heard any of -- the names of any of these

people or you're acquainted with them in any way.  And if you are, please raise your hand.

All right.  Will counsel stipulate that I do not have to note for the record that there were no hands raised in response to my future questions?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  I'm going to ask defense counsel to stand and introduce himself, the defendant, as well as anyone else seated at counsel table to the prospective jurors.

MR. STEWARD:  Good morning.  My name is Dean Steward.  I'm a lawyer from Orange County, and I represent Paul Tanaka.

MR. HAIG:  Good morning.  I'm Jerome Haig.  I'm also a lawyer from Los Angeles.  I represent Mr. Tanaka as well.

THE COURT:  Thank you.

Is there any member of the jury panel who is acquainted with or has seen counsel or the defendant or who may have heard their names prior to today?

Okay.  We'll just keep that -- just keep that in mind, and we'll get to that.

Do any of you or any members of your families know or have any kind of relations with me?

Okay.  Could you join us over here for just a moment.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  I used to work at Sonnenschein Nath & Rosenthal, Daisy Brito.

THE COURT:  Oh, hi, how are you?

THE PROSPECTIVE JUROR:  Hi, I remember when you were appointed to District, yes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Good to see you.

THE COURT:  It's good seeing you.

Ms. Brito used to work for the same law firm that I did.

THE PROSPECTIVE JUROR:  Many years.

THE COURT:  Many years.

THE PROSPECTIVE JUROR:  For many years.

THE COURT:  All right.  But I don't think we've ever had any --

THE PROSPECTIVE JUROR:  No.

THE COURT:  -- social relationship, and I don't know her personally.

Okay.  If you could just resume your seat.

THE PROSPECTIVE JUROR:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  During the trial of this case, the following persons may be called as witnesses:  I'm going to ask the clerk to read the names of the witnesses who may be called in this case.

THE DEPUTY CLERK:  Robert Olmsted; John Clark; Al

UNITED STATES DISTRICT COURT

Gonzales; Denise Conte; Peter Eliasberg; Pat Maxwell; Steve Roller; Steve Martinez; Robert Bayes; Mickey Manzo; Connie Cervantes; David Dahle; Bobby Lyons; Judy Gerhardt; Linda Farrar; Michelle Miller; Gus Academia; Tara Adams; Kathy Voyer; Ralph Ornelas; Michael Bornman; Gilbert Michel; William David Courson; John Powell; David Betkey; William "Tom" Carey; John Torribio; Leah Tanner; Ruben Martinez; Sue Bissman; Mark Lilianfeld; Larry Waldie; Cecil Rhambo; Duane Harris; Paul Yoshinaga; Ed Medrano; Rodney Lyons; Helen Hayase; Carlos Lifesjoe; Victor Cockrell; Carlos Narro; David Lam; Leroy Baca.

THE COURT:  Have any of you heard of or otherwise been acquainted with any of the witnesses just named that you believe would affect your ability to be a fair and impartial juror in this case or make it difficult for you to be fair and impartial?

Okay.  All right.  I'm going to -- why don't we start with the lady here, yeah, that's fine.  Why don't you come over here and join us.

(Discussion held at sidebar.)

THE COURT:  Okay.  If you could just stand here next to the microphone.

THE PROSPECTIVE JUROR:  Sure.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Okay.  I'm actually a member of the media, and I'm very familiar with this case.  And I'm

familiar with, obviously, the former sheriff Lee Baca. About a month or two ago, I worked very closely in my job with -- I work for NBC news channel which is part of the NBC news network, and in that job I work very closely with Channel 4, KNBC. And about a month or two ago, they covered a press conference with officials when the former sheriff was having a hearing because he was pleading guilty to charges related to this. They covered a press conference with officials. They alerted me to it. I distributed their feed to the network news shows for NBC if they were interested.

My affiliates and I work locally around my region and around the country for whoever wanted to -- you know, for whoever had interest outside of the local market. I also -- I've worked with sketch artists for this court before, purchasing their sketches for various trials. They didn't contact me directly about the Lee Baca hearing, but KNBC had alerted me. I alerted the network and the division I work for just letting them know the schedules are available and --

THE COURT: By the way, my mother is very upset about these sketches.

THE PROSPECTIVE JUROR: And I don't think that the network purchased them, but I don't know because they didn't have me directly call the sketch artist. And I'm also on the distribution list for the U.S. Attorney's Office for the Central District here, so I've received press releases about

it.  I'm on Sheriff's elite press releases.  I'm sorry, am I talking too much?  I just want to make sure I -- I'm just trying --

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  -- to be honest about everything and everything I know.  So as I said, I'm very familiar.  I knew this trial was coming up.  I knew jury selection was going on.  I don't know.  I can't think of anything else right now to say, but I'm --

THE COURT:  Okay.  I have a few things.  Now, despite everything you know about what you've read, what you've heard, do you think you can put that aside and judge this case based solely on what you hear here in the courtroom?

THE PROSPECTIVE JUROR:  I think I could.

THE COURT:  Okay.  Any doubt in your mind?

THE PROSPECTIVE JUROR:  No.  The only doubt or concern of mine would be, again, because I do work in the media, I don't know if there's going to be days where we're not meeting and I have to go to work, I am concerned I am going to be hearing about this case a lot, whether it's through my e-mails or whatever.  I just -- I don't know if I can avoid that if I'm doing my job, if you will.

THE COURT:  Well, if you were selected as a juror, as I mentioned earlier, all jurors are restricted in what they can write or say about the case, and that includes

communicating with other people about the case and about their jury service, including e-mails.  So you'd probably have to suspend talking about the case or commenting about the case.

THE PROSPECTIVE JUROR:  My concern would be that if I was on my conference call or something like that with Channel 4 and they start talking, you know what I'm saying?

THE COURT:  You'd have to hang up and say, I can't be a party to this.

THE PROSPECTIVE JUROR:  And is that going to make it look obvious?

THE COURT:  Huh?

THE PROSPECTIVE JUROR:  Is that going to make something look obvious?

THE COURT:  Is it going to make something look obvious?

THE PROSPECTIVE JUROR:  Like, well, maybe she's on that jury and -- maybe she's on that jury.  That's another thing I had a concern about.

THE COURT:  Oh, you can tell people that you've been selected to be a juror on a case, but you're instructed you can't talk about it.

THE PROSPECTIVE JUROR:  Okay.  Okay.  I think I -- I think that was another concern of mine, just that they know I'm -- you know, I mean, my employers, my coworkers know I'm here for jury duty, and that concerns me that -- it's a

UNITED STATES DISTRICT COURT

concern.

THE COURT:  Okay.  That's fine.  I guess the real question is do you feel that you'd be able to serve as a juror in this case and follow the Court's instructions and not talk with anybody about the case or about anyone who has anything to do with it and put aside what you've heard and what you've learned about the various individuals in this case and decide this case based just on the evidence you hear here in the courtroom?

THE PROSPECTIVE JUROR:  Yes.

(Reporter admonition.)

THE COURT:  Okay.  Why don't --

THE PROSPECTIVE JUROR:  Can I ask now something else that I should have said before and that I didn't because I misread something and because I have you here?  I wanted to -- where it said availability from employer, my employer only pays ten days, and that's my fault for not reading that and listening to that properly.  I just wanted to put that there too.

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Now, are you married?

THE PROSPECTIVE JUROR:  I'm not.

THE COURT:  Okay.  How many people reside in your household?

THE PROSPECTIVE JUROR:  Me.

THE COURT:  Okay.  Would it be a financial hardship for you to serve if the case went, say, 15 days?

THE PROSPECTIVE JUROR:  No, because I believe I could call my human resources department and just let them know that I'm on a case that's going to go longer, and I would hope that they would work something out with me.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  And one of the things that we do if requested, we can call HR and tell them, ask them that a person's been asked to serve on a jury and it's going to be a little longer than your standard --

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  -- if that becomes necessary.

THE PROSPECTIVE JUROR:  Okay.  And if this is a case that's going to get media coverage, maybe some media presence in the courtroom or a sketch artist, is it a problem that I may have worked or may have worked with that media person in the room or that I've communicated and purchased sketches?

THE COURT:  I don't think so, as long as you don't communicate to them about your jury service while you're on the panel.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  So no blogs, no tweets.

THE PROSPECTIVE JUROR:  Nope.  Okay.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  All right.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. STEWARD:  I still don't know her name.

THE COURT:  I'll get it.

You have her name?

THE DEPUTY CLERK:  No.

THE COURT:  Oh, you don't either.  Okay.

(End of sidebar discussions.)

THE COURT:  Ms.?  I'm sorry.

THE PROSPECTIVE JUROR:  Me?

THE COURT:  Yes.

(Discussion held at sidebar.)

THE COURT:  In the course of your employment, are you familiar with any of these people?

THE PROSPECTIVE JUROR:  The names.

THE COURT:  Just the names?

THE PROSPECTIVE JUROR:  The names.

THE COURT:  You haven't talked to them?

THE PROSPECTIVE JUROR:  I've never talked to them.

THE COURT:  Okay.  That's fine.

THE PROSPECTIVE JUROR:  But it's names and what I've read --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- because of my job.

THE COURT:  All right.  And what's your name?

THE PROSPECTIVE JUROR:  My name's Candace Kisiel.

THE COURT:  Candace?

THE PROSPECTIVE JUROR:  Kisiel.

THE COURT:  Okay.  And how do you spell your last name?

THE PROSPECTIVE JUROR:  K-I-S-I-E-L.

THE COURT:  Okay.  Thank you.

THE PROSPECTIVE JUROR:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  Anybody -- I think another person had their hand raised.

All right, sir.

(Discussion held at sidebar.)

THE COURT:  Hi, how are you?

THE PROSPECTIVE JUROR:  Fine.

THE COURT:  You'd raised your hand that you might find it difficult to be a juror on this case.  Why is that?

THE PROSPECTIVE JUROR:  I know ex-sheriff Baca very well, been to numerous events that he's been at I'm involved with.  When he got into his little jam, I really lost total

confidence in him.  I'm still kind of leery also because I actually voted for Paul when he was running for Sheriff, just to see what was going to happen with that.

I've been involved in law enforcement now for 35 years. I'm now retired, so I have been at events with all of them. I've heard things that they've said.  I think they both lost a little bit of their integrity, so I might question the validity of things that they would say.

THE COURT:  Okay.  You think you'd have a difficult time putting the things that you've heard them say and the experiences that you've had with them, might have some difficulty putting that out -- putting that out of your mind and deciding this case based solely on the evidence you hear here in the courtroom?

THE PROSPECTIVE JUROR:  It's kind of based on what they say.  You know, I mean --

THE COURT:  Well --

THE PROSPECTIVE JUROR:  It's hard to say.  I mean, I would hope that I would be fair and impartial just like you would want someone to be.

THE COURT:  Well, what's important here is that the jurors in deciding the case, that they decide the case based solely --

THE PROSPECTIVE JUROR:  On the evidence.

THE COURT:  -- on the evidence --

THE PROSPECTIVE JUROR:  Sure.

THE COURT:  -- that they hear here in the courtroom. And, you know, everybody has a different life experience that they bring to the task.

THE PROSPECTIVE JUROR:  Sure.

THE COURT:  But in deciding the guilt or innocence of the defendant, it's important that people make their decision based just on the evidence that's seen and heard here in the courtroom.  And if you can do that, that's fine.  If you're going to have any difficulty doing that, we need to know.

THE PROSPECTIVE JUROR:  Well, I hope I would vacillate.  I hope that I would be able to put forth that best effort to do that.

THE COURT:  Uh-huh.  Well --

THE PROSPECTIVE JUROR:  That's the best I can say. I don't want to say, Oh, yeah, sure, no question.  I mean --

THE COURT:  Well, that's okay.

THE PROSPECTIVE JUROR:  -- no one knows if it's a yes or no.

THE COURT:  If you can't commit to doing that, that's fine.  But we need jury -- we need members of the jury who are committed and commit to deciding this case based just on the evidence and leave the outside influences outside the courtroom.

THE PROSPECTIVE JUROR:  I will attempt to do so, to the best of my ability.

THE COURT:  We need more than an attempt.  We need people who can commit.  If you can commit, that's fine.  If you don't -- in good conscience, if you don't think you can, we just need to know that.

THE PROSPECTIVE JUROR:  I think I may question some of the things that certain folks will say.  Just from my past experiences, even though you want to listen to the evidence, there's things that I know about the Sheriff's Department that could influence my decision.

THE COURT:  Okay.  What law enforcement agency were you with?

THE PROSPECTIVE JUROR:  I was with the Los Angeles Airport Police for 32 years, and prior to that I was ten and a half years with the Los Angeles Police Department as a detention officer where we would do the exchange-bys with the Sheriff's Department.

THE COURT:  Okay.  Could you have a seat on that bench for just a second.

Go ahead.

MR. STEWARD:  I was just going to say I can't think of many follow-up questions other than his name, and beyond that, we'd suggest he's challenged for cause.

MR. FOX:  We would stipulate.  We'll stipulate to

UNITED STATES DISTRICT COURT

him.  I think he's Michael Edwards because I saw 359 on his badge, if that matches up.

MR. HAIG:  Matches up with his occupation?

MR. FOX:  We should ask him what his occupation is still.

THE COURT:  Sir.

Okay, and your name?

THE PROSPECTIVE JUROR:  Michael Edwards.

THE COURT:  Okay.  We'll let you know, so just resume your seat in the audience.

THE PROSPECTIVE JUROR:  Where I was before or the front?

THE COURT:  Right where you were before.

(End of sidebar discussions.)

THE COURT:  All right.  I believe there was one more person who had their hand up, if you'd join us up here, please.

(Discussion held at sidebar.)

THE COURT:  Morning.  If you could stand here close to the microphone.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Is there a reason you feel that you couldn't be fair and impartial in this case?

THE PROSPECTIVE JUROR:  Well, not fair, just that I work for the county jail.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  That's my only thing.

THE COURT:  Okay.  And which jail do you work at?

THE PROSPECTIVE JUROR:  Right here in county jail, Twin Towers.

THE COURT:  Okay.  How long have you worked there?

THE PROSPECTIVE JUROR:  Five years, five and a half.

THE COURT:  Okay.  And what do you do there?

THE PROSPECTIVE JUROR:  I'm an inmate crew leader.

THE COURT:  An inmate?

THE PROSPECTIVE JUROR:  Inmate crew leader.  I supervise inmates when they come out to work --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- for cleaning.

THE COURT:  Okay.  Do you think that -- well, let me ask you, would you have any difficulty putting aside what you may have seen in the jails or heard and decide this case based solely on the evidence you hear here in the courtroom?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Can you decide this case based solely on the evidence?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you put aside what you may have heard or seen in the jails and decide this case based just on what you hear here?

THE PROSPECTIVE JUROR:  Yes.

THE COURT: Okay. Did any of the names that were read off to you, did they ring a bell? Do you know any of those people?

THE PROSPECTIVE JUROR: No, just the last name Leroy Baca, just that.

THE COURT: Okay. So you'd heard of Mr. Baca?

THE PROSPECTIVE JUROR: Not -- yeah, uh-huh.

THE COURT: Okay. Anybody else?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. You ever heard the name of the defendant?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Mr. Tanaka?

THE PROSPECTIVE JUROR: Just heard it.

THE COURT: Okay. But you haven't had any contact with him?

THE PROSPECTIVE JUROR: No. No.

THE COURT: Okay. And you can put aside anything you may have heard about Mr. Baca or Mr. Tanaka and decide this case based solely on the evidence?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. All right. If you could just have a seat.

THE PROSPECTIVE JUROR: Okay.

MR. FOX: We believe that she's 422, Maria

Santosvilleda.  It says that she's an inmate crew leader as an occupation.

THE COURT:  Okay.  Anything else?

MR. STEWARD:  No, not from us.

THE COURT:  Thank you.

(End of sidebar discussions.)

THE COURT:  Okay.  Other than the people that were called up, is there anybody else who's acquainted with any of the witnesses who were named?

You should note that the parties are not required to call all of these witnesses, and they may find it necessary later to call other witnesses.  As I had mentioned earlier, this is a case in which the defendant is charged with conspiring to obstruct justice and endeavoring to obstruct justice or a grand jury investigation of civil rights violations in the Los Angeles County jails.

The government alleges that the defendant was the undersheriff with the Los Angeles County Sheriff's Department at a time when the federal government was conducting a grand jury investigation of whether certain deputies were using excessive force and accepting bribes at the Los Angeles County Sheriff's Department jails.  The government alleges that it was utilizing an inmate, Anthony Brown, as an informant in that investigation.

The charges allege that after the defendant and other

members of the Los Angeles County Sheriff's Department became aware that inmate Brown was a federal informant, they conspired to hide inmate Brown from a federal grand jury by changing inmate Brown's name, by altering the Sheriff's Department computer records, moving inmate Brown to other facilities operated by the Los Angeles County Sheriff's Department; that they tampered with witnesses and allegedly threatened the arrest of an FBI agent.

The charge against the defendant is contained in an indictment.  The indictment is simply the description of the charges made by the government against the defendant.  It is not evidence of anything.  To these charges, the defendant has pled not guilty, and it will be the question of his guilt or innocence to these charges that you'll be asked to decide if you're selected as a trial juror in this case.

Now, we actually started yesterday, and we have put in 12 people in the jury box, and the reason that you were called is because we need some additional jurors.  Now I'm going to continue asking you questions, and it's important that you listen to the questions that are asked because you may be called to replace one of the jurors seated in the jury box, and I will ask you if any of those prior questions that I've asked pertain to you.

Therefore, it's important that each of you listen carefully to the questions that I will be asking and keep in

UNITED STATES DISTRICT COURT

mind any of which call for an affirmative answer or other explanation on your part.  In that way, if you're called into the jury box, I won't have to repeat each of the questions to you.  Now, it's important that all of you remain in the courtroom during the questioning so that if you're called in to replace a juror you will have heard all the Court's questions.

Now, later on this morning we will take a break, and when we do take our break you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  This includes communicating by e-mail with anyone about the case. Do not use any social networking sites such as blogs, Myspace, Facebook, Twitter, and if anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet, using other reference materials, and do not make any investigation about the case on your own.  If you need to communicate with me, simply give a note to the clerk.  And most importantly, do not make up your mind about what your verdict should be until after you've gone to the jury room to decide the case and you and

42

your fellow jurors have discussed the evidence.  Keep an open mind until then.

Now, are any of you taking any medication that would make it difficult for you to give your full attention to the evidence during this trial?  Just raise your hand.

All right.  Sir, if you'd just come forward for a moment, please.

(Discussion held at sidebar.)

THE COURT:  Hi.  Okay.  What medication are you taking?

THE PROSPECTIVE JUROR:  I'm taking for high blood pressure in the morning.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And for the nighttime, I take it, like a prostate enlargement.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  So I have to go to the bathroom like, you know, prostate.

THE COURT:  Okay.  We take breaks about every hour and a half, hour and 45 minutes.  You think you could sit through that?

THE PROSPECTIVE JUROR:  Sometimes when I sit for long time, like I lightheaded because like my neck right here, so I don't know.  And I feel like I'm --

THE COURT:  Okay.  Well, if you're ultimately

selected as a juror, you would be able to stand up whenever you wanted in the jury box, and do you think that might help with that?

THE PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Because sometimes I feel kind of dizzy like --

THE COURT:  Okay.  What's your name?

THE PROSPECTIVE JUROR:  Tito Valdez.

THE COURT:  Okay.  Just have a seat right there on the bench.

THE PROSPECTIVE JUROR:  Right there?  Okay.

THE COURT:  Thank you.

MR. FOX:  We would stipulate to having Mr. Valdez excused.

MR. STEWARD:  As would we.

THE COURT:  Okay.  Thank you.

MR. FOX:  Your Honor, I think he's Number 7.

MS. RHODES:  7 -- do we have a list of the seven, five or six?

THE COURT:  The seven and five should have been on the list from yesterday.

MS. RHODES:  Okay.

MR. HAIG:  His name is Tito Valdez?  Jerome Haig.

(End of sidebar discussions.)

THE COURT: All right. Sir, if you'd just resume your seat in the audience, please.

THE PROSPECTIVE JUROR: Thank you.

THE COURT: As a juror, you're obligated to follow the law given to you by the Court. Is there anyone who'd be unwilling or unable to follow the law as given to you by the Court, disregarding your own notions or ideas as to what the law is or ought to be?

One important task of the jury is to listen to the testimony of the various witnesses and to decide how much or how little weight the testimony should be given. Would any of you be unable or unwilling to perform this task?

Does any prospective juror know anybody else on the panel? Go ahead and take a look.

All right. So we've got a room of strangers.

Now, again, we expect all presentations of all phases of this case, including the opening statements, the evidence, the argument and the instructions, will last approximately three weeks. And except for today, we're going to start at 8:00 in the morning, and we're going to quit at 1:30, and we'll have two short breaks during that time period.

Now, all of you think you can be with us for the next three weeks during that time period?

Okay. All right. If you'd come over here, please.

(Discussion held at sidebar.)

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm the sole provider of my three kids, and I'm four months pregnant.  I'm considered high-risk pregnancy also.

THE COURT:  Okay.  When are you due?

THE PROSPECTIVE JUROR:  I'm due September.

THE COURT:  September?

THE PROSPECTIVE JUROR:  September.

THE COURT:  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm customer service.

THE COURT:  Where do you work?

THE PROSPECTIVE JUROR:  HD Supply in San Fernando.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  How many people reside in your household?

THE PROSPECTIVE JUROR:  It is my sister and her family, myself with my kids.

THE COURT:  Okay.  And how many children do you have?

THE PROSPECTIVE JUROR:  I have three.

THE COURT:  Okay.  And how old are they?

THE PROSPECTIVE JUROR:  There's a 5-year-old, 10-year-old and a 12-year-old.

THE COURT:  Okay.  And how many people are working

in your household?

THE PROSPECTIVE JUROR:  Just me and my sister.

THE COURT:  Okay.  And what does your sister do for a living?

THE PROSPECTIVE JUROR:  I believe she works for Medical.

THE COURT:  Okay.  If you could just have a seat there on the bench.

MR. FOX:  Your Honor, I think she's juror 650, Lorena Maciel.

THE COURT:  Well, I'll ask her when she comes back.

MR. FOX:  Okay.

MR. STEWARD:  We would like to excuse her.

MR. FOX:  Agree.

THE COURT:  Okay.  We're going to excuse you, and I want you to return to the jury assembly room on the third floor.  And what is your name?

THE PROSPECTIVE JUROR:  Lorena Maciel.

THE COURT:  Thank you.

MR. FOX:  Your Honor, if we can raise one more issue.  We checked on our list from yesterday, and we did not see a Tito Valdez on it.  So I don't know we have a list of the seven.

MR. HAIG:  This is Jerome Haig.  I agree.  We don't have him on our list.

**UNITED STATES DISTRICT COURT**

THE COURT:  We'll see if we can --

MR. HAIG:  Thank you, Your Honor.

THE COURT:  -- fix that.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, as jurors you're going to be the finders of fact in this case.  You're required to base your decisions solely on the evidence that's presented here in court.  You may not consider any facts or information that you've learned outside of court, and you may not rely on your own prejudices or biases in judging this case.

THE PROSPECTIVE JUROR:  We couldn't hear you.

THE DEPUTY CLERK:  Your microphone.

THE COURT:  That's fine.  Okay.  Sorry.

As jurors you're going to be the finders of fact in this case.  You're required to base your decision solely on the evidence that's presented here in court.  You may not consider any facts or information that you learn outside of court, and you may not rely on your own prejudice or biases in judging this case.  Do any of you believe you would not be able to do this?

As a judge, it's my job to instruct you on the law that's applicable to this case.  You're required to find the facts and then apply the law as I give it to you to those facts.  Do any of you feel you'd have any difficulty in accepting and following my instructions concerning the law that governs this

case?

As you may know, a defendant is presumed innocent until proven guilty. This presumption of innocence continues until the jury concludes, if it does, that the defendant is guilty beyond a reasonable doubt. If the jury finds that the government has not proved the defendant's guilt beyond a reasonable doubt, it must return a not guilty verdict, and you cannot return a guilty verdict unless you find that the government has established the defendant's guilt beyond a reasonable doubt. This is a different standard than is used in civil cases. There, the jury simply has to find that a party has established that its version of the facts is more probably true than not.

Is there anything in the criminal standard of proof beyond a reasonable doubt that you believe would make it difficult for you to be a fair and impartial juror in this case?

Yes, ma'am.

THE PROSPECTIVE JUROR: What are you saying?

THE COURT: Okay. What I'm saying is that there is a standard of proof in a criminal case that's proof beyond a reasonable doubt, and that's different than the standard that's used in a civil case. In a civil case, the jury simply has to find that one party has shown that its version of the facts is more probably true than not. In a criminal case, you have to show, and the jury has to find, that the government has proved

its case beyond a reasonable doubt.

And what I'm asking you is is whether there's anything in the standard of proof beyond a reasonable doubt that you believe would make it difficult for you to be a fair and impartial juror in this case.

THE PROSPECTIVE JUROR:  I'm just not sure if I would understand the whole thing.

THE COURT:  That's fine.  All right.  We'll get to that in just a moment.  Thank you.

Unlike the government, the defendant has no burden and does not have to present any evidence if he chooses not to do so.  You must wait until all of the evidence has been presented before making up your mind.  Are there any of you who believe that you could not withhold judgment until all of the evidence has been presented?

The potential punishment for the crimes that have been charged is a matter for the Court to decide.  Are there any of you who believe that you could not follow that instruction?

Now, are there any of you who believe that you for some reason should not be seated as a juror in this case?

Okay.  All right.  I'm going to have the lady in the back, if you'd join us over here.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Just one minute.  And what is your name?

THE PROSPECTIVE JUROR:  Tip Petcha.

THE COURT:  Okay.  And your last name?

THE PROSPECTIVE JUROR:  P-E-T-C-H-A, Petcha.

THE COURT:  Okay.  Now, you had raised a question about proof beyond a reasonable doubt.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  The Court is going to give you some further instructions, and I hope you understand what those terms mean.  Okay?

What do you do for a living?

THE PROSPECTIVE JUROR:  Right now, I'm not -- I am retired.

THE COURT:  Okay.  And what did you do before you retired?

THE PROSPECTIVE JUROR:  I -- the manager of the snack shop.

THE COURT:  Okay.  And where did you work?

THE PROSPECTIVE JUROR:  In Hollywood.

THE COURT:  And where are you from originally?

THE PROSPECTIVE JUROR:  Thailand.

THE COURT:  Okay.  And how long have you been in this country?

THE PROSPECTIVE JUROR:  About 30 years.

THE COURT:  Okay.  And are you married?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what does your husband do?

THE PROSPECTIVE JUROR:  Right now, he doesn't have job.

THE COURT:  Okay.  Did you get a copy of the questionnaire yet?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Because at first -- at first when you said that if we can stay for three weeks, I misunderstood that is -- cannot stay for three weeks or something, so --

THE COURT:  Okay.  So you would -- you'd have difficulty staying for three weeks?

THE PROSPECTIVE JUROR:  Also, yeah.

THE COURT:  Okay.  What I'd like you to do is fill out this questionnaire and take that up to the jury assembly room and give it to one of the officials.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  And then we'll let you know.

THE PROSPECTIVE JUROR:  Oh, okay.  Thank you.

THE COURT:  All right.  Anybody have any objection?

MR. STEWARD:  No.

MR. FOX:  No.

(End of sidebar discussions.)

THE COURT:  Now, for the other people that have

raised your hands, all right, why don't we take the first person on the second row there.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Okay.  I remember we had talked with you earlier.  You have the dizziness problem, correct?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Just have a seat.  Just resume your seat in the audience.  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  Who's next?  All right.

THE DEPUTY CLERK:  He's on the list from yesterday, this gentleman that's coming up.

THE COURT:  Okay.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  Stand a little over here.  Now, is there a reason you believe you can't --

THE PROSPECTIVE JUROR:  Okay.  First off, I couldn't comprehend pretty much saying that what you said, and then I'm biased towards race because I was beaten up by a couple Hispanic guy and was robbed by that person, so I'm not sure.

THE COURT:  Okay.  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm a travel agent.

THE COURT:  You're a travel agent?

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  Okay.  And who do you work for?

THE PROSPECTIVE JUROR:  A local travel agent.

THE COURT:  What's the name of it?

THE PROSPECTIVE JUROR:  Dynasty Travel.

THE COURT:  Okay.  And where are they located?

THE PROSPECTIVE JUROR:  Monterey Park.

THE COURT:  Okay.  And how long have you worked for them?

THE PROSPECTIVE JUROR:  About six years, seven years.

THE COURT:  Okay.  And where are you originally from?

THE PROSPECTIVE JUROR:  China.

THE COURT:  Okay.  And how long have you been here?

THE PROSPECTIVE JUROR:  About 12 years.

THE COURT:  12 years?  Did you go to school here?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Where'd you go to school?

THE PROSPECTIVE JUROR:  Cal Poly.

THE COURT:  Cal Poly?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  And how long did you go to Cal Poly?

THE PROSPECTIVE JUROR:  About two and a half.

THE COURT:  Two and a half years?

THE PROSPECTIVE JUROR:  Yeah, but I have bad listening.

THE COURT:  You have bad?

THE PROSPECTIVE JUROR:  Listening here.

THE COURT:  You have bad hearing?

THE PROSPECTIVE JUROR:  Yes.  Some of the time I couldn't hear completely what you were saying, so sometime just didn't hear what you said.

THE COURT:  Okay.  Well, we have a device that you can use that will assist you in hearing.

THE PROSPECTIVE JUROR:  Yeah, okay.

THE COURT:  Okay?  What's your name?

THE PROSPECTIVE JUROR:  Jia Fang, J-I-A, last name F-A-N-G.

THE COURT:  Okay.  Just have a seat right there on the bench for me.

Do you have those other -- here's our alphabetized list from yesterday.

(End of sidebar discussions.)

THE COURT:  Okay.  Anybody else?

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Basically, I won't be able to attend this because I really don't have a job right now, and

I'm actually taking care of my brothers, taking them to school early in the morning.  And it's kind of pretty distant from where I live to get here, and I don't have any transportation to get here, sir.

THE COURT:  Okay.  Where do you live?

THE PROSPECTIVE JUROR:  Lakewood, California, sir.

THE COURT:  And how many people reside in your household?

THE PROSPECTIVE JUROR:  Right now, it was just my two parents and my two brothers right now, and both of my parents -- well, my mother works in fruit and agriculture in Los Alamitos, and my father works in construction.  So basically, they both have the same -- they only have one car to use.  So today I had to use my mother's car for a ride now, and her friend had to pick her up from work, and she can't be missing any days of work whatsoever.

THE COURT:  Okay.  Are you working?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  You're a student?

THE PROSPECTIVE JUROR:  I'm trying to -- I'm trying to go back to school right now, and I got laid off on my last job because the hours were cut back.

THE COURT:  Okay.  Just have a seat on that bench right there.

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  I'll ask him some more questions if you want to keep him.

MR. STEWARD:  No, stipulate to him being dismissed.

MR. FOX:  Agree.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Anybody else?  Okay.

(Discussion held at sidebar.)

THE COURT:  Hi, what's your name?

THE PROSPECTIVE JUROR:  Yvette.

THE COURT:  Yvette?

THE PROSPECTIVE JUROR:  Jennings.

THE COURT:  Okay.  And is there a reason you don't think you should be seated as a juror in this case?

THE PROSPECTIVE JUROR:  Well, due to the 21 days, I cannot -- I can't be able to -- without work.

THE COURT:  Okay.  Where do you work?

THE PROSPECTIVE JUROR:  I work in freight for order. I'm accounting.

THE COURT:  Okay.  And do they reimburse you for jury service?

THE PROSPECTIVE JUROR:  No, they don't.  They don't pay me.  I'm only the one working right now.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  No, I'm a single parent.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  Do you have any children?

THE PROSPECTIVE JUROR:  One.

THE COURT:  How old is your child?

THE PROSPECTIVE JUROR:  He's 21.

THE COURT:  Okay.  Is he living with you?

THE PROSPECTIVE JUROR:  Yeah, it's only me and him, and he's not working.

THE COURT:  And he's not working?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Just have a seat next to those two gentlemen on the first row.

MR. FOX:  Are these the ones time-qualified by the magistrate?

THE COURT:  I have no idea what's going on.

MR. FOX:  Okay.  Yvette Jennings.

MR. JAUREGUI:  Jennings.

MR. FOX:  658.

THE PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  So I was laid off five months ago, and I've been going to interviews.  And I have a bunch of interviews set up for next week, and I don't want to miss the opportunity to get a new job.  And I don't know if it's important, but my father too was a jail warden, so I don't want that to affect the case.

THE COURT:  What's your marital status?

THE PROSPECTIVE JUROR:  I'm married.

THE COURT:  Okay.  What's your husband do?

THE PROSPECTIVE JUROR:  He has a small business that hasn't been really doing very well.

THE COURT:  Okay.  What's the nature of the business?

THE PROSPECTIVE JUROR:  It's a distribution company.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And I'm sending a child to college.

THE COURT:  Okay.  How many people currently reside in your household?

THE PROSPECTIVE JUROR:  My mother and my -- my son's in the dorm, and my husband and myself.  And my unemployment's going to run out next month -- I mean, no, end of the month, this month.

THE COURT:  Okay.  See that lovely lady sitting on the first row?  Go grab a seat next to her.

THE PROSPECTIVE JUROR:  Thank you.

MR. STEWARD:  My thought is to excuse the last two ladies, the Latino gentleman to their right with -- the gentleman sitting to the right of him, my sense would be he just doesn't want to serve, and those excuses are not enough.

THE COURT:  I probably concur, but if you like him,

**UNITED STATES DISTRICT COURT**

we'll keep him.

MR. FOX:  Yeah, I agree at this stage, and to the extent he's going to be stricken, I'd like the penalty box for him.  Because I agree with Mr. Steward, I think that he just doesn't want to serve but...

MR. STEWARD:  I think we're going to let him go on the theory that we do have a number of jurors at this point, so to be safe.

THE COURT:  All right.

(End of sidebar discussions.)

THE COURT:  Anybody else?  Okay.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Hi, Judge.

THE COURT:  Hi, how are you?

THE PROSPECTIVE JUROR:  Good.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Okay.  I'm financially drowning.  Three weeks on this trial would devastate me.

THE COURT:  Okay.  Are you married?

THE PROSPECTIVE JUROR:  Married.

THE COURT:  Kids?

THE PROSPECTIVE JUROR:  Two kids in college, one on the way to college.  And my mother-in-law just had a stroke last week, and now I got to financially take care of her until she gets back on her feet.

THE COURT:  Okay.  Does your wife work?

THE PROSPECTIVE JUROR:  Part-time as a caterer.

THE COURT:  And what do you do for a living?

THE PROSPECTIVE JUROR:  I'm a foreman on the docks.

THE COURT:  Okay.  And you work full-time?

THE PROSPECTIVE JUROR:  I work full-time every day.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Every day.

Also, just to let you know, no offense, but I don't know if I trust attorneys because my brother-in-law is going through an ugly, ugly divorce.  His attorney happens to be a twin brother of the attorney that's representing her.  Come to find out he was best friends with the father, so he fires him.  Then there's criminal allegations against him.

THE COURT:  You're ahead now, so don't --

THE PROSPECTIVE JUROR:  Okay.  Just laying it out there.

THE COURT:  That's okay.

THE PROSPECTIVE JUROR:  Being truthful.

THE COURT:  That's okay.  So see those two ladies over there?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  First row, have a seat there.

    (End of sidebar discussions.)

THE COURT:  Anybody else?

(Discussion held at sidebar.)

THE COURT:  Hi.

THE PROSPECTIVE JUROR:  Hi.

THE COURT:  You don't think you can be with us?

THE PROSPECTIVE JUROR:  Well, I'm a now newly-retired fireman, was so for 35 years.  Back when this all took place, there was lots of talk on calls and scenes about his guilt.

THE COURT:  About?

THE PROSPECTIVE JUROR:  About his guilt and that the officers were all saying he was guilty.  Up until I heard about the indictment, I thought he was already in jail.  I'm not proud of it, but I got to tell you that I was already of the opinion that he was guilty and that he'd already gone to jail. I just got to be honest with you.

THE COURT:  That's okay.  I appreciate that.

Think you'd have difficulty putting that aside and judging this case solely on the evidence you hear here in court?

THE PROSPECTIVE JUROR:  Well, I'd like to try.  I mean, I would like to think that I could do that, but all this time I was under the impression that he was guilty.  But these people that claim to be in the know knew that he was guilty, and so I felt compelled to come and tell you.

THE COURT:  That's fine.  I appreciate that.

But what I -- what we want are jurors who can put aside

what they may have heard, opinions they may have formulated and who can sit here and decide the guilt or innocence of the defendant based on just what they hear here in court.  And if you can do that, we'd love to have you.  If you can't, we just need to know that.

THE PROSPECTIVE JUROR:  I don't know that I can.  That's why I said it.

THE COURT:  That's fine.  Okay.  Just have a seat -- what's your name?

THE PROSPECTIVE JUROR:  My name, Ed Weaver.

THE COURT:  Okay.  Just have a seat right there on the first row.

MR. FOX:  We stipulate.

MR. STEWARD:  We do as well.

THE COURT:  All right.  Okay.  So what I'm going to do is I'm going to send these people back up.  I'm going to excuse the rest of the people, send them back up, and then we'll take a five- or ten-minute break and let the people from yesterday come in and start.

MR. FOX:  Do we know the names of all of them?  The last one wearing the scarf --

MR. JAUREGUI:  The one that has the job interviews next week.

MR. FOX:  I didn't want to look at her number because of where it was placed.

**UNITED STATES DISTRICT COURT**

(End of sidebar discussions.)

THE COURT:  All right.  The lady with the scarf, if you could come here.

(Discussion held at sidebar.)

THE COURT:  Okay.  What's your name?

THE PROSPECTIVE JUROR:  Joanne.

THE COURT:  Joanne?

THE PROSPECTIVE JUROR:  Lauximana [phonetic].

THE COURT:  Okay.  All right.  You can go to the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?

(End of sidebar discussions.)

THE COURT:  Ms.  Ms.  Yoo hoo.

(Discussion held at sidebar.)

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Tell them you've been excused.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  Sir.

(Discussion held at sidebar.)

THE COURT:  You can return to the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

(End of sidebar discussions.)

THE COURT:  Okay.  Now, other than the people who are seated on that first row, the rest of you think you can all be with us, correct?

Okay.  All right.  Thank you.

Now, the gentleman that's seated on the end here in the first row.

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  You can return to the jury assembly room on the third floor.  Okay.

And, I'm sorry, your name again?

THE PROSPECTIVE JUROR:  Weaver, Ed Weaver.

THE COURT:  All right.  Thank you.

And, sir, your name?

THE PROSPECTIVE JUROR:  John Mascola [phonetic].

THE COURT:  All right.  Sir, you can return to the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  And, Ms., your name?

THE PROSPECTIVE JUROR:  Yvette Jennings.

THE COURT:  All right.  And you can return to the jury assembly room on the third floor.

THE COURT:  And, sir, your name?

THE PROSPECTIVE JUROR:  Mario Gomez.

THE COURT:  All right.  And, sir, you can return to

the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And, sir?

THE PROSPECTIVE JUROR:  Jia Fang.

THE COURT:  Okay.  If you'd just have a seat there in the audience.

All right.  Ladies and gentlemen, we're going to take a ten-minute break, and again, I want to remind you you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and you're not allowed to -- you're not allowed to permit others to discuss the case with you.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not use any social networking sites.  Do not read any news stories, articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.  If you need to communicate with me, simply give a signed note to the clerk.

Now, has anybody seated here today read anything about this case in the last 24 hours, 48 hours?  Okay.  All right.

Would either of you have any difficulty putting aside

anything that you may have read or heard and deciding this case based solely on the evidence that's presented here in court? Both of you think you can do that? Okay.

The record should reflect that both prospective jurors nodded that they could do that.

All right. Thank you. You can take a break. We're going to resume in ten minutes.

(Pause in proceedings.)

THE COURT: Okay. We'll resume in another ten minutes. I take it there may have been an article that appeared yesterday.

MR. STEWARD: Actually, several, I think, Your Honor. They're all part of the same news system, but Mr. Haig saw the one in South Bay.

MR. HAIG: And there was one in the Times this morning. Not much detail but...

THE COURT: Okay. I'll remind people again -- we'll give them instructions, okay? Anything else?

MR. FOX: Your Honor, we have some witnesses we told we'd call around noon to let them know whether they should be expected. Based on timing, I'm guessing that we don't get to them today. Is it okay if we call them off? Because I'm thinking the earliest we have a jury is probably three o'clock at this point after closing statements.

THE COURT: How long is your opening statement?

**UNITED STATES DISTRICT COURT**

MR. FOX:  Opening statements.  Did we get to closings already?  Opening, I think mine's going to be about 45 minutes.

THE COURT:  How long is your opening statement?

MR. HAIG:  About 20 minutes, Your Honor.  Well, I don't want to under -- let's say 25 minutes.

MR. FOX:  We could have one witness available if that's better for you.

THE COURT:  Tell you what.  Why don't we have at least one, and I'll let you know by -- you're probably right, but I'll let you -- that's fine.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Of course, now you'll both go, Oh, that panel's just fine.

Okay.  See you in a couple minutes.

MR. FOX:  Thank you.

(Off the record at 11:24 a.m.)

(On the record at 11:40 a.m.)

THE DEPUTY CLERK:  Recalling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is FBI Special Agent Leah Tanner.

**UNITED STATES DISTRICT COURT**

THE COURT:  Good morning.

MS. RHODES:  Morning.

MR. STEWARD:  And, Your Honor, Dean Steward for Mr. Tanaka.

MR. HAIG:  And Jerome Haig for Mr. Tanaka.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

MR. STEWARD:  Morning.

THE COURT:  All right.  Ladies and gentlemen, we're going to resume with jury selection.

If I could see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  I believe where we were yesterday, there were no additional questions for any of the jurors seated in the jury box.  Do you have any challenges for cause?

MR. STEWARD:  For cause in the jury box, no.

MR. FOX:  No, Your Honor.

THE COURT:  All right.  First peremptory is going to rest with the government.

MR. FOX:  We've already explained to the defense that we are going to move to strike Prospective Juror Number 2.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, each side is entitled to a certain number of peremptory challenges to

UNITED STATES DISTRICT COURT

prospective jurors seated in the jury box.

(Reporter admonition.)

THE COURT: A peremptory challenge allows counsel to remove a prospective juror that he or she believes may be unsympathetic to his or her case. A peremptory challenge is one for which no reason need be given. Please don't be offended if a peremptory challenge is exercised. It's simply something that lawyers do.

All right. The first peremptory rests with the government.

MR. FOX: Thank you, Your Honor.

The government thanks and excuses Prospective Juror Number 2.

THE COURT: All right. You'd like to ask the Court to thank and excuse Juror Number 2?

MR. FOX: Oh, sorry. Sorry, Your Honor. We would like to ask the Court to thank and excuse Prospective Juror Number 2.

THE COURT: All right. You're excused. You may return to the jury assembly room on the third floor. Thank you very much.

All right. I'm going to ask the clerk to call the name of another prospective juror. As your name is called, if you'd please come to the lectern, please.

THE DEPUTY CLERK: Jon Gebhart.

THE COURT:  Sir, did you hear the questions that I've inquired about earlier?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  Not that I believe.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  I'm going to ask if you'd take the second chair on the first row, and if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name's Jon Gebhart.  I currently live in Lancaster, California.  I was born and raised there.  I spent some time in Long Beach going to school and living there afterwards.  I'm currently single, no children.  I have my bachelor's in political science.  No military service.  Currently work for Northrop Grumman.  In the past, I worked for the Long Beach Police Department as a dispatcher.

THE COURT:  What do you do for Northrop Grumman?

THE PROSPECTIVE JUROR:  I'm a tool prep attendant.

THE COURT:  And when you were working at the Long Beach Police Department, did you have contact with any of the patrol officers?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Anything about your experiences at the Long Beach Police Department that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Are you going -- there may be testimony by a law enforcement officers in this case.  Are you going to be able to judge their credibility the same way that you would that of any other witness?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ever taken any courses in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  I did take a few courses in constitutional law.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to follow the Court's instructions?

THE PROSPECTIVE JUROR:  No.  I do have prior jury service with a criminal trial.

THE COURT:  When was that?

THE PROSPECTIVE JUROR:  Two years ago.

THE COURT:  And what was the case about, just generally?

THE PROSPECTIVE JUROR:  It was a DUI case.

THE COURT:  And was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ever served as a party or as a witness in a criminal case or a civil case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  Yes to 4 and 10.

THE COURT:  Could you tell me about Number 4.

THE PROSPECTIVE JUROR:  I served an internship at a courthouse, superior court, for a summer under a judge.

THE COURT:  What kind of cases did the judge hear?

THE PROSPECTIVE JUROR:  Mostly criminal cases of all varieties.

THE COURT:  Okay.  And where was that at --

THE PROSPECTIVE JUROR:  Lancaster, California.

THE COURT:  -- the superior court?

THE PROSPECTIVE JUROR:  Lancaster, California.

THE COURT:  Anything about that experience that caused you to have any concerns about your ability to be fair and impartial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And what was the other question?

THE PROSPECTIVE JUROR:  Number 10.  My father, he works for the California Department of Corrections as a sergeant.  He's been doing that for 23 years.

THE COURT:  And which facility does he work at?

THE PROSPECTIVE JUROR:  The facility in Lancaster.

THE COURT:  You ever talk to him about his work?

THE PROSPECTIVE JUROR:  A little bit.  He doesn't like to disclose a whole lot, but some general things.

THE COURT:  Think you'd have any difficulty putting aside anything that you and he may have talked about and decide this case based solely on the evidence you hear here in court?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you very much.

Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Any additional questions either side would like addressed to the newly-seated juror?

MR. FOX:  Can I have one moment, Your Honor?

THE COURT:  Yes.

(Plaintiff's counsel conferred off the record.)

MR. FOX:  None from the government, Your Honor.

MR. STEWARD:  None from the defense, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

MR. STEWARD:  Yes, Your Honor.  We'd ask the Court to thank and excuse Juror Number 2, Mr. Gebhart.

THE COURT:  All right.  Sir, you're excused. Getting closer.  You may return to the jury assembly room on the third floor.  Thank you very much for your service.

I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Lauren Wilton.

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  What we discussed yesterday that, no, my employer will pay for as much as they need to pay for.

THE COURT:  Okay.  All right.  If you could take that empty chair.  If you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Sure.  My name is Lauren Wilton.  I live in La Crescenta, California.  I have lived there for two and a half years.  Prior to living in La Crescenta, I lived in Pasadena.  I am married.  I do not have any children.  I have a bachelor of science in human resources management.  I have a bachelor of science in human resources management from Sonoma State University and a master of business administration with a concentration in HR from Cal Poly Pomona.  I do not have any military service.  I work in human resources at Nestle in Glendale.

THE COURT:  What does your husband do for a living?

THE PROSPECTIVE JUROR:  My husband's an attorney.

THE COURT:  And who does he work for?

THE PROSPECTIVE JUROR:  He works for a company called Mechanical Concepts.  It's an in-house counsel.  He doesn't work in criminal law or anything like that.

THE COURT:  Okay.  Ever taken any criminal justice seminars or classes?

THE PROSPECTIVE JUROR:  Business law, but nothing related to the criminal justice system.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  I did.  Two and a half years

ago, I served on a three-and-a-half week trial in a criminal case involving gangs, attempted murder, kidnapping.

THE COURT:  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes, we were.

THE COURT:  Ever been a party or a witness in a criminal or civil case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  Yes, there were several -- a few questions that asked about any people that you know or related to that work for the Sheriff's Department, and I have two friends that are both sheriffs with the Los Angeles County Sheriff's Department.

THE COURT:  Okay.  Do you see them on a regular basis?

THE PROSPECTIVE JUROR:  Somewhat regularly.

THE COURT:  Uh-huh.  Do you ever talk to them about their work?

THE PROSPECTIVE JUROR:  I mean, it comes up.  I talk to them about my work too.

THE COURT:  Would you have any difficulty putting

aside anything that the two of you ever talked about about things in connection with their work as deputy sheriffs?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Could you be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  I think so.

THE COURT:  Any doubt in your mind?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes or affirmative answers to any --

THE PROSPECTIVE JUROR:  No, that was -- that was the only things that came up.

THE COURT:  Okay.  By the way, has anybody seated in the jury box read any news reports about this case in the last 24 hours?

Okay.  All right.  Any additional questions for the newly-seated juror?

MR. FOX:  We have a few, Your Honor.

THE COURT:  All right.  Let's go to sidebar.

(Discussion held at sidebar.)

MR. FOX:  Your Honor, the government would like some follow-up questions based on her friendship with the people who are in the Sheriff's Department:  what rank they are, what their duties are, have they discussed with her whether they worked in the jails and what happened in the jails, whether

they discussed with her the defendant, Paul Tanaka.

THE COURT:  Okay.

MR. HAIG:  That's Mr. Haig's thought as well.

(End of sidebar discussions.)

THE COURT:  Okay.  Can you join us over here for a moment.

THE PROSPECTIVE JUROR:  Sure.

(Discussion held at sidebar.)

THE COURT:  The friends that you have that work in the Sheriff's Department, do you know what -- well, it's not a precinct, but what station?

THE PROSPECTIVE JUROR:  One of them is in the Santa Clarita area, and one of them is in the La Crescenta area.  I couldn't tell you any -- like what place they go to or anything.

THE COURT:  That's fine.  Do you know what their ranks are?

THE PROSPECTIVE JUROR:  I do not.

THE COURT:  Okay.  Do you know if either of them have ever worked in the jails?

THE PROSPECTIVE JUROR:  One of them might have.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  But it would have been the one that's in Santa Clarita.

THE COURT:  Okay.  Have you had any discussions with

them about their work that they performed in the jails?

THE PROSPECTIVE JUROR:  Not in the jails, no.

THE COURT:  Okay.  You ever had any discussions with either one of them about the defendant in this case, Paul Tanaka?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  You ever had any discussions with them about anything to do with this case?

THE PROSPECTIVE JUROR:  Huh-uh.

THE COURT:  Okay.  If you could just have a seat right on that bench there.

Okay.  Do you have a pass for cause as to the --

MR. STEWARD:  Yes.

MR. FOX:  Yes, Your Honor.

(End of sidebar discussions.)

THE COURT:  Could you resume your seat.  Thank you.

Do you have any other yes or affirmative answers to any of the questions?

THE PROSPECTIVE JUROR:  No, those were the only yes answers.

THE COURT:  All right.  Thank you very much.

All right.  The next peremptory rests with the defense.

MR. STEWARD:  And, yes, Your Honor, we have conferred with counsel.  We'd ask the Court to thank and excuse Juror Number 8, Mr. Hernandez.

THE COURT:  All right.  Sir, you're excused.  Thank you very much for your service.

I'm going to call -- ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Lauri Lehtihalme.

THE COURT:  Let's try it one more time.

THE DEPUTY CLERK:  Lauri Lehtihalme.

THE COURT:  Sir, did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Beg your pardon?

THE COURT:  Did you hear the questions I asked earlier of the prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, other than some of the questions I have some yes on.

THE COURT:  Okay.  We'll get to that.

Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  Only if it goes beyond April 27th.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Because I have prepaid trips on a cruise and airfare, et cetera.

THE COURT:  All right.  That shouldn't be a problem.

All right.  If you could take that empty chair on the second row, please.

All right.  If you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  I'm Lauri Lehtihalme, also known as Larry.  I live in Granada Hills.  I lived there since 1970.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  I'm married.

THE COURT:  And do you have any children?

THE PROSPECTIVE JUROR:  Yes, I have two daughters.

THE COURT:  And how old are your children?

THE PROSPECTIVE JUROR:  My daughters are 43 and 40.

THE COURT:  Okay.  And what do they do?

THE PROSPECTIVE JUROR:  No, wait a minute.  43 and 46, I'm sorry.

THE COURT:  I think she probably would have preferred the 40.

And what do your children do for a living?

THE PROSPECTIVE JUROR:  Okay.  One of my daughters lives in Porter Ranch, and the other daughter lives in Newbury Park.

THE COURT:  And what do they do for a living?

THE PROSPECTIVE JUROR:  The oldest, Tina, is a high

school counselor, Newbury Park High School, and my youngest daughter, Shauna, is an assistant principal at Hale Middle School in Woodland Hills.

THE COURT:  Okay.  And what is your educational background?

THE PROSPECTIVE JUROR:  My education background is I have some college and also business college.

THE COURT:  Ever served in the military?

THE PROSPECTIVE JUROR:  I'm sorry, what?

THE COURT:  Have you ever served in the military?

THE PROSPECTIVE JUROR:  I was in the reserves in Canada for a short period of time back in the mid-50s.

THE COURT:  And what do you do for a living?

THE PROSPECTIVE JUROR:  My first -- I had two.  My first career was manager in a telephone industry utilities, and the second career, 25-plus years as a financial advisor, self-employed.

THE COURT:  And does your wife work?

THE PROSPECTIVE JUROR:  My wife is retired.

THE COURT:  And what did she do prior to her retirement?

THE PROSPECTIVE JUROR:  She retired from the United States House of Representatives, worked for a congressman who's currently retired.

THE COURT:  You ever taken any courses in criminal

justice?

THE PROSPECTIVE JUROR:  I had some training through the L.A.P.D. in the neighborhood watch back in the '70s.

THE COURT:  Okay.  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Yes.  Not on a federal, but yes on the state.

THE COURT:  Okay.  And when was that?

THE PROSPECTIVE JUROR:  I think I served three or four times -- three times -- I would probably say about four, five years ago.  The years roll by.

THE COURT:  Okay.  And do you recall if that was a civil or criminal case?

THE PROSPECTIVE JUROR:  I'm sorry, what?

THE COURT:  Was that a civil or criminal case that you served as a juror?

THE PROSPECTIVE JUROR:  One was criminal.  I was excused on that because of financial impact, and the other was a civil case.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Two civil cases.

THE COURT:  Were the juries able to reach verdicts in those civil cases?

THE PROSPECTIVE JUROR:  In the civil case, there was a payment made to the -- to the plaintiff.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Monetary.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No, I have not.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  No, I don't have a questionnaire.

THE COURT:  Remember the questionnaire you had some yes answers?

THE PROSPECTIVE JUROR:  Number 2, we've been a victim of crime, yes.  We had two burglaries, and I also had a car stolen.

THE COURT:  Is there anything about the way those cases were handled that caused you to have any dissatisfaction?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes responses to any of the other questions?

THE PROSPECTIVE JUROR:  No.  I'm sorry, repeat that.

THE COURT:  Sure.

THE PROSPECTIVE JUROR:  What number is that?

THE COURT:  Do you have any yes responses to any of the other questions?

THE PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Number 4, through friends of ours, we met them several times on social occasions.  He's a federal judge.

THE COURT:  He's probably underpaid.  There isn't enough money.

You ever talk to him about the kind of work that he does --

THE PROSPECTIVE JUROR:  No.

THE COURT:  -- or she does?  Okay.

Any other yes responses to any of the other questions?

THE PROSPECTIVE JUROR:  Yeah, I'm looking through that.  Number 10, I have some close friends that are retired from the L.A.P.D., and my wife's cousin -- well, actually my wife's brother-in-law's nephew is retired RCMP, and I had two former football teammates way back in the '50s and '60s who were law enforcement officers, and they both died.

Number 11, yes, I make financial contributions to the L.A.P.D. support organization called S.O.L.I.D. for Devonshire Division.

THE COURT:  You think you can put aside the fact that you make those contributions and be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  You ever talk to anybody about the work they do for the Los Angeles Police Department?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  What they do in the police department, their work?

THE COURT:  Uh-huh.  You ever talk to them about their work?

THE PROSPECTIVE JUROR:  What they did when they retired, yeah.  I used to know what they did, yes.

THE COURT:  Okay.  Any of them ever worked in the jails?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Think you can put aside any discussions you may have had with current or former members of the Los Angeles Police Department and decide this case based solely on the evidence you hear here in court?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any additional questions?

THE PROSPECTIVE JUROR:  No.  All the other questions is no.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  No, I got no other --

THE COURT:  Okay.  Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  We have an issue we'd like to discuss, Your Honor, if we could.

UNITED STATES DISTRICT COURT

THE COURT:  All right.

(Discussion held at sidebar.)

MR. STEWARD:  We were concerned yesterday and continue to be concerned about his hearing.  It appears to us that he struggled at times to hear things.

(End of sidebar discussions.)

THE COURT:  Sir, could you join us over here, please.

(Discussion held at sidebar.)

THE COURT:  I think when you were here yesterday you mentioned that you may have trouble with your hearing?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  This is a device that might be of assistance to you with your hearing.  Do you want to try it?

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Yeah?  There's a volume control right there.  Let me get on one of those mics.

THE DEPUTY CLERK:  Hello.  Hello.

THE COURT:  Do you hear anything?

THE PROSPECTIVE JUROR:  I don't hear anything yet.

THE COURT:  Okay.

THE DEPUTY CLERK:  Hello.  Hello.

THE COURT:  Try that.

THE DEPUTY CLERK:  Hello.  Hello.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is that good?

THE DEPUTY CLERK:  Your Honor, that doesn't work with sidebar.  Should I --

THE COURT:  That's fine.

Any additional --

MR. STEWARD:  No.

THE COURT:  All right.  Sir, you can resume your seat.

THE PROSPECTIVE JUROR:  Thank you.

MR. FOX:  May I have a moment with counsel?

THE COURT:  Yeah.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, if we could just ask him general questions of him when it's not at sidebar so we can test it, see if he can hear.

THE COURT:  That's fine.

MR. FOX:  Thank you.

(End of sidebar discussions.)

THE COURT:  Sir, I believe you indicated that one of your relatives work for the Los Angeles Police Department; is that correct?

THE PROSPECTIVE JUROR:  It's two of my friends, yes. They're retired.

THE COURT:  Okay.  And do you know what they did for the Los Angeles Police Department?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Yes.  One was a helicopter sergeant in a helicopter, air patrol.

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  And the other individual worked undercover in the drug enforcement.

THE COURT:  Okay.  And you had mentioned that one time that you had known these people because I think either they or you had played football?

THE PROSPECTIVE JUROR:  I'm sorry, can you repeat that?

THE COURT:  Sure.  I believe you'd indicated that you may have met them originally because they had played football or you had played football?

THE PROSPECTIVE JUROR:  Yeah, they were my teammates, and later on they went into law enforcement.  And one was a member of the Montreal Police Department, and he was killed in a high-speed chase.  And the other one worked for the Toronto Police Department.  He was in the fingerprint, and he died unfortunately at a young age in the mid-40s of liver ailment, cancer.

THE COURT:  All right.  And does that --

THE PROSPECTIVE JUROR:  And then my wife's brother-in-law's nephew's retired from the RCMP.

THE COURT:  Okay.  And is that headset working better now?

UNITED STATES DISTRICT COURT

THE PROSPECTIVE JUROR:  Yes, it is very good.

THE COURT:  Okay.  Thank you.

All right.  I believe the next peremptory rests with the government.

MR. FOX:  May I have a moment, Your Honor?

THE COURT:  Yes.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, the government asks you to thank and excuse Prospective Juror Number 5, please.

THE COURT:  All right.  Sir, you're excused.  You may return to the jury assembly room on the third floor.

All right.  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Larry Leahy.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Good afternoon.  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, I did.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  Not as long as it didn't go past three weeks, I'd be okay.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  What's -- is there a date that you need to be --

THE PROSPECTIVE JUROR:  No.  I'm just self-employed, so it would be a bit of a burden.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  But I feel it's my duty to serve, so --

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  -- that's no problem.

THE COURT:  Anything about the nature of these charges that causes you to have any concern about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  If you could take the empty chair on the first row, please, and if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Yeah.  My name is Larry Leahy, and I've lived in Santa Monica, California since 1980. Before that, in New York.  And I'm single, no children.  Did my graduate work at NYU in the film department.  No military experience.  Currently a writer for film and a teacher presently.  And no immediate members in the military.  Have not done jury duty before.

THE COURT:  Ever been on a criminal or civil case

UNITED STATES DISTRICT COURT

either as a party or a witness?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  Thank you very much.

Ladies and gentlemen, we're going to take our break for lunch now.  Again, I want to remind you until this trial is over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or articles about the case or about anyone who has anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet, using other reference materials, and do not make any investigation about the case on your own.  If you need to speak with me, simply give a note to the clerk.

We're going to resume at 1:30.  There are a number of places to eat.  There are a couple of sandwich shops directly

across the street.  There is a farmers' market to the right about two blocks down off of Main Street.  There's Mexican food two blocks to the right, Chinese food three blocks further.  So have a good lunch.  And there's a cafeteria on the fourth floor, but I am not vouching for it.

All right.  We'll see everybody -- let's be back here at -- let's make it 1:25.  All right.  Thank you.

(The prospective jurors exited the courtroom.)

THE COURT:  All right.  Is there anything else we need to take up?

MR. FOX:  No, Your Honor.  Thank you.

MR. STEWARD:  No, Your Honor.

THE COURT:  Okay.  We'll see everybody about 1:25.

(Off the record at 12:17 p.m.)

(On the record at 1:28 p.m.)

THE COURT:  All right.  Welcome back, and we're going to resume with jury selection.

I believe we had heard from Prospective Juror Number 5.

Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

MR. STEWARD:  And, Your Honor, we'd ask the Court -- we have consulted with counsel, and we'd ask the Court to thank

and excuse Juror Number 11, Ms. Burns.

THE COURT:  All right.  You're excused.  You may return to the jury assembly room on the third floor.  Thank you very much for your service.

I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Won Chang.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Why don't you come over here.

(Discussion held at sidebar.)

THE COURT:  Were you here yesterday?

THE PROSPECTIVE JUROR:  Oh, yes, sir.

THE COURT:  Okay.  And did you hear the questions that I asked earlier?

THE PROSPECTIVE JUROR:  Oh, yes.  I'm sorry.  I do remember asking if I've been -- if I would have any issues.

THE COURT:  That's okay.

THE PROSPECTIVE JUROR:  But yes, I heard your questions.

THE COURT:  Okay.  Is there anything about the nature of these charges that causes you to have any concerns

about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  Nope.

THE COURT:  Okay.  Why don't you take that open chair on the second row.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  All right.  Thank you.

(End of sidebar discussions.)

THE COURT:  Sir, if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Won Chang.  Right now I live in Venice, which is nearby Santa Monica.  I recently moved there three weeks ago.  Prior to that, I lived in Northridge since 1999.  And currently I'm single, no children. My education is bachelor of science in civil engineering and master of science in computer science.

THE COURT:  And where'd you go to school?

THE PROSPECTIVE JUROR:  For bachelor's I went to UC Berkeley.  For master's I went to CSUN, which is CSU Northridge.

THE COURT:  Ever served in the military?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  And what do you do for a living?

THE PROSPECTIVE JUROR:  Currently I'm working at Rockwell Collins working as a software engineer.

THE COURT:  And how long have you been there?

THE PROSPECTIVE JUROR:  I worked there six months as a contractor, and I became a full-time on last month.

THE COURT:  Okay.  And where did you work prior to that?

THE PROSPECTIVE JUROR:  Prior to that I was just student.

THE COURT:  Okay.  Ever taken any courses in criminal justice?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And I'm sorry, are you married?

THE PROSPECTIVE JUROR:  No, I'm single.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  This is my first time.

THE COURT:  You ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay.  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, and actually I have three questions that would apply to me.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  First is Question Number 1,

UNITED STATES DISTRICT COURT

my brother, younger brother, he was arrested for DUI.

THE COURT:  When was that?

THE PROSPECTIVE JUROR:  I believe it was sometime in 2013.  I'm not sure exactly which month.

THE COURT:  Okay.  And do you recall what police agency was involved?

THE PROSPECTIVE JUROR:  I'm not 100 percent sure, but I believe it was Sheriff's Department.

THE COURT:  Okay.  Do you know what city that occurred in?

THE PROSPECTIVE JUROR:  It was Los Angeles.

THE COURT:  Is there anything about the way that that case was handled that causes you to have concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Can you put that aside, your brother's arrest, and decide this case based solely on the evidence you hear here in court?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  Any other affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  There were two other questions, Number 22 and 25.  Number 22 was regarding if anyone was having been -- that I knew been to Los Angeles County jail.

That would be my younger brother when he was arrested for DUI.

THE COURT:  And how long was your brother incarcerated in the county jail?

THE PROSPECTIVE JUROR:  It was just one night.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And did you say Question 25?

THE PROSPECTIVE JUROR:  25.  So close friend of mine is in Army reserve right now, and my younger brother is actually impending him joining Army.

THE COURT:  What does your brother do for a living?

THE PROSPECTIVE JUROR:  He used to be contractor manager, I believe -- oh, construction manager, I'm sorry.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  After DUI he had to quit his job, and after that he's been trying to join Army.  But there's been some delays, and he's been unemployed for, I believe, two years now.

THE COURT:  Any other affirmative responses to any of the other questions?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Thank you.

Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Either party wish to have any additional questions asked of the newly-seated juror?

MR. FOX:  Not from the government, Your Honor.

MR. STEWARD:  No, Your Honor.  Thank you.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

MR. STEWARD:  Could I have just one moment, Your Honor?

THE COURT:  Yes.

(Defense counsel conferred off the record.)

MR. STEWARD:  Thank you, Your Honor.  We ask the Court to thank and excuse Juror Number --

THE COURT:  Have you conferred with the other side?

MR. STEWARD:  Oh, I'm sorry.  My apologies.

(Counsel conferred off the record.)

MR. STEWARD:  I have now, Your Honor.  We'd ask the Court to thank and excuse Juror Number 8, Mr. Leahy.

THE COURT:  All right.  Sir, you're excused.  You may return to the jury assembly room on the third floor.

THE PROSPECTIVE JUROR:  Your Honor, do I still stay here, or am I done?

THE COURT:  No, you're going to go up to the third floor in the jury assembly room and just tell them you've been

excused.

THE PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Thank you.

All right.  I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Katrina Bulanek.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the nature of these charges that causes you to have concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you could take the empty chair on the second row, please, and if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Katrina Bulanek. I live in Bellflower.  I've lived for there about five years.

**UNITED STATES DISTRICT COURT**

Before moving there, I lived in Oklahoma.  I'm married.  I have two children, 14 and 8.  I have an associate's degree in business administration.  No military service.  I am currently a management coordinator and expediter for Mayekawa.  My husband is a claims adjuster for Progressive and --

THE COURT:  Ever taken any coursework in criminal justice or any attended any seminars?

THE PROSPECTIVE JUROR:  No, I haven't.

THE COURT:  Ever been on a jury before?

THE PROSPECTIVE JUROR:  No, I haven't.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Okay.  Which ones?

THE PROSPECTIVE JUROR:  Number 2, I've had my home broken into.

THE COURT:  Okay.  When was that?

THE PROSPECTIVE JUROR:  12 years ago.

THE COURT:  Anything about that experience that

causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other affirmative responses to any of the other questions?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Which ones?

THE PROSPECTIVE JUROR:  Number 4.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  My father-in-law is a retired U.S. Marshal, and he worked in the court systems here in L.A.

THE COURT:  You ever talk to him about the work that he did?

THE PROSPECTIVE JUROR:  Only for him to tell funny stories, but nothing serious in nature.

THE COURT:  Okay.  Can you put aside that relationship and judge the credibility of a law enforcement officer in the same way you would that of any other witness?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Any other affirmative responses to any of the other questions?

THE PROSPECTIVE JUROR:  Yes, I have -- I'm not sure which number it is.  My brother-in-law is a lieutenant deputy sheriff with Orange County.

THE COURT:  Do you know what kind of work he does?

THE PROSPECTIVE JUROR:  I have no idea.  He doesn't talk about his job with me.

THE COURT:  Okay.  When was your father-in-law -- when was he employed by the U.S. Marshals Service?

THE PROSPECTIVE JUROR:  I honestly don't know.  He was well past retired when I met him.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And I met him in '97, so...

THE COURT:  Okay.  Any other affirmative responses to any of the other questions?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  All right.  Thank you so much.

Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

MR. HAIG:  Your Honor, there's a juror that just raised their hand.

THE PROSPECTIVE JUROR:  I just wanted to mention -- make an addition as to Question Number 2, I did have my house broken into twice.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  So just wanted to add that.

THE COURT:  All right.  Anything about that experience that causes you to have any concerns about your

ability to be fair and impartial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.

MR. FOX:  I have one follow-up question, though, for Prospective Juror Number 8 if -- I think I could probably here unless you want to go to sidebar, Your Honor.  It's up to you.

THE COURT:  Okay.  What is it?

MR. FOX:  I just don't know what a management coordinator is, and I was hoping she could tell us about her job.

THE COURT:  Tell us a little bit about what a management coordinator does.

THE PROSPECTIVE JUROR:  I basically make sure that all of the men above me do their jobs.

THE COURT:  And I'm sure that's a full-time job.

THE PROSPECTIVE JUROR:  Yes.  I have to -- I have a meeting with them once a week and make sure that they're all in line with what they're doing and so they're all communicating with each other.

THE COURT:  Okay.  And I'm sorry, the company you work at?

THE PROSPECTIVE JUROR:  Mayekawa.

THE COURT:  Anything else?

MR. FOX:  No, Your Honor.  Thank you.

THE COURT:  All right.  I believe the next

peremptory rests with the government.

MR. FOX:  One moment, Your Honor.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, the government asks you to thank and excuse Prospective Juror Number 12.

THE COURT:  All right.  You're excused.  You may return to the jury assembly room on the third floor.

All right.  I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Mary Beth Salter.

THE COURT:  Good afternoon.  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  I did.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  I think if it went over three weeks and I had some travel that came up, I could get it covered by a colleague.

THE COURT:  Okay.  Anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT: All right. If you could take the empty chair on the second row. If you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR: My name is Mary Beth, and I live in Pasadena. I've been there about 20 years. Before that, I lived in Covina. I'm single without kids. I have a business degree from Cal State Fullerton. No military service. I work for Deloitte & Touche, and I'm a meeting and event planner there. No prior jury service. And no military.

THE COURT: Ever taken any courses or attended any seminars in criminal law or criminal justice?

THE PROSPECTIVE JUROR: No.

THE COURT: Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR: No, I haven't.

THE COURT: Okay. And you put on parties? You're an event planner?

THE PROSPECTIVE JUROR: Corporate meetings, special events.

THE COURT: Oh, okay.

THE PROSPECTIVE JUROR: Parties too sometimes.

THE COURT: Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR: Yes, I have.

THE COURT: Do you have any yes responses to any of

those questions?

THE PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Any additional questions for the newly-seated juror?

MR. FOX:  No, Your Honor.

MR. STEWARD:  No, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

(Defense counsel conferred off the record.)

(Counsel conferred off the record.)

MR. STEWARD:  And, Your Honor, we'd ask the Court to thank and excuse Juror Number 10, Ms. Wang.

THE COURT:  All right.  You're excused.  You may return to the jury assembly room on the third floor.  Thank you very much --

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  -- for your service.

All right.  I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Mark Nolan.

THE COURT:  Did you hear the questions I asked of

UNITED STATES DISTRICT COURT

the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  If you'd take the empty chair on the second row, please.  Okay.  If you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name's Mark Nolan.  I live in Ventura.  I've lived there for 11 years.  Prior to that, I was living in Tustin.  I'm divorced, no children.  Completed two years of college.  No military service.  My occupation, I'm a regional sales manager.  I handle from Colorado to Hawaii for my company.

THE COURT:  And what's the name of the company?

THE PROSPECTIVE JUROR:  It's Calavo Growers of California.

**UNITED STATES DISTRICT COURT**

THE COURT:  And what did your spouse do for a living prior to your divorce?

THE PROSPECTIVE JUROR:  An advocate for the hearing-impaired.

THE COURT:  Ever taken any coursework or attended any seminars in criminal justice?

THE PROSPECTIVE JUROR:  Not in criminal law, no.

THE COURT:  Okay.  Any legal training?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any prior jury service?

THE PROSPECTIVE JUROR:  Yes, a civil trial about 30 years ago.

THE COURT:  Do you recall what it was about?

THE PROSPECTIVE JUROR:  Personal injury.

THE COURT:  Was the jury able to return a verdict?

THE PROSPECTIVE JUROR:  Yes, they were.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  I have not.

THE COURT:  Any other jury service?

THE PROSPECTIVE JUROR:  That was it.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  I did.

THE COURT:  And do you have any yes responses to any

of those questions?

THE PROSPECTIVE JUROR:  Yes to item 2.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  My brother's wife was murdered about 30 years ago.

THE COURT:  What city did that event take place?

THE PROSPECTIVE JUROR:  San Jose, California.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Oh, I would say it ran its course as it seemed that it should.

THE COURT:  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Thank you.  Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Any additional questions for the newly-seated juror?

MR. FOX:  One moment, Your Honor.

Nothing from the government, Your Honor.

MR. STEWARD:  Nothing from the defense, Your Honor.

THE COURT:  All right.  I believe the next

peremptory rests with the defense.

MR. STEWARD:  May we have just a moment, Your Honor?

THE COURT:  Yes.

(Defense counsel conferred off the record.)

(Counsel conferred off the record.)

MR. STEWARD:  And, Your Honor, we'd ask the Court to thank and excuse Juror Number 1, Mr. Munoz.

THE COURT:  All right.  Sir, you're excused.  You may return to the jury assembly room on the third floor.

All right.  I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Yuri Konenenko.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is there anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  However, it's three weeks, I can do it, you know, because I'm self-employed.  Longer than three weeks, it's too tough.

THE COURT:  Okay.  Could you take that empty chair

on the first row, please, and if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Okay.  My name is Yuri Konenenko.  I live in Hollywood.

THE COURT:  Okay.  Do you have a microphone?

THE PROSPECTIVE JUROR:  My name is Yuri Konenenko.  Is that all right?  Okay.  My name is Yuri Konenenko.  I live in Hollywood since 1980s.  And I'm married, no children.  I have a college education.  No military service.  Now I'm self-employed.

THE COURT:  Okay.  And what do you do?

THE PROSPECTIVE JUROR:  I have a website which I maintain, and I play poker regularly.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And --

THE COURT:  What does your wife do for a living?

THE PROSPECTIVE JUROR:  She's a manager in a supermarket.

THE COURT:  And which market does she work for?

THE PROSPECTIVE JUROR:  Ralphs supermarket.
I served once on civil case.

THE COURT:  Okay.  And when was that?

THE PROSPECTIVE JUROR:  It was maybe eight years ago.

THE COURT:  Do you recall generally what the case

was about?

THE PROSPECTIVE JUROR:  It was regarding mesothelioma case, yeah.

THE COURT:  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever taken any coursework in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative answers to any of those questions?

THE PROSPECTIVE JUROR:  I have yes to Question -- let me see.  Okay, Question Number 1, I was arrested one time.

THE COURT:  And when was that?

THE PROSPECTIVE JUROR:  It was like more than 20 years ago.

THE COURT:  And do you know what police agency was involved?

THE PROSPECTIVE JUROR:  The Los Angeles Police Department.

THE COURT:  And was -- do you have any -- do you have any dissatisfaction about the way that case was handled by the Los Angeles Police Department?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Could you join us over here for a moment, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  What were you arrested for?

THE PROSPECTIVE JUROR:  I don't know.  It was false arrest.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  It was -- what happened was I was working as security guard, and one night I was driving from my post to my home.  I got stopped.  They searched me.  They saw a gun in my house.  They arrested me.  I told them I have a uniform, security guard license.  They still arrested me, put me in the police station.  I spent the night there.

And the next day they took me to county jail.  I stayed there like six or seven hours.  Then my number was called out, and the gentleman asked me what happened to me.  I said I don't know.  I told him the story, and he just said let me go, and that's it.  So I was never put in front of a judge.  It was false arrest 100 percent.

THE COURT:  Okay.  Now, there may be law enforcement officers that may testify as witnesses in this case.  Can you

put aside that experience of having been arrested and be fair
and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yeah, I think so.

THE COURT:  Okay.  Any doubt in your mind?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Can you judge the credibility of
a law enforcement officer the same way you would that of any
other witness?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  You'd indicated that you're
self-employed and you play poker.  Do you play poker for a
living?

THE PROSPECTIVE JUROR:  Yeah, I guess so.

THE COURT:  And how long have you been doing that?

THE PROSPECTIVE JUROR:  A long time.

THE COURT:  Okay.  Any other yes responses to any of
the other questions?

THE PROSPECTIVE JUROR:  No, I don't see anything.

THE COURT:  Okay.  You want to take a look?

THE PROSPECTIVE JUROR:  Take a look?

THE COURT:  Just want to make sure that you don't
have any other answers here.

        (Pause in proceedings.)

THE PROSPECTIVE JUROR:  No.  My wife makes donations
to police officers.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  But that's about it.

(Pause in proceedings.)

THE PROSPECTIVE JUROR:  No, I don't see no problems.

THE COURT:  Okay.  Do you know what agency she makes donations to, what police --

THE PROSPECTIVE JUROR:  I have no idea.

THE COURT:  Okay.  When you were taken over to county jail, how much time did you spend there?

THE PROSPECTIVE JUROR:  About -- I was taken by a bus early in the morning, so probably 2:00, 3:00 p.m., 4:00 p.m.

THE COURT:  Did you have any complaints about the way you were treated when you were over at the county jail?

THE PROSPECTIVE JUROR:  In that county, I was -- I didn't feel comfortable.  I was in my uniform, you know.  500 people were -- that's about it, yeah.

THE COURT:  Okay.  So there was nothing -- I understand it wasn't the most pleasant experience, but you didn't have any complaints about any of the personnel in the jails?

THE PROSPECTIVE JUROR:  No, not the -- the personnel was rough, you know, but they were screaming and this provocation, what am I supposed to do.

THE COURT:  Okay.  Think you can put that aside and

UNITED STATES DISTRICT COURT

be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Any doubt in your mind?

THE PROSPECTIVE JUROR:  Don't know.

THE COURT:  Okay.  So can you commit to being fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  Yes, I'll do my best.

THE COURT:  Okay.  Okay.  Can you have a seat right there?

MR. FOX:  Your Honor, we would -- we thought we heard him say he runs a website.  Maybe we'd like to know what that website is and what it's about.

MR. STEWARD:  I thought that was his poker, but an explanation would be nice.

THE COURT:  All right.

You'd indicated earlier that you ran a website.

THE PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  What's the website about?

THE PROSPECTIVE JUROR:  It's information about gambling, different strategies to play different, you know, games.

THE COURT:  Different games like poker?

THE PROSPECTIVE JUROR:  Blackjack, poker, lots of other things, you know, baccarat, everything.

THE COURT:  I could have used that a couple weeks

ago.

Okay.  Have a seat right there.  I'll be right back.

Anything else?

MR. FOX:  No follow-up from the government.

MR. STEWARD:  No follow-up for the defense.

THE COURT:  Pass for cause?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Sir, if you'd resume your seat.

(End of sidebar discussions.)

THE COURT:  All right.  I believe the next peremptory rests with the government.

MR. FOX:  May we have a moment with counsel?

THE COURT:  Yes.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, the government asks you to thank and excuse Prospective Juror Number 1, please.

THE COURT:  All right.  Sir, you're excused.  You may return to the jury assembly room on the third floor.  Thank you very much for your service.

THE PROSPECTIVE JUROR:  Your Honor, I need to talk to you guys.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Something happened at lunch

I need to tell you about.

THE COURT:  All right.

(Discussion held at sidebar.)

MR. JAUREGUI:  Your Honor, we hear there's a gentleman in the first row all the way to the left, first person, he raised his hand trying to get your attention.

THE COURT:  Okay.  Thank you.

THE PROSPECTIVE JUROR:  Nothing bad happened.  So part of -- one of my positions at UCLA was working in the registrar/student affairs office in the school of law.  And at lunch, as I was leaving the building, I saw two of my former students walking the halls.  They didn't see me.  I didn't approach them.  I didn't do anything, but I just felt like you should know that.

THE COURT:  Okay.  That's fine.  Those Bruins are just --

THE PROSPECTIVE JUROR:  They're everywhere.  I mean, it doesn't affect my -- I have no bias, nothing, but just thought you should know.

THE COURT:  Okay.  That's fine.  Thank you.

THE PROSPECTIVE JUROR:  Uh-huh.

(End of sidebar discussions.)

THE COURT:  I believe somebody had their hand up.

THE PROSPECTIVE JUROR:  Yes, I just want to get 30 seconds to go to the restroom.  I drank too much.

THE COURT:  That's fine.

THE PROSPECTIVE JUROR:  Is that okay?

THE COURT:  Yeah, that's fine.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Okay.

(Pause in proceedings.)

(Discussion held at sidebar.)

THE COURT:  Anything else?  Okay.

(End of sidebar discussions.)

THE COURT:  I think he did say 30 seconds.

Okay.  While we're waiting, I think we'll go ahead and call the name of another prospective juror.

Okay.  How many of you want to bet that the next name we call is the guy who just left.

THE DEPUTY CLERK:  Gregory Weller.

THE COURT:  Close.  Sir, did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Anything about the nature of these

charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  If you could take the empty chair on the first row, and if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Greg Weller.  I live in Santa Clarita, California.  I've lived there all my life, but I spent about two years in Oklahoma, and that was about seven months ago.  I am single, no children.  I have an associate's degree in engineering.  I've never been in the military.  I work for AmerisourceBergen, a pharmaceutical distribution company.

THE COURT:  Ever taken any courses in criminal justice?

THE PROSPECTIVE JUROR:  No, I have not.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  No, I have not, sir.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  I had a Workman's Comp lawsuit, but I had nothing to do with it.  I was connected to the lawyer and got a check.

THE COURT:  Anything about that experience that causes you to have any concerns about your ability to be fair

and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No.  I just contacted the lawyer, and he sent me a check.  It was great.

THE COURT:  Okay.  You got money out of a lawyer?  That's --

THE PROSPECTIVE JUROR:  He got 20 percent out of it.  I mean...

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have.  I don't have one on me, though.

     Thank you.

THE COURT:  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  Number 4, I have -- a friend's mom, she is a secretary at a law firm.  I don't know what law firm, and I don't really talk to her about her work at all.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  Number 25, I enlisted into the military, but I soon after dropped my enlistment.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No, that's it, sir.

THE COURT:  All right.  Pass for cause as to the

newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Any additional questions for the newly-seated juror?

MR. FOX:  Not from the government, Your Honor.

MR. STEWARD:  Not from the defense, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

(Defense counsel conferred off the record.)

(Counsel conferred off the record.)

MR. STEWARD:  Your Honor, we would ask the Court to thank and excuse Juror Number 8, Ms. Bulanek.

THE COURT:  All right.  You're excused.  You may return to the jury assembly room on the third floor.

All right.  I'm going to ask the clerk to call the name of another prospective juror.

THE DEPUTY CLERK:  Dayle Campbell.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  Yes, some items, but I can disclose that later.  But everything's okay right now.

**UNITED STATES DISTRICT COURT**

THE COURT:  All right.  Anything about the nature of these charges that causes you to have any concerns about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  If you could join us over here.

(Discussion held at sidebar.)

THE COURT:  Okay.  If you could stand next to this microphone, and if you could keep your voice down.

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  What is it about the nature of the charges that causes you to have concerns?

THE PROSPECTIVE JUROR:  Okay.  So that would be items number 3, 6, 7, 22 and 24, and that's in regards to my son.

THE COURT:  Okay.  Hold on one second.

Okay.  Is there anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  Perhaps, yes.

THE COURT:  Okay.  What's that?

THE PROSPECTIVE JUROR:  Okay.  My son is on SSI, and I have to provide work for myself so I can help him out, and this has to do with these items.

THE COURT:  Okay.  Hold on one second.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Let's start with Number 3.

THE PROSPECTIVE JUROR: Yes, sir. Okay. My son was a professional baseball player. He got drafted fifth round by the Detroit Tigers, and he was riding in L.A. And it was a law enforcement agency that stopped him, threw him on the ground, took him to jail. After that, they took him to UCLA Medical Center psych ward and shot him up with drugs, and he had a bad allergic reaction. And he -- right now he itches and he scratches. That's why he's on SSI. His career was ruined, okay.

So I'm just -- okay. I'm just trying to help him out as much as possible, okay. And I don't like the way he was treated. I got to be fair with you. I don't.

THE COURT: Okay. What police agency was involved?

THE PROSPECTIVE JUROR: Okay. So that was Hawthorne Police Department.

THE COURT: Okay.

THE PROSPECTIVE JUROR: Okay.

THE COURT: Uh-huh. And you know this case doesn't have anything to do with the Hawthorne Police Department?

THE PROSPECTIVE JUROR: No. Yes, I understand that, but I can forgive, but I can't forget what happened to him.

THE COURT: And you don't think you can be fair and impartial?

THE PROSPECTIVE JUROR: It's very difficult. I don't think I could.

UNITED STATES DISTRICT COURT

THE COURT:  What's the other question?

THE PROSPECTIVE JUROR:  Oh, my -- okay, sorry, this is what I mentioned briefly to you yesterday.  I have relatives that are law enforcement.  I told you I have a daughter works at L.A. County Probation, and I also have one who works in the juvenile courts.  I have a son-in-law -- okay, I hate to be repetitive, but he works for L.A. County Sheriff.  He does surveillance, or used to do that, and I didn't get a chance to mention this.  I have ex-son-in-law who works at a security prison, okay.

So anyway, those are the things I just wanted to share with you.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I told you my wife, she passed, but she used to work with L.A. County Probation.  Of course, she's passed.  So basically, that's it, sir.

THE COURT:  Have a seat on the bench there for just a second.

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  I will ask some additional questions if anybody wants to keep him on the jury.

MR. STEWARD:  Our position is he has a number of issues, perhaps any one of which is enough that we'd ask he be excused in combination, and I -- regrettably, I think he needs to go.

MR. FOX:  That's fine, Your Honor.  I have my notes from yesterday stating that he didn't want to be here yesterday, so I think that's the case today.

THE COURT:  Yep.

Just have a seat in the audience, and we'll let you know.

THE PROSPECTIVE JUROR:  Okay.

(End of sidebar discussions.)

THE COURT:  All right.  Let's call the name of another prospective juror, please.

THE DEPUTY CLERK:  Frank Sternat.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, I did, Your Honor.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  I'm sorry?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the nature of these charges that causes you to have any concerns about your ability

to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you could take the empty chair on the second row.

Excuse me, sir, have a seat.

All right.  Sir, if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Okay.  My name is Frank Sternat.  I live in Rancho Palos Verdes.  I've lived there for 38 years.  And before I lived there, I was in Torrance for a couple of years.  I am married.  I have six children, three of my own and three step.  Ages:  Whoa, 59, two 57s, one 55, one 54 and one 48.

THE COURT:  They're all still living at home?  No.

THE PROSPECTIVE JUROR:  No.

THE COURT:  Don't worry, they'll be back.

What do they do for a living?

THE PROSPECTIVE JUROR:  The oldest one is unemployed.  She's too old to get a job, they say.  And the -- one 57, which is my daughter, she's unemployed, she just stays home.  I think she does some babysitting.  The other, 57, is a stepson, and he is -- he works for a firm that imports -- imports stuff for security badges and stuff from the Orient mostly.  The 55 is a manager of a warehouse.  The 54 is an electrician, and the 48 is a -- she works for a -- it's like a

mutual fund in Canada.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And my education is engineering degree -- mechanical engineering degree, bachelor of science.  And I was never in the military.  I work at Boeing as an engineer.  My wife used to be a banker.  She's now retired.

THE COURT:  Ever had any coursework or attend any seminars on criminal justice or criminal law?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any prior jury service?

THE PROSPECTIVE JUROR:  Yes, about seven times.

THE COURT:  Okay.  Do you recall the most recent time you served on a jury?

THE PROSPECTIVE JUROR:  The most recent one was about eight years ago and was in Torrance Municipal Court.  It was a -- it was a criminal case, and it was settled out of court.

THE COURT:  Do you recall any of the other cases in which you served as a juror?

THE PROSPECTIVE JUROR:  Yes, there was one in Long Beach which was a criminal case.  It was a -- stolen property, and that was a hung jury.

THE COURT:  Any others that you recall?

THE PROSPECTIVE JUROR:  Yeah, there were -- there

was -- one was a -- there was one civil case, and I didn't complete that one because I broke my leg.

THE COURT: Okay.

THE PROSPECTIVE JUROR: And then there was two others that were criminal, but they were settled out of court. They made a settlement, and it was over.

THE COURT: Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR: No.

THE COURT: Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR: Yes, I did.

THE COURT: Do you have any yes or affirmative responses to any of those questions?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. Pass for cause as to the newly-seated juror?

MR. FOX: Yes, Your Honor.

MR. STEWARD: Yes, Your Honor.

THE COURT: Any additional questions for the newly-seated juror?

MR. FOX: One moment, Your Honor.

Nothing from the government, Your Honor.

MR. STEWARD: And nothing from the defense, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the defense.

(Defense counsel conferred off the record.)

(Counsel conferred off the record.)

MR. STEWARD:  Your Honor, we'd ask the Court to thank and excuse Juror Number 8, Mr. Sternat.

THE COURT:  Sir, thank you very much for your service.  You may return to the jury assembly room on the third floor.

All right.  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Eric Audas.

THE COURT:  Good afternoon.  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  Just the length seems like a little long for me.  I talked to my boss yesterday.  He said it might be a little bit of an issue, but that's kind of it.

THE COURT:  Okay.  Anything about the nature of these charges that causes you to have any concerns about your

UNITED STATES DISTRICT COURT

ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Where do you work?

THE PROSPECTIVE JUROR:  I'm a sales agent for a printing ink company.

THE COURT:  Okay.  Let me talk to you for just a second here.

(Discussion held at sidebar.)

THE COURT:  Does your employer reimburse you?

THE PROSPECTIVE JUROR:  I'm not exactly sure.  They just told me to -- I told them I had jury duty, and then I told him I came yesterday.  And then I told them the length of the case and how long it was going to take, and he said that it could become an issue because I just landed a couple really nice big accounts and they're kind of service-oriented.

And he's afraid that if I'm gone too long that the accounts are going to suffer.  Therefore, my wages are going to because I'm commission-based, and so he said that it could affect my commission if the account suffers because I'm gone. And there's two of them that I'm in charge of that are pretty big.

THE COURT:  What are your normal hours?

THE PROSPECTIVE JUROR:  I get up at 5:30, leave my house at 6:00, usually get home around 6:00.

THE COURT:  Okay.  And where is your -- where's the

UNITED STATES DISTRICT COURT

business located?

THE PROSPECTIVE JUROR:  My headquarters is in San Dimas, and the accounts in question with -- one of them is in Corona, and the other one is in Long Beach.

THE COURT:  Okay.  If the case were over in two and a half weeks, is that going to be a problem for you?

THE PROSPECTIVE JUROR:  It's just -- it's just to me, I mean, my biggest problem is that the customers -- I mean, I had like 30 voicemails yesterday from three accounts, and it's just -- I mean, the time constraint would be a little hard, but, I mean -- I mean, I kind of -- I like the idea of serving.  It just seems like if it went too long, it would be kind of a hardship financially as well.

THE COURT:  Okay.  Well, I guess I need to get a better -- I didn't -- we're not going to -- well, we are going to quit every day at 1:30, and that'll presumably give you time to respond to any --

THE PROSPECTIVE JUROR:  I would have to see -- most of it is on-call service.  If they call me, I got to get there, and that's my -- that's the biggest thing.  Because I'm a tech service rep for both of the accounts at the same time.

THE COURT:  Okay.  What business is your company?

THE PROSPECTIVE JUROR:  It's printing ink.  We sell to high-end printers.  It's a lot of customer service.

THE COURT:  You sell the actual printing equipment

or the ink?

THE PROSPECTIVE JUROR:  The ink for the equipment.

THE COURT:  And the name of your company again?

THE PROSPECTIVE JUROR:  Great Western Printing Ink.

THE COURT:  Okay.  Have a seat right there for a second.

What do you guys want to do?

MR. STEWARD:  Well, again, because we have a good supply of jurors back behind him, I just -- I would hate to see this guy suffer financially, and who knows, the government's case may go four weeks, in which case he'd be in a lot of trouble.  Of course, the government might go two.

THE COURT:  If this case goes four weeks, I'm going to be in a lot of trouble.  Why don't we just put him at the -- put him at the back and --

MR. FOX:  That's fine, Your Honor.

THE COURT:  Okay.

We'll let you know at the end of the day.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  So just grab a seat in the audience.

(End of sidebar discussions.)

THE COURT:  All right.  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Gregory Stube.

UNITED STATES DISTRICT COURT

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.

(Discussion held at sidebar.)

THE COURT:  Okay.  If you could just speak into the microphone.

THE PROSPECTIVE JUROR:  Yeah, I have kind of followed this case from the beginning and formed an opinion on it.

THE COURT:  Okay.  How have you followed the case?

THE PROSPECTIVE JUROR:  When it first broke, watching it on the news and also reading about in the newspaper.  I also know when the defendant was running for sheriff, I -- excuse me, I investigated him a little bit more on the Internet and kind of came up with a negative feeling towards him.

THE COURT:  What do you do for a living?

THE PROSPECTIVE JUROR:  I'm a water distribution operator.

THE COURT:  And who do you work for?

THE PROSPECTIVE JUROR:  City of Ontario.

THE COURT: Okay. I assume that if this was a civil case or some other case, you could serve?

THE PROSPECTIVE JUROR: If it was -- yeah, if it was anybody else that I haven't read about. I just feel that I wouldn't be fair to him. That's --

THE COURT: Okay. So if it was an unpublicized bank robbery case, you could serve?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Just have a seat in the audience. We'll let you know.

THE PROSPECTIVE JUROR: Okay.

(End of sidebar discussions.)

THE COURT: Let's call the name of another prospective juror.

THE DEPUTY CLERK: Cynthia Lara.

THE PROSPECTIVE JUROR: Hi. Do I go --

THE COURT: No, that's fine. I'm just going to stay here.

THE PROSPECTIVE JUROR: Oh, okay.

THE COURT: Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR: No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  The length.

THE COURT:  Okay.

(Discussion held at sidebar.)

THE COURT:  You need to come to the microphone.

THE PROSPECTIVE JUROR:  The length because my brother has terminal cancer in Tennessee, and we're just trying to make -- I'm sorry, I'm so nervous.

THE COURT:  That's okay.

THE PROSPECTIVE JUROR:  I'm trying to make it to him.  They gave him two months to live in August.  So we're trying to make it out there because we're going to be driving until the weather gets better.  So we're just hoping, so four weeks it should be better in May than it is in April because of the rain and going on the 10 freeway.  That's what my husband says.

THE COURT:  Okay.  So when do you think you're going to leave to go back?

THE PROSPECTIVE JUROR:  I think we're going to leave to go back -- we want to go back as soon as possible, but at the end of it -- middle of May, I'd like to say.

THE COURT:  Okay.  Well, this case will be over with by the end of -- it'll be over before the end of April.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  But I am also impartial because I have a lot of friends that are on the Sheriff's Department.  And he was a jailer in West Covina, and they -- and so then -- and they talk, you know, with people.  And my boss years ago was beaten up by a sheriff, and he won the case through the -- but -- and I just have -- my brother was ex-sheriff, retired sheriff.

THE COURT:  Okay.  Do you think you'd have difficulty putting aside these --

THE PROSPECTIVE JUROR:  What I've heard?

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  Probably yes, and I've -- because I've heard other things about the jails and stuff, and I have a whole bunch of -- on the criminal questionnaire, I think the things that I have an exclusion but...

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm a nervous wreck.

THE COURT:  Just have a seat on the bench right there.

THE PROSPECTIVE JUROR:  Right there?

THE COURT:  Uh-huh.

MR. FOX:  Just so you know, Your Honor, my notes from yesterday say that she said that serving's not a hardship, but she knows all about the case.  Now she's raised about four

other issues that she didn't raise yesterday, she's raised

knowing about the case today, but I think she's another one

that probably does not want to be here --

MR. STEWARD:  Agreed.

MR. FOX:  -- but has made a record that neither

party probably wants her.

MR. STEWARD:  And I agree with that as well.  We

agree.

THE COURT:  All right.  Now, you understand that if

I get the sense that people are trying to get out of jury duty,

that I will keep them here --

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  -- this entire trial?

THE PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Even though they're not on the jury, do

you understand that?

THE PROSPECTIVE JUROR:  Yeah, I just -- I just don't

think too -- I am just -- I don't know with this big case, I

don't know how I would handle it, but I have to do what I have

to do.  But I just -- whatever you think.

THE COURT:  Have a seat in the audience.  You may be

here for a while.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  Uh-huh.

(End of sidebar discussions.)

THE COURT:  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Sheila Fuller.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything about the nature of these charges that would cause you to have any concerns about your ability to serve as a juror in this case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  If you could take that empty chair on the second row.

All right.  Do you have a copy of the background questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  If you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Sheila Fuller.  I live in Dominguez Hills.  I've lived there for 19 years now. Before, I lived in Los Angeles.  I'm a widow.  I'm the mother

of three:  one daughter, two sons.  My daughter is deceased.

THE COURT:  And how old are your sons?

THE PROSPECTIVE JUROR:  My sons are 39 and 35.

THE COURT:  Okay.  And what do they do for a living?

THE PROSPECTIVE JUROR:  One is a customer service representative; the other is a buyer.

THE COURT:  Okay.  And by whom are they employed?

THE PROSPECTIVE JUROR:  I'm not sure of one.  One is -- I'm not sure, service representative, but the one that's a buyer, he's with Frieda's, Incorporated.

THE COURT:  Okay.  Your educational background?

THE PROSPECTIVE JUROR:  I have a bachelor's in business management.

THE COURT:  Ever served in the military?

THE PROSPECTIVE JUROR:  No, I haven't.

THE COURT:  And what do you do for a living?

THE PROSPECTIVE JUROR:  I'm a retired payroll technician from the Los Angeles Unified School District.

THE COURT:  Ever taken any coursework or attended any seminars in criminal justice?

THE PROSPECTIVE JUROR:  No, I haven't.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  Many times.

THE COURT:  Okay.  Do you recall the most recent occasion?

THE PROSPECTIVE JUROR:  Four years ago.

THE COURT:  And do you recall what kind of case it was?

THE PROSPECTIVE JUROR:  It was criminal.

THE COURT:  And was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes, it was.

THE COURT:  Do you recall generally what the case was about?

THE PROSPECTIVE JUROR:  Child molestation.

THE COURT:  Ever been a witness or a party in a civil or criminal case?

THE PROSPECTIVE JUROR:  No, I haven't.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Do you have any yes or affirmative responses to any of those questions?

THE PROSPECTIVE JUROR:  No, I do not.

THE COURT:  Okay.  Pass for cause as to the newly-seated juror?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Does either party wish to have any additional questions asked of the newly-seated juror?

UNITED STATES DISTRICT COURT

MR. FOX:  Not from the government, Your Honor.

MR. STEWARD:  Not from the defense, Your Honor.

THE COURT:  All right.  I believe the next peremptory rests with the government.

MR. FOX:  One moment, Your Honor, please.

(Plaintiff's counsel conferred off the record.)

(Counsel conferred off the record.)

MR. FOX:  Your Honor, the government accepts this jury as presently constituted.

THE COURT:  All right.  Next peremptory rests with the defense.

MR. STEWARD:  Thank you, Your Honor.

(Defense counsel conferred off the record.)

(Counsel conferred off the record.)

MR. STEWARD:  Your Honor, we'd ask the Court to thank and excuse Juror Number 1, Mr. Weller.

THE COURT:  All right.  Sir, you're excused.  You may return to the jury assembly room on the third floor.

All right.  Let's call the name of another prospective juror.

THE DEPUTY CLERK:  Miguel Flores.

THE COURT:  Sir, did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there anything I've inquired about

that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you could take the empty chair on the first row, and if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Miguel Flores.  I live in Baldwin Park.  I lived there most of my life.  Not married, no children.  Some college.  No military.

THE COURT:  What do you do for a living?

THE PROSPECTIVE JUROR:  I work for Home Depot.  Let's see.

THE COURT:  Ever taken any coursework in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any prior jury service?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes or affirmative responses to any of those questions?

THE PROSPECTIVE JUROR:  Number 10, my brother's a sheriff.

THE COURT:  Okay.  And is that with the Los Angeles County Sheriff's Department?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what does he do?

THE PROSPECTIVE JUROR:  I believe he's a transporter.

THE COURT:  Okay.  Is --

THE PROSPECTIVE JUROR:  I think that's the correct terminology for it.

THE COURT:  Okay.  Is he a uniform employee, or is it civilian employee?

THE PROSPECTIVE JUROR:  Uniform.

THE COURT:  Do you know if he's ever worked in the jails?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Could you join us over here for just a minute.

     (Discussion held at sidebar.)

THE COURT:  Have you ever talked to your brother about the work he does in the jails?

THE PROSPECTIVE JUROR:  No, not really.

THE COURT: Okay. Are you -- so you and he have never had any discussions about what he does?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. Has he ever mentioned to you the name of the defendant?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. Have you read anything about this case?

THE PROSPECTIVE JUROR: No.

THE COURT: Do you think you can put aside the fact that your brother works for the Los Angeles County Sheriff's Department and judge this case based solely on the evidence you hear here in court?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. There may be witnesses who are deputies with the Los Angeles County Sheriff's Department, witnesses who are law enforcement officers. Can you put aside the fact that your brother is a deputy and decide their credibility the same way you would that of any other witness?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Any other affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. Thank you very much.

THE PROSPECTIVE JUROR: Can I go back?

THE COURT: Why don't you have a seat on the bench for just a moment.

MR. FOX: Just out of abundance of caution, Your Honor, I'd like to know his brother's name just in case there's something that's come up about him in the investigation. I doubt there has been, but just out of abundance of caution.

MR. JAUREGUI: Maybe his rank and where he works.

THE COURT: Okay. Do you know what station your brother works in?

THE PROSPECTIVE JUROR: You know, I haven't talked to him about his job recently. The last I've known is that he's a transporter bus driver, last time I heard from him.

THE COURT: Okay. And do you know -- what's his name?

THE PROSPECTIVE JUROR: Jose Flores.

THE COURT: Jose Flores. Okay.

Do you know what his rank is?

THE PROSPECTIVE JUROR: No. No, I don't.

THE COURT: Okay. Just have a seat right there.

MR. FOX: The government doesn't have any follow-up questions.

MR. STEWARD: Nor does the defense.

THE COURT: Pass for cause?

MR. STEWARD: Yes.

MR. FOX: Yes, Your Honor.

THE COURT:  All right.  Sir, if you could resume your seat.

(End of sidebar discussions.)

THE COURT:  All right.  I believe the next peremptory rests with the government.

MR. FOX:  May I have a moment, Your Honor?

THE COURT:  Yes.

(Plaintiff's counsel conferred off the record.)

(Counsel conferred off the record.)

MR. FOX:  Your Honor, we accept the jury as presently constituted.

THE COURT:  All right.  Next peremptory rests with the defense.

MR. STEWARD:  May we have one moment, Your Honor.

THE COURT:  All right.

(Defense counsel conferred off the record.)

MR. STEWARD:  Your Honor, the defense accepts the panel as constituted.

THE COURT:  All right.  Any reason why the panel shouldn't be sworn?

MR. FOX:  No, Your Honor.

MR. STEWARD:  None, Your Honor.

THE COURT:  I'm going to ask the clerk to swear the panel.

THE PROSPECTIVE JUROR:  Your Honor, can I speak to

you at sidebar?

THE COURT:  Yes.

(Discussion held at sidebar.)

(Sealed portion of transcript to be separately filed with Judge Anderson's authorization.)

(End of sidebar discussions.)

THE DEPUTY CLERK:  If you'll all stand and raise your right hand for me.

(The jury panel was sworn.)

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  Thank you very much.

Ladies and gentlemen, we're going to take four alternates for this case, but before we start that, we're going to take our final break of the day.

Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including people involved in the trial, your fellow jurors, members of your family, nor are you permitted to allow others to approach you and try to talk with you about this case.  This includes communicating about the case by e-mail.  Don't use any social networking sites, any blogs, Facebook, Twitter.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any news reports about the case or anyone who has anything to do

with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.  If you need to communicate with me, simply give a note to the clerk.

Let's come back at -- let's make it five after the hour, and I think we can probably speed through this very quickly.

(The jury exited the courtroom.)

THE COURT:  All right.  Ladies and gentlemen, we'll be back in about ten minutes.

MR. STEWARD:  Your Honor, we have an issue, if we may either at sidebar or when the jury has left.

THE COURT:  Okay.  I'm going to ask any prospective jurors to temporarily step outside for a moment.

(Pause in proceedings.)

MR. STEWARD:  It has to do with what we discussed.

THE COURT:  Just one second.

MR. STEWARD:  Sure.  I'm sorry.  What we just discussed at sidebar, Mr. Haig and I observed Ms. Wilton after she sat down and after the Court assured her, in our view, she looked in a very frightened manner at our client.  We remain deeply concerned that she is on this panel, and we would point out that she's had at least a full day to bring these concerns to us.

She waited until seconds before she was going to be sworn

in to bring these to the attention of the Court, and we're deeply concerned starting this trial with a juror in that frame of mind.  We believe we made a reasonable request.  The Court approved the request, and it's not our fault that this lady waited until the very end to say anything about this.

THE COURT:  Made a reasonable request to do what?

MR. STEWARD:  Originally to use names instead of numbers.

THE COURT:  Yeah, and I cautioned both sides that based on our past experience, that it would probably be better to use an anonymous jury.

Now, I will make some further inquiries of the juror to assure myself that she can be fair and impartial.

MR. FOX:  Your Honor, may I also add, while we were at sidebar the defense did not try to strike her for cause at that point.  And you asked if there was any reason why they couldn't be sworn in, and then they were sworn in, and now this issues's being raised.

So this seems to be a complication that is of the defense's making right now, and to the extent that she is afraid and concerned about reaching a verdict against Mr. Tanaka, that would only inert his benefit.  So I don't know how this is prejudicial to the defense, and like I said, this is an issue that I see is their own making.

MR. STEWARD:  I'll accept that the woman here looks

like she's afraid of our client.

THE COURT: Sir, I don't know how you can discern that from looking over at her at this point. So again, I'll make some further inquiries of the juror and satisfy myself that she can remain fair and impartial and that she can render a just verdict in this case.

MR. STEWARD: Thank you, Your Honor.

THE COURT: Okay.

MR. FOX: Your Honor, I'm sorry, there was one very minor point. You said this was going to be the last break of the day. I've not had a chance to set up my opening PowerPoint slides. I don't want to set anything up with the prospective jurors in here.

THE COURT: That's fine. You'll have some time.

MR. FOX: Thank you, Your Honor.

(Off the record at 2:58 p.m.)

(On the record at 3:10 p.m.)

THE COURT: Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK: Please be seated.

THE COURT: All right. We're going to impanel four alternates. The first name that's called will be Alternate Number 1, will take the last seat on the first row.

Alternate Number 2 will take the last seat on the second row.

Alternate Number 3 will take the seat closest to the jury box, and Alternate Number 4 will take the remaining seat just outside the jury box.

All right.  I'm going to ask the clerk to call those names, please.

THE DEPUTY CLERK:  Albert Shaheen.

THE COURT:  All right.  Sir, if you'd just step to the lectern there.

Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  If you'd take that last seat on the first row, please.

THE DEPUTY CLERK:  Kang Chan.

THE COURT:  Sir, did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Is there anything that I've inquired about that you should tell us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Sir, if you'd take that last seat on the second row.

THE DEPUTY CLERK:  Peggy Lim.  I think she was excused.

Nicole Crosgrove.

THE COURT:  Good afternoon.

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you could take that seat just outside the jury box.

THE DEPUTY CLERK:  Elaine Haley.

THE COURT:  Did you hear the questions I asked of the other prospective jurors?

THE PROSPECTIVE JUROR:  Yes, I did.

THE COURT:  Is there anything that I've inquired about that in good conscience you should disclose to us?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything about the length of the trial that would prevent you from serving?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Okay.  If you could take that last seat there.

And if I could see Juror Number 2 over at sidebar for just a moment.

(Discussion held at sidebar.)

(Sealed portion of transcript to be separately filed with Judge Anderson's authorization.)

(End of sidebar discussions.)

THE COURT:  Let me just talk to the court reporter for just one second.

(Pause in proceedings.)

THE COURT:  All right.  We're going to start with Prospective Alternate Number 1.  Do you have a copy of the background questionnaire?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.  If you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Yes.  My name is Al Shaheen.

I live in Long Beach.  I've been there 30 years.  Prior to that, I lived in Colorado, Arizona, Berkley, Bakersfield and South Africa.  I'm married.  I have two children from a prior marriage.  My daughter is 30 and lives in Ireland.  My son is 28 and lives in Mexico City.

THE COURT:  And what do your children do for a living?

THE PROSPECTIVE JUROR:  My daughter works for -- I don't remember the name, but they are distributing the money to the -- from the Catholic church to victims of abuse, and my son is a student.  I have a BS in chemistry, a master's in education.  No military service.  I'm, excuse me, a chemistry teacher at Poly High School in Long Beach.

THE COURT:  Jackrabbits.

THE PROSPECTIVE JUROR:  That's right.

THE COURT:  There you go.

THE PROSPECTIVE JUROR:  Home of scholars and champions.

THE COURT:  Home of scholars and champions.

THE PROSPECTIVE JUROR:  Right down the street from St. Anthony.

THE COURT:  That's right.

THE PROSPECTIVE JUROR:  I work for Long Beach Unified School District.

THE COURT:  I think I took chemistry from -- no.

THE PROSPECTIVE JUROR: Maybe one of your kids, yeah.

THE COURT: It was probably my brother.

THE PROSPECTIVE JUROR: Yeah. My wife is a real estate agent and --

THE COURT: Ever taken any coursework in criminal law or criminal justice?

THE PROSPECTIVE JUROR: No.

THE COURT: Any prior jury service?

THE PROSPECTIVE JUROR: No.

THE COURT: You ever been a party or a witness in a criminal or civil case?

THE PROSPECTIVE JUROR: No, Your Honor.

THE COURT: Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR: Yes, I have.

THE COURT: Do you have any yes or affirmative responses to any of those questions?

THE PROSPECTIVE JUROR: I do.

THE COURT: Okay.

THE PROSPECTIVE JUROR: Number 1, my son was arrested eight years ago, spent 11 days in the Central Jail here in L.A., was convicted. He also spent some time at Wayside Honor for a probation violation on a prior misdemeanor. I, maybe 20 years ago, received a couple of phone calls from

LBPOA for donations, and I did donate some small amounts back then. That's another one. I think 22 was the conviction -- oh, detained. Yes, my son was in the county jail. I think that's it.

THE COURT: Let me ask you just a couple of questions. You ever had conversations with your son about that experience?

THE PROSPECTIVE JUROR: The day I picked him up, he didn't like it. Other than that, I mean, I think 11 days there taught him more than 20 years of nagging from me about how to straighten out his life, so...

THE COURT: Can you put aside that experience and be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Did he have any complaints about the treatment that he received?

THE PROSPECTIVE JUROR: No. The vending machines, he didn't like the food.

THE COURT: Any other yes or affirmative responses to any of the other questions?

THE PROSPECTIVE JUROR: No, Your Honor.

THE COURT: All right. If you could pass the microphone to the next gentleman seated behind you, and, sir, if you could take the background questionnaire and tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Kang Chan.  I live in Cerritos.  I've been there for 28 years.  Before moving to Cerritos, I was in West Los Angeles.  I am married.  I have two children, both daughters.  The older daughter is 29 years old.  She is an accountant.  And the younger daughter is 23 years old.  She is a financial analyst.  I have a master's degree electrical engineering.  I served two years in the Army in Taiwan.  I was a second lieutenant.  I used to be engineer and a sales manager before I retired.  I retired in 2013.

THE COURT:  Who did you work for at the time of your retirement?

THE PROSPECTIVE JUROR:  I worked for Xerox Corporation, TDK Semiconductor and PCB semiconductors.

THE COURT:  And does your wife work?

THE PROSPECTIVE JUROR:  Yes, she works for Siemens Corporation.

THE COURT:  And what does she do for a living?

THE PROSPECTIVE JUROR:  She's a computer programmer.

THE COURT:  Ever taken any coursework in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Ever served on a jury before?

THE PROSPECTIVE JUROR:  I'm sorry?

THE COURT:  Have you ever served on a jury?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And when was that?

THE PROSPECTIVE JUROR:  I served twice.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  It was -- the first time was over 20 years ago.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  The second time, maybe ten years ago.

THE COURT:  Okay.  Do you remember what those cases were about?

THE PROSPECTIVE JUROR:  The first one was a criminal.

THE COURT:  Okay.  Was the jury able to reach a verdict?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what about the other one?

THE PROSPECTIVE JUROR:  I can't remember for certainty.

THE COURT:  Do you recall if the jury was able to reach a verdict in that one?

THE PROSPECTIVE JUROR:  The first one, we did.

THE COURT:  Okay.  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the

criminal case questionnaire?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  There is a -- there's a document that's entitled Jury Questions Criminal Case Questionnaire.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have that?

THE PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Okay.  Did you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  For Number 1, Number 2.

THE COURT:  Okay.  Could you tell us about Number 1.

THE PROSPECTIVE JUROR:  My nephew had a plea bargain with a break-in incident.  He was jailed for six months.

THE COURT:  And do you know what police agency was involved?

THE PROSPECTIVE JUROR:  He was in Buena Park.  I'm not sure which station it was.

THE COURT:  Is there anything about that experience that causes you to have any doubts about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And what about Number 2?

THE PROSPECTIVE JUROR:  The second one?

THE COURT:  Yes.

THE PROSPECTIVE JUROR:  I was mugged about almost 40

years ago in West L.A.

THE COURT:  Where did that take place?

THE PROSPECTIVE JUROR:  West Los Angeles.

THE COURT:  Okay.  Did you have any complaints about the way the case was handled by the police?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Any other yes or affirmative answers to any of the other questions?

THE PROSPECTIVE JUROR:  No others.

THE COURT:  All right.  Thank you very much.  If you could pass the microphone.

And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  Okay.  My name is Nicole Crosgrove.  I live in Simi Valley.  I've been there for about 24 years.  I left for a little bit for college.  I was in the Napa Valley, Riverside and San Bernardino for a couple years. I am single.  I don't have any children.  I have a master's and a bachelor's in social work.  I do not have any military service.

I currently work for agency called Koinonia.  It's a foster family agency.  I used to work for Ventura County Children & Family Services for about two years.  I haven't taken any classes in criminal justice.  I don't have any prior jury experience, and I haven't been a party or witness to a case.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you very much.

And if you could tell us a little bit about yourself.

THE PROSPECTIVE JUROR:  My name is Elaine Haley.  I live in Los Angeles all my life.  I live in Los Angeles.

THE COURT:  Okay.  And your marital status?

THE PROSPECTIVE JUROR:  I'm single, no children.  I have a bachelors of science degree in business administration.  No military service.  I currently work for the Department of Children & Family Services for L.A. County.  Before that, I worked for the Los Angeles Unified School District.

THE COURT:  Ever taken any courses in criminal law or criminal justice?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Okay.  And what type of classes have you taken?

THE PROSPECTIVE JUROR:  I had criminal class in minorities and the legal system at Cal State L.A., and also a class in written communications in criminal justice.

THE COURT:  Okay.  Think you can put aside that

classwork and follow the Court's instructions on the law that's applicable to this case?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Any prior jury service?

THE PROSPECTIVE JUROR:  No prior jury service.

THE COURT:  Ever been a party or a witness in a civil or criminal case?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the criminal case questionnaire?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Do you have any yes responses to any of those questions?

THE PROSPECTIVE JUROR:  I have two yeses to 1 and 2.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I've been arrested myself back in 1989, and the case was dismissed.

THE COURT:  Do you know what police agency was involved?

THE PROSPECTIVE JUROR:  It was Temple City Sheriff's Department, Los Angeles County.

THE COURT:  Is there anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

THE PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Okay.  You can put aside that experience and be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  And what about Question 2?

THE PROSPECTIVE JUROR:  I had someone use my name before and got arrested in my name back in 1992, and I went to court to resolve that matter.

THE COURT:  Okay.  Anything about that experience that causes you to be concerned about your ability to be fair and impartial to both sides?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you very much.

If I could see counsel at sidebar, please.

And do you have any yes responses to any other of the questions?

THE PROSPECTIVE JUROR:  No yeses to any other questions.

THE COURT:  Okay.  Thank you.

(Discussion held at sidebar.)

THE COURT:  Okay.  Pass for cause as to the alternates?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  Okay.  Do you have any additional follow-up questions for any of the alternates?

MR. FOX:  May I have one moment with Ms. Rhodes?

THE COURT:  Yes.

(Plaintiff's counsel conferred off the record.)

MR. FOX:  We don't have any follow-up, Your Honor.

THE COURT:  Okay.  What we're going to do is I'm going to -- you're going to have two challenges apiece.  First will go to the government, next to the defense, and then back to the government and then to the defense.  Okay?  All right.

(End of sidebar discussions.)

THE COURT:  All right.  The first peremptory rests with the government.

MR. FOX:  Your Honor, the government accepts the present panel as presently constituted.

THE COURT:  And the next peremptory rests with the defense.

MR. STEWARD:  And, Your Honor, we also accept the alternates as currently impanelled.

THE COURT:  Any reason why the alternates shouldn't be sworn in?

MR. FOX:  No, Your Honor.

MR. STEWARD:  No, Your Honor.

THE COURT:  Okay.  I'm going to ask the clerk to swear the alternates.

THE DEPUTY CLERK:  Would you please stand and raise your right hands for me.

(The alternate jurors were sworn.)

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  Ladies and gentlemen, I want to thank you for your service today.  You may now return to the jury assembly room on the third floor, and have a nice day.

(The prospective jurors exited the courtroom.)

THE COURT:  Ladies and gentlemen, what we're going to do is we're going to take a short break.  I'm going to have you retire into the jury room.  The clerk is going to go over with you some logistics for when you come in in the morning, going to show you how you enter into the courtroom and into the jury room, and he's going to give you a number to call if you're running late in the morning.

I want to remind you that if you're not used to coming downtown in the mornings, you need to give yourself plenty of time because traffic can sometimes get a little snarled.  And the most important thing is we can't start unless all of you are present, and so make sure that you give yourself enough time to get here by eight o'clock.  We're going to start at 8:00, go to 1:30, and then we're going to quit.

Okay.  I'm going to ask the clerk to take you back into the jury room, go over that information, and then we're going to get started.  I'm going to have some instructions for you, and then we'll have the opening statements of counsel.

(The jury exited the courtroom.)

UNITED STATES DISTRICT COURT

THE COURT:  All right.  I'm going to have some instructions -- preliminary instructions for the jury.  I'm going to give them 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.11, 1.12, and I'll probably give 2.2.

MR. FOX:  No objection, Your Honor.

MR. STEWARD:  No objection, Your Honor.

THE COURT:  All right.

All right.  I think it's probably going to take him about ten minutes to get the jury squared away, and as soon as he's ready, then we'll have the opening statements.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much.

And let's keep in mind it's an opening statement, not a closing argument.

(Off the record at 3:38 p.m.)

(On the record at 3:51 p.m.)

THE COURT:  All right.  Are we ready to proceed?

MR. FOX:  The government is, Your Honor.

MR. STEWARD:  The defense is as well, Your Honor.

THE COURT:  All right.  I'm going to ask the clerk to bring the jury in.

(The jury entered the courtroom.)

THE COURT:  Please be seated.  I think we're missing one alternate.

THE DEPUTY CLERK:  Please be seated.

UNITED STATES DISTRICT COURT

THE COURT:  Ladies and gentlemen, you are now the jury in this case, and I want to take a few minutes to tell you something about your duties as jurors and to give you some instructions.  These are preliminary instructions.  At the end of the trial, I will give you more detailed instructions.  Those instructions will control your deliberations.  You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

This is a criminal case brought by the United States government.  The government charges the defendant with conspiring to obstruct justice and endeavoring to obstruct justice.  The charges against the defendant are contained in the indictment.  The indictment is simply the description of the charges made by the government against the defendant.  It is not evidence of anything.  The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.

In addition, the defendant has the right to remain silent and never has to prove innocence or to present any evidence. In order to help you follow the evidence, I will now give you a brief summary of the elements of the crime which the government must prove beyond a reasonable doubt to make its case.

In order for the defendant to be found guilty of

conspiring to obstruct justice, the government must prove each of the following elements beyond a reasonable doubt:  First, beginning on or about August 18th, 2011 and continuing through on or about December 20th, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice; second, the defendant became a member of the conspiracy knowing its object and intending to help accomplish it; and third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful.  It does not matter whether the crime agreed upon was committed.  For a conspiracy to have existed, it is not necessary that the coconspirators made a formal agreement or that they agree on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways or perhaps helped one another.  You must find that there was a plan to commit the crime of obstruction of justice.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy even though

the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which furthers the purpose of the conspiracy does not thereby become a member of the conspiracy.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful.  A lawful act may be an element of conspiracy if it was done for the purpose of carrying out the conspiracy.  The government is not required to prove that the defendant personally did one of the overt acts.

In order for the defendant to be found guilty of obstruction of justice, the government must prove each of the following elements beyond a reasonable doubt:  First, the defendant influenced, obstructed or impeded or tried to influence, obstruct or impede a federal grand jury investigation; and second, the defendant acted corruptly with knowledge of a pending federal grand jury investigation.

Corruptly means that the act must be done with the purpose of obstructing justice.  The government does not need to prove the defendant's conduct had the actual effect of obstruction.

**UNITED STATES DISTRICT COURT**

However, the government must prove that the defendant's actions would have had the natural and probable effect of interfering with a grand jury investigation.

These instructions are preliminary, and the instructions I will give you at the end of the case will control. The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits which are to be received into evidence and any facts to which all the lawyers stipulate.

The following things are not evidence and you must not consider them as evidence in deciding the facts of this case: Statements and arguments of the attorneys, questions and objections of the attorneys, testimony that I instruct you to disregard and anything you may see or hear when court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses. Some evidence is admitted for a limited purpose only.

When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which one can find another

fact.

For example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence such as a turned-on garden hose may explain the water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience and common sense.  You are to consider both circumstantial and direct evidence.  The law permits you to give equal weight to both, but it's for you to decide how much weight to give any evidence.

There are Rules of Evidence which control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess at what the answer would have been.  Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you're deciding the case, you must not consider the evidence which I told you to disregard.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.  In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witness's memory, the witness's manner while testifying, the witness's interest in the outcome of the case and any bias or prejudice, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all the evidence and any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury either by having a conference at the bench when the jury is present in the courtroom or by calling a recess.

Most often, those conferences will involve a determination as to whether evidence is admissible under the Rules of Evidence.  It is appropriate to take these matters up outside the presence of the jury.  Should I conclude that a more prolonged discussion is necessary, I may excuse you from the courtroom.  We will, of course, do what we can to keep the number and length of these conferences to an absolute minimum. I may not always grant an attorney's request for a conference.

Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

I now want to say a few words about your conduct as jurors. First, keep an open mind throughout the trial and do not decide what the verdict should be until after you and your fellow jurors have completed your deliberations at the end of the case. Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging or any Internet chat room, blog, website or other feature.

This applies to communicating with your fellow jurors until I give you the case for your deliberation, and it applies to communicating with anyone else including your family members, your employer, the media or press and the people involved in the trial, although you may notify your family and your employer that you've been seated as a juror in the case.

But if you're asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and report that contact to the court.

Because you will receive all of the evidence and legal instructions you properly may consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party's had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of the proceedings. If any juror is exposed to any outside information, please notify the court immediately.

At the end of the trial, you'll have to make your decision based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given. If you wish, you may take notes to help you remember what witnesses said. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.

Do not let note-taking distract you so that you do not hear other answers by witnesses.  When you leave, your notes should be left in the courtroom.  Whether or not you take notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes.

The next phase of the trial will now begin.  First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.  The government will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the government may cross-examine.

After the evidence has been presented, the attorneys will make closing arguments, and I will instruct you on the law that applies to the case.  After that, you will go to the jury room to deliberate on your verdict.

All right.  Does the government wish to make an opening statement at this time?

MR. FOX:  We do, Your Honor.  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes, please.

///

///

**PLAINTIFF'S OPENING STATEMENT**

MR. FOX:  In 2011 the defendant, Paul Tanaka, had risen to become the Number 2 in the Los Angeles County Sheriff's Department, the Number 2 in charge of a department that is as large as any law enforcement agency in the country. He was the undersheriff of the LASD, of the Sheriff's Department, and he had a scandal on his hands.  He learned about a federal investigation; an investigation into deputy abuse and deputy corruption within the Los Angeles County jails; an investigation into his deputies; an investigation into the culture of the Sheriff's Department that the defendant, Paul Tanaka, fostered and created.

The defendant had a decision on his hands at that point, and he decided to impede the investigation, to conceal the crimes of his deputies.  But instead of just concealing the crimes, Mr. Tanaka committed his own.  Instead of squashing the scandal, Mr. Tanaka created a greater one than he ever imagined.  Mr. Tanaka and other members of the Sheriff's Department conspired to obstruct justice.

He and his coconspirators decided to hide an inmate who was a federal informant, decided to go around and tamper with witnesses to try to force them not to cooperate with the federal investigation.  Mr. Tanaka and his coconspirators decided to go out and threaten the arrest of the case agent, the FBI case agent who had been investigating the Sheriff's

Department to try to convince the FBI to back off of its investigation.

As a result of his conduct, Mr. Tanaka is charged with two crimes:  first with conspiring to obstruct justice; and second with obstruction of justice.  It is our burden to prove our case to you beyond a reasonable doubt, to prove that Mr. Tanaka committed these crimes beyond a reasonable doubt.  It's a standard that we embrace and we will meet it with an overwhelming amount of evidence that I will take you through now.

But every crime has some context to it.  Before I get into really the heart of the case, I want to provide that context because it will show that Mr. Tanaka had knowledge of what the federal investigation would find out if it were to continue. If his efforts to obstruct the investigation had not been successful, this is what the federal government would find out.

Let me take you back to 2006.  Mr. Tanaka was an executive within the Sheriff's Department.  He was, effectively, Number 3 within the Sheriff's Department, the assistant sheriff reporting only to the undersheriff and to the Sheriff Leroy Baca himself.  In 2006 Mr. Tanaka was in charge, was the assistant sheriff over custody within the Sheriff's Department. And at that time, a captain at Men's Central Jail, one of the main places you'll be hearing about in this investigation, a captain brought issues to his attention.

A captain wrote a memo, decided that there was a problem in Men's Central Jail, deputy cliques, especially on two very different important floors, the 2000 and the 3000 floor.

Your Honor, may I have a second to --

THE COURT:  Yes.

MR. FOX:  Your Honor, we were having this issue during the break as well.  I believe it's with the Court's equipment.  If you want me to continue, I'll be happy to continue.  If we can take a two-minute break to try to solve this?

THE COURT:  That's fine.

MR. FOX:  Thank you, Your Honor.

(Pause in proceedings.)

MR. FOX:  Thank you, Your Honor.  May I continue?

THE COURT:  Yes.

MR. FOX:  In 2006 a captain at Men's Central Jail wrote a memo regarding deputies, a memo regarding deputy cliques that were going on in the 2000 and 3000 floor at Men's Central Jail.  That's where the Sheriff's Department housed the most hardened criminals, and that's where the most hardened deputies were.  They had formed cliques on each floor, exclusive cliques keeping people out of the groups and controlling those floors, backing each other no matter what was happening.

The captain also found that there was a problem with

force, physical abuse that could be going on in the jail.  So he came up with a plan to try to stop this excessive force and try to break up the deputy cliques.  The captain came up with a plan to rotate the deputies so they wouldn't only be working on one floor.  Mr. Tanaka, hearing about this plan, decided to stop it, decided to do away with it.  He overruled the plan, said that the supervisors needed to stay off the floors where the deputies were, less supervision, and let the deputies do what they needed to do.  And then Mr. Tanaka decided to transfer the person who had brought the issue to the table, transfer the captain out of Men's Central Jail, get rid of the problem.

In 2007 Mr. Tanaka became the undersheriff -- I'm sorry, the assistant sheriff of patrol.  No longer working with the jails, Mr. Tanaka was instead working with the patrol stations, overseeing the patrol stations around Los Angeles County.  And very similar to 2006, in 2007 a captain at one of those stations, Century Station, had a problem.  He had noticed too many shootings, too much force, too many citizen's complaints, and a deputy clique, something called The Regulators, an exclusive group of deputies at the station that were part of the problem, that were leading to the excessive force.

Captain came up with a plan, increase supervision.  He would go out to all of the scenes of all the shootings to make sure that things were being handled appropriately, to make sure

the internal investigations were being handled appropriately. The captain would also increase the amount of accountability on the deputies working within Century Station.  He would put a case, is what it's known as, put a case on deputies who were a problem, who were committing misconduct, refer them to Internal Affairs.  Mr. Tanaka's response was he went out to Century Station.  He gave a speech to the deputies, to the supervisors, to the captain at Century Station, and he said that if the captain's putting too many cases, too many Internal Affairs referrals on deputies, that Mr. Tanaka was going to put a case on the captain who was doing that.  Mr. Tanaka said, "I don't like Internal Affairs," and Mr. Tanaka said that he was going to later transfer -- he decided to later transfer that captain.

2010, Mr. Tanaka's still the undersheriff of patrol. You'll learn that he did have influence, though, throughout the Sheriff's Department.  There's a commander, Bob Olmsted, you'll hear from, who once again found issues going on in the jail. The commander is one level above the captain in the jail.  The commander oversees all the jails within the county, and he decided to have an audit done of the force of the internal investigations happening within Men's Central Jail.

And this audit found that there were poor internal investigations of the deputies.  That's what an internal investigation is of:  wrongdoing of the Sheriff's Department's own people, an investigation of that.  There was out of control

force that the commander found, and he found that the captain at that time, a new captain at Men's Central Jail, did not have the right amount of oversight.  He was on the wrong floors at the wrong times, not supervising deputies, not making sure that these issues didn't spin out of control.

So the commander went to his boss, his supervisor, who said, "I can't do anything about it," went to another assistant sheriff, the one over custody, who said, "I can't do anything about it, but I'll put you in touch with someone who might."  Put him in touch with Paul Tanaka, who again was over control of the time.  And Commander Olmsted went to Mr. Tanaka and said, "We need to transfer this captain.  This captain's a problem.  Force is out of control.  The internal investigations are not being done right.  We need to transfer this captain."

What did Mr. Tanaka do?  He refused to read the memos on these issues that Mr. Olmsted brought to his attention that was brought to this meeting.  Mr. Tanaka did say, "I will send my lieutenant aide out to Men's Central Jail to figure out what the problem is, to figure out if the problem truly is the captain you're telling me about."

And the aide went to Men's Central Jail, did discover what the problems were, reported back to Mr. Tanaka, and Mr. Tanaka brought Commander Olmsted back into his office and said, "You're right, the captain is the problem.  Captain Cruz is the problem, but you know what?  I'm not going to transfer him, I'm

not going to demote him.  Instead, what I'm going to do is promote him.  Because I, Paul Tanaka, am going to be Sheriff soon, and I'll be Sheriff for the next 15 years.  Dan Cruz is someone I can trust and I need to surround myself with. Despite these issues, I need to promote the captain because he's going to be part of my command staff when I'm Sheriff."

In 2011 Sheriff Leroy Baca needed a new undersheriff, and he decided to promote Paul Tanaka to that position.  And it was in 2011, August of 2011 that Paul Tanaka found out about this federal investigation of the abuse and corruption going on amongst the deputies in the jail, the excessive force that the investigation was looking at and the corruption, bribery that deputies were engaging in within the jail.

In order to investigate this, Mr. Tanaka found out that the FBI interviewed dozens of inmates who had been reporting to the FBI on similar problems, the abuse going on in Men's Central Jail largely on the 2000 and 3000 floors, the bribery. And the FBI also conducted an undercover operation, decided to find out if what the inmates were saying about corruption was true, introduced an undercover agent to one of the deputies and offered a bribe to see if a deputy would bring a phone to the inmate who was helping the FBI out with the investigation, the inmate informant, his name's Anthony Brown.

The deputy took the bribe.  The deputy brought the phone into Men's Central Jail to Anthony Brown proving that the

deputy was corrupt.  And the FBI had asked the inmate to use that phone to report back on the civil rights abuses, the physical force, excessive force that were going on in the jails so the FBI would know when to come back to the jail when one of these incidents had happened, who to interview so that it wouldn't raise any red flags, so the Sheriff's Department would not know that the FBI was conducting this investigation.

And by the way, let me go back one minute to the inmates. You'll find out that Anthony Brown, just like a lot of these inmates, was on 2000 and 3000 floor during some of this time. One of the hardened criminals, Anthony Brown himself was serving 400 years in prison, had a ton of criminal history, but he had had enough.  He knew he'd be serving the rest of his life in prison, but he like other inmates had decided, We can't deal with this abuse anymore.  So he reported it to the FBI.

Mr. Tanaka in 2011, August 2011 also learned that there were grand jury subpoenas flying all over the place, that the federal government was conducting a grand jury investigation of this matter.  So Mr. Tanaka did what he had done in the past. He had overruled and undermined people in the past.  While he couldn't overrule the FBI, he could undermine it.  He could obstruct the federal grand jury investigation.  And Mr. Tanaka did so by hiding the inmate Anthony Brown who had been working as the informant, hiding him from the FBI, from the federal grand jury, from the United States Marshals Service, all

looking for Anthony Brown.

Mr. Tanaka and his coconspirators would tamper with witnesses, tell those witnesses, order those witnesses in some cases not to speak to the federal government.  And Mr. Tanaka and his coconspirators would threaten the arrest, once again, of the agent who was causing so much trouble by being in those jails, interviewing those inmates, setting up that undercover operation.

What I'm going to show to you now is the people that were involved in this crime.  There are others, but these are a lot of the central people that you'll learn about.  Again, at this time, Paul Tanaka was reporting to Sheriff Leroy Baca.  To the left of your screen, you'll see OSJ.  To the right of your screen, you see ICIB.  I'll explain ICIB in a second.

Let me talk about OSJ.  OSJ is also known as Operation Safe Jail.  It's basically a special unit to do special projects within the jail.  Greg Thompson was the one who led OSJ, and during the time of this conspiracy, the time of this obstruction of justice, Greg Thompson was reporting directly to Paul Tanaka.  There are several layers ordinarily between a lieutenant and the undersheriff, but in this instance, Greg Thompson is someone that Paul Tanaka had worked with for decades, would report straight to Paul Tanaka.

OSJ would be used to hide Anthony Brown, that inmate informant.  Greg Thompson would bring in his own people, people

he trusted in OSJ.  Mickey Manzo and Gerard Smith, they would be the ones that would be part of the central plan to hide Anthony Brown.  In addition to hiding Anthony Brown, Paul Tanaka and the Sheriff's Department decided to station two deputies with OSJ outside of Anthony Brown's cell, remove him from a very secure area of the prison of the jail and have two guards stand outside of his cell so no FBI agent, no Marshal could access Anthony Brown.

They also brought in Deputy James Sexton, someone who knew the computer systems, someone who could make Anthony Brown come in and out of the system, as I'll explain in a little bit.  But James Sexton had a special pet name for this operation that they were engaged in.  He called it Operation Pandora's Box, of reference to Greek mythology when the box is opened and all the evils of the world spill out.  Because the Sheriff's Department knew, Mr. Tanaka knew, his coconspirators knew that if this got out, if the federal investigation was successful, the evils that were going on within Men's Central Jail would be known to the world.

On the right-hand side, ICIB, Internal Criminal Investigations Bureau.  This bureau was supposed to be conducting criminal investigations of its own employees. Internal Affairs looks at policy violations, administrative violations.  ICIB was there to look at criminal violations to refer deputies for prosecution.

The head of ICIB at this time was Captain Tom Carey, William "Tom" Carey.  He reported directly to Paul Tanaka.  Paul Tanaka had one other person within ICIB he knew he could trust, another person who throughout this conspiracy was reporting directly to Paul Tanaka, basically his eyes and ears within ICIB, Lieutenant Steve Leavins.  I mentioned before that Paul Tanaka had aides that he would send out to do special projects.  Mr. Leavins had been Mr. Tanaka's aide, and Mr. Tanaka had sent him to ICIB to become a lieutenant and be his eyes and ears within ICIB.

Captain Carey, Lieutenant Leavins brought in two sergeants to do some of the dirty work, Scott Craig and Maricela Long.  ICIB would help hide Anthony Brown, but they would also be the ones essential to tampering with witnesses.  They would be the ones to go up to deputies, explain, "Federal government is manipulating you.  FBI's lying to you.  If you have a grand jury subpoena, if you get a grand jury subpoena, tell me about it, and we'll do something about it.  I'm a sergeant.  I order you, Deputy, not to speak to the FBI."

Those are some of the things you will hear that the sergeants and Lieutenant Leavins said to some of the witnesses that they feared might cooperate in the federal government; some of the people who were witnesses to some of the crimes, the deputies who were witness and, in some cases, committed some of the crimes that the FBI was investigating.

Let me take you through the chronology now of August 18th to September 22nd.  On August 18th, Sheriff Leroy Baca received a phone call from the head of the FBI in Los Angeles and told Sheriff Baca, "You have our phone.  We want it back.  You have an FBI phone in your custody that was seized at Men's Central Jail."  Mr. Baca called Mr. Tanaka right after that call and told him, "We have a phone belonging to the FBI," and Mr. Tanaka made calls to figure out what was happening.

Now, this phone had been seized by the Sheriff's Department ten days beforehand, and they didn't really do anything to investigate the case.  Sat on it.  It involved an inmate who was serving 400 years, not a high priority even though he was reporting that an employee had given him the phone, a Sheriff's Department employee had given him the phone.

But on August 18th, after they learn this phone was connected to the FBI, things changed.  This became urgent.  On August 19th, Greg Thompson sent his two deputies, Mickey Manzo and Gerard Smith, to interview Anthony Brown, to confront him with the fact that they knew he was an FBI informant, that they knew he was being used to investigate deputies.  And Anthony Brown said, "Yes, you're right.  I am part of this investigation.  I am a federal informant, and I am helping in this investigation of deputy abuse and of this bribery -- and of bribery."

Greg Thompson, Mickey Manzo and Gerard Smith had a meeting

with Paul Tanaka that day to report back what they had found out.  Later, all of them, including Mr. Tanaka, had a meeting with Sheriff Leroy Baca to report back what they had found out, which confirmed what they already knew.  And on the next day there was a larger meeting when they brought in ICIB.  This you'll hear referred to as the "Saturday meeting" sometimes during this trial.

And during this Saturday meeting, Sheriff Leroy Baca led the meeting, during this meeting put Paul Tanaka in charge of the operation for the Sheriff's Department.  And as they went through the facts, you will hear that Paul Tanaka said over and over again, "F the FBI."  "F the FBI," and stated over and over again that this was one of the most important investigations involving the Sheriff's Department in its 160-year history.

Paul Tanaka and Leroy Baca stepped out of the room.  Paul Tanaka came back in, and Mr. Tanaka said, "I've never seen the Sheriff more livid in his life.  We're going to do what he wants.  We're going to hide the inmate, keep the inmate away from the FBI, and we're going to make sure the FBI stays out of our jails."

Unfortunately for Mr. Tanaka, that didn't happen.  On August 23rd, agents from the FBI came to Men's Central Jail unaware of this edict passed down that they couldn't meet with their informant.  They came to Men's Central Jail, asked for him, and a deputy, unaware of the order as well, put them in

the same room, allowed the FBI to interview Anthony Brown. When Mr. Tanaka's coconspirators found out about it, they stopped, terminated the interview right away. Greg Thompson, Tom Carey, Steve Leavins sent about a six-foot-six, 250-pound deputy into the room. "This interview's over. This inmate's not to be interviewed. Who authorized you to interview this inmate?" And grabbed the inmate, took him out of the room as the FBI said, "We'll come back to get you" to Anthony Brown. "We'll come back to get you."

Then the people on your screen had the unenviable task of telling Paul Tanaka what happened. They went to his office, sat down and explained to him that the FBI had been given access to speak to Anthony Brown. Mr. Tanaka responded, "You failed me. You failed me." Once again, "F the FBI," and once again, "This is one of the most important investigations involving the Sheriff's Department in its 160-years' history." He knew what would happen if the FBI -- if the federal government was successful in its investigation.

Mr. Tanaka also told Greg Thompson, "Since you failed me, you're the one that gets to brief the Sheriff on this." And you'll hear that Greg Thompson then went to brief Sheriff Leroy Baca about the fact that the FBI had been able to have access to its own informant.

That same day, Mr. Tanaka, at the same meeting when they were discussing how the FBI had access to Anthony Brown, came

up with a plan to hide Anthony Brown.  At first, the plan was to move him out of the jail where the FBI knew he was, get him out of the jail.  They later found out that because Anthony Brown had had a heart procedure, he couldn't leave the jail at that time.  He needed to have doctors around.  He needed to have nurses around, and he needed to be near Men's Central Jail.

They also came up with a plan at this time, however, to have the two OSJ guards stand outside of Anthony Brown's cell, and Mr. Brown at that time was moved from the most secure area of Men's Central Jail, referred to as 1750, to the 8,000 floor where they put inmates with staph infections and the like, and had two OSJ guards standing outside of this floor, the 8,000 floor, to make sure that the FBI could not have access to him, that there would not be another screw-up.

On August 24th, Mickey Manzo within OSJ drafted an e-mail, a new policy e-mail about keeping the FBI out of the jails, one that was dictated to him by Paul Tanaka at the meeting the day beforehand, and this one said that Paul Tanaka had to authorize any meeting between the FBI and any inmate.  The FBI would not be allowed to meet with an inmate unless Paul Tanaka approved of it.

Mickey Manzo sent that e-mail to Greg Thompson.  Greg Thompson changed just a little bit of it and sent it on to Mr. Tanaka's aide Chris Nee, who asks Mr. Thompson to call him.

And when Mr. Thompson called him, they made one big change to the policy.  Mr. Thompson wrote later about that phone call on the FBI notice to facility commanders, Will Mr. Tanaka be satisfied if I remove all reference to him or the executives?  In other words, Mr. Tanaka's name needed to be off the policy.  Mr. Tanaka did not want anybody else to know that he was going to be the one keeping the FBI out of the jails, that that was his job.

On August 25th, the Sheriff's Department received something that they expected would be coming, something they expected to be coming but they really didn't want to see.  It's called a federal writ, a court order, something that demanded that the Sheriff's Department turn Anthony Brown over to the federal government, to the U.S. Marshals Service so he could testify before the grand jury investigating this case.

The same day, Mr. Thompson sent three people into what's known as the Inmate Reception Center, basically the clerk's office within Men's Central Jail where they have the computer databases that have all the information about the inmates.  They have the physical record files that have the files of all the inmates, all the history of inmates, and he sent three people in his unit to the Inmate Reception Center to have Mr. Brown released from the computer system.

Now, what did that mean?  Did it mean that Mr. Brown would be deleted from the computer system?  No.  It meant they'd

actually go on the computer system and have the files show he'd been released, Anthony Brown had been released from sheriff's custody. Initially, a woman by the name of Tara Adams, a deputy within the Inmate Reception Center, said, "No, I will not do this. I need a court order in order to do this." And the deputies decided, because they had Paul Tanaka's backing, that they would invoke his name and said, "Are you going to say no to Paul Tanaka? Are you going to say no to the undersheriff, Paul Tanaka?" Tara Adams initially said, "Yes, I need a court order. I'm going to say no to Paul Tanaka unless I get something in writing."

There was another clerk in the office who got a little scared and decided to release Anthony Brown from the computer system, decided to get rid of his digital fingerprint that showed that he was in Men's Central Jail. So the deputies got their way, and the deputies also took the physical records file of Anthony Brown out of the Inmate Reception Center.

And the Inmate Reception Center, by the way, is also where the writs would arrive. That's who would receive the writs by fax, and they got him out of the Inmate Reception Center. That original records jacket would never be seen again. At least by the federal government would never be seen again. You'll learn that other members of the Sheriff's Department have engaged in great efforts to try to find this records jacket, the records jacket where an original writ would also appear. Never been

found.  You'll hear about that.

That day, the Sheriff's Department, the conspirators began to change Anthony Brown's name.  He was given an alias he never had before and would never have since, the name of John Rodriguez.  As they moved him to the 8,000 floor, he became John Rodriguez.  They didn't fingerprint him because fingerprints would link John Rodriguez to Anthony Brown.  The FBI would be able to see, the Marshals Service would be able to see that Anthony Brown was really John Rodriguez and he was still at Men's Central Jail.  So they changed -- they said that he refused fingerprints.  They wouldn't put his social security number on the form either for the very same reason.  And two OSJ guards continued to guard him.

On August 26th, the Sheriff's Department began to get worried.  We took care of the facts from the Marshals Service with the court writ, the court order, but what if the federal government shows up at Men's Central Jail with the order?  What if they ask for the inmate, saying, "I've got a court order for Anthony Brown"?

Tom Carey wrote, "He's not to be released without approval of the Sheriff's Department."  The captain of Men's Central Jail asked, "What attorney are we going to use about the possible court order from the FBI?"  And Greg Thompson, one of the coconspirators, had a truthful statement that showed that the whole intent here was to delay the production of Anthony

Brown to the federal grand jury. "Probably the one who is on vacation for a month." You'll learn that writs were never approved by attorneys, that was not part of the process. It's a form, but in this case, they wanted to make sure that they delayed as much as possible.

The same day, Anthony Brown was moved out of Men's Central Jail, and John Rodriguez, his alias at the time, was eliminated. He became Kevin King and booked in San Dimas Station miles and miles away from Men's Central Jail. The FBI couldn't come to Men's Central Jail to ask for him. The Marshals Service couldn't do that either because he was no longer at Men's Central Jail. You'll see the court order -- or the order that changed the policy. There's a court order presented by federal officers, which we do -- do not -- you'll seat it in bold. You'll see it in all caps. "Do not release the inmate or allow any contact between the federal government and the informant."

On August 29th, a few days later, Sheriff Leroy Baca came to this building, came to the U.S. Attorney's Office, came with Undersheriff Tanaka, came with some other people and went to the U.S. Attorney himself and demanded that the U.S. Attorney stop working with the FBI in this investigation and only work with the Sheriff's Department. They wanted control over the investigation again. They wanted to control what would be investigated and how hard it would be investigated. So Sheriff

Baca demanded to the U.S. Attorney that the FBI would be taken off.  This was another delay tactic because they just wanted to get their arms around what was going on, circle the wagons.

The very next day, August 30th, Paul Tanaka went to Men's Central Jail.  He went there with the ICIB people:  Tom Carey, Steve Leavins, Maricela Long and Scott Craig.  This was a rare appearance at Men's Central Jail for Paul Tanaka.  He was there to be briefed on what was going on because they decided that would be the day that they would tamper with deputies, that would be the day that they would tell deputies not to cooperate.

They talked to Gilbert Michel, the deputy who accepted the bribes.  They decided to talk to him.  They told him, as I told you before, "I'm a sergeant with the Sheriff's Department. You're being manipulated by the FBI.  You're being lied to by the FBI.  They're trying to take down the Department.  They're trying to use you to get information on the Department.  I order you not to cooperate with the federal government.  I order you."  And you'll hear that they were briefing Paul Tanaka throughout the day at Men's Central Jail.

On September 2nd, a few days later, Steve Leavins, the lieutenant that worked for Paul Tanaka earlier, went with somebody else to Paul Tanaka's office, had his office swept for bugs, listening devices that might be installed by the federal government in Paul Tanaka's office.  They had it swept to make

sure there was no listening device that could be hearing the conversations that were going on in Mr. Tanaka's office about this crime.  Also swept Leroy Baca's office for bugs.  Also swept the conference room that the executive used -- Mr. Tanaka used to have conversations about this matter.

Also on September 2nd, the inmate Anthony Brown had been sufficiently tampered with.  You'll learn that he informed the Sheriff's Department that day he didn't want to speak to the FBI anymore.  He thought -- and you'll see it.  He thought that the FBI had left him for dead.  And why did he think that?  The Sheriff's Department coconspirators Scott Craig, Maricela Long, Steve Leavins had been in his ear, had told him, "The FBI hasn't come back for you."  They didn't want him to know about the writ.  They wanted him to think that the FBI had left him for dead, and he thought that.  He said on September 2nd, "I'll cooperate with you, the Sheriff's Department, but only if you want me to.  If you don't want me to, I don't have to say anything more about deputy abuse."

On September 8th, the Sheriff's Department tried to find another way to get its arms around the investigation.  What the Sheriff's Department did, ICIB, Tom Carey's group, is they went out, they went to a judge that you'll hear from, a superior court judge, works in the county courts.  And they went to him with an order, and they said, "We would like an order to force the FBI to turn over all of its records on the investigation,

all of the records about the inmates that they're working with, the undercover officers that the FBI's employing to investigate the jails.  We want everything related to its investigation.  Everything."

And the court told the Sheriff's Department that he couldn't do that because the superior court, local court had no jurisdiction over any federal agency.  They cannot order the federal government to turn over records.  Something called the Supremacy Clause.  Supremacy Clause, the federal government cannot be ordered by a local court to do something like that.

And this was brought to the Sheriff's Department's attention.  If they didn't know -- if the law enforcement agency didn't know about the law, then they certainly did at that point in time.  You would think that this would cause people to slow down, consider their actions, but the Sheriff's Department, Paul Tanaka and the rest decided to double down instead.

On September 13th, they began to conduct surveillance of FBI agents, specifically Special Agent Leah Marx, who you've heard referred to also as Leah Tanner, her new name.  Conducted surveillance of her to try to figure out whether she was meeting with other deputies.  Who was she meeting with?  Could we catch her in some bad act?  Could we catch her doing something embarrassing or, better yet, criminal?  They couldn't find anything.  They didn't find anything on her.  They had

planned and they did conduct surveillance of another FBI agent to try to determine his lifestyle.

On September 25th, after finding nothing in the surveillance, Mr. Tanaka began doing some research to determine what is this really all about, how big could this investigation be, who could be behind this investigation, this order to investigate the Sheriff's Department?  He sent to ICIB, to Captain Carey, Steve Leavins articles; one from the Washington Post that talked about how the U.S. Department of Justice was boosting activity to police the police.  He sent another one from the L.A. Times that discussed the investigation that was going on with the FBI, how the FBI, federal government was looking at abuse and corruption within the L.A. County jails. And Mr. Tanaka, at that point in time, wrote in an e-mail, "I guess this shows where the orders are coming from, from the top."  He knew, he believed, he suspected that this was a high-level decision to investigate the Sheriff's Department based on its pattern of abuse and corruption within the jails.

The very next day, Paul Tanaka and the rest of his coconspirators decided to go all in.  September 26th, 2011, they took their last and most aggressive act of obstruction to try to force the FBI to back off.  Sergeant Scott Craig -- and you'll see him in this trial -- he went with Maricela Long, his partner, out to Leah Marx's house.  And he sat outside of her residence with his gun showing, blazer off.  Sat there, waited

for her to come home.

When she got there, he had a surprise for her.  Told her that she was the subject of a felony complaint.  Not true, but he told her that.  Told her that they were there to try to talk about how to arrange for her arrest.  And you'll see his arms shoot up, "We can do it like this in front of your neighbors, in front of everyone in broad daylight, or we can talk about another way of doing it."

When she put -- said, "You know what?  You can't talk to me about this.  I need to put you in touch with the assistant director in charge of the FBI, the head of Los Angeles's office, Steve Martinez.  You need to get in touch with him."  Scott Craig, the sergeant, said, "He needs to get in touch with me.  It's that important.  He needs to get in touch with me."

About an hour later, Special Agent Marx's supervisor called Maricela Long -- you'll hear this call -- and he told her -- he told her, "I heard from my agent that you threatened her arrest.  I hear she's going to be arrested."  Maricela Long said, "She's going to be."  Her supervisor, Carlos Narro, said, "Does the Sheriff know about this?"  Maricela Long said, "Yes, the Sheriff knows about this, sir."  He then said, "Well, who can I speak with about the charges?  What are the charges going to be?"  And Carlos Narro was told by Maricela Long, "You're going to have to talk to the undersheriff.  That's Paul Tanaka.  He knows what the charges are going to be."  Special Agent

Narro asked, "How do I get in touch with Paul Tanaka?" Maricela Long and Scott Craig then said the phone number for Sheriff's Headquarters so they could call Paul Tanaka.

You'll also learn that Paul Tanaka over these years has admitted as much of his conduct under oath.  He's admitted that he knew on August 18th that that phone that they found belonged to the FBI, that the Sheriff had received a call from the head of the FBI in Los Angeles saying, "You have our phone, and we want it back."

You'll hear also that Paul Tanaka knew that Sheriff Leroy Baca's attitude was, The FBI should not be investigating us. We police our own.  Paul Tanaka knew that the Sheriff did not want the FBI involved in any investigation of the Sheriff's Department.

You'll also hear that Mr. Tanaka knew that Anthony Brown, the informant, that Mr. Tanaka's admitted that Anthony Brown was an informant for the FBI detailing deputy abuse and corruption going on in the jails.

You'll also learn that Paul Tanaka's admitted that he was aware of the grand jury subpoenas that were being issued at the time and he was aware that there was a court order or writ for Anthony Brown's testimony.  He was aware of the movement, he's admitted, of Anthony Brown, that they were hiding Anthony Brown, and you'll also hear that he admitted that despite the court order, he was aware that they were conducting

surveillance of the FBI.

Our evidence will be presented to you through witnesses from the Sheriff's Department, witnesses from the FBI. You'll hear recordings. You'll see a bunch of e-mails and documents, and they will all detail how Paul Tanaka tried to cover up the crimes of his deputies and how he committed his own in the process.

And at the conclusion of our evidence and the conclusion of our case, we are going to come back up here, my co-counsel and I, and we will ask you to deliver the only verdict that will be consistent with that evidence, and that's a verdict of guilty; that Paul Tanaka's guilty of conspiring to obstruct justice and of obstruction of justice.

Thank you, Your Honor.

THE COURT: All right. Thank you.

Does the defense wish to give an opening statement at this time?

MR. HAIG: Yes, Your Honor.


**DEFENDANT'S OPENING STATEMENT**

MR. HAIG: Good afternoon, and thank you for listening to us.

After my opening statement, you'll then hear the evidence. The evidence will consist of witnesses and exhibits. For those of who who have or have not been privy to being on a trial

before, you'll hear, of course, evidence from the prosecution, which is the government in this case, followed by evidence from the defense and followed by closing argument and jury instructions from Your Honor.  After that, it'll be your decision to decide what the facts are in this case and, from those facts, whether any crime was committed and if the defendant, Paul Tanaka, is guilty or not guilty of the two charges that he's facing.

What you're not going to see back in the jury room is anything involving a decision that you've got to make about Paul Tanaka's management style or Paul Tanaka's personality or who Paul Tanaka was as a manager or a peace officer.  You'll hear lots of evidence in this case from the government about those things, about many, many things that happened before 2011, before the summer of 2011.  The facts in this case and what you have to decide in this case are what happened between August 18th, 2011 and September 26th, 2011, and whether those facts merit any kind of criminal action or criminal decision on your part.

Now, you know and you've heard already, but you'll hear evidence from the witness stand about how long Mr. Tanaka served in the Sheriff's Department, how, in the times relevant to this, he was the assistant sheriff and then later on the undersheriff; and that he lived by a creed, a core value of the Sheriff's Department, which is, as a leader in the Sheriff's

Department, that they commit themselves to honorably performing their duties with respect for the dignity of all people, integrity to do right and fight wrongs and wisdom to apply common sense and fairness to all that they do.

That wasn't just something that was written on the back of a business card or just plastered on a wall. It was something that, in Paul Tanaka's view, all deputy sheriffs should endeavor to do; be honest and forthright, follow the law and assert yourself when necessary and back off when you're not supposed to do something. That's the way Paul Tanaka wanted to manage.

Paul Tanaka was the type of manager in the Sheriff's Department that if you did your job and you showed up for work on time and you left when the job was done and not a minute before and you earned the money that the government was giving you, along with all the other benefits, then Paul Tanaka would never have a problem with you. But if you were a deputy sheriff or a chief or a commander or a captain and you were doing things that, in Mr. Tanaka's view, were not emblematic of the creed of the Sheriff's Department, then you had to answer to Mr. Tanaka.

His goal and his job wasn't to make friends. His goal was to be a good cop, and he came to work every day, and the people that supported him, the people that liked him in the Sheriff's Department -- and you will hear some of those today -- or not

today, during the trial, of course -- they will say those exact same things.  They will say the things that I am saying right now; that Mr. Tanaka expected excellence from himself and gave no quarrel to the things that he would do.  And he expected the exact same thing from the deputy sheriffs, from the lowest deputy sheriff all the way to the person right below him in command, to do the things that were necessary to follow on the creed.

Now, as I said, the first part of this case will not focus on any of the things that were going on during the summer of 2011.  What they will focus on is his job as assistant sheriff and as undersheriff.  And you'll hear from various sheriff deputies or former sheriff deputies about some of the things that they didn't like about Mr. Tanaka, whether they didn't like his management style or that they didn't like some of the things that he did, whether they felt that they might have been overlooked for a promotion or a certain plum assignment.

You will understand the discretion that a manager has in any organization and especially in the Sheriff's Department to mold the people that run that organization in a way that he or she sees fit, and that's exactly what Paul Tanaka did.  Paul Tanaka was not this megalomaniac.  This was not the Paul Tanaka Sheriff's Department.  This was the Los Angeles County Sheriff's Department.  He was but one deputy.

Now, he had risen in the ranks.  He didn't become

assistant sheriff out of nowhere. He had risen in the ranks. He was trusted by the Sheriff of Los Angeles County, by Leroy Baca to administer certain departments and to oversee others, and he showed up to work every day doing exactly what the Sheriff asked him to do, which was to make the departments under his command the best that he could make them.

Did that mean that he didn't think that deputies should be punished for evil deeds that they did or bad deeds that they did while wearing the uniform? Absolutely, he thought that they should be punished. He would never look the other way when a deputy, whether that would be a deputy sheriff at the jail or a commander or a chief or a captain, would do something illegal or wrong. And if that meant pulling that person aside, yelling at them, using language that you'll probably hear about, that's the way it was done. Because Paul Tanaka didn't think that being a nice guy was on his job description. He had no problem being a nice guy, but that wasn't what he came to work for. He came to work to be a good cop and a good supervisor and to follow the creed.

After you hear many, many witnesses that talk about some of the things that were going on in the Sheriff's Department in their view, you'll also start hearing from some of the witnesses that were involved in the issues that are germane and relevant to the actual charges in this case. You'll hear that there was an FBI special agent who was contacted by an inmate

named Anthony Brown.

Now, Anthony Brown, as Mr. Fox conceded, was serving a very, very long state prison sentence, but he hadn't gone to state prison yet. The way the system works in state court is you plead guilty and get sentenced or you go to trial and get sentenced. In this case, Anthony Brown went to trial. He was sentenced to 423 years to life for a series of armed robberies, very serious offenses.

Now, when somebody's sentenced to state prison out of state court, there has to be some sort of communication between the county jail who houses all the inmates that are either awaiting going to court, that haven't posted bail or can't post bail, or those that are serving local sentences and those who are serving state prison sentences who haven't been sent to state prison yet. Because the Los Angeles County Jail is not a California state prison, but they obviously have to contact and communicate with people in the state prison authority. So during this time when somebody has been sentenced to state prison, they stay in county jail until the prison comes back and gets them.

Before that happened, he had contacted -- Mr. Brown had contacted Special Agent Leah Marx, now Leah Tanner, and he said he wants to become a confidential informant. Eventually, the FBI -- and this was all unbeknownst to anybody in the Sheriff's Department except for one person in the Sheriff's Department,

and that was a person by the name of Deputy Gilbert Michel.

Now, Deputy Gilbert Michel will be testifying in this case.  He was a deputy working in the Sheriff's Department working at the county jail, and he wanted to make a little bit of extra money.  And the way he made some extra money was he helped Anthony Brown bring a cell phone into county jail.

Now, how did that happen?  It happened because Anthony Brown contacted Deputy Michel while Deputy Michel was working one of his regular shifts.  They got a rapport going, and eventually he said, "Hey, I'd like to get a phone, you could make a little bit of money."  And the deal was set up, obviously not with Special Agent Marx, but with somebody else who went by the name of CJ who was also an FBI agent but obviously was not acting as an FBI agent who contacted Deputy Michel and gave him a phone, and that phone was then smuggled in by Deputy Michel into the Men's County Jail [sic].

Now, this cell phone was not a cell phone that was regulated by the FBI, wasn't being able to be monitored by the FBI in realtime.  When I say "realtime," I mean actually realtime.  So as something's being said, it can be listened to.  That wasn't like this.  This was a store-bought, retail Boost Mobile phone that was brought into the county jail and could only be monitored by logging onto a Boost Mobile proprietary network where you could find out what the text messages were being sent and perhaps what phone calls were being sent or

received for that matter.  But if any photographs were being taken, any video was being done, if any phone calls were being made that couldn't be monitored in realtime in that anybody could be actually knowing what exactly was going on.

So you will learn that a cell phone in county jail is not a good thing to have for any inmate, and certainly not for an inmate as dangerous as Anthony Brown.  The cell phone in this case could have been used, and the agents -- the FBI agents knew this, could have been used in a way to do a lot of danger.  In fact, at one point in time, Anthony Brown's cellmate discovered that Mr. Brown had the phone.  And so Mr. Brown sought permission to have this cellmate call his girlfriend, to placate him so he wouldn't turn him in on the phone.  And that permission was granted.  And that permission was granted without looking into who this girlfriend was, what the charges of the cellmate were, whether he was being charged with a domestic violence offense or something else, and without even knowing whether this cellmate called his girlfriend and asked his girlfriend to do something to a witness that was on one of his cases.

We have no idea what this phone call was, and there was nothing stopping Anthony Brown from making any phone calls to anybody with that phone, except for Special Agent Marx being able to shut that phone off when she wanted to.  But there was nothing in realtime that would stop him from texting or phoning

anybody that he wanted to.

So on August 8th of 2011, Anthony Brown is being moved from one location to another because he had some medical problems, and he had this phone in a potato chip bag.  The phone was found during a routine search by deputies.  They seized the phone.  They took the phone, and then they started asking him questions about it.  Now, contrary to what the government just told you, this was not something that they just ignored and dropped because the Sheriff's Department and the people that are in charge of monitoring the safety of the jails and the integrity of the jails knew that having a cell phone in the jail is a big deal.

So they asked.  They asked Anthony Brown how he got this phone, and he lied to them, and he kept lying to them.  He never told them, "Hey, I got this phone from Deputy Michel." He talked about a nurse.  He talked about a bunch of people smuggling this phone and helping him smuggle the phone in.  The Sheriff's Department had no idea that there was a corrupt deputy that had smuggled that phone in.  Only the FBI knew that, and of course they weren't going to let the Sheriff's Department know that.  And that's their prerogative, that's fine, and nobody here is saying that they should have spilled the beans on what was going on in their investigation, and that's not what this case is about anyway.

Special Agent Marx found out that -- right away that this

phone had been seized, and during that time, they had to have known what the implications were of that; that there was a deputy sheriff that had committed a crime, accepted a bribe and smuggled in contraband, not only in violation of his oath as a deputy sheriff, but in violation of the law, and that one of the only persons that was a witness to this was actually Anthony Brown himself.  And you'll learn that the Federal Bureau of Investigation, the U.S. Attorney's Office, they did nothing to get that inmate out of that jail right away.  They had nothing at all to protect that inmate at all.  As a matter of fact, for those ten days between August 8th and August 18th, nobody in the federal government knew, except for Special Agent Marx, that that phone had actually been seized.  Nobody in the upper echelons of it knew.  Nobody had any idea.

So he just sat there.  No FBI agent ever visited him between the time that the phone was seized until August 23rd, which was five days after the FBI alerted the Sheriff's Department.  And even on August 23rd, which is, again, five days after the head of the FBI in Los Angeles told the head of the Sheriff's Department Leroy Baca, "You've got our phone, we'd like our phone back," Special Agent Marx didn't even know when she went to the county jail on that day that that conversation had happened.  She had no idea that the informant, Anthony Brown's identity had been made known to the Sheriff's Department in any way at all.

Now, was it the director of the FBI, Steven Martinez's job, to do that?  Might have been.  Might have been somebody else's job, we don't know.  But we know that whatever happened between the upper echelons of the FBI, the person that was monitoring this informant, the person who was in charge of this informant was never told what was going on with this informant, and we know that the person that was in charge of this informant didn't care enough to bring that informant out of the county jail and out of a dangerous situation.

Here's what we do know, though.  On August 14th or 15th, Mickey Manzo -- and you saw his name on the flickering screen a while ago -- Mickey Manzo asked for a court order, and it was Leroy Baca, Sheriff, and it was a miscellaneous court order in state court as they were investigating how Anthony Brown got this phone and who he got it from.  They wanted to curtail his rights as an inmate, his rights to have social visits, his right to make phone calls.

And the only way they could do that would be getting a court order to explain to a judge in Los Angeles County Superior Court exactly what was going on with this phone, how this phone was found and how this inmate is an ongoing danger to the safety and integrity of the county jail unless some of these rights that he gets as an inmate get taken away, and that's exactly what happened.  The superior court judge signed the order.  Keep in mind this is three days before anybody in

the Sheriff's Department has any idea that this guy is connected to any kind of FBI investigation at all.

So two days later, they start looking at this phone, the Sheriff's Department starts looking at this phone, and they find out that one of the numbers dialed on this phone went to an office in Westwood at the federal building in the civil rights division. And so that person then decided to contact somebody that he knew on the federal side, and later that day or the next day is finally when it got escalated all the way to the top.

Now, it's up to you to determine why that happened, but this became a low-level investigation by some deputies working at the jail who continued to work on this case after August 18th, like Deputy Manzo for instance. This became a low-level investigation to a top-level investigation. So it wasn't the second in command calling the second in command. It was the top man calling the top man, the assistant director of the FBI in Los Angeles, the person that goes on TV, the head of the whole office.

He called Lee Baca, and he said, "Give me my phone back." Lee Baca says, "What are you talking about?" He had no idea, and there's no reason he would have any idea. This was not a big deal to him, and there's no reason why anybody would understand or expect that a phone being found on an inmate at county jail would ever rise to the level of the Sheriff, the

undersheriff, the assistant sheriff or any of the commanders at Sheriff's Headquarters even knowing anything about this, and it's clear that they didn't.  I don't think those facts will ever be in dispute.

But here's what was requested.  While Lee Baca was trying to figure out what was going on, his counterpart on the federal side, Steven Martinez, the director of the FBI in Los Angeles, said he wanted the phone back.  He said the integrity and identity of this informant had been compromised and that that informant was to be protected.  Unbeknownst -- that was on the 18th of August.  Unbeknownst to Mr. Martinez was that, as I talked about a few minutes ago, when somebody gets sentenced to state prison, they go to county jail and prison comes to get them.

Anthony Brown was due to be sent to state prison on Saturday, August 20th, the same day as that Saturday meeting that Mr. Fox talked to you about a few moments ago.  One of the lieutenants that you've heard his name already, Thompson said, "I think we just let him go.  Let him be the state's problem. We don't need him here.  We don't care."  After they found out the FBI was involved already, "Let him go to state prison." You'll never see Mr. Tanaka's order of anything countermanding that at all.  In fact, there was only one person really that cared about it, and it was Lee Baca.  Because at that meeting, Lee Baca said, "Take that guy off the bus.  He's not going

anywhere."

And he gave two directives, two directives that Paul Tanaka, when he's given statements to the FBI, when he's testified -- and you'll hear some of the testimony -- when he's testified on numerous occasions regarding this incident under oath, that he was given two broad directives:  protect the inmate, as the FBI requested, and investigate the crime.

Now, investigating the crime means how did that deputy actually get that phone into the jail.  And during all the discussion of this, you're not just dealing with rookie police officers.  You're dealing with people that have a combined hundreds of years of knowledge in investigating crimes all the way from the top to the bottom, and there was a consensus that nobody would be that foolish to do something so dangerous as to smuggle an unregulated cell phone into an inmate like Anthony Brown.

Now, that happened.  But at the time and on the ground, the people in the Sheriff's Department didn't think that that was something that the FBI actually would authorize.  So they were investigating not only Deputy Michel's role, but potentially another role, a role of somebody in the FBI that might have also been on the tape.  Because it's not ludicrous to think that just like a deputy sheriff could take a bribe, somebody else could take a bribe too.

Now, thankfully we know that that didn't happen.  We now

know today that the smuggling of that cell phone into the county jail was an authorized investigation.  We now know that Agent Leah Marx, Leah Tanner, she did it, not because she was trying to get some money or some drugs or do a favor to a friend, she did it because she was doing an investigation and she was authorized by her highers-up to do it.  We know that now in 2016.  In 2011 the people on the ground in the Sheriff's Department, they didn't know what was going on.  They didn't understand what was going on.

So the two broad directives that were given -- protect the inmate -- how does an inmate get protected?  Well, not only do you have to protect an informant against other people in the county jail who weren't really too fond of informants -- they call them snitches -- but you've also got a deputy sheriff who is presumably friends with other deputy sheriffs who know that the key to this person's being locked up again -- or of Michel being locked up is in the words and deeds of Anthony Brown. They wanted to protect him from -- Anthony Brown, that is, from harm from other deputies.

The last thing that anybody wanted to happen, including Paul Tanaka, was anything to happen to Anthony Brown.  And it's a very common -- and you'll hear witnesses testify about this as well.  It is very common that when somebody is trying to be moved around or trying to be protected in county jail that their names are changed and that their locations are changed.

Nothing uncommon about that.

So what happened after August 18th, and what happened after August 23rd?  You'll see evidence of a writ being served.  You'll see evidence of a grand jury investigation.  After August 23rd, the FBI never one time contacted anybody in the Sheriff's Department -- Mr. Tanaka, nobody else -- and said, "Hey, we'd like to speak to Anthony Brown, could you arrange an interview?"  Or, "We'd like to house him in a federal facility, can you do that?"  Not once did that happen.

Not only did not once that happen, but Lee Baca was going crazy.  This was consuming all of his time.  It's convenient that the government talks about Mr. Tanaka doing this and Mr. Tanaka doing that or Mr. Tanaka in conjunction with coconspirators.  Mr. Tanaka worked at Sheriff's Headquarters, so he knew some of the larger things that were going on, the two things I told you about:  protect the inmate, investigate the crime.  He's not an investigator.  He didn't interview witnesses.  He didn't give broad directives to "F the FBI."  He never said those words.

You'll never get anybody in here at those meetings that's going to come in and say, "I don't want the FBI in our business."  That might have been something that Lee Baca said because Lee Baca was mighty upset, and the only time that Lee Baca wasn't upset was when he was gone for two weeks.  And when was Lee Baca gone for two weeks?  The first two weeks of

September, took a vacation.

During those two weeks, there's nothing that Paul Tanaka was doing in this investigation. And why was there nothing? Because it wasn't his investigation to run. The fact that he may have known certain things that were going on, certain high-level things -- protecting the inmate, investigating the crime -- that's what he knew, and those were broad directives and those were legal orders; not only legal orders from his own boss that he's got to follow if they're lawful orders, but actually a directive and a request from an FBI agent; not just any FBI agent, but the lead FBI agent in Los Angeles to protect the inmate.

So while Lee Baca's on vacation, Anthony Brown then gets sent to state prison. During all this time, nobody goes to the county jail and the FBI department and says, "We want to talk to him." Nobody does. Lee Baca gets back from vacation on a Friday, and by Monday everything is going crazy again. He's upset about everything that's going on. He's on TV. He's telling people the FBI can't break the law to enforce the law. He sets up a meeting with the directors of the federal prosecutor's office, and you'll hear from them as well, where he basically tells them, "You can't do this." He tells anybody, "Leah Marx has committed a crime, and she needs to be held accountable." You will never hear Mr. Tanaka ever having said that because he didn't.

There's no e-mail saying "Let's arrest Leah Marx." There's no directive from Paul Tanaka saying "Let's go arrest Leah Marx." There's no directive from Paul Tanaka saying "Let's block the FBI's investigation." Because the truth is this investigation wasn't a huge deal, nothing really came out of it, and they weren't afraid of anybody finding out what was going on. You'll hear that Mr. Tanaka didn't have a problem turning over any files.

As a matter of fact, you'll hear that the Sheriff's Department complied with writ after writ after writ on all the investigations. They cooperated not only with the FBI but with state court orders, with the ACLU, with other monitors. The last thing Mr. Tanaka wanted was to put up a big wall so that nobody could see what was going on.

Because Mr. Tanaka was smart enough to know that there were problems going on in the jail, just like there's problems in any large organization. He was also smart enough to know that he wanted to cooperate and wanted to be open with the people that were looking at what was going on in the jails so that he could not only show his subordinates but show the world, "We've got problems and we're trying to fix those problems. If we've got problem deputies, we want to take care of those guys." Again the creed, the creed of the Sheriff's Department, to use your wisdom and use your common sense and use your best judgment to be a good steward of the job that

you're lucky enough to have, to be a good and honest peace officer whether you're a deputy sheriff or whether you're the assistant sheriff, whether you're the captain or whether you're the undersheriff.

Yes, you will hear many, many things in this trial.  It'll be up to you to determine whether the facts that you hear in this trial, and specifically the facts that you hear regarding what happened in August of 2011, amount to any criminal offense committed by Paul Tanaka.  And we are confident that after the presentation of all the evidence in this case, that there will be one verdict and one verdict only, and that will be not guilty.

Thank you, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to adjourn for the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case in Internet chat rooms, through blogs, bulletin boards, e-mails, text messages, tweets.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it,

including seeing anything online.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make up -- and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

If you get a daily newspaper at your home, you may want to have your -- any other person in your household put aside those papers and save them for you because it is a case that has received a certain amount of publicity.  Or you may want to just temporarily stop your daily newspaper until this trial is over.

All right.  Ladies and gentlemen, we're going to resume tomorrow morning at eight o'clock.  We'll go from eight o'clock to 1:30.  Again, please leave yourself plenty of time to get here by eight o'clock because we can't start until all of you are present.

All right.  Thank you very much.  Drive carefully.  We'll see you tomorrow morning.

(The jury exited the courtroom.)

THE COURT:  Okay.  Anything else we need to take up?

MR. FOX:  Your Honor, I'm wondering if we can get in here at 7:30.  I think it's the court equipment rather than

ours that's the problem because it was a problem with the Elmo along with our laptop.  I think there's an electrical issue.  It seems to work when you had your technical person here, and if you can have -- if your staff can have somebody here at 7:30, we will do our best to work on it.  Is that possible?

THE COURT:  Anything's possible, yes.  You can -- you'll be able to gain access at 7:30.  We'll attempt to reach somebody in the IT department and see if they can be in early tomorrow morning.

MR. FOX:  Thank you.

THE COURT:  The parties have an opportunity to meet and confer about these exhibits?

MR. FOX:  We have, Your Honor, and we will be filing something if we haven't already -- go ahead, Liz -- I'm sorry, Ms. Rhodes.

MS. RHODES:  Yes, we did meet and confer mostly over e-mail.  We do have their responses, and we are trying to put it into the form the Court requested in its minute order, and we'll file something tonight.

THE COURT:  All right.  Okay.  For whatever it's worth, I believe the Ninth Circuit has spoken on whether or not coconspirator statements violate the confrontation clause, and I think the law is pretty clear that both the Supreme Court and the Ninth Circuit have held that coconspirator statements do not implicate the confrontation clause.  For whatever that's

UNITED STATES DISTRICT COURT

worth, if it's of any assistance to you, and if you need some case citations, I'm more than happy to give you those.

All right. We'll see everybody tomorrow morning at 8:00 a.m.

MR. FOX: Do you need to know who we're calling tomorrow, or do you want me to just meet with the defense and let them know?

THE COURT: Well.

MR. FOX: You usually like to know, that's why I'm bringing it up.

THE COURT: All right.

MR. FOX: Your Honor, we expect to call tomorrow Al Gonzales, John Clark, Pat Maxwell, Steve Roller, Bob Olmsted, Peter Eliasberg, Robert Bayes. That's probably enough, but if we get to anybody else, we'll probably try to stick Mickey Manzo in at the end.

THE COURT: All right.

MR. FOX: Thank you.

THE COURT: Thank you. We'll see everybody tomorrow.

(The proceedings adjourned at 5:27 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


              I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date:  *August 24, 2016*


                    /s/ SHAYNA MONTGOMERY
                    _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**