**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
     vs.                   )   CASE NO. CR 15-255-PA
                           )
PAUL TANAKA,               )
                           )
          Defendant.       )
_____)

**REPORTER'S TRANSCRIPT OF**

**JURY TRIAL PROCEEDINGS - DAY 3**

**FRIDAY, MARCH 25, 2016**

**8:07 A.M.**

**LOS ANGELES, CALIFORNIA**

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

EILEEN DECKER
United States Attorney
BY: BRANDON D. FOX
LIZABETH A. RHODES
EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
BY: H. DEAN STEWARD
Attorney at Law
107 Avenida Miramar, Suite C
San Clemente, California 92672
(949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

LAW OFFICE OF JEROME J. HAIG
BY: JEROME HAIG
Attorney at Law
21143 Hawthorne Boulevard, Suite 454
Torrance, California 90503
(424) 488-0686

**ALSO PRESENT:**

Leah Tanner, FBI Special Agent

**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

**PLAINTIFF'S
WITNESSES**                                               **PAGE**

ALFRED GONZALES

          Direct Examination by Mr. Fox                9
          Cross-Examination by Mr. Haig                21


JOHN CLARK

          Direct Examination by Mr. Fox                35
          Cross-Examination by Mr. Haig                44


STEVEN ROLLER

          Direct Examination by Mr. Fox                47
          Cross-Examination by Mr. Haig                63
          Redirect Examination by Mr. Fox              76


PATRICK EDWARD MAXWELL

          Direct Examination by Mr. Jauregui           83
          Cross-Examination by Mr. Steward             93
          Redirect Examination by Mr. Jauregui         103
          Recross-Examination by Mr. Steward           105


ROBERT OLMSTED

          Direct Examination by Mr. Fox                106
          Cross-Examination by Mr. Steward             125


PETER ELIASBERG

          Direct Examination by Ms. Rhodes             139
          Cross-Examination by Mr. Steward             162


ROBERT BAYES

          Direct Examination by Mr. Jauregui           172
          Cross-Examination by Mr. Haig                187

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|--------------------|----------|
| 1 | Clark 2006 Memo | 39 | 39 |
| 4 | Roller 2007 Memo | 58 | 60 |
| 5 | Johnson 2010 Memo | 94 | 95 |
| 6 | McCorkle 2010 Memo | 119 | 119 |
| 9 | E-mail Dated 5/5/11 | 160 | 160 |
| 12 | E-mail Dated 8/18/11 | 180 | 180 |
| 13 | E-mail Dated 8/18/11 | 178 | 179 |
| 112 | ACLU Letter to Baca, October 28, 2009 | 141 | 142 |
| 113 | ACLU Annual Report, May 5, 2010 | 144 | 147 |
| 114 | Rutherford v. Baca, Notice of Filing of Report, September 9, 2010 | 150 | 151 |
| 115 | Rutherford v. Baca, Plaintiff's Supplemental Filing, February 7, 2011 | 152 | 154 |
| 311 | 2010 Maxwell POE Complaint | 94 | 95 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 25, 2016**

**8:07 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is FBI Special Agent Leah Tanner.

THE COURT:  Good morning.

MS. RHODES:  Morning.

MR. STEWARD:  And, Your Honor, Dean Steward and Jerome Haig for Mr. Tanaka.  He's present.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Okay.  I have three notes from the jurors.

The first one is from Juror Number 9.  "It occurred to me as I drove home last night that I have a childhood friend that still hangs out with my younger brother that may be a sheriff. His son is presently trying to become a sheriff.  Years ago, over 25 or 30, I sold this childhood friend his first house.

Although this childhood friend still has a friendship with my brother and family, I don't hang out with him and only see him on occasion when my brother has a gathering."

MR. FOX:  Your Honor, the government's position with Number 9 is that it's pretty clear that Juror Number 9 did not lie to us during the voir dire process; that this does not show any bias that Juror Number 9 might have, and that there's no reason to strike Number 9 for cause.

MR. STEWARD:  We agree.

THE COURT:  Okay.  This is from Juror 7.  "I remembered something on my way home.  My wife on my dad's side used to be the warden at the Vacaville State Prison.  It was when I was a child.  Not sure how long, never spoke to him about it."

MR. FOX:  Your Honor, same issues.  We don't think that the juror was lying.  We don't think this shows bias.

Can I have one quick moment.

(Plaintiff's counsel conferred off the record.)

MR. FOX:  Okay.  So again, the government doesn't think this is a reason to strike the juror.

MR. STEWARD:  We agree.

THE COURT:  All right.  And the last one is Alternate Number 1.  "I was an officer and shareholder in the mid-80s for a small construction company building residential properties, apartments and houses.  In 1985 a resident from the

**UNITED STATES DISTRICT COURT**

area at one of our job sites filed a complaint alleging he had been injured while in front of our property.  The corporation was named but, to the best of my recollection, no one was named individually.  I appeared as an officer of the corp in Compton Superior Court.  We paid a settlement after one court session of less than $10,000.  I don't recall the exact amount."

MR. FOX:  Same thing, Your Honor.  It looks like they're just being conscientious in raising issues, but they don't go to lying or bias.

MR. STEWARD:  We agree.

THE COURT:  Okay.

MR. FOX:  Thank you.

THE COURT:  Oh, one other thing.  Old age.  I got a brief look at the filing last night.  It looks like most of these objections involve a confrontation clause.  Again, once the government has established that a coconspirator exception applies, the confrontation clause is really inapplicable, doesn't apply, and both the Supreme Court and Ninth Circuit have held that.

You can state your objection on the record.

MR. STEWARD:  I believe we've adequately stated in our papers what we've said before, we understand the Court's ruling.  We disagree, but we understand.

THE COURT:  Okay.

MR. FOX:  Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

(End of sidebar discussions.)

MR. FOX:  Do you want our witness on the stand, Your Honor?

THE COURT:  No, that's all right.  If you could just have him here in the courtroom.

MR. FOX:  I will do that.

THE COURT:  All right.  Let's bring the jurors in.

(Pause in proceedings.)

(The jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.

THE JURY PANEL:  Good morning.

THE COURT:  Several of you gave us some notes.  We have reviewed those notes, or I've reviewed them with counsel. Thank you very much for being so conscientious, and none of these are issues.  In addition, I want to thank you all for being on time this morning so that we can get started.

All right.  Is the government prepared to call its first witness?

MR. FOX:  We are, Your Honor.  The United States calls Al Gonzales.

THE COURT:  Ladies and gentlemen, you've been given notebooks.  Again, you're free to take notes, but rely on your own memory of what was said by witnesses.

THE DEPUTY CLERK:  Could you please raise your right hand.

UNITED STATES DISTRICT COURT

(The witness, ALFRED GONZALES, was sworn.)

THE DEPUTY CLERK:  Please be seated.

When you're ready, will you state your full name for the record.

THE WITNESS:  Alfred Gonzales.

THE DEPUTY CLERK:  Thank you.

THE COURT:  Would you spell your last name, please.

THE WITNESS:  G-O-N-Z-A-L-E-S.

THE COURT:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Gonzales, are you currently working?

A    Part-time.

Q    When were you last working full-time?

A    2007.

Q    Where were you working at the time?

A    I was working for the Los Angeles Sheriff's Department.

Q    How long did you work for the Los Angeles Sheriff's Department?

A    26 years.

Q    What was the highest rank that you received?

A    Lieutenant.

Q    And in 2007 what was your job?

A    I was the day and p.m. watch commander; four days on days,

one day on the evening, p.m. shift.

Q    Where were you watch commander?

A    At Men's Central Jail.

Q    What is Men's Central Jail?

A    The largest jail facility -- men's jail facility in the county of Los Angeles.

Q    Who runs Men's Central Jail?

A    I don't understand the question.

Q    Who operates it?  Is it run by the Sheriff's Department?

A    Oh, yes, Los Angeles Sheriff's Department.

Q    And at the time that you were watch commander, what was your rank?

A    I was a lieutenant.

Q    How long had you been a lieutenant with Men's Central Jail?

A    I promoted from internal affairs in 2003 until the day I retired in March of 2007.

Q    What were your duties in internal affairs?

A    I investigated alleged misconducts by anyone on the Sheriff's Department, policy violations.

Q    When you promoted to become a lieutenant at Men's Central Jail, was that your first experience with Men's Central Jail?

A    No, sir.

Q    Could you please describe your previous experience at Men's Central Jail.

A      I began my employment with the County of Los Angeles in 1975.  I was a journeyman, sheet metal worker.  I worked there from 1975 until 1981 when I went to the academy.  I was then reassigned to the county jail.  Those six years were totally county jail as a sheet metal worker.  Then I was reassigned to Central Jail in -- after completing the academy for two more years.  I returned for an additional two years as a sergeant in the late 1990s working Inmate Reception Center, and then I returned for the fourth time as a lieutenant in 2003.

Q      Can you please describe what the Inmate Reception Center is.

A      That's where, when an inmate is arrested and he's going to be booked into the jail system, they come into the Inmate Reception Center, and it's adjacent to the county jail.

Q      What about when an inmate is released?  Do you know if the Inmate Reception Center has a duty with respect to that inmate and its records?

A      Yes.  They also release him from the same facility, the Inmate Reception Center.

Q      Are you familiar with the layout of Men's Central Jail from, let's say, the mid-2000s to when you left Men's Central Jail?

A      Very much so.

Q      Can you please describe how it's laid out in terms of the types of inmates that are assigned to various floors.

A      The majority of the jail is housed in -- the first floor is your hospital and your administration.  Your second floor is totally jail inmates, and they're your gang, high volatile inmates.  The third, 3000 floor is also as equally high level inmates, highly volatile.  Your new side, which is your 4,000, houses single-man cells, multi-man cells.  They also have highly but not quite as volatile as your second and third -- 2,000 and 3,000.

Then you have 4,000.  You have large dorms on 4,000, and you have 9,000, which is the third floor on the new side.  Then you have a hospital area as well.  It's a little convoluted, but you have a hospital area in the back, 6,000, 7,000 and 8,000.

Q      Mr. Gonzales, you mentioned when you graduated from the academy you went to go work at Men's Central Jail.  Is that the natural progression of deputies graduating from the academy?

A      Yes.

Q      I want to now take you to 2003 when you began working as a lieutenant at Men's Central Jail.  Did you have a chance to evaluate any issues that might be occurring at the jail at that time?

A      I was initially assigned to the graveyard shift, typically your slowest shift of the day.  So I had a lot of time to review, and I would review the day logs from the previous -- the operations logs from the previous day.  And I had a lot of

**UNITED STATES DISTRICT COURT**

time to just review reports coming through my desk -- or across my desk.

Q    Did that cause you any concerns when you went through those day logs?

A    Concerns -- I don't know if concerns, but I did notice a pattern.

Q    What was that pattern?

A    I noted a high level of force being used on specific floors in the jail.

Q    Which floors were those?

A    2,000 and 3,000.

Q    Those are the second and third floor?

A    Yes.

Q    Did you also have a chance to look at the reports that were generated about those use of force reports -- or excuse me, about those uses of force?

A    Some reports, yes.

Q    Did you notice any patterns with respect to them?

A    I noted a -- if this is the correct word -- a cookie-cutter approach to some of the reports.  They seemed to have the same sameness, no originality, same MO, operis -- operandi -- modis operandi.

Q    Did that cause you any concerns?

A    Yes, a little bit.

Q    Why is that?

**UNITED STATES DISTRICT COURT**

A     Well, I couldn't see the force being used the same way all the time, and it was repetitive.  The reports were being read -- were being written repetitive, and I thought there should be a variety of different incidents.

Q     Outside of the paper you were looking at, did you notice anything with respect to deputy behavior?

A     Initially, yes.

Q     And what was that?

A     Well, having spent so much time in the jails -- in custody division in my career, I noted a chronic -- immediate chronic tardiness and deputies leaving the facility before the end of their shifts.

Q     Are you familiar with the term "cliques"?

A     Yes.

Q     What, if anything, did you determine with respect to whether there were any deputy cliques at Men's Central Jail during that time?

A     I began my shift on graveyard shift at 2100 hours, which is nine o'clock in the evening.  The p.m. shift doesn't get off duty until 2200 hours, which is ten o'clock, so there's an hour overlap.  And so I would go up on the floors and try to interact with the men -- men and women.  But I also had a habit of being near the exits as the p.m. shift would exit, and I noted that 2,000 and 3,000 floors only would exit those floors and would only exit those floors when everyone on that floor

was present at the exit on that particular floor, for example, 2,000.  And not until every member of that shift was present at that door, they would in unison come down the escalators, march down the escalators very stone-faced, expressionless and walk out the gates.  And at times, I would be standing outside the gates in uniform with my rank showing, and they would walk right by me and never acknowledge me, would never talk and would not even commingle with anyone else in the jail.

Q    Are you familiar with John Clark?

A    Yes, sir.

Q    Who is John Clark?

A    One of my captains assigned to Men's Central Jail.

Q    Do you recall when he was captain of Men's Central Jail?

A    Approximately -- I believe he came in in 2004, and he transferred out, I believe, latter part of 2006.

Q    Did you have a chance to bring any of your concerns to the attention of Captain Clark?

A    Yes.

Q    Did the two of you come up with any sort of plan or a way of dealing with these problems?

A    Could you be more specific.

Q    Well, in terms of the deputy cliques and -- sorry, should have been more specific.  Thank you.

    In terms of the deputy cliques and the use of force and the cookie-cutter reports, did you discuss any plans with

Captain Clark?

A      Well, I had another concern that I also took to him, yes, I did.

Q      And what type of plan did you discuss with Captain Clark?

A      I went to him, and I expressed my concerns as to my observations in custody as well as their off-duty conduct.  And I suggested that we had these two major cliques, only on --

MR. HAIG:  Objection, Your Honor, hearsay.

THE COURT:  No.  Overruled.  Go ahead.

Q      (BY MR. FOX)  You may proceed.

THE COURT:  You may proceed.

MR. FOX:  Thank you, Your Honor.

THE WITNESS:  I told him that we had these two cliques, in my opinion, cliques on the p.m. shift on 2,000 and 3,000 floors, and I told him about my concerns with the force being used up there.  I told him about my concerns with their off-duty conduct, and then I explained to him how they would exit the jails and that I felt, in my opinion, the best way to deal with this is to break the floors up.

Q      (BY MR. FOX)  What do you mean by break the floors up?

A      I suggested that we would transfer everyone on those shifts within the shift, keep them on the shift but move them to different job assignments within the shifts so that everyone just rotated assignments.

Q      So their hours would not change?

A    Their hours would not change.

Q    Did there come a point in time in which you attended a meeting at Men's Central Jail that was being held by Paul Tanaka?

A    Yes.

Q    Do you recall when this was?

A    To the best of my recollection, it was June of 2006.

Q    Do you recall how the meeting was set up?

A    Could you be more specific.

Q    Sure.  Did you have advance notice of the meeting?  Was it -- do you recall whether it was an all-staff meeting that was announced?

A    To the best of my recollection, we were given about a day's notice.  It was mandatory.  Every supervisor assigned to Men's Central Jail had to be present; that included every sergeant, every lieutenant and the captain.  There were no line personnel in the meeting.

Q    Do you recall where within Men's Central Jail this meeting was held?

A    It was on the second floor briefing room.

Q    Had you ever met Mr. Tanaka before that?

A    No.

Q    Did you ever encounter him after that date?

A    No.

Q    Do you think you would recognize him again if you saw him?

A    Yes.

Q    I'd like you to please look around the courtroom and tell me whether you recognize Mr. Tanaka in the courtroom.

A    Yes.  Yes, I do.

Q    Can you please identify a piece of clothing that he's wearing or where he's sitting.

A    Mr. Tanaka's the first gentleman sitting at the bench at the table.

MR. FOX:  Your Honor, I'd like the record to reflect an in-court identification of Mr. Tanaka, please.

THE COURT:  The record will so reflect.

Q    (BY MR. FOX)  I want to talk about some of the specifics of this meeting.  Do you recall where you sat at the meeting?

A    I was on the front row.

Q    Do you recall whether anybody was near you?

A    I was in the front row.  Captain Clark was three seats to my right.  I had one of my sergeant friends next to me to my left.  The podium was to my left, and Mr. Tanaka was at the podium.

Q    Do you recall what Mr. Tanaka said at this meeting?

A    I can only paraphrase.  I don't remember it verbatim.

Q    Do you recall how he began the meeting?

A    I believe he stated that he was having this meeting due to the supervision assigned to Men's Central Jail.  He described it as being antiquated, and at one point he called us a bunch

of old dinosaurs.

Q    Do you recall whether Mr. Tanaka made any statements about lieutenants referring to deputies as gang members?

MR. HAIG:  Objection, Your Honor, leading.

THE COURT:  Sustained.

Q    (BY MR. FOX)  After Mr. Tanaka referred to the supervisors as a bunch of dinosaurs, what, if anything, did he say?

A    He stated that he had started to rectify the problem -- I'm only paraphrasing this -- and he said, "I have hand-selected three new lieutenants assigned to Central Jail." And then he continued, and he made reference to "How dare a lieutenant on the Los Angeles Sheriff's Department refer to deputy sheriffs as gang members, how dare him."

Q    Do you know who had referred to deputy sheriffs as gang members out of the lieutenants?

A    I believe he was referring to me.

Q    And why is that?

A    In 2000 -- I believe it was 2004, I was still working the graveyard shift, and my deputies -- the deputies on the p.m. shift, 2,000 and 3,000, were getting involved in off-duty conduct -- misconduct.  And one of the deputies happened to be walking by my office at one point, and I brought him into my office, and I decided I was going to give him some mentoring, counseling.  And I spoke to him, and I said to him -- I brought these incidents up to him and their conduct, walking out of the

UNITED STATES DISTRICT COURT

jail facility and the high level of force, and I said, "You guys" -- I said, "This is reminiscent of gang members. You guys remind me of gang members." I didn't call them gang members. I said, "You remind me of gang members," and I was trying to explain to him how this type of conduct could have ramifications on their careers.

Q    You mentioned Mr. Tanaka said he was bringing in three new lieutenants to work at Men's Central Jail. Do you recall the names of the lieutenants that he mentioned at that meeting?

A    Yes.

Q    Who were they?

A    Kevin Hebert, Wes Sutton and Christopher Nee.

Q    Do you recall if Mr. Tanaka said anything else about how you should be supervising deputies?

A    He was still at the podium, and he was describing the new generation of deputies, and he referred to them as the XYZ generation. "These are the XYZ generation." And he stepped away from the podium, and he cradled his arms in this fashion, and he said, "These are the Y generation. You will coddle them," and just as he said that, he looked in my direction. He looked directly at me, and he yelled, "Yes, you, Lieutenant, will coddle them."

Q    What, if anything, did Mr. Tanaka say about whether supervisors should be on the floors with the deputies?

A    At the conclusion of his -- it was near the conclusion of

his speech to us, he said, "You supervisors" -- I believe he said, "You" -- he didn't say the word supervisor.  He said, "You will stay off those floors and let the deputies do what they have to do."

Q    Based on your experience, did you notice whether there was a correlation between supervisors being on the floor and force going up or down?

A    It was my experience that if you have supervision on those floors, the deputies are going to do their jobs.  That's why we're there.  We're there to supervise the deputies, and there was a correlation.  We have supervisors on the floor, there's no force.  My supervisors are not on those floors, and force began to escalate.

I had force from time to time while I was on duty, and my first question was always where was my sergeant, where is my sergeant because I found that the sergeant wasn't on the floor, force went up.

MR. FOX:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. FOX:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

Q    (BY MR. HAIG)  Good morning, sir.

A    Morning, sir.

Q    In 2007, that's when you left the Sheriff's Department as

lieutenant.  Would that be correct?

A     Yes, sir.

Q     All right.  About what month?

A     March 19.

Q     And you retired as lieutenant from Central Jail?

A     Yes.

Q     That was your last assignment?

A     Yes.

Q     When you first got to Central Jail in 2003 -- well, when your last assignment was at Central Jail in 2003, that was after you promoted to lieutenant.  Would that be correct?

A     When I arrived at Central Jail?

Q     In 2003.

A     April 2003, yes, as a lieutenant --

Q     You had -- you had --

A     Newly-promoted lieutenant, yes.

Q     All right.  And after you promoted to lieutenant, you went from internal affairs to Central Jail?

A     No, no.  I was a sergeant at internal affairs.  I promoted to lieutenant, and my first day as a lieutenant was at Men's Central Jail.

Q     That's what I was asking.  Okay.  Thank you.

And who was your direct supervisor in 2003 when you got to Men's Central Jail?

A     Sergeant -- Captain Rick Adams.

**UNITED STATES DISTRICT COURT**

Q    At some point in time, Captain Rick Adams was replaced by Captain John Clark?

A    No, Captain Ray Leyva.

Q    Okay.  And then after Ray Leyva, then came John Clark?

A    Yes.

Q    All right.  And in 2003, do you know the rank of Paul Tanaka?

A    No.

Q    You don't know whether he was a chief, assistant sheriff or anything like that; is that correct?

A    He might have been a chief.

Q    All right.

A    I would be guessing.  I knew he was a manager.  I knew he had rank, but I was concerned about my job.

Q    Of course.  Right.  I'm not asking what you were concerned about, but in 2003, had you ever heard the name Paul Tanaka before?

A    Oh, yes.

Q    Okay.  And obviously, in 2007 before the meeting was called, you had heard the name Paul Tanaka?

A    Yes.

Q    And do you know what Paul Tanaka's rank was in 2007?

A    I believe he was an assistant sheriff.

Q    And when Mr. Tanaka came to Men's Central Jail as the assistant sheriff, was that a rarity for somebody of that rank

to actually come to the Men's Central Jail and hold a meeting?

A     I believe so.

Q     During your time as lieutenant at Men's Central Jail, do you ever recall the predecessor to Paul Tanaka coming to the jail and holding a meeting?

A     With supervisors?

Q     Yes.

A     No.

Q     This would be the only time that you recall the assistant sheriff ever coming to county jail when you were working there. Would that be correct?

A     I believe so.

Q     Did Mr. Tanaka show up there in a suit like he's wearing today, or was he in uniform?

A     I believe he was in a uniform.

Q     Can you describe the uniform that he was wearing?

A     A sheriff's uniform.

Q     A typical sheriff's uniform with a --

A     I don't recall, to be honest with you.  I don't recall whether he was wearing the uniform or not.

Q     If I were to show you a photograph of Mr. Tanaka in a uniform in 2007, would that refresh your recollection as to whether he was actually dressed that way at that time?

          MR. FOX:  Objection to the form of the question.

          THE COURT:  Sustained.

Q    (BY MR. HAIG)  During the meeting in 2007, were you in uniform?

A    Yes.

Q    And your captain, Captain Clark, was he in uniform?

A    I don't recall.

Q    Was it typical for the captain to wear a uniform to work every day?

A    He wore a suit at times.

Q    But you wore a uniform every day?

A    I wore a uniform every day.

Q    You were asked questions on direct examination about cliques; right?  You said the 2,000 floor and the 3,000 floor had what you call cliques when you were there; correct?

A    Yes.

Q    You also talked about how the 2,000 floor and the 3,000 floor were floors where inmates that were housed there could be problems for having violent propensities; correct?

A    That's correct.

Q    Those were the most difficult floors to manage as a line deputy on that floor.  Would that be correct?

A    Yes.

Q    And why is that?

A    You had your most volatile inmates, your high-level inmates on those -- your gang members on those two floors.

Q    And as a supervisor there, you would expect more use of

force incidents in managing that type of volatile inmate
population than a less volatile inmate population.  Would that
be correct?

A    No doubt.

Q    The cliques that you talked about, they were basically --
the people that worked on 2,000 floor liked to associate with
each other and were friends with each other.  Would that be a
correct statement?

A    I guess.

Q    Well, did you know some of the deputies that worked on the
2,000 floor from 2003 to 2007?

A    Did I know them?  I supervised them.

Q    So you knew who they were?

A    Yes.

Q    All right.  On one shift, let's say the p.m. shift, how
many deputies would be working on the 2,000 floor?

A    20 maybe.

Q    Same thing on the 3,000 floor?

A    I believe so.

Q    And when that shift was over, there would be an overlap
from p.m. to graveyard, as you stated; right?

A    Yes.

Q    And so there would be another 20 deputies that would come
in for graveyard shift, and an hour later the 20 deputies that
were on the p.m. shift would then leave?

**UNITED STATES DISTRICT COURT**

A       The -- yeah, they would be relieved staggerdly [sic], yes.

Q       And as they were leaving and going home, going into their cars and going to the personal vehicles, doing whatever they were doing, the people -- the deputy sheriffs that were on the 2,000 floor, they would wait for each other and all leave together as a unit.  Is that what you noticed?

A       Yeah, I noticed they were being relieved individually, but they wouldn't leave the floor.  They would stay on that floor. Even if the one member was late 15, 20 minutes, they would stay on that floor 15, 20 minutes until every member was present, and then they would leave together.

Q       You noticed -- you actually saw this happen face to face; right?

A       I had an incident where I had to order them off the floor.

Q       You had to order one of the persons that was basically off his shift off the floor; correct?

A       I had to order the entire shift off the floor.

Q       Because they wanted to wait around for all of the people to leave; right?

A       They were waiting around for an individual that I was counseling in the sergeant's office.

Q       Was this the same time that you were referring to this individual as acting like a gang member, that person?

A       No, it was a separate incident.

Q       And did the level of unity of the people on the 2,000

floor, for instance, did that bother you?

A    I understood cohesiveness.  I understood the comradery.  I did it as a deputy, but these deputies would not socialize with any other deputy in the facility other than their floor, and it was more a loyalty to their floor than to the Sheriff's Department.  And that gave me concern.

Q    The loyalty didn't give you a concern?

A    No, it was -- it was not so much the loyalty because they were -- coming off the way they came off those shifts and then their conduct off duty, because they were getting involved in bar fights and being arrested for DUIs, the same only two floors, 2,000 and 3,000, coupled together, that was giving me concerns.

Q    The comradery on those floors, was that a problem for you?

A    No.

Q    The fact that these deputy sheriffs that were all fairly young deputy sheriffs, all around the same age, probably early 20s; correct?

A    20s and 30s, yes.

Q    That they got along with each other, they trusted each other, they wanted to associate with each other, did that pose a problem for you?

A    No, no.  It was more than that, Counselor.  It wasn't just comradery.  They were taking it, in my opinion, a step further.  They were not socializing with anyone in the jail other than

themselves, and as they walked off the floors in mass, very stone-faced, they would even walk by me and not even acknowledge the presence of their supervisor.  That bothered me.

Q    You said that you had to intercede a few times when some of the people that were working on the 2,000 floor, the 3,000 floor got into off-duty issues; correct?

A    Yes.

Q    How many times did that happen during your time from 2003 to 2007 as a lieutenant?

A    The incidents that I'm referring to happened in a short period of time in 2003.

Q    From 2004 to 2007, none of these incidents happened?

A    While I was assigned to day shift, and since I'm assigned to day shift, I wasn't privy to what was happening as they were getting off on p.m. shift.  It could have happened.  I wasn't aware of it.

Q    All right.  So the cliques you're talking about on the 2,000 floor and the 3,000 floor that you noticed, this was in 2003.  Would that be correct?

A    Yes.

Q    And you have no personal knowledge of cliques that were going on after 2003 because you weren't monitoring that type of activity.  Would that be a correct statement too?

A    I wasn't on duty at that time.

Q    Therefore --

A    It could have happened, but I wasn't on duty.

Q    You didn't notice the cliques after 2003 when you changed your shift.  Would that be correct?

A    I didn't see the clique mentality on day shift.  I was not working p.m. shift as the deputies were getting off, so I wasn't -- I couldn't monitor them.

Q    I understand that.

A    I don't know whether it was or not.

Q    But when you're talking about these cliques, just so I can be -- ask you a precise question, are we talking about just one year of your observation, 2003?

A    The one year that I had the ability to observe them is when I saw it happen.  The one year that I worked graveyard shift in 2003 and 2004 is when I saw the cliques, yes.

Q    And that's when, in your belief, Mr. Tanaka was not yet assistant sheriff, he was a chief.  Would that be correct?

A    I don't know what rank Mr. Tanaka was at the time.

Q    Like you said, the only time you ever saw Mr. Tanaka face to face before coming into court today was that time at the meeting at the Central Jail in 2007?

A    The meeting was in 2006.

Q    2006; is that correct?

A    Yes.

Q    All right.  Was it in 2003 that you had the counseling

meeting with the deputy sheriff that was working at Men's Central Jail where you referred to him as acting like a gang member?

A    It could have been 2003, 2004, because I transferred to day shift in 2004, so it was 2003, 2004.

Q    Do you recall the name of this deputy sheriff that you were counseling as acting like a gang member?

A    I believe his name was Corales, I believe.

Q    Was Deputy Corales the only person you had ever referred to as acting like a gang member?

A    Yes.

Q    You'd never said that to any other deputy sheriff during the time that you were at Men's Central Jail from 2003 to 2007. Would that be a correct statement?

A    Yes.

Q    Did Deputy Corales take your advice to heart, or did he rebuff you?

A    In my opinion, I don't believe he was receptive to my advice.

Q    As a matter of fact, he was upset that you would refer to him as a gang member.  Would that be a correct statement?

A    I don't recall that.  I know that -- I don't believe he was receptive to it.

Q    As far as you know, the deputy sheriffs you supervised at Men's Central Jail are not members of a criminal street gang.

Would that be correct?

A    I wasn't calling them gang members.

Q    That's not the question I asked you.

Do you know whether the deputy sheriffs that work at Men's Central Jail are members of a criminal street gang?  Yes or no.

THE COURT:  Sir, you don't direct witnesses how to answer questions.  Just ask your questions.

Q    (BY MR. HAIG)  Do you know whether people -- deputy sheriffs that were working at Men's Central Jail when you were working there from 2003 to 2007 were members of a criminal street gang?

A    I didn't know that.

Q    Do you know whether the Sheriff's Department would hire somebody that is an active member of a criminal street gang?

A    I don't believe so.

Q    You talked about the three people after the June 2006 meeting where Assistant Sheriff Tanaka was there, the three people that were going to be coming to the jail to be supervisors that we said -- Mr. Sutton, Mr. Hebert and Mr. Nee; is that correct?

A    They were already assigned to the jail.

Q    And what were their ranks?  Did they all have the same rank or different ranks?

A    They were newly-promoted lieutenants.

Q    When Mr. Tanaka said that these people were going to be

working at the jail, you said they were already there?

A    To the best of my recollection, they were already there.
They had just arrived.  They had been there a couple of months.

Q    And these three, were they all men?

A    Yes.

Q    And these three gentlemen all had the same rank as you?

A    Yes.

Q    And did they perform essentially the same function that
you performed?

A    Yes.

Q    Just on different shifts?

A    Yes.

Q    How many lieutenants would be working at the same time at
Men's Central Jail?  It's a big jail, as you said.

A    At any one time?

Q    Yes.

A    Within the jail proper, two.

Q    Did either Mr. Sutton -- Lieutenant Sutton, Lieutenant
Hebert or Lieutenant Nee have the same assignment that you had,
just on a different shift while working at Men's Central Jail?

A    Yes.

Q    And after the June 2006 meeting, did any of your work
duties change?

A    No.

Q    You said that Mr. Tanaka yelled and said that "How dare

you" -- looking at you, "How dare you, Lieutenant, refer to a deputy sheriff as a gang member."  He yelled at you.

A     No.

Q     What did he say?

A     He said that, but he didn't yell at me.

Q     Well, he was yelling.

A     He yelled it, but he wasn't looking at me.

Q     You thought he was referring to you when he said that?

A     I thought only because I'd had this one incident, and I -- to the best of my recollection, I didn't know anyone else that had counselled a deputy and referred to him as -- reminded him of gang members.  So I believed, in my opinion, that he was probably referring to me.

Q     And as you think back upon this incident in 2003, do you probably think it was a mistake to refer to a Hispanic deputy sheriff as a gang member?

A     No.

          MR. HAIG:  I have nothing further.

          THE COURT:  All right.  Redirect?

          MR. FOX:  Nothing, Your Honor.

          THE COURT:  All right.  You may step down.  Thank you very much.

     Call your next witness.

          MR. FOX:  The United States calls John Clark.

          MR. STEWARD:  And, Your Honor, I neglected to move

to exclude witnesses before the first witnesses.  My apologies. I would make that motion now.

THE COURT:  I think we've already gone over that, that all witnesses are going to be excluded.

THE DEPUTY CLERK:  Please raise your right hand.

(The witness, JOHN CLARK, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  John Clark, last name C-L-A-R-K.

THE DEPUTY CLERK:  John with a J-O-H-N?

THE WITNESS:  Yes.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Are you currently employed, Mr. Clark?

A    Yes, I am.

Q    What do you do?

A    I'm a consultant with the Center for Public Safety Management.

Q    What do you do for that center?

A    This company does assessments of police departments around the country, and I participate in those assessments.

Q    How long have you been doing that?

A      About four months.

Q      Were you previously employed full-time?

A      Yes, I was.

Q      When was that?

A      I was with the Los Angeles County Sheriff's Department from April of 1979 until September of 2012.

Q      What was the highest rank that you achieved at the Sheriff's Department?

A      Captain.

Q      Where did you work as a captain?

A      I worked Transportation Bureau, Central Jail, Commercial Crimes Bureau, Transportation Bureau again and Internal Affairs.

Q      Let's go through just a couple of those.  When did you work for Men's Central Jail as captain?

A      August 2004 to December 2006.

Q      And what about Internal Affairs?

A      I was there February 2012 to September 2012.

Q      Let's focus on your time as captain of Men's Central Jail.

        At that time, did -- were deputies assigned to certain floors at the jail to work?

A      Yes.

Q      Could you please describe how they were assigned.

A      Well, generally, scheduling would assign them to certain floors to work for a particular job cycle, which is normally

the 28 days.

Q    Did this raise any concerns in your mind at the time?

A    Relative to the method of scheduling, no.

Q    Did it raise any concerns with respect to anything else?

A    Well, with the force issues that we were working to reduce, the deputies had worked these floors for a long period of time, and so I used as an option to try to address the force issues.

Q    So what did you do?

A    Well, throughout the period of time that I was there, we're managing the force and trying to address ways to reduce the force through administrative methods, through training, counseling, discipline.  And we weren't having the reduction in force that I had hoped for, so I instituted a rotation policy.

Q    What was this rotation policy that you introduced?

A    I was going to have the deputies transferred from job to job every two months, meaning different floors.

Q    Why did you think this would work?

A    Well, we weren't having the success I'd hoped for with the other methods that myself and other captains before me had tried, so I'd hoped that if there was something -- some group dynamics, group think, anything else that was going on on the floors by the long period of times they worked together, maybe this change would affect that and have some change in the number of force we were having.

Q    I imagine that the Sheriff's Department is a bureaucracy like many government entities; is that right?

A    Yes.

Q    So did you have to do anything particularly if you were going to implement this rotation plan, to clear it with anyone?

A    Yes.

Q    What did you have to do?

A    I had to run the policy by my commander.

Q    Did your commander approve of this policy?

A    He did.

Q    What was your commander's name?

A    Dennis Conte.

Q    Did you do anything else to implement this policy to get anybody to sign off on it?

A    I went through our employee relations and ran it by them.

Q    After running this by employee relations, were you still going forward with the plan?

A    I had announced it -- with the approval of my commander, I had announced it to the staff that it was going to be implemented at the next cycle change, which was going to be a few weeks down the road.

Q    When you say you had announced it to your staff, does that include the deputies?

A    Yes.

Q    What did you do to communicate the plan to the deputies?

UNITED STATES DISTRICT COURT

A    I wrote a memo out to the deputies and put it out to them in an e-mail on a Friday and told them I would come to briefings and discuss it the following week.

Q    Mr. Clark, I'd like you to open up your binder if you could to Exhibit Number 1, and please take a look at it.

Do you recognize that?

A    I do.

Q    What is it?

A    It's the copy of the memo that I sent out to the deputies.

Q    Do you know if that's the final copy of that memo?

A    That I'm not sure.  I see the date, but I'm not sure exactly the date I sent it out.

Q    Is this in substantially the same form, however, as the final version of the one you sent out?

A    I believe so.

MR. FOX:  Your Honor, I move for the introduction of Government Exhibit 1.

THE COURT:  Any objection?

MR. HAIG:  No, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 1 received into evidence.)

MR. FOX:  May I publish it to the jury, Your Honor?

THE COURT:  Yes.

Q    (BY MR. FOX)  Mr. Clark, if you could, please, just read for the jury the third paragraph of this rotation plan.

A    "In addition, although familiarity with the position usually makes the job easier, it can also create complacency which lends to officer safety issues."

(Reporter admonition.)

THE WITNESS:  Oh, okay.

"In addition, although familiarity with the position usually makes the job easier, it can also create complacency which lends to officer safety issues.  Personnel leaving the unit for other agencies have indicated they became bored or felt stagnated.  They point out moving around the jail and experiencing other aspects of the facility may have been beneficial to their morale.  I have also discussed with you the use of force and how change can be beneficial, whether the causal factors are systemic, operational or personal.  I want each one of you to have a lengthy career with the Sheriff's Department and succeed with your career goals."

Q    (BY MR. FOX)  You mentioned that you communicated the plan to deputies.  Is this the rotation plan, in substance, that you sent out to the deputies?

A    Yes.

Q    Were you able to implement this policy after meeting with the deputies and communicating this plan to the deputies?

A    No.

Q    Why not?  What happened?

A    I was told after that Mr. Tanaka did not approve of the

plan.

Q    After you were told that Mr. Tanaka did not approve of the plan, did you attend a meeting held at Men's Central Jail regarding this and other issues?

A    Yes.

Q    When was that?

A    I don't know the particular date, but I -- when I put this memo out on Friday, it was the Wednesday after that.

Q    Now, this memo has a date on it, doesn't it?

A    It does.

Q    What is that date?

A    February 8th.

Q    Do you know if that's the date that you sent out the memo?

A    I don't know for sure.

Q    Was it around that date that you would have sent out the memo?

A    It was sometime in February, I remember that.

Q    Where did this meeting take place with Mr. Tanaka?

A    It was in the second floor of Central Jail's briefing room.

Q    Who was in attendance?

A    Mr. Tanaka, myself, some of my lieutenants and some of my sergeants assigned to Central Jail.

Q    What occurred at this meeting?

A    Mr. Tanaka started talking to us about this planned

rotation, that it was not something he agreed with, and basically questioned why we would want to do something like that.

Q    What, if anything, occurred after he made that statement?

A    Well, shortly into his discussion, I stopped him and said that it was -- because he was talking to us as a group, and I made it clear to him it was my decision to do this rotation and not the sergeants and lieutenants that were in the room.

Q    What, if anything, did Mr. Tanaka say in response to that?

A    I don't recall a specific response, but the discussion continued with the group.

Q    At the conclusion of this meeting, was it your understanding that this plan would be rolled out or would not be rolled out?

A    It would not.

Q    Did you have an additional discussion with Mr. Tanaka that day?

A    Yes, I did.

Q    Where was that?

A    At Central Jail, there's the security side, which is inside the bars, and outside security, there's what we call admin hallway.

Q    When did this occur?

A    Shortly after the meeting finished.

Q    Who was present?

A    Mr. Tanaka, myself.

Q    What, if anything, did Mr. Tanaka say to you at this point?

Well, let me actually ask you first.

What, if anything, did you say to Mr. Tanaka at this point?

A    I told him that I thought this was the best thing for the unit and the future of the Department to implement this rotation.

Q    And what, if anything, did Mr. Tanaka say in response?

A    He told me to make it go away before it ended up in the Sheriff's office.

Q    What was your understanding as to what that meant?

A    I took it as I would be transferred.

Q    What happened after Mr. Tanaka held this meeting in the ensuing days?

A    Relative to this?

Q    Relative to you.

A    Okay.  Well, that was Wednesday.  On Thursday evening, I received a call from Chief Jones, who was the division chief at the time, and he told me I was being transferred effective that following Sunday.

Q    How many times during the course of your career did you encounter Mr. Tanaka?

A    I think we first met when we were lieutenants at Inmate

Reception Center, but I mean, I couldn't tell you how many times after that.

Q    Do you think you'd recognize him again if you saw him?

A    Yes.

Q    Could you please look around the courtroom and tell me if you recognize him.

A    He's sitting at the table to your left.

Q    Okay.  Where at that table?

A    Closest to me of the three gentlemen.

          MR. FOX:  Your Honor, may the Court reflect the in-court identification of Mr. Tanaka.

          THE COURT:  The record will so reflect.

          MR. FOX:  Thank you.

     One moment, Your Honor.

     Nothing further, Your Honor.

          THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

Q    (BY MR. HAIG)  Good morning, Mr. Clark.

A    Morning.

Q    The assignments -- the assignment rotation plan that you had just been talking about --

A    Yes.

Q    -- was in response to what you viewed to be too much violence on the 2,000 and 3,000 floors.  Would that be correct?

A    I wouldn't use the term "violence," but use of force that

occurred on those floors.

Q    "Use of force" means a deputy using force on one of more inmates or one or more deputies using force on one or more inmates.  Would that be correct?

A    Correct.

Q    And were there certain floors that you saw more use of force than other floors?

A    Yes.

Q    And what floors would those be?

A    Generally, it was 2,000 and 3,000.

Q    Did you make any attempts before trying to implement this rotation plan to identify some of the problem deputies on either the 2,000 floor or the 3,000 floor?

A    Yes.  As part of my administrative responsibilities, I reviewed force frequently with the force reports, the statistics on force, discussed it with the watch commanders, and we addressed individuals that had higher uses of force or problematic force.

Q    Before announcing this group transfer policy for the deputies working at county jail, did you attempt to look at the actual deputies that you viewed to be a problem regarding use of force?

A    Yes, I did, and the issue of the problem is there's also the number of force that was appropriate use of force also, but the number of force can be problematic for a deputy also, even

though they're all appropriate.  So it wasn't just always improper force, it was the number of force was an issue also.

Q    Mr. Tanaka, at that time, was the assistant sheriff in 2006?

A    Yes.

Q    And do you recall whether his job assignment had any kind of role supervising Men's Central Jail?

A    He was in the chain of command.

Q    And had you asked at that time Assistant Sheriff Tanaka before coming out with this memo, and he had told you, "I don't want you to do it," then the memo wouldn't have come out; correct?

A    Correct.

Q    As being part of your chain of command, he had the right to veto this rotation plan.  Would that be correct also?

A    Yes.

Q    And that's, in fact, what he did.  Would that be correct?

A    Yes.

        MR. HAIG:  Thank you.  I have nothing further.

        THE COURT:  Redirect?

        MR. FOX:  Nothing, Your Honor.

        THE COURT:  All right.  Thank you.  You may step down.

        THE WITNESS:  Thank you.

        THE COURT:  Call your next witness.

UNITED STATES DISTRICT COURT

MR. FOX:  Your Honor, the government calls Steve Roller.

(Pause in proceedings.)

MR. FOX:  Your Honor, the witness is taking a restroom break.  He'll be in in a minute.

(Pause in proceedings.)

THE DEPUTY CLERK:  Just stand here for me, please. Raise your right hand.

(The witness, STEVEN ROLLER, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Steven M. Roller, R-O-L-L-E-R.

THE DEPUTY CLERK:  Do you spell Steven with a P-H?

THE WITNESS:  With a V.

THE DEPUTY CLERK:  With a V.  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Roller, are you currently retired?

A    Yes, I am.

Q    How long have you been retired?

A    2012, October.

Q    What did you do before that?

A    I was a captain with the Los Angeles County Sheriff's

UNITED STATES DISTRICT COURT

48

Department.

Q     How long had you been with the Los Angeles County Sheriff's Department?

A     Since September 17th, 2000.

Q     Was that the first law enforcement agency that you worked for?

A     No, it wasn't.

Q     How many law enforcement agencies have you worked for?

A     Counting the Sheriff's Department, four.

Q     What was the previous law enforcement agency that you'd worked for right before the Sheriff's Department?

A     Compton Police Department.

Q     What was your rank there?

A     I was a captain.

Q     And when you came over to the Sheriff's Department, what rank did you start at?

A     Lieutenant.

Q     At some point in time, did you work for an undersheriff at the Sheriff's Department?

A     I worked for two undersheriffs, Bill Stonich and Larry Walde.

Q     What is the role of the undersheriff in the Sheriff's Department?

A     He is the second in command of the Sheriff's Department, responsible for basically overseeing the day-to-day operations

of the Department.

Q     What do aides to undersheriffs do?

A     The aide to the undersheriff, when I was there, dealt with correspondence with going to meetings, dealing with various commands within the Sheriff's Department and carrying out the directives of the undersheriff.

Q     When did you stop being an aide to an undersheriff?

A     In 2005 when I promoted to captain.

Q     When you were promoting from an aide to another position within the Sheriff's Department, how do you select where you're going to go?

A     In my case, I was sent as a group of three candidates to an interview because there was a contract city involved in the command that I commanded.  So I went for an interview process involving city leaders and government officials from that particular city and also the county representative.

Q     You mentioned your promotion from a lieutenant to a captain; is that correct?

A     That's correct.

Q     And where did you eventually work as a captain?

A     My first unit of assignment was commanding Century Station.

Q     What is Century Station?

A     Century Station is a sheriff's station, which actually physically is in the city of Lynwood, which is responsible for

patrolling five county areas and a contract city of Lynwood.

Q    Do you recall the exact location of Century Station?

A    It's at Alameda, just south of Imperial Highway.

Q    When you decided to go to Century Station, did you have any communications with anyone in your chain of command about whether that was the appropriate assignment?

A    Well, Mr. Walde, who was the undersheriff before I went for the interview, basically told me that I didn't really need to go to that location because I would get a choice assignment being the executive aide to the undersheriff.  But I expressed my desire to participate in that because I had a municipal law enforcement background, and I wanted to command a sheriff's station.

Q    When did you become the captain of Century Station?

A    It was, I believe, in April of 2005.

Q    Did you notice any issues that demanded your attention when you became captain of Century Station involving the deputies?

A    Yes.  There was a group of deputies who had pretty much taken over the scheduling, the overtime, the car assignments; basically running ramshod on the other deputies that were there, kind of a rogue organization who were in charge of the station.

Q    Was there a name that they identified themselves with?

A    Yes, they called themselves the Regulators.

**UNITED STATES DISTRICT COURT**

Q    Along with the Regulators, did you see some other problems involving deputies at the Century Station?

A    Yes.  When I took command of the station, they had the highest amount of significant force incidents in the county. They also had the highest number of officer-involved shootings in the county.  In fact, they had more officer-involved shootings than the entire rest of the Sheriff's Department combined.

Q    What about citizen complaints, were there any issues with respect to citizen's complaints?

A    Yes, they were at the very top of the citizen complaints also.

Q    And what is a citizen's complaint?

A    When a citizen would either come into the station or call and file a complaint about the conduct of the deputies during a contact that they might have.

Q    Did you do anything to confront these issues?

A    Yes.  The first thing that I did was have conversations with supervisors to -- causing them to be supervisors, do their job as supervisors.  We then had several meetings with the deputies where we stressed the importance of doing good police work, honest police work.  And what it did was it resulted in a lowering of force issues considerably, shootings -- I rolled on every officer-involved shooting that we had which lowered the shooting incidents.  The citizen complaints were significantly

lower.  I took a strong disciplinary posture towards any misconduct that was done there, and it seemed to have a very significant effect.

Q    I want to ask you about a couple of things you just mentioned.  You said you rolled at every shooting.  What does it mean that you rolled?

A    I would respond to the actual scene of the shooting.  I would then be walked through with the shooting team from homicide and Internal Affairs, and then I would go back and talk to the deputies involved.  And then when the reports came through, I would have a firsthand knowledge of what had transpired and also what the scene looked like.

With every involved shooting, there's a force review, executive force review that's done by the executives of the Department, and the captain would attend those and participate in a discussion of the shooting and give his opinion as to whether the shooting was within policy, out of policy, and if there was a recommendation for discipline.

Q    You mentioned also in your previous answer something about strong discipline of the deputies.  Do you recall that?

A    Yes.

Q    What did you mean by strong discipline of the deputies?

A    There were several cases where internal investigations, or unit level investigations which is an internal investigation into conduct which is done by a supervisor at the unit of

assignment.  There were several that I initiated for disciplinary reasons for policy violations.  In addition, I inherited several investigations that were started by the previous captain at that station that were not completed, so I was able to adjudicate those.  A couple of those resulted in terminations of deputies.

Q    You had spoken previously about the Regulators, the group that was within Century Station.  Did you do anything with respect to the Regulators?

A    Yes.  There was a funeral for an officer who was killed in the line of duty who previously had worked Century and had transferred to another station.  During that funeral, one of the Century deputies got up and made a speech at the funeral and made a comment that we were not sure of actually what it meant.

My chief at the time turned to me and said, "What's going on?  What does that mean?"  I said I would find out.  There was also a floral arrangement that was delivered and was on display at the funeral which was done in black and white and had a number on the center of the funeral arrangement, and we didn't know what that signified.  So I was instructed to find out through my sources at Century what that meant.

Q    Did you learn through your sources what that meant?

A    Yes.  Several days later, I did learn that what it meant was it was a Regulator symbol, that was his Regulator number,

and that the saying basically was "Regulators for life, life for Regulators."

Q    Did the existence of the Regulators cause you any concerns?

A    Yes, they did.

Q    Why is that?

A    When I was executive aide to the undersheriff, the undersheriff had received an anonymous correspondence while I was there that I opened and read which alluded to extortion of not only deputies but other people in the community done by the Regulators, the fact that they were extorting probationary deputies to contribute financially to various events.  There was also a charitable alleged fundraiser to make up salary for a deputy that had been suspended by the Department, to make up his loss salary and cover his loss of wages for his misconduct.

Q    Mr. Roller, I want to focus now on any efforts you tried to either disband or break up the Regulators.  Did you take any efforts to do those things?

A    Yes.  I was in constant contact with my boss, a chief and also my area commander.  I was then notified that there had been, due to my efforts, a private meeting set up with three members of the Regulators who purported to be the leaders of the organization.  They met in a park and disclosed the organization to the chief.  Chief then came back, informed me of the conversation.

He then had a meeting in my conference room that was attended by six or seven of the Regulator leaders, my chief, two commanders and my operations staff.  We told them at the time that it was okay to be a social organization, but there were activities that the station needed to decrease and stop happening and that their influence on the station would end.

Q    Did you find that it did end at that point in time?

A    It reduced.  It did not totally end.

Q    Did you do anything else to try to break up this group?

A    Yes.  I had several meetings with the entire staff of Century Station, pointing out the fact that, number one, at previous meetings they had denied the existence or knowledge of the organization but now we knew what they were and that they were operating.

I then made changes in various staffing positions to remove those people who were Regulators from positions where they could control certain activities within the station, the watch deputies, the scheduling people, and that seemed to have a definite impact on the activity.

Q    I want to direct your attention to June of 2007.  At some point in time around that time frame, did a meeting occur with Mr. Tanaka at Century Station?

A    Yes.

Q    Okay.  Do you remember the date that that occurred?

A    The meeting was June 28th, 2007.

Q     And what -- first of all, who was present at that meeting?

A     I was told to have the entire staff of Century Station that was available to be at the meeting.

Q     Where was this meeting held?

A     It was held in the Kenny Hahn Auditorium at Century Station, which is a large meeting area.

Q     In terms of those present, you're familiar with people that are sworn and people that are not sworn; is that right?

A     Yes.

Q     What is the difference between people who are sworn and not sworn?

A     Sworn personnel are certified police officers, peace officers.  The nonsworn are the support staff, the clerical staff.

Q     And did both sworn and nonsworn attend that meeting?

A     Yes.

Q     When Mr. Tanaka arrived, what occurred at this meeting?

A     Well, the meeting had already been in progress.  The meeting was originally called for two o'clock.  So I started the meeting by talking about the activities that had been occurring at Century Station, the fact we had made a big improvement in our force, our shootings were down, the citizen complaints were down, the citizen accommodations were up.

Mr. Tanaka then arrived at about 2:30 in the afternoon.  I turned over the floor to Mr. Tanaka so that he could address

the people at the station.

Q    At some point in time, did Mr. Tanaka make a statement about Internal Affairs?

A    Yes, he did.

Q    What, if anything, did he say about Internal Affairs?

A    He stated he hated Internal Affairs; they had no place in the Department; and that investigations ruin the deputy's lives; and that it's not fair to them to have investigations since it impacts them, impacts their family, leaves them uncertain; and that he didn't like the fact that captains were putting investigations on deputies or personnel; and that he would see to it that any captain that put excessive or unnecessary investigations on a deputy would be investigated themselves.

Q    Are you familiar -- are you familiar with the term "blue line"?

A    Yes.

Q    What is that term?

A    The blue line is a term that's referred to the law enforcement conduct that a law enforcement officer takes.  We "tow the blue line," which means we're supposed to be honest and above board and do everything according to the book and policy, and that's that blue line that separates us from the criminal element.

Q    What, if anything, did Mr. Tanaka say about the blue line

at that meeting?

A    Mr. Tanaka said that he understood that Century was a rough area full of gang members, and that in dealing with gang members sometimes you ought to tow the blue line and even cross it at times.

Q    Are you familiar with the term "gray area"?

A    Yes.

Q    What, if anything, did Mr. Tanaka say about the gray area?

A    Well, at that time he didn't say anything about the gray area.  He just said that you had to cross that blue line in dealing with the gang members and be very aggressive against them.

Q    I want to direct your attention to your binder, Exhibit 4 in your binder, please.

      Can you open it up and look at Exhibit 4.

A    Yes.

Q    Do you recognize that?

A    Yes.

Q    What is it?

A    This is a copy of a memorandum that I drafted to Willie J. Miller who was my district commander.  This copy has a name of a deputy redacted, and it is not the original.  It is a copy that was taken out of my computer.  The reason I know that is the copy that I sent to Commander Miller was signed above my printed name.

UNITED STATES DISTRICT COURT

Q      You don't know who took that out of your computer?

A      No, I don't.

Q      And you said the name is redacted.  What do you mean by redacted?

A      There's a black thick line drawn through the deputy's last name at the bottom of the page.

Q      Why did you create this memo?

A      After Mr. Tanaka had addressed the deputies, I went back in my office, and I was just in shock that here the undersheriff of the Department had made statements to deputies that basically contradicted everything that I was trying to do at Century and had accomplished.  I was trying to get them to tow the blue line, and I just had somebody tell them, a high-ranking person, that they had to be very aggressive and sometimes cross that blue line.

So the first thing I did was bring my operations staff into the office and say, "Did you guys take that the same way I did?"  And they said, "Oh, yeah, definitely."

MR. HAIG:  Objection, Your Honor, hearsay as to the last part of the statement.

THE COURT:  Overruled.

THE WITNESS:  So once that was done, I made a phone call to my chief, and I was instructed to prepare a memo through the chain of command to document what he had said.

Q      (BY MR. FOX)  And is that what that memo is?

A    That's what this memo is.

Q    Is Exhibit 4 -- I know you mentioned it's a copy, but is it in substantially the same condition -- the text in it as the memo that you prepared?

A    Yes, the text is complete with the exception of the redaction.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 4.

        THE COURT:  Any objection?

        MR. HAIG:  No, Your Honor.

        THE COURT:  It will be received.

    (Exhibit No. 4 received into evidence.)

        MR. FOX:  May I publish it, Your Honor?

        THE COURT:  Yes.

Q    (BY MR. FOX)  I'm not sure if it's easier, Mr. Roller, for you to read -- for you to read the copy that's in front of you or to read what's on this computer screen in front of you, but what I'd like you to do, first of all, is read the second paragraph of your memo.

A    Okay, just a second.  I closed the book, so I've got to find it again.

        THE COURT:  There should be a copy on the screen just to your right.

        THE WITNESS:  My eyes aren't that good, Your Honor.

        THE COURT:  Okay.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  Second paragraph, you said?

Q    (BY MR. FOX)  Yes, please.  It starts with "This assembly."

A    "This assembly took place in the Kenneth Hahn Auditorium. Originally scheduled for 1400 hours, it began with me giving an overview of activities within Century's area as it relates to crime reduction, personnel, expectations and a request for future suggestions on impeaching crime and improving community -- improvement.  At 1430 hours, Mr. Tanaka arrived and addressed the group.  He covered various general topics and stated his purpose for the visit."

Q    Now if can you continue with the next paragraph, please.

A    "He went on to field various questions from the group including plans for 2008 personnel shortages and other general questions.  In concluding his remarks, he stated that he did not like the lengthy new pursuit policy and solicited input through the unit commander to shorten the policy.

"He also stated that he believed that deputies and officers should function right on the edge of the line in that deputies needed to be very aggressive in their approach to dealing with gang members.  He also said that the captain and supervisors should not be so hasty in putting on cases on deputies and that they should think about what they are doing and see if there is another way to address the issue.

"He said that a lot of supervisors are quick to just put

UNITED STATES DISTRICT COURT

cases on people, and that when they become supervisors, they forget what it is like to be a deputy.  He said that he would be checking to see which captains were putting the most cases on deputies, and he would be putting a case on them.  He said that when a deputy has a case on him, he cannot function properly in the field and it has a negative impact on his performance and his personal life.  He said that he didn't like the Internal Affairs Bureau and the way they worked."

Q    Mr. Roller, how long did you remain captain of Century Station?

A    Three weeks after I wrote this memo, I was on vacation and I received a phone call in the Gulf of Alaska telling me that I'd been transferred effective immediately.

Q    Who did you receive phone call from?

A    First it was my chief's aide.  He transferred me to the undersheriff who then transferred me to the Sheriff.

Q    And who was the Sheriff at the time?

A    Leroy Baca.

Q    What was Mr. Tanaka's role in the organization at this time?

A    He was an assistant sheriff.

Q    Do you recall what responsibilities he had as assistant sheriff?

A    Part of his responsibility was over the patrol stations Region 2, which Century was in, he was the assistant sheriff.

Q    Was this a transfer that you were seeking?

A    No.

Q    Do you think that you would recognize Mr. Tanaka again if you saw him?

A    Oh, definitely.

Q    Could you please look around the courtroom and let me know if you see him.

A    He's the person sitting at the table wearing the red, white and gray tie, blue shirt and gray suit.

        MR. FOX:  Your Honor, may the record reflect the in-court identification of Mr. Tanaka?

        THE COURT:  The record will so reflect.

        MR. FOX:  One moment, Your Honor.

    No further questions, Your Honor.

        THE COURT:  Cross-examination.

                    CROSS-EXAMINATION

Q    (BY MR. HAIG)  Good morning, Mr. Roller.

A    Good, thank you.

Q    I want to go to the time when you first got to Century Station.  What was -- was that in -- I'm just trying to look at my notes here.  What date was that that you got to Century Station?  2005?

A    2005.

Q    Okay.  When you were the aide to Undersheriff Walde, I'm assuming that was after you were the aide to Undersheriff

Stonich?

A       That's correct.  Undersheriff Stonich retired.

Q       And Undersheriff Walde worked in Sheriff's Headquarters?

A       Yes.

Q       And that would be in what city?

A       Monterey Park.

Q       And so that's where you worked too?

A       Yes.

Q       Did you have day-to-day contact with Paul Tanaka while you were Undersheriff Walde's aide?

A       I wouldn't say it was every single day, but I did have contact with him and his staff probably on a daily basis.

Q       Where was he working at that time?

A       The other side of the fourth floor.  On the same floor as I was, just in a different office.

Q       What was Mr. Tanaka's rank at that time?

A       Assistant sheriff.

Q       Okay.  What was he in charge of in 2005?

A       2005, I don't know whether he was on the administrative end -- I believe he was in 2005.

Q       When you elected and chose to become the captain -- after promoting to captain, excuse me, you chose to go to Century Station?

A       Well, I was selected to go to Century Station.

Q       You've talked about how as promoting from an aide to the

undersheriff, you have a privilege to pick a good spot; correct?

A    That's correct.

Q    And people tried to talk you out of going to Century Station?

A    Well, some of them thought I was going to one of the most difficult commands in the Sheriff's Department.

Q    A difficult command because -- because Century Station patrols a high crime area.  Would that be correct?

A    Yes.

Q    And what cities does Century Station patrol?

A    Walnut Park, Florence, Firestone, Watts, Willowbrook and Lynwood.

Q    Those areas have a lot of different gangs; correct?

A    Yes.

Q    And a higher rate of crime than many other -- probably most other stations?

A    Yes.

Q    Because of your work in the Compton Police Department and your job as captain in the Compton Police Department, which is not too far from Century Station, was that one of the reasons why you wanted to work there?

A    Yes, and I wanted a patrol station because my background was municipal.

Q    You go to Century Station in 2005; right?

A    Yes.

Q    And from 2005 to June of 2007, had you had any visits from any assistant sheriff between -- before Assistant Sheriff Tanaka actually came and saw you?

A    No.

Q    You state in the memo that you wrote --

MR. HAIG:  Exhibit 2, I believe?  Is that correct?

MR. FOX:  4.

MR. HAIG:  4, I'm sorry.

Q    (BY MR. HAIG)  -- in Government's Exhibit 4 that this was a part of Mr. Tanaka's visits to all patrol commands going to Century Station.

A    That was the way it was stated to me when the visit was requested.

Q    How long did this visit or this meeting take?

A    Well, the total time of the meeting was about two hours. Mr. Tanaka was there for probably 45 minutes.

Q    And you prepared this memo only two days after?

A    This memo was prepared on a Saturday.  The phone call directing me to do it was done on a Friday.

Q    Would you say that your memory was pretty fresh at the time you prepared this memo?

A    Yes.

Q    Certainly better than it is today, which is several years later?

A     Yes.

Q     You stated when you testified a moment ago -- and correct me if I'm wrong -- that at the time, Assistant Sheriff Tanaka said that he hated Internal Affairs?

A     That's correct.

Q     Do you see anything in your memo to which you can attribute Mr. Tanaka using the words "I hate Internal Affairs"?

A     There's nothing in my memo, it's from my recollection and my recollection the day that I wrote this.  This memo, it was quite honestly toned down because I knew it wouldn't just stop at our division.  I knew it was going to be passed on. Mr. Tanaka being an assistant sheriff, quite honestly, I didn't know what would be done with this memo by the Sheriff, if it ever would make it to the Sheriff.

Q     You intentionally, as you state today, toned down the memo?

A     That's correct.

Q     And put things in the memo that were not an accurate depiction of what Mr. Tanaka told you it would be?

A     No, that's not what I said.  What I said was I toned down things.  The content of the memo is accurate in what it depicts, it just is not in the strongest language that I could have used.

Q     In your testimony today, would it be accurate that Mr. Tanaka on June 28th, 2007 said that he hated Internal

Affairs?

A     Yes.

Q     Did you use the word "hate" in your memo?

A     No, I did not.

Q     In your testimony on direct examination, did you talk about this blue line?

A     Yes.

Q     And that Mr. Tanaka used the words "the blue line"?

A     Yes.

Q     Is the blue line anywhere in your memo that you wrote two days later?

A     No, I said that they should function right on the edge of the line.  I did not say the color.  I said the line.

Q     Do you say -- is there anywhere in your memo that they should cross over the line?

A     No, what it says is they should function right on the edge and be aggressive.

Q     Do you think it's improper police work to be aggressive in patrolling a high gang and crime area?

A     Not if you're obeying the law yourself and doing it within policy.

Q     Did Mr. Tanaka ever tell you that day that you should not obey the law, that deputies should not obey the law and do things out of policy?

A     No, what he said was sometimes deputies had to cross the

**UNITED STATES DISTRICT COURT**

line.  To me, that meant violating law or policy.

Q    Is there anything in the memo that you wrote two days later that shows that Mr. Tanaka said that deputies should cross the line?

A    No, but it was said to my chief when I reported the conversation that night.

Q    Did you put it in your memo?

A    No.

Q    As a matter of fact, in your memo, you put in that they should go to the edge of the line.

A    What I said was that, to quote the memo, they should function right on the edge of the line.  And once again, that was because I knew this memo would get sent up to the chain, and obviously, I must have been right, I was transferred two weeks later without warning.

Q    Do you think deputies should be aggressive in their approach to dealing with gang members?

A    Sometimes that works.

Q    That's what Mr. Tanaka told you that day and told the group of people that day, they should be aggressive?

A    Yes, but in the context that he said it, he said to be aggressive and sometimes cross that line, which is different than just being aggressive when you deal with gang members.

Q    I'm looking at the middle paragraph.

        MR. HAIG:  And if we could publish that again.

UNITED STATES DISTRICT COURT

Q     (BY MR. HAIG)  Do you see that -- the middle paragraph that starts with "He also stated"?

A     Where in the middle paragraph are you looking at? Beginning of the paragraph or end of the paragraph?

Q     Actually, if you look at the monitor right there, sir, right in front of you.

A     It's not on --

Q     Do you see the highlighted portion?

A     Yes.

Q     Could you read that, please.

A     "He also stated that he believed that deputies and officers should function right on the edge of the line in that deputies need to be very aggressive in their approach to dealing with gang members."

Q     That statement that you just read, do you have any quarrel with that statement?

A     Other than the fact that it is not 100 percent or in the context of what he said, it is toned down because this document was going to travel up through the chain and was a overview. But his exact comments were made to my boss and my boss's boss at the time that I reported what he had said, and like I said earlier, I was in shock because that had contradicted everything that I had tried to do at Century.

Q     The statement that's highlighted that you just read, just that statement that's in your memo, do you have a problem with

that statement?

A    No, I wrote it.

Q    Do you have a problem with that statement being something that you disagree with?  Just that statement that's written in your memo, not the other things that you had just spoken about.

A    Well, I think you have to take the two sentences in context.  If you're referring to just -- just those two sentences taken out of context, there's nothing in that out of context that is erroneous.

Q    You stated during this time that Mr. Tanaka was touring the station and making the statements that he said that captains that put unnecessary or excessive investigations on the deputies would get cases put on them as well?

A    Yes.

Q    You think it's a good thing to put unnecessary and excessive investigations and cases on deputies?

A    Unnecessary ones, no, but you don't know whether they're necessary until you complete the investigation.  Excessive, if you're in a position or command that has a lot of cases that you want to investigated, what's excessive?  A captain who puts on necessary investigations or begins the necessary investigations is doing his job.  A captain who ignores investigations or deals with them when they are not being investigated and doesn't investigate the conduct -- the negative conduct is not doing his job.  You don't know whether

**UNITED STATES DISTRICT COURT**

the investigation is totally necessary until it's adjudicated. If it's adjudicated and the complaint is sustained, then it was necessary.

Q    As a captain, you can't make any kind of preliminary determination whether an investigation looks to you to be necessary or excessive or not?

A    Captain is basing his initial decision whether to create an investigation usually on either a crime report or a citizen complaint.  Sometimes those are glossaries.  Sometimes a deputy will say things and not include things or a citizen may overreact or report something that is erroneous.  So the purpose of the investigation is to not only get to the truth of the matter, but it's to adjudicate the complaint, whether that be to clear the officer or to find that the officer did something that was egregious and needs to be handled through discipline.

Q    In your --

A    The purpose of an investigation is a fact-finding mission.

Q    In your experience, did you see captains putting -- I'm not talking specifically at Century Station, but in your experience as a deputy and as a supervisor, did you see times when supervisors would unnecessarily put cases on deputies as a way of management style?

A    No.

Q    Now, you didn't have the view that Assistant Sheriff

Tanaka had at that time being the assistant sheriff over patrol of the entire Sheriff's Department; correct?

A    No, I didn't have his view, but I sat in through enough case reviews as the executive aide to the undersheriff.  Also, my previous experience at the City of Compton doing investigations, work in Internal Affairs to know I'm sure Mr. Tanaka saw not only Century Station, but he saw the rest of the stations within the command.

Q    Of course.  So he had, obviously, more perspective than you would have just being the station commander for one station?

A    Certainly.

Q    You said three weeks later after you published this memo to your supervisor, that you were instructed that you were being transferred?

A    That's correct.

Q    Isn't it true that Sheriff Baca is the only person that could transfer captains?

A    Well, officially his name comes out on the memo involving the transfers, but knowing what I know about the inner workings of the Sheriff's Department, that's not true.

Q    So you're just guessing when you're saying that?

A    No, I'm not guessing.

        MR. FOX:  Objection, Your Honor, argumentative.

        THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

MR. HAIG:  I'll rephrase, Your Honor.  Thank you.

Q     (BY MR. HAIG)  You said knowing what you know about the inner workings, you feel that that's not true.

A     That's correct.

Q     That's your opinion?

A     It's my opinion through my experience and what I observed as being the executive aide to the undersheriff -- or two undersheriffs and seeing a total of about three years of transfers go through the office.

Q     Did you talk to the Sheriff about this opinion that you have?

A     Yes, I did.

Q     Did he confirm that opinion to you?

A     No, what the Sheriff did was tell me that I was transferred for an investigation that occurred before I ever got to Century Station.

Q     You have no idea whether the Sheriff transferred you after reading this memo based upon his own best judgment, do you?

A     No, what I was told was later that Mr. Tanaka and the Sheriff met with a group of Regulators on the parking lot of Century Station --

MR. HAIG:  I'd object, Your Honor.  This is beyond the scope.

THE COURT:  You stepped on this yourself.  Overruled.  Finish your answer.

UNITED STATES DISTRICT COURT

THE WITNESS:  I was told while I was on vacation -- and I left a week after this memo was written for a two-week Alaska vacation.  I was told by my aide that Mr. Tanaka and the Sheriff showed up at Century Station.  They met with three of the leaders of the Regulators, and later on that afternoon I received a call.

And what was unusual about the transfer is every other transfer on the Sheriff's Department usually comes out in a jay dick form and it's dated two or three weeks in the future, when I was told my transfer was effective immediately that afternoon and my replacement had already been put in place when I got the phone call.

Q    (BY MR. HAIG)  Who was your replacement?

A    Jim Hellmold.

Q    And where did you go after being transferred?

A    I went to captain of Internal Criminal Investigations Bureau.

Q    Also known as ICIB; correct?

A    That's correct.

Q    You knew after you got transferred that the new captain, Captain Hellmold, was successful in reducing the amount of citizen's complaints, shootings through Century Station?

A    I don't know whether he was successful in reducing them substantially.  I wasn't privy to a lot of that data.

Q    You do know that the incidents of citizen complaints and

officer-involved shootings reduced at Century Station after you left, do you not?

A    I hope so.

Q    Do you know that to be true?

A    No.

Q    Do you know Captain Hellmold?

A    Do I know him, yes.

MR. HAIG:  Thank you.  I have nothing further.

THE COURT:  Redirect?

MR. FOX:  Thank you, Your Honor.

REDIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Roller, Mr. Haig asked you questions about whether you were aware of whether Mr. Tanaka was referring to other captains putting cases on other captains who might be unnecessarily putting cases on deputies.

Do you recall that?

A    Yes.

Q    Who was Mr. Tanaka speaking to at the time he made the statement?

A    He was speaking to the group of Century Station.

Q    Were there deputies --

A    I was the only captain there.

Q    Were there any other deputies there other than those that worked at Century Station?

A    No.

**UNITED STATES DISTRICT COURT**

Q   You said that you made the statement that Mr. Tanaka -- I'm sorry, you said that a statement was made to your chief that Mr. Tanaka said crossed the line.  Who was it that made the statement to your chief that Mr. Tanaka had made this statement?

A   I did.

Q   And you said that the statement was also made to your boss's boss?

A   Yes.

Q   Was that -- who is that?

A   That was my division chief, Ronnie Williams.

Q   You also mentioned your boss as well, that the statement was made to your boss.  Who was that?

A   That was Commander Willie Miller, and also in the room was Commander Ralph Martin.

Q   And who made the statement reflecting Mr. Tanaka's statement at that meeting that you had with your boss and your boss's boss?

A   I made the statement.

Q   And approximately when was this that you told them about Mr. Tanaka's statements?

A   First thing day after the meeting; I tried to get in touch with him that night and couldn't do it.

Q   I want to pull up one last thing on your memo.  I would just like you to read this last line if you could in the

context of something that Mr. Haig asked you.

Let me ask the question first, and unfortunately, I'm going to need some technical assistance once again.

Mr. Haig asked you a question about whether your memo reflected that Mr. Tanaka had said that he hated Internal Affairs.  Do you recall that?

A     Yes.

Q     It might be easier for you to read the hard copy of the memo in front of you, the very last -- there we go -- the very last sentence there on that third paragraph.  Do you see it there?

A     Yes.  "He said he didn't like the Internal Affairs Bureau and the way they worked."

MR. FOX:  I have no more questions, Your Honor.

THE COURT:  Recross?

MR. HAIG:  No, thank you.

THE COURT:  All right.  You may step down.  Thank you very much.

Ladies and gentlemen, we're going to take our first break of the morning.  Again, I want to remind you until this trial's over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on Internet chat rooms, through Internet blogs, bulletin boards,

**UNITED STATES DISTRICT COURT**

e-mails or by text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read or watch any news reports or other accounts about the trial or anyone associated with it, including looking online.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.  Please keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

All right.  We'll come back at 10:15.  Please leave your notebooks on your chairs.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. STEWARD:  Very briefly, Your Honor.  I think Mr. Maxwell is our next witness, and if so, we have a defense exhibit I wanted to run by the Court before I jumped into it. It's a page out of this gentleman's personnel file indicating that back in 1980 he was fired from a police organization, the Le Claire Police Department, for being unable to get along with one or more others in the Department and he blames it on the police chief.  The date of it is February 1980.  I'd like to go into it as a pattern of this gentleman not being able to get along.  I believe he'll testify and blame Mr. Tanaka for the

**UNITED STATES DISTRICT COURT**

ills of his career, and we think it's very similar, and we'd like to go into it.

THE COURT:  What's the exhibit number?

MR. STEWARD:  It's Defense 356.

THE COURT:  356?

MR. STEWARD:  Correct, Your Honor.

THE COURT:  What's the government's view?

MR. JAUREGUI:  Your Honor, we would object on multiple grounds.  First of all, this is a 36-year-old event. Secondly, I believe it will be completely irrelevant. Obviously, we'll have to wait to see, but it has no bearing on his truthfulness or credibility.

I do believe it's improper impeachment.  Like I said, it's 36 years old, and it's also the witness's own statement.  So I just don't think -- I think it's -- we would object to it on multiple, multiple grounds.

THE COURT:  Okay.  Let's see where we are once he testifies.

MR. STEWARD:  Thank you, Your Honor.

(Off the record at 10:03 a.m.)

(On the record at 10:16 a.m.)

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Okay.  Let's avoid saying good morning to the witness.  That's sort of state court deal, but I'll tell

**UNITED STATES DISTRICT COURT**

him good morning.  You want to cut their hearts out anyways, so let's avoid doing that.

MR. HAIG:  I was trying to be polite.

THE COURT:  I know.

MR. HAIG:  I won't do it anymore.

THE COURT:  That's all right.

I've looked at this.  I think it -- is this the only incident that you've got?

MR. STEWARD:  Well, no, there are other things not like that.

THE COURT:  Okay.  Well, based on what I know right now, which is not a whole lot, it's probably too old, and under 403 I think it sort of wastes a lot of time.  But let's see how it goes.  But if you're going to try to get into this, why don't you give me a heads-up before you do.

Certainly.

MR. JAUREGUI:  Your Honor, I would just say, I also don't -- this is Eddie Jauregui speaking for the government.  I also don't think it's proper under Rule 608(b).  I think it's a specific instance.  It doesn't go to his character for truthfulness -- his character or truthfulness.  I just don't think it's proper impeachment material.

THE COURT:  Well, at this point I sort of agree with you.

MR. FOX:  One minor housekeeping issue, Your Honor.

**UNITED STATES DISTRICT COURT**

The defense has no objection to witnesses who've already testified being in the courtroom after they're done testifying. Is that okay with Your Honor?

THE COURT:  That's fine.

MR. FOX:  Thank you.

MR. JAUREGUI:  Thank you, Your Honor.

(End of sidebar discussions.)

THE COURT:  All right.  Let's bring our jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  Call your next witness.

MR. JAUREGUI:  Your Honor, the government calls Commander Pat Maxwell.

THE DEPUTY CLERK:  If you'll raise your right hand for me.

(The witness, PATRICK EDWARD MAXWELL, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Patrick Edward Maxwell, M-A-X-W-E-L-L.

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  Counsel.

MR. JAUREGUI:  Thank you, Your Honor.

//

DIRECT EXAMINATION

Q     (BY MR. JAUREGUI)  Sir, how are you employed?

A     I'm employed by the Los Angeles County Sheriff's Department.

Q     And how long have you been employed with the Los Angeles County Sheriff's Department?

A     Approximately 30 and a half years.

Q     And what is your current rank in the Department?

A     Commander.

Q     How long have you been a commander?

A     Since July of 2013.

Q     And prior to becoming a commander, what did you do within the Sheriff's Department?

A     I was a captain at Norwalk Sheriff's Station.

Q     And how long did you hold that position?

A     A little bit over six years.

Q     And what were your responsibilities as the captain of the Norwalk station?

A     I was the unit commander of Norwalk Station, and on our Department is a captain.  I basically served as the chief of police for the City of Norwalk and the City of La Mirada and the unincorporated areas of Whittier County.

Q     And did you oversee other staff members when you were the captain of the Norwalk station?

A     Yes.

Q     And how many staff members did you oversee?

A    I had approximately 190 sworn officers and approximately 50 professional staff.

Q    And those sworn officers, what ranks were they?

A    They were lieutenants, sergeants and deputy sheriffs.

Q    Prior to becoming the captain, did you hold any other position at the Norwalk station?

A    Yes, I did.

Q    And what was that position?

A    Operations lieutenant.

Q    And how long did you serve as the operations lieutenant of the Norwalk station?

A    Approximately three and a half years.

Q    Sir, when you were the captain, was Paul Tanaka in your chain of command?

A    Yes.

Q    And how was he in your chain of command?  Where did he fall within the chain of command?

A    I was the captain of Norwalk station, and above me would be the area commander, and then you have a division chief of my division, and then you would have the assistant sheriff of patrol, which was Paul Tanaka.

Q    Okay.  In 2007 when you were the captain, were you familiar with an entity called the Internal Affairs Bureau?

A    Yes.

Q    And how were you familiar with the Internal Affairs

Bureau?

A    Well, it's a unit in itself in our Department.  It's headed up by a captain and investigators.

Q    Okay.  And what does the Internal Affairs Bureau do?

A    The Internal Affairs Bureau, they investigate allegations of misconduct that aren't criminal in nature.  They only do administrative investigations.  We have another unit that investigates any type of criminal allegations.

Q    And when you say they investigate misconduct, whom are -- who are they investigating?

A    Any member of the Los Angeles County Sheriff's Department, either sworn or professional staff.

Q    Commander Maxwell, are you familiar with the phrase "putting a case on someone"?

A    Yes.

Q    And what do you understand that phrase to mean?

A    It's kind of a term that -- you know, putting a case on somebody in terms of administrative investigations is basically you open up an administrative investigation on an employee.

Q    In 2007 had you ever discussed the Internal Affairs Bureau with Paul Tanaka?

A    Yes.

Q    And where did that discussion take place?

A    It was at Headquarters bureau.  It was just a casual conversation.

Q    Okay.  And who was involved in that conversation?

A    Myself and Paul Tanaka.

Q    And where were you at Sheriff's Headquarters?

A    I don't exactly recall what floor I was on.

Q    Were you in a conference room, a meeting room?

A    I don't recall.

Q    Okay.  What was -- you discussed Internal Affairs; correct?

A    Yes.

Q    And what was the discussion?

A    Paul was upset because he told me at Century Station that there were a lot of internal investigations that were opened on deputies, and he was upset -- the number -- about them.  And I recall there was like 20 open cases, and he said he was personally going to go down there and look into it and he might have to put a case on the captain.

Q    And, Commander Maxwell, did you know who the captain of Century Station was at that time?

A    Captain Roller.

Q    Now focusing on your time as captain of the Norwalk station, did you hold staff meetings, Commander Maxwell?

A    Yes, I did.

Q    And who attended your staff meetings?

A    My managers and supervisors.

Q    And when you say "my managers and supervisors," who do you

mean?

A    The lieutenants I would refer to as managers.  At the time, I believe I had seven or eight lieutenants and approximately 30 sergeants who are supervisors.

Q    And were those people under you in the command structure?

A    Yes.

Q    Okay.  Did you ever invite any Sheriff's Department executives, any individuals above you in the chain of command to attend your staff meetings?

A    Yes, I have.

Q    And had you ever invited Paul Tanaka to attend any of your staff meetings?

A    Yes, I did.

Q    And approximately when was that?

A    It was approximately 2009.

Q    And what was Mr. Tanaka's position within the Department at that time?

A    He was the assistant sheriff in charge of patrol operations and detective bureau and, I believe, Homeland Security.

Q    And why did you invite then Assistant Sheriff Tanaka to visit your station?

A    One of the main reasons is Paul's very knowledgeable in the budget and how the money flows through the Department, and I wanted him to share his knowledge with my supervisors to

better understand of how the Department operates.

Q    And did he, in fact, make remarks or comments to your -- and just to be clear, when you say your supervisors, are you -- excuse me, are you again speaking about the sergeants and lieutenants who work under you?

A    Yes.

Q    And did Mr. Tanaka, in fact, make comments or remarks to those sergeants and lieutenants?

A    Yes, he did.

Q    And approximately how many people were present, Commander Maxwell?

A    Normal staff meeting, there's usually 30 to 35 people present.  It fluctuates because people are on vacation or have another obligation or they're excused for it.

Q    And where did this meeting take place?

A    At Norwalk Sheriff's Station in the downstairs assembly room.

Q    And what did Mr. Tanaka say in his remarks to your sergeants and lieutenants?

A    He talked about the budget, other things going on in the Department, and then at some point, he started to -- started telling the staff what a difficult job deputy sheriffs have to do and we need to support them and, you know, what they do day in and day out is very tough.  And then he moved to the right a couple steps, and he said, "And you guys need to allow them to

work in the gray area."

Q    And, Commander Maxwell, did you have a reaction to this comment about allowing the deputies to work in the gray area?

A    Did I have a reaction?

Q    Yes.

A    Not a verbal one, no.

Q    Did you have any reaction to it?

A    I mean, within myself I was, you know, surprised that that was said.

Q    And why were you surprised, Commander Maxwell, about this gray area comment?

A    Well, the gray area is very -- it has -- in law enforcement it has a very negative position.  I mean, the gray area's unknown, and in police work you don't have unknown.

Q    And what did you -- did you personally have an understanding of what gray area meant?

A    Yeah, my definition, my understanding of gray area is to work, you know, outside policy or outside the law.

Q    Commander Maxwell, did you say anything to your staff at Norwalk station about Paul Tanaka's comments?

A    Yeah.  After Paul left I addressed my staff, and I said, you know, "I don't know what Mr. Tanaka was talking about, the gray area, but I want to be very clear here.  There is no gray area.  You know, our deputy sheriffs, we have a responsibility that they don't get themselves in trouble, and, you know,

**UNITED STATES DISTRICT COURT**

they're either in policy or out of policy.  They're either operating within the Constitution or outside of the Constitution.  There is no gray area.  Do you understand me?"

Q    Now switching topics, Commander Maxwell, as a captain at Norwalk station, were you familiar with something called a gang meeting?

A    Yes.

Q    And how were you familiar with the term "gang meeting"?

A    Well, the -- they start -- when Paul took over as assistant sheriff, he started these meetings on Monday, and they were originally called a gang meeting.  And it was where different station captains would come down to Headquarters, and there would be a lot of crime strategies discussed and go over last week's crime or the weekend's crime and, you know, what are you guys doing about this?

And in those meetings would be all different ranks.  It would be the station captains, but you may have a division chief or two in there from patrol.  You'd have lieutenants.  You'd have sergeants.  You'd have some professional staff from the crime analysts.  You would have maybe the narcotics unit in there.  The gang unit would also be in there.  And, you know, they fluctuated, but the amount of people fluctuated between 30 and 50 people during these meetings.

Q    And, Commander Maxwell, I'm sorry if I misspoke, where would these meetings take place?

A    At the time they were taking place at our old headquarters in Monterey Park down in the basement conference room.

Q    Oh, I apologize.  Go ahead.

A    No, I'm sorry.

Q    And as the captain of the Norwalk station, did you attend any of these meetings?

A    Yes.

Q    Now, Commander Maxwell, do you recall anything unusual happening at any of these gang meetings with -- where Mr. Tanaka was present?

A    Yes.

Q    And approximately when was that?

A    This was also in approximately 2009.

Q    And what was unusual about that meeting in 2009?

A    Well, during one of the meetings -- usually Paul would chair these meetings, and he would go around the room calling each station captains, and he was very good at calling captains at task that weren't doing their job.  And as he was going around the room -- and he always had a red file in front of him, a stack of papers.  And I don't know if he was reading from something, but just out of the blue he made a comment, and he goes, "Do you believe" -- he goes, "L.A.P.D.," he goes, "Do you believe that they have" -- and I don't remember the exact number, but he said, "Do you believe L.A.P.D. has approximately, you know, a couple hundred Internal Affairs

investigators?"

And all of us in the room -- I mean, I know myself, I was kind of surprised it was that high.  And he goes, "You know, and" -- "You know, we have" -- "and like I said, the numbers aren't right" -- or "I don't recall the exact numbers, but the sum is what I'm going to get at here," is he said that, "You know, we have 45."  He goes, "In my opinion, that's 44 fucking too many."

Q    And, Commander Maxwell, did you have a reaction to that statement?

A    Yeah, I mean, I was surprised.  I looked at one of my fellow captains in the room, and we just kind of looked at each other in kind of a startled look.

Q    And why were you -- why did you have a startled look on your face?

A    Well, Internal Affairs is a tough job to begin with.  The investigators that work there are usually sergeants, and they have a very tough job to do.  You know, they're the policemen of the policemen, and, you know, when you have an assistant sheriff basically just almost disregarding them or what they do on the Department, and, you know, that spread like wildfire.

That was back to Internal Affairs within 30 minutes, and, you know, you got a room full of managers and you have one of your top people in the Department discounting basically the Internal Affairs Bureau.

Q    Commander Maxwell, you've had personal interactions with Paul Tanaka before; correct?

A    Yeah.

Q    And if you saw him today, would you recognize him?

A    Yes.

Q    Do you recognize him in the room today?

A    Yes, he's at the defendant's table in the middle wearing a dark suit, striped tie.

MR. JAUREGUI:  Your Honor, the government requests that the Court take notice of the witness's identification of the defendant.

THE COURT:  The record will so reflect.

MR. JAUREGUI:  Your Honor, may I have a moment?

THE COURT:  Yes.

MR. JAUREGUI:  No further questions for this witness, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  You filed a POE complaint against Mr. Tanaka; correct?

A    Yes.

Q    When was that?

A    May of 2010.

Q    Can you tell the jury what a POE complaint is.

UNITED STATES DISTRICT COURT

A      POE complaint is called -- it's short -- excuse me, short for Policy of Equality that came out of a federal consent decree, a 30-year federal consent decree for a process where you can file complaints in the Department.

Q      And at the time you filed this, was Mr. Tanaka a superior officer to you?  Was he higher in rank?

A      Yes, he was assistant sheriff.

Q      And in your experience over the many years you've been in the Sheriff's Department, are these complaints common?

A      Can you define "common"?

Q      Well, are you aware of -- at the time in 2010, are you aware of anyone else filing a POE complaint against a superior officer in the L.A. County Sheriff's Department?

A      It happens all the time.

Q      Did it happen in 2010?

A      You know, those records are confidential.  I don't have access to them, but I would say yes.

Q      So you don't know for sure?

A      In 2010 I do.

Q      Take a look if you would at a white binder.  It may be at your feet.  Looks like this, and I'd ask you to be careful when you open it, it's kind of overstuffed.

A      I have it, sir.

Q      Take a look if you would at Exhibit 311, 3-1-1.

A      Okay.

**UNITED STATES DISTRICT COURT**

Q      You have it?

A      Yes, sir.

Q      Do you recognize this?

A      Yes.

Q      And is this a document that you created?

A      Yes.  Yes.

Q      And is this the POE complaint you and I have been talking about?

A      This was a narrative, yes.

Q      Two-page document, and you recognize this as that complaint; correct?

A      Yes, sir.

        MR. STEWARD:  Your Honor, I'd offer 311 at this time.

        THE COURT:  Any objection?

        MR. JAUREGUI:  No, Your Honor.

        THE COURT:  It will be received.

     (Exhibit No. 311 received into evidence.)

        MR. STEWARD:  And if I can switch over to the Elmo.  May I publish it, Your Honor?

        THE COURT:  Yes.

Q      (BY MR. STEWARD)  And, Mr. Maxwell, this is the document we've been talking about; correct?

A      Yes.

Q      And it's a two-pager; right?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And if we can take a look at the first paragraph, you describe an e-mail that you received from -- looks like Lieutenant Joe Gooden, aide to Assistant Sheriff Paul Tanaka.

See that?

A    Yes.

Q    And the e-mail was directed at station captains; correct?

A    Yes.

Q    And it's your understanding that would be station captains throughout the Los Angeles Sheriff's Department; correct?

A    Yes, sir.

Q    Okay.  So all captains, including you, received this memo; right -- or e-mail -- I'm sorry, e-mail?

A    I would assume so, yes.

Q    And in this e-mail, you were asked -- you and all of the other captains were asked to create certain reports.  Is that accurate?

A    Yes.

Q    And could you tell us what kind of reports was the e-mail requiring you to prepare?

A    I don't recall.

Q    Well, let's take a look at your POE complaint, Number 311, and it talks about preparing a lengthy written report about their station's target gang, target tagger gang, nonrevocable parole operations, Section 8 housing and a host of other issues

related to crime within the station's jurisdiction; right?

A    Yes.

Q    And you wrote that; correct?

A    Yes.

Q    And your objection in this POE complaint was to have to prepare these various documents and take the time to do that; right?

A    No, I believe you're misstating.  My complaint was not about doing the report.  That was just the background leading up to the event that happened.

Q    Okay.  Tell us what the event was that happened.

A    Well, there was three captains that were called in Chief Laing's office, and it was myself, Captain Mike Claus, C-L-A-U-S, and Captain Dave Halm, H-A-L-M.  And when we got there, inside that meeting was Chief Tom Laing, L-A-I-N-G, Commander Mike Rothans and Commander Bill Ryan.

And Chief Laing was visibly upset.  He was really red in the face, and he said he'd just been to Mr. Tanaka's office and got his ass ripped.  And he said that, you know, Tanaka said, "You guys are fucking dead to him, you don't get anymore fucking resources" and on and on.  And Tom Laing is a very religious man.  First time I ever heard him cuss, but he was, you know, really upset, and we're no longer allowed to come to the gang meetings -- and I'd have to read this to refresh my memory, but that was along the lines.

**UNITED STATES DISTRICT COURT**

Q    Do you recall that all of this discussion centered around the fact that you had complained about preparing these reports?

A    Say that again, sir.  I'm sorry.

Q    Sure.  The discussion you just described was caused by a meeting with Mr. Tanaka and that particular captain wherein he and you and the other captain, L-A-I-N-G or whatever it was, complained about having to do what you thought was busywork and you don't have time "as my staff and I are constantly carping and working to save time and save the Department from incurring paid overtime."  That was the heart of your complaint, isn't that true?

A    Well, the key to that, it was -- it was my complaint, but the threats were delivered to three captains; the other two had nothing to do with it.

Q    So your complaint was that you had to do more work under this demand by Mr. Tanaka; right?

A    I would describe it as busywork.

Q    And you didn't want to do it; right?

A    No, I didn't have the resources or the time.

Q    Okay.  And yet, at that time as captain at Norwalk, you were being paid around 180,000 a year; right?

MR. JAUREGUI:  Your Honor, I'm not sure how this is relevant.  I would object.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  You know, sir, in 2010 I don't really

know my salary, but I'm not going to say you're incorrect.
It's in the ballpark.

Q    (BY MR. STEWARD)  How many hours a week were you working
in 2010?

A    You know, a station captain probably works -- or at least
I did anywhere from 60 to 80 hours a week.

Q    And you did not want to spend any more time on what you
call busywork; right?

A    Yeah, I guess.

Q    And this POE complaint was found to be unfounded; right?

A    You know, I don't know because no one was ever
interviewed.

Q    Did you receive any benefit from making this complaint?

A    What do you mean "benefit"?

Q    Well, were you relieved of the obligation to file these
extra busywork reports?

A    Yes.  The three captains had received an e-mail that we
were excused from doing the report, and then my Chief Laing
told me I was no longer allowed to attend the gang meetings.

Q    Now, you've sued civilly the Los Angeles Sheriff's
Department; right?

A    At the end of 2012.

Q    Any other lawsuits?

A    I'm sorry?

Q    Any other lawsuits against the Los Angeles County

Sheriff's Department?

A    No.

Q    Just that one.

You sued Paul Tanaka personally in that lawsuit; right?

A    I believe he was listed as a defendant along with the County and Lee Baca.

Q    And you have a personal bias against Paul Tanaka; isn't that true?

A    Professional, yes.

Q    Personally as well; right?

A    Professionally.

Q    Now, in this lawsuit in 2012, you were seeking monetary compensation; right?

A    Yes.

Q    You were seeking large -- a great deal of money; right?

A    I don't know if it actually listed any amount.

Q    But the lawsuit itself is Patrick Maxwell vs. the Sheriff's Department, Paul Tanaka and perhaps others; right?

A    And Lee Baca.

Q    And because of this lawsuit, your intention was to gain a great deal of money; right?

A    What's your definition of "a great deal of money"?

Q    Couple hundred thousand bucks at least; right?

A    Well, I was looking to recover the money that I was denied in a promotion to commander, that's correct.

Q    And who denied you that promotion, in your view?

A    Sheriff Baca and with input from Paul Tanaka.

Q    And it's your understanding that only Sheriff Baca could promote at captain and above; right?

A    He's the only one that had the authority, but Paul Tanaka had a lot of power.

Q    When was the first time you spoke with the FBI about this case?

A    They called me last week.

Q    I'm sorry, the first time you spoke with the FBI.  Last week?

A    Yes, sir.

Q    You never did an interview with Agent Tanner or any other FBI agent before last week?

A    No, sir.

Q    Now, you talked about the gray area.  Isn't it true that the phrase "the gray area" is subject to a number of interpretations?

A    Yes, it could be.

Q    And at the time you heard Paul Tanaka talk about the gray area, you don't know what he meant, do you?

A    No, of course not.

Q    And so what you were talking about earlier on direct is your personal opinion about what he was talking about; right?

A    Mine and about every other seasoned law enforcement

UNITED STATES DISTRICT COURT

officer.

MR. STEWARD:  Move to strike.  Hearsay, Your Honor.

THE COURT:  Sustained.  The answer is stricken, and the jury should disregard it.

Q    (BY MR. STEWARD)  Do you recall, when he made the statements about the gray area, Mr. Tanaka using his hands?

A    Yes.

Q    And did he talk about or analogize a football field?  Do you remember that?

A    I don't know what he was thinking.

Q    No, I'm not asking that.  I'm asking what he said that time when he discussed the gray area and you were present.  You remember him using his hands, but do you also remember him talking about the hands being a football field?

A    No.

Q    Do you remember him discussing a football field in connection with the gray area at all?

A    No, sir.

Q    Did you settle that lawsuit?

A    Yes.

Q    How much did you get?

A    The County settled for 140,000, and after costs I received, I believe, 67,000.

MR. STEWARD:  I have nothing further, Your Honor.  Thank you.

THE COURT:  All right.

MR. JAUREGUI:  Your Honor, permission to do a brief redirect?

THE COURT:  That's fine.  You don't need my permission.

REDIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Commander Maxwell, you -- in cross-examination you talked about POE.  What does POE stand for?

A    Policy of Equality.

Q    And the nature of -- and it's a complaint; correct?

A    Yes.

Q    The nature of your complaint, was it that you had to do busywork, the nature of your POE complaint?

A    No.  As I stated earlier, my complaint was not about the busywork.  My complaint was about the threats of losing resources and the threats to my career and the hostile work environment that was created by those threats.

Q    And who did you understand to be making threats to your career?

A    Well, I was told by Commander Rothans and Chief Laing that these threats were made by Paul Tanaka.

MR. STEWARD:  Move to strike.  Hearsay, Your Honor.

THE COURT:  Sustained.  The answer is stricken, and the jury should disregard it.

Q      (BY MR. JAUREGUI)  And, Commander Maxwell, at the time that you filed this POE complaint, how long had you been in the Sheriff's Department?

A      20 -- approximately 25 years.

Q      And had you ever filed a POE complaint before that?

A      No, sir.

Q      And have you ever filed a POE complaint since then?

A      You know, let me back up for a second.  I'm sorry, I have filed POE complaints as a mandated reporter, and what I mean by that is as a manager on the Department, if anyone reports any type of sexual harassment, any type of inappropriate -- cartoon hanging on a wall, I mandate the call and file a POE.  That is the first time that I filed a POE as a victim, not as a mandated reporter but as a victim, and I've not since filed one as a victim since then.

Q      Okay.  And the lawsuit that Mr. Steward asked you about, it was settled out of court?

A      Yes.

Q      And who -- do you know who paid the settlement cost to you?

A      County of Los Angeles.

       MR. JAUREGUI:  No further questions, Your Honor.

       THE COURT:  All right.

       MR. STEWARD:  I just have one follow up, Your Honor, if I may.

THE COURT:  All right.

RECROSS-EXAMINATION

Q     (BY MR. STEWARD)  Mr. Maxwell, counsel just asked you about the essence of what you were complaining about, and it's on page 2 of your POE, your complaint was "This has instantly caused me stress.  Last night, May 19th, 2010, I vomited several times and could not sleep.  The actions and statements made by Assistant Sheriff Paul Tanaka is typical of his demeanor, and he must be held accountable.  How an executive could make these threats and affect my 220,000 citizens I serve along with staff of 250 personnel is beyond my comprehension."

That's what you were complaining about; right?  You'd been caused stress?

A     I think I testified what I was complaining about.

Q     But you'll agree with me the paragraph that I just read, you wrote that; right?

A     Yes.

Q     And that was part of your POE complaint; right?

A     Sure.

Q     And that was given to the -- who did you give it to?  Where did this complaint go?

A     It goes to the -- eventually, the Equity Panel, Internal Affairs Bureau.

Q     Okay.

MR. STEWARD:  No further questions, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Anything else?

MR. JAUREGUI:  No, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Call your next witness.

MR. FOX:  The government calls Robert Olmsted.

THE DEPUTY CLERK:  Stand here, please.  Please raise your right hand.

(The witness, ROBERT OLMSTED, was sworn.)

THE DEPUTY CLERK:  Please have a seat.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Robert Olmsted, O-L-M-S-T-E-D.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Olmsted, what do you do for a living?

A    I retired from the Los Angeles County Sheriff's Department.

Q    How long have you been retired?

A    Probably about five and a half years now.

Q    What are the years that you worked for the Sheriff's Department?

A    January of '78 until November of '10.

Q    Why did you become a member of the Los Angeles County Sheriff's Department?

A    My dad was on the Department.  I saw the comradery.  He encouraged me to do it and, through my personality, thought I'd do well.

Q    What rank did you achieve with the Sheriff's Department before you retired?

A    I retired as a commander.

Q    During the time that you were employed by the Sheriff's Department, generally what roles did you serve?

A    I worked at the jail as a deputy.  I worked patrol.  I went to the training bureau, back to patrol and various assignments as sergeant, lieutenant.  My last assignment was the commander that oversaw the three jails:  Men's Central Jail, Twin Towers and Century Regional Detention Facility.

Q    How long were you a commander over those jails?

A    About two years.

Q    So what years were that -- were they?

A    I was promoted in April of '8 and retired November of '10.

Q    Had you previously served an executive function within Men's Central Jail?

A    Yes.

Q    What was that?

A    I was the captain at Men's Central Jail.

Q    When was that?

A    That would have been the very end of '06 until April of '08.

Q    How did you find out that you were going to become the captain of Men's Central Jail?

A    I was -- at the time I was a captain of our Commercial Crimes Bureau Fraud Units, and I received a phone call from Paul Tanaka asking me to go to Men's Central Jail as the captain on a body swap.

Q    Who was the captain that you were going to replace?

A    John Clark.

Q    Do you recall what Mr. Tanaka's position was at the time when he called you?

A    I believe he was the assistant sheriff over custody.

Q    And you said this was over the phone.  Was it just the two of you on the phone?

A    Yeah.  I assumed it was just the two of us, yes.

Q    Do you recall whether Mr. Tanaka explained why he wanted you to become captain of Men's Central Jail?

A    Yes.  He said that there's morale issues and grumblings of heavy-handedness by the deputies.  I assumed that to mean force.

Q    What did you understand the grumblings of heavy-handedness to mean?

A    That there was -- gave the impression of excessive force or a lot of force cases that were occurring at Men's Central

Jail.  Just because there's force doesn't mean it's all bad, but there was an excessive amount of force being played out.

Q    Did Mr. Tanaka say anything to you about a rotation plan?

A    Yes.

Q    What did he say about that?

A    He said that John Clark tried to initiate a rotation plan of the 3,000 -- actually, of all of the jail -- the entire Men's Central Jail, specifically the 3,000 floor, and he nixed it and said that he wants another direction.  There's morale issues and wants me to go and do a body swap and take his place.

Q    When you were captain of Men's Central Jail, what were your duties?

A    Oversaw the safety and security of the jail, basically. It's both the safety and security of the jail, the inmates and the deputies that work there.

Q    Where was your office?

A    Inside the building but outside the jail.

Q    Was there anyone higher ranking than you within that facility?

A    No.

Q    When you were commander, where were your offices?

A    Across the street at Twin Towers.

Q    When you began as captain of Men's Central Jail, did you learn about any pressing issues that you needed to deal with?

A      Oh, yes.  Yes.

Q      What were they?

A      A variety of issues.  I saw that -- gave the appearance of force -- excessive force or force that was occurring at the jails.  I had deputies with broken right hands.  I saw that the uniforms were rather shoddy.  The deputies did not carry mace.  Those that did were ostracized.  There were no tasers deployed at all.  So any type of less lethal processes in handling inmates were not -- not being utilized.  I mean, I can go on and on with some of the stuff that I needed to address.

Q      Did you recognize anything about the behavior of the deputies themselves?

A      Oh, yeah, absolutely.  There's -- it's standard that when the captain walks among the facility they put out what's -- it's a 10-code that's basically law talk that says the captain's walking and lets everybody to know to be on your toes, which is fine, I'm glad they're on their toes.

I walk up to the 3,000 floor, and I'm immediately surrounded by about nine, ten deputies, and it was like they're all standing in a circle around me.  And I'm looking at them, and the first response out of the ringleader was, "What are you doing up on our floor?"  And I -- right then and there, I said --

MR. STEWARD:  Move to strike, Your Honor, as hearsay.

THE COURT: Overruled. The answer will stand.

THE WITNESS: Right then and there, I realized I had a significant problem in terms that -- shall I say I very forcibly told the deputies to get back to their jobs. At the most, there should have only been two deputies on that floor that would handle the freeway traffic. So I'm looking at probably seven that were not doing their jobs within that jail at that particular time. The fact that I was challenged, the captain of the facility, was, in my opinion, atrocious. So I -- right then and there --

MR. STEWARD: Objection to the narrative at this point, Your Honor.

THE COURT: Why don't you just finish your answer, then he'll ask you another question.

THE WITNESS: Right then and there, I knew I had a problem.

Q    (BY MR. FOX)  Are you familiar with the term "force packages"?

A    Yes.

Q    What are force packages?

A    Any time there's a force that's applied, there's an investigation that must -- must occur. That force package is written -- it consists of written documentation by the deputies that apply the force. There's an oversight of both the sergeant, captain -- sergeant, lieutenants and captain that get

applied to that package.  The inmate gets interviewed.  Any witnesses that views force will be interviewed, should be applied to it, any doctor's notes or medical attention.  So it's a complete synopsis of the entire incident up to and including the application of the force and the review of the package of the force itself.

Q    Are there different types of investigations that can come out of these force packages?

A    Sure.  Like I -- I think I might have said earlier is that sometimes force must be applied and it becomes legitimate use of force.  When it looks like there's training issues or violations of policies on the Department, there needs to be an investigation.  The unit can do the investigation.  Internal Affairs can do the investigation, and internal criminal can take a look at it from criminal perspective as well.

Q    When you said "internal criminal," do you mean ICIB?

A    Yes.

Q    And how do the force packages come into play with any of these investigations?  Are they used in any way for the investigations?

A    I'm sorry, I don't understand the question.

Q    You mentioned the force packages.

A    Yes.

Q    And are they used in any way in order to evaluate the deputies with any of these investigations?

A      Oh, absolutely.  Once force is applied, the sergeant who does most of the work and takes a look at the inmate, interviews the inmate, interviews the doctors, he does a synopsis of the force itself and puts a recommendation down. It's in policy or out of policy, and then that gets reviewed by a lieutenant, and that gets reviewed by a captain.

Q      Did you play any role in reviewing the force packages while you were captain at Men's Central Jail?

A      Yes.

Q      What role did you play?

A      Those force packages that were complete and given to me by my operations lieutenant were then given to me, and I would review them at my desk.

Q      Did you notice any pattern with respect to these force packages when you were reviewing them as captain of Men's Central Jail?

A      Yes.  I noticed that there's what we call a boilerplate-type protocol that was occurring.  In other words, I would see the same verbiage over and over and over again that the deputy would strike or use his flashlight to subdue the inmate.  It would glance off the shoulders and hit the inmate in the head.

After seeing these type of -- this is just one, but after seeing these type of protocols being used in force packages or being -- being applied, I saw that as a red flag, that any time

you have to hit -- or you hit an inmate in the head, that's significant force.  It really needs to be looked into.

Q     Did you do anything to try to fix those issues?

A     Sure.

Q     What did you do?

A     Training.  You go to the floors, talk to the inmates.  I talked to the deputies.  I would do investigations to determine whether or not they're in policy or out of -- out of policies.

Q     Did you see anything with respect to the amount of force that was being used by deputies in Men's Central Jail at the time you were captain?

A     I saw that it needed to be addressed, and during my tenure, my stats, we were able to lower force by 30 percent when I got promoted and moved across the street as commander.

Q     And when did that occur?

A     I moved over in April of '08, so the 16 months I was there force literally had gone down by 30 percent.

Q     You mentioned that you were commander over three different jails.  What were your duties, though, in overseeing those three different jails?

A     To ensure that the captains that were in -- that are in charge of the jails would follow custody protocols, administrative policies, investigations were done timely, and just administrative oversight in general, budget issues.

Q     Who took over for you as captain of Men's Central Jail

when you were promoted to commander?

A      My operations lieutenant at the time, Dan Cruz.

Q      And how many captains were reporting to you when you were commander?

A      Three.

Q      One for each jail?

A      Yes.

Q      What, if anything, was brought to your attention while you were commander regarding Men's Central Jail?

A      There was a report that was done in May of -- I believe it was May of '9.  It's the chief of custodies.  We call it SCIF, the Sheriff's Critical Information Form.  It's a semiannual review of protocols within the jails, all the jails, not just the southern but the northern jails as well.

      And it was -- they looked at the indices of number of escapes, number of forces used, this type of stuff.  It was used as a best-practice/worst-practice protocols.  At Men's Central Jail it was glaring that significant force was off the scale at Men's Central Jail at that particular time.

Q      Did you observe anything troubling to you while Captain Cruz was reporting to you?

A      Yeah.  I determined that he wasn't being truthful with me. He was hiding quite a bit of the force that was being used.  I found out about this because I had other people who would call me up and tell me to look into other uses of force that

occurred that I was not notified about that were significant.

Q    Did you also see issues with force packages while you were commander with respect to Men's Central Jail?

A    Yes, I did.

Q    What was that?

A    Hearing others tell me there was significant force that was going on in the jail --

MR. STEWARD:  Move to strike.  Hearsay.

THE COURT:  Excuse me.  Without going into what others told you, if you can just describe what it was that you did.

THE WITNESS:  I asked the operations lieutenant, which was the Number 2 person at Men's Central Jail, to do a random review of force packages for me.  I said just grab 30 at will, review them for me, do them in detail and bring me the results.

Q    (BY MR. FOX)  Did you later look at a report that was generated with respect to these 30 force packages?

A    Are we talking about a report on the assessment of those 30?

Q    Let's go to that, yes, please.

A    Yes.

Q    Okay.  And what did you find out?

A    Out of those 30, that 18 of them were out of Department policy.  18 had -- all 18 had been approved by -- at one layer

of supervisory position up to and including the captain and gave the impression that all those 18 were then appropriate uses of force and were later determined to be unlawful uses of force.

Q    I want to break that down a little bit.  You're saying that there were some approvals of these force packages.  Of these 30 force packages, how many of those had been approved by at least one level of supervisor?

A    All of them, all 30 had been approved by one level or not.

Q    And based on the outside audit that you had commissioned by the lieutenant, how many of those did you find to be out of policy actually and should not have been approved?

A    18.

Q    You mentioned also that there were issues with the amount of force.  Did you try to deal with these issues with the captain of Men's Central Jail?

A    Yes, I did.

Q    Were the issues solved after trying to deal with the issues of the captain at Men's Central Jail?

A    No.

Q    So what did you do?

A    I went to my chief, and I said, "I think to fix this, I think we need to move the captain."

Q    When was this?

A    I'm thinking that's probably January of '10.  That's a

UNITED STATES DISTRICT COURT

guess.

Q    You mentioned the audit that you had done where it was found that 18 out of the 30 were out of policy, and did you also commission a study regarding the amount of force --

(Reporter admonition.)

MR. FOX:  Sorry.

Q    (BY MR. FOX)  Did you also have a report prepared regarding the amount of force that was being used in Men's Central Jail?

A    Yes.  I had -- including those 30 packets, I had them take a look at the number of Internal Affairs investigations that we had, those deputies that had used, if I remember right, ten or more uses of force in the last two years, and I think there was one other report I don't recall off the top of my head.  And I had that all evaluated by my peers and myself.

Q    Can you take a look in that binder in front of you at Exhibit 5, please.

A    Okay.

Q    What is it?

A    This is a review from Captain Greg Johnson to Steve Johnson, the commander, regarding the use of force packets from Men's Central Jail, an audit.

Q    Is that the audit that you've been referring to?

A    That's one of them, yes.

Q    Can you please take a look at Exhibit 6 as well.

**UNITED STATES DISTRICT COURT**

A      Okay.

Q      What is Exhibit 6?

A      It's a memorandum from Mark McCorkle, lieutenant, to Steve Johnson and myself, both commanders of custody division, confidential use of force at Men's Central Jail; i.e., rollouts, Internal Affairs rollouts.

Q      Are those true and accurate copies of the reports that you received that you've been referring to in your testimony?

A      They appear to be, yes.

        MR. FOX:  Your Honor, I move for the admission of Governments Exhibits 5 and 6.

        MR. STEWARD:  No objection.

        THE COURT:  They'll be received.

    (Exhibit Nos. 5 and 6 received into evidence.)

Q      (BY MR. FOX)  Mr. Olmsted, you said that you went to your chief regarding these issues.  Did you -- was the problem solved after you went to your chief?

A      No.

Q      What did you do?

A      Told my chief, I said, "If you can't solve the problem, I have to go over your head."

Q      So what did you do?

A      I went to Assistant Sheriff Cavanaugh.

Q      Approximately when did you go to Assistant Sheriff Cavanaugh?

A     Within a few days after talking to the chief, so January sometime in 2010.

Q     Why did you go to Assistant Sheriff Cavanaugh versus another assistant sheriff?

A     Cavanaugh is the direct supervisor of my chief, which would be the second in command above me, and that's the standard protocol for chain of command.

Q     Did you bring these issues to Assistant Sheriff Cavanaugh's attention?

A     Yes, I did.

Q     How long of a meeting did you have with him, if you recall?

A     An hour at least.  Hour, hour 15 minutes.

Q     Did Mr. Cavanaugh provide you with an acceptable answer to you?

A     No.

Q     What, if anything, did he say?

          MR. STEWARD:  Objection, hearsay.

          MR. FOX:  Your Honor, I can reask a different question.

          THE COURT:  All right.

          MR. FOX:  Thank you.

Q     (BY MR. FOX)  Was it your understanding after your meeting with Assistant Sheriff Cavanaugh that Captain Cruz would be replaced?

A       No.

Q       Was it your understanding that there might be a follow-up conversation that you could have with somebody?

A       He said he was going to try --

MR. STEWARD:  Objection, move to strike.  Hearsay.

THE COURT:  Sustained.

Q       (BY MR. FOX)  After your meeting with Assistant Sheriff Cavanaugh, did you receive a phone call from another executive at some point?

A       Yes, I did.

Q       When was that?

A       Probably a week later.

Q       Who did you hear from?

A       Paul Tanaka.

Q       What was his title at that point?

A       Assistant sheriff.

Q       Over what?

A       Patrol detectives.

Q       Who was on the phone besides you and him?

A       Two of us, I think.

Q       When did that conversation occur?

A       The week after Cavanaugh's meeting, so probably the middle of January.

Q       What, if anything, did Mr. Tanaka say to you in that phone conversation?

A    I'm sorry, that was an in-person conversation.

Q    Was there a conversation to set up the in-person conversation?

A    Yes.

Q    And who was that with?

A    I don't know who set it up, but I ended up going to his office about a week later.

Q    Let's talk about that meeting in his office about a week later.  Was anyone else present besides you and Mr. Tanaka?

A    The first meeting, no.

Q    Where was his office at the time?

A    Monterey Park.

Q    Is there a specific area of Monterey Park in terms of -- this was at Sheriff's Headquarters; correct?

A    Sheriff's Headquarters on the fourth floor.

Q    And what, if anything, did you talk to Mr. Tanaka about in this meeting?

A    I expressed my concerns, as I did with Mr. Cavanaugh, the use of force issues that were going on, the fact that, in my opinion, they were out of control.  I brought with me a stack of paper two, three inches thick.  You don't go to an executive on the Department without having all your ducks lined up, and told him that -- I said, "The way to solve this problem is truly a leadership issue, and we need to move to Dan Cruz."

Q    You mentioned you brought a stack of documents with you.

Did you bring Government's Exhibits 5 and 6 with you?

A      The -- yes.

Q      And you said that you mentioned that Dan Cruz -- you needed a change in leadership.  You were referring to Dan Cruz; is that right?

A      Correct.

Q      What, if anything, happened after you explained this to Mr. Tanaka?

A      He says, "We're not moving Dan Cruz.  We're going to promote him and" --

Q      Was it at that conversation or a future --

A      No, I'm sorry.  At that particular point, no.  He said in the first meeting, it was "Let me look into it."

Q      Did Mr. Tanaka explain to you on that date how he would look into it?

A      Yes, he did.

Q      What did he say?

A      He said he's going to send his aide, which is Duane Harris, down to Men's Central Jail to do an investigation to find out what the problems are.

Q      Did you provide the stack of documents that you brought to the meeting to Mr. Tanaka?

A      No.

Q      Why not?

A      He didn't ask for them.

UNITED STATES DISTRICT COURT

Q    Did you describe the information that was in those reports
to Mr. Tanaka?

A    Yes.

Q    Did you have a follow-up meeting with Mr. Tanaka?

A    Yes.

Q    When was that?

A    I think it was about a week later.

Q    And who was present for that meeting?

A    The latter half of the meeting was Duane Harris, his aide.

Q    And the first half of the meeting?

A    Just he and myself.

Q    Where did it occur?

A    In his office, same location.

Q    What, if anything, did Mr. Tanaka mention to you when it
was just you and Mr. Tanaka in the meeting?

A    He said it was -- he was apologetic.  He said he found out
that the problems were Dan Cruz.  At that point, he says,
"We're not going to move Dan Cruz, we're going to promote him.
I'm going to send Duane Harris down there to be his operations
aide, and between Duane Harris and you, his commander, you will
make Dan Cruz successful."

Q    What, if anything, did Mr. Tanaka say about Mr. Tanaka's
own future with the Department?

A    He says, "I make all the decisions on the Department.  I
make all the promotions on the Department."  And then he told

me three people he was not going to promote and said that, "I'm going to be the Sheriff for the next 15 years, and these people are going to work for me, so I need to know who the people are that I promote."

MR. FOX:  One moment, Your Honor.

No more questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  Dan Cruz did get transferred; right?

A    I believe about three months later, yes.  I think it was about three months.

Q    And Cruz was the problem, or at least part of the problem at the jail; right?

A    In my opinion, yes.

Q    And you didn't get along with Cruz?

A    I didn't like the way he hid stuff from me.  That's not how we operate on the Department.

Q    Okay.  And the two of you ended up frequently arguing; isn't that true?

A    Yes.

Q    Loudly?

A    I would assume there's probably one or two heated discussions we had behind closed doors, yes.

Q    Now, you were originally asked by Mr. Tanaka to become a

captain at the jail; correct?

A    I already was a captain.

Q    Okay.  No, no, I'm talking originally.  Let's go back to when you first came to MCJ.  It's my understanding from direct that you were called by Mr. Tanaka and asked to become a captain at the jail; correct?

A    Yeah, asked to take the command of Men's Central Jail, yes.

Q    Okay.  And did you have some sort of a relationship with Mr. Tanaka prior to that?

A    No.

Q    Any idea why he called you?

A    Nope.

Q    But he told you there were problems at the jail; right?

A    Yes.

Q    And he felt that you were going to be part of the solution; right?

A    Yes.

Q    He sent you to the jail to have an impact; right?

A    Yes.

Q    And you found that was difficult to do; right?

A    No.

Q    The jail -- well, let's talk about this.  You supervised, as captain only, the Men's Central Jail or other facilities?

A    As captain, it was Men's Central Jail only.

Q    And then you became commander?

A    Correct.

Q    And as commander, it was everything except the two farthest north facilities in the County.  Does that sound right?

A    I was in charge of Men's Central Jail, Twin Towers and Century Regional Detention Facility.

Q    Okay.  And just generally, the job of maintaining, supervising and holding people in a jail setting is a difficult job; right?

A    Sure.

Q    And the Men's Central Jail is one of the largest, if not the largest, jail facility in the country; right?

A    It's large, yes.  I'm not sure if it's largest in the country.

Q    When did you first talk to the FBI about the things that you've testified here today?

A    It had to have been, I'm guessing -- I retired in '10, so I'm thinking in February, March, April of '11.

Q    So for the last four, five years, you've talked with the FBI periodically about the things that you've testified about today; right?

A    Yes.

Q    Okay.  And in your contact with the FBI, did you tell anyone at the Sheriff's Department that you were having these

UNITED STATES DISTRICT COURT

conversations with the FBI?

A    I might have mentioned it to a cohort, but no one on the Department, I don't think.

Q    And have you had an opportunity to look at the written statements that you've made over the last couple years produced by the FBI?

A    Recently?

Q    At any time.

A    No, not the statements I made to the FBI, no.

Q    Okay.  Are you aware that, in their view, you were a CHS, a confidential human source?

A    I believe it was called a source, yes.

Q    Okay.  So that term is somewhat familiar to you?

A    No.  That's the first time -- I heard "source" only. That's the first time I heard the other acronym.

Q    Okay.  So you were, in terms of the -- let's talk about the confidential side.  Did you share with anyone else the fact that you were talking to the FBI on occasion?

A    I might have mentioned it months later to a peer.  That's about it.  Nobody active on the Department, no.

Q    It was your intention to be sure that no one active on the Department found out that you were talking to the FBI; right?

A    I didn't want them to know, no.

Q    Now, for the information you were providing the FBI, were you paid for that?

A    No.

Q    Did you receive any type of nonmonetary benefit?

A    No.

Q    Were you asked periodically every 90 days to fill out a form which discussed what you could and could not do as a source?

A    Yes, but I don't know if it was 90 days.  But yes, I was admonished several times.

Q    Okay.  And the admonishment was both orally and on a written form; correct?

A    I know it was orally, and I might have done one initially on written form, I don't recall.

Q    Okay.  In terms of timing, as I understand it, you became a captain in 2006 at the jail; right?

A    No, I was a captain before that.  I went to Men's Central Jail at the end of 2006.

Q    Okay.  So you're at Men's Central Jail as a captain 2006 until you became -- you were promoted as a commander; right?

A    Correct.

Q    And when was the promotion to commander?

A    April of '8.

Q    Okay.  And then you left in 2010?

A    Correct.

Q    Now, your efforts to pass along the problems you were encountering, I think you told us that you went to -- who was

**UNITED STATES DISTRICT COURT**

your immediate supervisor in --

A    Dennis Burns, the chief of custody.

Q    And that would be when you were commander; right?

A    Correct.

Q    You're commander for approximately two years?

A    Correct.

Q    And you went to Burns and got no satisfaction, for want of a better phrase?

A    Correct.

Q    Okay.  Same thing with Marv Cavanaugh, you went to him; right?

A    Correct.

Q    And you got no satisfaction there either; right?

A    Correct.

Q    So then you went to Mr. Tanaka?

A    Yes.

Q    Okay.  Was he directly above Cavanaugh at that point?

A    No.

Q    He was above that.

A    No.

Q    Explain it to me, will you?  Where was he here?

A    They were peer assistant sheriffs, two sets of responsibilities on the Department.

Q    Okay.  Cavanaugh was over custody; right?

A    Correct.

Q   And Mr. Tanaka was not at that point; right?

A   Correct.

Q   He was over patrol?

A   Correct.

Q   Okay.  But you went to him anyway, Mr. Tanaka?

A   I was asked to go to his office, yes.

Q   Now, did you ever approach Leroy Baca?

A   Yes.

Q   How many times?

A   Twice.

Q   How did -- let's start with the first one.  When was that?

A   I want to say that was September of '10.

Q   Okay.  And what were the circumstances?  How did you try to chat with him?

A   I was -- I came back to the Department.  At that time, I was off for a personal reason.  I came back to the Department for an event that I knew he was going to be at.  I was a senior command staff, so I greeted him when he walked up.  And I told him at that point, I said, "Lee, I'm retiring.  I'm done and -- but I've got to tell you what's going on at Men's Central Jail, some issues there."  And that was the first time.

Q   Okay.  And was the event a barbecue for the dedication of a building in the jail system?

A   Yeah, a dedication of the barbecue at Twin Towers, yes.

Q   Okay.  So very informal; correct?

A    Yes.

Q    At any point, did you attempt to visit Leroy Baca at his office?

A    I was asked to go to his office prior to my retirement, and I want to say that was probably October, maybe.

Q    Did you go?

A    Yeah.

Q    Get any satisfaction from him?

A    No.

Q    Now, you said there was another instance where you attempted to approach him?

A    Yes.

Q    Just generally, what happened there?

A    It was the last Sunday before Christmas in '10 at an event that -- a charity that I do that I coordinate that I knew he was going to attend.  At that particular time, I again approached Baca, and I said, "We need to do something about this."  He said, "Talk to me after the event," and then he left.

Q    Did you get any satisfaction from him, any follow-up after that?

A    No.

Q    And during the times that you're talking about that we've been discussing, he was the Sheriff; right?

A    Correct.

Q    The buck stopped with him?

A    Correct.

Q    Okay.  Were you frustrated that you couldn't get things done?

A    Yes.

Q    And yet, while you were commander, you had a great deal of power to make changes in the jail system; right?

A    Not a great deal of power.  I mean, to make any changes I'd have to go to Dennis Burns because he's the chief of custody who would have to approve the changes, yes.

Q    Well, let's talk for a moment -- you mentioned John Clark and the rotation plan.  That was not a plan that you supported; correct?

A    No, I would have supported it.

Q    Okay.  Do you recall testifying back in Washington, D.C. --

A    No.

Q    -- in --

A    No.

Q    Okay.  Do you recall at any point indicating that you can't just transfer everybody as that plan anticipated?

A    No, I would have approved the plan.

Q    Okay.  But you were gone by the time the plan was discussed; correct?

A    I wasn't even -- I was still the captain at the fraud

detail at, as I understand, the time the plan was discussed.

Q    Okay.  But that was one of the problems that you encountered when you came in first as a captain and then as a commander; right?

A    It wasn't a problem because I knew it couldn't have been facilitated.  So therefore, since it was not inputted, I didn't even attempt to try.

Q    My fault.  What I was getting at was the deputies on the 2,000 floor and 3,000 floor and their tight-knit groups, was that a problem when you came in?

A    Oh, yes.  Yes.

Q    Okay.  And what, if anything, did you do about that?

A    I learned from a very good executive on the Department that handled Men's Central Jail, and I talked to him before I went there, that you need to manage by walking around.  So I literally spent probably eight hours a day inside the jail facility, and I would spend the other four -- three or four hours outside in my administrative office.  So I managed by walking around and seeing, having my thumb on the pulse to see what was going on and made changes that way.

Q    Okay.  Did that work?

A    Yes.

Q    Do you know if anybody else had tried that before?

A    Yes.

Q    Apparently, it didn't work with them?

UNITED STATES DISTRICT COURT

A     No, it did because this is the advice I got from this particular -- I think he was assistant sheriff when he retired.

Q     Okay.  And who was that?

A     Dahlman, Dennis Dahlman.

Q     So it was that simple to cure the problem of the cliques on 2,000 and 3,000 by just walking around?

A     It didn't cure it.  It kept them on their toes.  Again, part of the problem was the 10-code, letting everybody know when the captain was walking.

Q     Now, you had little contact with Paul Tanaka personally; isn't that true?

A     Correct.

Q     And how many times did you have personal meetings with him to discuss problems at the jail?

A     Just those two meetings we discussed earlier.

Q     And you indicated to Mr. Tanaka that everything was fine at the jail; isn't that true?

A     No.

Q     You did blame Daniel Cruz for a lot of the problems at the jail to Mr. Tanaka; right?

A     Yes, I believe and still do that it was a supervisory leadership issue.

Q     And that's why you were put in charge, or at least put in initially as captain at the Men's Central Jail; right?

A     I don't know the reason for it but --

UNITED STATES DISTRICT COURT

Q    Okay.  And yet, when you left, many of these same problems still existed; right?

A    No.

Q    Well, isn't that why you went to the FBI?

A    Well, when you say "left," you mean when I left and retired or when I left for captain?

Q    When you retired.

A    Okay.  Can you ask the question again then, please.

Q    Sure.  Sure.  Weren't many of the same problems -- the cliques, use of force, all of these things -- still in existence at the time you retired?

A    Yes.

Q    Okay.  And that was why you went to the FBI; right?

A    Yeah, there was an incident that caused me to go to the FBI, yes.

Q    Okay.  And you went to them rather than them coming to you; correct?

A    Correct.

Q    Okay.  And you would have these periodic meetings at Starbucks and places like that; right?

A    We met several times, yes.

Q    And you were providing them as much inside information as you could; right?

A    Correct.

Q    Why?

A     Felt it was the right thing to do.

Q     You did the same thing for the Los Angeles Times; isn't that true?

A     Correct.

Q     You went to them quietly and supplied them with information on a number of occasions; right?

A     Correct.

Q     You've described yourself before as a whistleblower; right?

A     Correct.

Q     Have you ever sought monetary compensation from the County for the things that you've talked about today?

A     No.

Q     Never sued them?

A     Nope.

          MR. STEWARD:  Thank you, Your Honor.  I have nothing further.

          THE COURT:  All right.  Redirect?

          MR. FOX:  One moment, Your Honor.

     Nothing further, Your Honor.

          THE COURT:  Sir, you may step down.

          THE WITNESS:  Thank you.

          THE COURT:  Thank you.

     Call your next witness.

          MS. RHODES:  Thank you, Your Honor.  The government

**UNITED STATES DISTRICT COURT**

will call Peter Eliasberg to the stand, but before that we'd like to read two stipulations that have been filed.

THE COURT:  That's fine.

MS. RHODES:  The first stipulation we'd like to read is a stipulation regarding e-mails, and it reads "Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon Fox, Lizabeth Rhodes and Eddie Jauregui, and defendant Paul Tanaka, by and through his counsel of record, Dean Steward and Jerome Haig, hereby stipulate as follows:  Government's Exhibits 9 through 78 are true and correct copies of e-mails transmitted over the Los Angeles County Sheriff's Department's e-mail server on or about the dates listed in the exhibits."  And it's signed March 13th and 14th by the parties.

Your Honor, that's Exhibit Number 190.

Also, we'd like to read Exhibit 191 a stipulation regarding ACLU filings and correspondence with the LASD, and it reads as follows:  "Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon Fox, Lizabeth Rhodes, Eddie Jauregui, and defendant Paul Tanaka, by and through his counsel of record, Dean Steward and Jerome Haig, hereby stipulate as follows:  Government's Exhibits 112 and 116 are letters sent from the

American Civil Liberties Union to Sheriff Baca at the Los Angeles County Sheriff's Department on or about the dates listed in the exhibits.  Government's Exhibits 113 and 115 -- through 115 are court filings made by the American Civil Liberties Union in litigation against the Los Angeles County Sheriff's Department.  The filings were made on or about the dates listed in the exhibits," and it's signed by all parties.

THE COURT:  Ladies and gentlemen, the parties have agreed to certain facts that have been stated to you.  You should therefore treat these facts as having been proved.

MS. RHODES:  And now the government would call Peter Eliasberg to the stand.

THE DEPUTY CLERK:  Please stand here for me, please.  Raise your right hand.

(The witness, PETER ELIASBERG, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Peter Eliasberg.  My last name is spelled E-L-I-A-S-B-E-R-G.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MS. RHODES)  What do you do for a living?

A    I'm a civil rights lawyer.  I'm the legal director at the ACLU of Southern California.

UNITED STATES DISTRICT COURT

Q     And ACLU is an acronym?

A     It is.  It stands for American Civil Liberties Union.

Q     And what is the American Civil Liberties Union?

A     It's a nonprofit organization that's devoted to protecting the civil rights and civil liberties, primarily those protected in the Bill of Rights in the United States Constitution but others also.

Q     How long have you been an attorney for the ACLU?

A     A little over 20 years.

Q     And as part of your job at the ACLU, did you come into contact with the Los Angeles County Sheriff's Department?

A     Yes, I did.

Q     How?

A     Primarily through work that -- the ACLU has been monitoring conditions in the Los Angeles County jails for a very long time, more than three decades as a result of having prevailed in a case on behalf of inmates in the county jails called Rutherford, and then there were subsequent court orders in Rutherford that gave us access to walk the -- walk the housing units, talk to inmates in the jails.  We also receive many, many complaints from inmates and their family members about conditions in the jail, and that's how I -- that's my -- has been my principal interaction with the Sheriff's Department.

Q     And you said the ACLU has access.  Is that access unique

UNITED STATES DISTRICT COURT

to the ACLU?

A      Pretty much.  I mean, there's other people -- jail chaplains have special access and so on, but yes, it's not typical --

(Reporter admonition.)

THE WITNESS:  Sure.  It is not typical for lawyers to be able to walk in the housing units and talk to inmates in the jails.

Q      (BY MS. RHODES)  Now, you mentioned that the litigation that allows the ACLU access is quite old.  How long have you been working monitoring the jails for the ACLU?

A      I started working in late 2009 and early 2010.  There were times before that when I would get involved with a particular issue, but in terms of doing it on a regular basis, like 2009, early 2010.

Q      I'd like you to turn if you would -- it should be in front of you near the end -- Exhibit 112.

MS. RHODES:  May I have one moment, Your Honor?

THE COURT:  Yes.

(Counsel conferred off the record.)

THE WITNESS:  I see it.

Q      (BY MS. RHODES)  And what is this?

A      It's a letter that colleagues of mine sent dated October 28th, 2009 to Sheriff Baca -- or at the time, Sheriff Baca.

Q      And you didn't sign this.  Were you aware of it?

A    Yes, I was.

Q    And were you aware of the complaints that caused the letter?

A    Yes, I was.  I talked to my colleagues about the complaints that prompted them to write this letter and send it.

MS. RHODES:  Your Honor, at this time I'd move to admit Exhibit 112.

THE COURT:  Any objection?

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 112 received into evidence.)

Q    (BY MS. RHODES)  Now, Mr. Eliasberg, what was the purpose of this letter?

A    Well, the purpose of the letter was to try to get changes -- inmates had complained to us on a regular basis that when they talked to us about conditions in the jails that they would be retaliated against, that deputies would warn them, threaten them, tell them not to do things -- tell them not to talk to the ACLU.  And it made our job very hard.  Not only we felt wrong for the inmates themselves, but it also made it very hard for us to do our job monitoring jail conditions if inmates felt that they were in danger if they talked to us.  So we wrote a letter to Sheriff Baca basically saying this is a big problem, and we'd like you to meet with us to address and figure out ways to get this to stop.

**UNITED STATES DISTRICT COURT**

MS. RHODES:  And if I could have that published.

Q    (BY MS. RHODES)  I'd like you --

MS. RHODES:  If I could just have the second sentence of the first paragraph blown up.

Q    (BY MS. RHODES)  And I'd like you to read it.  It starts "We have documented."

A    "We have documented a persistent and increasing number of retaliation incidents when inmates have complained about conditions in the jail."

Q    Okay.  And then the third paragraph, please, that starts "However."

A    "However, our joint efforts have not been adequate to address the problem of retaliation and excessive force, which has continued to worsen despite the creation of the reporting process."

Q    And what happened as a result of this letter?

A    Well, we continued to hear about these problems.  We saw no lessening in the complaints about retaliation.  So, in effect, nothing happened, or nothing good happened.

Q    Did you get any response that you recall from the Sheriff's Department as a result of this letter?

A    I do not remember a response to this specific letter.  I do remember that about a year after this or maybe even a little bit more than a year --

MR. STEWARD:  Objection, nonresponsive.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q      (BY MS. RHODES)  And did you later, through the Rutherford litigation, file reports with the court regarding the conditions in jail and the excessive force?

A      Yes, we did.

Q      I'd like to turn your attention to 213 -- I'm sorry, 113, and, Mr. Eliasberg, I think Exhibit 113 spans both that binder and the next one which is at your feet to your right.

A      Okay.  I have both binders.

Q      Do you recognize Exhibit 113?

A      Yes, I do.

Q      And what is it?

A      It is a report that we filed with the court in the Rutherford case about conditions in the Los Angeles County jails that we thought were very problematic, including information that we received from numerous inmates about excessive unnecessary force, beatings being administered by deputies against inmates in the jails.

Q      And as part of the filing, did you attach a lengthy report at -- I think it's page 4 of that filing.  It's A134764.

A      Yes, we did.

Q      And what was that?

A      Well, the report was a documentation of the conditions that we were particularly troubled by, which included what we believed was a pattern of excessive force in the jails by

deputies.  There were other things discussed in the report too, other conditions, crowding conditions and so on, but it was about the main issues that we thought were going on in the jails that were improper.

Q    And the main issues were?

A    Well, they included excessive force, overcrowding, inmates not getting out-of-cell time that they were entitled to.  Those were the principal -- and mistreat treatment of inmates with mental illness.

Q    And when you file these reports, was the other side the Sheriff's Department?

A    Yes.

Q    Is it your understanding that this report, this filing got served on the Sheriff's Department?

A    Yes, I know it did.

Q    Did you also do anything to give the Sheriff's Department these reports?

A    I don't know with every one of the reports we did whether we did things beyond actually serving them in the litigation.

Q    Did you issue press releases with regard to these reports?

        MR. STEWARD:  Objection, relevance.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  Yes, we did.

Q    (BY MS. RHODES)  And why?

A    Because we wanted -- it's my belief that sometimes when

there's serious problems and what we believe to be a legal action going on, that public knowledge of that can have a beneficial affect in pressuring people who we believe are behaving improperly, to change that behavior.

Q    At the beginning of the report, is there an executive summary?

A    Yes, there is.

Q    How long is that?

A    My memory was about two pages -- yeah, page and three quarters.

Q    And did you assist in writing that executive summary?

A    I did.

MS. RHODES:  I'd like to have that published.

THE COURT:  Has it been offered?

MS. RHODES:  No, it has not.  I'm sorry, Your Honor.

Before I do that, let me perfect it, Your Honor.  I apologize.

Q    (BY MS. RHODES)  Does the filing also include declarations?

A    Yes, it does.

Q    Of whom?

A    Either only inmates or former inmates who are almost -- the declarations were either all inmates or former inmates, that was a very large percentage of the declarations.

Q    What's a declaration?

A      A declaration is a sworn statement.

Q      And approximately how many declarations does Exhibit 113 contain?

A      My recollection is about 45, but we put in a table of the declarations.  If I look at that, I could tell you exactly how many.

Q      Would that help refresh your recollection?

A      It would.  We list 40 -- 40, but I think in two cases there was not an actual declaration, so I think it was 38 declarations.

MS. RHODES:  Your Honor, at this time I move to admit Exhibit 113.

THE COURT:  Any objection?

MR. STEWARD:  No, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 113 received into evidence.)

Q      (BY MS. RHODES)  I'd like to go back to the executive summary, and this is the executive summary that you assisted in writing, Mr. Eliasberg?

A      That's correct.

Q      Can you read -- and we'll blow up -- the second sentence of the first paragraph that starts "Today."

A      "Today, many of the awful conditions targeted by the original lawsuit persist, together with an apparent culture of violence and fear, including prisoner-on-prisoner assaults and

**UNITED STATES DISTRICT COURT**

the use of excessive force by deputies.  This violence fuelled in significant part by the overarching problem of chronic overcrowding in the cell blocks of Men's Central Jail is one of the most compelling reasons why this ageing, decrepit facility must have its population dramatically reduced or be closed."

Q    And can you read the first sentence of the fourth paragraph as well.

A    Is it okay if I just do it from the --

Q    Yeah, if you'd just wait one second, I think we can also get it on the screen so that everyone can read it along with you.  First paragraph -- first sentence of the fourth paragraph.

A    That begins "The widely reported"?

Q    Yes.

A    "The widely reported violence at Men's Central Jail is particularly disturbing because the vast majority of people being held at the jail are simply awaiting trial.  In other words, they are presumed innocent and have yet to get their day in court.  In addition, a high percentage of these prisoners suffer from mental disabilities, and many are unable to control their own disturbed behaviors.  A national expert found that abuse of prisoners by deputies at Men's Central Jail is not only very likely but is disproportionately directed at prisoners with serious mental illness.  The taxing" --

THE COURT:  I believe this was only supposed to be

**UNITED STATES DISTRICT COURT**

the first sentence.

MS. RHODES:  Thank you, Your Honor.

THE WITNESS:  My apologies.

THE COURT:  That's all right.

Q    (BY MS. RHODES)  Now I'd like to turn to the exhibits -- I'm sorry, to the declarations that you referenced previously. And if you could go to the first declaration, and at the bottom it's A134837.

Do you have that in front of you?

A    Yes, I do.

Q    And is this one of the declarations that you filed along with your report?

A    Yes.

Q    Can you please read paragraph 6 of that declaration.

A    "It seems like the guards are their own gang in here. They put their hands on inmates to show off their authority. The whole jail is overwhelming, and I fear for my safety.  I never know when someone will come and beat me and then accuse me of assault."

Q    What happened as a result of this filing with these declarations?

A    Well, the problems persisted.  We didn't see any improvement.  In fact, I think, if anything, things got worse.

Q    Did anyone at the level of assistant sheriff or above call you?

A      No.

Q      Did the Sheriff's Department respond to this in any forum?

A      Yes.

Q      What?

A      The chief spokesperson for the Sheriff's Department made comments in the media about how the ACLU --

          MR. STEWARD:  Objection, hearsay, Your Honor. Hearsay.

          THE COURT:  Sustained.

Q      (BY MS. RHODES)  Based on the comments -- based on comments in the media, did you do anything?  Let me rephrase.

       Based on the Sheriff's Department's responses in the media, did that cause you to have confidence that things would change?

A      No.

Q      Did you continue to file reports?

A      Yes.

Q      What was the next one you filed?

A      I believe it was about six to eight months later.

Q      And can you look at Exhibit 114.

A      I have it.

Q      And what is that?

A      It's the notice of filing with the court of a second report about conditions in the jails.

Q      What's the date of that?

A      September 9th, 2010.

Q      And was this also publicly filed?

A      Yes, it was.

Q      Was a copy served on the Sheriff's Department?

A      Yes.

Q      Does it -- what -- what does it talk about as well?

A      It talks about -- in one sentence, the theme was "The problems that we identified in our previous report continue; if anything, are getting worse.  We've seen no progress or change in the things that we identified in the report from earlier in the year."

Q      And that includes the excessive force that you were hearing about?

A      Yeah, I believe that was the first topic we addressed in the second report.

        MS. RHODES:  Your Honor, I'd move to admit Exhibit 114.

        MR. STEWARD:  No objection.

        THE COURT:  It will be received.

    (Exhibit No. 114 received into evidence.)

Q      (BY MS. RHODES)  Did you do anything else to bring to light what was happening in the jails besides filing this report?

A      We held a press conference with the issuance of the report, and I believe I did a number of media interview -- I'm

sure I did a number of media interviews after the report was issued.

Q    What, if anything, happened as a result of this report?

A    We noticed no change or improvements in the conditions and problems with excessive force that we identified.

Q    Based on that, did you move for a protective order?

A    Yes, we did.

Q    What is that?

A    Well, in this case, the protective order that we moved for in that particular case was basically saying that the people who are our clients, the inmates in the jails, are afraid to talk to us because they're being retaliated against for talking to us, and we asked the court for an order that basically barred the Sheriff's Department from taking any adverse action against inmates for talking to us.

Q    And do you recall approximately when that protective order was filed?

A    I don't remember the exact date, no.  It was around this time, but I don't remember exactly when.

Q    And can you turn to Exhibit 115.

A    I have it.

Q    During the course of -- during the course of applying for a protective order, did something happen?

A    Yes.  We had moved for a protective order, and the court hadn't ruled on the motion.  And then in January of 2011,

UNITED STATES DISTRICT COURT

something happened that we brought to the court's attention in a supplemental filing for the protective order.

Q    What was that?

A    One of my colleagues who had the title then of jail project monitor -- I believe she's now the jail project director -- was in the jails talking to an inmate.  She was in an attorney room.  She heard scuffling.  She went and looked through a glass window that looked out into the housing unit and saw two deputies beating an inmate --

          MR. STEWARD:  Objection, Your Honor.  This is all hearsay.

          THE COURT:  Sustained.  The answer --

          MR. STEWARD:  Move to strike the balance of -- the beginning of that sentence.

          THE COURT:  The answer is stricken.  The jury should disregard it.

Q    (BY MS. RHODES)  Did you get a report which caused you to file something in the protective order?

A    Yes.

Q    Why did you file -- did it cause you to file a declaration?

A    Yes.

Q    Whose declaration was that?

A    The declaration of Esther Lim.

Q    Why did you file her declaration?

**UNITED STATES DISTRICT COURT**

A    Because we believed it was relevant to the relief we were asking for, the protective order we were asking for.

Q    How -- how was it relevant?

A    We had alleged that -- and supported those allegations with sworn statements that one of the ways that inmates were punished for talking to the ACLU was by being beaten up by deputies.

Q    I'd like you to turn your attention to Exhibit 115.

     Do you recognize that?

A    Yes.

Q    What is it?

A    It's a supplemental filing in support of the motion for protective order.

Q    And does it contain the declaration of Esther Lim that we've just spoken about?

A    Yes.

          MS. RHODES:  Your Honor, I'd move to admit 115.

          MR. STEWARD:  No objection.

          THE COURT:  It will be received.

     (Exhibit No. 115 received into evidence.)

Q    (BY MS. RHODES)  Why did you think that the contents -- that what Esther Lim had seen and declared in her declaration were significant?

A    Well, as I said, I thought it was significant because we had previously submitted to the court statements from inmates

saying that one of the ways they got retaliated against was by being beaten up. The Sheriff's Department's response almost uniformly was inmates make stuff up and the ACLU exaggerates. This was the first time I was aware of that anybody --

(Reporter admonition.)

THE WITNESS: This was the first time I was aware of that anyone who was not an inmate or former inmate had actually observed deputies beating an inmate in the jails.

Q    (BY MS. RHODES)  And with the filing and with Esther Lim, did you also issue a press release?

A    Yes, we did.

Q    Why?

A    Because we continued to hope that public pressure and public knowledge of what was happening in the jails might force the Sheriff's Department to change its practices and behavior.

Q    And when you say "its practices and behavior," did that include the way it was conducting investigations?

A    Yes.

Q    After you issued a press release, did you learn anything about the way they were conducting the internal investigation with regard to Esther Lim?

A    Yes.

Q    What did you learn?

A    Two things:  Particularly they -- a sheriffs official made public statements about her and her credibility --

MR. STEWARD:  Move to strike, Your Honor.  Hearsay.

THE COURT:  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs or chat rooms or bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it, including anything online.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

We'll come back at quarter after.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Sir, you may step down.

All right.  We'll address the objection as soon as we get back.

(Off the record at 12:01 p.m.)

(On the record at 12:15 p.m.)

MR. FOX:  Your Honor, do you want the witness out of the room?

THE COURT:  Yes, please.

Okay.  Do you wish to be heard?

MS. RHODES:  Yes, Your Honor.  The -- this is not hearsay because it's not offered for the truth.  In fact, what the Sheriff's Department did was call into question the credibility of Esther Lim.  We're certainly not saying there is any truth that the person who witnessed this would or would not do certain things.  The Sheriff's Department said this is not a credible witness, and the affect on the hearer, a second reason that it's not hearsay is that the affect was that the ACLU had no faith, certainly no renewed faith in any kind of investigation that would first challenge the credibility of a witness to a crime before opening any investigation.  So it's not hearsay, and it has an affect on the hearer.

MR. STEWARD:  That's actually a pretty decent argument, Your Honor, and I'll withdraw my objection on the not-for-the-truth portion of it.

THE COURT:  That's a first.

MS. RHODES:  May I bring up one other thing, Your

**UNITED STATES DISTRICT COURT**

Honor, while the jury is not here?

THE COURT:  Yes.

MS. RHODES:  Not our next witness, but the witness after that, we submitted a compulsion order to Your Honor, and he would only testify with that compulsion.  I haven't been at my computer, I don't know if that came through ECF, and also you may need to instruct him orally.  So I just bring that to the Court's attention.

THE COURT:  Well, couple things.  One, the order has been signed.

MS. RHODES:  Okay.

THE COURT:  And if he's going to need -- if he's going to need to be instructed, we're going to do that outside the presence of the jury.

MS. RHODES:  It's Mickey Manzo.  We'll take a break then before that.

THE COURT:  All right.

Yeah, let's bring the jury in, and if you could have the witness...

MR. JAUREGUI:  The next witness, Your Honor?

MR. FOX:  Eliasberg.

THE COURT:  Mr. Eliasberg.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  If we could have the witness

come forward, please.

MS. RHODES:  Your Honor, may I proceed?

THE COURT:  Yes, please.

Q     (BY MS. RHODES)  Mr. Eliasberg, when we broke, we were talking about the press that covered Ms. Lim and the declaration you filed.  Do you remember that?

A     Yes, I do.

Q     Did the Sheriff's Department respond publicly?

A     Yes.

Q     How?

A     I remember particularly quotations from the Sheriff's spokesperson Steve Whitmore and the L.A. Times basically attacking Ms. Lim's credibility saying that if things had really happened the say she said they did, she would have done things differently.

Q     And was that troubling to you?

A     Extremely.

Q     Why?

A     Because I didn't think -- I thought that Ms. Lim was a witness to potential criminal activity, and I couldn't believe that the law enforcement agency that would have responsibility for investigating that potential criminal activity would criticize a principal witness in public.

Q     Now, we've spoken a bit about press coverage that the ACLU engaged in.  I'd like you to turn back to Binder 1, Exhibit 9

if you could.

A    I have the exhibit.

Q    Okay.

        MS. RHODES:  And, Your Honor, based on the stipulation, I would like to move Exhibit 9 into evidence.

        THE COURT:  Any objection?

        MR. STEWARD:  The stipulation, Your Honor, was as to foundation.

        MS. RHODES:  May I have one moment, Your Honor?

        THE COURT:  Yes.

    (Counsel conferred off the record.)

        MR. STEWARD:  No objection, Your Honor.

        THE COURT:  All right.  It will be received.

    (Exhibit No. 9 received into evidence.)

Q    (BY MS. RHODES)  Now, Mr. Eliasberg, could you --

        MS. RHODES:  If we could publish this.

Q    (BY MS. RHODES)  Mr. Eliasberg, if you could read who this is from.

A    It's from James R. Lopez.

Q    And can you read the second person who is CC'd there.

A    Yes, it says Tanaka, Paul K.

Q    Now can you read the date sent.

A    5/5/2011, so May 5th, 2011.

Q    And then can you read the first full paragraph after the dash.

A     "Assistant Sheriff Tanaka hosted your weekly staff meeting.  All chiefs were in attendance.  Issues relating to the recent media coverage of the Department were discussed."

Q     And then the fourth dash and what appears immediately below it, just the opening line.

A     "Below is a copy of an article in today's Los Angeles Times (Fatarichi/Blankstein [phonetic]) reporting on a lawsuit filed yesterday by the deputies assaulted during the MCJ Christmas party."

Q     Okay.  And the article is entitled?

A     "L.A. County Sheriff's Department fosters 'gang-like activity' among jail deputies, suit alleges."

Q     Okay.  If you could turn to the second page of that e-mail, the third paragraph, second sentence that starts "The allegations," could you read that.

A     "The allegations come amid other recent accusations of brutality inside county jails.  Last February, an ACLU representative spurred an internal criminal investigation after she said she saw two deputies, unaware of her presence, beating an unconscious inmate for at least two minutes."

Q     And then the last paragraph that starts "Sheriff's spokesperson," could you just read that first sentence.

A     "Sheriff's spokesman Steve Whitmore denied the allegations that the Sheriff's Department fosters 'lawlessness' among jail employees, saying the Department has taken swift action in

response to the incident.  'The whole story will be told, and we look forward to the opportunity to tell it.'"

Q    I'd like you to turn to Exhibit 10.

MS. RHODES:  May I have one moment, Your Honor?

THE COURT:  Yes.

(Counsel conferred off the record.)

MS. RHODES:  Your Honor, I have no further questions.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  Mr. Eliasberg, Exhibit -- I think it's 9 that we were just looking at -- you have that in front of you?

A    I do now.

Q    And are you named anywhere in this?

A    I don't see my name, no.

Q    Okay.  It appears to be from a James R. Lopez.  Do you know who that is?

A    I don't.

Q    To bcenter11@gmail -- do you know who that is?

A    I'm guessing it's a list, sir, if not a person, but no, I don't know if it's a person or who it is.

Q    And then there's a number of cc's after that; correct?

A    Yes.

Q    And one of them appears to be Mr. Tanaka?

A    Yes.

Q    And then there are a number of -- appears to be bullet points after "Good morning.  Yesterday was busy was uneventful."  Do you see that?

A    Yes.

Q    And it's just in the last one at the bottom that a -- appears to be a copy of an L.A. Times article is pasted on there.  You see that?

A    Yes.

Q    Okay.  And in order to review this and believe anything it says in here, one has to believe the L.A. Times; right?

MS. RHODES:  Objection, calls for speculation.

MR. STEWARD:  I'll withdraw it.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  But you don't know anything about this e-mail above the L.A. Times being pasted; correct?

MS. RHODES:  Objection, foundation.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  No, it's not correct.  I know about the news broadcast, "The Gang Behind the Badge."

Q    (BY MR. STEWARD)  I'm sorry, I wasn't clear.

This is not your e-mail; right?

A    No, it's not.

Q    Okay.  And the first time you saw this was when it was produced to you by the prosecution; right?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    Okay.  How long ago was that?

A    About a week ago.

Q    Now, you understand that -- let me back up.

You've been looking at and monitoring the Los Angeles County jail system for a number of years; right?

A    That's correct.

Q    Your agency, your organization has been doing it even longer; right?

A    Yes.

Q    And you understand that the Sheriff's Department has no control over how many criminal cases the D.A.'s office files; right?

A    I don't know that to be true.

Q    Okay.  You do understand that the budget for the Sheriff's Department in this county is controlled by the County Board of Supervisors; right?

MS. RHODES:  Objection, calls for speculation.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  Well, the Sheriff's Department doesn't have a source of funding other than from the County Board of Supervisors; right?

MS. RHODES:  Same objection.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  The Sheriff's Department does not

control the number of inmates under its care and security; right?

MS. RHODES:  Objection, calls for speculation, Your Honor.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  The Sheriff's Department must work within a given budget, you know that to be true; right?

A    I don't really understand the question.

Q    Okay.  Well, for example, jail overcrowding, that's one of the things that your organization has been complaining about for years; right?

A    That's correct.

Q    Do you believe that the Sheriff's Department has the ability to just build another jail?

MS. RHODES:  Objection, beyond the scope, calls for speculation.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Not by themselves, no.

Q    (BY MR. STEWARD)  So when you're talking jail overcrowding, in your many years of experience of monitoring the jail, you know that they have only X number of beds; right?

A    I guess, yes.

Q    Now, have you ever had a conversation with Paul Tanaka?

A    Yes.

Q    When?

**UNITED STATES DISTRICT COURT**

A    Well, I was at a meeting he attended in 2011, and I had a conversation with him at a debate for sheriff in, I believe -- I don't know what exact year when the sheriff's election took place.

Q    Do you recall talking to the FBI on March 12th, 2015, just about a year ago?

A    I've talked to the FBI.  I don't know if the date was March 12th, 2015, no.

Q    Okay.  In attendance was Ms. Tanner, used to be Ms. Marx, Assistant U.S. Attorney Mr. Fox, and they spoke to you on that date.  You recall that?

A    I recall meeting with those people.  I don't remember the date, no.

Q    Okay.  Do you recall telling them at any point that you don't recall any specific meeting with Mr. Tanaka?

A    I don't recall saying that because I've had -- I've been at a meeting with him.

Q    So if that's in some sort of report, that would be inaccurate; is that right?

A    I'm sorry, what would be inaccurate?  That I said that?

Q    That you never had a meeting with him.

A    If it said I'd never been in a meeting with him, that would be inaccurate.

Q    Now, the letter to Sheriff Baca in October of 2009 that we looked at, I don't recall the exhibit number, but the one we

looked at first this morning, do you have that in mind?

A    Yes.

Q    It was not addressed to Paul Tanaka; right?

A    That's correct.

Q    There was no CC or carbon copy indication that it went to Mr. Tanaka; right?

A    I don't believe so, no.

Q    And, in fact, in October of 2009, Mr. Tanaka was not the undersheriff; is that correct?

        MS. RHODES:  Objection, calls for speculation.

        THE COURT:  Sustained.

Q    (BY MR. STEWARD)  Do you know whether or not Mr. Tanaka was even in the chain of command for the jail in October of 2009?

A    No, I don't.

Q    Now, you -- holding defendants in a pretrial facility, a jail, is a difficult job right?

        MS. RHODES:  Objection, calls for speculation, beyond the scope.

        THE COURT:  Sustained.

Q    (BY MR. STEWARD)  There was a discussion about inmates who are mentally ill and the issues surrounding them and holding them in custody.  Wasn't that what you discussed with government counsel?

A    I'm not sure what are you talking about.  The conversation

in 2015?

Q    No, I'm now talking about this morning, March 20, whatever it is today.  Didn't you discuss this morning with government counsel, and I believe you read from something --

A    Oh.

Q    -- talking about the difficulty of keeping mentally ill prisoners in custody?

A    Yeah, there was reference to that in the report I read from, yes.

Q    Okay.  Well, and you know based on your years of experience -- and you have a lot of years of experience with L.A. county jail system; right?

A    Yes.

Q    Okay.  You know from that experience that it is difficult to control, maintain and keep safe mentally ill inmates; right?

         MS. RHODES:  Objection, misstates testimony, Your Honor.

         THE COURT:  I think it does, actually, but -- you understand the question?

         THE WITNESS:  I think so, Your Honor.

         THE COURT:  All right.  You can answer.

         THE WITNESS:  Yes, I think that can be difficult.

Q    (BY MR. STEWARD)  Okay.  And the complaints that the ACLU has had for the last 30 years about the jail system in Los Angeles County are not unique to Los Angeles County; right?

A    I would not agree with that.

Q    Okay.  Overcrowding -- other states, other counties have those issues; right?

A    Yes.

Q    Okay.  Force complaints -- other jails, other counties have those complaints; right?

A    Yes, but I've said that the violence in the L.A. county jails I believe is worse than anywhere in the country.  So I don't agree the fact there were forced complaints in other countries means that was the same as went on with the L.A. county jails, no, I don't agree with that.

Q    So you're familiar with these issues in the Los Angeles County jail system; right?

A    Yes.

Q    But you don't know about Fulton County in Georgia, you don't know about the degree to which these issues have arisen; right?

A    No, I don't agree with that.

Q    You are aware of the jail problems in Fulton County?

     I'm sorry, that's a question.

A    I have talked to people about conditions in jails and prisons in the south including Fulton County, yes.

Q    Now, for example, in some of the things you talked about this morning, the ACLU has had major issues with jail overcrowding; right?

**UNITED STATES DISTRICT COURT**

A       You referring to our national office?

Q       No, I'm referring to you, this office, this county.
Overcrowding has been an issue that the ACLU has complained
about again and again and again; right?

A       Yes.

Q       Okay.  And in terms of overcrowding, what does the ACLU
suggest that the L.A. County Sheriff's Department do about it?

            MS. RHODES:  Objection, beyond the scope.

            THE COURT:  Let's go to sidebar for a moment.

       (Discussion held at sidebar.)

            THE COURT:  Okay.  I have her objection.  Want to be
heard?

            MR. STEWARD:  Certainly.  I think this is a general
area that's of importance having to do with their position --
ACLU's position in the jail and the years -- the litigation
that they've been talking about on direct.  If the Court feels
that it's beyond the scope, then we'll just call Mr. Eliasberg
back in our case.  It's that easy.

            MS. RHODES:  I do think it's beyond the scope.  I'm
not sure what relevance the overcrowding has to this case,
either the defense of -- or not, and so --

            MR. STEWARD:  Our position is -- I'm sorry, I didn't
meant to cut you off.

            MS. RHODES:  And so I think it may be a 403 issue,
which would be a waste of time.

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  Okay.  Our position is the ACLU has a significant bias here, and that's where we're going with all of this; that these are issues that the Sheriff's Department can't solve because they don't have the money to do it, and these guys have been pushing it and pushing it.

Now, I've tried to go there a couple of different ways but...

THE COURT:  Okay.  Well, if you want to do this in your own case, we'll then address it.  Let's move this along.

MR. STEWARD:  Okay.

(End of sidebar discussions.)

MR. STEWARD:  And nothing further, Your Honor.

THE COURT:  All right.  Any redirect?

MS. RHODES:  No, Your Honor.  Thank you.

THE COURT:  All right.  You may step down.  Thank you.

And the name of your next witness?

MR. JAUREGUI:  Robert Bayes, Your Honor.

THE COURT:  All right.

THE DEPUTY CLERK:  Please stand here for me and raise your right hand.

(The witness, ROBERT BAYES, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

UNITED STATES DISTRICT COURT

THE WITNESS:  Robert Bayes, B, as in boy, A-Y-E-S.

THE DEPUTY CLERK:  Thank you.

THE COURT:  Before we start, let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  I know the parties had a stipulation that the witnesses who have testified can stay in here, but if you recall him, do you have any objection to him staying in the audience?

MR. STEWARD:  Not really, no.

THE COURT:  Okay, that's fine.

(End of sidebar discussions.)

MR. JAUREGUI:  Your Honor, may I proceed?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Mr. Bayes, how are you presently employed?

A    I'm with the L.A. County Sheriff's Department, and I'm a sergeant.

Q    And how long have you worked for the Los Angeles County Sheriff's Department?

A    25 years.

Q    And how long have you been a sergeant?

A    Since December 2013.

Q    Going back to August 2011, Mr. Bayes, what was your rank

then?

A    I was a detective with the Jail Investigation Unit.

Q    And could you please explain to the jury what the Jail
Investigation Unit is.

A    Jail Investigation Unit is one of four units in the
Custody Investigative Services Unit, and we are the detectives
that handled all the cases or reports that are written inside
of the jails, court services and Transportation Bureau, and the
reports would be anything from a simple vandalism to attempted
murder.

Q    And, sir, where physically were you located at that time?

A    At the Men's Central Jail, 3,000 floor.

Q    And you said that JIU -- I'm sorry, is JIU another term
for the Jail Investigation Unit?

A    Yes.

Q    And you said that JIU was one of four divisions within a
larger group; correct?

A    Correct.

Q    And what were the other divisions?

A    OSC, Operation Safe Jail, K-9 and Jail Liaison.

Q    And did your responsibilities include writing reports?

A    Yes.

Q    Did there come a time, Sergeant Bayes, that you came to be
involved -- that you came to know of an inmate named Anthony
Brown?

A     Yes.

Q     And when was that?

A     August 8th, 2011.

Q     And how did you get to know that name?

A     I received a call from Sergeant Orpe, O-R-P-E, who is a Men's Central Jail sergeant, and he notified me that his deputies had found a cell phone in Anthony Brown's property.

Q     And what were you asked to do, if anything, about that?

A     Since I answered the phone in our unit, I assumed the handle or took the handle on the case.  The deputies brought the cell phone down to my office, and I took off the numbers off the back of the cell phone.  They then took the cell phone down to Homicide Bureau and ran it on a cellebrex [phonetic].

Q     And, sir, just so everyone's clear, when you said you took the handle, what does that mean?

A     I assumed -- I assume control of the investigation.

Q     Okay.  And what was the investigation -- what were you doing, or what were you tasked with doing?

A     Possession of a cell phone in the jail.

Q     Okay.  And did you interview the inmate Anthony Brown?

A     Yes.

Q     Did you interview him on August 8th, 2011?

A     No.

Q     When did you first interview Anthony Brown?

A     August 16th, 2011.

Q    And how did that interview come to be?

A    Deputy Jason Colon, C-O-L-O-N, had sent me an e-mail, and I received that e-mail on August 16th in the morning when I got to work.  And he said that he had interviewed Anthony Brown the night prior on August 15th.

Q    Okay.  And who is Deputy Colon?

A    Deputy Colon works for Operation Safe Jail.

Q    And what did he tell you about an interview on August 16th, if anything?

A    On August 16th, he mentioned that he had interviewed Anthony Brown the night prior and that he was going back for a second interview.

          MR. HAIG:  Objection, Your Honor.  Hearsay.

          THE COURT:  If you could just avoid telling us at the moment what he said.

Q    (BY MR. JAUREGUI)  Sir, did you end up participating in an interview on August 16th?

A    Yes.

Q    Of Anthony Brown?

A    Yes.

Q    And who participated in that interview?

A    Myself, Detective Armand, A-R-M-A-N-D, Villagomez, V-I-L-L-A-G-O-M-E-Z, and Deputy Jason Colon.

Q    And what, if anything, did you learn about the cell phone after that interview -- or in that interview?

A    I learned from Anthony Brown, after talking to him approximately an hour, that he had a contact on the outside named CJ, and CJ was helping to bring the cell phone into the jail through a deputy, and possibly narcotics also.

Q    And what did you do with that information, if anything?

A    Took that information back to my sergeant, Chris Reddington, R-E-D-D-I-N-G-T-O-N, and briefed him on the interview that we had with Anthony Brown.  And during that interview, he said that we should notify ICIB or Internal Criminal Investigation Bureau.

Q    And, Sergeant Bayes, did you then notify the Internal Criminal Investigation Bureau?

A    Yes, I did.

Q    And whom -- with whom did you speak?

A    Lieutenant Rob Peacock, P-E-A-C-O-C-K.

Q    And did there come a time, sir, after speaking to Lieutenant Peacock, that you spoke with an individual named Greg Thompson?

A    Yes.

Q    And who is Greg Thompson?

A    Greg Thompson was my lieutenant and CISU.

Q    And when did you speak with him?

A    Approximately four o'clock that afternoon.

Q    And what did you speak to him about?

A    He called me.  I was already at home, and he called me.

And he was very irate and cussing, and he asked me why I notified ICIB.

Q    And what did you tell him?

A    I told him that in the conversation with Sergeant Reddington, that Sergeant Reddington advised that we should notify ICIB, so I made that call.

Q    And what did he say to you, if anything?

A    He just was asking -- I guess he -- in my interpretation, he had talked to Detective Villagomez and/or Sergeant Reddington before he called me, and he asked me if that -- he wanted to find out if I would tell him the truth.

Q    And just to be clear, what was Greg Thompson's role within the jail, if any, at that time?

A    He was my lieutenant in Custody Investigative Services Unit.

Q    And what, if anything, did you do next?

A    I hung up the phone.  Got tired of his cussing at me and belittling me, so I hung up on the phone on him.

Q    Did you have an understanding, sir, of why -- why he was so angry with you or why he was cussing at you?

A    My impression was that I guess I shouldn't have called ICIB, that was something that he should have done as a lieutenant in our group.

Q    Okay.  Sergeant Bayes, I'd like to now have you look at Exhibit Number 12 in the big black binder in front of you,

UNITED STATES DISTRICT COURT

please.

A    Yes.

Q    And do you recognize that exhibit?

A    Yes, I do.

Q    And what is it?

A    It is an e-mail from my lieutenant, Greg Thompson, to Chris Reddington, myself, Gerard Smith, G-E-R-A-R-D, Jason Colon and regarding a briefing on the Brown case.

Q    I'm sorry, Sergeant Bayes, I meant to direct your attention to Exhibit Number 13.  Could you please look at Exhibit Number 13.  We'll come back to Exhibit Number 12.

A    Okay.

Q    And do you recognize that exhibit?

A    Yes, I do.

Q    And what is it?

A    It is an e-mail from Greg Thompson to myself.

Q    And do you recall receiving this e-mail from Lieutenant Thompson?

A    Yes.

        MR. JAUREGUI:  Your Honor, the government moves to admit Exhibit Number 13.

        THE COURT:  Any objection?

        MR. HAIG:  No, Your Honor.

        THE COURT:  It will be received.

        (Exhibit No. 13 received into evidence.)

**UNITED STATES DISTRICT COURT**

MR. JAUREGUI:  And if I could ask Mr. Fox to publish that exhibit.

Q    (BY MR. JAUREGUI)  Okay.  Sergeant Bayes, could you -- do you see the "To" line in this e-mail?

A    Yes.

Q    It says Roberto E. Bayes; correct?

A    Correct.

Q    Is that you?

A    Yes.

Q    And if you wouldn't mind, could you please read this e-mail to the jury.

A    "Bob, I had to change plans.  Anthony Brown will be shipped to CDC on the next available bus.  Until then he will be in 1750 and no phones, no visits, especially from outside LE without my approval."

Q    Okay.  And, Sergeant Bayes, do you understand what 1750 means in this e-mail?

A    Yes.

Q    And what does it mean?

A    1750 is a jail area that's in Men's Central Jail.  It is our highest classified area where the most notorious inmates that we house, our most violent or people that have high -- like celebrities or those type of -- high type of notoriety-type cases could be housed on there.

Q    And the end of that e-mail that says "no phones, no

**UNITED STATES DISTRICT COURT**

visits, especially from outside LE without my approval," do you see that?

A    Yes.

Q    Do you have an understanding, sir, of what "LE" means?

A    "LE" means law enforcement.

Q    Okay.  Now if we can go back to Exhibit Number 12.

And do you recognize this exhibit?

A    Yes.

Q    And what is it?

A    This is an e-mail from Greg Thompson to Sergeant Reddington, myself, Gerard Smith and Jason Colon, briefing on Brown case.

Q    Okay.  And if you wouldn't mind reading this e-mail to the jury as well.

THE COURT:  Has it been offered?

MR. JAUREGUI:  Your Honor, the government offers Exhibit Number 12 into evidence.

MR. HAIG:  No objection.

THE COURT:  It will be received.

(Exhibit No. 12 received into evidence.)

MR. JAUREGUI:  And, AUSA Fox, if you could please publish that exhibit.

THE WITNESS:  "I would like to meet Tuesday 8/23/11, 2011, afternoon to discuss your progress on this case.  I know JIU has an SW that morning, so at this time let's plan on 1300

in JIU."

Q     (BY MR. JAUREGUI)  Okay.  And at this point in time, Sergeant Bayes, had you written any reports about your interview of Anthony Brown?

A     Yes.

Q     And what had you written at that point in time?

A     I had written a memorandum on August 17th, 2011.

Q     Okay.  And had you shared that memorandum yet with anyone?

A     Yes.

Q     And who did you share it with?

A     Lieutenant Thompson.

Q     Okay.  Did you speak to Lieutenant Thompson at any point after receiving this e-mail discussing the progress of your case?

A     Yes.

Q     And when was that?

A     On the 26th.

Q     Prior to the 26th, sir, had you spoken to -- did you speak to him at any point right after this August 18th e-mail?  Did you speak with Lieutenant Thompson on August 19th?

A     Oh, I'm sorry, I'm reading the 23rd.  Yes, I did.

Q     And what did you speak with Lieutenant Thompson about?

A     He'd sent me an e-mail -- actually that e-mail was sent to me on August 18th after I left work.  So on the 19th, I was working overtime, and I got off overtime at six o'clock p.m.  I

looked at my e-mails, and Lieutenant Thompson had sent me an e-mail in regards to a meeting he had with the undersheriff.

Q    And what did he say?

A    I sent him an e-mail just saying "Hey, how'd your meeting go," and he said "Call me."

Q    And did you end up calling him?

A    Yes, I did.

Q    And what did -- what did you discuss?

A    He said that the undersheriff knows who Gerard Smith and Mickey Manzo is, but he doesn't know who the fuck Robert Bayes is because he didn't go to the meeting.

Q    And what did you understand that to mean?

A    That apparently I should have gone to the meeting.

Q    At that point in time, had you written a report -- a full report on the cell phone incident involving Anthony Brown?

A    No.

Q    And did you then -- after the discussion with Lieutenant Thompson on the 19th, did you speak with him again about your report?

A    Not on the 19th, no.

Q    At any point after the 19th, sir?

A    The 23rd, he had called me and asked me to make the report a conspiracy and that it would be a conspiracy with one unknown female, one unknown male voice.

Q    Okay.  And at that point, by August 23rd, were you writing

a report -- had you been writing the report up as a conspiracy?

A      No.

Q      And did he tell you why he wanted you to write the report up as a conspiracy?

A      No.

Q      Did he tell you who the male voice was?

A      No.

Q      Did he tell you who the female voice was?

A      No.

Q      Did you follow Lieutenant Thompson's commands?

A      I did on the 26th.

Q      What happened on August 26th?

A      Lieutenant Thompson called me at my office, and he requested that I write the conspiracy report and deliver it to him expeditiously because he was going to a meeting at Sheriff's Headquarters to meet with the undersheriff and others in regards to this Anthony Brown cell phone matter.

Q      And I believe I asked you -- if I haven't asked you this question, I apologize.  How did you plan to write the report if not as a conspiracy?

A      As a simple possession of a cell phone in jail.

Q      And would that be a misdemeanor or a felony offense?

A      Misdemeanor.

Q      Okay.  And on August 26th, did you proceed to write the report?

A    Yes, I did.

Q    And what did you do?

A    I wrote the report with what knowledge I had, and I took it to Lieutenant Thompson, who was across the street at the Twin Towers Correctional Facility.  He read the report and told me that it was a piece of shit and that he was going to dictate or direct me how to write the report he wanted to present.

Q    And what happened next?

A    I went to an adjacent office, which was Sergeant Gutierrez's office, and Lieutenant Thompson told me that he was going to send me e-mails and to cut and paste these e-mails and put it into a report form.

Q    And did you do that?

A    Yes, I did at his direction.

Q    And what did you write in the report?

A    Everything that he sent to me in e-mail form.  It was like a timeline, and I had never seen that before.

Q    And did you write that it was a conspiracy?

A    Yes.

Q    And did you include certain names in that report?

A    Yes.

Q    And, sir, what names did you include in that report?

A    He gave me three names -- David Dahle, D-A-H-L-E, Leah Marx, M-A-R-X, and Mr. Plympton -- I think it's Wayne Plympton.

Q    Okay.  And did you know who those individuals were?

UNITED STATES DISTRICT COURT

A       No, I did not.

Q       Do you know if they were affiliated with law enforcement at that time?

A       Affiliated with the FBI?

Q       At that time, did you know that, sir?

A       May I refresh my recollection?

Q       Sure.  Would looking at --

        MR. JAUREGUI:  Can I have a moment, sir, Your Honor?

        THE COURT:  Yes.

        (Plaintiff's counsel conferred off the record.)

Q       (BY MR. JAUREGUI)  Sergeant Bayes, I'm just going to move on from that point.

        What happened after you finished writing the report?

A       Lieutenant Thompson -- I gave him the completed report, and he signed it.  And he said that he was going over to Sheriff's Headquarters, and he asked me to follow him in a separate car, which I did.

Q       And did you go to Sheriff's Headquarters?

A       Yes, I did.

Q       And what happened when you got there?

A       I sat outside in the sheriff's -- sheriff's area greeting area outside his office.  Sat there approximately two to two and a half hours.  To my right there was a white type of office with a closed door.  To my left was a sheriff's office, and he -- during that time, he came out, he greeted me and then

continued from my left to his right.

Q    And then what happened?

A    During the time, say toward the end of the two and a half hours, the door burst open from the office to my right, and the undersheriff, Paul Tanaka, came out screaming, "Motherfuck, fuck, fuck," and he was completely irate and pissed off.

Q    Sir, do you recognize Paul Tanaka in the room today?

A    Yes.

Q    Could you please identify him.

A    He's the gentleman on the defense table in the middle.

MR. JAUREGUI:  Your Honor, if the record would reflect that the witness has identified the defendant?

THE COURT:  The record will so reflect.

Q    (BY MR. JAUREGUI)  Sergeant Bayes, at this point in time, did you have any idea that the cell phone found on Anthony Brown was connected to the FBI?

A    No.

Q    At this point in time, had you interviewed Anthony Brown any other time than the one time you interviewed him?

A    No.

Q    And did you continue investigating the Anthony Brown incident after August 26th?

A    Yes.

Q    Was the investigation ultimately taken away from you, sir?

A    Yes.

Q    And do you know where the investigation went?

A    Went to the Internal Criminal Investigation Bureau, or ICIB.

        MR. JAUREGUI:  Your Honor, if I could have a moment?

        THE COURT:  Yes.

        MR. JAUREGUI:  No further questions for this witness, Your Honor.

        THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

Q    (BY MR. HAIG)  Sergeant, what is your current assignment?

A    I am a sergeant at the Inmate Reception Center.

Q    At Men's Central Jail; right?

A    At Inmate Reception Center.

Q    At MCJ?

A    No, across the street.

Q    Across the street.  Okay.

     When did you leave JIU?

A    December 2013.

Q    Does that coincide with when you were promoted?

A    Yes.

Q    The investigation of an inmate having contraband is something that JIU would take charge of at the time that you worked there; correct?

A    Yes.

Q    And the inmate having a cell phone, was that a rare or not

**UNITED STATES DISTRICT COURT**

a rare occurrence?

A    Somewhat rare.

Q    Because you answered the phone on August 8th, 2011, the case just became assigned to you by you assigning it to yourself.  Would that be correct?

A    Correct.  I answered the phone, yes.

Q    And how long after answering the phone did you actually get the phone delivered to you?

A    Maybe an hour or two.

Q    That was on August 8th; right?

A    August 8th, yes.

Q    And I think you stated that the first time you actually had a face-to-face with Mr. Anthony Brown was August 16th?

A    Yes.

Q    What did you do between August 8th and August 16th to investigate how Anthony Brown actually got the phone into his possession?

A    Anthony Brown, at the time on August 8th, did not want to talk, and so I didn't talk to him.

Q    How do you know that?

A    He said that he -- he told the deputies he did not want to talk about the cell phone.

Q    Do you know another deputy sheriff named Mickey Manzo?

A    Yes.

Q    What was his job in August of 2011?

A    Operation Safe Jail.

Q    And how is that different than JIU?

A    Operation Safe Jail is like the gang unit, and inside our jails they go out and gather intelligence, talk to gang members, try to elicit information on narcotics or weapons that are inside the jail, try to quell riots.  In talking to gang members, they try to elicit information to try to solve homicides out in the streets and talk to -- you know, homicides or any crimes of other various agencies.

Q    In August of 2011, would JIU and OSJ work together from time to time on cases?

A    Time to time.  Not on cases, just if there might be gang-related, but very rarely on cases.

Q    Sharing intelligence sometimes?

A    Sometimes.

Q    Okay.  When you interviewed Mr. Brown on August 18th, did you have any information at that time that he had spoken to any other deputies?

A    Just Deputy Colon.

Q    Did you have any detailed interviews from Mr. Brown of any conversations he'd had?

A    No.

Q    Did you have any idea that Mickey Manzo was doing any work on the Anthony Brown matter --

A    No.

**UNITED STATES DISTRICT COURT**

Q    -- at that time?

Did you ever learn that there was a order signed by a Los Angeles County Superior Court judge regarding some restrictions to Anthony Brown?

A    I have learned that, yes.

Q    Did you know it at the time in mid-August of 2011?

A    No.

Q    When did you learn that?

A    I believe at the -- at the trial.

Q    At one of the trials of somebody that's not seated in the court; correct?

A    Correct.

Q    All right.  So you didn't do anything to try to get any kind of court order regarding Anthony Brown; correct?

A    The only court order I did was a court order to get the information from Sprint on the cell phone.

Q    This was -- go back to the cell phone.  This was a Boost Mobile cell phone and Boost is owned by Sprint Corporation; is that right?

A    Yes.

MR. JAUREGUI:  Your Honor, calls for speculation.

THE COURT:  That's all right.  The answer will stand.

Next question.

Q    (BY MR. HAIG)  Why did you seek an order for the cell

UNITED STATES DISTRICT COURT

phone records from Sprint?

A    That's what I've always done on a cell phone.  If I've had a cell phone in custody, I tried to get what information is -- has been used on a cell phone.

Q    During the time that you were investigating the cell phone, how it got into Anthony Brown's hands between August 8th and August 16th, did you have any conversations with Lieutenant Thompson about your investigation?

A    Yes.

Q    And when do you think that first conversation was that you had with Lieutenant Thompson?

A    Actually, I think that was on the 17th.

Q    The 17th was the first time you ever spoke to him?

A    In regards to giving him information on the cell phone, yes.

Q    And that would be the first time that he ever made any inquiry to you regarding the Anthony Brown matter and specifically the cell phone that he had in his possession?

A    Yes.  He just told me to keep him apprised after I did the court order, and that's what I did.

Q    What court order are you talking about?  The order --

A    The cell --

Q    -- the cell phone court order?

A    Yes.

Q    All right.  Not the order that I spoke about a moment

ago --

A     The cell phone court order.

Q     Right.  Which is not the same as the one that you saw in that other trial you talked about.  Would that be correct?

A     No.

Q     That's not correct?

A     I'm sorry?

Q     Is it the same order, or is it not the same order?

A     It is not the same order.

Q     All right.  Thank you.

Did Lieutenant Thompson tell you why he had some interest on August 17th about this incident and specifically the Anthony Brown phone incident?

A     We had a meeting that he, excuse me, invited me, Sergeant Reddington, Jason Colon and Gerard Smith to attend a meeting with the captain -- Captain Ornelas of Men's Central Jail regarding information that the captain had in regarding Anthony Brown.

Q     That would be Captain Ralph Ornelas?

A     Yes.

Q     O-R-N-E-L-A-S?

A     Yes.

Q     Before you went into the interview on August -- let's see -- August 16th with Anthony Brown?

A     Yes.

**UNITED STATES DISTRICT COURT**

Q    Before that interview, did you have any independent information that the cell phone that was found on him on August 8th was actually brought to him or assisted being brought to him through a deputy sheriff?

A    No.

Q    It was only during that interview with him on the 16th that he finally told you that there was a deputy sheriff involved.  Would that be correct?

A    Yes.

Q    Did he give you the name of the deputy sheriff?

A    No.

Q    Did you -- you obviously asked him the name?

A    Yes.

Q    You asked where this person worked?

A    Yes.

Q    Asked for a physical description?

A    No.  He was very vague in his description, if any.  He just mentioned the name CJ and that they would contact the deputy on the outside.

Q    And based upon that, you said you reported your findings and were advised to turn this over to ICIB?

A    I reported it to ICIB due to they handle crimes involving personnel -- sworn personnel.

Q    You were actually ordered to turn it over to ICIB.  Would that be correct?

A      I'm not sure what you're -- what date you're talking about or --

Q      On August 16th.

A      Turning over what, sir?  I'm not clear on --

Q      Well, turning over the investigation or at least alerting ICIB that there was a potential criminal violation by a sworn deputy.

A      I alerted them, yes.

Q      Why did you do that?

A      I had talked with my sergeant, Chris Reddington, and he worked Internal Affairs Bureau, and him being my sergeant, we talked about it.  He hemmed and hawed back and forth, and he stated, "Yeah, we need to contact ICIB because, you know, a deputy may be involved in this."

Q      And later on, when Lieutenant Thompson found out about this, he was not happy?

A      Correct.

Q      And it appeared to you that he was not happy because you didn't go to him first?

A      Correct.

Q      Not necessarily because of the referral to ICIB?

A      I'm sorry?

Q      Was he unhappy about the referral, or was he unhappy that you referred to it without talking to him first?

A      I believe I -- without me talking to him, I overstepped my

bounds and went out of the chain of command.

Q    Turn, if you will, to Exhibit 13.

(Counsel conferred off the record.)

Q    (BY MR. HAIG)  Sergeant Bayes, you already testified a little bit about this, but August 13th at 1:30, Lieutenant Thompson wants to have a follow-up meeting with you -- I'm sorry, that's the wrong one.  Go to 12, please.  I made the same mistake that counsel made.

You have that now, Sergeant?

A    Yes.

Q    Okay.  So just to keep the chronology correct, the matter's been referred to ICIB.  Thompson chewed you out.  Couple days later, you then get this e-mail from Lieutenant Thompson saying that he wants a follow-up meeting a few days away, August 23rd.

A    Yes.

Q    So you calendared that, and you were ready to go; right?

A    We never had the meeting.

Q    Never had the meeting, right.

The JIU, we know what that is.  SW, that would be a search warrant that was being executed?

A    Yes, correct.

Q    All right.  Later that day, Exhibit 13, this is again addressed to you from Lieutenant Thompson.  Obviously, your name is Bob, so meaning that Anthony Brown is being sent to

**UNITED STATES DISTRICT COURT**

state prison; right?

A     Correct.

Q     You knew at this time that Anthony Brown was a -- already a sentenced inmate awaiting transfer to state prison at the time you started your investigation on August 8th.  Would that be correct?

A     No, I did not know.

Q     You found out eventually; right?

A     I knew that he was looking at an extensive amount of years, 25 years to life or 400-plus years.

Q     Didn't you learn that pretty early on in your investigation?

A     I would say, yes.

Q     Because one of the things that you do in JIU is you make a referral as to whether criminal charges should be filed.  Would that be correct?

A     Once the investigation is done, yes.

Q     And you said that the possession of a cell phone in county jail is a misdemeanor; right?

A     Correct.

Q     A misdemeanor's punishable by a maximum of six months' confinement; correct?

A     Correct, or 30 days.

Q     But a maximum of six months is the maximum for a misdemeanor?

A    Correct.

Q    And this misdemeanor specifically has a maximum of six months?  Do you know that to be true?

A    I don't recall.

Q    Your advice would have been to just not refer the case to prosecution if you aren't looking at a six-month max on top of 423 years.  Wouldn't that be correct?

A    Correct.

Q    Whereas if somebody was serving five days for a traffic warrant, there might be a different recommendation; right?

A    Yes.

Q    When you received this e-mail on August 18th, you weren't surprised at all, were you?

A    I received the information, and that was just from Lieutenant Thompson.  I had -- no, it didn't really correlate with me with the cell phone of the investigation.

Q    Did you respond in any way to Lieutenant Thompson when you received the e-mail at 1:31 p.m. on August 18th that Mr. Brown was going to be sent to state prison?  Did you correspond with him in any way about how you felt about that?

A    No.

Q    And based upon that, the meeting was clearly going to be canceled that had already been set for August 23rd?

A    Well, it got canceled because of the search warrant on the 23rd.

Q    Well, if we go back to Exhibit 12, sir, in the chronology on August 18th, you have a meeting set up regarding the Anthony Brown cell phone incident; right?

A    Yes.

Q    And this is before you know or are even advised about any federal government involvement in the cell phone.  Would that be correct?

A    Correct.

Q    The e-mail that came a few hours later, a little over three hours later at 1:30, which is the following exhibit, Exhibit 13, that for all intents and purposes canceled your meeting on the 23rd because Anthony Brown wasn't going to be in county jail anymore and there really wasn't going to be any more investigation for you to do.  Would that be correct?

A    Well, my understanding that -- you know, even if Anthony Brown is sent away to state prison doesn't mean I stop my investigation.

Q    Of course not.  But did you take this e-mail to mean that the meeting would be canceled or not canceled?

A    No, it had no affect at all about the meeting being canceled.

Q    On August 18th, when did you finish your workday, if you recall?

A    Approximately 3:30.

Q    And when did you work next after August 18th?

A    I worked overtime on August 19th.  Or do you mean back at my normal position at JIU?

Q    Well, that's -- I'm going to ask the next question.  So you worked overtime, not a JIU assignment, some other assignment?

A    Correct.

Q    Where did you work?

A    At the County Services Parks Division at Mona Park Pool.

Q    Does that mean you didn't have access to your normal e-mail because you weren't at your desk?

A    Correct.

Q    An e-mail came that you never saw?

A    Yes.

Q    And that e-mail asked you to go to Sheriff's Headquarters for a meeting regarding the Anthony Brown matter?

A    Yes.

Q    And what time was that meeting supposed to be?

A    I believe 1:00 or 1:30.

Q    On what date?

A    August 19th.

Q    And clearly, had you received that e-mail, you would have gone?

A    Yes.

Q    It was not only an order, but that's something you would just do; right?

UNITED STATES DISTRICT COURT

A    Yes.

Q    Did anybody try to contact you in any way, specifically Lieutenant Thompson, or anybody else to get you to go to that meeting?

A    No, but Mickey Manzo contacted me about seven o'clock that night to find out what information I had to pass on to him so he could talk about it during the meeting, per Lieutenant Thompson.

Q    Seven o'clock on the night of the 18th or the 19th?

A    18th.

Q    So you knew that a meeting was going to happen the next day, you just didn't know that you had been invited because you hadn't seen the e-mail.  Would that be correct?

A    Yes.

Q    Because Manzo had told you that he was going to go to Headquarters for a meeting?

A    He said he was attending a meeting.  I didn't know what meeting he was referring to or what time it was.

Q    Did you give Manzo the information he requested of you?

A    Yes.

Q    When did you find out that you had actually missed the meeting?

A    On the 19th at 6:00 p.m.

Q    And how did you find out?

A    Excuse me.  I checked my e-mail after my overtime shift at

the County Parks.

Q    Are you -- do you know, is there a way you can check your e-mail remotely of your desk?

A    Oh, I didn't have a desk.  I was standing at our -- posted at a community pool.

Q    Well, how were you able to check your e-mail?

A    I responded back to the headquarters of the County Parks to pick up my overtime slip, and they had computers there to use.

Q    And Mr. Thompson -- or Lieutenant Thompson told you that it did not appear that the undersheriff was happy that you had missed that meeting.  Was that the impression that you had gotten?

A    I just got the impression that because I didn't go to the meeting, he knew who Gerard Smith was and Mickey Manzo and didn't know who I was.

Q    August 23rd comes around, and you're asked to make a report -- a conspiracy report, as you've testified to --

A    Yes.

Q    -- right?

Was that a phone call you got from Lieutenant Thompson or an e-mail to do that?

A    I believe I received a phone call.

Q    Was anybody else on the line?

A    No.

Q    During that phone call, did Lieutenant Thompson ever mention the undersheriff as wanting this to be done?

A    No.

Q    You then wrote the report, and you sent the report to Lieutenant Thompson.  Would that be correct?

A    I wrote the report on the 26th.

Q    And you sent it to Lieutenant Thompson?

A    I walked it over personally.

Q    And he looked at it and said -- I'm using your words -- that it was a piece of shit?

A    Correct.

Q    How'd that make you feel?

        MR. JAUREGUI:  Objection, Your Honor.

        THE COURT:  Sustained.

Q    (BY MR. HAIG)  Did the things that you put in that first report, the August 26th report that Lieutenant Thompson didn't like and used those words, did that report have accurate statements in there, as far as you knew?

A    It had a -- the only information that I -- I had acquired up to that point.

Q    It was things that you knew of personally, and you could attest that the things in that report were true and correct, to the best of your knowledge.  Would that be correct?

A    Yes.

Q    But Lieutenant Thompson didn't like that report, and he

wanted three now-known FBI agents to be put as suspects or coconspirators in a new report.  Would that be correct?

A    Yes.

Q    And the report that you initially gave him that he didn't like, didn't have any of those three folks -- Dahle, Marx or Plympton -- listed as suspects; is that correct?

A    Correct.

Q    Just listed as witnesses; right?

A    I don't believe I had them at all in the first report.  I just had an unknown male voice and unknown female voice.

Q    What followed was Lieutenant Thompson sending you e-mails for you to cut and paste into a report?

A    Yes.

Q    And you followed his orders; correct?

A    Correct.

Q    And you prepared a report that did not reflect your personal knowledge of the facts in that report.  Would that be correct too?

A    Yes.

Q    And you signed that report?

A    I did not sign it.  I put my name listed on the bottom as the author.

Q    And by putting your name on that report, you know that that report is to be relied upon by people who would look at that report as having statements that were entered truthfully

and accurately and completely by the author of that report. Would that be correct?

A    Yes.

Q    And you knew that to be incorrect to write a report that was not accurate and to put your name on that report?

A    I did not know if the information he was giving me was inaccurate, as I didn't know -- I wasn't privy to any of the information he was giving me.  It was stuff that was handled or done behind my back.

Q    As you weren't privy to that, did it ever occur to you to ask Lieutenant Thompson to prepare a report that you could then attach as a supplemental report to your actual report?

A    That was a report I gave him in the instant that he thought was a piece of shit.

Q    Is there any -- did you ever ask Lieutenant Thompson then to write his own report that he thought that -- based upon what he knew about the case instead of telling you what to put in your own report?

A    No, because he was in a -- appeared to be in a frenzy, in a hurry, and was directing me to write this report at his question.

Q    He directed you to write a report and to put your name at the end of the report.  Would that be correct, sir?

A    Yes.

Q    All right.  And that report did not reflect what you knew

about the case; correct?

A    Correct.

Q    And you said that these were cut and pasted from various e-mails from Lieutenant Thompson sent you successively on that day?

A    Yes.

Q    In any part of these e-mails, did Lieutenant Thompson or was there any notation about the undersheriff, Paul Tanaka, wanting any of these things to go into the report?

A    Not that I'm aware of.

Q    When you were at Sheriff's Headquarters and you saw the undersheriff, was that the first time you had ever seen him face-to-face?

A    Probably that close.

Q    Had you ever had a conversation with him before that date?

A    Not that I'm aware of.

Q    Did you have any conversation with him on that date?

A    Not that I'm aware of, no.

Q    You said he exited --

A    Oh, on that day, no, I did not.

Q    All right.  You said you waited for about two and a half hours at Sheriff's Department Headquarters?

A    Yes.

Q    In Monterey Park?

A    Yes.

Q    What floor, if you recall?

A    I believe it was the fourth floor.

Q    And were you in a waiting room, or can you just tell us where you were seated and waiting.

A    I was outside of the Sheriff's office where the sergeants or lieutenants sit at the desk, I guess it's like a lobby.

Q    When you say the Sheriff's office, actually Sheriff Baca's office; correct?

A    Sheriff Baca, yes.

Q    When you saw the undersheriff, Paul Tanaka, walk out after two and a half hours and he was cursing, and he appeared to be not real happy; correct?

A    Correct.

Q    Whose office did you see him walk out of, if any?

A    He walked out of the meeting room to my right.

Q    Did he converse with you at all after he walked out?

A    No.

Q    Was any commentary made by him in any way about your report or anything that you had done in this case?

A    No.

Q    And except for hearing him curse and looking upset, you had no context at all to what he was cursing and was upset about.  Would that be correct, sir?

A    Yeah, I had no idea what he was mad about.

         MR. HAIG:  Thank you.  No more questions.

**UNITED STATES DISTRICT COURT**

MR. JAUREGUI:  No further questions from the government, Your Honor.

THE COURT:  All right.  Thank you, sir.  You may step down.

Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  I have a note from the jury.  Maybe you can give me some clue as to what I can say about this.

"Can you please remind the others not to use strong perfume?"

MR. HAIG:  The other jurors?  Is that what you think it means?  This is Jerome Haig.

THE COURT:  No, I think it means you.

MR. JAUREGUI:  You're clearly "the others."

MR. HAIG:  Because you all are right next to him.

THE COURT:  Could be that.  That's true.

Anyway, I'm going to let them go.

MR. FOX:  Your Honor, do you want to deal with the Mickey Manzo issue now?  Because he is here.

THE COURT:  Yeah, I'll let them go, and then we can take him on Tuesday.

MR. FOX:  Perfect.

THE COURT:  Okay.

MR. FOX:  Thank you.

(End of sidebar discussions.)

UNITED STATES DISTRICT COURT

THE COURT: Ladies and gentlemen, we're going to break for the day. Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you. This includes discussing the case on the Internet, through blogs, bulletin boards, e-mails or text messages. If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it. That includes anything online. Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

We're going to resume on Tuesday, so you'll have Monday off. We're going to start at eight o'clock, and we will go again until 1:30. Please have a nice weekend. Thank you all for showing up and have a nice weekend. We'll see everybody on Tuesday.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  We have one other issue we want to take up.

MR. FOX:  Would you like me to bring Mr. Manzo in?

MS. RHODES:  Is that the issue?

THE COURT:  Let's go to sidebar for a moment.

(Discussion held at sidebar.)

THE COURT:  Does he have a lawyer?

MR. FOX:  He does, who's here.  It's Mr. Lombard still.

THE COURT:  Mr. Lombard hasn't told him that he's got to --

MR. FOX:  We haven't -- we haven't had a chance to give him the order, so we don't know what they've communicated --

THE COURT:  Okay.

MR. FOX:  -- to each other.

THE COURT:  Well, to avoid --

MR. FOX:  Do you want me to bring Mr. Lombard in?

(End of sidebar discussions.)

THE COURT:  Mr. Lombard, could you join us, please?

(Discussion held at sidebar.)

MR. LOMBARD:  Good afternoon, Your Honor.

THE COURT:  How are you?

MR. LOMBARD:  Having some flashbacks, but I'm okay.

THE COURT:  There's been an order that has been submitted to me granting Mr. Manzo immunity from any testimony he might offer during this trial.  Have you had a chance to discuss that with him?

MR. LOMBARD:  I have, Your Honor.  Well, I knew that issue was pending.

THE COURT:  Okay.  Is this going to be -- does he need to be -- well, do I need to talk with him?

MR. LOMBARD:  No, Your Honor.

THE COURT:  Okay.  Okay.  You got a copy of the order?

MR. LOMBARD:  I do not have a copy.

MS. RHODES:  We will have a copy, and we will get it to him.  It's electronically filed, and we'll be able to get it to him.

THE COURT:  Is it on the docket now?

THE DEPUTY CLERK:  I'm assuming it is, but I don't know.  I was given it last night.

MS. RHODES:  If you'll give me a copy, I --

THE DEPUTY CLERK:  I can make copies.

MS. RHODES:  That would be great, thank you.

THE COURT:  Okay.  All right.

MR. FOX:  Do you want to know the order of witnesses here, or do you want -- I've got my notes over there, actually. It would be better for me to --

THE COURT:  Okay.

(End of sidebar discussions.)

MR. FOX:  Your Honor, I believe on Tuesday we will start with Mickey Manzo.  Then we will hear from Special Agent David Dahle.  Michelle Miller will be the next witness, and then if we have time, potentially Bobby Lyons and potentially Judy Gerhardt.  I think that probably will be enough, but if we even have more time than that, Linda -- her last name looks like Farrar but is pronounced Farrar -- will be the next witness.

THE COURT:  All right.

All right.  Anything else?

MR. FOX:  Nothing from the government, Your Honor.

THE COURT:  All right.  Have a nice weekend.  We'll see you on Tuesday at 8:00.

MR. FOX:  Thank you, Your Honor.

MS. RHODES:  Thank you, Your Honor.

(The proceedings adjourned at 1:34 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


            I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*



                    /s/ SHAYNA MONTGOMERY
              _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**