UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
      vs.                   )      CASE NO. CR 15-255-PA
                            )
PAUL TANAKA,                )
                            )
            Defendant.      )
_____)


REPORTER'S TRANSCRIPT OF

JURY TRIAL PROCEEDINGS - DAY 4

TUESDAY, MARCH 29, 2016

8:04 A.M.

LOS ANGELES, CALIFORNIA


_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM


UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
         EDDIE A. JAUREGUI
         Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
         Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900


**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686


**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent


**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

**PLAINTIFF'S
WITNESSES**                                                                    **PAGE**

MICKEY MANZO

        Direct Examination by Mr. Fox                    8
        Cross-Examination by Mr. Steward                88
        Redirect Examination by Mr. Fox                105
        Recross-Examination by Mr. Steward             108


DAVID DAHLE

        Direct Examination by Mr. Fox                  109
        Cross-Examination by Mr. Steward               144


JUDY GERHEARDT

        Direct Examination by Mr. Jauregui             155

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|---------------------|----------|
| 11 | E-mail Dated 8/15/11 | 157 | 158 |
| 15 | E-mail Dated 8/18/11 | 17 | 17 |
| 16 | E-mail Dated 8/18/11 | 19 | 18 |
| 17 | E-mail Dated 8/18/11 | 19 | 19 |
| 18 | E-mail Dated 8/19/11 | 26 | 26 |
| 19 | E-mail Chain Ending at 8/19/11 | 13 | 14 |
| 20 | E-mail Dated 8/19/11 | 29 | 29 |
| 21 | E-mail Chain Ending 8/20/11 | 36 | 36 |
| 22 | E-mail Chain Ending 8/23/11 | 37 | 37 |
| 23 | E-mail Chain Ending 8/23/11 | 48 | 48 |
| 24 | E-mail Chain Ending 8/24/11 | 63 | 63 |
| 25 | E-mail Chain Ending at 8/24/11 | 51 | 51 |
| 26 | E-mail Dated 8/24/11 | 53 | 53 |
| 27 | E-mail Chain Ending 8/24/11 | 140 | 140 |
| 28 | E-mail Chain Ending 8/24/11 | 42 | 42 |
| 30 | E-mail Chain Ending 8/24/11 | 55 | 55 |
| 31 | E-mail Dated 8/24/11 | 64 | 66 |
| 32 | E-mail Chain Ending 8/25/11 | 76 | 76 |
| 34 | E-mail Dated 8/25/11 | 57 | 58 |
| 35 | E-mail Chaing Ending 8/26/11 | 161 | 162 |
| 39 | E-mail Chain Ending 8/26/11 | 79 | 79 |
| 40 | E-mail Dated 8/26/11 | 72 | 72 |

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS (CONTINUED)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 41 | E-mail Dated 8/27/11 | 81 | 81 |
| 43 | E-mail Dated 8/30/11 | 163 | 164 |
| 44 | E-mail Chain Ending 8/30/11 | 163 | 164 |
| 47 | E-mail Chain Ending 9/2/11 | 82 | 83 |
| 49 | E-mail Dated 9/3/11 | 85 | 85 |
| 50 | E-mail Dated 9/7/11 | 86 | 86 |
| 81 | Recording of Anthony Brown Interview, 8/19/11 Excerpts | 120 | 124 |
| 84 | Recording of Anthony Brown Interview, 8/21/11 Excerpts | 121 | 124 |
| 87 | Recording of Anthony Brown Interview, 8/23/11 Excerpts | 121 | 124 |
| 91 | Recording of Anthony Brown Interview, 8/24/11 Excerpts | 121 | 124 |
| 94 | Recording of Anthony Brown Interview, 8/26/11 Excerpts | 122 | 124 |
| 96 | Recording of Anthony Brown Interview, 9/2/11 | 122 | 124 |
| 133 | Calendar Book for 2011, Including for 8/22/11 to 8/31/11 | 68 | 69 |
| 134 | "Daily Activities" Notebook | 38 | 39 |
| 135 | "G" Notebook | 83 | 84 |
| 136 | "DONE 11/1/11" Notebook | 49 | 50 |
| 201 | Grand Jury Transcript - Mickey Manzo, November 19, 2014 | 15 | |
| 351 | Document Signed by Superior Court Judge | 98 | 99 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 29, 2016**

**8:04 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR FOX:  Good morning, Your Honor.  Brandon Fox and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Special Agent Leah Tanner with the FBI.

THE COURT:  Good morning.

MR. STEWARD:  And, Your Honor, Harry Steward and Jerome Haig for Mr. Tanaka.  He's present this morning.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

MR FOX:  Your Honor, I was hoping we could have a brief sidebar about an issue before we brought out the jury.

THE COURT:  Okay, that's fine.

MR FOX:  Thank you.

(Discussion held at sidebar.)

MR FOX:  I just want to let you know that Ms. Rhodes's father is having surgery tomorrow.  It was something that was preplanned, but it looks like it's a little more serious than was originally anticipated.  She came back last night, decided she needs to go back today.  I don't know -- that's why she's not here.  I don't know if or how you

**UNITED STATES DISTRICT COURT**

want to handle it with the jury, but we're prepared to proceed forward.

THE COURT:  Okay.  Do you want me to mention it to the jury?

MR FOX:  I don't think it's necessary to mention it to the jury.  If they have a question, obviously, about it then you can answer it, but at this stage I don't think it's necessary.  Just so you're aware, I'm going to take over her witnesses, but I'm just getting this for the first time so it may be a little bit rough around the edges.

THE COURT:  All right.  We're missing one of the jurors.

MR FOX:  Okay.

THE COURT:  So I'm going to go back in and find out who it is and see if we can contact them and figure out where they are.

MR FOX:  Okay.  Thank you, Your Honor.

(End of sidebar discussions.)

(Off the record at 8:06 a.m.)

(On the record at 8:06 a.m.)

THE COURT:  Yes, all the jurors are present.  Is he going to be long?

MR. HAIG:  No, no.  It was a quick pit stop.

(Pause in proceedings.)

THE COURT:  All right.  Let's bring the jury in.

(The jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.

THE JURY PANEL:  Good morning.

THE COURT:  All right.  If you'd call your next witness, please.

MR. FOX:  Yes, Your Honor.  The United States calls Mickey Manzo.

THE DEPUTY CLERK:  Just stand here for me, please.  Raise your right hand.

(The witness, MICKEY MANZO, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Mickey Manzo, M-A-N-Z-O.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  Your Honor, may I proceed?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Manzo, what do you do for a living?

A    Currently, I am a receiving associate at Home Depot.

Q    What did you do before that?

A    I was a deputy sheriff for L.A. County.

Q    How long were you a deputy sheriff for L.A. County?

A    About eight years.

Q    When did you begin as a deputy sheriff?

**UNITED STATES DISTRICT COURT**

A       July of 2006.

Q       And when were you last employed by the Sheriff's Department?

A       October of 2014, maybe.

Q       How did your employment with the Sheriff's Department end?

A       I was convicted of a felony and was fired for it.

Q       What was the felony?

A       I think there are two, conspiracy and obstruction of justice.

Q       As a general matter, what were the allegations that led to your conviction?

        MR. STEWARD:  Objection, relevance, 403.

        MR. FOX:  Your Honor, I'll -- we'll get into this.

        THE COURT:  That's fine.

        MR. FOX:  Thank you.

Q       (BY MR. FOX)  Mr. Manzo, what is the current status of your conviction?  In other words, are you appealing your conviction, or has it been completely resolved?

A       We're currently appealing it.

Q       Are you testifying here voluntarily today?

A       No.

Q       Under what circumstances are you testifying?

A       I was given immunity.

Q       What do you understand that immunity to be?

A       I'm required, per the immunity agreement, to tell the

truth on all matters, and it covers me from that being used against me other than perjury.

Q    Do you understand whether it affects your conviction at all that you're testifying here today under the grant of immunity?  In other words, is this going to affect your conviction at all that you're here today testifying?

MR. STEWARD:  Objection, relevance.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Can you ask me again?  I'm sorry.

Q    (BY MR. FOX)  Sure.  Will the immunity -- the compelled immunity that you're under, will that affect your conviction?

A    No.

Q    Are you receiving any benefits from the government in testifying today?

A    No.

Q    I want to go back to your first duties as a deputy sheriff.  You mentioned that you began working as a deputy sheriff in 2006.  Can you please explain for the jury just briefly how you become a deputy sheriff.

A    You take -- I think the initial step is a written test. You fill out the application, take the written test and go through an extensive background check.  It took -- on average, I believe it's six to eight months, and then ultimately you get a phone call saying that you're hired.  And you either get an academy date or, in my case, they say you're starting, you

know, this date at Men's Central Jail because I had already graduated the academy.

Q    How much training do you receive regarding custody facilities before you begin at Men's Central Jail?

A    I didn't receive any.

Q    When you first became a deputy sheriff in 2006, what was your first assignment within Men's Central Jail?

A    I was a deputy sheriff trainee assigned to the 3,000 floor, specifically modules 3200, 3400, and then halfway through the week I would switch to 3600, 3800.

Q    At some point in time, did you become a member of OSJ?

A    I did, yes.

Q    What is OSJ?

A    OSJ stands for Operation Safe Jails.  There's a lot of -- we wear many hats, but the easiest way is that we were in charge of the safety and security of the jails through intelligence, interviewing inmates and things like that.

Q    Who was your lieutenant at the time that you were working for OSJ?

A    Lieutenant Mike Pippin.

Q    And when was that that you began working for OSJ?

A    I would say end of October, early September of 2008.

Q    I want to direct your attention now to August and September of 2011.  Was Mike Pippin still your lieutenant at that time?

**UNITED STATES DISTRICT COURT**

A      No.

Q      Who was the lieutenant of OSJ at the time?

A      Greg Thompson.

Q      In terms of members of OSJ, was there anyone higher ranking than Mr. Thompson at the time?

A      No, he was the unit commander.

Q      Was there anybody between you and Mr. Thompson in terms of rank?

A      We had three sergeants.

Q      And at some point in time, did anything unusual happen with a cell phone in August of 2011?

A      Yes, one was found.

Q      And do you know the name of the inmate that the cell phone was found on?

A      Anthony Brown.

Q      How did you become a part of this -- the events regarding the cell phone?

A      I initially found out about it through another OSJ deputy. He relayed to me that the 3,000 --

        MR. STEWARD:  Objection, hearsay.

        MR. FOX:  Your Honor, we don't need the second part of that statement, so I'll move on.

Q      (BY MR. FOX)  At some point in time, did you learn that that phone was connected to an outside law enforcement agency?

A      Yes.

**UNITED STATES DISTRICT COURT**

Q    How did you learn that it was connected to an outside law enforcement agency?

A    Noah Kirk.

Q    Who was Noah Kirk?

A    Noah Kirk was a member of OSJ.

Q    Did he also have another role?

A    Yes, he was assigned to an FBI task force in Pomona.

Q    And, obviously, we're going to be getting into some of the details regarding the cell phone.  In terms of the facts that relate to the cell phone, did you report to any sergeant regarding anything related to the cell phone, or were you reporting directly to Mr. Thompson?

A    Initially, we briefed sergeant -- our sergeant, and then -- and after that just went straight to Lieutenant Thompson.

Q    Mr. Manzo, if you can open up your book to Exhibit 19, please, yes.  Do you recognize that document?

A    Yes.

Q    What is it?

A    This is an e-mail from Gerard Smith to me with forwarding an e-mail from Deputy Kirk -- Deputy Noah Kirk to Gerard Smith.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 19.

        MR. STEWARD:  No objection, Your Honor.

        THE COURT:  It will be received.

**UNITED STATES DISTRICT COURT**

(Exhibit No. 19 received into evidence.)

MR. FOX:  And, Special Agent Tanner, could you please pull up Government Exhibit 19, and if you can highlight the first e-mail on the chain at the bottom.  Thank you.

Q    (BY MR. FOX)  Mr. Manzo, can you briefly describe what this e-mail is.  You said who it was from, but what's the subject matter of the e-mail?

A    It's basically Deputy Kirk informing Deputy Smith exactly what he did to identify the number.

Q    Would you mind reading the e-mail from Mr. Kirk to Mr. Smith, the one that's highlighted on August 18th at 8:37 p.m.

A    You want me to start from "From/Sent" or --

Q    You can start "Per our conversation."

A    Okay.  "Per our conversation, I took the number that was called of the ITMS and forwarded that to Jennifer Naujock.  Naujock is the analyst for the FBI task force that I am on -- that am on.  Naujock agreed to do a workup on the number and told me she would contact me when she was done.  A few minutes later, Naujock contacted me by phone and questioned me as to why I wanted information on this phone number.  I told her that I believed that this number was responsible for assisting to bring cell phone into the jail.  Naujock then informed that the number belonged to the FBI out of West Los Angeles.  She said the number belonged to a civil rights investigator.  Naujock

UNITED STATES DISTRICT COURT

then informed me that she needs to speak with her supervisor before she spoke with me anymore about the situation.  I agreed and informed her that she should have her supervisor contact Lieutenant Thompson.  I gave her Lieutenant Thompson phone number to his office and call was ended.  Kirk."

Q    Did you do anything to report this information to anyone above you?

A    I don't remember.

Q    Would it refresh your memory to read a portion of testimony that you provided earlier in this matter?

A    Yes.

Q    Okay.  If you could please look at Exhibit -- in your binder, Exhibit -- I believe it's 201.  Yes, 201, and specifically directing your attention to pages 12 to 13 of that exhibit.

A    The pages again?  I'm sorry.

Q    12 to 13, please.

    Let me know when you finish that.

A    Okay.

Q    Let me reask the question now.

    At some point, did you report this information to somebody above you?

A    Eventually, we told Lieutenant Thompson.

Q    Do you know approximately when you told Mr. Thompson?

A    I can't remember.  It was after Deputy Kirk had already

talked to him.

Q    Okay.  Are we talking about a week later?

A    No, it was probably within an hour or two of finding out.

Q    Who was there when you spoke to Mr. Thompson?

A    I imagine it was Deputy Smith.

MR. STEWARD:  Move to strike.  Speculation.

THE COURT:  Sustained.

Q    (BY MR. FOX)  Did Mr. Thompson, when you spoke to him, provide you with any instructions?

A    Yes, he wanted Deputy Smith and I to interview Brown, Anthony Brown.

Q    Did Mr. Thompson tell you why he wanted you to interview Anthony Brown?

A    He didn't elaborate.  He just wanted us to get him on tape.

Q    Did Mr. Thompson make any reference to any executives in the Department?

A    I don't know right then, but he did eventually on the same day.

Q    What did he say?

A    That whatever was on that tape, whatever Brown said, that he would be playing it for the executives.

Q    Did you have an understanding as to who Mr. Thompson was referring to when he mentioned the executives?

A    The Sheriff, Sheriff Baca at the time, and the assistant

sheriff, Assistant Sheriff Tanaka.

Q    Mr. Manzo, could you please look at the previous binder and Exhibit 15 and 16 and 17, please.  Let's just start with 15 for now.  Do you recognize Exhibit 15?

A    It's a Department e-mail.

Q    I'm sorry, and your name is not listed on this e-mail; is that correct?

A    That is correct.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 15.

MR. STEWARD:  Your Honor, preserving our prior objections, we'd have no objection at this time.  Well, I object to be consistent.

THE COURT:  All right.  It'll be provisionally admitted.

(Exhibit No. 15 received into evidence.)

MR. FOX:  Thank you, Your Honor.  And, Special Agent Tanner, could we publish, please, Government Exhibit 15, and could you highlight the e-mail.

Q    (BY MR. FOX)  Mr. Manzo, at some point in time, did you learn who Christopher Nee was?

A    Yes, I knew who he was.

Q    What role did Mr. Nee perform in August of 2011?

A    He was Mr. Tanaka's aide.

Q    And you mentioned that Greg Thompson, who's the third

person on the "to" line, was your lieutenant.  Do you know who William T. Carey was at the time?

A    At the time, I didn't know who he was.

Q    Did you learn in the coming weeks who Mr. Carey was?

A    Yes.

Q    Who was he?

A    I knew him as Tom Carey, and he was the captain of ICIB.

Q    What about Liam Gallagher, who's the second person listed on the to line?

A    I don't know who that is.

Q    Could you please read this e-mail starting with the subject line.

A    "Subject: Meeting.  Good evening, gentlemen.  Mr. Tanaka would like to meet with you in his office tomorrow at 1330 hours.  If you have any questions, please call me at (323) 526-5118 office or (213) 505-0878 cell phone.  Thank you."

Q    All right.

        MR. FOX:  And, Your Honor, I also move for the admission of Government Exhibit 16 that I believe will be the subject of the same objection.

        MR. STEWARD:  That's true, Your Honor.

        THE COURT:  Same ruling.

        MR. FOX:  Thank you, Your Honor.

        THE COURT:  It will be provisionally admitted.

        (Exhibit No. 16 received into evidence.)

MR. FOX:  Thank you.  Special Agent Tanner, if you could please publish Exhibit 16.

Q    (BY MR. FOX)  Mr. Manzo, do you know who Julie Montgomery was at the time?

A    No.

Q    Okay.  This e-mail is dated August 18th at 8:59 p.m. from Chris Nee.  Can you please read the subject line and the e-mail itself.

A    "Subject: Sheriff's meeting.  Regarding the Sheriff's meeting with the undersheriff, Captain Carey, Lieutenant Thompson and Lieutenant Gallagher at 2:00 p.m., I have reserved the EPC room from 2:00 p.m. to 2:30 p.m."

Q    And now, Mr. Manzo, if you could turn your attention to Government Exhibit 17.

MR. FOX:  And, Your Honor, I'm going to be moving for the admission, and again, I think we have the same issues.

MR. STEWARD:  Yes, Your Honor, we object as well.

THE COURT:  All right.  The objection's overruled. It will be provisionally admitted.

(Exhibit No. 17 received into evidence.)

MR. FOX:  All right.  And, Special Agent Tanner, if you could please publish this exhibit and then highlight the e-mail that's dated August 18th at 9:02 p.m.

Q    (BY MR. FOX)  Mr. Manzo, could you read this e-mail that is, again, at 9:02 p.m. right in the middle of the page.

A    "Subject: Regarding meeting.  Chris, FYI, I was going to wait until I had more evidence to go at Anthony Brown in an interview as to the source of the phone.  I may have to bump the plan up to tomorrow due the fact he will be on a state bus Saturday night.  At this time, I would rather dump him and make him the state's problem while we continue collecting facts to ascertain if my suspicions were correct of we have an employee problem.  Besides, if he doesn't want to cooperate, there is nothing we can offer him with 400-plus years handing (sic) over his head.  Could you also provide a computer so I can play the calls and everybody can make their own opinion.  Greg."

Q    Mr. Manzo, had you had discussions with Mr. Thompson about what he discussed as his suspicions at the time?

A    I'm sure I did.

        MR. STEWARD:  Move to strike.  Speculation.

        THE COURT:  Sustained.  The answer is stricken.  The jurors should disregard it.

Q    (BY MR. FOX)  Mr. Manzo, had you had a chance at this point to learn what Anthony Brown's status was as an inmate within the jail in terms of had he been convicted of a crime?

A    Yes.

Q    Do you know whether he'd been sentenced to a period of incarceration at this point?

A    Yes, I believe it was 423 years, something to that effect.

Q    As a general matter, what happens to inmates within the

county jail who are sentenced to a term of imprisonment?

MR. STEWARD:  Objection, foundation.

MR. FOX:  Your Honor, I'm happy to ask.

Q    (BY MR. FOX)  Mr. Manzo, based on your experience as a deputy within the Sheriff's Department at this point in time for five years, did you have an understanding as to what would happen to an inmate who was sentenced to a lengthy term of imprisonment?

A    Yes.

Q    What would happen to inmates who were sentenced to a lengthy term of imprisonment while they were inmates at Men's Central Jail?

A    Once they are convicted and sentenced, it takes about two weeks and then they will be sent to a state prison.

Q    Who runs the state prison?

Let me ask a different question.  Does the county -- does the Sheriff's Department run the state prison?

A    No.

Q    All right.

MR. FOX:  And, Special Agent Tanner, can you please highlight the top two e-mails.

Q    (BY MR. FOX)  Mr. Manzo, could you please read the e-mail that is the second one listed here from Mr. Nee to Mr. Thompson at 9:23 p.m., starting with the word "absolutely."

A    "Absolutely I will have a laptop available.  See you

tomorrow."

Q    And then please read the top e-mail on this chain, starting with the word "thanks."

A    "Thanks, Chris.  Will it be okay to bring two of the OSJ guys working the case?"

Q    Mr. Manzo, on August 19th after you'd received the instructions from Mr. Thompson, did you do anything with respect to Anthony Brown?

A    Yes, we interviewed him.

Q    Did you record that interview?

A    Yes.

Q    Where did the interview take place?

A    It was in the 6000 interview room, one of them, the big one.

Q    What is the 6000 interview room?  Is that within Men's Central Jail?

A    Yes.

Q    And you mentioned that it's a big interview room.  How large is it approximately?

A    Maybe ten by ten -- ten feet by ten feet, maybe.  That's big.

Q    And you've conducted interviews with inmates over the years in this room?

A    Yes.

Q    Are inmates usually handcuffed or unhandcuffed while you

interview them?

A    We usually didn't handcuff them, but it depended on their status.

Q    Did you stay for the entire interview?

A    No.

Q    Why not?

A    I stepped out a couple times to call Lieutenant Thompson and give him updates, and then at one point, Anthony Brown said, you know, he had personal property that was --

MR. STEWARD:  Objection, hearsay.

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

MR. FOX:  It's not essential, Your Honor.  Just so you're aware, we've not prepped with this witness.  He's adverse to the government, so we're going to get into these issues where I don't know what his answer's going to be at this point.

THE COURT:  Okay.

(End of sidebar discussions.)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  The objection is sustained.  Yes.

MR. FOX:  Thank you, Your Honor.

Q    (BY MR. FOX)  Mr. Manzo, after the interview, what did you do?

A    We briefed Lieutenant Thompson.

Q    Where did you brief him?

A    I don't remember if we called him or we walked over to his office across the street.

Q    And when you say "we," who were the participants in that conversation?

A    Myself and Deputy Smith.

Q    Do you recall some of the things that you told Mr. Thompson about your interview of Mr. Brown?

A    We told him what Brown's initial claim was and that he was asking for certain things in return for cooperation.

Q    What, if anything, did you tell Mr. Thompson about the FBI and Mr. Brown?

A    That Brown claimed that he was working for the FBI.

Q    And when you say "working for the FBI," did you discuss with Mr. Thompson what role he was performing with the FBI?

A    Probably, yes.

Q    Do you recall what that was?

A    I don't remember my exact words.

Q    Did you mention anything to Mr. Thompson about what types of cases Mr. Brown said he was reporting on to the FBI?

A    Yes.

Q    What did you say about that?

A    Brown's term was "inmate beatings," but uses of force, illegal uses of force.

        MR. STEWARD:  Move to strike.  Hearsay.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.  Just tell us what you said.

Q    (BY MR. FOX)  Did you tell Mr. Thompson what Mr. Brown had related to you?

A    Yes.

Q    And what was that with respect to the investigation?

MR. STEWARD:  Objection, calls for hearsay.

MR. FOX:  Maybe I can be more particular in my question, Your Honor.

Q    (BY MR. FOX)  What is it that you said to Mr. Thompson about what Mr. Brown had related to you?

A    I told Lieutenant Thompson that Brown said that he was working with the FBI on inmate abuses inside Men's Central Jail.

Q    What, if anything, occurred after you briefed Lieutenant Thompson?

A    We went to a meeting at Sheriff's Headquarters.

Q    Where is Sheriff's Headquarters, or at least where was it at the time?

A    It was in Monterey Park.

Q    Why did you go to Sheriff's Headquarters?

A    That's where the Sheriff was, and he wanted a briefing.

Q    Did you have a meeting with the executives within the Sheriff's Department at that time?

A    Yes.

Q    Who was present?

UNITED STATES DISTRICT COURT

A     The Sheriff, Sheriff Baca, Mr. Tanaka, Lieutenant Thompson, Deputy Smith, myself, and I believe there were two or three other people, but I don't remember who they are.

Q     Mr. Manzo, please turn your binder if you could to Exhibit 18.

MR. FOX:  And, Your Honor, I move for the admission of Government Exhibit 18.

THE COURT:  Any objection?

MR. STEWARD:  Same as before, yes, Your Honor.

THE COURT:  All right.  The objection's overruled. It will be provisionally admitted.

(Exhibit No. 18 received into evidence.)

MR. FOX:  Special Agent Tanner, could you please publish this exhibit and highlight the e-mails.

Q     (BY MR. FOX)  Mr. Manzo, could you please read the first e-mail in this chain at 10:32 a.m. from Mr. Nee to Mr. Thompson with the "Subject: Question."

A     "I thought I saw an e-mail from you last night wherein you were asking if you could bring along two of your investigators to today's meeting, but it disappeared from my e-mail when I looked for it this morning.  If you want to bring them along you can.  I don't know if the boss will have them attend the meeting, but if not we can have them sit outside until you guys are done.  If I dreamed up that e-mail, I apologize, and if so, I need to get a new life.  See you at 1330."

Q    Could you please read the top e-mail now.

A    "No problem, Chris.  I will have them in tow."

Q    Mr. Manzo, in previous e-mails it references a meeting with the undersheriff at 1:30 and a meeting with the Sheriff at two o'clock.  Do you recall that?

A    Recall the e-mails?  I recall the e-mails, yes.

Q    Is that what happened?  There was a meeting with the undersheriff at 1:30 and a separate meeting with the Sheriff at two o'clock?

A    I don't remember.  I remember it as one meeting.

Q    What happened at this one meeting?

A    It was a quick -- well, not quick, but it was just a brief of everything that we had.

Q    Who gave that briefing?

A    Lieutenant Thompson.

Q    And when you say "everything that we have," what did Mr. Thompson state?

A    Exactly what Anthony Brown claimed, that he was -- the situation with the cell phone, he got it from a deputy through -- he was working with the FBI to identify inmate abuses, and I think that's pretty much it.

Q    At that meeting, did anyone indicate that they were already aware that Mr. Brown was linked to the FBI?

A    I don't recall.

Q    Do you recall the demeanor of anyone at that meeting?

MR. STEWARD:  Objection, vague.

THE COURT:  Do you understand the question?

THE WITNESS:  I do, yes.

THE COURT:  You can answer.  Overruled.

THE WITNESS:  I do, yes.

Q    (BY MR. FOX)  Do you recall what Mr. Baca's was at that meeting?

A    He was confused or kind of -- he didn't understand what was going on.

Q    What about Mr. Tanaka's demeanor?

A    He was visibly upset.

Q    Along with being visibly upset, did Mr. Tanaka say anything that made you believe he was upset?

A    I don't remember.

Q    Did Mr. Baca or anyone else in that meeting give any orders about Anthony Brown?

A    Yes.

Q    Who did -- who gave those orders?

A    The Sheriff, Sheriff Baca.

Q    What did he say?

A    That he wanted Anthony Brown kept in our custody.  He wanted him interviewed.  He wanted everything off the phone, and he wanted to know what the hell was going on.

Q    We saw in a previous e-mail from Mr. Thompson that Mr. Thompson wanted him on the next available bus that coming

Saturday.  Did Mr. Baca's orders have any effect on what Mr. Thompson had stated?

A     Yes.

Q     What was that effect?

A     Once he said he wasn't leaving our custody, we had to cancel Brown leaving our custody, obviously.

Q     You mentioned earlier in your testimony that Mr. Thompson wanted to play some of the recordings of your interview of Mr. Brown for the executives.  Did that happen at the August 19th meeting?

A     I don't remember it happening.

Q     Do you recall how long the meeting lasted?

A     I would say less than an hour.

Q     Mr. Manzo, can you please turn to Exhibit 20.

        MR. FOX:  And, Your Honor, we move for the admission of Government Exhibit 20.

        MR. STEWARD:  Same objection, Your Honor.

        THE COURT:  Objection's overruled.  It will be provisionally admitted.

        (Exhibit No. 20 received into evidence.)

Q     (BY MR. FOX)  Mr. Manzo --

        MR. FOX:  And, sorry, Special Agent Tanner, could you please publish Exhibit 20, and have Mr. Manzo please read it once it's highlighted.

        THE WITNESS:  "From" --

Q     (BY MR. FOX)  Let me just ask you this.  This one is from Mr. Nee to Mr. Leavins.  Who did you know Mr. Leavins to be at the time?

A     I didn't know him at the time.

Q     Did you later find out who he was?

A     Yes.

Q     At this time, who was Mr. Leavins?  What role did he perform?

A     Lieutenant Leavins was a lieutenant for ICIB.

Q     You had mentioned Mr. Carey before also being with ICIB. In terms of rank, who was higher ranked?

A     Captain Carey.

Q     Could you please read the subject line of this e-mail.

A     "Please give me a call when you get a chance. Nonemergent."

Q     Had Mr. Leavins been at your meeting with the executives on the 19th?

A     I don't remember him being there.

Q     Was there a subsequent meeting with the executives soon after August 19th?

A     Yes.

Q     When was that?

A     The next day.

Q     Where was that meeting held?

A     Same spot, Sheriff's Headquarters.

UNITED STATES DISTRICT COURT

Q    Was Mr. Leavins at that meeting?

A    Yes.

Q    Who else was at that meeting?

A    Captain Carey, Lieutenant Peacock, myself, Deputy Smith, Lieutenant Thompson, Sheriff Baca, Mr. Tanaka and probably two or three more, but I don't remember them.

Q    You mentioned the name Robert Peacock.  I believe that's the only one that you haven't -- who you haven't described previously.  Who was Robert Peacock at the time?

A    Lieutenant Peacock, he was the operations lieutenant for ICIB.

Q    Do you remember what day of the week this was held?

A    Saturday.

Q    Do you know the purpose for this meeting?

A    Yes, we were going to play the phone calls that we had recovered for the Sheriff.

Q    And did that happen?

A    Yes.

Q    Did anybody give any briefings at the time as well?

A    Yes, Lieutenant Thompson.

Q    What did he say?

A    The same thing he said the day before, just to get the whole group on the same page.

Q    And when you say "the same thing he said before," what do you recall him saying?

A    Basically the same thing, you know, this is what Brown is claiming.  He's an informant for the FBI.  He's reporting the inmate abuses that are allegedly happening at Men's Central Jail.  He got a phone in from a deputy.

Q    Did any of the executives provide you with any information about the phone in the Saturday meeting?

A    Yes.

Q    Who provided you that information?

A    The Sheriff, Sheriff Baca.

Q    What did Mr. Baca say?

A    He said that he had been in contact -- I don't remember with who in the FBI and that they acknowledged the phone -- they acknowledged knowledge of the phone, and that they asked for it back.

Q    You mentioned phone calls that you played -- recordings of phone calls with Mr. Brown.  What were those phone calls of?

A    They were of a female that we later identified as Special Agent Marx talking to Anthony Brown about receiving a cell phone.

Q    Did you later determine where those phone calls -- where Mr. Brown placed those phone calls, to what number did he dial?

A    Oh, the FBI civil rights.

Q    What, if anything, did Mr. Tanaka do in response to your playing those phone calls?

A    He -- he was mad, irate.

Q    Did he do anything?

A    Yeah.  He stood up, slammed his hands on the table, and I apologize for my language, but he said, you know, "Those motherfuckers, who do they think they are?  Fuck them," and went on, yes.

Q    Did Mr. Tanaka state who he was referring to with the word "them"?

A    Yes, he was referring to the FBI.

Q    Other than the meetings on August 19th and August 20th, had you met with Mr. Tanaka before?

A    Maybe once, just -- I was supposed to brief him on something, but it didn't happen.  This was in late 2010, maybe.

Q    Did you have any meetings with him after August 20th?

A    He was at meetings that I was at, but not one-on-one or -- just a small group and him.

Q    Do you think you'd recognize him again if you saw him?

A    Yes.

Q    Could you please look around the courtroom and let me know if you see Mr. Tanaka in court.

A    I see him.

Q    Okay.  Could you please describe him or point him out.

A    He's sitting in the middle on the right.

MR. FOX:  Your Honor, I ask for the in-court identification of Mr. Tanaka to be put on the record.  May the -- sorry, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Yeah, the record will reflect that the witness has identified the defendant.

Q    (BY MR. FOX)  Did Mr. Baca provide any orders at this meeting?

A    He reiterated the same orders, and he also tasked Captain Carey, he would be heading the investigation and that everything that came out of the investigation would be run through Mr. Tanaka.

Q    What happened after Mr. Baca made those statements?

A    I don't remember.

Q    Did Mr. Baca stay around for the rest of the meeting?

A    For the Saturday meeting, yes.

Q    At some point in time, did he and Mr. Tanaka leave the conference room?

A    Not on Saturday, no.

Q    Was there a previous meeting where he and Mr. Tanaka left the conference room?

A    Friday.

Q    At the Friday meeting.  Okay.

     What happened after they left the conference room at the Friday meeting?

A    Everybody just waited until Mr. Tanaka came back in.

Q    And what happened after Mr. Tanaka came back in at the Friday meeting?

A    Mr. Tanaka explained that he'd known the Sheriff for a

long time -- I can't remember the exact years he said -- and that he'd never seen him that visually upset, and this was going to be a huge investigation and that he didn't want us -- he wanted everybody to, you know, be on the same page and get this done for the Sheriff.

Q    When you say that Mr. Tanaka said that this would be a huge investigation, do you remember specifically what he said?

A    No, I can't remember.

Q    At that meeting, the Friday meeting, did Mr. Tanaka give any orders with respect to whether other law enforcement could speak to Mr. Brown?

        MR. STEWARD:  Objection, leading.

        THE COURT:  Sustained.

Q    (BY MR. FOX)  Do you recall Mr. Tanaka providing any orders with respect to Mr. Brown at that --

        MR. STEWARD:  Same objection.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  Not directly to me.

Q    (BY MR. FOX)  To anybody at the meeting?

A    The orders were relayed through Lieutenant Thompson and Captain Carey.

Q    And what is it that Mr. Carey and Mr. Thompson told you about Mr. Tanaka's orders?

A    That nobody could interview Brown without Mr. Tanaka's approval.

Q    Mr. Manzo, if you could please look at Government Exhibit 21.

MR. FOX:  And, Your Honor, I move for the admission of this exhibit as well.

MR. STEWARD:  Same objection, Your Honor.

THE COURT:  Objection's overruled.  It will be provisionally admitted.

(Exhibit No. 21 received into evidence.)

MR. FOX:  Special Agent Tanner, if you could highlight the top e-mail, please, and actually the top two, now that I think about it.

Q    (BY MR. FOX)  Mr. Manzo, could you read the bottom e-mail, the 8:33 p.m. e-mail from your lieutenant to Crystal Miranda.

A    "Crystal, I'm getting old.  Mr. Rhambo and I didn't speak today, so I'm not sure which policy he is referring to."

Q    At the time, did you know who Crystal Miranda was?

A    No.

Q    Did you later learn who she was?

A    I probably did, but I can't remember.

Q    What about Rhambo, do you know somebody within the Sheriff's Department at the time with the last name of Rhambo?

A    Yes.

Q    Who is that?

A    At the time, he's one of the assistant sheriffs, I believe.

**UNITED STATES DISTRICT COURT**

Q    Could you read the top e-mail, please, the one from Thompson to Miranda and himself at 9:00 p.m.

A    "Crystal, I spoke with Mr. Tanaka today.  I know what policy he is referring to.  Tell Mr. Rhambo to drop the hammer. We are ready on our end.  Lieutenant Fedele has started at MCJ to ensure it will be followed."

Q    And, Mr. Manzo, if you could turn to Exhibit 22, please.

MR. FOX:  And, Your Honor, I move for the admission of Government Exhibit 22.

MR. STEWARD:  Same objection, Your Honor.

THE COURT:  Overruled.  It will be provisionally admitted.

(Exhibit No. 22 received into evidence.)

MR. FOX:  Special Agent Tanner, could you publish that exhibit and highlight for now the bottom e-mail.

Q    (BY MR. FOX)  Mr. Manzo, could you please read this from Ms. Miranda to Mr. Rhambo at 10:57 a.m. on August 23rd.

A    "Sir, Greg said that you may release the policy when you are ready.  Lieutenant Dan Fedele has started at MCJ to ensure it will be followed.  Thanks, Crystal."

MR. FOX:  Special Agent Tanner, could you highlight the top two e-mails, please.

Q    (BY MR. FOX)  Mr. Manzo, could you read the one that has the time of 12:06 p.m. on August 23rd.

A    "Okay, I will call the chiefs.  Please get me a copy of

the entry policy for my review today.  Thanks."

Q    And then the top e-mail from Ms. Miranda to Mr. Thompson at 12:19 p.m.

A    "Hello, Greg.  Do you have a copy of the entry policy he is referring to or should I contact Dan Fedele?  Thanks, Crystal."

          MR. FOX:  One moment, Your Honor.

     Your Honor, may I have a moment, please?

          THE COURT:  Yes.

     (Pause in proceedings.)

          MR. FOX:  Your Honor, may I approach your clerk with Government's Exhibits 133, 134, 135 and 136, please?

          THE COURT:  Yes.

Q    (BY MR. FOX)  Mr. Manzo, please look at Exhibit 134 first.

     Do you recognize it?

A    I do.

Q    What is it?

A    It's my old notebook.

Q    How did you use that notebook in particular?

A    I used it for the task force.

Q    And when you say "the task force," which task force was that?

A    I don't remember if we gave it a name, but it was the one that I -- I went on loan to ICIB shortly after this.

Q    Are there notes in that notebook relating to Anthony Brown

and the cell phone?

A    Yes.

Q    If you can look -- actually open it up and let me know if it's in substantially the same condition as when you made the notes in there.

A    Looks the same to me.

Q    Okay.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 134.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 134 received into evidence.)

MR. FOX:  And, Special Agent Tanner, if we could just look at the first page for now, and if you highlight the very top of it, the top third.

Q    (BY MR. FOX)  Mr. Manzo, whose handwriting is that next to the word "steno notebook" -- or "steno book," excuse me?

A    Those are my writing.

Q    What does it say?

A    Daily activities.

MR. FOX:  And, Special Agent Tanner, could you turn toward page 4 of that exhibit.  Okay, and let's highlight the top third again of that exhibit, please.

Q    (BY MR. FOX)  What are your notes there above the two lines?

**UNITED STATES DISTRICT COURT**

A    Do you want me to --

Q    Could you read them, please.

A    -- read them?  "8/20, 2011, 0900, meeting SHB, polygraph, verify his claims, try to get FBI West L.A. phone roster."

Q    What are these notes -- you mentioned these are your notes.  What is it that you're taking notes of at this point in time?

A    I can't remember.

Q    Is this the same day as the Saturday meeting?

A    The 20th, yes.

Q    And did the Saturday meeting occur in the morning?

A    It did.

Q    Did you personally perform any of those items that are listed above the two lines?

A    I went to the meeting.  I drove him to the polygraph, and that's about it.

Q    Did you do anything to try to get any phone rosters?

        MR. STEWARD:  Objection, leading.

        THE COURT:  Overruled.

        THE WITNESS:  I'm sorry, can you ask again?  I'm sorry.

Q    (BY MR. FOX)  Did you do anything to try to obtain the FBI's phone roster?

A    No, every number that I had was given to me.

Q    By who?

**UNITED STATES DISTRICT COURT**

A     Lieutenant Thompson, Captain Carey.

Q     And, Mr. Manzo, just so it's clear, you and I have not met in preparation for your testimony; is that correct?

MR. STEWARD:  Objection, irrelevant.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  No, we have not.

Q     (BY MR. FOX)  And that's because you didn't want to meet with the government before your testimony; is that correct?

A     That is correct.

Q     You mentioned that every number was given to you.  What were you doing with the numbers that you'd receive?

A     I would run them through our ITMS system.

Q     You mentioned the ITMS system was your telephone monitoring system; is that correct?

A     Yes, stands for Inmate Telephone Monitoring System.

Q     What does it mean you were running it through your system?

A     Each cell at Men's Central Jail has what looks like a pay phone in it, and each phone number from the pay phone, we can track every call they make, and on most of it we can listen to it.  Sometimes we can even live monitor, so you just enter the destination number or phone number they were calling and you could get it within two minutes of the call ending.

Q     Were you aware of the purpose of you tracking the phone calls that were made to the FBI phones?

A     I might have been at the time, but I don't remember.

**UNITED STATES DISTRICT COURT**

Q    Mr. Manzo, could you turn to Exhibit 23, please.  And actually, before we get into that let me ask you some other questions.  Could you look at Exhibit 28 first.  What is Exhibit 28?

A    It's an e-mail from -- an e-mail chain from Lieutenant Thompson to me.

Q    Generally, what is the subject matter in this e-mail chain?

A    It looks like Lieutenant Thompson is -- he gave me four or five numbers to run through the ITMS system, and I'm responding to him.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 28, please.

MR. STEWARD:  No objection on this one, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 28 received into evidence.)

MR. FOX:  And, Special Agent Tanner, could you please publish the bottom e-mail on Government Exhibit 28.

Q    (BY MR. FOX)  Mr. Manzo, could you please read this e-mail that is at 10:08 p.m. on August 23rd from Mr. Thompson to you and Mr. Smith.

A    No subject.  "Here are the numbers on the business cards for Brown's visitors today.  David Dahle (310) 477-6565, Leah Marx (310) 477-6565, Wayne Plympton (310) 477-6565 and cell (424) 202-1185.  Please check ITMS."

**UNITED STATES DISTRICT COURT**

Q    Mr. Manzo, this e-mail states that Mr. Brown had visitors on August 23rd.  Do you know who those visitors were?  Obviously, their names are there, but do you know who they were affiliated with?

A    Yes.

Q    How did you find this out that he had visitors that day?

A    I was told.

Q    By who?

A    One of the guys in jail liaison.  I don't remember who it was.

Q    And did the information you receive have an affect on what happened with you and Mr. Thompson and Mr. Smith?

        MR. STEWARD:  Objection, foundation, vague.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  I'm sorry, can you ask again, please?

Q    (BY MR. FOX)  Sure.  Did it just -- let's stick with Anthony Brown.  Did the information you receive have an affect on Mr. Brown's housing conditions ultimately?

A    Yes.

Q    What information did you receive?

A    That the FBI, these three particular agents, were interviewing Brown.

Q    Where were you at the time when you learned that the FBI was at Men's Central Jail to interview Anthony Brown?

A    I was at Men's Central Jail outside of the secure side of

UNITED STATES DISTRICT COURT

the jail and the jail liaison office.

Q    Do you recall when you were told that the FBI was there?

A    As far as the time?

Q    Yeah, the time if you remember it.

A    Maybe late morning.

Q    Who were you with at the time?

A    Deputy Smith.

Q    Had you been with Mr. Leavins earlier that day?

A    Yes.

Q    Where were you?

A    Wayside.  We call it Wayside, the jail up north.

Q    Based on what your orders were previously, was the FBI supposed to be interviewing Anthony Brown according to the Sheriff's Department?

A    No.

Q    So what happened?

A    We were notified about the interview.  I think Lieutenant Leavins was right behind us.  So we, in turn, told him.  He made a phone call and asked that the meeting be canceled.

Q    Which meeting was that?

A    I'm sorry, the interview, the interview between the FBI and Anthony Brown.

Q    What happened next?

A    The interview was ultimately canceled, stopped.

Q    Did you have a meeting related to this after the interview

was canceled?

A    Yes.

Q    With who?

A    Lieutenant Leavins called in the deputies from 17 -- 1750 and wanted to know how it happened.

Q    Did you also have a discussion with Mr. Thompson about these events?

A    Yes.

Q    When did this conversation occur?

A    In between the interruption of the meeting and the meeting with the deputies.

Q    Who was present for this conversation with Mr. Thompson?

A    I think it was a phone call.  It was just me and him.

Q    What, if anything, did Mr. Thompson say to you about what had happened?

A    I just told him what happened.  He said okay, and then I think that was it, and then we had another conversation.

Q    What happened in the second conversation?

A    He informed me that he was going to go up to Mr. Tanaka's office and, in his words, fall on the sword.

Q    What happened -- well, let me back up.  You said that Mr. Thompson was going to go and have a meeting with Mr. Tanaka.  Did you attend that meeting as well?

A    I did, yes.

Q    Who else was there?

A    Deputy Smith, and I remember Captain Carey being there.

Q    And Mr. Thompson was there as well?

A    Yes, I'm sorry.

Q    Was Mr. Tanaka there?

A    Yes.

Q    Where did this meeting take place?

A    In Mr. Tanaka's office.

Q    Do you remember when it took place?

A    Later that day, I...

Q    What, if anything, occurred at that meeting?

A    We got yelled at quite extensively.

Q    By who?

A    Mr. Tanaka yelled at us.

Q    What do you recall him saying?

A    He was mostly yelling at Lieutenant Thompson and Captain Carey, but basically that they let him down.  We all did as a group, we let him down, and that, you know, this was a huge important investigation and we screwed up.

Q    Did Mr. Tanaka say anything about the FBI at this meeting?

A    Yes.

Q    What did he say?

A    "Fuck them."

Q    Was there discussion at this meeting about what would happen with respect to Anthony Brown's housing conditions?

A    I don't remember if it was during the meeting or right

after, but yes, there was a discussion.

Q    Was -- what was decided about Mr. Brown's housing
conditions?

A    That he was going to be moved.

Q    And where did you decide -- or where did the participants
in that meeting decide that Mr. Brown would be moved?

A    It was -- San Dimas was ultimately the choice.

Q    Okay.  Was he moved to San Dimas that day?

A    No.

         MR. STEWARD:  Objection, foundation.

         THE COURT:  The answer will stand.

         MR. FOX:  Thank you, Your Honor.

Q    (BY MR. FOX)  What happened?  Why wasn't he moved to
San Dimas that day?

A    Brown had a medical issue that we had to figure out a
solution for.

Q    Was there a discussion at that meeting as well about
whether OSJ would perform a different role with respect to
Anthony Brown?

A    Yes.

Q    What was that?

A    We would -- there would now be two OSJ deputies sitting
outside his cell.

Q    Who was present at that meeting when that was decided?

A    I believe Captain Carey was there because he's the one

that told me, and it might have been me, Captain Carey and Smitty -- Deputy Smith, I'm sorry.

Q     Now I want you to turn to Exhibit 23, please.

          MR. FOX:  And, Your Honor, I move for the admission of Government Exhibit 23.

          MR. STEWARD:  Same objection, Your Honor.

          THE COURT:  Objection's overruled.  It will be received.

     (Exhibit No. 23 received into evidence.)

          MR. FOX:  Special Agent Tanner, could you please highlight the bottom e-mail on this page.

Q     (BY MR. FOX)  This one is from Daniel Fedele to Greg Thompson.  Do you know who Mr. Fedele was at the time?

A     Yes.

Q     What role did he perform within LASD?

A     He was the operations lieutenant of Men's Central Jail.

Q     And what is the subject of this e-mail?

A     "Your 1750 question."

Q     What does the e-mail state?

A     "I personally just looked at the board in 1750.  Right now there is a note on there that no one talks to him without your approval.  I talked to Senior Bonner who said they just changed it.  Prior to the change, the board reflected that no one sees him without your, my or Lamar's approval.  Lamar says that the A/Senior knew of the special handle and ignored it."

**UNITED STATES DISTRICT COURT**

MR. FOX:  Special Agent Tanner, could you publish the second e-mail.  No, I'm sorry, the one that's second from the top.  Sorry about that.

Q     (BY MR. FOX)  In this e-mail at 3:57 p.m. from Mr. Thompson to Mr. Fedele, what is it that is stated in the e-mail?

A     It says that "delayed re meeting with PT."

MR. FOX:  Could you take it down, please.  Thank you.

Q     (BY MR. FOX)  Did you speak to Anthony Brown on August 23rd?

A     Yes.

Q     Do you recall who else was present for that?

A     Myself, Deputy Smith, Lieutenant Leavins, and I believe Captain Carey was in and out.

Q     Where did this interview take place?

A     It was in an extra room on the 7000 floor of Men's Central Jail.

Q     Do you know if that was recorded, that interview was recorded?

A     I believe so, yes.

Q     Could you please look at, in front of you in one of those envelopes, Exhibit 136.  Yeah, please look at it.  Do you recognize it?

A     I do.

UNITED STATES DISTRICT COURT

Q    What is it?

A    It is a notebook just like mine.

Q    Do you know whose handwriting is in that notebook?

A    It looks like Deputy Smith's.

Q    Do you recognize Deputy Smith's handwriting?

A    I do.

Q    How long had you been partners?

A    At that time, two years.

Q    And have you continued to maintain a close relationship with Mr. Smith since that time?

A    Yes.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 136.

        MR. STEWARD:  Objection, Your Honor, speculation as to who the author is.

        THE COURT:  Overruled.  You can answer.  Overruled. It will be admitted.

    (Exhibit No. 136 admitted into evidence.)

        MR. FOX:  Thank you, Your Honor.

    Special Agent Tanner, if you could publish the first page, first of all.  Okay, and now move on to page 5 of that exhibit and then please highlight the first paragraph.

Q    (BY MR. FOX)  What does this state up here?

A    It says "FBI told him they met with Michel seven times."

Q    Did you know who Michel was?

A      Yes.

Q      What relevance did he have to Anthony Brown?

A      He was the deputy that smuggled the phone to Anthony Brown.

MR. FOX:  Special Agent Tanner, could you publish in the bottom quarter of the page starting with -- after the list of names, actually.

Q      (BY MR. FOX)  What does the first line here say?

A      "In person/Mr. T."

MR. FOX:  You can take that down, please.

Q      (BY MR. FOX)  And now, Mr. Manzo, if you could turn to Exhibit 25 and look at it.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 25.

MR. STEWARD:  Same objection, Your Honor.

THE COURT:  Overruled.  It will be received.

(Exhibit No. 25 received into evidence.)

MR. FOX:  Special Agent Tanner, could you publish the last e-mail on that first page right there.  Thank you.

Q      (BY MR. FOX)  Mr. Manzo, could you please read starting with August 23rd the section that is highlighted.

A      On August 23rd, 2011 at 10:12 p.m., Gregory Thompson wrote "I'm good for the butt chewing.  It was the 'you failed me' that hurt me.  The last thing I want to hear from you, him or the Sheriff are those words, but as always, I learned who to

UNITED STATES DISTRICT COURT

rely on.  Thanks."

Q    Could you tell, based on the previous e-mail, who this was written to -- who Mr. Thompson wrote this to?

A    Yes, Cecil Rhambo.

MR. FOX:  Special Agent Tanner, could you now highlight the e-mail right above that.

Q    (BY MR. FOX)  And this is an e-mail from Mr. Rhambo to Mr. Thompson at 10:49 p.m.  Could you please read the text of this e-mail.

A    "I think in this instance assumption, which is the mother of all screw-ups, occurred.  Combine that with the sensitive nature of the event and it becomes a very complex issue to manage.  I hear you.  I'm sensitive to letting him or the Sheriff down too.  He still loves you as do I.  Believe me, it hurt him to emote on you that way."

MR. FOX:  Okay.  Now the e-mail right above that, please.

Q    (BY MR. FOX)  Mr. Manzo, please read this e-mail from Mr. Thompson at 11:05 p.m.

A    "I know.  That's why the act is already forgotten.  I did learn something, follow up on every direction, even your friends assure you they will handle the task.  Just to let you know, I briefed MCJ PM and EM supervisors in regards to new FBI and outside LE interviewing procedures and that revised policy we'll be following.  I will do the same for days.  Do you want

**UNITED STATES DISTRICT COURT**

me to write the policy for your review?  Greg."

MR. FOX:  And now the top e-mail, please.

Q    (BY MR. FOX)  Go ahead and read this from Mr. Rhambo to Mr. Thompson at 9:30 a.m. on the 24th.

A    "Okay.  No, I'm reviewing current policy.  We can look at amending it (them) first.  Thanks."

Q    Mr. Manzo, can you turn your attention now to Exhibit 26. Do you recognize that?

A    Yes.

Q    What is it?

A    It is the initial draft of what ultimately turned into the policy.

Q    And are you the author of this document?

A    I am, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 26.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 26 received into evidence.)

MR. FOX:  And, Special Agent Tanner, if you could highlight everything but the signature line on that.

Q    (BY MR. FOX)  Mr. Manzo, generally, what is it that you discuss in this e-mail?

A    This e-mail is basically what was relayed to me as far as what needs to be -- what information needs to be taken from the

FBI in this case in order for them to interview any inmate.

Q    You said it was relayed to you.

A    Yes.

Q    Who relayed this to you?

A    Lieutenant Thompson.

Q    Did he tell you whose orders these were coming from?

A    Yes.

Q    What did he say?

A    He said that this is what Mr. Tanaka wanted.

Q    And can you please read this e-mail from you to Mr. Thompson at 9:47 a.m. on August 24th.

A    Yes.  "Good morning.  Effective immediately, all FBI requests for interview will be approved by Undersheriff Tanaka. If the FBI requests access for any reason to your facility, get the following information:  Name; badge or ID number; place of assignment; i.e., special problems, robbery detail, et cetera; contact phone number; inmate who is being interviewed; case number or brief synopsis of case; future date and time they are available to interview.  The above information will be documented by the facility's main control and verified by the facility's watch sergeant and watch commander.  If any of these questions cannot be answered, they will not be allowed access to your facility.  Once all of the information is obtained, a phone call to Undersheriff Tanaka's office will be made.  An e-mail response from Undersheriff Tanaka or someone he

designates will be sent to the requesting party with an

approval or denial."

Q     Mr. Manzo, was this information contained in this e-mail

discussed at your August 23rd meeting with Mr. Tanaka?

A     Yes.

Q     Who mentioned it -- this information?

A     Mr. Tanaka.

Q     Mr. Manzo, can you now turn to Government Exhibit 30.

        MR. FOX:  And, Your Honor, I move for the admission

of Government Exhibit 30.

        THE COURT:  Any objection?

        MR. STEWARD:  Same objection, Your Honor.

        THE COURT:  Overruled.  It will be received.

    (Exhibit No. 30 received into evidence.)

        MR. FOX:  Special Agent Tanner, if we could publish

the second page of that exhibit first, please.  And could you

highlight that e-mail.

Q     (BY MR. FOX)  Mr. Manzo, generally, what information is

contained in this e-mail from Mr. Thompson to Mr. Nee and

Crystal Miranda at 11:27 a.m. on August 24th?

A     It's basically the same e-mail as we just read, the one

that I wrote, and that it looks like Lieutenant Thompson is

asking for the okay to implement it.

Q     Let's have you read actually what he says at the first

line, first sentence, please, of that e-mail.

**UNITED STATES DISTRICT COURT**

A     "Chris, Crystal, can I get the boss's approval to put this out custody-wide?  Verbal notification isn't working as well as I thought it would."

Q     And can you please read the first line after "Good morning."

A     "Effective immediately and until further notice, all FBI requests for interviews will be approved by Undersheriff Tanaka.  If the FBI requests access for any reason to your facility, get the following information."

Q     That's plenty, thank you.

MR. FOX:  Special Agent Tanner, can you now go to the first page -- I'm sorry, the second page again, but the very top of it.

Q     (BY MR. FOX)  Mr. Manzo, this is going to be easier for you to probably look at in your book because it's an e-mail that spans the first and second page.  Why don't you please read for the jury off of page 1 who this e-mail is from and to that Special Agent Tanner's highlighted.

A     It's from Christopher Nee to Gregory Thompson.

Q     And what time and date is the e-mail?

A     Wednesday, August 24th at 11:39.

Q     What is it that Mr. Nee states in this e-mail?

A     It says "Greg, can you give me a call at (323) 526-5118? Thanks."

MR. FOX:  Now, Special Agent Tanner, can you go to

**UNITED STATES DISTRICT COURT**

the first page of that exhibit and publish the 6:02 p.m. e-mail.

Q     (BY MR. FOX)  Mr. Manzo, can you read this e-mail at 6:02 p.m. from Mr. Thompson to Mr. Nee.

A     "Chris, was Mr. Tanaka going to make the changes on the FBI notice to facility commanders, or will he be satisfied if I remove all reference to him or the executives?  If so, I will send out tomorrow morning."

        MR. FOX:  Special Agent Tanner, can you now publish the -- highlight the one that's right before this at 9:23 p.m.

Q     (BY MR. FOX)  Mr. Manzo, can you read what's said between Mr. Nee and Mr. Thompson at 9:23 p.m.

A     "He said that you were going to make changes to it."

Q     And now, Mr. Manzo, could you turn to Government Exhibit 34.  Do you recognize this e-mail?

A     Yes.

Q     What is it generally?

A     It's a pared-down version of what we were talking about.

        MR. STEWARD:  Move to strike.  Opinion and conclusion of the witness.

        THE COURT:  Sustained.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 34.

        MR. STEWARD:  Same objection, Your Honor.

        THE COURT:  Overruled.  It will be received.

**UNITED STATES DISTRICT COURT**

(Exhibit No. 34 received into evidence.)

MR. FOX:  Special Agent Tanner, could you highlight everything above "Any questions, please call me."

Q    (BY MR. FOX)  Mr. Manzo, this is an e-mail from Mr. Thompson to a list of individuals, custody captains, ops lieutenants, custody commander and MCJ jail liaison.

What is the date and time of this e-mail?

A    Thursday, August 25th, 2011 at 12:45 p.m.

Q    What's the subject?

A    "Inmate interviews."

Q    Could you please read it.

A    "Effective immediately, all FBI requests for inmate interviews will be approved by MCJ jail liaison.  All FBI requests in person or telephonic shall be referred to MCJ jail liaison.  Once approved, the inmate will be transported to MCJ and made available to the FBI.  MCJ jail liaison shall be the only entity to facilitate FBI interviews inside of our custody facilities.

Q    Is there any mention to -- of Mr. Tanaka or the undersheriff's office in this e-mail?

A    No.

Q    Now I want to go back to what we were talking about about August 23rd and how circumstances changed with respect to OSJ's role with Anthony Brown.  Do you know why OSJ began guarding Anthony Brown outside of his cell?  What was the purpose of

**UNITED STATES DISTRICT COURT**

that?

A    Because we were ordered to.

Q    And we saw 1750 referenced earlier.  Where was Anthony Brown housed prior to August 23rd?

A    I think he was in 1750 G Row.

Q    And after that meeting with Mr. Tanaka, was there a change in his -- was he still on 1750 G Row after that?

A    Yes -- in the computer, yes.

Q    What about physically?

A    No.

Q    What happened to him physically?

A    He was moved to -- I don't remember the exact cell, but it was 8200.

Q    You had mentioned before that in the August 23rd meeting Mr. Tanaka made some statements about the FBI having access to Mr. Brown.  What, if anything, did Mr. Tanaka state about having anybody guard Anthony Brown from that point forward at the August 23rd meeting?

A    I don't remember.

Q    Would it help refresh your recollection if you were to review your previous testimony under oath?

A    Yes.

Q    Could you please turn to Exhibit 201, page 84.

A    I'm sorry, page 84?

Q    Page 84, and specifically lines 4 to 6.

**UNITED STATES DISTRICT COURT**

A       Okay.

Q       Does that refresh your recollection?

A       It does, yes.

Q       Can you please close your book.

        What, if anything, did Mr. Tanaka say to you on August 23rd about whether anybody should be guarding Anthony Brown?

A       He said that he wanted a 100 percent guarantee it wouldn't happen again and that if we needed to, to put somebody out there.

Q       During that meeting, did -- were there any discussions about Mr. Brown's safety on August 23rd in terms of why you should move him?

A       Not that I remember.

Q       What was the focus at that meeting with Mr. Tanaka on August 23rd?

A       The fact that his order wasn't followed.

Q       What order was that?

A       That Brown was allowed out of his cell for an interview.

Q       With who?

A       The FBI.

Q       At that meeting on August 23rd, was there any reference in the meeting with Mr. Tanaka to Sheriff Baca?

A       Yes.

Q       And what was that?

A       Lieutenant Thompson asked if the Sheriff knew about the

FBI getting an interview, and Mr. Tanaka said, "No, but you're going to tell him."

Q    What happened after that?

A    I believe that was it, and Lieutenant Thompson went into the Sheriff's office.

Q    You mentioned that Mr. Brown was moved in Men's Central Jail.  Where was he moved to on August 23rd?

A    8200.

Q    What is 8200?

A    It changes varying what the facility needs, but at the time, it was MSRA (sic) isolation.

(Reporter clarification.)

        THE WITNESS:  M-S-R-A (sic), MRSA.

Q    (BY MR. FOX)  M-R-S-A?

A    Yeah, something like that.  M-R-S-A.

Q    Are you familiar with what MRSA is?

A    It's a staph infection.

Q    How did the people involved in that meeting decide that that's where Mr. Brown would be housed?

A    I showed Captain Carey around the facility, showed him what we had, and he chose.

Q    "He" meaning?

A    Captain Carey.

Q    Were there OSJ deputies who stood guard outside of his cell at 8200 from that point forward?

A     Yes.

Q     Who were the first two individuals to stand guard?

A     Myself and Deputy Smith.

Q     What types of shifts did you take?

A     I believe they were eight hours, but I don't really remember.

Q     Who came up with a schedule about which deputies would be sitting outside of Mr. Brown's cell?

A     The deputies, they got to pick their times.

Q     Was there someone who coordinated the schedules?

A     Yeah, Deputy Smith and myself.

Q     How did you inform other deputies that they would be guarding Mr. Brown?

A     We called a meeting.

Q     Where was this meeting?

A     In Hero's Park at Men's Central Jail.

Q     What is Hero's Park?

A     It's an eating slash smoking slash there's a basketball court.  It's a little area outside of security, outside of the jail at Men's Central Jail.

Q     And who was present for this meeting?

A     Myself, Deputy Smith, all of the Men's Central Jail office minus Justin Crumlish.

Q     When you said the Men's Central Jail office, are we talking about specifically OSJ or --

UNITED STATES DISTRICT COURT

A     Yes, yes, the OSJ guys.  I believe Iris C., OSJ was there.

Q     And approximately when did this meeting occur?

A     I would say morning.

Q     Of what date?

A     I don't remember.

Q     Mr. Manzo, could you turn to Exhibit 24, please.

A     Okay.

            MR. FOX:  And, Your Honor, I move for the admission
of Government Exhibit 24.

            MR. STEWARD:  Same objection, Your Honor.

            THE COURT:  Overruled.  It will be received.

        (Exhibit No. 24 received into evidence.)

            MR. FOX:  Special Agent Tanner, if you could publish
the bottom e-mail, the one at 7:56 a.m.

Q     (BY MR. FOX)  Mr. Manzo, in this e-mail from Mr. Thompson
to Mr. Gilbert at 7:56 a.m., I'm going to ask you to read it,
but first of all, do you know who William Gilbert was at the
time?

A     Yes.

Q     What role did he play?

A     He was a detective in MCJ jail liaison.

Q     Who oversaw jail liaison?

A     Lieutenant Thompson.

Q     And this is dated August 24th at 7:56 a.m.  Could you
please read the e-mail from Mr. Thompson.

A    "In your rounds this morning, could you stroll up to 8200 and ensure our OSJ contingent is outside of Anthony Brown's cell.  We also need to discuss why you were not notified for Brown's visit.  See you around 10."

Q    Okay.

MR. FOX:  And let's just skip to the top one now, Special Agent Tanner.

Q    (BY MR. FOX)  In this e-mail from Mr. Gilbert to Mr. Thompson at 11 -- I'm sorry, 9:11 a.m. on that same date, what does it say?

A    "Sorry, boss.  I meant to say on my way.  We have two OSJ deputies sitting in the hallway by his door.  They said Smitty briefed them on the rules and what is expected of them."

Q    And now if you could turn your attention to Government Exhibit 31.  Do you recognize that?

A    Yes.

Q    What is it?

A    It is the e-mail that Deputy Smith sent out explaining what we were going to do.

Q    Did this e-mail get sent out by Mr. Smith before or after your meeting at Hero's Park?

A    After.

Q    Let's focus on, then, what was said first at the meeting at Hero's Park.  Who spoke at that meeting?

A    I think Deputy Smith and myself.

UNITED STATES DISTRICT COURT

Q    What is it that you and Mr. Smith communicated to the OSJ deputies?

A    We briefly brought them up -- or caught them up on what was going on with Anthony Brown, found the phone -- they knew by then, but we found the phone.  We might have discussed nobody can talk to him without the approval of the undersheriff so they knew because they were going to be sitting on him, and then just explained the shifts to them and how it would work as far as CARPing and overtime and things like that.

Q    What, if anything, did you say to the OSJ deputies about the executive's reaction to finding out that the FBI was connected to Anthony Brown?

MR. STEWARD:  Objection, leading.

THE COURT:  Sustained.

Q    (BY MR. FOX)  Mr. Manzo, did you discuss anything about the executives at this meeting with the OSJ deputies at Hero's Park?

A    Yes.

Q    What did you say?

A    I let -- I relayed to them the events when we played the tape for Mr. Tanaka, how he said, "Those motherfuckers, fuck the FBI," things like that.

MR. FOX:  Now, Your Honor, I move for the admission of Government Exhibit 31 if I did not do that before.

MR. STEWARD:  No objection to this one, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  It will be received.

(Exhibit No. 31 received into evidence.)

MR. FOX:  And, Special Agent Tanner, let's just start with the top portion of it and the first full paragraph.

Q    (BY MR. FOX)  This e-mail says it's from Gerard Smith.  Do you know if he actually wrote it?

A    He did.

Q    How do you know that?

A    I read it after he wrote it.

Q    You mean before he sent it out?

A    Yes, sir.

Q    And who are the people on the to line?

A    Want me to read it?

Q    No, just generally, do you know who these people --

A    This is the -- most of the OSJ, the south OSJ guys.

Q    Were these people present at the Hero's Park meeting, generally?

A    Generally, yes.

Q    What about the CC line?  Obviously, your name's on it. Who else is on there?

A    Greg Thompson and Dave Gutierrez.

Q    Who was Dave Gutierrez?

A    He was our sergeant.

Q    Okay.  And what is the subject line of this e-mail?

A    "Confidential."

**UNITED STATES DISTRICT COURT**

Q     Please read the first paragraph into this e-mail.

A     "If you are getting this e-mail, you have been -- you have been signed up to work this very important detail.  I am in charge of security and scheduling for this detail.  Please don't let me or the unit down.  I have covered the background regarding Anthony Brown, male -- MB male block 21968," that's his booking number, "2009547.  No local gang affiliation.  The inmate we are tasked with protecting.  For clarification, his cell door 8225 will not be opened without the two OSJ deputies who are assigned to be posted.  If you get a pass for any movement other than medical, call me for approval.  Use your common sense.  There will be no other movement without the presence of the following people:  Undersheriff Tanaka, ICIB Captain Tom Carey, ICIB Lieutenant Leavins, Lieutenant G. Thompson, Deputy G. Smith or Deputy M. Manzo."

            MR. FOX:  Special Agent Tanner, can you now highlight the third paragraph starting "It has."

Q     (BY MR. FOX)  Mr. Manzo, please read this.

A     "It has been expressed to me several times now that this is one of the most important investigations involving the Los Angeles County Sheriff's Department in its 160-year history.  No joke.  So please do not hesitate to call me first if you need anything."

Q     Do you know who expressed this to Mr. Smith?

A     I do, yes.

Q     How do you know that?

A     I heard him say it.

Q     Who expressed to Mr. Smith that this was one of the most important investigations involving the LASD in its 160-year history?

A     Mr. Tanaka.

Q     When did he express that?

A     The Saturday meeting.

Q     And then if you look at the next paragraph and what's below it, could you just please generally describe for the jury what this is.

A     This is the breakdown of which personnel is going to be on what shift.

Q     What time period is covered?  There are just two dates on this first page, but if you look at the second page as well.

A     So August 24th to August 29.

Q     Now, Mr. Manzo, can you turn toward one of those envelopes again, Exhibit 133.  Do you recognize that?

A     Yes.

Q     What is it?

A     This is what we called the CYA log.

Q     And what did CYA stand for?

A     "Cover your ass."

Q     Why did you call that a CYA log?

A     I don't really know why.  I know what it's for, but I

UNITED STATES DISTRICT COURT

don't know why we called it.

Q    Then why don't we focus on that.  What was this log used for?

A    Anything pertaining to Anthony Brown was supposed to go in the log.  When you fed him, when he had his meds, anything.  If you took him outside for a cigarette, if anybody came in to just walk by or talk to him, it's all supposed to go in there.

Q    Were there instructions provided in there as well for the OSJ deputies?

A    I believe so, yes.

Q    Okay.  Let's look at 1 -- on that exhibit, 1 --

         MR. FOX:  Oh, Your Honor, I'm sorry, I move for the admission of Government Exhibit 133.

         MR. STEWARD:  No objection on this one, Your Honor.

         THE COURT:  It will be received.

    (Exhibit No. 133 received into evidence.)

         MR. FOX:  And you can publish 133, page 3.  Highlight, thank you, starting there on the 23rd and the 24th.

Q    (BY MR. FOX)  Mr. Manzo, what's reflected on these pages, generally?  We don't need the specific information.

A    Who is sitting on him and at the times and then if anything happened.

Q    And is this the first date that people are sitting on Mr. Brown?

A    Yes.

Q    If you can now look at page 6, please.

MR. FOX:  And let's highlight, first of all, the red portion.

Q    (BY MR. FOX)  Can you start with number 3.  What does it say under number 3?

A    "Any pass will be approved by, one, Smith (909) 815-8064; two, Manzo (562) 318-4637; three, Lieutenant Thompson (213) 393-6570; four, Lieutenant Leavins (323) 243-4099; five, Captain Carey no number.

MR. FOX:  One moment, Your Honor, please.

(Pause in proceedings.)

Q    (BY MR. FOX)  Are you familiar with something called an inmate record jacket?

A    Yes.

Q    What is an inmate record jacket?

A    It is -- it holds all of his booking information as far as the paperwork that needed -- that was filed that needed -- so he could be booked into our custody.

Q    Was this for every inmate that they had an inmate record jacket?

A    I believe so, yes.

Q    In about the same time period, late August of 2011, did there come a time when Mr. Leavins asked you to do something with respect to Anthony Brown's record jacket?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    What is it that he asked you to do?

A    He asked me to get it.

Q    Did he explain why?

A    He did not.

Q    Did you get it?

A    No.

Q    Why not?

A    I didn't know how.

Q    So what did you do instead?

A    I called -- I believe it was Mike Rathbun, OSJ deputy who worked IRC and was familiar with the process to get it.

Q    You've mentioned IRC a couple times.  What is IRC?

A    It stands for Inmate Reception Center.  That's where -- when you're a fresh new inmate, that's where you go so you can be processed.

Q    What type of paperwork is at IRC?  Do you know if the inmate -- for example, do you know if the inmate record jackets are housed there?

A    Yes.

Q    And did you call Mr. Rathbun to talk to him about this issue?

A    Yes.  I believe so, yes.

Q    And what did you tell Mr. Rathbun?

A    I asked him to get the jacket for Anthony Brown.

Q    Did you provide Mr. Rathbun with any instructions as to

what to do with the jacket after he obtained it?

A    Yes.

Q    What did you say?

A    I asked him to slide it under Lieutenant Thompson's door.

Q    Mr. Manzo, can you turn your attention to Government Exhibit 40.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 40.

        THE COURT:  Any objection?

        MR. STEWARD:  Same objection, Your Honor.

        THE COURT:  Overruled.  It will be received.

    (Exhibit No. 40 received into evidence.)

        MR. FOX:  And, Special Agent Tanner, can you publish the first -- the bottom e-mail.

Q    (BY MR. FOX)  This is an e-mail from Jason Pearson.  Who was Jason Pearson?

A    He was an IRC OSJ deputy also.

Q    Was he also one of the deputies that was ordered to stand guard outside of Anthony Brown's cell?

A    Yes.

Q    You mentioned Mr. Rathbun earlier.  Is that who is CC'd on this e-mail?

A    Yes.

Q    And what does the e-mail from Mr. Pearson to Mr. Thompson at 8:59 p.m. on August 26th state?

A      "Sir, Rathbun will be delivering the inmate record jacket for our friend.  It will be slid under your door for your review in the morning.  Jason."

Q      Did Mr. Thompson respond to this e-mail?

A      Yes.

Q      And stating what?

A      "Thank you."

MR. FOX:  Going back to 133 and the second page, please.

Q      (BY MR. FOX)  Mr. Manzo, what is the handwriting at the top?  Can you read that?

A      Rodriguez, John 2855633.

Q      Do you know who that was?

A      John Rodriguez was the first alias used for Anthony Brown.

Q      And then there's a name under there that is printed.  What is that name?

A      Kevin King.

Q      Who was Kevin King?

A      I don't remember what number, but he was also -- an alias for Brown.

Q      And when you say these were aliases for Mr. Brown, were these aliases that Mr. Brown used himself?

A      No.

Q      Who provided these names for Mr. Brown?

A      The L.A. County Sheriff's Department.

**UNITED STATES DISTRICT COURT**

Q    And we see some numbers on there.  Both of them start 285, one under Mr. Rodriguez and one to the left of Kevin King.  Do you know what those numbers are?

A    Yes, those are booking numbers.

Q    Do you recall whether Mr. Brown at some point was moved from Men's Central Jail to another facility?

A    Yes, he was.

Q    And when approximately was that?

A    I don't remember.

Q    At some point, do you know if he was returned to Men's Central Jail after being at another facility?

A    He was, yes.

Q    And what facility was he brought to in the interim?  After he left Men's Central Jail but before he came back.

A    San Dimas Station.

        THE COURT:  Is this a good time to take our first break of the day?

        MR. FOX:  Yes, this is a break time.  Thank you, Your Honor.

        THE COURT:  Ladies and gentlemen, we're going to take our first break of the day.  Again, I want to remind you until this trial is over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing

the case in Internet chatrooms, through blogs, bulletin boards, e-mails or by text messaging.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read or listen to any news reports about the trial. Do not look at anything online.  Do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, please keep an open mind until all of the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

All right.  Thank you.  We're going to come back at ten o'clock.

THE DEPUTY CLERK:  All rise.

(The jury exited the courtroom.)

THE COURT:  All right.  Sir, you may step down.

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Anything we need to take up?

MR. FOX:  Not that I know of, Your Honor.

MR. STEWARD:  No, Your Honor.

THE COURT:  All right.  Thank you.

MR. FOX:  Thank you.

(Off the record at 9:46 a.m.)

(On the record at 10:04 a.m.)

THE COURT:  All right.  All the exhibits that were provisionally admitted are now admitted, and all electronic devices, PDAs, laptops, cell phones need to be turned off.

All right.  Let's bring the jury out.

THE DEPUTY CLERK:  All rise.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR. FOX:  May I resume, Your Honor.

THE COURT:  Yes, please.

Q    (BY MR. FOX)  Mr. Manzo, before the break we were talking about Mr. Brown's location and the dates of the location.  I want you to turn your attention to Exhibit 32, please.

Is this a true and accurate copy of e-mails that you received on August 24th and 25th of 2011?

A    Yes.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 32.

MR. STEWARD:  No objection on this one, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 32 received into evidence.)

MR. FOX:  And, Special Agent Tanner, if you could highlight the top e-mail.

JUROR WON CHANG:  Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Yes.

JUROR WON CHANG:  There's notes on my notes that I did not write.

THE COURT:  Okay.  If you could -- let's make sure you number...  None of what is written on this page is yours?

JUROR WON CHANG:  It's not mine.  Is there two pages?

THE COURT:  I'm sorry, there are two pages here.  Would you show him this page and see if that's his.

JURO WON CHANG:  Yeah, this one is not mine.  The one before is mine.

THE COURT:  The one before, okay.  And that is yours, correct?

JUROR WON CHANG:  Yes.

THE COURT:  Okay.  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Okay, I'll let you read this.

MR. FOX:  It looks to me like notes from your instructions of the elements of an offense.

MR. HAIG:  This is Jerome Haig.  I'm just wondering that maybe somebody swapped.

THE COURT:  It could, but I believe the notebooks are marked.  Somebody could have grabbed...

MR. STEWARD:  We're just wondering about the very first -- "jurisdiction, did the FBI have jurisdiction."  Was

that out of preinstructions?

MR. FOX:  May I see it, Your Honor?

MR. STEWARD:  It's a great question but...

MR. FOX:  Oh, "The defendant knew the statement was false."  This is for 1001.  This is 1001 type Instruction, 1001 type charges.

THE COURT:  The only other thing I can think of is that perhaps this notebook may have been used by somebody else and then reused.  If you want me to make any further inquiries...

MR. STEWARD:  I would just ask if he read this page.  Did he read the four bullet points that are on there.

MR. FOX:  Could we do that at the end of the day.

MR. STEWARD:  No objection.

THE COURT:  That's fine.

MR. FOX:  Thank you, Your Honor.

(End of sidebar discussions.)

THE DEPUTY CLERK:  She needs her medication.

THE COURT:  That's fine.  Let's take a short break.

(Pause in proceedings.)

MR. FOX:  May I resume, Your Honor.

THE COURT:  Yes, please.

Q    (BY MR. FOX)  Mr. Manzo, we're looking at the top e-mail in Exhibit 32.  Can you please read the substance of this e-mail.

A      Starting from the bottom?

Q      Yeah, so this is the August 25th, 2011 e-mail at 9:37 a.m., starting with the part that's highlighted on your computer screen.  Go ahead.

A      "Just FYI, the extension to the location is 37979, and from the outside it is (213) 974-7979."

Q      Can you tell from this e-mail whether Mr. Brown was located in the downtown MCJ facility or in San Dimas at this time?

A      He would have still been at Men's Central Jail.

Q      Now I want you to turn your attention to Exhibit 39.

MR. FOX:  And, Your Honor, I move for the admission of this exhibit, Government Exhibit 39.

THE COURT:  Any objection?

MR. STEWARD:  Same objection, Your Honor.

THE COURT:  All right.  The objection's overruled. It will be received.

(Exhibit No. 39 received into evidence.)

MR. FOX:  Okay.  Special Agent Tanner, if you could highlight the bottom e-mail on this page, please.

Q      (BY MR. FOX)  Mr. Manzo, what's highlighted is the August 26th, 2011 e-mail at 7:29 p.m.  Do you know who John Bonner was at the time?

A      Yes.

Q      Who was he?

**UNITED STATES DISTRICT COURT**

A    He was on loan to the MCJ jail liaison.

Q    And that unit is also run by Mr. Thompson; is that correct?

A    Yes.

Q    And see the subject line?

A    Yes.

Q    Who did you know John Rodriguez to be on August 26th of 2011?

A    That would have been Anthony Brown.

MR. FOX:  Can you please, Special Agent, highlight the 7:44 p.m. -- actually, I'm sorry, let's have him read that one into the record.

Q    (BY MR. FOX)  Go ahead, Mr. Manzo.

A    "Boss, you will be getting a call re his meds or removing him from the computer.  Just FYI.  In Bill's office going through the inmate mail if you need to talk to me.  JB."

MR. FOX:  Now if you could highlight the 7:44 p.m. e-mail.

Q    (BY MR. FOX)  In this e-mail from Mr. Thompson to Mr. Bonner, what does Mr. Thompson state?

A    "Thought he was on self meds.  Since he's not, he goes home."

Q    Did there come a time in which the Sheriff's Department decided that Mr. Brown could self-medicate himself?

A    Yes.

Q    Was it around this time listed in the e-mail?

A    I'm not sure.

Q    Do you know -- do you have any understanding as to what "he goes home" means?

A    No.

          MR. STEWARD:  Objection, calls for speculation.

          THE COURT:  Sustained.

          MR. FOX:  And then the e-mail right above that, 7:45 p.m.

Q    (BY MR. FOX)  What does this state from Mr. Bonner to Mr. Thompson?

A    "Sergeant Soto will call you re meds."

Q    And what is stated at the top of that first e-mail on the page?

A    "On the cell."

Q    Mr. Manzo, if you can now turn your attention to Exhibit 41.  Do you recognize this exhibit?

A    Yes.

Q    Is this an e-mail that you received?

A    Yes.

          MR. FOX:  Your Honor, I move for the admission of Government Exhibit 41.

          MR. STEWARD:  No objection.

          THE COURT:  It will be received.

     (Exhibit No. 41 received into evidence.)

**UNITED STATES DISTRICT COURT**

MR. FOX:  And, Special Agent Tanner, if you could just publish the first half of that e-mail, please, all the way down to maybe 9/1.

Q     (BY MR. FOX)  Generally, what is this?

A     It's a schedule for the OSJ deputies beginning on 8/29.

Q     And what does it state at the very beginning of that e-mail on August 27th at 2:49 p.m.?

A     "The operation has been moved to San Dimas Station, 270 South Walnut Avenue, Jailer (909) 450-2750.  Schedule is as follows.  If you have any conflict, I need to know ASAP."

Q     I want to now turn your attention to Exhibit 47.  Do you see a name on there Chris Johnson?

A     Yes.

Q     Do you know who Chris Johnson was at this point, September 2nd, 2011?

A     Yes.

Q     Who was Chris Johnson?

A     Anthony Brown.

Q     Was this also a name that the Sheriff's Department came up for Anthony Brown, or was this a name that Mr. Brown called himself?

A     Sheriff's Department.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 47.

MR. STEWARD:  Same objection, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.  It will be received.

(Exhibit No. 47 received into evidence.)

MR. FOX:  All right.  And, Special Agent Tanner, if you could highlight the 9:21 a.m. e-mail.

Q    (BY MR. FOX)  Mr. Manzo, could you please read this e-mail between Mr. Smith and Mr. Thompson at 9:21 a.m.

A    "Sergeant Johnson has made him a K-10 per OSJ and you. Updated housing will be 8225, inmate new name Johnson, Chris, number 2863148, case number 9999999.  Getting medical update now.  Go kill something."

Q    And you understand that last thing to be about hunting and not related to this case?

A    Yes.

Q    All right.  If I can now have you turn to the exhibit book that contains -- oh, I'm sorry.  Yeah, it's that one, 135.  If you could find 135 in the envelope.

Do you recognize that notebook?

A    Yes.

Q    Can you please look through it and tell me what it is.

A    It looks like Deputy Smith's notebook.

Q    And is it from around the time of these events that we've been talking about?

A    Yes.

Q    And when you say it looks like it's his notebook, it's his handwriting in that notebook; is that correct?

A     Yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 135.

MR. STEWARD:  Objection, foundation and speculation on the author.

THE COURT:  You're familiar with Deputy Smith's handwriting?

THE WITNESS:  Yes, sir.

THE COURT:  And that appears to you to be his handwriting?

THE WITNESS:  Yes, sir.

THE COURT:  Objection's overruled.  It will be received.

(Exhibit No. 135 received into evidence.)

MR. FOX:  Special Agent Tanner, if you could publish the first page of that exhibit.  Okay.  And highlight the G and what's next to it, please.

Q     (BY MR. FOX)  What's stated next to the big G?

A     "AB-8-24-."

MR. FOX:  And now, Special Agent Tanner, if you can publish page 15 of that exhibit and highlight the first third of that page.

MR. STEWARD:  Excuse me, Your Honor.  I'm not seeing any page numbers.

MR. FOX:  I'll be happy to -- I'm sorry, Your Honor,

UNITED STATES DISTRICT COURT

I'll take Mr. Steward to it.

(Counsel conferred off the record.)

Q    (BY MR. FOX)  Mr. Manzo, can you please read in what is written on this notebook right here.

A    "AUSA investigation police brutality, use of force from 2009 to 2011.  Complaints.  69PC.  243BPC.  All use of force."

Q    Do you know what 69PC is?

A    Not any more.

Q    Do you know what 243BPC is?

A    No, sir.

Q    Mr. Manzo, I now want to turn your attention to Exhibit 49.  Do you recognize this exhibit?  After you've had a chance to put that away, thank you.

A    Yes.

Q    What is it?

A    It's a schedule of who's going to sit on him starting 9 -- or September 4th of 2011.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 49.

MR. STEWARD:  No objection on this one, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 49 received into evidence.)

Q    (BY MR. FOX)  And, Mr. Manzo --

MR. FOX:  If I can have Special Agent Tanner highlight the first half of that e-mail.

Q     (BY MR. FOX)  -- could you generally describe what this is.

A     This is the schedule of the OSJ deputies who will be sitting on Brown now at MCJ, back at MCJ.

Q     And what does the first sentence say in this e-mail on September 3rd at 11:03?

A     "The operation has been moved back to MCJ 8200."

Q     And while Special Agent Tanner's highlighted September 4th and September the 5th, can you tell based on the hard copy of the e-mail in front of you how long the schedule lasts?

A     It looks to September 10th.

Q     Can you now turn to the next exhibit, Exhibit 50.  Do you recognize this?

A     Yes.

Q     What is it?

A     Schedule who's going to be sitting on Anthony Brown from, looks like September 11th to the 15th.

Q     Is this an e-mail that you received at this time?

A     Yes.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 50.

        MR. STEWARD:  No objection, Your Honor.

        THE COURT:  It will be received.

    (Exhibit No. 50 received into evidence.)

        MR. FOX:  And if you could, Special Agent Tanner,

UNITED STATES DISTRICT COURT

thank you, highlight that portion.

Q    (BY MR. FOX)  Mr. Manzo, could you please describe for the jury again the dates that are listed in here, although we've only got a couple highlighted.

A    It starts on September 11th and ends the 17th -- September 17th.

Q    Was Anthony Brown kept in Men's Central Jail during this entire time from September 2nd to September 17th?

A    I'm not sure.

Q    At some point in time, did the OSJ deputies take Anthony Brown somewhere outside of Men's Central Jail?

        MR. STEWARD:  Objection, foundation.

        MR. FOX:  Your Honor, I'll be happy to establish it.

Q    (BY MR. FOX)  Mr. Manzo, you mentioned in the earlier part of your testimony that you were aware that Anthony Brown had been sentenced to state prison; is that correct?

A    Yes.

Q    Do you know if Mr. Brown was ever taken to state prison?

A    Yes.

Q    Do you know approximately when that occurred?

A    I can't remember the date.

Q    Okay.

        MR. FOX:  One moment, Your Honor.

    No further questions, Your Honor.

        THE COURT:  Cross-examination?

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  Going back to Exhibit 31, an e-mail, could you pull that out, take a look at it.  Do you have it?

A    Yes, sir.

Q    And this is one of the e-mails that you went over with Mr. Fox; correct?

A    It is.

Q    It's dated August 24th, 2011, yes?

A    Yes.

Q    And you are shown in the CC, carbon copy, line; right?

A    Yes.

Q    So you received this; right?

A    Yes.

Q    Take a look, if you will -- and I apologize for putting a circle around it; it's my copy -- the portion that says the following:  "I have covered the background regarding Anthony Brown" -- ID information -- "no local gang affiliation.  The inmate we are tasked with protecting."  You see those words?

A    Yes, sir.

Q    And those words do not say "we are tasked with hiding"; correct?

A    Correct.

Q    And it doesn't say "we are tasked with obstructing justice from the FBI finding him"; right?

UNITED STATES DISTRICT COURT

MR. FOX:  Object to the form of the question.  Also the document speaks for itself, Your Honor.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I'm sorry, can you ask again, please.

Q    (BY MR. STEWARD)  Sure.  The e-mail does not say "we are tasked with hiding Brown from the FBI"; correct?

A    That is correct.

Q    And, in fact, according to this e-mail on August 24th, your job and the others named on this is to protect him; correct?

A    Correct.

Q    And in the meeting -- the Friday meeting and the Saturday meeting with Sheriff Baca, safety of this individual was one of the topics that came up; right?

A    That is correct.

Q    And safety of the individual was a concern of the -- let's call them the executives; right?

A    Yes.

Q    Because Brown himself had now been exposed by the third week of August as an informant for the FBI; right?

A    Correct.

Q    And in terms of being in the county jail, that's a very dangerous fact for him; right?

A    Yes.

Q    Any number of inmates would like nothing better than to

UNITED STATES DISTRICT COURT

stab him; right?

MR. FOX:  Objection, foundation and argumentative.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  And you worked in the jails for how long, sir?

A    Roughly six and a half years.

Q    And so you're familiar with the daily routine in all jails; right?

A    Yes.

Q    And someone who is known to be an informant for law enforcement could be in jeopardy of being physically harmed by other inmates; right?

A    That is correct.

Q    And Mr. Brown, in particular, was also now known to be an informant for the FBI; right?

A    Yes.

Q    And that would not be a good thing when it came to the deputies surrounding him; right?

A    Correct.

Q    So as of August 24th when this e-mail was written and received by you, Brown was having -- he had danger around him from two different sources, inmates and deputies; right?

A    Yes, but I didn't write the e-mail.

Q    Okay.  But you'll agree with me he was in danger?

A    I agree.

Q    Okay.  And that was discussed at both the Friday meeting and the Saturday meeting with Leroy Baca; right?

A    Yes.

Q    And part of Baca's words to you in the Saturday meeting -- let me back up.  Is this a meeting where he was wearing a tracksuit?

A    Yes.

Q    Okay.  So the tracksuit meeting on Saturday, he emphasized to you and all of the attendees that he didn't want this man harmed in any way; right?

A    Correct.

Q    And he emphasized that; right?

A    Yes.

Q    Now, Mr. Fox asked you about purposes and the topics that came up at that Saturday meeting; right?  You remember that about an hour ago?

A    Yes.

Q    And you never once mentioned the safety of Mr. Brown, did you?

A    I don't remember.

Q    You're in a difficult position right now, aren't you, sir?

A    I don't see how but --

Q    Well, you're a convicted felon.  That's not a good thing; right?

A    That's true.

UNITED STATES DISTRICT COURT

Q      You've been sentenced; right?

A      Yes.

Q      And you're on bail, on appeal to the Court of Appeals; right?

A      Yes.

Q      And you can be prosecuted for your testimony here today; correct?

A      Yes.

Q      You can be prosecuted for perjury; right?

A      That is correct.

Q      And the people that decide whether or not you've told the truth are the folks at the table to my right; correct?

        MR. FOX:  Objection, argumentative.

        THE COURT:  Sustained.

Q      (BY MR. STEWARD)  What was your rank in 2011?

A      Deputy.

Q      So not a sergeant, not a captain, nothing like that; right?

A      No.

Q      And this would have been in August 2011?

A      Yes.

Q      The decision to move Mr. Brown, was that made in your presence or not?

A      Which -- which move are you talking about, sir?

Q      When the decision was made to move Brown to the outlying

**UNITED STATES DISTRICT COURT**

jail, the first decision to move him, were you present for that decision?

A    I was not.

Q    And you heard this from who?

A    It was discussed between Lieutenant Thompson and Captain Carey and Mr. Tanaka at the -- I don't remember the date, the day after the FBI -- or the day -- the meeting the day the FBI got in, sorry.

Q    How do you know that?

A    It was relayed to me through Lieutenant Thompson.

Q    I'm sorry, through who?

A    Lieutenant Thompson.

Q    Okay.  But other than his word or what he said to you, you don't know whether Mr. Tanaka was involved in that decision at all; correct?

A    That is correct.

Q    You're just reporting back what Thompson told you; right?

A    Correct.

Q    And in that first meeting on Friday, was there any discussion about moving Mr. Brown?

A    Not that I recall, no.

Q    How about on Saturday, the tracksuit meeting?

A    No, not that I remember.

Q    Now, you worked on the 3,000 floor at the Men's Central Jail; correct?

A     Yes.

Q     And when did you do that?

A     I think -- I started July of 2006, all the way up to
September of 2008.

Q     Roughly two years?

A     Roughly.

Q     Okay.  And what kinds of inmates were on the 3,000 floor?

A     Anything from medium general population all the way up to
what we could call K-10, the highly aggressive inmates.

Q     Most dangerous people in the jail system?

A     That's fair, yes.

Q     And the jailers, the deputies are subject to assaults
there; correct?

A     Yes.

Q     Okay.  Somewhat frequent assaults; right?

A     Yes.

Q     And you'll agree with me that it is, in the jail system,
perhaps the most difficult assignment a deputy can have?

A     I'd agree with that.

Q     Does the same go for the 2,000 floor?  Well, let me back
up.  Did you work the 2,000 floor?

A     Only once.

Q     Same kind of inmates?

A     They had the protective custody inmates, so it made it a
little harder.

Q    Now, the meeting -- let's go back to the tracksuit
meeting, which was August 20th, I believe you testified.  In
this particular meeting, did Sheriff Baca do most of the
talking?

A    Yes.

Q    And other than the briefing on where things stood at that
time, did he do virtually all the talking?  If you remember.

A    I can't remember.

Q    Fair enough.  And did he tell everyone in that meeting to
get to the bottom of what was happening?

A    Yes.

Q    You remember those exact words?

A    Yes.

Q    And he also wanted everyone in that room to understand
that Brown needed to be protected; right?

A    Yes.

Q    And that was important to him; right?

A    He said it, so yeah.

Q    Was he yelling?

A    I don't remember him yelling.

Q    What was his demeanor?

A    Normal.  I don't really know him.  He was odd.

Q    Let's go to August 23rd, three days later in the meeting
where Mr. Tanaka is yelling.  Have that in mind?

A    Yep.

Q    Okay.  And when he was yelling about "you failed me," he was looking directly at Deputy Smith; isn't that true?

A    He looked at him, not the whole time, but at one point when he said that, yes, he was looking at Smith.

Q    And afterwards in the meeting, Smith was surprised that Mr. Tanaka was looking directly at him; correct?

A    Yes.

Q    And you talked about that; right?

A    Yes.

Q    And Mr. Tanaka, at some point in that conversation on the meeting on the 23rd, instructed you, perhaps Mr. Thompson, to go tell Sheriff Baca what had happened; right?

A    He instructed Lieutenant Thompson, not me.

Q    Okay.  Did you go into that meeting?

A    With the Sheriff?

Q    Yes.

A    No.

Q    Okay.  Mr. Tanaka did not say "we need to hide this from Sheriff Baca"; correct?

A    He did not say that, no.

Q    Okay.  And he had Thompson go in to talk to Baca to explain what occurred; right?

A    Yes.

Q    And that's because Mr. Baca was the Sheriff; right?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    And at the tracksuit meeting, it was Baca who said "get to the bottom of this"; right?

A    Yes.

Q    And Mr. Tanaka was trying to make sure that the boss was advised of the development; right?

A    Yes, that's fair.

Q    Why did you guys go to Tanaka's office in the first place?

A    I'm sorry?

Q    Why did you guys go to Tanaka's office on August 23rd in the first place?

A    Because he wanted to see Lieutenant Thompson about why the protocols weren't followed for Brown.

Q    And how do you know that?

A    That's what Lieutenant Thompson told me.

Q    Now, you had come across Anthony Brown before the tracksuit meeting; correct?

A    Are you asking if I knew who he was prior to that meeting?

Q    Yes, sir.

A    Yes.

Q    And, indeed, just three days before the Friday meeting, August 19, you had secured a court order regarding Mr. Brown restricting his phone privileges and making sure he had to have monitored visits; isn't that true?

A    I wrote the court order.  I don't know when it was, but I wrote it.

Q    Okay.  Let's take a look at an exhibit.  Mr. Manzo, I think you have a white binder up there.  It may be towards your feet.  Got it?  And take a look, if you would, at Exhibit 351, 3-5-1.

     First question, does that look familiar to you?

A    Yes.

Q    And it's kind of hard to see, and I think it must have been highlighted and turned out kind of black, but can you see that on the top upper left-hand corner underneath Sheriff Leroy Baca's name appears to be your name.  Kind of hard to make out, but does that look like your name?

A    Yes.

Q    Okay.  And then again on the order a little bit farther down, does that look like your name?

A    Yes.

Q    About two-thirds of the way down, and take a look at the second page if you would, you see the date there?

A    16th, yes.

Q    16th of what?

A    August 16th.

Q    Of what year?

A    2011.

Q    So this would have been signed three days -- three or four days before the tracksuit meeting; right?

A    Yes.

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  At this time, Your Honor, I'd offer 351.

THE COURT:  Any objection?

MR. FOX:  Yes, Your Honor.  This, as it stands right now, is hearsay.  If I could have a moment with Mr. Steward, though, that might help.

THE COURT:  That's fine.

(Counsel conferred off the record.)

MR. FOX:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 351 received into evidence.)

Q    (BY MR. STEWARD)  And, Mr. Manzo, I think you may have told us, but what was your role in regard to this particular document?

A    I wrote it.

Q    Okay.  And when you say you wrote it, would that be the third and fourth page of it?

A    Yes.

Q    And this has to do with issues regarding Anthony Brown and his use of phones; correct?

A    Correct.

Q    And it also commands that his visits in the future be monitored; correct?

A    Correct.

Q    And it's signed off by, appears to be a superior court

judge?

A    Yes.

Q    So before the discovery of the FBI cell phone, you personally were already having issues with this inmate; right?

A    Me personally?  No.

Q    Okay.  And how did you get the information that you put in this particular document?

A    I don't remember if I got them from the detective or actually -- I don't believe I talked to Anthony Brown prior to, excuse me, the Friday, the 19th I think.

Q    Have you and I ever talked before?

A    I'm sorry?

Q    Have you ever talked to me before?

A    No, sir.

Q    First time we've ever talked; right?

A    Yes.

Q    Now, you're called an affiant in the statement of probable cause here.  Did you know these facts that you put in?

A    Yes.

Q    Okay.  So you were aware of the problems with Brown immediately prior to the discovery of the cell phone, correct, the FBI cell phone?

A    I'm not sure what problems you're referring to.

Q    Okay.  Take a look, if you would, at -- third page your affiant starts at the top, first paragraph, second paragraph,

**UNITED STATES DISTRICT COURT**

third paragraph, fourth paragraph, "Inmate Brown refused to make any statements regarding the phone."

A    Okay.

Q    What phone are we talking about there?

A    It would have been the cell phone.

Q    Okay.  So this is about the FBI cell phone; correct?

A    Yes.

Q    Okay.  This is in response to the discovery of the phone and the discovery of the information that it was actually an FBI phone; correct?

A    It would have been in between that.

Q    Okay.  So this was an effort that you made or were part of to restrict Brown from anybody visiting him except with a monitor and no more cell phone -- no more phone privileges at all; right?

A    Correct.

Q    Now, counsel asked you about Brown's movements.  At one point, I think we read an e-mail about Brown was about to be sent off to state prison.  Do you know if he was eventually sent to state prison?

A    He was.

Q    Okay.  Did you play any role in having him sent off to state prison, contact anybody or do anything?

A    I was -- I drove up there, not with him, but we followed him up there.

UNITED STATES DISTRICT COURT

Q    And do you know how it was he was finally released to go to state prison?

A    He was rebooked as Anthony Brown.  I have no idea how that worked itself out, but ultimately, he came back to Men's Central Jail as Anthony Brown.

Q    We looked at the e-mail this morning talking about him -- Brown about to get on the bus to state prison the coming Saturday.  You remember that?

A    Yes.

Q    Okay.  Do you know or do you have any knowledge at all why he was not put on that bus on the following Saturday?

A    Yes.

Q    And tell us how did that happen.

A    Sheriff Baca decided he wanted Brown in our custody.

Q    Okay.  And how do you know that?

A    He said that he's staying in our custody.

Q    And when did he say that?

A    It had to be the Friday.

Q    Okay.  And it was Saturday when he gave the orders about keeping the inmate safe, right, tracksuit meeting?

A    Yes.

Q    And at the tracksuit meeting, he also talked about getting to the bottom of what was going on with the FBI; right?

A    Correct.

Q    And fair to say that Sheriff Baca was not happy at the

Saturday tracksuit meeting?

A    That's fair, yes, sir.

Q    And it was not -- well, let me back up.  In the meetings that you had with Paul Tanaka Friday, Saturday and then the 23rd, did he ever give you an order of any kind?

A    I don't -- I don't remember him doing any -- giving any.

Q    Throughout the entire period of time, mid-August to late September, did Paul Tanaka ever give you an order in regard to the cell phone, Brown or any of this?

A    I don't remember.

Q    Well, you seem to have a pretty good memory.  Did he or didn't he?

MR. FOX:  Objection, Your Honor, to the form of the question.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  Now let's take a look, if we can, at Government's 30.  Do you have Exhibit 30 there?

A    Yes, sir.

Q    Now, you're not --

MR. STEWARD:  Is this 30?

MR. HAIG:  Sorry.

MR. STEWARD:  Can't get good help these days.

Q    (BY MR. STEWARD)  Looking at 30, this was not addressed to you; correct?

A    No.

Q    When was the first time you ever saw this e-mail?

A    Maybe when we were doing -- preparing for our trial.

Q    Okay.  So it would have been more than a year after August 24th, 2011?

A    Couple years, yeah.

Q    Okay, couple of years.  And looking at the body of it, do you know anything about this at all?

A    I'm not 100 percent sure what it's about.

Q    And other than three, perhaps four of the e-mails that we've looked at that came to you by way of a CC or were sent to you direct, you were not privy to any of those other e-mails back in 2011; correct?

A    I don't believe so, no.

Q    So the passages that you read to us, you didn't receive; correct?

A    Correct.

Q    This is the ones not addressed to you that you're not on. You didn't send any of those; right?

A    Correct.

Q    And all you're doing is reading the e-mails; correct?

A    Correct.

Q    And, in fact, do you recall that the FBI was never banned from the jail, Men's Central Jail; right?

A    Correct.

Q    There were simply conditions that were to be fulfilled

before they could interview any inmate; right?

A    Correct.

Q    And in the e-mails we've looked at, Brown is not singled out, it's for any inmate; right?

A    Yes.

MR. STEWARD:  I have nothing further, Your Honor. Thank you.

THE COURT:  Redirect?

MR. FOX:  Yes, Your Honor.  Thank you.

REDIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Manzo, I'll start with Government Exhibit 30.  This is page 2.  Mr. Steward asked you if you were aware of any portion of Government Exhibit 30.

Were you aware of the substance of the portion that Special Agent Tanner is blowing up now?

A    Yes.

Q    How were you aware -- well, first of all, what is this portion?

A    It is the draft of the policy I wrote.

Q    Okay.  So you wrote this, and who told you to write this?

A    Greg Thompson.

Q    And were you involved in a meeting with Mr. Tanaka in which he stated this information that was in here?

A    Yes.

Q    Mr. Steward asked you about whether the conditions applied

UNITED STATES DISTRICT COURT

to any inmate.  Let me first ask you this:  What conditions were you aware of that would have to take place in order for the FBI to interview an inmate at Men's Central Jail?

MR. STEWARD:  Objection, foundation as to time.

MR. FOX:  I'll be happy to clarify that, Your Honor.

Q    (BY MR. FOX)  In August and September of 2011 after this e-mail goes out, what conditions were in place before the FBI was going to be allowed to interview any inmate at Men's Central Jail?

A    These.

Q    Okay.  Who needed to ultimately approve the visit of the FBI?

A    Initially, it was Mr. Tanaka.

Q    And Mr. Steward asked you whether this applied to any inmate.  Was part of your job to determine who the FBI was in contact with at Men's Central Jail, which inmates the FBI was in contact with?

A    Was that part of my job?

Q    Correct.

A    Yes.

Q    Who provided you with that job?

A    Lieutenant Thompson.

Q    Mr. Steward asked you questions about that August 16th court order and declaration by you; is that correct?

A    Yes.

Q    And at that time, did you know that Anthony Brown was an FBI informant?

A    I don't remember if I did or not.

Q    Was the first time you were aware that he was an informant when you received the e-mail that we went over in direct from Noah Kirk?

        MR. STEWARD:  Objection, leading.

        THE COURT:  Sustained.

Q    (BY MR. FOX)  Do you recall the Noah Kirk e-mail?

A    I do.

Q    What did that -- what information did that provide you?

A    That Brown was in contact with the civil rights division of the FBI.

Q    Did you know that information before you received that e-mail?

A    No.

Q    Mr. Steward asked you how your statements could be used against you, and you indicated that you could be prosecuted for perjury; is that correct?

A    Yes.

Q    Under what conditions would you be prosecuted for perjury?

A    Under which ones?

Q    Yeah, how could you -- what could you do today that would cause you to be prosecuted for perjury?

A    Lie.

108

MR. FOX:  One moment, Your Honor.

(Plaintiff's counsel conferred off the record.)

MR. FOX:  No further questions, Your Honor.

MR. STEWARD:  I have just one, Your Honor, if I may.

RECROSS-EXAMINATION

Q    (BY MR. STEWARD)  Who decides if you're lying?

MR. FOX:  Objection, Your Honor, argumentative.

THE COURT:  Sustained.

MR. STEWARD:  No further questions.

THE COURT:  Anything else?

You may step down, sir.

Call your next witness.

MR FOX:  The United States calls David Dahle.

THE DEPUTY CLERK:  Just stand here for me, please.

Raise your right hand.

(The witness, DAVID DAHLE, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is David Dahle.  Dahle is spelled D-A-H-L-E.

THE DEPUTY CLERK:  Thank you.

MR FOX:  One moment, Your Honor.

May I begin, Your Honor?

THE COURT:  Yes, please.

**UNITED STATES DISTRICT COURT**

DIRECT EXAMINATION

Q     (BY MR. FOX)   What do you do for a living?

A     I'm a special agent with the FBI.

Q     How long have you been a special agent with the FBI?

A     About six and a half years.

Q     What are your duties?

A     My duties are to investigate public corruption allegations in the Los Angeles area.

Q     Are you assigned to a particular squad?

A     Yes.

Q     Which squad is that?

A     It's called Public Corruption 1.

Q     How long have you been assigned to that squad?

A     Little over six years.

Q     Did there come a time in which you were assigned in an investigation involving deputies within the Sheriff's Department?

A     Yes.

Q     Approximately when did that occur?

A     That occurred approximately mid-August 2011.

Q     Had this investigation already existed, or was this a new investigation?

A     The investigation had already existed.  It was open sometime in the middle of 2010.

Q     Who were the agents involved in the investigation that

were already working on the case?

A    The agents who were already working on the case when I was assigned was Special Agent Leah Marx and Special Agent David Lam.

Q    Are you aware of what allegations were being investigated at the time that you were assigned the case?

A    Yes.

Q    As a general matter, what types of allegations were being investigated?

A    Generally, the investigation was focused on allegations that Los Angeles Sheriff's Department deputies were assaulting inmates and then charging the inmates with assault against them to cover it up.  There were also allegations that deputies were smuggling in contraband into the jail in exchange for cash bribes.

Q    Do you have a role in the investigation?  Is there a specific title that you have?

A    Yes.

Q    What is that?

A    I am a case agent.

Q    Who are the other case agents involved?

A    Currently, the other case agents are Special Agent Leah Marx and Special Agent Jason Dalton.

Q    At the time that you were assigned the case, who were the case agents?

UNITED STATES DISTRICT COURT

A    At the time I was assigned, Special Agent Marx, Special Agent David Lam, myself, Special Agent Jason Dalton were assigned around the same time to the investigation.

Q    At the time that you were assigned the investigation, did you do anything to determine whether the grand jury was being used in the investigation?

A    Yes.

Q    What did you do?

A    I was informed that grand jury subpoenas had been served on the Sheriff's Department in, around June, July of 2011 and early August 2011 for different incidents, different use of force incidents that we heard about.

Q    What are grand juries?

A    Grand juries are -- it's a body of citizens, and it is anywhere from 16 to 23 people.  They come about once a week and hear testimony and other evidence about specific cases going on.

Q    Is there a single grand jury sitting at once, or are there multiple grand juries that are sitting?

A    There are multiple grand juries sitting.

Q    And are there different types of grand juries that sit?

A    Yes.

Q    What types of grand juries are there?

A    There's an accusatory grand jury and investigatory grand juries.

**UNITED STATES DISTRICT COURT**

Q      What types of grand juries were used in this investigation?

A      Investigative grand juries were used in this investigation.

Q      What's the difference between the two?

A      The difference is that investigative grand juries hear much more testimony, much more evidence about a specific case before they make a decision on whether to indict somebody.

Q      Do you have a specific role with respect to the grand juries?

A      Yes.

Q      What role is that?

A      I was appointed to be the custodian of records for this case and several other cases.

Q      Who appointed you to be the custodian of records?

A      The grand jury.

Q      In what ways did the FBI and yourself support the grand jury?

A      We act generally as an arm of the grand jury.  We serve subpoenas on behalf of the grand jury.  We take what people produce from those subpoenas.  They give it to us.  We provide and present those things to the grand jury as documents, other pieces of evidence.  We interview people on behalf of the grand jury, and we either take those people and have them testify in the grand jury or we testify as to what they told us in the

grand jury.  Generally, that's what happens.

Q    And let's talk overall with respect to the investigation.
How many abuse incidents were part of this investigation?

A    Dozens, if not hundreds.

Q    And what years were looked at for these incidents?

A    Primarily 2009 through 2012, but there were some incidents
that we looked at from even earlier than 2009.

Q    Did it focus on certain jails?

A    Yes.

Q    Which jails did the investigation focus on?

A    The investigation focused on two jails primarily in this
case.  One was Men's Central Jail, which is about three
quarters of a mile from here.  It's a sheriff-controlled
custody facility.  Right across the street is a jail called the
Twin Towers Correctional Facility, and that's also a
sheriff-controlled jail.  Both those jails were our focus.

Q    With respect to Men's Central Jail, were there specific
floors that were focused --

A    Yes.

Q    -- part of the focus of the investigation?
     Which floors were that?

A    We heard a lot of allegations about two specific floors.
It was the 2,000 at Men's Central Jail and the 3,000 in Men's
Central Jail.  And in Twin Towers, we heard allegations about
excessive force incidents occurring on the floors that housed

inmates with mental health issues.

Q    With respect to the 2,000 and 3,000 floors, was there anything involving the inmates on those floors that made this a complicated investigation?

A    Yes.

Q    What is that?

A    Generally, the inmates housed on the 2,000, 3,000 floor, a lot of them are -- they have a history of violence.  They have lengthy, what we call rap sheets, criminal records.  It makes them, to other people, seem inherently untrustworthy.  So in this case, they were our victims.  We were looking at suspects who were law enforcement officers.  It's very hard to make a case against a law enforcement officer when your star witness is an inmate.

Q    What about the Twin Towers?  You mentioned that there were some mental health inmates that were there.  Did the same considerations apply?

A    Yes.

Q    Are you aware of whether in August of 2011 and before that, whether the Sheriff's Department had installed any cameras in Men's Central Jail where these incidents were occurring?

A    There were cameras installed in a few places in the facilities, but not in the places where most of the allegations of the excessive use of force was being committed.

Q    Is that the same with Twin Towers as well?

A    That's my understanding.

Q    Are you familiar with grand jury subpoenas as part of your duties as an FBI agent and a custodian of records for the grand juries?

A    Yes.

Q    What are grand jury subpoenas?

A    Grand jury subpoenas are court orders compelling either a person to come and testify in front of the grand jury or compelling them to produce something to give to the grand jury like a document or some other tangible item.

Q    Who generally decides whether to issue a grand jury subpoena?

A    The decision usually is made between the agents on the case in consultation with the prosecutors on the case.

Q    Are there times in which a grand jury will ask for specific subpoenas to be cut?

A    Yes.

Q    And did that happen in this case?

A    I believe they asked for certain pieces of information, and we generally tried to provide them with that if it was possible.

Q    Are you familiar with the number of grand jury subpoenas, as a general matter, that were issued in the investigation of abuse and corruption within the Sheriff's Department?

A    Generally.

Q    Okay.  Ballpark, how many grand jury subpoenas were issued?

A    I would say safely over 80.

Q    And are you familiar with how many people have testified in the grand jury with respect to this investigation?

A    Generally, yes.

Q    Approximately, again ballpark, how many are we talking about?

A    A conservative estimate would be over 80.

Q    And how many grand juries have been used over time in this investigation?

A    Several.

Q    As part of issuing subpoenas to people for their testimony, were there times in which the FBI instead would interview these people?

A    Yes.

Q    Can you please describe the circumstances in which this would occur.

A    Yeah, that actually happened quite a bit.  We would go interview somebody who was housed inside of a jail.  They'd give us information about what they witnessed or if they were a victim of something.  And then we would come back, consult with the prosecutors on the case, and then if it was determined that information was something that the grand jury -- it would be

helpful to them, then one of the agents on the case would go inside the grand jury and provide testimony to the grand jury based on what either inmate or other witness -- civilian -- told us on the outside.

Q    Based on your role as records custodian, did you become familiar with when the first subpoena was issued in this case on the Sheriff's Department?

A    Yes.

Q    Approximately when did that occur?

A    Approximately June or July of 2011.

Q    And over time, how many documents have been obtained throughout the investigation as part of this grand jury subpoena process?

A    At this point, it's over half a million.

Q    Special Agent Dahle, I want to now turn your attention to the investigation that was going on exactly during August and before that of 2011.

    First of all, are you aware of the difference between an overt and a covert investigation?

A    Yes.

Q    What is the difference?

A    The difference is a covert investigation is an investigation where the person, target or suspect that we're looking into doesn't know that we're actually investigating them.  An overt investigation is where somebody may be

knowledgeable that they're being investigated.

Q    And when you were assigned the case in August of 2011, was the investigation overt or covert?

A    It had elements of both.

Q    Can you please explain.

A    Yeah, the Sheriff's Department was aware that we were investigating excessive use of force allegations because of the subpoenas that --

MR. STEWARD:  Move to strike.  Foundation and opinion and conclusion of the witness.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. FOX)  Without getting into whether the Sheriff's Department was aware of anything, can you just describe the overt steps that were taken in the investigation when -- prior to the time that you became involved in the investigation.

A    Sure.  We served grand jury subpoenas on the Sheriff's Department.  That was overt.  That wasn't a secret.  The covert part of the investigation was the undercover operation that had -- there was FBI undercover agent, it involved Anthony Brown, the inmate, and a deputy named Gilbert Michel.

Q    With respect to the grand jury subpoenas that you mentioned that were -- that were issued in July and -- I'm sorry, June of 2011, I think it was your testimony, did that relate to a specific incident?

A    Yes.

Q    What incident was that?

A    It was a use of force incident that took place in the Twin Tower jail involving an inmate named James Parker, and the allegations were that deputies --

THE COURT:  Objection, Your Honor, relevance.

MR FOX:  Your Honor, I can establish the relevance.

THE COURT:  All right.

Q    (BY MR. FOX)  Special Agent Dahle, did this involve the ACLU?  Did this incident involve the ACLU in some manner?

A    Yes.

Q    How was that?

A    ACLU jail monitor witnessed inmate James Parker being assaulted by deputies while she was there visiting another inmate.

MR. STEWARD:  Move to strike.  Hearsay.

THE COURT:  Overruled.

Q    (BY MR. FOX)  You mentioned that the investigation was also covert based on an undercover investigation.  What was that undercover investigation?

A    It was -- it was investigation -- let me explain.  Anthony Brown was an inmate in Men's Central Jail.  He obtained information that a deputy named Gilbert Michel would bring in contraband in exchange for a cash bribe.  So the FBI agents assigned to the case -- this was before I got on the case --

UNITED STATES DISTRICT COURT

designed an operation designed to see if that was true.

There was an FBI undercover agent with a nickname of CJ. It was an alias name who communicated with Deputy Gilbert Michel and pretended to be Anthony Brown's friend outside of jail. Deputy Gilbert Michel agreed to smuggle in a cell phone in exchange for cash, took the cell phone and cash from the undercover agent and delivered the cell phone to Anthony Brown inside of the jail.

Q    Now directing your attention to when you were first assigned the case, did you learn around that time whether something had happened with respect to the cellular phone?

A    Around the time I was assigned to the case, I learned that the cell phone that Deputy Michel had smuggled in had been found by the Sheriff's Department.

MR. FOX:  Your Honor, at this time I'd like to read a stipulation.

THE COURT:  All right.

MR FOX:  The parties have agreed that Government Exhibit 80 -- and by the way, this is Exhibit 191, stipulation regarding recordings -- Government Exhibit 80 is a true and accurate recording of an interview conducted of Anthony Brown by Los Angeles County Sheriff's Department Deputies Gerard Smith and Mickey Manzo on August 19th of 2011.  Government Exhibit 81 contains true and accurate excerpts of the recording in Government Exhibit 80.  Government Exhibit 82 accurately

identifies the speakers and is an accurate transcription of Government Exhibit 81.

Second, the parties stipulate that Government Exhibit 83 is a true and accurate recording of an interview conducted of Anthony Brown by LASD Lieutenant Steven Leavins, Deputy Gerard Smith and Mickey Manzo on the morning of August 21st, 2011. Government Exhibit 84 contains true and accurate excerpts of the recording in government Exhibit 83. Government Exhibit 85 accurately identifies the speakers and is an accurate transcription of the excerpts contained on Government Exhibit 84.

Third, the parties stipulate that Government Exhibit 86 is a true and accurate recording of an interview conducted of Anthony Brown by LASD Captain William "Tom" Carey, Lieutenant Leavins, Deputy Smith and Deputy Manzo on August 23rd of 2011. Government Exhibit 87 contains true and accurate excerpts of the recording in Government Exhibit 86. Government Exhibit 88 accurately identifies the speakers and is an accurate transcription of the excerpts contained on Government Exhibit 87.

Fourth, the parties stipulate that Government Exhibits 89 and 90 are true and accurate recordings of an interview conducted of Anthony Brown by Lieutenant Leavins, Sergeant Scott Craig, Sergeant Maricela Long and Deputies Smith and Manzo on August 24th of 2011. Government Exhibit 91 contains

**UNITED STATES DISTRICT COURT**

true and accurate excerpts of the recording in Government Exhibits 89 and 90, and Government Exhibit 92 accurately identifies the speakers and is an accurate transcription of the excerpts contained on Government Exhibit 91.

Fifth, the parties stipulate that Government Exhibit 93 is a true and accurate recording of an interview conducted of Anthony Brown by Sergeants Craig and Long on August 26th, 2011. Government Exhibit 94 contains true and accurate excerpts of the recording in Government Exhibit 93. Government Exhibit 95 accurately identifies the speakers and is an accurate transcription of the excerpts contained on Government Exhibit 94.

Sixth, the parties stipulate that Government Exhibit 96 is a true and accurate recording of an interview conducted of Anthony Brown by Deputy Smith on September 2nd, 2011. Exhibit 97 accurately identifies the speakers and is an accurate transcription of Exhibit 97.

Seventh, the parties stipulate that Exhibit 98 is a true and accurate recording of an interview conducted of LASD Deputy William David Courson on August 30th of 2011. Government Exhibit 99 accurately identifies the speakers and is an accurate transcription of Government Exhibit 98.

Eighth, the parties stipulate that Government Exhibits 100 and 101 are true and accurate recordings of an interview conducted of LASD Deputy Gilbert Michel, by Lieutenant Leavins,

Sergeant Scott Craig and Maricela Long on August 30th of 2011. Government Exhibit 102 contains true and accurate excerpts of the recordings in Government Exhibits 100 and 101.  Government Exhibit 103 accurately identifies the speakers and is an accurate transcription of Government Exhibit 102.

Only three more.

Ninth, Government Exhibit 104 is a true and accurate copy of a voicemail message -- voicemail message Sergeant Craig recorded on September 9th, 2011.  Exhibit 105 is an accurate transcription of Exhibit 104.

Tenth, Exhibit 106 is a video recording that fairly and accurately depicts an encounter between LASD Sergeants Craig and Long and Federal Bureau of Investigation Special Agent Leah Marx on September 26, 2011.  Exhibit 107 is a fair and accurate audio recording of that encounter.  Exhibit 108 accurately identifies the speakers and is an accurate transcription of Government Exhibit 107.

And finally, the parties stipulate that Exhibit 110 is a fair and accurate recording of a portion of a telephone conversation that occurred between LASD Sergeant Maricela Long and FBI Supervisory Special Agent Carlos Narro on September 26, 2011.  Exhibit 111 accurately identifies the speakers in Government Exhibit 110 and is an accurate transcription of that exhibit.

Your Honor, I now move to admit Exhibits 81, 84, 87, 91,

94, and 96.

MR. STEWARD:  Your Honor, no objection, except to the one involving witness Courson, which we stipulated to the foundation.  We don't stipulate to the relevance, and we believe it's irrelevant to the trial.

MR FOX:  Your Honor, at this point, I've not moved for that one to be part of evidence.  I just read the stipulation related to that one.

MR. STEWARD:  Fair enough.

THE COURT:  All right.  They'll be received.

(Exhibit Nos. 81, 84, 87, 91, 94, and 96 received into evidence.)

Q    (BY MR. FOX)  Special Agent Dahle, I'm now going to play from Exhibit 81, which is the excerpts from Exhibit 80.

First of all, how did you obtain Exhibit 80 as part of the investigation?

A    The Sheriff's Department produced these recordings after we gave them a subpoena and requested them.

MR. FOX:  So I'm going to play right now, Your Honor, Excerpt 1 from Exhibit 80.

THE COURT:  Do you have transcripts that you --

MR FOX:  They will sync on there.  If the jury would prefer, I also have jury binders.  So if we want to give them a preference, I can hand them out.

THE COURT:  We can either give you a binder with a

transcript that you can following along, or on the screen, I believe there will be a written transcript that will follow along.

Why don't we try this one, and then if you have a preference, if you want the binders we'll hand those out.

And before you do that, ladies and gentlemen, the parties have agreed to certain facts that have been stated to you. You should, therefore, treat these facts as having been proved.

MR FOX:  Thank you, Your Honor.  Now I'm playing this first cut.

(Exhibit 80, Excerpt 1, played in open court.)

MR FOX:  Your Honor, do you want me to continue, or do you want to pass out the binders?

THE COURT:  Does anybody want a binder?

Okay.  You're about to hear a recording that's been received into evidence.  A transcript of the recording is being provided to help you identify the speakers and to help you decide what the speakers say.  Remember that the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully, the transcript will not be available during your deliberations.

MR FOX:  Your Honor, may I have one second?

(Plaintiff's counsel conferred off the record.)

MR FOX:  Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

I'm now going to play the second excerpt.

(Exhibit 80, Excerpt 2, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, we heard in the first clip that this happened on August 18th.  When is this in comparison to when you were first assigned the case?

A    I was assigned the case around this time.  I don't remember the specific date, but it was around this time.

Q    And we just heard the voice of Anthony Brown; is that correct?

A    That's correct.

Q    And who did you know Anthony Brown to be, or who do you know him to be now?

A    He was an inmate housed in Men's Central Jail.  He was the inmate who was part of the undercover operation.  He was the inmate who Deputy Gilbert Michel smuggled the phone into.

THE COURT:  I'm going to play now the third clip.

(Exhibit 80, Excerpt 3, played in open court.

Q    (BY MR. FOX)  Special Agent Dahle, are you aware of the identities of the people who were involved in the investigation in seeing Anthony Brown before you were involved?

A    I'm not -- I've never met them, but they were undercover FBI agents.

Q    And the one -- are you familiar with someone named CJ as an undercover name?

A    That was a name that an undercover agent went by.

**UNITED STATES DISTRICT COURT**

Q    Was he male or female?

A    He was male.

Q    And I believe you had mentioned a David Lam and Leah Marx at the time, and I guess their genders, please.

A    Leah Marx is female.  David Lam was a male.  They were interviewing several inmates in the Men's Central Jail from 2010, 2011.

Q    All right.

        MR. FOX:  Now I'm going to play clip number 4.

    (Exhibit 80, Excerpt 4, played in open court.)

        MR FOX:  I'm now going to play clip 5.

    (Exhibit 80, Excerpt 5, played in open court.)

        MR FOX:  Now playing the 6th.

    (Exhibit 80, Excerpt 6, played in open court.)

        MR FOX:  Now the next clip.

    (Exhibit 80, Excerpt 7, played in open court.)

        MR FOX:  Now the next clip.

    (Exhibit 80, Excerpt 8, played in open court.)

        MR FOX:  The next one.

    (Exhibit 80, Excerpt 9, played in open court.)

        MR FOX:  And the next.

    (Exhibit 80, Excerpt 10, played in open court.)

        MR FOX:  Next clip.

    (Exhibit 80, Excerpt 11, played in open court.)

    (Exhibit 80, Excerpt 12, played in open court.)

**UNITED STATES DISTRICT COURT**

MR FOX:  Next clip.

(Exhibit 80, Excerpt 13, played in open court.)

MR FOX:  Next clip.

(Exhibit 80, Excerpt 14, played in open court.)

MR FOX:  And, Your Honor, just for your planning purposes, I think there's about ten more minutes of this.  I can certainly continue, but I'll stop whenever you tell me to.

Playing the next clip.

(Exhibit 80, Excerpt 15, played in open court.)

MR FOX:  Next clip.

(Exhibit 80, Excerpt 16, played in open court.)

(Exhibit 80, Excerpt 17, played in open court.)

(Exhibit 80, Excerpt 18, played in open court.)

(Exhibit 80, Excerpt 19, played in open court.)

MR FOX:  And the last clip from this exhibit.

(Exhibit 80, Excerpt 20, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, we heard a reference to Mr. Smith saying Twin Towers in the recordings and investigations going on there.  That subpoena that you mentioned in June of 2011, where did that incident take place that was the subject of that subpoena?

A    Twin Towers.

Q    And there was also a mention to a Christmas party that Mr. Smith made, probably since a Christmas party.  Are you aware of allegations that were made regarding a Christmas party

in 2010?

A      Yes, the allegations were that --

MR. STEWARD:  Objection, nonresponsive.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  The allegations were that deputies who worked in the visiting portion of Men's Central Jail were beat up by deputies who worked in the 3,000 of Men's Central Jail, and it was -- it created a lot of media attention for the Sheriff's Department.

MR. FOX:  Your Honor --

MR. STEWARD:  Move to strike.  Nonresponsive. Irrelevant.

THE COURT:  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it, including looking online.  Do not do any research such as consulting dictionaries, searching the Internet or using other

reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at five after the hour.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR FOX:  Should we excuse the witness, Your Honor?

THE COURT:  Yes, you may step down.  Thank you.

Okay.  Do you wish to be heard on counsel's objection?

MR FOX:  I heard multiple objections, Your Honor.  I think it was nonresponsive, and I think it was responsive to my question.  I don't recall what the other --

THE COURT:  I think he also objected on relevancy grounds.

MR FOX:  And if you look at Government Exhibit 9, it discusses the exact same incident that Special Agent Dahle's talking about.  It's just providing the context to what Mr. Smith meant by Christmas party, which is also again reflected in Government Exhibit 9, which is an e-mail that the defendant received.

MR. STEWARD:  Your Honor, our position is that the

unfortunate event of a bunch of drunken, off-duty deputy sheriffs beating each other up is not relevant to the case. It's 403 and should not come before the jury.

THE COURT:  All right.  We'll resolve that when I get back.

MR FOX:  And, Your Honor, just so you understand the 403 grounds we're going to move on.  It's not like we're going to ask any more questions of this witness of this issue, so it's not going to delay anything in any way.  Thank you.

THE COURT:  All right.  Thank you very much.

(Off the record at 11:49 a.m.)

(On the record at 12:06 p.m.)

THE COURT:  All right.  Let's bring the jury in.  The objection is overruled.  The answer will stand.

MR FOX:  Would you like the witness on the stand too, Your Honor?

THE COURT:  Yes, please.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR FOX:  May I resume, Your Honor?

THE COURT:  Yes, please.

Q    (BY MR. FOX)  Special Agent Dahle, I want to now turn your attention to Exhibit 84, which is the excerpts of the August 21st, 2011 recordings.  How did you obtain this -- these recordings?

A    These recordings were made by the Sheriff's Department. We served them with subpoena and compelled them to produce them.

MR. FOX:  I'm going to now play -- and, Your Honor, this will be synched as well -- the first excerpt from that exhibit.

(Exhibit 84, Excerpt 1, played in open court.)

(Exhibit 84, Excerpt 2, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, what bureau did Mr. Leavins work for?

A    He worked for the Internal Criminal Investigations Bureau, also known as ICIB.

MR. FOX:  Play the next excerpt.

(Exhibit 84, Excerpt 3, played in open court.)

MR FOX:  Playing the next clip.

(Exhibit 84, Excerpt 4, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, Anthony Brown just referenced a Deputy Bravo.  Do you know who Deputy Bravo is?

A    Yes.

Q    What is his name?

A    His name is Deputy Justin Bravo.

Q    Do you know if he's related to anybody in the Sheriff's Department?

A    Yes.

Q    What is that based on?

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  Objection, relevance.

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

THE COURT:  Was your objection to the last question as to what that's based on or --

MR. STEWARD:  No, the next one actually that's coming up about who Bravo's relative is.  It has nothing to do with this case.

MR FOX:  Very simply, Your Honor, Justin Bravo is the nephew of Leroy Baca, so they were aware of -- or they believed that part of the investigation involved Leroy Baca's nephew, which I think provides motivation.

MR. STEWARD:  Except that he's not part of this case.  He wasn't part of Sexton.  He wasn't part of any of that.  It's a totally different investigation, as I understand it.

MR FOX:  Your Honor, it's part of -- we do consider Mr. Baca to be a coconspirator, and I think that his plea agreement points to that.

THE COURT:  Okay.  The objection's overruled.

(End of sidebar discussions.)

MR FOX:  May I continue, Your Honor?

THE COURT:  Yes, please.

Q    (BY MR. FOX)  What is your knowledge of Mr. Bravo's relation to anybody in the Department based on?

A     It's based on my review of his personnel file.

Q     And according to the personnel file, who is Mr. Bravo related to?

A     His uncle is former sheriff Lee Baca.

MR. FOX:  We'll play the next clip.

(Exhibit 84, Excerpt 5, played in open court.)

MR. FOX:  Next clip.

(Exhibit 84, Excerpt 6, played in open court.)

MR FOX:  And the next clip.

(Exhibit 84, Excerpt 7, played in open court.)

MR FOX:  Next clip.

(Exhibit 84, Excerpt 8, played in open court.)

MR FOX:  And the next.

(Exhibit 84, Excerpt 9, played in open court.)

MR FOX:  Next clip.

(Exhibit 84, Excerpt 10, played in open court.)

MR FOX:  Next clip.

(Exhibit 84, Excerpt 11, played in open court.)

MR FOX:  Next one.

(Exhibit 84, Excerpt 12, played in open court.)

MR FOX:  The next one.

(Exhibit 84, Excerpt 13, played in open court.)

MR FOX:  And the next.

(Exhibit 84, Excerpt 14, played in open court.)

MR FOX:  And now playing the last clip.

**UNITED STATES DISTRICT COURT**

(Exhibit 84, Excerpt 15, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, up until that date, August 21st of 2011, had you ever met with Anthony Brown?

A    No.

Q    Have you ever met with Anthony Brown as of now?

A    Yes.

Q    When was the first time you met with him?

A    First time I met with Anthony Brown was August 23rd, 2011, two days after that last interview that we just listened to.

Q    Where did you interview him?

A    I interviewed him at Men's Central Jail.

Q    Who were you with when you interviewed him?

A    I was with Special Agent Leah Marx and Special Agent Wayne Plympton.

Q    Where at Men's Central Jail did you interview Anthony Brown?

A    We interviewed him at a section of the jail called the 6,000 area.  It's the first floor of the jail.  There's interview rooms for any type of law enforcement to interview inmates.  Usually the inmates are brought down by deputies from other parts of the jail.  They bring them to the room, and we go in the room and interview them, and that's what happened that day.

Q    What was the purpose of meeting with him that day?

A    The purpose was because we had heard that the phone had

UNITED STATES DISTRICT COURT

been found, and we wanted to know what the circumstances were regarding that.

Q     Do you remember what time you met with him?

A     We met with him approximately 10:40 a.m.

Q     What was the process that you engaged in in order to get to the place where you were able to interview Anthony Brown?

A     We went to the jail.  We parked in the parking lot.  I think we secured our weapons in the car before we went into the facility.  We went into the facility through the public entrance where there's like a bench where you check in with a deputy.  Then we went down a corridor that goes into the jail.

And then inside the jail, we checked in with a deputy who we gave our IDs to and told him, "We want to interview this inmate."  He said, "Okay."  They opened the gates for us, led us into the secured portion of the jail.  We went to the watch commander's office, also told them, "Hey, we want to meet with inmate Anthony Brown."  "Okay."

So then we went to the 6,000 area where the interview rooms are, and deputies brought down Anthony Brown, and we just started interviewing.

Q     Was Mr. Brown handcuffed when you met with him?

A     Yes.

Q     And could you please describe in the 6,000 room whether there's anything separating you and the inmate.

A     No.  There's just a table in there.  It was a very small

room with no windows, kind of like a closet.

Q    Without getting into what exactly was said, I just want to go over the subject matter of what you discussed with Anthony Brown that day.  Can you please describe the subjects that you covered with him on the 23rd.

A    Yeah, we covered how -- the circumstances of how the phone was found, what had happened after the phone was found, generally those things.

Q    Did anything unusual happen during your interview of him?

A    Yes.

Q    What happened?

A    About an hour and ten minutes, give or take a few minutes, the door to the room was thrown open, and a very big sergeant with the last name Waterman, he entered the doorway and started shouting, "This interview's over.  Who gave you permission to interview this inmate?  He's not to be interviewed."

       Right then, a bunch of deputies ran in, grabbed Anthony Brown and took him out of the room very quickly, and we were confused.  I remember watching as they were taking him away --

       MR. STEWARD:  Objection, nonresponsive at this point.

       MR. FOX:  I'll be happy to ask --

       THE COURT:  Next question.

       MR FOX:  Thank you, Your Honor.

Q    (BY MR. FOX)  And as the deputies were grabbing Anthony

Brown and bringing him out of the room, what, if anything, did anyone from the FBI say?

A    Special Agent Leah Marx told him, "We'll be back for you," something to that effect.

Q    Special Agent Dahle, I want to now play Government Exhibit 87, which is the excerpts of an August 23rd recording that the Sheriff's Department made.

How did you obtain this recording?

A    Same process:  We served a subpoena on the Sheriff's Department compelling them to produce this recording.

MR FOX:  I'm going to play the first clip now.

(Exhibit 87, Excerpt 1, played in open court.)

Q    (BY MR. FOX)  Based on this time, when was this in relation to your interview of Anthony Brown?

A    This is about an hour and a half after Anthony Brown was taken out of our interview.

MR FOX:  Playing the next clip.

(Exhibit 87, Excerpt 2, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, I have a couple follow-up questions based on what we just heard.  We've heard Anthony Brown a few times now make reference to Leroy Baca's nephew, Justin Bravo, as someone who gave him a phone, and Mr. Brown said that was part of an undercover operation.

Was that part of an undercover operation?

A    No, that was not true.

Q    And right there, Mr. Brown was talking about paperwork, and I think it was Mr. Carey referenced that "maybe the feds took it."

Did -- on August 23rd, did you take any paperwork from Anthony Brown?

A    No.

MR. FOX:  I'm going to play the third clip from this exhibit.

(Exhibit 87, Excerpt 3, played in open court.)

MR FOX:  Next clip.

(Exhibit 87, Excerpt 4, played in open court.)

MR FOX:  And the next clip.

(Exhibit 87, Excerpt 5, played in open court.)

MR FOX:  The next one.

(Exhibit 87, Excerpt 6, played in open court.)

MR. FOX:  Next clip.

(Exhibit 87, Excerpt 7, played in open court.)

MR. FOX:  Next clip.

(Exhibit 87, Excerpt 8, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, Anthony Brown referred to a Director Wayne.  What was the title of Wayne Plympton who you went with on August 23rd to the jail?

A    Wayne Plympton was a special agent, just like myself and Special Agent Leah Marx.  He was just older.

MR. FOX:  Now I'm going to play the last clip.

**UNITED STATES DISTRICT COURT**

(Exhibit 87, Excerpt 9, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, in this recording, we heard Mr. Leavins telling Anthony Brown he'd be moved to a station jail.  I want to have you look at Exhibit 27.

MR FOX:  And, Your Honor, I move for the admission of this exhibit.

MR. STEWARD:  Same objection, Your Honor.

THE COURT:  Overruled.  It will be received.

(Exhibit No. 27 received into evidence.)

MR FOX:  I'm going to publish it now.

Q    (BY MR. FOX)  Special Agent Dahle, can you read this e-mail from Steve Spackman on August 24th, 2011 at 10:03 a.m. to Tom Carey and others.

A    "Subject re:  Tom, Lyons at [sic] I are scheduled to attend a meeting today at 1300 hours in SCV with L.A.P.D., SCV and the FBI, re a group called the Yamasee.  Are you going to need him, me or anyone else in my crew for a Dimas operation today?"

Q    It says here Robert Lyons's e-mail address was fbi.gov.

Do you know whether he was an FBI agent or affiliated with somebody else?

A    Robert Lyons was not an FBI agent.  He was a sheriff's deputy who was assigned to an FBI task force.

Q    Did he work with civil rights or public corruption in any way?

**UNITED STATES DISTRICT COURT**

A      No.

Q      Now showing you the 10:05 a.m. e-mail on the same date, August 24th, from Tom Carey to Steve Spackman, what does this state?

A      It says "We will not.  The inmate takes too many meds to house him at San Dimas."

MR. FOX:  Your Honor, I'm now going to begin playing excerpts from Exhibit 91 which are part of the recordings of Exhibit 89 and 90 from August 24th.

THE COURT:  Again, ladies and gentlemen, you're about to hear a recording that's been received into evidence. A transcript of the recording is being provided to help you identify the speakers and help you decide what the speakers say.  Remember that the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully, the transcript will not be available during your deliberations.

MR FOX:  Thank you, Your Honor.

(Exhibit 91, Excerpt 1, played in open court.)

MR FOX:  Playing the second clip.

(Exhibit 91, Excerpt 2, played in open court.)

MR FOX:  Next clip.

(Exhibit 91, Excerpt 3, played in open court.)

MR FOX:  The next clip.

(Exhibit 91, Excerpt 4, played in open court.)

MR FOX:  And the final clip from that exhibit.

(Exhibit 91, Excerpt 5, played in open court.)

Q    (BY MR. FOX)  Special Agent Dahle, after you left Men's Central Jail on August 23rd, did you do anything with respect to Gilbert Michel?

A    Yes.

Q    What did you do?

A    Myself, Special Agent Marx, Special Agent Plympton, Special Agent David Lam, Special Agent Farrell Binder approached Deputy Michel at his residence and presented evidence to him of the bribery operation that had occurred. There was a video showing that he took the phone and the cash. We confronted him with the other evidence in the case -- not myself, but the other agents did -- and asked him to see if he would cooperate with our investigation.

Q    Do you remember when this occurred?

A    It occurred sometime in the afternoon on August 24th, 2011.

Q    What was the purpose of approaching him?

A    The purpose was to see if he would give us information about other deputies doing similar things, if he knew about the beatings, if he knew about other deputies willing to take bribes.

Q    You mentioned that the -- it was presented to him that he

**UNITED STATES DISTRICT COURT**

had the possibility of cooperating.  After that day, was it clear whether he was going to cooperate or not?

A    It wasn't clear.  It was kind of left up in the air.

Q    Was there anything done with respect to Gilbert Michel's girlfriend on that date by the FBI?

A    Yes.

Q    First of all, who was she?

A    At that time, Deputy Michel had a girlfriend named Angela Caruso.  She was also a deputy, and we weren't sure what her role, if any, was in the bribery scheme.  At the same time that agents approached Deputy Michel, other agents approached Angela Caruso, and they served Angela Caruso with a grand jury subpoena for a date when she would have to come and testify in front of the grand jury.

Q    In addition to the approach of Mr. Michel and Ms. Caruso, were there any other ways in which the investigation became overt around that time?

A    Yes.

Q    In what ways?

A    A grand jury subpoena -- or several subpoenas were served on the Sheriff's Department that called for numerous documents related to deputies and inmates linked to excessive force incidents in the jail.

Q    What ultimately happened with Gilbert Michel?

A    Gilbert Michel ultimately decided to cooperate a few weeks

later, and he ultimately pled guilty to the bribe.

MR. FOX:  One moment, Your Honor.

(Plaintiff's counsel conferred off the record.)

MR FOX:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  You started working with Deputy Marx on this particular case in summer of 2011?

A    Sometime mid-August 2011.

Q    Okay.  And at that point, how long had you been an FBI agent?

A    About two years.

Q    And what types of assignments had you had prior to August of 2011?

A    All my cases generally involved public corruption investigations in some kind of manner, fraud.  I was on a public corruption squad.  So, I mean, that was generally what we were doing.

Q    And you were first put on a public corruption squad as soon as you graduated from the FBI academy?

A    That's correct.

Q    Okay.  And that would have been 2009?

A    I graduated from the academy in December 2009.  I started working in Los Angeles in January 2010 approximately.

Q    Did you replace Agent David Lam?

A    It wasn't like I replaced him.  It's that the case was transferred from the civil rights squad to the public corruption squad, and I was added to the case.

Q    Okay.  He left the case at some point; right?

A    That's correct.

Q    Was he removed?

A    No.

Q    What were the circumstances of his leaving the investigation in this case?

A    I think he was just asked if he still wanted to be on the case, and since he was on the civil rights squad, I don't think he wanted to be transferred with the case to public corruption. I think he was given a choice.

Q    That's your understanding?

A    That's my understanding.

Q    You indicated that Deputy Michel started cooperating a week or two after you initially approached him?

A    It was a few weeks after.

Q    Okay.  And as soon as you were certain that he would cooperate, you didn't need Anthony Brown anymore; correct?

A    I wouldn't say that we didn't need him.

Q    Let me be more specific.  There was no need for Brown's testimony after that?

A    I wouldn't say that either.

UNITED STATES DISTRICT COURT

Q    Well, you actually have said that before, haven't you?

A    It depends how you ask the question.  I think we needed Anthony Brown -- depending on what investigation you're talking about, if it related specifically to the bribe that Gilbert Michel brought in, then I think it's a fair characterization that we didn't need him for that since Gilbert Michel confessed.

Q    Do you recall testifying in U.S. vs. Sexton on September 10th, 2014?

A    That was -- I testified in that trial.  I don't know if that was the day, but I assume you're correct if you're reading from the transcript.

Q    Fair enough.  Do you recall being asked --

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

THE COURT:  If you want to impeach somebody with prior testimony, simply give me the page number and the line, and I'll give you a chance to read it, voice any objection, read it and move on.

MR. STEWARD:  Okay.  Fine.

(End of sidebar discussions.)

(Counsel conferred off the record.)

MR. STEWARD:  And, Your Honor, I've pointed out to counsel that this is the Sexton case, September 10th, 2014. The page numbers are obliterated by the PACER filing, but it

does have a page number of 24 at the top.

MR FOX:  Your Honor, unfortunately, I cannot -- we're looking in two separate things, so I can't figure out in here what number 24 is unless I'm given some time.

MR. STEWARD:  In order to save time, I'll move on.

Q    (BY MR. STEWARD)  Now, on the August 23rd meeting with Anthony Brown, I think you testified you spoke with him for approximately an hour; is that right?

A    About.

Q    I'm sorry, I didn't hear.

A    Yeah, that's true.  It was about an hour.

Q    Okay.  And he was not handcuffed; is that correct?

A    I think he was handcuffed.

Q    Was he handcuffed with his wrists?

A    I think so.

Q    Okay.  How about his legs, were they cuffed as well?

A    It's possible.  I don't remember if his legs were cuffed.

Q    Do you recall asking -- well, let me back up.

A deputy brought him to you; is that correct?

A    That's correct.

Q    Okay.  Just one deputy?

A    No, there were several.

Q    Okay.  And the several, did you ask them to remove his cuffs?

A    Yes.

Q    And they complied?

A    They said that if we wanted his cuffs removed, a deputy would have to sit in on the interview, and so we decided that we would rather interview him without a deputy there.  So the cuffs stayed on.

Q    Let me fast forward an hour.  Do you recall Sergeant Waterman, very large deputy, coming in and telling you that the interview was terminated because Brown was not handcuffed?

A    That's definitely not why it was terminated.

Q    Well, that's not what I asked.

Did he tell you that?

A    No, he didn't tell us that.

Q    Now, at the conclusion of the interview with Brown, the three of you were asked to wait in the watch commander's office by one of the deputies; correct?

A    Correct.

Q    Okay.  And you were not escorted out of that room by deputies; correct?

A    No.

Q    I'm sorry, must be a bad question.

Were you or weren't you escorted out of that room?

A    I mean, we weren't physically escorted out.  I mean, they asked you go to the watch commander's office.

Q    They didn't say, Get out of the building, or, Get lost, or anything like that; correct?

A    Not in words.

Q    What do you mean by that?

A    It wasn't a friendly tone.

Q    Okay.

A    But...

Q    And you didn't go to the watch commander's office, did you?

A    No, we did.

Q    Okay.  And how long were you there?

A    I'd have to estimate somewhere between 5 and 15 minutes.

Q    Okay.  And you understood that -- I believe he was captain at the time -- Captain Tom Carey was coming to speak with you from another location?

A    Somebody told us he was coming and asked us if we would wait until he got there.

Q    And you declined to do that; correct?

A    We didn't decline, but ultimately we left.

Q    You went ahead and left; right?

A    Yes.

Q    Why'd you leave?

A    We waited for a period of time and ultimately decided we should just leave because we, one, needed to talk to our supervisors, and we really wouldn't tell anything to Captain Carey even if he showed up because there's secrecy rules, and we wanted to tell our supervisors what had happened.  It was

disconcerting.

Q    Okay.

A    You know, it was several reasons.

Q    But at this point -- and we're talking August 23rd, 2011 -- by this point, Sheriff's Department personnel knew that the phone they discovered back on August 8th was an FBI cell phone; right?

A    I believe they knew.

Q    Okay.  And you didn't want to discuss that with them, given the fact that they knew it was an FBI phone; right?

A    I don't think it's what I wanted.  It's because there are rules about what we can tell people, and we can't talk about grand jury investigations.  So we just left.

Q    And after August 23rd, did you ever seek to interview Anthony Brown again?

A    Yes.

Q    When was that?

A    He was transported to state prison on September 12th, and I think agents went and talked to him around that date.

Q    Did you ever seek to interview him again between August 23rd and September 12th, the time he was still at the county jail?

A    I don't think any agents physically went down there to interview Anthony Brown.

Q    Are you aware of any agents physically -- not

**UNITED STATES DISTRICT COURT**

physically -- calling the jail and asking to speak with him?

A    I'm not aware.

Q    Did you become aware that there were procedures that would have allowed any FBI agent to interview him if they were followed?

A    We learned -- what -- at what time are you talking about?

Q    I'm sorry, my fault.  After August 23rd, but before September 12th when he left.

A    I didn't know of any procedures.  I didn't know what was going on in the jails personally.

Q    And you -- I'm sorry.  In your role as co-case agent in this case, are you aware of the beginnings of the relationship between Brown and the FBI?

A    Just from reading reports.

Q    Do you know who approached who?

A    I'm not sure how the relationship started.  There was interviews in the jail, and a relationship was formed after that.

Q    So you don't know whether your co-agents approached Brown first or Brown somehow approached the FBI?

A    I could speculate, but I don't know 100 percent why.

Q    That's fine, thank you.

     Now, we heard in the recordings, a few of the beginning recordings Deputy Smith referred to his boss.  Did you hear that as we went through these tapes?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    Okay.  And then farther along, it sounded like Smith was introducing Lieutenant -- I think it was, at the time, Leavins as his boss.  Did you hear that as well?

A    Yes, I did.

Q    And as you sit there today, do you believe that Smith's boss was Lieutenant Leavins at that time in 2011?

A    I think there's different ways to answer that question.

Q    That's a lousy question.  I'll ask a different one.

Did we hear Paul Tanaka on any of those recordings?

A    His voice, no.

Q    You did hear Lieutenant Leavins say that his primary concern was for Brown's safety.  You heard that; right?

A    That's what he said.

Q    Okay.  And you heard that on the tape, that Leavins said it; right?

A    He did say that.

Q    Any reason to doubt that that's what he told Anthony Brown?

          MR FOX:  Your Honor, objection to relevance.

          THE WITNESS:  I'm not sure what he was thinking.

          THE COURT:  Excuse me one second.  There's an objection pending.

     Sustained.

Q    (BY MR. STEWARD)  And he specifically mentioned danger

UNITED STATES DISTRICT COURT

from deputies in that facility; isn't that true?

A     That's what he said.

Q     Now, Anthony Brown lied a number of times when he was talking to the FBI; correct?

A     I believe so, yes.

Q     He gave a couple of different stories initially; right?

A     Correct.

Q     And did Wayne Plympton introduce himself to Brown as the director?

A     No, Special Agent Plympton never said he was a director. I think that was a misunderstanding because Agent Plympton looked older.  He had gravitas, I think.  I think that was the reason why.

Q     I'm not going to ask you what older is.

      He also said Brown said he'd had cell phones for two years.  Was that a lie?

A     That was a lie.

Q     How long had he had that -- well, let's start with this: Had he had two different phones?

A     No.

Q     And when did he get the one phone that he had?

A     July 2011, I believe.

Q     Mr. Fox asked you about, apparently, an incident where a bunch of deputies beat each other up.  You have that in mind?

A     Yes.

Q    Are you aware, in your role in this case, that Paul Tanaka was on the disciplinary panel that reviewed that incident?

MR FOX:  Objection to the form of the question. Also relevance.

THE COURT:  Why don't you rephrase the question.

Q    (BY MR. STEWARD)  In connection with your investigation of this case, and specifically your looking into the incident where the deputies beat each other up, are you aware that disciplinary action was taken against them?

A    Yes.

Q    Are you aware that Mr. Tanaka was part of the disciplinary panel that reviewed the incident?

A    No.

Q    Are you aware that most of those deputies were fired?

A    Yes.

Q    And the ones who weren't fired were disciplined.  Do you understand that as well?

A    I believe so.

Q    Thank you.

MR. STEWARD:  Nothing further, Your Honor.

MR FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. JAUREGUI:  Your Honor, the government calls Judy Gerheardt.

THE COURT:  All right.

THE DEPUTY CLERK:  Stand here for me, please, and raise your right hand.

(The witness, JUDY GERHEARDT, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Judy Gerheardt, G-E-R-H-A-R-D-T.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Are you currently employed?

A    I am.

Q    How are you employed?

A    I work for the Los Angeles County Sheriff's Department.

Q    And how long have you been employed by the Sheriff's Department?

A    35 and a half years.

Q    What is your current rank in the Department?

A    I'm a commander.

Q    And how long have you held the rank of commander?

A    Six weeks.

Q    In August and September of 2011, Commander Gerheardt, what position did you hold within the Sheriff's Department?

A    I was a lieutenant assigned to the Risk Management Bureau.

Q    And what is the Risk Management Bureau?

UNITED STATES DISTRICT COURT

A       The Risk Management Bureau is an organization within the Sheriff's Department that oversees civil litigation, responds to requests for public records, maintains a personnel performance index and corrective action plans, those types of activities for employee-based conduct.

Q       And how long were you the captain of that bureau?

A       I was the captain there for just under three months, and I was a lieutenant there for seven years.

Q       And what were your responsibilities -- what were your responsibilities in the Risk Management Bureau?

A       In my role of a captain or lieutenant?

Q       In your role as lieutenant.

A       In my role as lieutenant, I was the discovery unit lieutenant which means that I oversaw the Sheriff's Department's response to Pitchess motion, which is a state court motion that involves police personnel records.  I oversaw the public records response -- responses from the Sheriff's Department, and I oversaw the personnel performance index, commonly known as PPI.

Q       And when you talk about responding to public records requests, would that also include responding to subpoenas for documents?

A       Depending on the nature of the subpoena, yes.

Q       Okay.  As a result of your work in the Risk Management Bureau, Commander Gerheardt, are you familiar with the

Department's recordkeeping structure?

A    Yes.

Q    And were you familiar with the Department's recordkeeping structure in 2011?

A    Yes.

Q    And in 2012?

A    Yes.

Q    Okay.  Do you know whether the Sheriff's Department produced records to the United States government in response to subpoenas -- grand jury subpoenas issued in the summer of 2011?

A    Yes, I'm well aware.

Q    Okay.  And did you have a role in producing documents at the Sheriff's Department -- I'm sorry, did you have a role in producing Sheriff's Department documents to the federal grand jury?

A    I did.

Q    And what was your role, Commander Gerheardt?

A    I oversaw the coordination of gathering of that information, tracking and log it and producing it to counsel subsequent to subpoenas.

Q    Okay.  I'm going to direct you to some exhibits now in front of you, Commander Gerheardt, and if I can direct you to Exhibit Number 11, please.

A    Yes, sir.

Q    Okay.  Do you recognize that document?

A      I do.

Q      And how do you recognize it?

A      It is an e-mail from myself to Lieutenant Steve Leavins, dated 8/15/2011 at 11:01 a.m.

            MR. JAUREGUI:  Your Honor, the government moves to admit Exhibit Number 11.

            MR. STEWARD:  Same objection, Your Honor.

            MR. JAUREGUI:  Your Honor, I would just note Ms. Gerheardt is on that e-mail.

            MR. STEWARD:  Oh, and I withdraw my objection.

            THE COURT:  All right.  It will be received.

      (Exhibit No. 11 received into evidence.)

            MR. JAUREGUI:  Thank you, Your Honor.

Q      (BY MR. JAUREGUI)  Approximately -- and if you could take a look at that exhibit, please, Commander Gerheardt.

A      Yes, sir.

            MR. JAUREGUI:  And if I can ask AUSA Fox to please publish Exhibit 11.

Q      (BY MR. JAUREGUI)  Is there an attachment to that exhibit, Commander Gerheardt?

A      Yes, sir.

Q      What is the attachment?

A      It is a copy of a federal subpoena numbered 1004.

Q      And generally speaking, what is it that the subpoena is requesting?

                    UNITED STATES DISTRICT COURT

A    It requests documents regarding a particular force incident and several employee information regarding employees of the L.A. County Sheriff's Department.

Q    Okay.  You mentioned that you had forwarded this document to Lieutenant Leavins; is that correct?

A    Yes, sir.

Q    And who was Lieutenant Leavins at that time?

A    Lieutenant Leavins was a lieutenant that was assigned to the Internal Criminal Investigation Bureau, commonly known as ICIB.

Q    And was he in a specific subsection of the ICIB?

A    He was the operations lieutenant.

Q    Did Lieutenant Leavins have a role within something called -- are you familiar with something called the task force?

A    Yes.

Q    How are you familiar with that?

A    The task force was created about this time in August 2011 regarding use of force in the jail.

Q    And do you know, Commander Gerheardt, whether Lieutenant Leavins played a role in that task force?

A    Yes, he led the task force.

Q    Okay.  Did the task force have anything to do with a cell phone found on an inmate named Anthony Brown?

A    Yes.

Q    And what is your understanding of what the task force --
what the task force's role was in that event?

A    My understanding was that the task force was created to
investigate uses of -- incidents of use of force in the jail.
Within that scope, there was an incident of the cell phone that
was found on inmate Anthony Brown, and that fell into that task
force arena.

Q    And, Commander Gerheardt, did you receive subpoenas before
this subpoena that we're looking at, now and after?

A    Yes.

Q    And in the summer to fall time frame of 2011, did you
provide copies of those subpoenas to anyone?

A    Some of them, yes.

Q    And to whom did you provide the subpoenas?

A    To Lieutenant Leavins.

Q    Did you also create any reports relating to the work you
were doing responding to the subpoenas?

A    Yes.

Q    And what did you do with those reports?

A    I forwarded them to Lieutenant Leavins.

Q    Did you forward them to anyone else?

A    I believe I forwarded them to Lieutenant Leavins, Captain
Tom Carey and Ms. Michelle Miller.

Q    And who were they?

A    Captain Tom Carey was the captain of Internal Criminal

Investigations Bureau, and Michelle Miller is a civilian employee who was working as a staff with the task force.

Q    And, Commander Gerheardt, at that time, do you know who ICIB reported to?

A    I believe at that time they reported to Commander Joe Hartshorne.

Q    And do you know to whom Lieutenant Leavins reported to?

A    In the --

Q    Reported, excuse me.

A    Well, in the task force?

Q    Yes.

A    My understanding was that he reported directly to Mr. Paul Tanaka.

Q    Commander Gerheardt, I want to ask you to turn to Exhibit Number 35, please.

A    Yes, sir.

Q    Do you recognize that document?

A    Yes.

Q    And what is it?

A    It is an e-mail trail that begins on August 24th from -- of 2011 from Mr. Saif Kutubi to Greg Thompson, CC'd to myself, requesting documents pursuant to a grand jury subpoena.

        MR. JAUREGUI:  Your Honor, the government moves to admit Exhibit Number 35.

        MR. STEWARD:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 35 received into evidence.)

Q    (BY MR. JAUREGUI)  Commander Gerheardt, what is the subject line in this e-mail chain?

MR. JAUREGUI:  Oh, if I can ask AUSA Fox to please publish that exhibit.

THE WITNESS:  The subject line reads "Documents for grand jury subpoena."

Q    (BY MR. JAUREGUI)  And focusing on the bottom part of this exhibit, which is now published before the jury, who is Saif Kutubi?

A    Saif Kutubi was a civilian employee that worked on my staff.

Q    And Gregory Thompson, do you know who he was?

A    Gregory Thompson was a lieutenant that was in charge of Jail Investigations Unit, JIU.

Q    Do you know, Commander Gerheardt, whether Mr. Thompson had a role on the task force?

A    I don't recall.

Q    Okay.  Did you direct Mr. Kutubi to send this communication to Mr. Thompson?

A    Yes.

Q    Towards the end of this document, it says "All documents relating to the presentation of the Carrillo case for consideration as indicated in the report of Robert Bates."

Do you see that?

A      Yes.

Q      And then it continues?

A      Yes.

Q      Who is the person referenced here as Robert Bates?

A      We concluded that the person they were referring to was Robert Bayes, B-A-Y-E-S, and it was a typographical error.  And the six-digit number is the employee number, which is a unique identifier for members of the Los Angeles County Sheriff's Department.

Q      And does this document end up -- I'm sorry, does this e-mail from Mr. Kutubi end up getting forwarded to anyone else?

A      Yes.

Q      And to whom is it forwarded?

A      Lieutenant Greg Thompson forwarded it to Steve Leavins and William Carey.

Q      Okay.  Commander Gerheardt, can I ask you to please turn to Government Exhibit Numbers 43 and 44, please.

And if you can just let me know when you've had a chance to look at them.

A      Yes, sir.

Q      Do you recognize these documents, Commander Gerheardt?

A      I do.

Q      And what are they generally?

A      It is an e-mail from myself to then Lieutenant Chris Nee,

dated August 30th, 2011 at 5:15 p.m., the subject line reading "Forward FBI subpoenas."

Q    And that's Exhibit Number 43?

A    Yes, sir.

Q    And what is Exhibit Number 44?

A    Exhibit Number 44 is a response to my e-mail from Chris Nee, the same date, August 30th, 2011 at 5:16 p.m.

MR. JAUREGUI:  And, Your Honor, the government moves to admit Numbers 43 and 44.

MR. STEWARD:  No objection, Your Honor.

THE COURT:  They'll be received.

(Exhibit Nos. 43 and 44 received into evidence.)

Q    (BY MR. JAUREGUI)  And, Commander Gerheardt, who was Chris Nee at the time?

A    Lieutenant Chris Nee served as the undersheriff's executive aide.

Q    And at that time, the undersheriff was whom?

A    Paul Tanaka.

Q    And if you could, please read the subject line -- I think you already did, Commander Gerheardt.  The subject line in this is "FBI subpoenas," correct, Number 43?

A    Correct.

Q    And could you please read the text of your e-mail into the record.

A    The text reads "Chris, please confirm receipt of these

subpoenas.  They are being sent at the request of Commander Joe Hartshorne.  We just received them today and have not done any work on them yet.  Please let me know if you need anything else.  Judy."

Q    And who is Commander Hartshorne?

A    Commander Hartshorne oversaw the Risk Management Bureau and also ICIB.

MR. JAUREGUI:  I want to turn now to the next page, please, Mr. Fox.

Q    (BY MR. JAUREGUI)  What are we looking at here, Commander Gerheardt?

A    These are the business cards that I was given by the -- from the agents that served these subpoenas to my office.

MR. JAUREGUI:  And then the next page, please.

Q    (BY MR. JAUREGUI)  Commander Gerheardt, if I can get you to tell the jury, who is this letter addressed to?

A    It's addressed to the Los Angeles County Sheriff's Department, attention legal department.

Q    And the address is in Monterey Park?

A    Yes, sir.

Q    Is that Sheriff's Headquarters, Commander Gerheardt?

A    It was at that time.

Q    And the subject line in this letter?

A    "Federal grand jury subpoena."

Q    And how many subpoenas are included in this exhibit,

Commander Gerheardt?

A     There are three subpoenas.

Q     And you sent this e-mail to Christopher Nee at 5:15 p.m.; correct?

A     Yes.

Q     And did Commander Hartshorne tell you to do anything else besides send this e-mail to Christopher Nee?

A     He told me to wait.

Q     Did you have an understanding of -- and where did he tell you to wait?

A     In my office.

Q     Do you have an understanding of why you were being directed to wait?

A     I assumed I was waiting for further instructions.

Q     And did you then wait for a telephone call or anything?

A     I did.

Q     And what happened next?

A     After a sufficient amount of time, I called back to Mr. Tanaka's office and asked Lieutenant Nee if I could go home.

          MR. JAUREGUI:  Your Honor, before I move on to the next exhibit, I'm not sure if you'd like me to continue or if this is -- if the Court would like to --

          THE COURT:  How much longer do you have of this witness?

UNITED STATES DISTRICT COURT

MR. JAUREGUI:  Probably about 10 or 15 minutes, Your Honor.

THE COURT:  Okay.  Ladies and gentlemen, I think we're going to break for the day.  Again, I want to remind you until this trial is over, you're to not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, any blogs, bulletin boards, e-mails or text messaging.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it, including looking online.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

All right.  I'm going to excuse the witness for a moment and see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  We have this note that was found in one

of the juror's notebooks.  I believe this was sealed at the time it was in the notebook.  It hadn't been torn out, and from what I see, this is probably -- it was already in the notebook from another case.  I don't think it really has anything to do with this case.

MR. STEWARD:  I'm fine with that.  My concern was the Question Number 1 at the top of it regarding FBI jurisdiction, which obviously would also apply to this case.  But I agree with the Court, that unless we have some other information, there's really nothing we can do with it at this point.  I don't think it will help asking him -- the juror.

THE COURT:  I don't think it will either.  I think it's possible it will make things worse.

MR FOX:  Okay.  And what I'm understanding from Mr. Steward is there's no objection to keeping this juror.

MR. STEWARD:  Correct, at this point.

THE COURT:  All right.  Thank you.

(End of sidebar discussions.)

THE COURT:  All right.  Ladies and gentlemen, we're going to call the day.  We're going to resume tomorrow morning at 8:00 a.m.  Thank you very much for being on time today, and we'll see you tomorrow.  Have a nice day.  Please leave your notebooks on your chairs.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  And who's after Ms. Gerheardt?

MR. JAUREGUI:  It would be Michelle Miller, Your Honor, who's another custodian, and followed by Linda Farrar from the Marshal's office.

MR FOX:  And, Your Honor, I think we're going to get to several witnesses tomorrow.  In addition to them, Tara Adams, Gus Academia, Kathy Voyer.

THE COURT:  Voyer?

MR FOX:  Yeah, V-O-Y-E-R, and there's a witness with a scheduling issue that I think we're going to have to take out of order.  His name is John Powell.  If we get to anyone past Mr. Powell, it will be Ralph Ornelas and Michael Bornman, going in the same order that I provided to the defense previously.

THE COURT:  All right.  Anything we need to take up at this time?

MR FOX:  Your Honor, tomorrow I'm probably going to ask the Court to take judicial notice of the grand juries.  We filed something -- I don't know if the defense has an objection to our filing on -- I worked out the language with the defense, but it was not a joint submission, so I don't know if they have an objection to it or not.

THE COURT:  When did you file it?

MR FOX:  I think I filed a request for judicial notice about two weeks ago.  I can -- I can find it on the docket and print it out.

**UNITED STATES DISTRICT COURT**

THE COURT:  That's all right.  I'll find it.

MR. HAIG:  I looked at it at the time.  We don't have a problem with it, Your Honor.

THE COURT:  All right.

MR FOX:  Thank you.

THE COURT:  All right.  We'll see everybody tomorrow morning.

MR. JAUREGUI:  Thank you, Your Honor.

(The proceedings adjourned at 1:34 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


          I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*


                    /s/ SHAYNA MONTGOMERY
          _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**