UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
      vs.                     )      CASE NO. CR 15-255-PA
                              )
PAUL TANAKA,                  )
                              )
            Defendant.        )
_____)

REPORTER'S TRANSCRIPT OF

JURY TRIAL PROCEEDINGS - DAY 5

WEDNESDAY, MARCH 30, 2016

8:03 A.M.

LOS ANGELES, CALIFORNIA

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY: BRANDON D. FOX
         EDDIE A. JAUREGUI
         Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY: H. DEAN STEWARD
         Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY: JEROME HAIG
         Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686

**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent

**UNITED STATES DISTRICT COURT**

3

**INDEX OF WITNESSES**

**PLAINTIFF'S WITNESSES** **PAGE**

JUDY GERHEARDT

      Direct Examination (Continued) by Mr. Jauregui    8
      Cross-Examination by Mr. Steward    24


MICHELLE MILLER

      Direct Examination by Mr. Jauregui    30
      Cross-Examination by Mr. Steward    43
      Redirect Examination by Mr. Jauregui    44


LINDA FARRAR

      Direct Examination by Mr. Jauregui    46
      Cross-Examination by Mr. Steward    56


TARA ADAMS

      Direct Examination by Mr. Jauregui    61
      Cross-Examination by Mr. Steward    89
      Redirect Examination by Mr. Jauregui    94
      Recross-Examination by Mr. Steward    96


GASAT ACADEMIA

      Direct Examination by Mr. Fox    98
      Cross-Examination by Mr. Steward    106
      Redirect by Mr. Fox    108


KATHERINE VOYER

      Direct Examination by Mr. Fox    109
      Cross-Examination by Mr. Steward    115


RALPH GABRIEL ORNELAS

      Direct Examination by Mr. Fox    122
      Cross-Examination by Mr. Haig    161
      Redirect Examination by Mr. Fox    181

**UNITED STATES DISTRICT COURT**

4

**INDEX OF WITNESSES (CONTINUED)**

**PLAINTIFF'S
WITNESSES**                                                      **PAGE**

JOHN POWELL

        Direct Examination by Mr. Fox                      182
        Cross-Examination by Mr. Steward                   200
        Redirect Examination by Mr. Fox                    204


MICHAEL BORNMAN

        Direct Examination by Mr. Fox                      206
        Cross-Examination by Mr. Steward                   214

**UNITED STATES DISTRICT COURT**

## INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 2 | Sheriff's Headquarters Bureau Diagram | 189 | 191 |
| 3 | MCJ Captain's Office Diagram | 130 | 131 |
| 36 | E-mail Chain Ending 8/26/11 | 139 | 140 |
| 37 | E-mail Chain Ending 8/26/11 | 139 | 140 |
| 38 | E-mail Chain ending 8/26/11 | 139 | 140 |
| 45 | E-mail Dated 8/30/11 | 154 | 154 |
| 51 | E-mail Chain Ending 9/7/11 | 9 | 10 |
| 53 | E-mail Chain Ending 9/8/11 | 197 | 197 |
| 58 | E-mail Dated 9/9/11 | 199 | 199 |
| 73 | E-mail Dated 9/27/11 | 160 | 160 |
| 119 | Los Angeles County Sheriff's Department Technical Operations Documents | 193 | 194 |
| 120 | Grand Jury Subpoenas LASD Received from June to October 2011 | 13 | 14 |
| 121 | Inmate Release Processing Record | 16 | 17 |
| 122 | Copy of Records Jacket | 17 | 18 |
| 123 | Copy of Records Jacket | 17 | 18 |
| 124 | Inmate Total Movement History Record | 16 | 17 |
| 125 | Booking Record for "John Rodriguez" | 17 | 18 |
| 126 | Inmate Information Center Record for "John Rodriguez" | 16 | 17 |
| 127 | Inmate Total Movement for "John Rodriguez" | 16 | 17 |

**INDEX OF EXHIBITS (CONTINUED)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 128 | Booking Record for "Kevin King" | 17 | 18 |
| 129 | Inmate Information Center Records for "Chris Johnson" | 16 | 17 |
| 130 | Inmate Total Movement History Record for "Chris Johnson" | 16 | 17 |
| 131 | Inmate Information Center Record | 16 | 17 |
| 153 | ICIB Task Force Weekly Report, 9/11/11 to 9/17/11 | 37 | 38 |
| 155 | Handwritten Letter | 39 | 40 |
| 160 | Federal Court Writ | 49 | 50 |
| 162 | Phone Records for US Marshal Service Fax Machines | 51 | 51 |
| 163 | Phone Record for LASD Inmate Reception Center Fax Machine | 54 | 51 |
| 173 | Pages from MCJ Roster | 18 | 23 |
| 174 | Pages from TTCF Phone Roster | 18 | 23 |
| 175 | Page from TTCF Roster 2011 | 18 | 23 |
| 176 | Custody Ops HQ Cell Phone Roster | 20 | 22 |
| 177 | Cell Phone Roster | 20 | 22 |
| 178 | Administrative Phone Roster | 20 | 23 |
| 179 | Executives Roster | 20 | 22 |
| 186 | E-mail | 46 | 48 |
| 348 | Release of AB Booking Package | 25 | |
| 359 | Ornelas Grand Jury Transcript (Portion) | 180 | |

**LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 30, 2016**

**8:03 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is FBI Special Agent Tanner.

THE COURT:  Good morning.

MR. JAUREGUI:  Good morning.

MR. STEWARD:  And, Your Honor, Harry Steward and Jerome Haig for Mr. Tanaka.  He's present.

THE COURT:  Good morning.

MR. HAIG:  Good morning, sir.

THE COURT:  Okay.  I believe yesterday the government indicated that it was going to ask the Court to take judicial notice that it made a filing.  That was the -- the filing was the government's request for judicial note.

MR. FOX:  Oh.

THE COURT:  Is that what you were referring to?

MR. FOX:  Yes, Your Honor.  I apologize for the mistake.

THE COURT:  It's okay.

Okay.  Are we ready to proceed?

**UNITED STATES DISTRICT COURT**

8

MR. JAUREGUI:  Yes, Your Honor, and I think we'll be ten minutes or so with Ms. Gerheardt.

THE COURT:  Okay.

MR. JAUREGUI:  Oh, if I could just raise one issue, Your Honor.

THE COURT:  Yes.

MR. JAUREGUI:  Commander Gerhardt is in full uniform today.  There is a reason for that.  She has a photograph at nine o'clock.  I've let the defense know.  I'm going to ask her that just at the start so the jury understands why today she's wearing full uniform.

THE COURT:  All right.

MR. JAUREGUI:  Thank you.

THE COURT:  Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Good morning, ladies and gentlemen.

THE JURY PANEL:  Good morning.

MR. JAUREGUI:  Your Honor, may I proceed?

THE COURT:  Just want to remind you that you remain under oath.

THE WITNESS:  Okay.

THE COURT:  All right.

DIRECT EXAMINATION (CONTINUED)

Q    (BY MR. JAUREGUI)  Commander Gerheardt, I notice today

UNITED STATES DISTRICT COURT

you're dressed in your full L.A. County Sheriff's Department uniform.  Could you please explain why today you're dressed in uniform.

A    I am taking a photograph at nine o'clock this morning, and so rather than try to change from business clothes to uniform, I wore a uniform today.

Q    Thank you.

Okay.  Commander Gerheardt, can I please direct your attention to the government's exhibit book, and I want you to please turn to Government Exhibit Number 51.

(Reporter admonition.)

MR. JAUREGUI:  Yes, I apologize.

(Reporter clarification.)

MR. JAUREGUI:  Number 51, please.

THE WITNESS:  Yes, sir.

Q    (BY MR. JAUREGUI)  Okay.  Do you recognize Exhibit Number 51?

A    I do.

Q    And what is it?

A    It is an e-mail trail that begins with an e-mail from myself to Lieutenant Pat Libertone dated Wednesday, September 7th, 2011.

MR. JAUREGUI:  Your Honor, the government moves to admit Exhibit 51.

MR. STEWARD:  No objection, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  It will be received.

(Exhibit No. 51 received into evidence.)

MR. JAUREGUI:  And, AUSA, could you please publish that exhibit, and we'll start with the lower half.

Q    (BY MR. JAUREGUI)  Commander Gerheardt, this is an e-mail from you to someone named Patrick Libertone with the subject line "Need document"; is that right?

A    Yes, sir.

Q    And what is the date of the e-mail?

A    Wednesday, September 7th, 2011 at 3:34 p.m.

Q    And who is Patrick Libertone?

A    At the time, Patrick Libertone was a lieutenant that worked Inmate Reception Center.

Q    And generally, what are you -- what are you requesting in this e-mail?

A    I was requesting a -- what the Sheriff's Department commonly refers to as a booking jacket for Mr. Anthony Brown with a booking number of 2009547.

Q    And where it says "Please provide the following," and it starts with base files, is that -- is that just another word for a booking jacket?

A    Base files was the term that was used in the subpoena, and we interpreted that to mean a booking jacket.

Q    Okay.  And it says "I was referred to you for this."  Do you see that?

UNITED STATES DISTRICT COURT

A    Yes, sir.

Q    And who referred you to Lieutenant Libertone?

A    My recollection is that I was referred to IRC from Records and Identification Bureau.

Q    And what did Mr. Libertone say to you, if anything?

A    Mr. Libertone --

MR. STEWARD:  Objection, hearsay.

THE COURT:  I'm sorry.  Was there an objection?

MR. STEWARD:  Yeah.  I'm sorry I didn't say it loud enough.  Hearsay.

MR. JAUREGUI:  I can rephrase the question, Your Honor.

THE COURT:  All right.

Q    (BY MR. JAUREGUI)  Did you obtain the case jacket from Mr. Libertone?

A    I did not.

Q    What did you do next?

A    I contacted Lieutenant Greg Thompson.

Q    And did Mr. Thompson have the case jacket when you contacted him?

A    No.

Q    And did he refer you to someone else?

A    Yes.

Q    Who did he refer you to?

A    He referred me to Lieutenant Steve Leavins.

**UNITED STATES DISTRICT COURT**

12

Q      Did you speak to Lieutenant Leavins about the case jacket?

A      I am not sure if I spoke to him or if I e-mailed him.

Q      Okay.  And did you obtain a case jacket from Lieutenant Leavins?

A      I did not.

Q      Did Lieutenant Leavins say anything to you about the case jacket either by phone or e-mail?

A      My recollection is that Lieutenant Leavins communicated to me that he would maintain control of the booking jacket.

Q      So did he say he had the jacket?

A      That's my recollection, yes.

Q      Okay.  And, Commander Gerheardt, did you ever get Anthony Brown's original case jacket in 2011?

A      I received an electronic copy of a jacket.

Q      In the days and weeks following these e-mails -- or this e-mail and the ones we were looking at yesterday, did you continue getting subpoenas from the federal government?

A      Yes, I did.

Q      And did you receive any orders from within the Department about what to do with those subpoenas?

A      Initially, there was direction from the Department that we were going to stand down on the subpoenas, that the Sheriff's legal counsel was going to reach out to the federal government and decide how the Department was going to respond.

Q      And were those orders given to you to stand down?

A    Yes.

Q    Who gave you those orders?

A    It was referred to me -- or it was told to me by then Captain Tom Carey.

Q    And who was Captain Tom Carey?

A    He was the captain of the Internal Criminal Investigations Bureau.

Q    And did you stand down on those subpoenas as a result of that order?

A    I continued to gather documents, but I did not produce them.

Q    Okay.  I'm going to refer you to Government Exhibit 120, please, Commander Gerheardt.

A    Yes, sir.

Q    Do you recognize Exhibit 120?

A    If I may have a moment.

     Yes.

Q    And what do you recognize it to be?

A    There are a collection of subpoenas that were issued by the government to the Sheriff's Department.

Q    And earlier I asked you whether you continued looking for a case jacket in 2011.  Did you --

     MR. JAUREGUI:  Oh, I'm sorry, Your Honor.  I move for the admission of Exhibit Number 120.

     MR. STEWARD:  No objection, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  It will be received.

(Exhibit No. 120 received into evidence.)

Q    (BY MR. JAUREGUI)  Did you continue looking for Anthony Brown's case jacket in 2012?

A    Yes.

Q    And what prompted you to continue looking for that case jacket?

A    I believe we received another subpoena.

Q    Did there come a time -- I withdraw that question.

Did the additional subpoena that you're referring to, did it request Anthony Brown's case jacket by any other name?

A    At the time, I didn't know that it requested several jackets under several different names.  Later, I was told that it was all the same person, Anthony Brown.

Q    Okay.  Was one of those names John Rodriguez?

A    Yes.

Q    Was another one of those names Kevin King?

A    Yes.

Q    And was another one of those names Chris Johnson?

A    Yes.

Q    Did there come a time, Commander Gerheardt, where you believed you had actually found the original case jacket?

A    No.

Q    Are you familiar with someone named Commander Cooper?

A    May I clarify?

Q    Yes, please.

A    The original case jacket -- the case jacket that we came across was an electronic version of the original jacket.  That was produced.

Q    Okay.  Are you familiar with someone named Commander Cooper?

A    I am.

Q    And who is he?

A    At the time, he was a commander in custody division.

Q    And did you ever discuss the Anthony Brown case jacket with him?

A    I did.

Q    And what did you discuss with him?

A    I had received information that Commander Cooper may have the jacket, so I called his office.  He said he did not have it.  However, there was an employee in his office by the name of Greg Sivard, S-I-V-A-R-D, who thought he had the jacket in his office.  So I immediately responded over there to meet Mr. Sivard.  We went to his office, and he retrieved a folder that he thought was the Anthony Brown jacket.

Q    And was it?

A    It was not.

Q    What was it?

A    I believe it was a jacket for the John Rodriguez name.

Q    And did you produce that jacket to the federal government?

A     Yes, sir.

Q     Okay.  Commander Gerheardt, I'm going to direct your attention to a number of exhibits, and those would be Number 121, 124 --

A     Okay.

Q     -- 126 and -27 --

A     Yes, sir.

Q     -- 129 and 130 and 131.

A     Yes, sir.

Q     Commander Gerheardt, are these documents that are maintained on the Sheriff's Department's electronic systems?

A     Yes, sir.

Q     Are they true and correct copies of documents that the Sheriff's Department provided to the federal government pursuant to a grand jury subpoena?

A     It appears so, yes.

Q     Or any other request from the federal government?

A     Yes.

Q     And do these generally relate to Anthony Brown either by his own name or by the aliases you testified about?

A     Yes.

Q     And do they relate to inmate movement and booking information for those individuals?

A     Correct.

Q     Are they -- is it part of the Sheriff's Department's

**UNITED STATES DISTRICT COURT**

regular practice to create and maintain these kinds of records?

A    Yes.

Q    And does the Department keep these kinds of records as part of its regularly-conducted custodial activity?

A    Yes.

MR. JAUREGUI:  Your Honor, I would move for the admission of Exhibits 121, 124, 126 and -27 and 129 through 131.

MR. STEWARD:  No objection.

THE COURT:  They'll be received.

(Exhibit Nos. 121, 124, 126, 127, 129, 130 and 131 received into evidence.)

Q    (BY MR. JAUREGUI)  Okay.  Commander Gerheardt, I'm going to ask you to look at a few more exhibits, and those would be 122 and 123.

And tell me when you're done, Commander Gerheardt, or when you're ready.

A    I'm sorry, 121?

Q    122 and 123.

A    Yes, sir.

Q    And then 125 and 128.

A    Yes, sir.

Q    And generally speaking, Commander Gerheardt, are these the booking jackets or case jackets for Anthony Brown, John Rodriguez and the other aliases we discussed earlier, Chris

**UNITED STATES DISTRICT COURT**

Johnson and Kevin King?

A    Yes.

Q    And are these copies that were produced to the federal government by the Sheriff's Department?

A    Yes.

Q    And were they maintained in the ordinary course of -- were they maintained in the course of business by the Sheriff's Department?

A    Yes.

MR. JAUREGUI:  Your Honor, I move for the admissions -- admission of those exhibits, which were 122 and 123, 125 and 128.

MR. STEWARD:  No objection.

THE COURT:  They'll be received.

(Exhibit Nos. 122, 123, 125 and 128 received into evidence.)

Q    (BY MR. JAUREGUI)  A few more exhibits, Commander Gerheardt.  I want to direct your attention now to Exhibits Number 173 through 175.

I'll just start with 173, Commander Gerheardt.

A    Please.

Q    Do you recognize that exhibit?

A    Yes.

Q    And what do you recognize it to be?

A    It is a list of names and phone numbers from the Men's

**UNITED STATES DISTRICT COURT**

Central Jail.

Q    And does it say "Personnel Roster" at the top of that?

A    Yes.

Q    And it contains telephone numbers and cell phone numbers; correct?  Home numbers?

A    Correct.

Q    And if you could look at 174, please -- I'm sorry.  Was 173 produced to the government by the Sheriff's Department?

A    It was.

Q    And 174?

A    Yes.

Q    And what is 174?

A    It is a telephone roster for, it appears facility phone numbers within the Sheriff's Department.

Q    Including the IRC and ICIB?

A    Yes.

Q    And was that produced to the federal government by the Sheriff's Department?

A    Yes.

Q    Are they business records of the Sheriff's Department?

A    Yes.

Q    And 173 is as well?

A    Yes.

Q    175, please.

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    And what is 175?

A    175 is a phone roster for Twin Towers.

Q    And was that maintained in the ordinary course of business by the Sheriff's Department?

A    Yes.

Q    And was that produced to the federal government by the Sheriff's Department?

A    It was.

Q    And finally, 178, please.

A    Yes.

Q    Do you recognize it?

A    Yes.

Q    What is it?

A    It is an administrative phone roster for Sheriff's Department executives.

Q    Is that a document that was maintained in the ordinary course of business by the Sheriff's Department?

A    Yes.

Q    And did you produce it to the federal government in response to a request?

A    Yes.

Q    Okay.  And the last set of exhibits are 176 and -77 and 179.

A    Yes.

Q    Okay.  176, what is that, Commander Gerheardt?

UNITED STATES DISTRICT COURT

A       It is a list of phone numbers -- phone serial numbers and where they were assigned.

Q       But does it show, essentially, what cell phone number was assigned to what person within the Department?

A       Yes.

Q       Is that a a document that the Sheriff's Department created in response to a request from the government?

A       That's my recollection, yes.

Q       And did you produce it to the government?

A       Yes.

Q       177, please.

A       Yes.

Q       And what is this?

A       Is, again, a list of phone numbers and what either person or unit they were assigned to.

Q       And does this capture a specific period in time?

A       Yes, it captures the period of August 2011 to September 2011.

Q       Was this created in response to a request from the federal government by the Sheriff's Department?

A       That's what I recall.

Q       And did you produce it as a result of that request?

A       Yes.

Q       And lastly, 179, please.

A       Yes.

Q    And what is it?

A    It is, again, a list of cell phone numbers dated August 2011, September 2011 with names and rank and cell phone numbers.

Q    And it also includes the individuals within the executive level of the Sheriff's Department?

A    Some of the executives, yes.

Q    Okay.

MR. JAUREGUI:  Your Honor, the government moves for the admission of 176, 177 and 179.

MR. STEWARD:  Your Honor, we'd object on the grounds that these appear to be documents that were created for this litigation as in a police report, and on that basis we'd object.

THE COURT:  The objection's overruled.  They will be received.

(Exhibit Nos. 176, 177 and 179 received into evidence.)

Q    (BY MR. JAUREGUI)  Commander Gerheardt, returning back to the Anthony Brown jacket, did you ever at any time find the original case jacket for Anthony Brown?

A    No.

Q    And did you continue searching for it throughout 2012?

A    For clarification, are you referring to the paper jacket?

Q    Yes, the original paper case jacket for Anthony Brown.

A    Yes, we continued to look.

Q    And did you ever find it?

A    No, sir.

Q    Did you ever come to learn what happened to that case jacket?

A    My understanding is that when a booking jacket is -- when an inmate is released from custody, the booking jacket goes to Records and Identification Bureau.  They send it to a third party vendor that scans the contents of that jacket.  The contents is then sent back electronically, it is verified, and then the jackets are destroyed.

Q    So did you come to learn that Anthony Brown's case jacket was destroyed?

A    Yes, sir.

        MR. JAUREGUI:  May I have a moment, Your Honor?

        THE COURT:  Yes.

    (Plaintiff's counsel conferred off the record.)

        MR. JAUREGUI:  Two more questions, Your Honor.

    Well, first, Your Honor, we're going to also move for the admission of Exhibits Number 173 through 175 and 178, which we previously went through with this witness.

        MR. STEWARD:  No objection.

        THE COURT:  All right.  They'll be received.

    (Exhibit Nos. 173, 174, 175 and 178 received into evidence.)

Q    (BY MR. JAUREGUI)  Last question, Commander Gerheardt.  Do

24

you know whether the electronic version of Anthony Brown's case jacket that you produced to the government, do you know personally whether it had all the material that was included in the original case jacket?

A     My understanding is that when the information is sent to the third party vendor --

MR. STEWARD:  Objection, nonresponsive.

Q     (BY MR. JAUREGUI)  Do you know, Commander Gerheardt, whether it had everything that was included in the original case jacket?  Do you personally know that?

A     I don't know.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q     (BY MR. STEWARD)  So you were able to view an electronic copy of Brown's jacket; correct?

A     Yes.

Q     Do you recall there being a federal writ in that jacket?

A     No, sir.

Q     Is it that you don't recall, or there wasn't one there?

A     I don't recall seeing one because I don't believe one was there.  We looked for one and didn't find it.

Q     Okay.  Take a look if you would, there's a white binder probably by your feet.

**UNITED STATES DISTRICT COURT**

A     Yes, sir.

Q     And if you could take a look at Exhibit 348.

      Do you have that?

A     Yes, sir.

Q     Okay.  Appears to be a one-page document?

A     Yes, sir.

Q     Are you familiar with, first, just generally a form like this produced by the Sheriff's Department?

A     This form or in general, a form that's often used?  I'm not sure of your question.

Q     Well, I'm not sure of it either.

      A form exactly like this or similar to it that's used routinely by the Sheriff's Department.

A     No, sir.

Q     Have you seen this particular document before?

A     I believe so.

Q     Okay.  And would that be in connection with the events that are part of this particular case?

A     Yes, sir.

Q     Okay.  And is this on the letterhead of the L.A. County Sheriff's Department?

A     Yes.

Q     And on the left-hand side, does it indicate Leroy Baca, Sheriff?

A     Yes, sir.

**UNITED STATES DISTRICT COURT**

Q     Okay.  And you believe you've seen this before.

Do you remember when you may have seen it?

A     I don't, I'm sorry.

Q     Okay.  Within the last six months?

A     No, sir.

Q     Back in 2011?

A     I don't believe it was as early as 2011.

Q     And just generally, it refers to the booking jacket --

THE COURT:  Excuse me, Counsel.  Is this in evidence?

MR. STEWARD:  No, I was trying to lay a foundation, Your Honor.  I'll offer it at this time.

THE COURT:  Any objection?

MR. JAUREGUI:  Your Honor, we would object on foundation and authenticity.

THE COURT:  Sustained.

Q     (BY MR. STEWARD)  And this is a document that talks about Brown's --

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

THE COURT:  I think you've got the wrong witness for this document because she basically says she's not familiar with it, and I don't think you can try to describe it to the jury until it's in evidence.

MR. JAUREGUI:  That's our position, Your Honor.

MR. STEWARD:  Fair enough.  I'll accept that.  We'll use it with another witness.

THE COURT:  All right.

MR. STEWARD:  Thanks.

(End of sidebar discussions.)

Q    (BY MR. STEWARD)  Now, back in 2011, when a subpoena would come into the Sheriff's Department like the ones we've looked at this morning, was there some sort of a mechanism or procedure to track the subpoena as to whether it was fulfilled, who it should go to, that sort of thing?

A    In 2011 the recordkeeping regarding the subpoenas was less than stellar.

Q    Okay.  So a tracking system was not in existence in 2011?

A    There was a tracking system in existence.  However, it was very basic.

Q    Okay.  Now, I believe you testified that Commander Hartshorne wanted you or your department to forward subpoenas -- federal subpoenas to Mr. Tanaka's office; is that correct?

MR. JAUREGUI:  Objection, misstates the testimony, Your Honor.

MR. STEWARD:  I'll back up and ask it again, Your Honor.

THE COURT:  All right.

Q    (BY MR. STEWARD)  Were you directed to send federal

subpoena materials to Paul Tanaka's office?

A    Yes.

Q    And who was the one that asked you to do that?

A    Commander Joe Hartshorne.

Q    And again, he was your superior?

A    Correct.

Q    As far as you knew, the request did not come from Paul Tanaka; right?

A    As far as I knew, that's correct.

Q    Did you ever talk to Paul Tanaka about any of the things that you've testified to today?

A    I don't believe so.

Q    And I believe you mentioned Chris Nee, and it's N-E-E.

In 2011 what was your understanding of who he was?

A    He was the aide to the undersheriff, Mr. Paul Tanaka.

Q    And I think we looked either yesterday or today at Exhibits 43 and 44, e-mails confirming you sending material to Mr. Nee; correct?

A    Yes.

Q    Let's look at 43 if we can.

Do you have 43 in front of you?

A    I do.

Q    And this is from you to Mr. Nee; correct?

A    Correct.

Q    There is no CC or carbon copy to anyone else; right?

**UNITED STATES DISTRICT COURT**

A       That is correct.

Q       And then I think on 44, this is confirmation from Mr. Nee that he received the subpoenas that you sent; correct?

A       Yes, sir.

Q       And again, no CC's to anyone else; right?

A       Correct.

Q       And Paul Tanaka's name is not on either of these e-mails; correct?

A       That is correct.

            MR. STEWARD:  I have nothing further, Your Honor. Thank you.

            MR. JAUREGUI:  No further questions for this witness, Your Honor.

            THE COURT:  All right.  Thank you.  You may step down.

            THE WITNESS:  Thank you.

            THE COURT:  Call your next witness, please.

            MR. JAUREGUI:  Your Honor, the government calls Michelle Miller.

            THE DEPUTY CLERK:  If you'll raise your hand for me.

        (The witness, MICHELLE MILLER, was sworn.)

            THE DEPUTY CLERK:  Please have a seat.

        Will you please state your full name and spell your last name for the record.

            THE WITNESS:  Michelle Miller, M-I-L-L-E-R.

UNITED STATES DISTRICT COURT

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q      (BY MR. JAUREGUI)  Ms. Miller, are you employed?

A      Yes, I am.

Q      How are you employed?

A      I'm employed by the Los Angeles County Sheriff's Department.

Q      And how long have you been employed by the L.A. County Sheriff's Department?

A      Since May 5th of 1997, so almost 19 years.

Q      And what is your position within the Department?

A      I'm a law enforcement technician.

Q      And what is a law enforcement technician?

A      We provide various functions for the Department.  We usually start off as 9-1-1 operators and move into administrative functions working detective bureau, court liaison, fleet, ordering supplies, things like that.

Q      Are you a sworn or civilian employee of the Sheriff's Department?

A      I'm a civilian.

Q      Are you assigned to a specific bureau or unit within the department?

A      Yes, I'm assigned to Internal Criminal Investigations Bureau.

Q      And over the scope of your career, have you worked for any

other bureau within the Sheriff's Department?

A    Yes, I worked at Norwalk Sheriff's Station.

Q    In August and September of 2011, what bureau did you work in?

A    In August I was working at Norwalk Sheriff's Station.  I started with ICIB -- that's what we call Internal Criminal Investigation Bureau -- on September the 6th of 2011.

Q    And were you hired to work in ICIB on a specific project?

A    Yes.  I was asked to come work the Jail Investigation Task Force.

Q    Do you know, Ms. Miller, when the Jail Investigation Task Force was created?

A    I started on September the 6th, and that's the day we all met.  That was the first day.

Q    And when you say "we all met," who are you referring to?

A    Other members who were involved with the task force.

Q    So as far as you know, that was the first meeting of the task force?

A    Yes.

Q    Does the task force exist today?

A    No.

Q    Are you familiar with the name Anthony Brown?

A    Yes.

Q    How are you familiar with that name?

A    When we started the task force, that was one of the cases

that was being investigated by ICIB.  Deputy Gilbert Michel had smuggled in a phone, a cell phone, and had given it to an inmate by the name of Anthony Brown.

Q    Where were the task forces offices located when you started in September of 2011?

A    In Monterey Park at the Sheriff's Department Headquarters.

Q    And on what floor?

A    We were on the basement level.

Q    Who was the captain of ICIB in September of 2011?

A    It was Tom Carey.

Q    And did he have a role in the task force?

A    Yes, he was in charge.  He was our captain.

Q    Did he also work in the Sheriff's Headquarters?

A    No, his office was in Commerce where the main ICIB office was.

Q    So were there other employees at ICIB that were not located at the Sheriff's Department -- I'm sorry, at the Sheriff's Headquarters?

A    Correct, yes.

Q    And, Ms. Miller, to whom did Tom Carey report?

A    Our office reported to the Office of the Undersheriff.

Q    Was there a lead lieutenant within the task force?

A    Yes, Steve Leavins.

Q    And were there any other lead investigators within the task force?

UNITED STATES DISTRICT COURT

A     Yes, Sergeant Scott Craig and Sergeant Maricela Long.

Q     Do you know, Ms. Miller, whether Lieutenant Leavins met, as part of his role in the task force, with the executives in the Sheriff's Department in September of 2011?

          MR. STEWARD:  Objection, foundation.

          THE COURT:  Sustained.

Q     (BY MR. JAUREGUI)  Ms. Miller, did you ever hear Lieutenant Leavins say anything about meeting with executives in the Sheriff's Department?

A     Well, he would commonly say, "I'm going upstairs," and our assumption was, you know, upstairs to the fourth floor.

          MR. STEWARD:  Move to strike, Your Honor. Speculation.

          THE COURT:  Sustained.

Q     (BY MR. JAUREGUI)  Ms. Miller, did you ever --

          THE COURT:  Excuse me.  The answer is stricken, and the jury should disregard it.

Q     (BY MR. JAUREGUI)  Did you ever sit in meetings with Lieutenant Leavins?

A     Yes.

Q     Did he ever say anything in those meetings about meeting with executives of the Sheriff's Department?

A     Yes.

Q     And what did he say?

A     Oh, I don't recall specifics.  I know that they were --

generally when we had briefings, our briefings on Tuesdays, our

meetings, it would just be directions about our cases or what

was a priority, things like that.  And he would sometimes say,

"at the direction of the Sheriff" or "the Sheriff wants" or

"Mr. Tanaka," it was very general.

Q     And in 2011 what were your duties within the task force?

A     I was working case management.

Q     And did you have a role in producing documents to the

federal government in response to grand jury subpoenas?

A     Not in September.

Q     At any point after --

A     Yes.

Q     Okay.  And if I could ask you to please turn to Government

Exhibit Number 128.

      Do you recognize that exhibit, Ms. Miller?

A     Yes, I do.

Q     How do you recognize that exhibit?

A     I located this exhibit in -- I was doing an exhaustive

search for all Anthony Brown related documents in October --

well, starting in September into October of 2012, and I located

this document.  It was actually -- if you want me to describe

it a little bit more, it was a manila file folder.

      (Reporter admonition.)

            MR. STEWARD:  Objection.

            THE WITNESS:  Oh, I'm sorry.

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  And nonresponsive.

THE COURT:  Sustained.

Q    (BY MR. JAUREGUI)  Ms. Miller, is this a true and accurate copy of the -- did you produce this document to the government?

A    Yes, I did.

Q    Is this a true and accurate copy of the document that you produced to the government?

A    Yes, I did.

MR. JAUREGUI:  Your Honor, the government moves for admission of Exhibit Number 128.

MR. STEWARD:  No objection.

THE COURT:  I believe it's already in.

MR. JAUREGUI:  Okay.  Can I ask Mr. Fox to please publish page 2 of this exhibit.

Q    (BY MR. JAUREGUI)  Okay.  Do you recognize page 2 of this exhibit, Ms. Miller?

A    Yes.

Q    And what is it?

A    That is an inmate wristband sticker that was affixed to the inside of the manila folder.

Q    And what are the -- what are the numbers listed there above the bar code?

A    That is a booking number.

Q    And the name listed, what is the name?

A    King, Kevin.

UNITED STATES DISTRICT COURT

Q    Over the course of your work in ICIB, did you come to learn who Kevin King was?

A    Yes.

Q    And who was he?

A    That was an alias used to book Anthony Brown.

Q    And if you could turn to the next page.

        MR. JAUREGUI:  And, Mr. Fox, if you could have the next page, page 3.

Q    (BY MR. JAUREGUI)  Okay.  This image is sideways here on the screen, but it should be right side up in front of you, Ms. Miller.

    Could you please read what is visible there.

A    Johnson, Chris 2863148.

Q    And over the course of your work in ICIB -- well, did you see the original of this document?

A    Yes, the original is a Post-it note.

Q    Okay.  And over the course of your work in ICIB, did you come to learn who Chris Johnson was?

A    That it was an alias used also to book Anthony Brown.

        MR. JAUREGUI:  And if we can have page 6, Mr. Fox.

Q    (BY MR. JAUREGUI)  And if I could ask you to turn to the sixth page of that exhibit, Ms. Miller.

    What are we looking at here?

A    That is a booking slip.

Q    And who is the booking slip for?

UNITED STATES DISTRICT COURT

A    Kevin King.

Q    Okay.  I want to direct your attention to the top right part of this document.  Do you see where it says "jail custody record"?

A    Yes.

Q    And could you just read what it says there.

A    "Felony ICIB/OSJ Lieutenant Thompson @ TTCF."

Q    And what -- do you know what TTCF stands for?

A    Twin Towers Correctional Facility.

Q    And could you tell the jury, please, Ms. Miller, what the date and time arrested is listed as.

A    The date and time arrested is 8/26/11 at 1530 hours.

Q    And do you see the arresting agency name there?

A    Yes, it says LASD SDM.

Q    Do you know what SDM stands for?

A    That is the abbreviation for San Dimas station.

Q    Okay.  Could you turn to Exhibit 153, please.

      And, Ms. Miller, do you recognize Exhibit 153?

A    Yes.

Q    And what is it?

A    That is a task force weekly report from September 11th to the 17th of 2011.

Q    And is this a true and accurate copy of a document that was produced to the government in response to a request for subpoena?

A    Yes.

MR. JAUREGUI:  And, Your Honor, I move for the admission of 153.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 153 received into evidence.)

MR. JAUREGUI:  And if I can ask Mr. Fox to please publish the first part of page 1 of that exhibit.

Q    (BY MR. JAUREGUI)  Okay.  Ms. Miller, could I ask you to please read the bolded underlined part, and then if you could just walk the jury through the first three bullets.

A    "ICIB (Sergeants Craig and Long) conducted staff meeting. Discussed force presentation and investigation protocol. Interviewed Deputy Michel.  Deputy Michel resigned.  Reviewed Michel interview.  Briefed task force personnel on Michel's interview.  Met with Undersheriff Tanaka regarding Michel interview."

Q    And what is the date listed there at the top of that page?

A    September 11 to September 17.

Q    Okay.  And if I could ask you to please turn to page 3 of this exhibit.

MR. JAUREGUI:  And if Mr. Fox would publish that.

Oh, I'm sorry.  If you could please publish the bottom part.

Q    (BY MR. JAUREGUI)  Ms. Miller, could you please read the

bolded underlined part.

A    "OSJ (Deputies Manzo and Smith)."

Q    And do you know, Ms. Miller, who Deputies Manzo and Smith were?

A    Yes.  Deputy Mickey Manzo and Deputy Gerard Smith were OSJ investigators assigned to the Jail Investigation Task Force.

Q    And could you please read the second bullet listed there.

A    "Tracked FBI visitations for all custody facilities in L.A. County."

MR. JAUREGUI:  One moment, Your Honor.

(Plaintiff's counsel conferred off the record.)

Q    (BY MR. JAUREGUI)  And if you could please read the fourth bullet listed there.

A    "Identified the following inmates as having been contacted by the FBI."

Q    And okay, I'm going to have you now turn to Exhibit 155.

Do you recognize this exhibit, Ms. Miller?

A    Yes, I do.

Q    How do you recognize it?

A    I located it for subpoena production.

Q    And have you seen the original copy of this document?

A    Yes.

Q    And is this a true and correct copy of the document you located and produced to the government?

A    Yes.

UNITED STATES DISTRICT COURT

MR. JAUREGUI:  Your Honor, I move for the admission of Exhibit 155.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 155 received into evidence.)

MR. JAUREGUI:  And if Mr. Fox could publish page 1, the very top of it.

Q    (BY MR. JAUREGUI)  Ms. Miller, where did you locate this document?

A    I was doing an exhaustive search for all Anthony Brown related documents, and I located this in a filing cabinet. It's one of the administrative filing cabinets in the task force office.

Q    And if you could just please read the first two lines.

A    "From Anthony Brown to Lieutenant Steve and Captain Tom, Sergeant Long, Sergeant Gray."

Q    And what is the date?

A    September 8, 2011.

Q    And, Ms. Miller, there's a Lieutenant Steve in the "To" line.  Was there any other Lieutenant Steve on the task force besides Steve Leavins?

A    Not that I was aware of, no.

Q    And are you aware of any other Lieutenant Steve being involved in the Anthony Brown investigation?

A    No.

UNITED STATES DISTRICT COURT

Q    It also says Captain Tom in the "To" line.  Do you see that?

A    Yes.

Q    Was there any other Captain Tom involved with the task force besides Tom Carey?

A    No.

Q    And there are two sergeants listed there, Long and Gray; is that right?

A    Yes.

Q    And to your knowledge, was there a Sergeant Gray associated with the task force?

A    No.

Q    And who was Maricela Long's partner in the task force investigation?

A    Sergeant Scott Craig.

Q    Ms. Miller, over the course of your time with the task force, did you conduct multiple searches for documents relating to Anthony Brown?

A    Yes.

Q    And how would you describe your search for those documents?

A    Well, it would depend on whether it was a special request or a federal subpoena, but I would start my due diligence out by doing keyword search on sheriff files, locate everything that's electronically related to the investigation, and then I

UNITED STATES DISTRICT COURT

would start searching through paper documents, boxes that contained Anthony Brown, Gilbert Michel, you know, specifically to those documents. I'm looking for documents within paper files piece by piece.

Q    And do you know, Ms. Miller, whether the government requested that an August 2011 writ for Anthony Brown be produced to the government?

A    I don't recall any specific wording in the subpoena, but it would have fallen under the definition of a document if I had located it.

MR. STEWARD:  Move to strike.  Nonresponsive.

THE COURT:  Sustained.  The answer will be stricken. The jurors should disregard it.

Q    (BY MR. JAUREGUI)  Ms. Miller, did you attempt to locate a writ from the federal government for Anthony Brown?

A    Yes, I looked for all responsive documents for any Anthony Brown related subpoena.

Q    At any point in the course of your search, did you ever find that writ for Anthony Brown?

A    I did not.

MR. JAUREGUI:  One moment, Your Honor.

No further questions for this witness, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

//

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  In September of 2011, how many cases was ICIB working on, if you know?

A    I want to say we started out with anywhere from 25 to at least 100 cases that we were reviewing at the time. Specifically assigned criminal cases, I think by that point we had anywhere from 15 to 20.

Q    Okay.  And the Anthony Brown cell phone matter was one of those?

A    Yes, that we were investigating the suspect of Deputy Gilbert Michel.

Q    And you, the unit in general, was investigating lots of subjects in regard to a number of cases; correct?

A    Correct.

Q    Now, you indicated that Captain Carey relayed what Mr. Baca was saying and what Mr. Tanaka was saying; is that correct?

A    No, I was testifying to Lieutenant Leavins doing our briefings at our meetings.

Q    My apologies.  And Leavins would convey to you and the other members of ICIB his contact with the executives in the Department.  Is that a fair statement?

A    Yes.

Q    Okay.  And how often would Mr. Leavins brief you and the other, for want of better word, the troops in ICIB?  How often

would that happen?

A    We had a briefing meeting once a week where everybody was required to attend.

Q    And that would have started at the beginning of September?

A    Yes.

Q    And gone through when?

A    I think we had our briefings well into December, January.

Q    Okay.  Did Mr. Leavins ever tell you and the others that Leroy Baca wanted Anthony Brown hidden?

A    I do not recall that ever being said.

Q    Do you ever recall Leavins saying to you all that Leroy Baca wanted to hinder or obstruct the FBI in their investigation?

A    No.

Q    Did you ever hear from Mr. Leavins that Paul Tanaka said either of those things?

A    No.

        MR. STEWARD:  No further questions, Your Honor. Thank you.

        MR. JAUREGUI:  One moment, Your Honor.

    (Plaintiff's counsel conferred off the record.)

        MR. JAUREGUI:  Just briefly, Your Honor.

                    REDIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Ms. Miller, in terms of the chain of command in the task force, where did you fall?

A     We reported to Captain Tom Carey, ICIB, and in our organizational chain of command we reported to the Office of the Undersheriff.

Q     And, Ms. Miller, where did you fall on that chain of command?

A     I was very low on that chain of command.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.

MR. STEWARD:  No recross, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Call your next witness.

MR. JAUREGUI:  Your Honor, the government calls Linda Farrar.

THE DEPUTY CLERK:  Good morning.  Raise your right hand.

(The witness, LINDA FARRAR, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Linda K. Farrar.  Last is F, as in Frank, A-R-R-A-R.

THE DEPUTY CLERK:  Thank you.

//

46

DIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Ms. Farrar, are you presently employed?

A    I work for the U.S. Marshals Service.

Q    And how long have you been with the U.S. Marshals Service?

A    Approximately 23 years.

Q    And in the summer and fall of 2011, what were your duties within the Marshals Service?

A    I was a detention enforcement officer or supervisory detention enforcement officer.

Q    As part of your role, did you serve writs on local law enforcement agencies?

A    Yes, I did.

Q    And did those writs include writs demanding that an inmate that was held in local custody be transferred to the federal custody?

A    Yes.

Q    And I want to turn your attention, Ms. Farrar, to Government Exhibit Number 186 in the binders before you.

Actually, Ms. Farrar, let me ask you this before I get to that exhibit, and I will get to it very briefly.

When you receive writs from the federal government, from what office do they come?

A    They come from the clerk's office.  A judge signs off on a writ.  It's filed with the clerk's office and either comes to us directly from the clerk's office or from the U.S. Attorney's

Office.

Q    And when they come from the U.S. Attorney's Office, how do they typically come to you?

A    Sometimes -- most of the time they're hand-delivered; sometimes they're e-mailed to us.

Q    Okay.  And now turning to Government Exhibit Number 186, do you recognize that document?

A    Yes, I do.

Q    And how do you recognize it?

            MR. STEWARD:  Your Honor, may I have just a moment with counsel?

            THE COURT:  Yes.

        (Counsel conferred off the record.)

            MR. STEWARD:  Thank you, Your Honor.

            THE COURT:  Just one second.

        (Pause in proceedings.)

            MR. JAUREGUI:  May I proceed, Your Honor?

            THE COURT:  Yes.

Q    (BY MR. JAUREGUI)  And how do you recognize this document, Ms. Farrar?

A    It's an e-mail that went between myself and Assistant U.S. Attorney Lawrence Middleton.

            MR. JAUREGUI:  Your Honor, the government moves for the admission of Exhibit Number 186.

            MR. STEWARD:  No objection.

**UNITED STATES DISTRICT COURT**

THE COURT:  It will be received.

(Exhibit No. 186 received into evidence.)

MR. JAUREGUI:  And if we could -- actually, I'll put it here on the Elmo.

Q    (BY MS. JAUREGUI)  Ms. Farrar, just give --

MR. JAUREGUI:  Just give this Elmo its chance to catch up, Your Honor, I apologize.

THE JUROR:  Your Honor, may I take a bathroom break while we're waiting for the computer?

THE COURT:  That's fine.

(Juror No. 5 exited the courtroom.)

(Pause in proceedings.)

(Juror No. 5 entered the courtroom.)

THE COURT:  All right.  The record will reflect that Juror Number 5 has rejoined us.

MR. JAUREGUI:  Thank you, Your Honor.

Q    (BY MR. JAUREGUI)  Ms. Farrar, I'm showing you Government Exhibit Number 186, and I want to focus on the center part of this exhibit.

Could you please tell the jury what we're looking at here on the screen.

A    The top part or --

Q    The part that's on the screen, yes, the top part.

A    Yeah, it's an e-mail from U.S. Attorney, AUSA Lawrence Middleton asking, you know, for us to get this inmate for

testimony out of L.A. county jail.

Q    And that's an e-mail to you?

A    Yes.

Q    And who is the inmate who he's talking about?

A    It is Anthony Brown.

Q    And I'm going to now move the exhibit down so you could see the top part of it.

    If you could just tell me what we're looking at here.

A    It's just my response to AUSA Middleton telling him that I was going to be going out of town until September 6 and that he could contact Yolanda Baines who was filling in for me, and I was going to forward the e-mail to him -- to her, sorry.

Q    And do you recall, Ms. Farrar, just looking at the exhibit that AUSA Middleton said, We are going to -- we will be filing this writ today?

A    Yes.

Q    And did you end up handing responsibility for this writ to Ms. Baines?

A    Yes, I did.

Q    And does Ms. Baines presently work for the Marshals office?

A    No, she does not.

Q    Okay.  Now I want to turn your attention to Government Exhibit 160.  It's in front of you, Ms. Farrar.

A    Oh, sorry.

UNITED STATES DISTRICT COURT

Q    And while you're looking for that, Ms. Farrar, over the course of your career, you've seen writs issued by the federal courts; correct?

A    Oh, yes.  Hundreds.

MR. JAUREGUI:  Your Honor, while the witness is looking for that, the government would move for the admission of 160 which is a certified copy of that exhibit.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 160 received into evidence.)

MR. JAUREGUI:  And, AUSA Fox, could you please publish Number 160.

Q    (BY MR. JAUREGUI)  Ms. Farrar, what is this?

A    This is an application and order for a writ.

Q    And who is the writ for?

A    An Anthony Brown.

Q    And if you could just read the part that I'm highlighting right here.

A    "Order on application for writ of habeas corpus."

MR. JAUREGUI:  And could you just focus on the bottom part, AUSA Fox.

Q    (BY MR. JAUREGUI)  What is the date of the order?

A    August 25th, 2011.

Q    And who is it signed by?

A    By Judge Snyder.

UNITED STATES DISTRICT COURT

Q    Okay.  I want to focus your attention now, Ms. Farrar, on Government Exhibit Number 162.

MR. JAUREGUI:  And, Your Honor, we're going to be looking at 162 and 163, and the government would move for the admission of both of those exhibits.

THE COURT:  Any objection?

MR. STEWARD:  No objection, Your Honor.

THE COURT:  They'll be received.

(Exhibit Nos. 162 and 163 received into evidence.)

Q    (BY MR. JAUREGUI)  Are you there, Ms. Farrar?

A    Yes, sir.

Q    Okay.  Could you please turn to the second page of this exhibit.

MR. JAUREGUI:  And if I can ask Mr. Fox to please publish it.

THE COURT:  And this exhibit is which one?

MR. JAUREGUI:  Number 62, Your Honor, I apologize.  162.  Second page, please, and the top part.  All right.  We're going to do this.

Q    (BY MR. JAUREGUI)  Okay.  Ms. Farrar, I want to focus you on the top part of Exhibit Number 162.  Do you see a (213) 894 number listed at the top of this exhibit here?

A    Yes, I do.

Q    And do you recognize that phone number?

A    Yes, it's a fax number in our office.

UNITED STATES DISTRICT COURT

Q    And when you say "our office," you're talking about the Marshals office?

A    Yes, yes, the U.S. Marshals Service.

Q    Okay.

MR. JAUREGUI:  I'm sorry, Your Honor, may I have a moment, please?

THE COURT:  Yes.

(Plaintiff's counsel conferred off the record.)

MR. JAUREGUI:  Your Honor, while I'm trying to sort something out, I'm going to read, with the Court's permission, the stipulation entered into by the parties.  It's Exhibit Number 192 in the government's exhibit binder.

THE COURT:  All right.

MR. JAUREGUI:  A stipulation regarding phone records.  Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon Fox, Lizabeth Rhodes and Eddie Jauregui, and Defendant Paul Tanaka, by and through his counsel of record Dean Steward and Jerome Haig, hereby stipulate as follows:

Government Exhibit 162 contains phone records for (213) 894-3881 and (213) 894-7998 which were two numbers assigned to facsimile machines used by the United States Marshals Service in Los Angeles.

Government Exhibit 163 contains phone records for

(213) 217-4973 which was a number assigned to a facsimile machine used by the Los Angeles County Sheriff's Department Inmate Reception Center.

So stipulated and agreed on behalf, and then it has the parties' signatures, Your Honor.

THE COURT:  Ladies and gentlemen, the parties have agreed to certain facts that have been stated to you.  You should therefore treat these facts as having been proved.

(Plaintiff's counsel conferred off the record.)

Q    (BY MR. JAUREGUI)  Okay.  Ms. Farrar, I'm putting Exhibit Number 162 back on the Elmo for you, and I've highlighted a section there for you to see.  Do you see that?

A    Yes, I do.

Q    Okay.  Do you recognize -- and just so we're clear here, there are two sets of phone numbers here; correct?  I'm sorry, two columns of phone numbers?

A    Yes.

Q    And do you see one column that says "originating number"?

A    Yes, I do.

Q    And one that says "terminating number"?

A    Yes.

Q    And the part that I've circled here, do you recognize this phone number that I'm showing?  It starts (213) 217?

A    Yes, I do.

Q    And how do you recognize that phone number?

A    It is a fax number to Los Angeles County Jail, Warrants and Detainers section.

Q    And how do you know that, Ms. Farrar?

A    Because I have faxed thousands of records -- or thousands of documents to that number.

Q    Okay.  Now I'm showing you a separate page in this exhibit.  It's the part I've circled is 8/25/11 as the date; the time 9:40:53 a.m.  Do you see that?

A    Yes, I do.

Q    And do you see the two columns of phone numbers next to it?

A    Yes, I do.

Q    And what are those numbers?

A    (213) 894-7889 is our fax number at the Marshals Service, and the (213) 217-4973 number is the Los Angeles County fax number.

THE COURT:  You say that's the county number.  You mean that's the Sheriff's Department?

THE WITNESS:  Yes, the Los Angeles County Sheriff's Department Warrants and Detainers fax number.

Q    (BY MR. JAUREGUI)  Ms. Farrar, I'm going to show you Government Exhibit Number 163 which is in evidence, and directing your attention to the top part of the exhibit that says "Land line usage," do you see that?

A    Yes, I do.

Q    And what is that number that we're looking at?

A    It is the Los Angeles County Sheriff's Department, Warrants and Detainers fax number.

Q    And now moving down to this same page, and I've -- I've circled here an entry on this page, and could you tell the jury what we're looking at here.

A    The first phone number is (213) 894-7998, which is our fax number at the U.S. Marshals Service, and the other number is the number to Los Angeles County Sheriff's Department's Warrants and Detainers (213) 217-4973.

Q    Now I'm circling a separate entry on the same exhibit, Ms. Farrar.  Could you please -- and it's 8251183529A.  Do you see that?

A    Yes, I do.

Q    And if you could just please read that for the jury.

A    The first phone number is (213) 894-3881, which is a fax number in our office at the U.S. Marshals Service, and the number -- the second number is (213) 217-4973, which is the fax number to the Los Angeles County Sheriff's Department, Warrants and Detainers.

Q    And just to be clear about this, the first -- you refer to the first number.  Is that the originating number?

A    Yes, that is correct.

Q    And the second number, would that be the terminating number?

UNITED STATES DISTRICT COURT

A      Yes.

Q      And next to it there's a time period.  Do you see that?

A      Yeah, one minute and 15 seconds.

Q      And what does that represent?

A      I believe it represents how long it took for the fax to go through.

Q      And now I'm going to just go back to the first one we looked at on this page, and do you see it says point -- it says 0:14.  Do you see that?

A      Yes, I do.

Q      And what would that be?

A      I would assume that means 14 seconds for the time elapsed for the fax to go through.

MR. JAUREGUI:  No further questions for this witness, Your Honor.

THE COURT:  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q      (BY MR. STEWARD)  Counsel was just asking you about fax phone numbers and times and that sort of thing.

Do you know whether or not it was actually a fax that was sent during the periods of time he just discussed with you -- counsel discussed with you?

A      I would say yes since it originated from a fax number and went to a fax number.

Q    And beyond that, you have no knowledge as to whether somebody picked up the phone and actually off the fax machine may have had a conversation; right?

A    Not to my knowledge, no.

Q    Okay.  Did you -- were you the one that was faxing things right around that period of time?

A    I don't believe I was in the office on August 25th.  It would have been my employee Yolanda Baines.

Q    Okay.  And I think that you said that you had seen hundreds, if not thousands, of writs in your career?

A    I've seen hundreds of writs.

Q    Okay.  And that particular fax, is there any way to tell whose writ it was, if it was a writ?

A    No.

Q    Now, counsel showed you -- well, let me start with this: Looking at Exhibit 160, which appears to -- do you have that up there, 160?

A    I do.

Q    Okay.  A three-pager, appears to be an application for a writ, an order for a writ and the writ itself; right?

A    That is correct.

Q    In reviewing these pages, is there any indication that it was actually conveyed to the County?

A    No.

Q    So we've got a file stamp up in the corner; right?

UNITED STATES DISTRICT COURT

A      Yes.

Q      And that would be a file stamp from the U.S. District Court clerk's office; right?

A      That is correct.

Q      And then we've got a case number, and you know that's given by the clerk's office; right?

A      That is correct.

Q      And second page, we have -- appears to be Judge Snyder's signature August 25th; right?

A      That is correct.

Q      There's some numbering at the top where it says "Sealed document," and up here, is there any way to tell if this was conveyed to the Los Angeles County Sheriffs through the numbering at the top?

A      No, that numbering is something that is done by the clerk's office when they, I think, scan documents.

Q      And the third page, we have Mr. Middleton who was in the e-mail; right?

A      Yes.

Q      Any way to tell from that box or anything else on this piece of paper that the writ was conveyed to the Los Angeles County Sheriffs?

A      No.

Q      Now, looking at Government's 186, which is the e-mail counsel discussed with you, it's a two-pager; correct?

A    Yes.

Q    And these usually start backwards, upside down?

A    Uh-huh.

Q    So the original e-mail would have been the one that's at the bottom of the page and goes on to the second one; right?

A    Yes.

Q    And that's Mr. Middleton explaining to you about what he intends to do with this writ for the prisoner; right?

A    He's asking me how long it would take to -- if he gets us a writ, how long will it take to get the inmate into our custody.

Q    Okay.  And you very succinctly answer maybe a week if the County will let us have the inmate; right?

A    That is correct.

Q    And then he gives you another paragraph of information?

A    Yes.

Q    And then you tell him you're going to be out of town; right?

A    Yes.

Q    Did you ever have anything to do with this writ or this situation after this e-mail?

A    No, I forwarded it to Yolanda Baines who processed the writ.

Q    How do you know she processed the writ?

A    Because I would have checked on it and made sure she'd

done so.

Q    Okay.  Do you remember doing that?

A    Not off the top of my head, no.

Q    Okay.  Do you remember this whole incident?

A    I do vaguely, yes.

Q    Okay.  And you talked to the FBI about this back in April
of 2014; right?

A    Yes.

Q    And you told them then that you didn't remember the whole
situation that she and Middleton discussed in the e-mails;
right?  Remember telling them that?

A    Not -- not -- no, not particularly, but I know the
situation.  I do not remember all the specifics of it.

Q    Okay.  And your role in all of this was pretty much what
was in the e-mail; correct?

A    That is correct.

            MR. STEWARD:  Nothing further, Your Honor.  Thank
you.

            MR. JAUREGUI:  No redirect, Your Honor.

            THE COURT:  All right.  Thank you.  You may step
down.

            MR. JAUREGUI:  Your Honor, the government calls Tara
Adams.

            THE DEPUTY CLERK:  Please raise your right hand.

        (The witness, TARA ADAMS, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name's Tara Adams, T-A-R-A.  Last name Adams, A-D-A-M-S.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. JAUREGUI)  Ms. Adams, were you formerly employed by the Los Angeles County Sheriff's Department?

A    Yes, I was.

Q    When did you work for the Sheriff's Department?

A    From the year 2007 to 2014.

Q    And were you a sworn officer or a civilian employee?

A    Sworn officer.

Q    And what was your rank when you left the Department?

A    Deputy sheriff.

Q    In August of 2011, what was your assignment within the Department?

A    I was assigned to the records unit.  The title was head clerk deputy, watch deputy.

Q    And where is the records unit located?

A    It's attached to the Inmate Reception Center.

Q    And what is the Inmate Reception Center?

A    It's the receiving and processing of all male inmates that are housed within the county.  So a male inmate will be

received, processed, given a classification, medically triaged and then given a housing location throughout the county.

Q    Does IRC create files or records as well?

A    IRC does.  It creates a record jacket for every inmate that's housed, male and female within the county.

Q    And, Ms. Adams, do you know what is contained in a case jacket?

A    Yes, the record jacket has any bookings, any booking slips, initial booking slip and then a computer-generated booking slip.  It will have any additional warrants or holds of an inmate, court appearances, removal orders will be all filed inside the record jacket.

Q    And among the orders, would something like a writ be included in a booking jacket?

A    Yes, sir.

Q    And do you know, Ms. Adams, from working in the IRC, do you know where writs are sent when they're sent to the IRC?

A    They're sent to the Warrants and Detainers unit of the records unit.

Q    And typically, how does the Warrants and Detainers unit receive the writs?

A    It'll be typically a fax or a teletype -- electronic teletype.

Q    In August of 2011, how long had you worked at IRC?

A    IRC, approximately five years.

**UNITED STATES DISTRICT COURT**

Q    And how long had you been a deputy clerk?

A    Deputy clerk, for about a year and a half.

Q    At that time in August of 2011, who did you report to, Ms. Adams?

A    We didn't have a direct supervisor over our unit at that time.  I reported to -- it would be Lieutenant Libertone.

Q    And, Ms. Adams, are you familiar with the name Anthony Brown?

A    I am.

Q    And how are you familiar with that name?

A    He -- his name was brought to my attention on August 25th, 2011.

Q    And how was it brought to your attention?

A    Deputies were asking to have the inmate released from the computer system.

Q    Okay.  Let me take a step back.

     When did you begin working -- were you working on August 25th, 2011?

A    I was.

Q    And when did you begin working that day?

A    My shift started at 2:00, but I arrived at work at 1:45.

Q    And when you arrived at work, did anything unusual happen?

A    Yes.  I was arriving to work, and the office where I work, my lieutenant was standing waiting for me, and he told me they were waiting for me to show up.

UNITED STATES DISTRICT COURT

MR. STEWARD:  Move to strike.  Hearsay, Your Honor.

THE COURT:  Sustained.

Q     (BY MR. JAUREGUI)  Ms. Adams, when you showed up to work on August 25th, 2011, were there any individuals waiting for you that day?

A     Yes, there were.

Q     Who was waiting for you that day?

A     My lieutenant, Lieutenant Libertone, and three deputies.

Q     And did you know who those deputies were?

A     No, I didn't.

Q     Could you tell by looking at the deputies where they were assigned within the Sheriff's Department?

A     Yes.  By looking at them, I could identify they were wearing jeans and a green windbreaker that said Sheriff's Department on it.  Without their badge present, I identified them as OSJ, and then my lieutenant told me they were from OSJ.

MR. STEWARD:  Move to strike, Your Honor.  Hearsay.  The end, end part.

THE COURT:  The last part of the answer is stricken.  The jury may disregard it.

Q     (BY MR. JAUREGUI)  At any point in time, Ms. Adams, did those deputies identify themselves to you?

A     My lieutenant identified them for me.

Q     And at any point in time, did those deputies say to you what unit or division they were from?

UNITED STATES DISTRICT COURT

A     Yes.

          MR. STEWARD:  Objection, calls for hearsay.

          THE COURT:  Overruled.

Q     (BY MR. JAUREGUI)  And what did they say?

A     Yes, OSJ, Operation Safe Jails.

Q     Okay.  Was anyone else present when you arrived at work on August 25th, 2011?

A     The head clerk assigned to the office, Gus Academia.

Q     And, Ms. Adams, you mentioned earlier that the -- that you understood that you were being asked to release an inmate; correct?

A     That's correct.

Q     And how did you -- what did you do when you were told to release an inmate or asked to release an inmate?

A     I needed to input the information into the computer system to review it.

Q     And generally speaking, what did you understand releasing an inmate to mean?

A     Would mean that the inmate would be released from county jail.

Q     Did you input that -- did you receive an inmate's name?

A     I did.

Q     And what was that name?

A     I was given Anthony Brown's name and his booking number.

Q     And did you put that information into your computer

**UNITED STATES DISTRICT COURT**

system?

A     I did.

Q     And what happened when you did that?

A     When I put the information in, his booking number, it came up the inmate had a status of SP4.  So I identified the inmate was not eligible for release because he was pending transport to state prison.

Q     And what does SP4 mean?

A     State prison -- SP4 is state prison bound.  We've received the AOJ from the court, he's received a sentence, and he is to be transported to state prison.

Q     And when you determined that he was SP4, you said that he was ineligible for release; is that right?

A     That's correct.

Q     And what did you do with that information?

A     Well, I told them the inmate wasn't eligible for release. I was asking what they were looking to do, why they wanted the inmate released.  At one point, I recommended that the inmate be -- he could be released from the system but then immediately booked in under a new booking number and we can merge the information together, his record jacket, so we can merge them together.

Q     And why did you recommend that?

A     If they were looking to release the inmate, say, for his safety for some reason, they didn't want him to be named

**UNITED STATES DISTRICT COURT**

Anthony Brown, we could release that booking number, create a new name.  That would hide him from the general public, but then merge all the paperwork together so that way all information stayed the same, he would just have a different name.

Q    And what would be the purpose for merging the information together?

A    If they were in fear for his safety, to disguise him from the general public to be able to find him, they could give him a John Doe name, but then we could fingerprint him, and it would always come up that his actual name is Anthony Brown.

Q    And what happened when you made that recommendation?

A    Nothing.  It wasn't an option.

Q    And were you told -- did you say anything about fingerprinting the inmate?

A    Yes.  I said he would need to be immediately fingerprinted so we could always find him by his fingerprint or his CII number.

Q    And what did the deputy say to you in response to that, if anything?

            MR. STEWARD:  Objection, hearsay.

            THE COURT:  Overruled.

            THE WITNESS:  They didn't say anything.

Q    (BY MR. JAUREGUI)  Did you tell -- Ms. Adams, did you tell the deputies that the inmate would not be released?

A    Yes.

Q    And what did they say to you when you said that?

MR. STEWARD:  Objection, hearsay.

THE COURT:  Overruled.

THE WITNESS:  They said they had their orders to release the inmate.

Q    (BY MR. JAUREGUI)  And did they tell you who their orders were from?

A    Yes, they said they have the order from Tanaka.

MR. STEWARD:  Move to strike.  Hearsay.

THE COURT:  Overruled.

Q    (BY MR. JAUREGUI)  And at that time, Ms. Adams, did you know who Tanaka was?

A    Yes, he was the undersheriff of the Sheriff's Department.

Q    And when they said that they had their orders from Tanaka, what did you say in response to that?

A    I said that's fine, but he needs to put it in writing.

Q    And what did they say to you, if anything?

MR. STEWARD:  Your Honor, may I have a standing objection?

THE COURT:  No, you may not.

MR. STEWARD:  Objection, hearsay.

THE COURT:  Overruled.

THE WITNESS:  They said, "You are going to tell Tanaka no?"

Q    (BY MR. JAUREGUI)  And, I'm sorry, say that again.

A    They said, "Are you going to tell Tanaka no?"

Q    And what did you say to them in response to that question?

A    I said yes.

Q    And, Ms. Adams, why would you -- you understood Tanaka to be the undersheriff of the Department; correct?

A    That's correct.

Q    And why did you say that you would say no to Mr. Tanaka?

A    Because he didn't have the proper court documentation to allow the release to happen.  You would need -- because the inmate received a court sentence, you would need a document from the court superseding the original sentence, and that wasn't present.

Q    Did you know, Ms. Adams, from punching in Anthony Brown's name what his sentence was at the time generally?

A    No, I didn't.

Q    But you knew that he was bound for state prison?

A    That's correct.

Q    And did you ask if they had a court order?

A    I don't believe I did.  It was my understanding they didn't have any documents --

        MR. STEWARD:  Objection, nonresponsive at this point.

        THE COURT:  You may finish your answer.

        THE WITNESS:  It was clear they didn't have any

documents with them.

Q    (BY MR. JAUREGUI)  When you said to the deputies that you would tell Mr. Tanaka no, what did they say to you, if anything, in response?

MR. STEWARD:  Objection, hearsay.

THE COURT:  Overruled.

THE WITNESS:  One of the deputies stepped forward to use my phone, and he said, "We're going to call him, and you could tell him yourself."

Q    (BY MR. JAUREGUI)  And did you -- did they call Mr. Tanaka?

A    No, they didn't.

Q    What did you do next at that point, Ms. Adams?  Did you agree to release Anthony Brown?

A    No, I didn't.

Q    Was Anthony Brown eventually released from your system?

A    He was.

MR. STEWARD:  Objection, move to strike. Foundation.

THE COURT:  Sustained.

Q    (BY MR. JAUREGUI)  What happened next, Ms. Adams?

A    The deputies told me that they would call their captain and have their captain give me the orders to release the inmate.

MR. STEWARD:  Move to strike.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  That wasn't done.  At that same time as he was telling me he was going to call his captain, the head clerk I was working with, he released the inmate from the system.

Q    (BY MR. JAUREGUI)  And who was that?

A    Gus Academia.

Q    Was Mr. Academia -- he was -- you were the deputy clerk, he was your head clerk?

A    He was the head clerk assigned to the office, and I was the watch deputy assigned to work alongside him.

Q    Was he a civilian or a sworn employee?

A    He's a civilian.

Q    After Mr. Academia agreed to release Anthony Brown, what happened?

A    Gus released the inmate from the system, and a deputy took the record jacket from Gus, took it out of his hand.

Q    Did you attempt to stop the deputies from taking the record?

A    I did.  They were placing it in a manila envelope, and I told them they couldn't remove the record.  It was clear they were going to take the record jacket with them, and I told them --

MR. STEWARD:  Objection, nonresponsive at this point.

THE COURT:  Overruled.

THE WITNESS:  I told them they couldn't remove the record jacket from the unit.

Q    (BY MR. JAUREGUI)  And why did you tell them they couldn't remove the jacket from the unit?

A    Because it had all court documents for that inmate.  All record jackets are not to be removed from the records unit.  If for whatever reason those documents would be lost, we would lose all court documents pertaining to that inmate and potentially have an erroneous release on our hands.

Q    And what did they say to you, if anything, when you said they couldn't take the case jacket?

A    They didn't say anything.

Q    Did they take the case jacket with them?

A    They did.

Q    Do you know, Ms. Adams, whether there was a copy of the jacket retained?

A    I found out -- after the deputies left with the original jacket, a clerk came up to me and whispered she had a copy, she made a copy.

MR. STEWARD:  Move to strike.  Hearsay.

THE COURT:  Sustained.

Q    (BY MR. JAUREGUI)  Did you learn that a copy of the case jacket was made?

A    I did.

Q    Ms. Adams, have you ever released an inmate from the system at IRC?

A    Yes, I have.

Q    And had you ever yourself changed an inmate's name at the request of anyone else in the Department?

A    Yes.

Q    And I think you mentioned earlier that that's sometimes done for an inmate safety; correct?

A    That's correct.

Q    When that's done, when you've changed -- when you've changed an inmate's name or released an inmate, did you have court orders in those instances?

A    No.  Court orders to change an inmate's name, no.

Q    To release the inmate?

A    We've had court orders to release an inmate, yes.  To change an inmate's name, no.

Q    And the way Anthony Brown was released from your system, Ms. Adams, was that unusual?

A    Very.

Q    And why was that unusual?

A    The deputies were very adamant that the inmate be released even though there wasn't proper documentation.  Usually when we deal with this situation or situations similar, we'll always have proper documentation and/or an understanding of why we're being asked to do what we're doing, not demanding.

**UNITED STATES DISTRICT COURT**

Q     Ms. Adams, I'm going to turn your attention now to some exhibits.  If you could look at 122 in the exhibit binder, please, and there are multiple, so I'm not sure if the one in front of you has 122.

MR. JAUREGUI:  And, Mr. Fox, if you could bring up 122, page 1, please.  It's in evidence.

Q     (BY MR. JAUREGUI)  Okay.  Ms. Adams, it's in front of your computer as well.

Ms. Adams, do you recognize this as a case jacket?

A     As a record jacket, yes.

Q     As a record jacket, I'm sorry, I'm using the wrong term.

And what type of information is ordinarily contained on the outside of a records jacket?

A     Oh, basic name of the inmate, the last four numbers of the inmate's booking number so it can easily be identified, the booking number of the inmate, and any clerks who have handled the record jacket will typically stamp it with their name and employee number.

Q     And I don't know if I asked you this, Ms. Adams, but what does a records jacket look like physically?

A     It's a -- it's a folder that stands sideways.  You put the contents in from the top.

Q     And what are we looking at here in this -- on the screen?

A     This has a comments section for the records clerks to make their comments of what's been placed inside the jacket.

**UNITED STATES DISTRICT COURT**

There's a DCL hold that's been placed on August 8th.

Q    Okay.  Before we get there, would this be the outside of the jacket?

A    This is the outside of the records jacket.

Q    Okay.  And you mentioned DCL.  What is DCL?

A    Department of Corrections hold.

Q    And is that a federal entity or a state entity, do you know?

A    State.

Q    Okay.  And the -- do you see a release date for this inmate that we're looking at in 122?

A    I don't see a release date, no.

Q    Do you see -- Ms. Adams, let me direct your attention to the second line under "holds."  Do you see that?

A    I do.

Q    And what does that say, if you can read it?

A    On the second line?

Q    Yes.

A    It's "DCL was released."

Q    And what's the date?

A    8/7, August 7th.

Q    Okay.  And do you see a hold date?

A    I do.

Q    And what is the hold date?

A    August 8th.

UNITED STATES DISTRICT COURT

Q    And do you see a reason for release in this exhibit?

A    I do.  Towards the bottom, it says "release reason, other."

Q    And earlier we talked about aliases and giving aliases to inmates.  If an inmate had an alias, would that be reflected on the front of a records jacket?

A    No.

Q    It would not, okay.

MR. JAUREGUI:  I want to turn to 121, please, and it is in evidence.  And if Mr. Fox could publish the top part of 121.

Q    (BY MR. JAUREGUI)  Ms. Adams, what are we looking at here?

A    This is the printout from the AJIS system.

Q    What is the AJIS system?

A    Automated Justice Information System.  It's the system in which the Department uses to input all information pertaining to an inmate and their booking number.

Q    Okay.  Can you tell -- and do you work with that -- did you work with that system when you were at IRC?

A    Yes, sir.

Q    Okay.  Can you tell by looking at this document who this release document relates to?

A    Yes, Anthony Brown.

Q    And does it contain a release date?

A    It does.

Q     And what is the release date and also the time?

A     August 25th, 2011 at 1358 hours.

Q     And you were at work on August 11th -- August 25th, 2011 at that time; correct?

A     Yes, sir.

Q     And did you know then, Ms. Adams, what Anthony Brown looked like?

A     No, I didn't.

Q     And did you come to learn what he looked like at any point?

A     Yes, I did.

Q     And did you see Anthony Brown released on that date and time?

A     No, I didn't.

Q     What is the release agency reflected on this document?

A     Release agency is other.

Q     And what is the release location?

A     Release location is IRC.

Q     I want to turn you now to 124, please, and it is also in evidence.

      If it helps, Ms. Adams, you can just look at the screen.

             MR. JAUREGUI:  And, Mr. Fox, if you could just highlight a larger portion of that.

Q     (BY MR. JAUREGUI)  Okay.  What is this document, Ms. Adams?

A    This is the inmate movement system.

Q    And are you familiar with the inmate movement system?

A    Yes, sir.

Q    And what is it?

A    It's a system where we can identify the movement of every inmate based off their booking number.

Q    And did you open -- did you end up opening the exhibit in front of you or not?

A    No, I didn't.

          MR. JAUREGUI:  And, Mr. Fox, could you please show the whole document again.

Q    (BY MR. JAUREGUI)  And, Ms. Adams, what dates are visible on this exhibit?

A    August 16th, 2011 through August 25th, 2011.

Q    And does it then show the movement history for this inmate -- who is the inmate listed on this?

A    Anthony Brown.

Q    And does it show his movement history for that time period?

A    Yes, sir.

Q    Could you tell me where was Anthony Brown -- by looking at this document, could you tell where Anthony Brown was housed on August 18th?

A    On August 18th, the inmate was housed at Men's Central Jail, 3500.

Q      I'm sorry, go ahead.

A      3500.

Q      And is he then moved to a different section?

A      He is on August 18th moved to 1750, Men's Central Jail.

Q      And on August 25th, what does the document indicate happened then?

A      August 25th, it shows that the inmate was released.

Q      And where was he released?

A      It doesn't say where he was released.

Q      Okay.  I'm sorry, the last entry there, August 25th, 2011, 1:58 p.m.

A      Shows his housing location again, which was Men's Central Jail, 1751.

Q      And if it shows that he's released at 1:58 and then right above it it shows that he's at 1751, what does that indicate to you, if anything?

A      To me, leading up to the inmate being released, proper passes weren't sent for the inmate.  The inmate never arrived at the IRC release area, and I consider a glitch to be in the system.  The inmate was released while still housed at 1751, so it will automatically generate -- as soon as the inmate's released, it will generate his housing location.

Q      Okay.  And I'm going to direct you to 125, which is also in evidence.

          MR. JAUREGUI:  And if we could pull up 125, please.

**UNITED STATES DISTRICT COURT**

Q     (BY MR. JAUREGUI)  Ms. Adams, what are we looking at -- what are you looking at in 125?

A     125 is a record jacket for John Rodriguez.

MR. JAUREGUI:  And if you wouldn't mind turning to the third page of the exhibit, page 3, please.

Q     (BY MR. JAUREGUI)  Okay.  What are we looking at here on this page, Ms. Adams?

A     It's an initial booking slip, a carbon copy booking slip.

Q     And who is this for?

A     John Rodriguez.

Q     And what is the arrest date listed here?

A     The arrest date is August 25th, 2011.

Q     I'm going to do this to make it easier for you, Ms. Adams.  Okay.  I'm showing you page 3 of Exhibit 125 on the Elmo.  And what is the arrest agency?

A     Arrest agency shows LASD Temple Station.

Q     And what does it say under the prisoner's signature when booked?

A     "Refused."

Q     What does it say under the social security number?

A     "Refused."

Q     Who is the arresting officer?

A     Arresting officer is Deputy Colon.

Q     And at that time, did you know who Deputy Colon was?

A     Yes, I did.

Q     And did you know what unit or subdivision he was assigned to?

A     He was assigned to OSJ, Operation Safe Jails.

Q     So would he have been part of Temple Station?

A     No, he would not have.

Q     Okay.  I'm going to turn now to page 5 of this document.

THE COURT:  How much longer do you have with this witness?

MR. JAUREGUI:  I would say 10 minutes -- 5 to 10 minutes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the morning.  Again, I want to remind you that until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

**UNITED STATES DISTRICT COURT**

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at ten o'clock.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Okay.  Anything we need to take up?

MR. JAUREGUI:  I don't believe so, Your Honor, no.

MR. STEWARD:  No, Your Honor.

THE COURT:  All right.  Thank you.

(Off the record at 9:47 a.m.)

(On the record at 10:02 a.m.)

MR. FOX:  Your Honor, do you want the witness on the stand?

THE COURT:  Yeah, that's fine.

(Pause in proceedings.)

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR. JAUREGUI:  May I proceed, Your Honor?

THE COURT:  Yes, please.

Q    (BY MR. JAUREGUI)  Ms. Adams, I'm going to put Exhibit Number 125 back on the screen, and I'm publishing page 5 of the exhibit.

UNITED STATES DISTRICT COURT

And what are we looking at here, Ms. Adams?

A    This is the back of a booking slip.

Q    And do you see where it says "fingerprints" there in the center of the exhibit page?

A    I do, sir.

Q    And what does it say there in handwriting?

A    "Refused."

Q    And, Ms. Adams, earlier when you testified about changing an inmate's name, you have changed an inmate's name; correct?

A    Yes.

Q    In those instances -- and you did so without a court order?

A    That's correct.

Q    Did you ensure that the inmate was fingerprinted?

A    Always.

Q    And why did you do that?

A    It's important to be able to track an inmate.  So if an inmate's name is changed to John Doe, you always will have a fingerprint, a CII number generated that can easily track any aliases the inmate's been booked under.

Q    What's a CII number?

A    California Information Index number.

Q    And what does that number allow someone to do?

A    It allows all law enforcement agencies to identify an inmate.  So if I receive a call from an outside agency looking

for an inmate Juan Rodriguez, typically I would put in a CII number, just in case Juan Rodriguez decided to give a fake name like John Doe at the time of booking.  So it allows any law enforcement agency to quickly identify an inmate or individual.

Q    When you said a law enforcement entity or agency, would that include the FBI?

A    Yes.

Q    And when Anthony Brown was released by Gus Academia, was there -- did the deputies agree to fingerprint Anthony Brown?

A    No, they didn't.

Q    Okay.  I'm going to turn to page 6 of this exhibit.

And what are we looking at here, Ms. Adams?

A    This is a public information screenshot.

Q    And when you say "public information screenshot," is this something that's available to the public via the Sheriff's Department website?

A    That's correct.

Q    Okay.  And who is this public information screenshot for?

A    For John Rodriguez.

Q    And typically, what kind of information is available to the public from the Sheriff's Department website?

A    Basic information, birth dates, names, future court dates, arrest reason, arresting officer, arresting location.

Q    I'm sorry, just a logistical or practical thing,

Ms. Adams, are you touching the screen when you're looking at the exhibit?

A     No.

MR. JAUREGUI:  Just getting these white things on the screen, Your Honor.  If we could just -- okay.

Q     (BY MR. JAUREGUI)  And going back to this page, Ms. Adams, what is the date booked -- can you tell what the date booked is by looking at this page?

A     Down at the bottom, arrest date says August -- oh, I just touched it -- August 25th, 2011.  Maybe I was touching it.

Q     And what is the time booked?

A     Time booked is 1705 hours.

Q     And the arrest date, please?

A     The arrest date is August 25th, 2011.

Q     I'm going to turn now to the next page.

And what is the housing assignment listed for this inmate?

A     Housing location is -- I don't see that, sir.  It's not listed.

Q     Is it blank?

A     Yes, it's blank.  It's at the top.

Q     And under the release section, do you see that?

A     I do.

Q     What does it indicate under "release"?

A     Release date is August 26th, 2011 at 2029 hours, orders for release: from court.

UNITED STATES DISTRICT COURT

Q    The release reason --

A    Release description is court.

Q    And if you could just take a look at that whole exhibit in front of you, please, Ms. Adams.

A    What number was it, sir?

Q    It's 125, and it's in evidence.

Do you see a court order in that exhibit?

A    No, sir.

Q    I'm going to turn you to page 9 -- or directing your attention to page 9, I'm publishing it here on the screen for you.

What are we looking at here, Ms. Adams?

A    This looks like the inmate movement.

Q    Could you tell by looking at this where the inmate was located on August 25th, 2011?

A    August 25th, 2011, booked into IRC.

Q    And on August 26th, 2011, could you see where he was booked before his release according to this document?

A    Yes, Men's Central Jail, 1750.

Q    I'm going to direct your attention to Exhibit Number 127, please.

MR. JAUREGUI:  And I'm going to ask Mr. Fox to publish 127.

Q    (BY MR. JAUREGUI)  What are we looking at here, Ms. Adams?

A    This is the inmate movement history.

UNITED STATES DISTRICT COURT

Q     And who is it for?

A     For John Rodriguez.

Q     And according to this document, where was John Rodriguez on August 25th, 2011 at 5:05 p.m.?

A     He was -- looks like just received by IRC, the Inmate Reception Center.

Q     And according to this document, is he then moved on August 27th -- I'm sorry, August 25th?

A     He is, through the Inmate Reception Center.  So he went to booking front and then was processed to Men's Central Jail, IRCJ.

Q     And is he then released according to this document?

A     Yes, that's correct.

Q     And where -- when is he released?

A     At 829 hours, or 8:29 p.m.  Released, it looks like from court.

Q     And last exhibit is 129, please.

        MR. JAUREGUI:  Yes, please, if you can publish it, please, Mr. Fox.

        Okay.  And if we could just focus on the bottom of it.

Q     (BY MR. JAUREGUI)  Ms. Adams, what are we looking at?

A     This is a -- the public information for a Chris Johnson.

Q     And so this is something that the public could look up, could see on the Sheriff's Department website if they wanted to?

**UNITED STATES DISTRICT COURT**

88

A    That's correct.

Q    Okay.  Focusing your attention at the bottom part of this document, could you please tell us what the release reason is listed as.  Oh, I'm sorry.  If we could go to the back to the next page, please.

A    Release reason is other.

Q    And what is the description -- the reason description?

A    Reason description is custody.  Agency not listed.

Q    Now, Ms. Adams, have you testified in -- about these same subjects, the same types of things we're talking about today previously?

A    Yes, I have.

Q    And when was that?  Without telling us anything about it, when was that?

A    I believe 2014, May 2014.

Q    And, Ms. Adams, are you familiar with the defendant in this case, Paul Tanaka?

A    I am.

Q    Have you filed a lawsuit against Paul Tanaka?

A    Against the Sheriff's Department, and Paul Tanaka's named.

Q    Is he named in his personal capacity or in his official capacity, or do you know?

A    Official capacity.

Q    At the time that you previously testified, Ms. Adams, had you sued Paul Tanaka?

UNITED STATES DISTRICT COURT

A       No, I hadn't.

Q       And did you have a plan or a thought to sue him then?

A       No, I didn't.

              MR. JAUREGUI:  One moment, Your Honor.

        No further questions, Your Honor.

              THE COURT:  All right.  Cross-examination.

              MR. STEWARD:  Thank you, Your Honor.

                         CROSS-EXAMINATION

Q       (BY MR. STEWARD)  And when was that lawsuit filed?

A       It was filed May 2015.

Q       And the plaintiff is you?

A       Yes, sir.

Q       And the defendants are the Los Angeles County Sheriff's
Department; right?

A       That's correct.

Q       You've read the lawsuit; right?

A       I have.

Q       Okay.  And also defendants, Mr. Tanaka?  Yes?

A       That's correct, sir.

Q       Anybody else?

A       Yes, sir.

Q       Who else?

A       Chuck Antuna, the captain of IRC at the time of the
Anthony Brown incident; Juan Sanchez, a deputy I work with;
Mike Camacho; and our captain at the time of my resignation,

                    **UNITED STATES DISTRICT COURT**

Callier, I believe is the name.

Q    And you're seeking monetary compensation; correct?

A    Yes, I am.

Q    And this is not the first time you've sued the L.A. County Sheriff's Department; right?

A    No, sir, this is the first time.

Q    So the only lawsuit that you've ever filed is this one; correct?

A    That's correct.

Q    Not in the 1990s, a civil lawsuit?

A    No, sir.

Q    Okay.  When did you start with the Sheriff's Department?

A    2007.

Q    Now, when the three deputies you've described came to your place of employment that day, did you know any of those three?

A    No, I didn't.

Q    Had you ever seen them before?

A    Not to my recollection.

Q    And they were not wearing badges; correct?

A    That's correct.

Q    And your main means of identification that they were, in fact, sheriff's deputies was the green jacket?

A    That's correct, with the sheriff's logo.

Q    Okay.  Did they show you any ID?

A    No, they didn't.

Q    Were they -- in 2011, September, August, was your place of employment within a secured area?  In other words, did you have to show ID to get to your office?

A    Yes, you did.

Q    Okay.  And so the fact that they were there, you assumed they were real deputies; right?

A    That's correct.

Q    And one of them made the comment about "Are you going to disappoint Paul Tanaka," something like that?

A    No.

Q    Straighten me out.

A    They did not say --

Q    Straighten me out.  What did they say?

A    They said, "Are you going to tell Tanaka no?"

Q    Okay.  And at that point, you said, "Yes, I am"?

A    Yes.

Q    And you wanted it in writing; correct?

A    He would need to put it in writing.  If those were his orders, he would need to put the orders in writing, that's correct.

Q    And because this was a very unusual procedure, you suspected that Paul Tanaka didn't know about it; right?

A    No, I suspected he did know about it and gave the orders.

Q    Okay.  But that's why you asked for it in writing --

A    He would need to put it in writing.

UNITED STATES DISTRICT COURT

Q    -- so that you could verify that Mr. Tanaka knew about this; right?

A    That's correct.

Q    As you sit here today, you don't know whether or not he knew about their trip to your office, do you?

A    It is my belief that he gave the orders.

Q    Okay.  And what do you base that on?

A    Based off of -- a deputy is not going to use Paul Tanaka's name unless they have the orders from Paul Tanaka.

Q    Okay.  And then they said they're going to call Mr. Tanaka right then?

A    That's correct.

Q    And that didn't happen either, did it?

A    No, it did not.

Q    And by that point, you're thinking these guys are bluffing; right?

A    No, I wasn't, sir.

Q    And they didn't call Mr. Tanaka's office; right?

A    That's correct.

Q    And they didn't provide you with any written authorization or anything from Mr. Tanaka; right?

A    That's correct.

Q    And many of the things that you've testified about today are included in the civil suit against Mr. Tanaka; right?

A    Yes, sir.

Q    The entire incident with the three deputies is set out in some detail in your complaint against Mr. Tanaka; right?

A    That's correct, sir.

Q    And you're looking for money from that; correct?

A    Yes, sir.

Q    When did you leave the Sheriff's Department?

A    2014, sir.

Q    Why?

A    Because of the stress that I endured on the Sheriff's Department after the events of August 2011, I was not ready to go back to work.

Q    So when you say that, you were ostracized?

A    I was.

Q    Okay.  And that's really the heart of your lawsuit; correct?

A    One key point, sir, but not the heart of my lawsuit, no.

Q    Now, you were the one that suggested the name change of Anthony Brown when those three deputies came by; right?

A    I said -- yes, that's correct.

Q    And you had seen other instances where inmate names were changed; right?

A    That's correct.

Q    And that was, for among other reasons, inmate safety?

A    Inmate safety is one, yes, sir.

Q    And you've seen examples where, for example, an informant

UNITED STATES DISTRICT COURT

who informs against the Mexican Mafia needs to have the name changed for his protection; right?

A     That's correct.

Q     Okay.  And you've seen that more than once; right?

A     Yes, sir.

Q     Okay.  It's not unique; correct?

A     No, sir.

Q     Okay.  In this case when the deputies came to you, the three of them, did they tell you that other deputies may want to harm Mr. Brown?

A     No, they did not.

Q     If they had have told you that, would that have been a unique circumstance?

A     It would have been unique, yes, sir.

Q     So you'll agree with me that Mr. Brown and his situation was unique; right?

A     Yes, sir.

        MR. STEWARD:  I have nothing further, Your Honor. Thank you.

        THE COURT:  All right.

        MR. JAUREGUI:  One moment, Your Honor.

                    REDIRECT EXAMINATION

Q     (BY MR. JAUREGUI)  Ms. Adams, you mentioned -- defense counsel asked you about being ostracized in the Department; is that right?

**UNITED STATES DISTRICT COURT**

A     Yes, sir.

Q     And you mentioned that stress was one reason for your lawsuit?

A     Yes, sir.

Q     Could you explain to the jury the basis for your lawsuit.

A     Yes, sir.  It's known on the Department you do not say no to Paul Tanaka.  Once I said, you know, No, I will not follow these orders unless they're put in writing, or the clerks I work with, I will not allow them to place themselves in a position of releasing an inmate without proper court documentation, it was at that moment many events happened in the four years after that, three years after that that influenced my filing a lawsuit.

Q     And how were you ostracized?

A     People didn't want to interact with me.  I was the deputy who said no to orders.  You don't say no to Paul Tanaka.  Lieutenants -- no one told me the actions I took that day was the right thing to do.  No one wanted to place themselves in a position of going against the potential future Sheriff of the Department.

          MR. STEWARD:  Move to strike, Your Honor.  Speculation.

          THE COURT:  Overruled.

     (Plaintiff's counsel conferred off the record.)

Q     (BY MR. JAUREGUI)  And, Ms. Adams, you were asked by

defense counsel about the OSJ deputies; correct?

A    That's correct.

Q    Did they tell you that they were from OSJ?

A    They either told me or Lieutenant Libertone -- I believe it was Lieutenant Libertone said they were from OSJ.

MR. JAUREGUI:  No further questions, Your Honor.

MR. STEWARD:  Just one or two follow-up, Your Honor.

RECROSS-EXAMINATION

Q    (BY MR. STEWARD)  And you left the Department in 2014?

A    That's correct, sir.

Q    And what month, do you remember?

A    I believe the month would be June.

Q    And are you aware that Mr. Tanaka left the Department in March of 2013?

A    Yes, sir.

Q    Okay.  And so you worked almost a year after he was gone; correct?

A    Not correct, sir.  I was on maternity leave.

Q    So you came back after that?

A    No, sir.

Q    When did you actually physically leave the Department?

A    I guess it would be September of 2013.

Q    And Mr. Tanaka had left the Department six months before that; right?

A    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q    And you kept working those six months; correct?

A    That's correct.

MR. STEWARD:  Nothing further, Your Honor.  Thank you.

MR. JAUREGUI:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you.  You may step down.

Call your next witness.

MR. FOX:  The government calls Gus Academia.

THE DEPUTY CLERK:  Will you raise your right hand for me, please.

(The witness, GASAT ACADEMIA, was sworn.)

THE DEPUTY CLERK:  Thank you.

Will you please have a seat up there.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Gasat Academia.  Last name is spelled A-C-A-D, as in David, E-M-I-A.

THE DEPUTY CLERK:  Could you also spell your first name for us.

THE WITNESS:  Sure.  It's G-A-S-A-T, as in Tom.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

//

DIRECT EXAMINATION

Q    (BY MR. FOX)   Mr. Academia, where do you currently work?

A    I am presently working at the Los Angeles County Sheriff's Department.

Q    How long have you worked for the Sheriff's Department?

A    Approximately 26 years.

Q    What current role do you perform?

A    I'm a head custody records clerk.

Q    What are your duties as the head records custody clerk?

A    We handle problems on the floor on the shift, and we designate work for the employees, answer phone calls from other law enforcement agencies and the public.

Q    How long have you held that title?

A    About eight years.

Q    Where are your -- where is your present location?

A    At the Inmate Reception Center.

Q    Were you working August 25th of 2011?

A    Repeat the question, sir.

Q    Were you working on August 25th of 2011?

A    Yes.

Q    Were you at the Inmate Reception Center?

A    Yes.

Q    Do you recall an incident in which you ultimately released an inmate from the computer system?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    Can you describe that incident, please.

A    Well, there were three deputies that came into our office. I was working with Deputy Hadley.

Q    You say Deputy Hadley.  Did she go by a different name as well?

A    Deputy Adams.

Q    Okay.  Go ahead.

A    So these three deputies came into our office and asked me and Deputy Hadley about hiding an inmate.

Q    What happened after they asked you about hiding an inmate?

A    I suggested that I can change location to IRCM.

Q    What is IRCM?

A    IRC stands for Inmate Reception Center, M is for movement.

Q    Why did you suggest changing the housing location to that, to IRCM?

A    Well, that was done in the past, and this is just to have this inmate in a hiding place or not in a permanent housing location.

Q    What is the benefit of having the documents reflect that the inmate is at IRCM?

A    It's not going to show where this inmate is.  It's not going to show the housing location of the inmate, that this inmate could be in movement from one place to another.

Q    After you made this recommendation, what happened?

A    Well, the three deputies didn't like what I suggested.

UNITED STATES DISTRICT COURT

Instead, they wanted me to release this inmate out of the system.

Q    Is that what they said to you?

A    Yes, sir.

Q    Had this ever happened to you before that, somebody asked you to release an inmate out of the system?

A    No.

Q    At the time that they made this request of you to release the inmate out of the system, did you think you had the ability to release the inmate?

A    No.

Q    Why not?

A    I already ran the booking number in the database system, and I found out that this inmate is already sentenced to state prison.

Q    So what did that tell you that you needed in order to release the inmate from the system?

A    I needed some -- I needed a court order.

Q    Did you communicate that to the gentlemen that were in the office?

A    I did.

Q    What, if anything, did they say?

A    They said they don't have the court documents or the abstract of judgment authorizing this inmate for release to state prison.

**UNITED STATES DISTRICT COURT**

Q    What is an abstract of judgment?

A    It is a -- it is a court order that this inmate is ready to be transported to be -- to be transported to state prison.

Q    When you ran -- well, first of all, do you remember the inmate's name?

A    Say that again, sir.

Q    Do you remember the inmate's name that you were looking up?

A    Yes.

Q    What was his name?

A    Anthony Brown.

Q    When you looked up Anthony Brown, did you learn anything about his custodial status?  In other words, had he already been sentenced to prison?

A    He's already sentenced to state prison.

Q    Why was that important to you that he had been sentenced to state prison?

A    That he's the property of state prison.

Q    And why does it matter whether an inmate is property of state prison versus county prison -- jail, excuse me?

A    They should be still in custody.

Q    What happened after the two of you -- or I'm sorry, the four of you communicated about whether they had a court order or not?

A    Well, I told them that I can't release the inmate because

this inmate is sentenced to state prison.  Then afterwards, they left.

Q    What happened next?

A    About five to ten minutes, they came back -- these three deputies came back with Lieutenant Libertone.

Q    Do you remember what these deputies were wearing?

A    They were wearing civilian clothes, but they have green jackets with them that looks like a windbreaker.  It has imprinted "sheriff" on their jackets.

Q    And when they came back with Mr. Libertone, what, if anything, occurred?

A    Lieutenant Libertone came to me and ordered me to release the inmate from the system.

Q    Did anyone say anything to you about what they were going to do about Mr. Brown being property of the state?

A    They told me that -- you know, that they're going to be the one to transport this inmate to state prison.

Q    At some point, did you decide to release the inmate as Mr. Libertone told you that do?

A    Not yet.  I told him I needed a court order.

Q    And what did he say in response, if anything?

A    He told me that it's okay for me to release the inmate from the system.

Q    Did you do it at that point?

A    Not at that point, sir.  I called Minda Wilridge.

Q    Who is Minda Wilridge?

A    She's a Los Angeles County Sheriff civilian employee that supervises records state prison section.

Q    Now, you mentioned that she's a civilian employee.  Were you a civilian employee as well?

A    Yes, sir.

Q    What about Deputy Hadley, or as you referred to her as Deputy Hadley or Deputy Adams, was she a civilian or sworn employee?

A    She's a sworn employee.

Q    And after you contacted Ms. Wilridge, what, if anything, did she say to you about releasing the inmate?

A    She told me that we needed a court order or abstract of judgment.

Q    Did you communicate that to the people in the room?

A    I did.  I told Lieutenant Libertone.

Q    What happened then?

A    Well, Lieutenant Libertone was very persistent about releasing -- told me to go ahead and release the inmate.

            MR. STEWARD:  Move to strike, Your Honor.  Hearsay.

            THE COURT:  Overruled.

Q    (BY MR. FOX)  At that point in time, did you to that?

A    Yes, because he told me that the captain knows about this, that the commander knows about this and Undersheriff Tanaka knows about this.

UNITED STATES DISTRICT COURT

Q     So what did you do to release the inmate from the system?

A     Well, I sign out the jacket.  I wrote down "other" as the reason, and I put my signature in front of the jacket.

Q     Mr. Academia, I'm going to show on your screen Exhibit 122, which is in evidence, and specifically direct your attention to the bottom right-hand corner of the first page that I've highlighted.

      Do you see that area that I've highlighted on your computer screen?

A     Yes.

Q     Do you recognize the signature under "Released by"?

A     Yes.

Q     Whose signature is that?

A     That's my signature, sir.

Q     And what is listed under "Reason for release"?

A     It spells out OTHR, which is short for "other."

Q     Why did you write "other" down as the reason for release?

A     Well, at that time, they told me not to put anything there, just put "other" because they don't know where this inmate is going and they don't want anybody to know.

Q     What, if anything, did you do with this records jacket after you signed it and wrote on it?

A     After I signed it and wrote on it, I performed RL.13 function.

Q     I'm sorry, what did you do with the actual physical

**UNITED STATES DISTRICT COURT**

records jacket after you signed it and wrote on it?

A    I handed it to Lieutenant Libertone.

Q    Why did you provide the records jacket to Mr. Libertone?

A    Because I just released the inmate out of the system, and they asked for it.

Q    You mentioned in a previous answer that you performed RL.13.  What is RL.13?

A    Well, this is one of the computer screens that we use, and this is part of the Automated Justice Information System database that we use.  And this is where we can go to initiate the release of the inmate from custody or from the Sheriff's custody.

Q    I'm going to show you now on your screen what's in evidence as Exhibit 121.

Is this the RL.13 screen that you were referring to?

A    Correct, sir.

Q    And is that indicated in the upper left-hand corner of the document, RL.13?

A    Correct, sir.

Q    And I'm not going to spend a lot of time on this, Mr. Academia, but the release date and time are in the area that I'm highlighting; correct?

A    Correct.

Q    And the agency released to is also in that area as well; correct?

A    Yes.

Q    What does it list for the agency released to?

A    "Other."

Q    Did you type that in?

A    Yes.

Q    Why did you write -- type in "other" for agency release to?

A    Because at the time, they told me to just put "other" because they don't want anybody to know where this inmate is going.

Q    Does the computer automatically populate the release date and time, or is that something that you entered into this computer system?

A    It automatically populates.

Q    Mr. Academia, if you did not think that you could release the inmate without a court order, why did you decide to do it?

A    Because I was given a verbal order, and I was scared.  I was pressured.

        MR. FOX:  One moment, Your Honor.

    I have no more questions of this witness, Your Honor.

        THE COURT:  All right.  Cross-examination.

        MR. STEWARD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

Q    (BY MR. STEWARD)  And when the one of the three deputies said to you that Tanaka and other higher-up folks know about

this, you didn't know if this was true or not; correct?

A    Correct.

Q    Did you talk to Mr. Tanaka about this?

A    No, sir.

Q    Did you call him?

A    No, sir.

Q    Did you e-mail him?

A    No, sir.

Q    Did you make any attempts to find out if what these deputies were saying was true?

A    No, sir.

Q    And you didn't personally know these detectives; right?

A    No, sir.

Q    You didn't know what part of the Sheriff's Department they worked for; right?

A    Not at that time, sir.

Q    Now, you've been a part of, to use your word, hiding inmates before; correct?

A    Correct, sir.

Q    And usually, that's in the context of the safety and security of the inmate; right?

A    Correct, sir.

Q    And that would be when other inmates may want to harm a particular inmate; right?

A    Correct, sir.

Q    Have you ever been involved in hiding an inmate where deputies may be the ones that want to harm the inmate?

A    No, sir.

Q    So if that were true, this would be a unique situation; right?

A    Correct, sir.

       MR. STEWARD:  Thank you, Your Honor.  Nothing further.

       MR. FOX:  Your Honor, I have a brief redirect.

                    REDIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Academia, are you aware of whether inmates who have committed, let's say, violence on deputy sheriffs are still maintained in county custody?

A    Yes.

Q    Has anybody ever come to you and asked you to perform this type of release function with respect to those inmates who had previously committed violence on deputies?

A    No.

       MR. FOX:  Nothing further, Your Honor.

       MR. STEWARD:  No recross, Your Honor.

       THE COURT:  All right.  You may step down.  Thank you.

     Call your next witness.

       MR. FOX:  The United States calls Kathy Voyer.

       THE DEPUTY CLERK:  Stand here for me, please.

Raise your right hand.

(The witness, KATHERINE VOYER, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Yes.  Katherine Voyer, and it's spelled V, as in Victor, O-Y-E-R.

THE DEPUTY CLERK:  Do you spell Katherine with a C or a K?

THE WITNESS:  With a K.

THE DEPUTY CLERK:  Thank you.

THE WITNESS:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Ms. Voyer, what do you do for a living?

A    I'm currently retired.

Q    How long have you been retired?

A    One year today.

Q    What did you do before you were retired?

A    I was a lieutenant with the Los Angeles County Sheriff's Department.

Q    How long did you work for the Sheriff's Department?

A    For 28 years.

Q    Now, Ms. Voyer, I want to ask you about whether you have

any pending lawsuits against the Sheriff's Department currently.  Do you?

A     No.

Q     Have you sued the Sheriff's Department previously?

A     Yes.

Q     When approximately have you done that?

A     The first one -- there are two.  The first one was in, I believe, 2006, and the second one was 2013.

Q     Have you ever sued Mr. Tanaka personally?

A     No.

Q     I want to take you now to August of 2011, August 25th and 26th.  Were you working those days, do you recall?

A     Those exact days I'd have to check my calendar, but I don't remember which ones -- there was one day that I was not in work that day.

Q     Okay.  But either on August 25th or 26th, you're saying you worked one of those days but not the other?

A     Correct.

Q     Based on your role as a lieutenant, did you come to understand how writs would come into the Department?

A     Yes.

Q     How would they come in?

A     They'd come -- somebody would deliver it.  It would be what we'd call over-the-counter.  And then it would be served on our records personnel within the Inmate Reception Center,

and they would handle it.

Q    Where were you working in late August of 2011?

A    I was the administrative lieutenant, and I handled special administrative issues, medical liaison.  I had scheduling and training that I also oversaw and then any special projects that would come up.

Q    If writs were properly entered into the computer system that you received, how would that occur?

A    The clerks would enter it.

Q    And then how would the writs -- do you know how the writs would ultimately be processed?  In other words, how would the prisoners ultimately get to where they needed to go?

A    No.

Q    I want to ask you now about whether you learned in August of 2011 that a cellular phone had been found on an inmate at Men's Central Jail.

A    Yes.

Q    Do you recall how you learned about that?

A    Yes.

Q    How did you learn about it?

A    I walked into a conversation that was taking place in the Inmate Reception Center operations office.

Q    Did you know about the cell phone being recovered before that conversation, or was it at that conversation you learned about it?

A       It was during that conversation.

Q       Who was involved in that conversation?

A       There were two lieutenants.  One was Pat Libertone; he was the operations lieutenant, and then another lieutenant that I didn't recognize.

Q       Can you describe this other lieutenant for the jury, please.

A       He was about the same height as Libertone, about five-eleven, six-foot; male; Caucasian; mid- to late-30s.

Q       Now, in terms of rank, what position did you say you were at the time?

A       I was a lieutenant.

Q       So you were the same level as these other individuals; is that right?

A       That's correct.

Q       How can you tell if somebody's a lieutenant?

A       This person in this case, he was in full Class A uniform, and he had the single gold bar on his collar, which is the insignia for a lieutenant.

Q       And when you first walked up to these individuals, were they talking to you, or were they talking to each other?

A       They were talking to each other.

Q       What, if anything, did you overhear?

A       I heard them talking about not allowing any federal agent in to visit any inmate or into any facility.

Q    You mentioned that Mr. Libertone was someone you knew. Was he the one that said that, or was it the lieutenant you didn't know that said that?

A    It was the lieutenant I didn't know.

Q    You said that -- I'm sorry, did you say the federal agency wouldn't be allowed into the facility?  Is that what you said?

A    Correct.

Q    Okay.  Was there any discussion about the writ at that time?

A    Yes, there was.

Q    Who made a comment about a writ?

A    The other lieutenant.

Q    The one you didn't know?

A    Correct.

Q    What did that lieutenant say about a writ?

A    Said that if a writ was served anywhere to any facility -- custody facility, that it was not to be honored, and that Paul Tanaka's cell phone was to be called immediately, day or night.

Q    Did you hear anyone in that conversation refer to Anthony Brown -- the name Anthony Brown?

A    Yes.

Q    At some point, did they turn to you and give you any direction on what to do?

A    Yes.

Q    What happened?

**UNITED STATES DISTRICT COURT**

A    They asked that I go over to the watch commander for Inmate Reception Center, go over to the secure side where the inmates were being processed and pass that information along personally.

Q    Did you do that?

A    I attempted to.

Q    Why did you attempt to do that?

A    Because the watch commander wasn't in the office when I arrived.

Q    So what happened when you went over there to inform the watch commander of this?

A    I -- the reason for the personal delivery was that they didn't want anything traceable by e-mail, or they believed --

        MR. STEWARD:  Move to strike.  Nonresponsive.

        MR. FOX:  Your Honor, I'll ask a different question if that's okay with you.

Q    (BY MR. FOX)  When they provided you with the direction to go tell the watch commander, did they say anything about whether to write a note or not?

A    Yes, they did.

Q    What did they say?

A    They said do not write it down.

Q    Did they say anything about whether to use a phone or not?

A    Yes, they did.

Q    What did they say?

A    Do not use the phones.  They believe they were tapped.

Q    So what did you do?

A    I walked over to the watch commander's office.

Q    And what did you do once you got there?

A    I saw that the watch commander was not in his office, but on the blotter on the desk was a handwritten note with just that information.

Q    And what information was that?

A    That no writ be honored; that Paul Tanaka's cell phone was to be called; feds weren't allowed into the facility.  That was basically it.

        MR. FOX:  One moment, Your Honor.

    (Plaintiff's counsel conferred off the record.)

Q    (BY MR. FOX)  Ms. Voyer, did you say that the written note said the writ should be honored or shouldn't be honored?

A    Should not.

        MR. FOX:  No further questions, Your Honor.

                    CROSS-EXAMINATION

Q    (BY MR. STEWARD)  You have blamed Paul Tanaka for the destruction of your career at the Sheriff's Department; right?

A    I have not.

Q    Do you recall testifying in front of the federal grand jury March 27, 2013?

A    Yes.

        MR. STEWARD:  And for the Court and counsel, I'm on

page 27, lines 3 through 11.

Q    (BY MR. STEWARD)  You were asked the following question --

THE COURT:  Excuse me, sir.

MR. STEWARD:  I'm sorry, Your Honor.

THE COURT:  Let's see if counsel can find it.

MR. STEWARD:  My apologies.

(Counsel conferred off the record.)

MR. FOX:  Your Honor, I -- at this point, I object to this.

THE COURT:  All right.  Does somebody have a copy?

MR. STEWARD:  Certainly.  The Court can have mine.

Let me try again here, Your Honor.

Q    (BY MR. STEWARD)  Was there an incident some years ago involving Chief Ronnie Williams that Mr. Tanaka, in your view, was involved in?

A    Yes.

Q    Okay.  And as a result of that incident, did you -- well, did you testify -- do you recall testifying about that incident in the federal grand jury?

A    Vaguely, yes.

Q    Okay.  Were you asked the following question --

THE COURT:  No, no, no.

MR. FOX:  Your Honor, I object, not only in the form that this is happening, but also to the substance of it.

THE COURT:  Does somebody have a copy?

UNITED STATES DISTRICT COURT

Let's go to sidebar.

(Discussion held at sidebar.)

MR. FOX:  It's my understanding that Mr. Steward wants to impeach based on this page that I'm handing to Your Honor, page 27, lines 3 through 10.  It's not directly impeachable based on what she's saying.  He asked you, Do you believe Paul Tanaka destroyed your career.  This is more about Ronnie Williams.  She said that Paul Tanaka fully supported him and her career has been destroyed.  She's talking in passive voice.  He's not perfected this in order to be able to impeach her with this at this point.  He may be able to do that, but at this point he hasn't done it.

THE COURT:  And the question you asked her was what?

MR. STEWARD:  The original question was isn't it true you've told many people that Paul Tanaka has ruined your career.

THE COURT:  I don't think that's the question you asked her.

MR. FOX:  Your Honor, my recollection of the question was you blame Paul Tanaka for your career being ruined, something to that effect.

MR. STEWARD:  That's correct.  That's what I said.

MR. FOX:  And again, I'm not saying he's not going to be able to get there, but right now I don't think he's gotten there.

THE COURT:  I think he's probably right.

MR. STEWARD:  All right.  I'll try it again.

(End of sidebar discussions.)

Q     (BY MR. STEWARD)  You have a personal bias against Paul Tanaka; isn't that true?

A     In what regard?

Q     In regard to being a personal bias, you don't like him?

A     I don't know that it's just that I don't like him.  There were decisions that were made that I didn't agree with.

Q     But I'm not asking the basis for it.  I'm asking whether or not you have a bias against Paul Tanaka, as you sit there today.

A     Not really.

Q     Now, you're a friend of Robert Olmsted; right?

A     Yes, I knew him when he ran for Sheriff.

Q     Seen him here today?

A     No.

Q     Now, the lawsuits -- well, let's just concentrate on the 2013 lawsuit.  Is Mr. Tanaka named in any way in that lawsuit?

A     No.

Q     Is that lawsuit still pending?

A     No.

Q     The incident you testified about a few minutes ago with government counsel where you ran into Lieutenant Libertone and another un -- somebody you didn't know who was a lieutenant,

you have that in mind?

A    Yes.

Q    Where did that take place?

A    It was in the Inmate Reception Center operations office.

Q    Were there other people there?

A    Not that I remember.

Q    And when did this happen?

A    It was probably the third week -- the end of August of 2011.

Q    Okay.  And were you invited to this meeting, or you just happened to walk up?

A    I just happened to walk up.

Q    Okay.  And the two people that were talking were somebody that you didn't recognize; right?

A    Correct.

Q    Have you been able to identify that person since August of 2011?

A    No.

Q    And Lieutenant Libertone; right?

A    Yes.

Q    And today, Lieutenant Libertone is deceased; right?

A    That's correct.

Q    So there's no one else to corroborate your claim on the conversations; right?

        MR. FOX:  Objection, argumentative.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q     (BY MR. STEWARD)  Now, you were told to go to the IRC watch commander's office?

A     Yes.

Q     At that time, were you equal in rank with Libertone and the other unknown gentleman?

A     Yes.

Q     Do you know why they sent you?

A     Because I was free at the moment.

Q     Did it appear they were free also?

A     They -- Operations Lieutenant Pat Libertone, as the operations lieutenant, he looked like he was in the middle of handling something with this other lieutenant.

Q     And you went to the IRC watch commander's office; right?

A     Yes.

Q     How far is it from where you had the original conversation?

A     Probably takes you five to eight minutes to walk there. You have to go through into the secure side.

Q     And the -- you were asked to transmit two pieces of information; correct?

A     Yes.

Q     Don't allow the feds in, and if the writ's served, don't honor it; right?

A     And to call Paul Tanaka's cell phone.

Q       Did you know Lieutenant Libertone well?

A       Just from working with him at IRC.

Q       Do you know why he took you into his confidence on conveying these messages?

A       Because I was his coworker.

Q       Did you find it unusual that these instructions were given to you to pass along?

A       No.

Q       The instructions themselves, did you find anything unusual about them?

A       It was interesting, but I didn't know all the information, so that decision came way above me.

Q       And at that time, as far as you knew, there was nothing wrong with passing along that information; right?

A       Yes.

Q       Now, in your job in 2011, August and September, around that period of time, did it entail anything to do with warrants or detainers or writs, anything like that?

A       No.

Q       And the extent of your presence or participation in the Anthony Brown cell phone incident is the conversation you've described; right?

A       That's correct.

Q       Okay.  And nowhere is there any e-mail about the things that you've testified; right?

UNITED STATES DISTRICT COURT

A     Correct.

Q     No writings of any kind; right?

A     That I'm aware of.

            MR. STEWARD:  Thank you, Your Honor.  Nothing further.

            MR. FOX:  Nothing, Your Honor.

            THE COURT:  All right.  You may step down.  Thank you.

      Call your next witness.

            MR. FOX:  The government calls Ralph Ornelas.

      (Counsel conferred off the record.)

            THE DEPUTY CLERK:  Stand here for me, please.

            THE WITNESS:  Yes.

            THE DEPUTY CLERK:  Raise your right hand.

      (The witness, RALPH GABRIEL ORNELAS, was sworn.)

            THE DEPUTY CLERK:  Please be seated.

      Will you please state your full name and spell your last name for the record.

            THE WITNESS:  Ralph Gabriel Ornelas, O-R-N-E-L-A-S.

            THE DEPUTY CLERK:  Thank you.

            MR. FOX:  May I proceed, Your Honor?

            THE COURT:  Yes, please.

                        DIRECT EXAMINATION

Q     (BY MR. FOX)  Mr. Ornelas, are you currently working?

A     No, I'm retired.

Q    How long have you been retired?

A    Since January 30th of 2016.

Q    What did you do before you retired?

A    I was the commander of Twin Towers and -- which is the men's facility, and also Century Regional Justice Center, the woman's jail facility.

Q    When were you promoted to that position?

A    I was promoted in July of 2013.

Q    What did you do before that?

A    I was the -- before I was promoted, I was the captain of Men's Central Jail.

Q    How long were you captain of Men's Central Jail?

A    From March 27th of 2011 to July of 2013.

Q    I want to back up a little bit now.

How long generally have you been with -- were you with the Sheriff's Department before you retired?

A    35 years plus a couple months.

Q    Were you a captain at the time that you learned that you'd become a captain at Men's Central Jail?  Had you already been a captain?

A    Yes, I was a captain two years at the Narcotics Bureau for Detective Division.

Q    When were you captain for the Narcotics Bureau of the Detective Division?

A    I was promoted in March of 2009 to March 27th of 2011.

Q    In March of 2011, while you were captain of the Narcotics Bureau, did you have any unusual interaction with Paul Tanaka?

A    Yes.

Q    And what was that?

A    It was first started in the gang meeting, which starts at 1:30.

Q    What happened -- well, first of all, who's present at the gang meeting?

A    In the gang meeting, they have all the captains, lieutenants of narcotics, gangs -- lieutenants of gangs, station captains discuss gang issues within L.A. county jurisdiction.

Q    Where is this gang meeting held?

A    It was at the basement of the Sherman Block building.

Q    And do you remember approximately which day in March this occurred?

A    Yes, March 21st, 2011.

Q    And what is it that was unusual about that meeting?

A    Toward the end, Paul Tanaka disparaged me in regards to me bringing up an operation that was occurring in San Dimas station.

Q    What did that cause you to do ultimately?

A    After the end of the meeting, I went to my chief, Bill McSweeney, and I just wanted to advise him that I needed to have a word with the assistant sheriff.

Q    Who was that assistant sheriff at the time?

A    Paul Tanaka.

Q    Did you wind up trying to have a meeting with Mr. Tanaka?

A    Yes.  After I got the -- you know, the approval from my chief, I went over, walked on the other side of the building, and I encountered Sergeant Steve Leavins.

Q    At that time, what role was Mr. Leavins performing?

A    He was the chief's -- the assistant sheriff's aide.

Q    You mentioned that he was a sergeant.  Are you aware of sergeants generally being aides for executives within the Department?

A    Not to my knowledge, no.

Q    When you encountered Mr. Leavins, what happened?

A    I told him, "Can I have a moment with the assistant sheriff?"

Q    And where was Mr. Leavins at this point?

A    His desk is outside the opening door with the assistant sheriff's office.

Q    And when you asked Mr. Leavins if you could have a word with the assistant sheriff, what happened?

A    He left his desk and he walked in there, and I could hear him say to Paul Tanaka that, you know, Captain Ralph Ornelas is outside, he wants a word with you, and I could hear --

Q    Did you hear anything in response to that?

A    Yes.

Q    What did you hear?

A    I heard him say -- Mr. Tanaka say that "Get him in here."

Q    Did you go into Mr. Tanaka's office at that point?

A    Yes.

Q    And was Mr. Leavins present for that meeting that you then had with Mr. Tanaka?

A    No.

Q    What happened after you and Mr. Tanaka began to meet?

A    I walked up to him, put my hand out, and he didn't shake it.  He sat down.  He told me to sit down, and I did.

Q    After you sat down, what happened?

A    He told me in a loud tone of voice that "Didn't I tell you I didn't want you going out of the country?"  And I said, "Yes."

Q    Had you had a previous discussion with him about you going out of the country on official duty?

A    There was a conversation that took place, yes.

Q    And had you recently been out of the country as of March 2011 on official business?

A    Yes.

Q    Okay.  Where had you gone?

A    No, actually before March 2011, I was on vacation in Costa Rica.

Q    Had you had an official trip out of the country before that?

A    Yes.  There was a period of time when I was doing -- traveling to Mexico on behalf of the Sheriff training down in Mexico.

Q    When you said on behalf of the Sheriff, did you mean the Sheriff's Department or the Sheriff himself?

A    Sheriff at the time, Sheriff Lee Baca himself.

Q    When Mr. Tanaka said to you at this meeting, "Didn't I tell you to not go out of the country," what did you say in response?

A    I said, "Assistant Sheriff, you need to take that up with the Sheriff."

Q    What, if anything, did Mr. Tanaka say?

A    He said, "I effing told you I didn't want you going out of the country."

Q    Mr. Ornelas, at some point in time, did you discuss how you were performing as a captain in Mr. Tanaka's view?

A    Well, right after he said that, his next comment to me was, "You're the worst effing captain we have on the Department."

Q    What did you say in response to that?

A    I said to him, "Please provide me with some criticism or constructive criticism that I can improve myself."

Q    And what, if anything, did Mr. Tanaka say in response?

A    After that, he told me to get the eff out of the office.

Q    Did you?

A     Yeah, I did.

Q     What happened, if anything, approximately one week later?

A     March 25th was a Friday in 2011.  I received a phone call from Commander Jack Jordan.

Q     What were you informed of in that phone call?

A     Well, at the time I was carping, which means I was working as a deputy at Downey Court.

Q     Is this something that is common, something called carping?

A     Yes, it's during the time of our budgetary constraints, we had some problems.

Q     And what happened when you were carping on that Friday?

A     I was told to step outside by the commander's assistant aide, and then the commander got on the phone and told me that I needed to get my stuff out of my Norco office because I've been transferred to Men's Central Jail.

Q     In what function?

A     As a captain.

Q     Did you learn who would be replacing you as captain of the Narcotics Bureau?

A     Yes.

Q     Who was that?

A     Captain Duane Harris.

Q     Are you aware of any relationship that Mr. Tanaka had to Mr. Harris before that time?

UNITED STATES DISTRICT COURT

A    Yes.

Q    What was that relationship?

A    Captain Duane Harris was Paul Tanaka's aide -- lieutenant aide when he was the assistant sheriff.

Q    Now I want to move on to what happened as your duties as a captain when you took over for Men's Central Jail.

Why don't you just briefly describe what those duties were.

A    As a captain of Men's Central Jail, you have a multitude of responsibilities.  One is to make sure you engage all the community within side the jail, meaning the deputies, the chaplains, the inmates, the nurses, the whole community within side the community.  My other responsibility was to get my arms around and understand all the force packages, reading all the force packages that I have to read and approve of or make recommendations, all the Internal Affairs cases, civil claims, constantly engaging lieutenants and sergeants about my vision, what I wanted them -- how I wanted them to carry the job out within the jail.

Q    In August of 2011, you'd been on the job for about six months as captain; is that right?

A    Something like that.

Q    And at that time, had you had frequent exposure to Operation Safe Jail, OSJ?

A    Periodically, yes.

UNITED STATES DISTRICT COURT

Q    In what capacity?

A    Sometimes regards to protective custody inmates within the jail that I would engage with some of the staff in OSJ.

Q    When you're saying "protective custody inmates," how are those different than other inmates?

A    Protective custody inmates is some of them have not been vetted through about the risk factors of them being in the jail, that, you know, they can be green-lighted by gang members.  So our -- OSJ's job was to investigate that and determine is it valid, the information that these inmates is saying about their risk factor within the jail.

Q    And would they provide that information to you?

A    No.

Q    Okay.  What about ICIB?  What was ICIB at the time?

A    ICIB is Internal Criminal Investigations Bureau, but they don't report directly to me either.

Q    In August of 2011, where was your office?

A    My office was down the hallway from main control.  If you come out of main control, you make a right from the security.  You go all the way down to second door to the left would be the operations office and the secretariat and then into another hallway, and then that would be my office directly in front of that.

Q    Mr. Ornelas, if you can take out an exhibit binder that should be close to you.  It should be the first one, and I want

UNITED STATES DISTRICT COURT

you to look at Exhibit Number 3, please.

A      Is that Number 175-201?

Q      That's not, but there should be another one that starts with Number 1.

A      Can you repeat the exhibit, please.

Q      Yes, it's Number 3.

Do you recognize that document?

A      Yes.

Q      What is it?

A      It's a layout of the Men's Central Jail's captain's office.

Q      Does it appear to accurately depict that area?

A      Yes.

Q      Now, you didn't create that; correct?

A      No.

Q      So you don't know if it is to scale; is that correct?

A      I don't know that.

Q      But does it generally look to be about the right size?

A      It looks to be the right size, and the layout looks correct.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 3.

        MR. HAIG:  No objection, Your Honor.

        THE COURT:  All right.  It will be received.

    (Exhibit No. 3 received into evidence.)

**UNITED STATES DISTRICT COURT**

Q    (BY MR. FOX)  Mr. Ornelas, I'm now going to show it to you and the jury.

You were describing where this is compared to the secure area of Men's Central Jail; is that correct?

A    Yes.

Q    And where -- this whole thing says -- title that says "MCJ Captain's Office."  Which portion of the screen that we're looking at was your office located in?

A    Where it says "Captain."

Q    So the upper right-hand corner?

A    Yes, sir.

Q    And if you, as captain, wanted to get to the secure area of Men's Central Jail, where would you go?

A    I would have to walk out my door into the operations office, and then you walk in the door to the bottom of the screen and make a right.

Q    You mentioned the operations office.  Is that the office that's in the bottom right-hand corner?

A    Yes.

Q    And you would go through both those doors that are depicted in this sketch here?

A    Yes.

Q    Based on your job as captain of Men's Central Jail, were you familiar with the layout of the jail in August of 2011?

A    Yes.

UNITED STATES DISTRICT COURT

Q      What is the highest area of security in Men's Central Jail as of 2011?

A      As of 2011, the highest security of inmates we would have would be in 1750.

Q      Are you familiar with G Row in 1750?

A      Yes.

Q      What was different about G Row of 1750?

A      G Row had cameras along the row.

Q      And what would those cameras be doing?

A      Focusing on the inmates in those cells.

Q      What types of inmates were placed in 1750?

A      As an example, in 2011 it would be Mexican Mafia, Black Guerrilla Family, Aryan Brotherhood.  We also would put in there police officers in there also that have been arrested.

Q      What about inmates that there were concerns about their safety, would that be one area that they would go into?

A      Yes.

Q      And if inmates who were located in 1750 were to be transported and there were concerns about their safety as they were being transported, what would occur?

A      Inmates would be handcuffed through a cuffing port by the cell, escorted out and then change the handcuffs around to make sure they have a waist chain, and then it would have -- depends on the inmates.  They would have at times -- depends on their risk level -- two -- two deputies escorting them and sometimes

**UNITED STATES DISTRICT COURT**

even a sergeant with a handheld camera.

Q    And what would the sergeant do with this handheld camera?

A    He would film every step of this.  This way, anything took place between the deputies and the inmate or the inmate with the deputies or inmate with another inmate walking by.

Q    Mr. Ornelas, I want to now ask you about Anthony Brown and your knowledge of a cell phone that was found on Anthony Brown.

At some point as captain of Men's Central Jail, did you learn about a cell phone being seized on an inmate?

A    Yes.

Q    When were you first informed of this cell phone that was found in your jail on an inmate?

A    I believe it was August 16th, 2011.

Q    You have since learned that that phone was found eight days beforehand; is that correct?

A    Yes.

Q    How did you first learn on August 16th that there was an inmate that was found to have a cell phone?

A    It was brought to my attention by my operations lieutenant, Dan Fedele.

Q    And we saw on Government Exhibit 3 the upper left-hand area says "ops lieutenant."  Is that where the ops lieutenant had an office?

A    Yes, sir.

Q    And that's where Mr. Fedele sat at the time?

A    Yes.

Q    Did there come a time after that initial meeting on August 16th, so a later date, that you learned that this phone that was found on the inmate traced back to the FBI?

A    Yes.

Q    How was it that you personally found out that that phone was traced back to the FBI?

A    I was on vacation, and I received an e-mail from a friend of mine from the FBI.

Q    Who was that friend?

A    Supervising Special Agent Robert Clark.

Q    How do you know Mr. Clark?

A    Special Agent Robert Clark and I worked together on numerous initiatives in Central America.

Q    Do you know generally what types of crimes Mr. Clark supervised the investigations of?

A    Yes.

Q    What types of crimes?

A    Gangs and narcotics.

Q    Do you remember approximately which date you received this call from Mr. Clark?

A    I believe it was August 18th of 2011.

Q    Where were you at the time?

A    I was in El Salvador on vacation.

Q    And what did Mr. Clark tell you about this phone?

UNITED STATES DISTRICT COURT

A    He said, Ralphie, he said that it's out that the phone that was found is an FBI phone.

Q    Did you do anything with this information?

A    No.

Q    Why not?

A    I just kept it to myself.

Q    I'm going to publish for you Government Exhibit 124, which is in evidence.

Mr. Ornelas, this is the inmate total movement history for Anthony Brown; is that correct?

A    Yes.  That's the inmate movement sheet, yes.

Q    You mentioned that on August 16th, you learned about the cell phone being found on the inmate.  Where was Anthony Brown located on August 16th of 2011?

A    Based on the inmate total movement sheet, he was in 7100 module, 7296.

Q    And was he moved anywhere, according to this document, on August 18th?

A    Yes.

Q    Where?

A    It states on August 18th, 10:46, he was moved to 3500 module, cell 10, C10, Charlie Row 10.

Q    Is this the approximate date that you received the call from Robert Clark that is listed here, August 18th?

A    Yes.

UNITED STATES DISTRICT COURT

Q    Showing you now the dates that are listed for August 23rd.

A    Yes.

Q    Does this show whether Mr. Brown, according to the documents, was moved to a different cell on August 23rd?

A    Yes, based on the sheet, he was, on 23rd, moved to --

Q    I'm sorry, Mr. Ornelas, I was about to lead you astray. Let me blow up a bigger portion of this.

Let me ask about August -- August 18th.  Does it appear he was also moved on August 18th, if you look at one o'clock p.m.?

A    Yes.

Q    Where does it show he was moved to?

A    He was moved to 1750.

Q    And then as of 1:19 p.m., where does it show Mr. Brown was located?

A    1750, Cell 3, G Row.

Q    And is that the row that you were talking about before that has the cameras trained on each cell?

A    Yes.

Q    And then I was about to ask you about August 23rd.

Where does it show that Mr. Brown is as of August 23rd?

A    August 23rd at 6:34 p.m., G Row, Cell 3.

Q    Were you aware of any orders as of August 23rd that Anthony Brown was not supposed to have contact with the FBI?

A    No.

Q    Were you aware on August 23rd -- as of that date, were you

aware that the FBI had had contact with Anthony Brown?

A    I don't recall that, no.

Q    Were you aware whether Anthony Brown was moved out of the 1751, G Row on August 23rd?

A    No.

Q    Are you familiar with the 8,000 floor?

A    Yes.  Of 2011, yes.

Q    Does anything on this document indicate that Anthony Brown was moved to the 8,000 floor of Men's Central Jail after August 23rd?

A    I do not see that, no.

Q    What is the 8,000 floor?

A    8,000 floor houses diabetic inmates or MRSA inmates that have a flesh-eating disease, and they isolate them there because of potential exposure to, you know, other staff and inmates.

Q    Looking at the 1:58 p.m. entry on August 25th, it shows that Anthony Brown was released.

    Were you ever informed around this time that Anthony Brown had been released from Men's Central Jail?

A    No.

Q    Did anyone ever tell you that Anthony Brown was moved from Men's Central Jail to a station facility?

A    No.

Q    Mr. Ornelas, were you informed whether Anthony Brown was

moved back into Men's Central Jail on September 2nd?

A    No.

Q    You had mentioned your March interaction with Mr. Tanaka.
In August and September of 2011, how would you describe your relationship with Mr. Tanaka?

A    Just business-like.

Q    Based on your experience as captain of Men's Central Jail, if OSJ had told you they had safety concerns about an inmate, what would you have done with that inmate?  Where would you have housed him?

A    I would have housed him in 1750.

Q    Mr. Ornelas, are you familiar with an issue being presented to you regarding a potential court order for an inmate around this time?  And I can be more specific, a court order from the FBI regarding an inmate.

A    No.

Q    I'd like you to look at Government's Exhibit 36.  I'm going to publish -- Mr. Ornelas, actually look at 36, 37 and 38 and tell me if you recognize these e-mails.

A    Okay.

Q    Okay.  With respect to those exhibits, the general subject matter is a court order; is that correct?

A    That's correct.

Q    Okay.

         MR. FOX:  Your Honor, I move for the admission of

UNITED STATES DISTRICT COURT

Government's Exhibits 36, 37 and 38.

MR. HAIG:  No objection, Your Honor.

THE COURT:  They'll be received.

(Exhibit Nos. 36, 37 and 38 received into evidence.)

Q    (BY MR. FOX)  Mr. Ornelas, are you familiar with who Greg Thompson is?

A    Yes.

Q    What role did he perform as of August 26, 2011?

A    He was the OSJ/JIU, Jail Investigations Unit, lieutenant in charge.

Q    Did you interact with him as part of your job?

A    Periodically.

Q    What about William T. Carey?

A    Only when it's an Internal Criminal Investigations case.

Q    Do you know what role he performed in August 2011?

A    He was the captain of Internal Criminal Investigations Bureau.

Q    Can you please read the e-mail that's at 10:42 a.m. at the very bottom there from Mr. Thompson to Mr. Carey.

A    Yes.  It says "Handled.  MCJ will accept if forced, but will advise the county attorneys have to review it.  Is this acceptable?"

Q    And can you please read the response from Mr. Carey to Mr. Thompson at 10:44 a.m.?

A    It says "Yes.  To be very clear, he is not released

UNITED STATES DISTRICT COURT

without approval."

Q    And it looks like you were copied -- I'm sorry, you were a recipient of the next e-mail at 10:45 a.m.  Is that accurate?

A    That's correct.

Q    And what does Mr. Thompson write in this e-mail to you and Mr. Carey at 10:45 a.m.?

A    He says "Yes.  Captain Ornelas is briefing his watch commanders and following up with an e-mail to each."

Q    Now it says "WCs," but you interpret that to be "watch commanders"; is that correct?

A    Yes.

Q    Did you brief your watch commanders about an issue regarding a court order at this point in time?

A    I must have based on this, yes.

Q    Do you recall having communications -- oral communications with Mr. Thompson or Mr. Carey about any issue regarding court orders received from the federal government around this time?

A    I don't recall that, no.

Q    Highlighting the top two e-mails in Exhibit 36, at 10:47 a.m. it's an e-mail from Mr. Carey only to Mr. Thompson. You're no longer a recipient, and what does it state there?

A    It says "Perhaps a note on a cell door.  I'll call Ralph as well."

Q    Do you recall Mr. Carey calling you about this?

A    I don't recall.

**UNITED STATES DISTRICT COURT**

Q    And what about the top e-mail, what does it state between Mr. Thompson and Mr. Carey at 10:47 a.m.?

A    "Will do when I brief my guys."

Q    Showing you now 37, Exhibit 37.

     Is it fair to say that the bottom three e-mails are the same as some of the e-mails we just saw on this exhibit?

A    Yes.

Q    I'm going to then highlight for you your e-mail, first of all, to Mr. Thompson at 10:47 a.m.  What did you write?

A    "Greg, what attorney are we going to use to review possible court order from the FBI?"

Q    Do you recall how you learned there was a potential court order from the FBI that was going to be served at Men's Central Jail?

A    I don't remember that.

Q    And what did Mr. Thompson do in response in this e-mail chain at 10:50 a.m.?

A    "Tom's handle.  Probably the one who is on vacation for a month."

Q    Did you understand that this related to a particular inmate?

A    Yes.

Q    Which inmate was that?

A    Anthony Brown.

Q    Showing you now Exhibit 38.

**UNITED STATES DISTRICT COURT**

Highlighting the first e-mail at 10:53, just the caption of that e-mail, who's this e-mail from?

A    It's from me, Ralph Gabriel Ornelas.

Q    Do you recall why you sent this e-mail?

A    My ops lieutenant sent it to me, and at that time, based on the language, I felt it made sense that day to refer any orders to the legal advisor of the Department.

Q    And the subject line of this, what does it state?

A    "Court order presented by federal officers."

Q    So this, what we're going to look at, doesn't apply to any court orders presented by any local officers?

A    No, it said federal.

Q    And who did you send this to?  It says MCJ lieutenants and MCJ sergeants.  Was this a distribution list?

A    Yes.

Q    And why did you copy Mr. Thompson on this e-mail?

A    I felt it was just necessary to copy him.

Q    You said that you received an e-mail from your ops lieutenant Mr. Fedele.  Is this the language that you received from Mr. Fedele?

A    Yes.

Q    Can you please read what is in this e-mail.

A    "Watch commanders and watch sergeants, if any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order or any other order of the court, you shall:

**UNITED STATES DISTRICT COURT**

144

One, receive the order, advise the federal officer that before you can proceed you'll have to submit the order to the Department's legal advisor for review.  Do not release the inmate or allow contact.  Two, take complete contact information from the federal officer, advise him or her that you will advise when the inmate is available.  Immediately contact Captain Ornelas or Lieutenant Dan Fedele for further instructions."

Q    Mr. Ornelas, as captain of Men's Central Jail, did writs ordinarily cross your desk?

A    No.

Q    Who was it that Mr. Thompson sent your e-mail to?

A    Captain William Carey.

Q    Mr. Ornelas, I'm going to now direct your attention to a few days later, August 30th of 2011.

Do you recall approximately when you arrived to work that day?  When I say arrived to work, I actually mean the physical location of Men's Central Jail.

A    I arrived at Palos Verdes Police Department at about 3:30 in the morning.

Q    Okay.  But what about Men's Central Jail?

A    Arrived at approximately 8:00 or 8:30.

Q    What time do you normally arrive -- what time did you normally arrive at Men's Central Jail while you were captain?

A    About six o'clock in the morning.

Q    When you arrived that morning, who besides your normal staff was there that day?

A    It was Tom Carey -- Captain Tom Carey, Steve Leavins, Greg Thompson, Maricela Long, Craig Scott.  I know there was somebody from Internal Affairs, but I don't remember the name.

Q    If there's an allegation of misconduct -- criminal allegation of misconduct by a deputy, are you aware of how it's referred for investigation within the Department?

A    Well, first of all, you would have to initiate a request of an investigation to Internal Affairs, but also that I would have to contact, get the approval of the chief to, you know, approve -- provide facts of why, and then the chief would -- you know, would approve it, and it would be requested that the Internal Criminal Investigations investigation would take place, which would precede the Internal Affairs investigation.

Q    When you arrived at Men's Central Jail that day and you saw these individuals, where were they located?

A    They were out in the -- outside my office in the secretariat office and then in the hallway.

Q    I'm pulling up the diagram again.

    Just based on what you see on the screen, can you describe where they were located?

A    They were not in my office, which is up on top, the right-hand corner.  They were outside, which would be below where it says "operations office," there's a hallway outside

**UNITED STATES DISTRICT COURT**

that door there.

Q    So it's below where we see on the screen?

A    Yes.

Q    And what happened after you encountered them?

A    I was briefed that, you know, Gilbert Michel was the deputy that brought the cell phone in, and they wanted -- requested that I relieve him of duty.

Q    At some point that day, did an executive within the Sheriff's Department arrive at Men's Central Jail?

A    Yes.

Q    Approximately what time did this occur?

A    I believe about 10:00 -- between 10:00 and 10:30.

Q    Who arrived?

A    Paul Tanaka.

Q    Was it unusual for Mr. Tanaka to be at Men's Central Jail?

A    During my tenure, yes.

Q    Do you recall approximately how many times while you were captain of Men's Central Jail that Mr. Tanaka came to Men's Central Jail?

A    I believe right before Baker to Vegas relay, which is a relay race, and then that day.

Q    When is the Baker to Vegas relay race run?

A    I believe it was March sometime.

Q    What happened after Mr. Tanaka arrived that morning?

A    Paul Tanaka and Greg Thompson, Steve Leavins and Tom Carey

UNITED STATES DISTRICT COURT

went into the operations office, Lieutenant Fedele's office which is over there to the top left.

Q     And were you in that office at the time?

A     No, I was still finishing up relieving Gilbert Michel, signing the paperwork.

Q     After you were done relieving Mr. Michel of his duties, what happened?

A     I gravitated in there into Lieutenant Fedele's office, top left-hand corner, and greeted.  And then they were talking, and then I -- I went outside to the back door, which is the top left in between the doorway between my office and Lieutenant Fedele's office, and I was concerned that, you know, all the rumors going to get out, that I needed to --

          MR. HAIG:  Objection, Your Honor, nonresponsive.

          MR. FOX:  Your Honor, I'll ask a follow-up question.

          THE WITNESS:  Go ahead.

          MR. FOX:  May I continue?

          THE COURT:  Yes.

Q     (BY MR. FOX)  Okay.  When you walked into Mr. Fedele's office and these individuals were there, what, if anything, was being discussed by the group?

A     I really wasn't part of that conversation when I came through.

Q     In other words, was the subject matter anything that was going on that day --

A      It was just about Gilbert Michel.

Q      And at some point in this conversation, did you decide you should be somewhere else based on your duties?

A      Yes.

Q      What was that that you believed you needed to do?

A      What I felt I needed to do, and Lieutenant Fedele and I discussed it, we pulled a policy that -- to brief my deputies that any time they encounter any federal, state or local agency, they have a requirement to notify the unit commander. Now, that doesn't mean that we weren't going to say they weren't going to cooperate with an investigation, but at least notify the unit commander.

Q      So what did you do?

A      I -- after Lieutenant Fedele and I discussed it, I did brief Paul Tanaka that I was going to do that, and he had no problems with that.  And I went upstairs to the briefing room on the 2,000 floor in security, and I gave a briefing on that policy.

Q      Approximately how many times that day did you give briefings of the policy to deputies?

A      I stayed 24 hours.  I stayed from that morning all the way to the next day to early morning shift.

Q      Why did you do that?

A      Because I felt it was important to make sure that our deputies understand the fact they have a requirement, if

they're engaged by any law enforcement entity, that they should notify the unit commander.

Q    Now, Mr. Ornelas, you've had an opportunity to look at that policy that you've been discussing; is that correct?

A    Yes.

Q    And anything in the text there say anything about not being able to cooperate in a federal investigation?

A    No.

Q    At some point in time during one of your briefings of the deputies, did one specific deputy approach you?

A    Yes.

Q    Who was that?

A    It was Deputy David Courson.

Q    And what, if anything, did he say to you when he approached you?

        MR. HAIG:  Objection, hearsay.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  Deputy Courson approached me, and he said, "Captain," he goes, "I was approached by an FBI agent."

Q    (BY MR. FOX)  Did he identify that FBI agent?

A    Yes.

Q    Who did he say he had been approached by?

A    Agent Leah Marx.

Q    And did Mr. Courson at the time explain to you whether he was approached by her in what he thought was an official or an

UNITED STATES DISTRICT COURT

unofficial capacity?

A    I believe, in his mind, it was unofficial capacity.

Q    What did he say to you that led you to that belief?

A    He believed that it may develop some type of relationship.

Q    Did he indicate to you he was interested in a relationship?

A    Yes.

Q    What did you do after Mr. Courson told you that he had had contact with an FBI agent?

A    I told him, "Come along with me," and --

Q    And what did you do?

A    I contacted Captain Tom Carey.

Q    Where was Mr. Carey at the time?

A    He was below -- within the diagram in the hall -- the main hallway, below where it says "operation office."

Q    Was anybody with him at the time?

A    I believe it might have been Steve Leavins.  I can't be sure of that, but I know he was with him.

Q    What happened after you encountered Mr. Carey and potentially Mr. Leavins?

A    I just turned Deputy Courson over to them.

Q    And what did you do?

A    I went back in my office.

Q    When you went back in your office, was anybody -- any other deputy around you at that point?

**UNITED STATES DISTRICT COURT**

A      No.

Q      Did you encounter any other deputies that day?

A      Yes.

Q      Who was that?

A      It was Justin Bravo.

Q      Where was Mr. Bravo when you encountered him?

A      He was outside on the couch where it says operations office.  In the bottom is a door, and to the right of it is a couch.

Q      So that's the very last thing that you see on the bottom right of this diagram; is that correct?

A      Yes.

Q      When you saw Mr. Bravo, were there other members of ICIB still in the general captain's office area?

A      Yes.

Q      Did you know of Mr. Bravo having any relationship to any executive within the Sheriff's Department?

A      Yes.

Q      What did you know?

A      He was the nephew of Sheriff Lee Baca.

Q      At some point in time, were you asked to leave your office?

A      Yes.

Q      When did that occur?

A      Sometime after that, I was sitting at my desk, and Paul

Tanaka walked in with Tom Carey, Steve Leavins and two sergeant investigators, and Paul Tanaka requested me to leave my office.

Q    Did you leave your office?

A    Yes.

Q    What happened after you left your office?

A    I went back inside security and walked around to engage my deputies and my staff.

Q    How long was it before you went back to your office?

A    It was probably at least an hour.  It takes me a while to walk around.

Q    You mentioned Mr. Leavin's relationship with Mr. Tanaka before as his aide.

Based on your experience in the Sheriff's Department, are you aware of whether Mr. Thompson had a relationship with Mr. Tanaka?

A    Yes.

Q    What were you aware of at the time?

A    They both worked Lynwood station together.

Q    Were you aware of any other relationship that they had?

A    Just the fact that Greg Thompson was at all the gang meetings on Monday afternoons.

Q    Would you observe any interaction that the two of them had?

A    Well, Greg was always providing information regarding gangs and inside custody and outside in the street.

Q    Now I want to take you to -- well, actually, let me ask you one more question about August 30th.

Were you aware of anything that ICIB was telling the deputies that they were meeting with that day on August 30th?

A    No.

Q    Mr. Ornelas, on the days following August 30th, do you recall anything being done to search MCJ's facilities for contraband?

A    Yes.

Q    What happened?

A    We locked down Men's Central Jail, and we searched every module, cell in the jail.

Q    Did you find any phones that were connected to the FBI during that search?

A    No.

Q    Did you find any contraband that was linked to the FBI during that search?

A    No.

Q    At some point in time, did you learn of a policy regarding allowing FBI agents to have access to interview inmates?

A    Yes, I learned that.  Yes, I did.

Q    Okay.  Can you please turn to Government Exhibit 34.

A    I'm sorry, say that again, please.

Q    34.  Actually, I can put it up here for you because it's in evidence.

**UNITED STATES DISTRICT COURT**

A    Okay.

Q    Mr. Ornelas, did you receive this e-mail?

A    Yes, I did.  It says "custody captains."

Q    And you were part of the group that received e-mails directed to custody captains?

A    Yes.

Q    And what did this direct you to do if an FBI agent attempted an interview at --

A    They had to be -- contact jail liaison -- Men's Central Jail jail liaison.

Q    Who was the person in charge of jail liaison?

A    Lieutenant Greg Thompson.

Q    I'd like to direct your attention now to Exhibit 45.  Can you please look in your book at Exhibit 45.

     Do you recognize that?

A    I see it now, yes.

Q    Okay.

          MR. FOX:  Your Honor, I move for the admission of Government Exhibit 45.

          THE COURT:  Any objection?

          MR. HAIG:  No, Your Honor.

          THE COURT:  It will be received.

     (Exhibit No. 45 received into evidence.)

Q    (BY MR. FOX)  Mr. Ornelas, I'd like you to read the e-mail from Gregory Thompson to Paul Tanaka on August 30th, 2011 at

5:36 p.m. with no subject line.

A    "Sir, I handled the FBI request as you suggested.  All future requests will be the same.  I will send out reoccurring e-mails to custody captains reminding them.  Similar requests by agency for inmate interviews must be approved by my unit."

Q    Oh, and I'm sorry, is there a response from Mr. Tanaka's e-mail account at 6:02 p.m.?

A    Yes.

Q    What does it state?

A    "Thanks."

Q    Okay.  I'd like to turn your attention now to Exhibit 48.

MR. FOX:  And, Your Honor, I move for the admission of Government Exhibit 48.

THE COURT:  Any objection?

MR. HAIG:  Your Honor, can I just look at it quickly, please?

THE COURT:  Yes.

MR. HAIG:  Yes, Your Honor, based upon hearsay grounds.

THE COURT:  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing

the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

We'll come back at five after the hour.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR. FOX:  If it's easier, Your Honor, I can pull it up on the screen here.

THE COURT:  I have it.

MR. FOX:  Okay.  And, Your Honor, our -- we believe this comes in for two reasons.  One, it's a coconspirator statement.  I think there's substantial evidence that Mr. Nee was involved in this offense, and the other thing is he was acting as the aide to Mr. Tanaka.  He was an agent of Mr. Tanaka, and he's making a statement to Steve Leavins who's another coconspirator.

I don't know if the defense's objection is based on what they've said previously about the confrontation clause and them not being in court, but I just wanted to let you know that those were our reasons for the admission of this document.

THE COURT:  Okay.  Is this your confrontation clause?

MR. HAIG:  It is, Your Honor.

THE COURT:  Okay.  The objection's overruled.

MR. FOX:  Thank you, Your Honor.

(Off the record at 11:50 a.m.)

(On the record at 12:05 p.m.)

THE COURT:  How long do you expect to be with this witness?

MR. FOX:  Five more minutes, Your Honor.

THE COURT:  Okay.  And who follows this witness?

MR. FOX:  We have John Powell who's going on vacation tomorrow.  We're calling him out of order, but I expect him to be about a 15-minute direct.  So I think we'll be able to conclude with him, and then we have one more witness after that, Michael Bornman who's here.

Did you want to break early, Your Honor?  Is that why?

THE COURT:  No.

MR. FOX:  So we should be able to fill the day with finishing this witness and the next two witnesses.

You doubt us.

UNITED STATES DISTRICT COURT

THE COURT:  No.  In fact, I'm thinking it might be a little early, but we'll see.

MR. FOX:  And, Your Honor, we do have Gilbert Michel coming here in case we do finish early.  So we'll have another witness available.  They're not prepared to cross him because I did not disclose him as a potential witness, but there's no way that we'll get to his cross today.

THE COURT:  All right.  Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  I believe there was an objection to Exhibit 48, and that objection was overruled.

MR. FOX:  I'm now publishing what's been received in evidence as Government's Exhibit 48.

Q     (BY MR. FOX)  Mr. Ornelas, first of all, do you know who Chris Nee was on September 2nd of 2011?

A     Yes.

Q     What role was he performing within the Sheriff's Department?

A     He was the lieutenant aide to then Undersheriff Paul Tanaka.

Q     And would you please read this e-mail that's 10:45 a.m. that I've highlighted on September 2nd from Mr. Nee to Mr. Leavins.

A     It says "Captain Ornelas called at approximately 1015

hours this morning advising that two FBI agents came to MCJ requesting to visit the below inmate regarding a gang case. One agent, Scott B. Mack, provided a business card, but the other agent, Dennis, was evasive when asked for a card and stated that he did not have one available.  Both agents stated their supervisor was Robert Clark who is known to Captain Ornelas."

Q    Do you recall this occurring, Mr. Ornelas, what's depicted in this e-mail?

A    Yes.

Q    What happened?

A    I was notified from my deputy in the lobby that two FBI agents were there.

Q    And it says that their supervisor was Robert Clark. That's the same person you mentioned earlier as having a relationship with?

A    Yes.

Q    What happened after the agents came?  Did they ask to interview an inmate?

A    I went out and greeted them, and I told them that I cannot let them inside.

Q    What did they say to you?

A    They said, you know, we just need to interview an inmate, and I said, I'm sorry.  I said, I cannot do that.

Q    So what did you do after you told them that they could not

interview the inmate?

A    I went back and sent an e-mail to Chris Nee.

Q    Why did you send it to Chris Nee when the e-mail we saw earlier said that JIU needed to handle these requests?

A    Because the directive came from Paul Tanaka that -- not to let any FBI into the jail.

Q    Now, this e-mail, as we mentioned, is to Mr. Leavins.  Was Mr. Leavins part of JIU?

A    No.

Q    What was he part of?

A    I believe at that time he was a lieutenant, ICIB.

MR. FOX:  And, Your Honor, I move for the admission also of Government Exhibit 73.  Mr. Ornelas is a recipient of this e-mail.

THE COURT:  Any objection?

MR. HAIG:  No, Your Honor.

THE COURT:  All right.  It will be received.

(Exhibit No. 73 received into evidence.)

Q    (BY MR. FOX)  What is the date of this e-mail, Mr. Ornelas, that I'm highlighting at the bottom of the screen?

A    Monday, September 26, 2011 at 2:04 p.m.

Q    Who did you send this e-mail to?

A    I sent it to Chris Nee, Greg Thompson, Dan Fedele and, at the time, Commander Eric Parra.

Q    What did you state in the e-mail?  Can you please just

UNITED STATES DISTRICT COURT

read it.

A    "Chris, once again I had Special Agents Scott Mack and Trent Milli came to my lobby to see inmate Damien Wilson.  I informed that I could not allow them to come to see this inmate at this time.  I informed them once I obtained a clearance, I will call their supervisor."

Q    I'm highlighting the e-mail that's just above it in the chain, September 27th, 2011 at 9:41 a.m.

     Is this a response from Mr. Nee to you?

A    Yes, sir.

Q    Does he copy Mr. Thompson or anyone else on the e-mail?

A    I don't see that.

Q    What does he state?

A    "Good morning, sir.  I was off yesterday, but I will advise the undersheriff about this.  Thank you."

Q    Why did you send this to Mr. Nee, the previous e-mail we looked at?

A    Because he would -- he would obtain the approval from the undersheriff.

        MR. FOX:  One moment, Your Honor.

    I have nothing further, Your Honor.

        THE COURT:  All right.  Cross-examination.

                   CROSS-EXAMINATION

Q    (BY MR. HAIG)  Mr. Ornelas, you've said that you had promoted to captain and then went to the Narcotics Bureau in

2009 -- March of 2009?

A    Yes, sir.

Q    And so you promoted, and then that was your next stop after getting promoted.  Would that be correct?

A    Yeah, I went from lieutenant to captain of Narcotics Bureau.

Q    And where were you working as lieutenant right before Narcotics Bureau?

A    I was the chief's aide of the Detective Division.

Q    And where is Narcotics Bureau housed?

A    It's housed in Whittier off of Colima and Telegraph.

Q    Did you know about any problems at Narcotics Bureau before getting there?

A    Yes, I knew the history.

Q    And could you describe briefly what that history was.

A    The history of Narcotics Bureau was that deputies in '88, '89 stealing money.

Q    You have an evidence room at the Bureau?

A    Yes.

Q    And in that evidence room, there would be drugs, narcotics?

A    Yes.

Q    And money?

A    Yes.

Q    That would be seized from a suspect and held as evidence

for a criminal case; correct?

A    Correct.

Q    And there was history of actually sworn deputies taking some of those potentially valuable items for their own personal use?

A    Yes.

Q    And you knew about that?

         MR. FOX:  Objection, vague.

         MR. HAIG:  I'll rephrase, Your Honor.

Q    (BY MR. HAIG)  At the time that you became captain of Narcotics Bureau in March of 2009, you knew about that history. Would that be a correct statement?

A    Yes, I knew about the history from 1988, '89, that there was a federal investigation against our deputies, yes.

Q    In March of 2009, Paul Tanaka was the assistant sheriff?

A    Yes.

Q    And he was assistant sheriff, and one of -- one of the items that he was -- places that he was supervising was Narcotics Bureau.  Would that be correct?

A    I believe that fell in his chain of command.

Q    Right.  And above -- obviously, above the assistant sheriff at the time would have been the undersheriff.  That would have been Mr. Waldie?

A    Yes.

Q    And then Sheriff Baca?

A    Correct.

Q    Who was your direct supervising officer at the time that you took over command of narcotics?

A    My commander was Jack Jordan, and the chief was Willie Miller.

Q    And then above the chief would have been Mr. Tanaka?

A    Correct.

Q    Now let's go to the meeting in 2011, March of 2011 in Mr. Tanaka's office.

A    Correct.

Q    Before that meeting, Mr. Tanaka had asked you about certain trips that you were taking abroad as part of your job as the captain of Narcotics Bureau; correct?

A    Correct.

Q    And as he said in that meeting on March 21st of 2011, he had told you on prior occasions not to take trips abroad; correct?

A    He mentioned it one time, yes.

Q    And he told you that the reason that he didn't want you to take trips abroad is because he wanted his captain to be present at the Bureau to oversee and monitor what was going on at Narcotics Bureau.  Would that be a correct statement?

A    Correct.

Q    And did you disagree with that statement?

A    No, I did not.

Q    And you saw it to be a proper and lawful order of a commanding officer.  Would that be correct?

A    I believe it's an order from an assistant sheriff, yes.

Q    But you ended up taking a trip in defiance of that order from Mr. Tanaka?

MR. FOX:  Objection, argumentative.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  After Mr. Tanaka ordered you not to take any more trips abroad as captain of Narcotics Bureau, did you, nonetheless, take a subsequent trip abroad outside of the country?

A    Yes, I did.

Q    And I believe you referenced that you had talked to Mr. Baca about getting approval for that trip.  Would that be correct?

A    No, that's not correct.

Q    Did you get any approval from anybody in your chain of command to take that trip?

A    Sheriff Baca directed me to take that trip.

Q    Did Sheriff Baca direct you to take that trip based upon some sort of request that you had made of him?

A    No.

Q    At the time that Sheriff Baca directed you to take that trip, did you advise Sheriff Baca that Assistant Sheriff Tanaka had asked you not to take any more trips?

A    I don't believe we had that conversation, no.

Q    Before taking the trip abroad that Sheriff Baca ordered you to take, did you inform anybody in your chain of command, and specifically Assistant Sheriff Tanaka, that you were going to be taking a trip on the orders of the Sheriff?

A    Yes.

Q    You told Mr. Tanaka that?

A    No, I told Chief McSweeney.

Q    Did you tell Mr. Tanaka that?

A    No.

Q    Did Chief McSweeney have any reason to know about the order from Mr. Tanaka about you not taking any trips?

A    That conversation never took place.

Q    So you never told him; right?

A    Never took place, no.

Q    Okay.  When you got the dressing down on March 20th -- or I think 21st of 2011 in Mr. Tanaka's office, he referenced -- specifically referenced, "Didn't I tell you not to take any more trips."  Would that be correct?

A    He said that.

Q    Right.

    At the time that you were transferred shortly thereafter to the county jail as captain, the assistant sheriff over county jail was Marv Cavanaugh?

A    Correct.

Q    And therefore, Mr. Tanaka was no longer your -- in your chain of command.  Would that be correct?

A    That's correct.

Q    But by August of 2011, Mr. Tanaka had become undersheriff; correct?

A    That's correct.

Q    So he would be in your eventual chain of command right below the Sheriff at that time?

A    Correct.

Q    Now, you stated that when Mr. Tanaka had come to the county jail in August of 2011, I think you said it was August 30th.  Would that be right?

A    That's correct.

Q    And that was the day that Gilbert Michel was relieved of his duties by you?

A    That's correct.

Q    You said that was the first time you had seen the undersheriff at the jail during your command except for the Baker to Vegas run?

A    That's correct.

Q    And that was in March?

A    March.

Q    Now, you got there in March of 2011; right?

A    Correct.

Q    So it would have been right after the Baker to Vegas run?

A    I believe -- no, I believe it was before.

Q    Right after you got there, I'm sorry.

A    Right.

Q    Right.

You got there in late March of 2011; right?

A    Correct.

Q    And about just a few months later, August is when you saw the undersheriff again at Men's Central Jail?

A    That's correct.

Q    Now, in August of 2011, you had OSJ deputies that were reporting directly to you.  Would that be a correct statement or not?

A    That's incorrect.

Q    That's incorrect.

Who did OSJ report to?

A    To Greg Thompson, and then Greg Thompson reports directly to the commander and then the chief.

Q    Did anybody in ICIB report directly to you?

A    No.

Q    If ICIB was handling an investigation of a deputy sheriff, which is one of the things that they would do; is that correct?

A    That's their responsibility, investigate criminal acts, yes.

Q    Would you expect to be advised of all their investigations?

UNITED STATES DISTRICT COURT

A    Sometimes, sometimes not.

Q    There was a certain confidentiality in ICIB that they wanted to keep their investigations close to the vest because of the sensitive nature of them; is that correct?

A    That's true.

Q    And you honored that and understood that; correct?

A    That's correct.

Q    You stated on August 16th that you found out about the cell phone and -- August 16th of 2011; right?

A    Yes.

Q    And you found out for the first time that a cell phone had been recovered from Anthony Brown from an FBI agent that you had become friendly with when you worked at the Narcotics Bureau?

            MR. FOX:  Objection, misstates the testimony.

            THE COURT:  Sustained.

Q    (BY MR. HAIG)  How did you find out -- how did you first find out about the cell phone that was recovered from Anthony Brown?

A    As I stated, it was on August 16th, Lieutenant Fedele showed me the e-mail.

Q    And what e-mail was it that he showed you?

A    It was an e-mail from Sergeant Rich Conley laying out what took place and what deputies found it, and the date that they originally found it was August 8th.

Q    And were you at work when you received that e-mail from Mr. Fedele?

A    Yes, I was.

Q    On August 18th, was that when you received the e-mail from Mr. Clark?

A    August -- I received an e-mail from Robert Clark August 18th, yes.

Q    And at that point in time, you were out of the country?

A    Yes, I was on vacation.

Q    You were in El Salvador?

A    Correct.

Q    And did that e-mail come on a personal e-mail or your work-related e-mail?

A    It was a work-related.

Q    And you were able to get that on your cell phone, I presume, or did you have to log into a computer?

A    No, I got it on my cell phone.

Q    And do you know whether this e-mail was sent from Mr. Clark's personal e-mail or from his work e-mail?

A    I have no knowledge of that.

Q    Did Mr. Clark advise you to keep this kind of to yourself?

A    No, he just he advised me it was out in the open, and I just didn't reveal anything.

Q    Do you recall what that e-mail said?

A    No, he just said, "Call me," and I called him.

UNITED STATES DISTRICT COURT

Q    And it was during the phone conversation with Mr. Clark that he advised you that the phone that was found on Anthony Brown was an FBI phone?

A    Yes.

Q    Did you get any more detail than just that it was an FBI phone?

A    No.

Q    Did you think that this was important information that you should relay to somebody else at the Sheriff's Department at that time?

A    I didn't.

Q    Do you recall what time of day or night that this phone call happened?

A    I don't recall.

Q    El Salvador, I'm sorry, what time zone would they be located in?

A    Depends on the time of the season, could be two hours or it could be one hour.

Q    This was in August, summertime.  Would that narrow it down for you?

A    Probably an hour ahead of time.

Q    An hour ahead of time, so Mountain Time zone, basically.

     Do you recall if this phone call came to you when the sun was shining or when it was evening?

A    It was during the daytime.

Q    When did you return back from El Salvador?

A    I believe it was the 21st of August.

Q    Between August 18th, getting the phone call from Special Agent Clark, and the 21st of August, did you take any action to inquire further about the information that Mr. Clark had told you about?

A    When I returned to the office, it was already out around the whole department that it was an FBI phone.

Q    When you say out around the whole department --

A    The information was out that it was an FBI phone.

Q    Was it things that just people were talking about?

A    People knew about it.

Q    Your ops lieutenant, Dan Fedele, he knew?

A    Yes.

Q    All right.  Did he give you any kind of briefing when you returned back about anything that was going on?

A    He engaged me -- he engaged me and told me that it was an FBI phone.

Q    Part of your job as working at the Men's Central Jail was to oversee the custodial facility.  Would that be correct?

A    Yes.

Q    All right.  Including the various floors where the inmates were housed?

A    Yes, my job is to manage the entire facility.

Q    And would you walk the floors from time to time?

A        Every day.

Q        A good supervisor would do that; right?

A        Correct.

Q        Would you expect that because you were the captain of the facility, that your deputies would be on their toes when you would be walking down the hall?

A        I would expect that.

Q        But do you think you were able to observe the things that were going on at the jail in an effective way, even knowing that your deputies would be on their toes?

A        Yes.

Q        The 3,000 floor, when you were working there and specifically in the middle part of 2011 -- until August of 2011, what kind of inmates were housed on 3,000?

A        Well, 3,000 floor could house almost 2,000 inmates and certain side of the floor is multi-man modules, and then the other side of the floor -- 31, 33, 35 and 37 -- is all one-person cells.

Q        This was considered a general population floor; correct?

A        On the one side, the multi -- multiperson cells is general population, but the other side was not.

Q        People that were in a more secure housing type of situation.  Would that be a correct assessment?

A        Yes.

Q        All right.  People that are in custody for various serious

offenses such as murder, rape, robbery, gang members, things of that nature?

A      Yes, and 31 was, also 35, protective custody cell module.

Q      On the 3,000 floor, did you experience a lot of use of force by inmates on deputies?

A      Yes.  There was use of force, yes.

Q      Would you say that 3,000 probably had the most use of force by inmates on deputies?

A      Based on my memory, I would say yes.

Q      And would the use of force by inmates on deputies include assaults?

A      Yes.

Q      And beatings?

A      What do you mean by beatings?

Q      Well, multiple inmates trying to assault a deputy?

A      Potentially, yes.

Q      Use of improvised weapons?

          MR. FOX:  Your Honor, I'm going to object beyond the scope and also not sure about the relevance.

          THE COURT:  Sustained.

Q      (BY MR. HAIG)  Did you ever know of any inmates using a term of assault on a deputy called gassing?

          MR. FOX:  Objection, Your Honor, same objection.

          THE COURT:  Sustained.

Q      (BY MR. HAIG)  After you returned back to -- or after you

went to Men's Central Jail as the captain, would you say your relationship with Mr. Tanaka was adversarial?

A    I would just say it's distant.

Q    But you also termed it to be business-like; correct?

A    Yes.

Q    All right.  Was there anything that you perceived that Mr. Tanaka did to you after your transfer to Men's Central Jail to undermine your authority or your command?

A    I wouldn't have any knowledge if he did.

Q    Did he ever have any kind of disagreement with you after that date in March of 2011 where he --

A    Counsel, we didn't interact.

Q    You said on August 30th that you were in Palos Verdes Estates; correct?

A    Yes.

Q    And that was in the morning?

A    Yes.

Q    Dealing with a deputy-related issue; right?

A    Yes.

Q    And you received a phone call?

A    Later on, I received a phone call.

Q    And asked you to come to Men's Central Jail as soon as possible?

A    Yes.

Q    And you did so?

A      I did.

Q      And when you got there, that was when you were first advised that Deputy Michel was the sheriff's deputy who had actually smuggled the phone in to Anthony Brown?

A      Yes.

Q      And you were asked to process his paperwork for removal from the Sheriff's Department?

A      I was requested to sit with him to have him sign the relieved of duty form.

Q      And did you do that?

A      Yes.

Q      And he sat with you as that form was completed?

A      Yes.

Q      What was your feeling about what Deputy Michel had done?

A      I was saddened.

Q      It was a horrific thing that he did, in your words; correct?

A      Yes.

Q      Also present you said at the time was Mr. Carey, Mr. Leavins, Mr. Thompson, Ms. Long and Scott Craig?

A      Counsel, with Gilbert Michel in my office?

Q      No, at the time that you arrived on August 30th to your office.

A      They were outside in the hallway, yes.

Q      And a little while later, Mr. Tanaka arrived; correct?

UNITED STATES DISTRICT COURT

A    Yes.

Q    Was that after you were already finished with Gilbert Michel?

A    Yes.

Q    Later that day, you went to brief all the deputies, and you said it took a couple shifts to brief all the deputies regarding the policy regarding communication with outside law enforcement and federal officers.  Would that be correct?

A    Yes.

Q    Did you feel that the policy that you were briefing these outside law enforcement -- these deputies on about outside law enforcement and federal law enforcement officers, did you feel that this was a bad policy?

A    No, I felt it was an important policy for them to hear.

Q    And you didn't feel that it was even a new policy, did you?

A    No, it was not a new policy.

Q    It was just a restatement of current Department guidelines.  Would that be correct?

A    Yes.

Q    What about the clearance of federal law enforcement officials before they could come in and interviewed any inmates in Men's Central Jail, did you feel that that was a new policy?

A    Yes.

Q    Did you feel that that was an improper policy?

**UNITED STATES DISTRICT COURT**

178

A      Improper or proper?

Q      Improper.

A      I felt that it was improper.

Q      You felt that the new policy was improper?

A      Yeah.

Q      Did you feel that the prior policy was improper too?

A      I can't remember the old policy, to be honest with you.

Q      Do you think it was a good idea to document the people, especially the outside law enforcement officials, coming through?  Did you think it was a good idea to document those people coming through and know who they would be interviewing or interacting with?

A      I think it was important we knew who was coming in, yes.

Q      The e-mail that you saw that stated that all FBI requests for inmate interviews would have to be approved by the MCJ jail liaison before the FBI would have access to the inmate, that was the e-mail that came through; correct?

A      Correct.

Q      And do you know why this e-mail came out?

A      Nobody conferred with me, so I would gather they were just trying to control who comes in.

Q      Would you say that the policy beforehand was failed as far as not monitoring the people that would come in?

A      I believe the policy, if I remember correctly, was sufficient, it was just the deputies didn't adhere to it

**UNITED STATES DISTRICT COURT**

enough.

Q    Do you recall testifying at a grand jury proceeding in relation to the matters that are being discussed --

A    Yes.

Q    -- in your testimony?

A    Yes.

Q    And that would be on May 15th, 2013?

MR. HAIG:  If I could have a moment, Your Honor?

THE COURT:  Yes.

(Counsel conferred off the record.)

MR. HAIG:  Your Honor, I'm reading from the grand jury transcript.

THE COURT:  Page and line number?

MR. HAIG:  It would be page 46 from the transcript on May 15th, 2013, starting on line 10 to line 20.

THE COURT:  Any objection?

MR. FOX:  No objection, Your Honor.

THE COURT:  All right.  Go ahead and read it, and we'll need a copy of whatever you read.  It will be marked.

MR. HAIG:  Very well.

"Question:  This e-mail states that all FBI requests for inmate interviews would have to be approved by MCJ jail liaison before the FBI would have access to the inmate; is that correct?

"Answer:  That's correct.

"Question:  Do you know why this e-mail came out?

"Answer:  Based on my memory and recollection, was to make sure it was vetted through all, through jail liaison, and they would obtain, you know, reasons why, justification, the name of the FBI agent.  Our policy was failed before in not documenting anybody that came through."

And, Your Honor, I can just take a copy out of my notebook and mark that at the present time?

THE COURT:  That's fine.

MR. HAIG:  As defense next in order.

THE DEPUTY CLERK:  359.

MR. HAIG:  3?

THE DEPUTY CLERK:  59.

MR. HAIG:  Thank you.

Your Honor, I would move 359 into evidence at this time.

THE COURT:  No.

Q    (BY MR. HAIG)  Did you have any personal dealings with Paul Tanaka after August 30th, 2011 regarding any -- any items of federal involvement in the jail or interviews in the jail by any federal law enforcement?

A    No.

Q    And as far as you knew, the outside law enforcement applied not just to the Anthony Brown incident but to all outside law enforcement.  Would that be correct?

A    That was my understanding.

UNITED STATES DISTRICT COURT

MR. HAIG:  Could I just have one moment, please, Your Honor?

THE COURT:  Yes.

(Pause in proceedings.)

MR. HAIG:  I have no more questions.  Thank you.

THE COURT:  All right.

REDIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Ornelas, I'm going to be showing on your screen Government Exhibit 34.

Mr. Haig just asked you if this policy applied to all law enforcement agencies and not just to the FBI.

Could you please read the policy itself that I've blown up for you on 12:45 p.m. on August 25th of 2011.

A    Yes.

Q    Go ahead.  Out loud, please.

A    "Effective immediately, all FBI requests for inmate interviews will be approved by MCJ jail liaison.  All FBI requests in person or telephonic shall be referred to the MCJ jail liaison.  Once approved, the inmate will be transported to MCJ and made available to the FBI.  MCJ jail liaison shall be the only entity to facilitate FBI interviews inside our custody facilities."

MR. FOX:  No further questions.

THE COURT:  Okay.

MR. HAIG:  No more questions.

UNITED STATES DISTRICT COURT

THE COURT:  All right.  You may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. FOX:  The United States calls John Powell.

THE DEPUTY CLERK:  Raise your right hand for me, please.

(The witness, JOHN POWELL, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  John Powell.  Last name spelling is P, as in Paul, O-W-E-L-L.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Powell, are you currently employed?

A    Yes.

Q    What do you do?

A    I'm a part-time retired hireback with the Los Angeles County Sheriff's Department.

Q    What does that mean?

A    That means I retired in 2014, the end of June, and I was hired back in August of 2014 to work on some projects for the

Department.

Q     Before you became a part-time hireback, how long had you been working for the Department?

A     33 years and 7 months.

Q     What were your duties -- let's take the last, say, five years that you were working with the Sheriff's Department. What were your duties with the Sheriff's Department?

A     I was the sergeant in charge of the technical operations detail.

Q     Now, as best you can in layman's terms, what were your duties while you did that?

A     We provided technical equipment expertise to investigators.  That included cameras, microphones, BodyWorn; mostly covert tracking devices, and also ran the audio and video forensic lab.

Q     You mentioned that you were a sergeant, I believe?

A     Yes.

Q     Did you supervise anyone?

A     Yes, I had a team of five investigators that were directly subordinate to me.

Q     What unit were you assigned to in August and September of 2011?

A     I was assigned to Detective Division for cyber crimes, the technical operations detail.

Q     Do you recall around this time having any conversations

with someone by the name of Steve Leavins?

A     Yes.

Q     Who did you know him to be at the time?

A     He was a lieutenant at Internal Criminal Investigations Bureau, also known as ICIB.

Q     When was the first time that you recall being in contact with Mr. Leavins around this time?

A     It would have been late August, early September of 2011.

Q     How was it that you came into contact with Mr. Leavins then?

A     He telephoned me.

Q     Where were you at the time?

A     I believe I was in the office, which was in Santa Fe Springs.

Q     What, if anything, did Mr. Leavins say to you when he called you?

A     He asked if we did bugging, countermeasures work, looking for hidden cameras, microphones and that type of operation.

Q     I believe you mentioned a term "countermeasures."  What are countermeasures?

A     Well, since we were in charge of putting in these type of devices, a natural progression would be that we would also be the ones looking for them if they were secreted by an adversary or another operator.

Q     Did Mr. Leavins -- well, did you tell Mr. Leavins whether

**UNITED STATES DISTRICT COURT**

you did engage in this sort of conduct?

A     Yes, I told him we had the equipment and the training to do electronic countermeasures.

Q     What, if anything, did he say in response?

A     He said, "Well, I'm going to have some work for you to do. I think we have a leak of information, and I would like you to, you know, be on standby, and it's going to be very soon."

Q     Did Mr. Leavins inform you what particular places he wanted you to search?

A     Yes, he told me the Sheriff's office, the undersheriff's office, the two EPC conference rooms and the downstairs task force room.

Q     You mentioned the Sheriff's office. Who was Sheriff at the time?

A     Lee Baca.

Q     What about undersheriff?

A     Paul Tanaka.

Q     You mentioned the EPC conference rooms, I believe. What does EPC stand for?

A     Executive Planning Counsel.

Q     And what is that?

A     That is a group of commanders and chiefs that talk about Department business.

Q     Along with rooms, did Mr. Leavins ask you if you would be able to search for these type of devices anywhere else?

A    He also mentioned that some vehicles were suspected of being tracked, or he wanted to eliminate the possibility that they were being tracked, and he asked us to look -- he told us we would be looking at some cars.

Q    Did he mention to you whose cars you'd be looking at?

A    He said there would be some ICIB investigators' cars, potentially the Sheriff's car, but probably not, and Paul Tanaka's car.

Q    What did you say in response?

A    I said, "That's fine, let us know when you want us to do it.  What's the concern?"  One of the things that we do for these types of operations is try to figure out if there is truly a threat, and I was told that, "Yeah, we think there's a leak."  And I explained to him that usually leaks are human, they're not electronic.

        MR. STEWARD:  Objection, Your Honor, to the narrative at this point.

        THE COURT:  Excuse me.  Overruled.  You can finish your answer.

        THE WITNESS:  I explained to him that normally leaks are human and not electronic, and that part of the process was to also talk with the person that had the concern.  And I asked to speak with the Sheriff or at least his aide about it.

Q    (BY MR. FOX)  What, if anything, did Mr. Leavins say to you in response to your request to speak to the Sheriff or his

aide?

A    He told me he has a lot on his plate, don't worry about it; he doesn't need to know.

Q    Did you plan anything, put anything on paper that day to conduct this work?

A    I believe on the 2nd, I documented, created a log.

Q    Was that based on that same phone call you had first with Mr. Leavins, or was there another discussion you had with him?

A    There may have been a second call that we're going to do this tomorrow, and that would have been Friday, the 2nd of September.

Q    Do you remember what day of the week that was?

A    That was a Friday.

Q    And did you normally work on Fridays?

A    No, normally I would be out of hours by Fridays, so I explained there would have to be some overtime.

Q    What was the status of overtime generally within the Department at that time?

A    It was hard to come by.

Q    Did you -- when you explained to him that you were out of hours, what, if anything, did he say in response?

A    Don't worry about it, we'll take care of it.

Q    What did you understand that to mean?

A    We'll pay you to work it.

Q    Now, was it unusual for this request to be coming through

**UNITED STATES DISTRICT COURT**

someone within ICIB to sweep the executives' offices?

A     Yes.

Q     Had you received requests like this to sweep certain offices in the past?

A     Yes.

Q     And who would these requests come from in the past?

A     Normally, through my chain of command, either the chief or the commander or the captain.

Q     You -- I believe you just mentioned that the work began on September 2nd.  So what happened on September 2nd?

A     I met one of my deputies at the office.  We gathered up the equipment, and we drove down to Sheriff's Headquarters.  We arrived 5:30 in the evening.

Q     Had Mr. Leavins told you what time he wanted you to conduct this operation?

A     Yes.

Q     What did he say?

A     He said he wanted to keep it quiet and that he wanted to do it after hours, and I explained to him that normally we would do things like this during regular business hours because devices can be turned off and on based on when people are around.

Q     What did Mr. Leavins say in response to that?

A     That he didn't really care, he wanted us to do it when no one else was around.

Q    So you arrived, and what happened when you arrived at the executive offices?

A    We unloaded our gear, and Steve Leavins met us, and he told us there were still people up on the fourth floor.  And we went to the basement conference room, or the task force room, and we worked that area first.

Q    You said that he mentioned there were people still up on the fourth floor.  Are you familiar with which offices are on the fourth floor?

A    Yes.

Q    Which offices are those?

A    The undersheriff, the Sheriff, the EPC conference rooms.

Q    And you also mentioned that you began working in -- I think you said the task force offices.  Where was that located?

A    In the basement of the building.

Q    At some point in time, did you finish that sweep and go to the executive offices?

A    Yeah.  As a matter of fact, I called Steve and said, "We're done down here."  He said, "Well, there's still people up here.  I'll come down there."  And at that point, I kind of told him some of the things that were a bit of a concern to me about that particular room.

Q    Can you please look in your binder -- I'm not sure if it's that one, but Exhibit 2.

A    It's a schematic.

**UNITED STATES DISTRICT COURT**

Q    Based on your work, are you familiar with the general layout of what's depicted in Exhibit 2?

A    Yes.

Q    And what is depicted in Exhibit 2?

A    It's the fourth floor of Sheriff's Headquarters in Monterey Park.

Q    Is that a depiction of the area that you swept for countermeasure activity on September 2nd of 2011?

A    This does not show the basement, but the fourth floor. And yes, we did the Sheriff's office, but not the entire thing. This shows like six or seven offices within what's labeled the Office of the Sheriff.  We just did Sheriff Baca's private office.

Q    Okay.  But overall, this looks like an accurate depiction of the fourth floor of Sheriff's Headquarters; is that correct?

A    Yes.

Q    Did you create this schematic?

A    No.

Q    Do you know if it's drawn to scale?

A    I don't know.

Q    Will it help you in your testimony today to talk about that schematic?

A    Yes.

        MR. FOX:  Your Honor, I move for the admission of Exhibit 2.

MR. STEWARD:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 2 received into evidence.)

MR. FOX:  And I'm going to highlight the bottom half of this exhibit.

Sorry, one second, Your Honor.

(Plaintiff's counsel conferred off the record.)

Q    (BY MR. FOX)  Mr. Powell, what is depicted in the area that I just expanded?

A    A portion of Detective Division, the Office of the Sheriff, the two EPC conference rooms and the undersheriff's office.

Q    We see a title that says "Office" in kind of the left-hand side of the middle area of the screen.

Do you see that where it just says Office?

A    Yes.

Q    And then we see below that "Office of the Undersheriff."

Do you know where within that area where it says Office of the Undersheriff that Mr. Tanaka's office really was during that time?

A    It's the corner office that's labeled "U/S office."

Q    And do you see the red dot there?  Is that -- that I've just placed?  Is that where Mr. Tanaka's office was at the time?

A    Yes.

Q    What did you -- well, did you go into his office that date?

A    Yes.

Q    What did you do?

A    We conducted a countermeasure sweep.

Q    Why don't you describe that for us.  What is that process?

A    Well, it's -- it's more of a physical search than anything, but we do bring electronic equipment in looking for transmitters, also looking for transmitters that may not be transmitting.  There's a device called a nonlinear junction detector that can find electronics that are turned off, and we basically do a physical search using both electronic means and physical searching.

Q    We see to the left of Mr. Tanaka's office what look to be a table and chairs depicted, and it says 225SF.
     Do you see that?

A    Yes.

Q    Do you know what that area is?

A    That's what's referred to as the small EPC conference room.

Q    Did you conduct a sweep in that room?

A    Yes.

Q    I'm going to put a red dot on that as well.
     And then to the left of there, we see what appears to be a larger room.  Do you see that?

UNITED STATES DISTRICT COURT

A    Yes.

Q    What is that room?

A    That's the main EPC conference room.

Q    Did you conduct a sweep of that office?

A    Yes.

Q    Put another red dot on that.

Now, you mentioned that you also were tasked with sweeping the Sheriff's office.

Do you see on the screen where Mr. Baca's office was at the time?

A    Yes.

Q    Where is that?

A    It's the far right-hand side corner office.

Q    Did I accurately put a red dot where his office was?

A    Yes.

Q    And did you find anything in his office?

A    No.

Q    Did you find any listening devices in any of these offices that you swept?

A    No.

Q    Is there another name for listening devices, by the way?

A    Bugging.

Q    I think it's in another binder, but I'd like you to look at Exhibit 119, please.  Check a binder -- I think it's going to be at your feet, Mr. Powell.

A       Of course it's on the bottom.

Q       Do you recognize this document?

A       Yes, this is a typical log sheet that we use to document any work that we do.

Q       Who creates these log sheets?

A       They're created by whoever has been tasked to create them or the person that got the phone call.

Q       And is it the person who's creating these sheets, do they have knowledge of the information that they provide in that document?

A       Yes.

Q       Is it part of the normal practice of the Department -- the Sheriff's Department to create these types of documents?

A       Yes.

Q       And are they then kept in the normal business practice of the Sheriff's Department?

A       Yes.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 119.

        MR. STEWARD:  No objection, Your Honor.

        THE COURT:  It'll be received.

     (Exhibit No. 119 received into evidence.)

Q       (BY MR. FOX)  Highlighting for you the first top half of the exhibit.

     Do you know whose handwriting this is?

A     Yes, this is a Deputy Brian Derooter's [phonetic] handwriting.

Q     Is he someone you supervised?

A     Yes.

Q     And who does it say the investigator is?

A     Steve Leavins.

Q     What does that mean, that he was the investigator?

A     That would either be the person making the request, or if it was a criminal re -- criminal case, it would be the actual investigator of the case.

Q     And what is the station bureau listed?

A     ICIB.

Q     What about the date requested?

A     September the 2nd, 2011.

Q     What about the date of the job, which I'm highlighting here?

A     September the 2nd, 2011.

Q     We see under "meet location," it appears to state SHB; is that right?

A     Yes.

Q     What does that stand for?

A     Sheriff's Headquarters Bureau.

Q     And what is handwritten under "brief description"?

A     "Sweep requested.  Areas of location.  See log number 11I014 for details."

**UNITED STATES DISTRICT COURT**

Q    I'm now showing you the fourth page of this exhibit.

What is shown here?

A    This is a log 11I014, which was referenced from the first one, and this is one that I filled out.

Q    Does it show the same investigator bureau and date?

A    Yes.

Q    What does it say for date of job?

A    "ASAP."

Q    And what about the description?

A    "TSCM at SHB.  See e-mail of findings."

Q    What is TSCM?

A    Technical Surveillance Countermeasures.

Q    I'm now highlighting page 5 of this exhibit and the handwritten portion of page 5.

What is reflected in here?

A    This is the -- an accounting of the hours that we spent on this particular request.

Q    We see numbers underneath the word "by."

What are those numbers?

A    Each member of my team had a three-digit number assigned to them when they were assigned to the unit.

Q    What was your number?

A    700.

Q    Who does it say overtime was paid by on September 2nd for 9.5 hours?

UNITED STATES DISTRICT COURT

A    ICIB.

Q    We saw in the document that one of the descriptions -- I think it was your description said "see e-mail of findings."

Do you recall that?

A    Yes.

Q    Can you turn to Exhibit 53 which is in the first binder that was originally up there.

A    53?

Q    Yes, please.  If it's easier for you, we're done with that other binder you're resting it on.  You can always put that down.

Do you recognize this document?

A    Yes.

Q    What is it?

A    It's a chain of e-mails exchanged between Steve Leavins and myself.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 53.

MR. STEWARD:  No objection.

THE COURT:  It will be received.

(Exhibit No. 53 received into evidence.)

Q    (BY MR. FOX)  And, Mr. Powell, we're not going to go into this in tremendous detail, but generally, what does this describe on pages 1 and 2 of your e-mail?

A    This is a detailed description of what we found when we

did our countermeasures and any concerns that came up during that operation.

Q    And on page 2, does it go into what you found in your search of the executive offices, including Mr. Tanaka's office?

A    Yes.

Q    You mentioned earlier that Mr. Leavins said in the first phone call to you that he wanted you to search vehicles as well for tracking devices.

What are tracking devices?

A    Usually GPS, Global Positioning System-based, provides the location information, and then there's a way to get that information back to an investigator that would -- may have deployed such a device.  They're used for all kinds of things: for tracking cars, people, mostly vehicles though.

Q    Is this something that law enforcement does, the tracking?

A    Yes.

Q    And you mentioned that Mr. Leavins said that one of the cars that would be searched would be Mr. Tanaka's car; is that right?

A    That's correct.

Q    Do you know -- did you personally search his car at a later date?

A    The first --

Q    Let me make it a little bit more specific.

Did you search his car in September of 2011 personally?

**UNITED STATES DISTRICT COURT**

A     No.

Q     Do you know if anybody did?

A     Yes, I directed two of my staff to do that.

Q     Do you recall approximately when that occurred?

A     It was on a Friday, would have been a week after the initial sweep, so Friday the 9th.

Q     Can you now look at Exhibit 58.

What is Exhibit 58?

A     This is another e-mail correspondence between -- coming from me to Steve reporting the results of the search of Mr. Tanaka's car that occurred on the 9th.

MR. FOX:  I move for the admission, Your Honor, of Exhibit 58.

MR. STEWARD:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 58 received into evidence.)

Q     (BY MR. FOX)  Now, Mr. Powell, focus on the top.

I think you mentioned that this occurred around September 9th; is that correct?

A     Yes.

Q     And I think you mentioned that this was a search of Mr. Tanaka's car?

A     Correct.

Q     Is anything -- does anything in here state that it was Mr. Tanaka's car?

**UNITED STATES DISTRICT COURT**

A    No.

Q    And is there a reason why his name's not in here?

A    We were asked to keep it quiet.

Q    And could you read the paragraph that states "just an FYI."  Do you see that?  "And just an FYI"?  I believe it's maybe the fifth paragraph.

A    Yes.

Q    Could you please read that out loud.

A    "And just an FYI, Ken Perry from Homicide was in our office while the inspection was occurring.  As much as we try to limit access and visibility to what occurs in our office, Brian says he saw the vehicle in the bay and made a comment about its presence."

Q    One moment.

Do you recall if anything was found, any tracking devices were found on Mr. Tanaka's car at this time?

A    No.  However, we couldn't get underneath of it.  It was too low to the ground.

MR. FOX:  I have nothing further, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  You did find that one of the EPC conference rooms was completely compromised; is that correct?

A    Yes.  There's an array of microphones up in the ceiling

that was connected into the Sheriff's data network and was actually live most of the time.  It was live when we were there.

Q    Were you able to detect where that went?

A    We detect --

Q    Who -- I'm sorry, who could listen?

A    Don't know.

Q    Okay.  Did you make any efforts to try and find out who would be listening?

A    Since it terminated into the Sheriff's data network, it would have to be someone that had access to the Sheriff's data network.

Q    Did Leavins or anybody else tell you that the concern was that media was somehow listening to these meetings?

A    Yes.

Q    Okay.  And so, in particular for the EPC conference room, that was a concern; right?

A    Yes.

Q    Okay.  Now, as you were doing these things, did you speak to Mr. Tanaka at all?

A    No.

Q    Did you speak to anyone other than Mr. Leavins about the projects that you undertook?

A    Yes.  I believe those e-mails were CC'd to my captain.

Q    Any of them go -- e-mails go to Mr. Tanaka?

A    Not that I'm aware of.

Q    Okay.  In 2011 were you providing information to the FBI?

A    Yes.

Q    And how long had you been doing that?

A    About ten years.

Q    And when I say "information," I mean about the Sheriff's Department; right?

A    Yes.

Q    For example, your sweep that you just testified about, did you inform the FBI that you had done that?

A    I actually contacted them before we did it to let them know that if, in fact, they had something there, we would find it.

Q    Okay.  And did anyone in the Sheriff's Department know that you were providing information to the FBI?

A    No.

Q    Were you paid for that information?

A    No.

Q    Did you receive anything of a nonmonetary value?

A    No.

Q    Was your work or your provision of information to the FBI secret?

A    Classified as secret or --

Q    Anybody else know about it other than perhaps your immediate family?

**UNITED STATES DISTRICT COURT**

A    I don't believe so.

Q    Okay.  Only the FBI; right?

A    At that time, correct.

Q    And did you periodically sign forms for the FBI that would indicate what you could and could not do as someone providing information?

A    I believe those were all recorded on phone calls.  I don't believe I actually ever signed anything.

Q    Okay.  And you began this relationship when?

A    The official was seven or eight, nine years ago, but I was actually giving them information before that.

Q    And is it still ongoing today?

A    I have conversations with FBI agents, yes, it's still ongoing.

Q    Other than the details of the search, have you ever provided the FBI with information about Mr. Tanaka?

A    No.

Q    Have you ever met Mr. Tanaka?

A    Yes.

Q    When did you meet him?

A    I was tasked with completing a study on how the Department could better manage investigative technology that could violate the Fourth Amendment.

Q    And approximately when was that?

A    Without the document in front of me, it's a good five

years ago, maybe longer.

MR. STEWARD:  Nothing further.  Thank you, Your Honor.

REDIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Powell, are you aware of Mr. Leavins having any role in dealing with the media?

A    No.

Q    Did you believe him when he said that it had been the media that was listening to the meetings?

MR. STEWARD:  Objection, calls for opinion and conclusion.

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

MR. FOX:  He testified earlier that he was to be informed of the reasons why they believe that there is a leak, and they determined what the potential causes are of that leak. And so it is important for them to know the truth of this, and if it goes to -- Mr. Steward opened the door that it goes to what he did after that.

Mr. Steward, based on his questions, which were perfectly appropriate, made it seem like this was the real reason why they were doing it, and that, by the way, is -- it's coming in for the truth of the matter asserted.  It's hearsay, I probably should have objected, but, you know, this is going to undermine that statement which should not be coming in for the truth of

the matter.

MR. STEWARD:  Our position is it's still an opinion, and therefore it's inadmissible.  It's that simple.

MR. FOX:  Admissible under Rule 701 and 702 if they're not expert opinions.

THE COURT:  The objection's overruled.

MR. FOX:  Thank you.

(End of sidebar discussions.)

MR. FOX:  Your Honor, may I ask the question again?

THE COURT:  Yes, that's fine.

Q    (BY MR. FOX)  Mr. Powell, did you think that Mr. Leavins was telling you the truth when he said that the media was listening to the meetings?

A    No.

Q    Why not?

A    Well, it was pretty clear to me that people were concerned about what was happening, and that I wouldn't have called the FBI and told them we were going to do a sweep.

Q    Now, Mr. Steward asked you about motivations for providing information to the FBI.

Do you recall those questions?

A    Yes.

Q    Why did you provide information to the FBI?

A    Well, on that particular occasion, I did not want to find or upset a legitimate criminal investigation.

**UNITED STATES DISTRICT COURT**

Q    What about -- previously you said that you'd been providing information for a number of years.  What generally was your motivation for cooperating with the FBI?

A    I love the Sheriff's Department.  I grew up on the Sheriff's Department, and my motivation was to make the Sheriff's Department as great as it was at one point.

MR. FOX:  Nothing further, Your Honor.

MR. STEWARD:  No recross, Your Honor.

THE COURT:  All right.  You may step down.  Thank you.

Call your next witness.

MR. FOX:  The United States calls Mike Bornman.

THE DEPUTY CLERK:  Will you raise your right hand for me.

(The witness, MICHAEL BORNMAN, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name's Michael Bornman, B-O-R-N-M-A-N.

THE DEPUTY CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Bornman, are you currently working?

A       No, sir.  I'm retired.

Q       Are you retired?

A       I am retired, yes.

Q       How long have you been retired?

A       Since November 28th of this last year.

Q       What did you do before that?

A       I was a captain with the L.A. County Sheriff's Department.

Q       How long had you been in the Sheriff's Department?

A       36 years.

Q       And how long had you been a captain?

A       Three years.

Q       I want to direct your attention to the year 2011.

What role were you performing within the Sheriff's Department at that time?

A       At that point in time, I was assigned to Men's Central Jail, and I worked a unit that was called special projects.

Q       How long had you been working for that unit?

A       I got there, I think in November of 2009, and I was there until April of 2012.

Q       What were the special projects?

A       Well, special projects would have been things that you bring into the unit that could upgrade working conditions.  It turned out being more of a risk management job, so the risk management was reviewing uses of force, administrative investigations, basically paperwork flow.

**UNITED STATES DISTRICT COURT**

Q     Was there reason why this became a special project?

A     Special project or risk management?  Which?

Q     Well, was there a reason why you were assigned to this task?

A     To -- because it was a new job that was there that I filled.

Q     Did you learn of any problems with force packages when you got there?

A     Yes.

Q     What was that?

A     A lot of them had never been reported or worked through the system.  I think I ended up finding about a hundred that hadn't been processed completely.

Q     I want to direct your attention to August of 2011.

      Did you at some point during that time become aware that deputies had found a cell phone on an inmate at Men's Central Jail?

A     Yes.

Q     Do you remember when approximately that occurred that you learned of it?

A     It was -- you know, the date of August 11 sticks in my head, so it was somewhere around that time.

Q     Did you have anything to do with any issues regarding that cell phone during August and September of 2011?

A     No.

Q    At some point, did you encounter Maricela Long and Scott Craig at Men's Central Jail after you learned about the phone?

A    Yes, I did.

Q    Do you remember when this was?

A    It was the last week near the end of August 2011.

Q    Where did you encounter them?

A    I encountered them in -- they were sitting at a conference table that was right in front of my office.

Q    And if you can turn to Exhibit 3.  Actually, I'm going to put it on the screen so you don't need to worry about it.  It's in evidence.

     Is your office depicted in this diagram?

A    No.

Q    Do you know where in relation to the MCJ captain's office your office was?

A    Yeah.  If you're looking at the diagram, my office would have been to the right of the captain's office.  You would take that hallway that's in front of his office to go into where mine was.

Q    And where was it according -- I mean, can you see where you saw Maricela Long and Scott Craig in this diagram?

A    Not in this diagram, no.

Q    Who else was there besides Maricela Long, Scott Craig and yourself?

A    Well, if -- if I can set the scene real quickly.  My

office was one of two that are in the back of a great big open office area, and I heard someone moving around outside of my office where this conference table had been set.  When I walked out, I saw Maricela Long sitting on the far right-hand part of the table.  To her right, and seated, was Scott Craig.  Across from them on the left-hand side of the table there was an IAB lieutenant.  Her name was Stephanie Fredericks.  Sitting to her left was a male sergeant that I recognized from Internal Affairs, but I don't recall his name.

Q    And you used the term IAB earlier.  Is that the same as Internal Affairs?

A    Yes.

Q    And when you walked into this area, what, if anything, occurred?

A    It was unusual to have people just walk into my office and sit at the conference table.  So I walked over to Maricela Long, and I said the obvious.  I go, "I guess you guys are having a meeting."

Q    And what did she say?

A    She said, "Yeah, Mr. Tanaka wants to have a meeting with us."

Q    And did you say anything in response to that?

A    I said, "Well, my office is literally right here.  I could stay in there, but I suppose I should probably leave."

Q    Did Ms. Long say anything to you?

A    Yeah, she nodded her head and said, "Yeah, it's probably best that you leave."

Q    What did you do?

A    I turned to head toward the door that was behind her, and I saw Lieutenant Steve Leavins walk in.

Q    And when you saw Mr. Leavins walking in, did the two of you have a conversation?

A    Yeah.  I mean, he's known me for 20 years at that time. He goes, "Hey, Mike.  What's up?"  And I said, "Well, I guess you guys are having a meeting."  He goes, "Yeah," he goes, "Mr. Tanaka wants to have a lunch meeting with us."  So I said, "Okay."  I go, "I guess I should probably leave then," and he agreed.

Q    Was there a reason why you felt that you should leave if Mr. Tanaka was going to be there?

A    Well, it was a meeting that was going to be held with an investigative team with the undersheriff there, and I didn't think it was appropriate that I should be in the room.

Q    What was your relationship like with Mr. Tanaka, if you had any relationship with him at the time in 2011?

A    I didn't have a relationship with him.

Q    And on your way away from that area, did you encounter anyone else besides Mr. Leavins?

A    Yes.  As I went past Leavins to go into the door that he had just walked through, I ran directly into Mr. Tanaka.

Q    Do you recall anything about what Mr. Tanaka was wearing at the time?

A    Yeah, he -- he wasn't wearing a suit coat.  He was wearing long-sleeve yellow shirt.  He was carrying a bag of what looked to be Subway sandwiches.

Q    Did you ever come back into that area that day?

A    Yes, I did.

Q    Did you encounter anyone from the group?

A    Yes.

Q    Who did you encounter?

A    I encountered Lieutenant Steve Leavins.

Q    Where was he?

A    When I first saw him, he was standing near where Maricela Long had been sitting, and as I walked into the room he turned around and sat in the chair, put his hands back behind his head, kicked his feet up on the table.  So that's where I saw him when I walked in.

Q    And what, if anything, did you say to Mr. Leavins?

A    I said, "The meeting's over, right?"

Q    And what did he say in response?

A    He said, "Yeah."  He goes, "Everybody's just leaving."

Q    What happened next?

A    Well, then as I approached him, he sat up in his chair and put his hands on the table in front of him.  And he shook his head, and he said, "Man, I have never seen Paul so angry."  And

I go, "At who?"  He said, "The feds," and he goes, "Well, more specifically, the FBI."

Q    Did he say anything about what Mr. Tanaka was going to do?

A    Well, he said -- he shook his head and chuckled, and he said, "He is going to make sure they never find that guy."

Q    What, if anything, did you say in response?

A    Well, I asked, "That inmate?"  And he said, "Yes."

Q    Did you say anything else to Mr. Leavins?

A    I kind of pointed at him, and I said, "You're handling that?"  And he put his arms up like in a surrender mode, and he shook his hands.  He goes, "Oh, no, no, no.  He's made it very plain that he's in charge of this operation."  And then he continued on.  He said, "You know what?"  He goes, "He calls me in the morning when I'm getting ready for work.  He calls me on my way to work.  He calls me and meets with me several times a day at work, and then he calls me when I'm on my way home.  He is very involved."

Q    What did you say in response?

A    At that point -- it wasn't a response.  I just asked him why Lieutenant Fredericks had been there because she was an Internal Affairs lieutenant.

Q    And what did he say to you?

A    He just kind of waved it off, and he said, "Well, we're doing a transition right now."

Q    Did he say a transition from what to what?

A    No, but having worked the Department, I figured it was from the Internal Affairs Bureau handing the case over -- and giving it over to ICIB.

MR. FOX:  One moment, Your Honor.

Nothing further, Your Honor.

THE COURT:  Cross-examination.

MR. STEWARD:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. STEWARD)  Counsel asked you if you had a relationship with Mr. Tanaka, and I assume that meant 2011, and was your answer that you had no relationship?

A    I told him I didn't have a relationship with him.  I obviously knew who he was and have worked around him, but I didn't have any kind of personal relationship with him.

Q    Wasn't your relationship with him in 2011 very poor?

A    I would say it was extremely poor.

Q    Antagonistic?

A    Not on my part.

Q    Well, do you recall an incident at Altadena station some years earlier regarding you and Mr. Tanaka?

A    Yes.

Q    Mr. Tanaka visited the station and found you there; correct?

A    Yes.

Q    Were you assigned to that station at the time?

A     Yes.

Q     Okay.  And he saw you there while you were on duty; right?

A     Yes.

Q     And at the time, you were wearing shorts and a shirt and about to go to softball practice?

A     Yeah.  What I was doing was -- I had told the station team who was practicing for a tournament that I would show up at my lunchtime and support them because frankly that's what Paul Tanaka said he wanted the managers to do was to support their people.

I worked the operations side of the shop, which was not the patrol side of the shop.  That day was a Friday.  It was very lightly staffed.  Some of the offices were even dark because there weren't people there.  So I had put on some softball equipment so I could go down there and support them.  Yes, that's what I did.

Q     And you're on duty; right?

A     Yes.

Q     And the time that you took to do that was your on-duty time; correct?

A     It was my lunchtime, and I can do what I want at my lunchtime.

Q     Shortly thereafter, you were transferred, right, from Altadena?

A     Oh, yeah.

Q    And you understand that Mr. Tanaka was responsible for that transfer?

A    Yes.  Yes.

Q    And do you also understand that it was because of your -- the incident he had with you and the softball clothes?

A    Well, frankly I think that might be a cover story that was told, but that's not what the reality was.

Q    Okay.  But you've certainly heard that; right?

A    Yes.

Q    And from then on -- well, let me back up a little bit.
Approximately what year was this, ballpark?

A    That would have been like September of 2009.

Q    And since then, your relationship with Mr. Tanaka has been poor; right?

A    I think it was poor prior to that.

Q    Now, in terms generally, you didn't believe that Paul Tanaka was aware of the volume of violence at the Men's Central Jail; correct?

A    I think generally I couldn't even make a determination on that because I don't know what he knew.

Q    Okay.  And yet, you've told others that; correct?

A    Told others what?

Q    Exactly what I just said, that he wasn't aware of the volume of --

A    Yeah, I think in the context of what you're saying I said

that I couldn't make a determination on what he knew because I
don't know what he knew.

Q     Well, and you've also said that you didn't think
Mr. Tanaka would stand for unnecessary and unjustified force;
right?

A     I think in the context of that, it was politically, he
couldn't come out and say he was for it.

Q     Okay.  But you've said those exact words; right?

A     I don't recall the exact words.  If you have a transcript,
I would go by that.

Q     Well, let's start with this.

      Do you know who the CCJV was, Citizens Committee on Jail
Violence?

A     Yes.

Q     And that was, as the name implies, a citizens committee
that looked into all of these issues; correct?

A     Yes.

Q     And you were interviewed by those folks; correct?

A     Yes.

Q     Do you recall being interviewed on April 18th, 2012 at the
Law Offices of Latham & Watkins?

A     I don't remember the date, but I'll go by that.

Q     Well, you remember the interview generally; right?

A     Sure, yes.

Q     And it was sitting around a conference room, was it?

A       I think so, yes.

Q       Now, did you later also testify in front of that citizens committee?

A       Yes, I did.

Q       Okay.  Do you recall telling the investigators that Mr. Tanaka is smart, calculating, educated, and that tolerating violence would negatively affect him?  Do you recall saying that?

A       I think so, sure.

Q       Okay.  And so tolerating violence is something that Mr. Tanaka would not want to do because, in your view, that would make him look bad; right?

A       Yeah, that's my perception, sure.

Q       And you also -- well, let me just -- I won't ask you about that.

        Your view is that Mr. Tanaka would not have tolerated excess violence because of how it would have made him look; right?

A       Yes.

Q       Now, you left the Sheriff's Department when?

A       November 27th of 2015.

Q       Okay.  And why'd you leave?

A       I ran out of gas after 36 years.

Q       Robert Olmsted a friend of yours?

A       Yeah, I know Robert Olmsted.

Q    Is he a friend of yours?

A    No, we don't -- we don't hang around.  We don't go out.
We don't meet.

Q    Didn't you leave the Sheriff's Department because you were
tired of being stepped on by Paul Tanaka?

A    No.  You know, at that point in time, I had made captain
on the Sheriff's Department.  I think that's a pretty big deal.
So I left because I've got bad knees and bad ankles and bad
feet, and I thought I had done all I could do.

Q    Did you ever say that to anyone, that you left because you
were tired of being stepped on by Paul Tanaka?

A    No, I don't believe so.

Q    Did you say that to Mr. Olmsted?

A    No.  I don't think so, no.

Q    Now, throughout the course of your career, you were
removed from or transferred from several different positions by
Mr. Tanaka; right?

A    I think two.  I don't think there were several that he
did.

Q    Okay.  Altadena, there's one?

A    Uh-huh.

Q    What's the other one?

A    It would have been Custody Support Services.

Q    And when was that?

A    Maybe 2004-ish.  I don't recall exactly.

**UNITED STATES DISTRICT COURT**

Q    Okay.  And did your removal from those two positions have anything to do with outside employment that you were involved in?

A    No.

Q    Something about a movie deal?

A    I don't know what you're talking about.

Q    But you've had strong feelings of a negative variety about Mr. Tanaka for many years; right?

A    That would have to be placed in some context.

Q    Well, you don't like him, do you?

A    No, I don't like him.

        MR. STEWARD:  Thank you, Your Honor.  Nothing further.

        THE COURT:  Anything else?

        MR. FOX:  Can I have one moment, Your Honor?

        THE COURT:  Yes.

    (Plaintiff's counsel conferred off the record.)

        MR. FOX:  No questions, Your Honor.

        THE COURT:  All right.  Sir, you may step down. Thank you very much.

        THE WITNESS:  Thank you, sir.

        THE COURT:  Ladies and gentlemen, we're going to break for the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people

**UNITED STATES DISTRICT COURT**

involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, in chat rooms, blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate to you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or accounts about the trial or anyone associated with it.  This includes going online.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to communicate with me, simply give a note to the clerk.

We're going to resume tomorrow morning at 8:00 a.m.

Please have a nice day and leave your notebooks on your chairs.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR. FOX:  Your Honor, may I raise an issue before I go into the witnesses?

I just wanted to put the defense on notice and let the Court know that this issue may arise.  Mr. Steward asked a lot

of questions of Mr. Bornman about his dislike for the defendant. I showed restraint. The answers would have been, if I had gone into it, that he felt that Mr. Tanaka was engaging in pay-to-play. In order to be promoted, they needed to donate to Mr. Tanaka's campaign, and that's a reason why he didn't like him.

Now, again, I showed restraint there. I think that Mr. Steward blew that door wide open, but I think that if there's another witness who is asked about whether they like Mr. Tanaka -- and there is -- there are plenty of witnesses who've told us this, about the pay-to-play -- that we should be allowed to get into it.

Based on the time of day, I didn't want to keep this witness over. I did not get into it, but again, I think that it's fair game at this point.

THE COURT: The witnesses for tomorrow?

MR. FOX: Thank you, Your Honor.

Gilbert Michel, William David Courson, David Betkey. We haven't made a final decision about whether we're going to call Tom Carey, but Tom Carey would be tomorrow if we do call him. I told the defense earlier that they are free to call him if we don't. Judge Torribio we will call tomorrow.

THE COURT: I'm sorry, Judge?

MR. FOX: John Torribio. He's the superior court judge.

THE COURT:  Right.  Okay.

MR. FOX:  Yes, and we will probably have an agent read in the testimony of Mr. Tanaka's previous testimony.  That agent's name is Joe Rock, R-O-C-K.  And if we get to it, we will finish our witnesses.  Those witnesses will be Leah Tanner, Ruben Martinez.  There's only one other witness that's listed on our list I believe that we plan on calling, and that is Dennis Conte.

If we rest tomorrow, which is a possibility, we will not call him because he's not in town.  So at this point, our case may wrap up tomorrow.  I think it's more likely that we're talking about early in the day on Friday.

THE COURT:  All right.  Is the defense intending to put on a case?

MR. STEWARD:  Yes, Your Honor.

THE COURT:  And you'll be ready to go on Friday?

MR. STEWARD:  We will, Your Honor.

THE COURT:  All right.  Anything else?

MR. FOX:  No, Your Honor.

So for your information, we're going to meet with the defense now so we can go over the potential defense witnesses and what it is that they would have to say.  They provided us with two statements -- I'm sorry, three statements by two witnesses yesterday, but right now they've got 22 people on the list.  So we just need some notice of who these actual

**UNITED STATES DISTRICT COURT**

witnesses are going to be.

THE COURT:  Okay.

MR. FOX:  Thank you.

MR. HAIG:  Your Honor, one other thing.  On Defense Exhibit 359, I just wanted to add the first page, which just basically is the title page of the --

THE COURT:  That's fine.

MR. HAIG:  -- grand jury transcript.  Thank you.

THE COURT:  You know, the evidence from the exhibit is --

(Reporter admonition.)

THE COURT:  The evidence from that exhibit is in, and all we're doing is marking it.  If there's appeal or something, somebody will have something to look at.

MR. FOX:  Thank you, Your Honor.  Nothing else.

THE COURT:  Okay.  Thank you very much.  We'll see everybody tomorrow.

(The proceedings adjourned at 1:35 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


        I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*



                    /s/ SHAYNA MONTGOMERY
                    _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**