UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CR 15-255-PA |
| | ) | |
| PAUL TANAKA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


REPORTER'S TRANSCRIPT OF

JURY TRIAL PROCEEDINGS - DAY 8

MONDAY, APRIL 4, 2016

7:59 A.M.

LOS ANGELES, CALIFORNIA


_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM


UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
        EDDIE A. JAUREGUI
        Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900


**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686


**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent


**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

**DEFENDANT'S
WITNESSES**                                                                  **PAGE**

PAUL K. TANAKA

        Cross-Examination (Continued) by Mr. Fox        19
        Redirect Examination by Mr. Haig                120
        Recross-Examination by Mr. Fox                  128


CHARLOTTE LYNN LYNCH

        Direct Examination by Mr. Steward               129
        Cross-Examination by Mr. Jauregui               131


CHARLES ANTUNA

        Direct Examination by Mr. Haig                  133
        Cross-Examination by Mr. Fox                    142


HELEN MIKIKO HAYASE

        Direct Examination by Mr. Haig                  147
        Cross-Examination by Mr. Jauregui               148


ANDRE BIROTTE, JR.

        Direct Examination by Mr. Steward               150
        Cross-Examination by Mr. Fox                    160


DAVID REAL

        Direct Examination by Mr. Haig                  167
        Cross-Examination by Mr. Jauregui               169


EDWARD MEDRANO

        Direct Examination by Mr. Haig                  171
        Cross-Examination by Mr. Jauregui               175

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|--------------------|----------|
| 1 | Clark 2006 Memo | 27 | |
| 2 | Sheriff's Headquarters Bureau Diagram | 68 | |
| 7 | Tanaka Testimony Transcript CCJB | 43 | |
| 15 | E-mail Dated 8/18/11 | 67 | |
| 21 | E-mail Chain Ending 8/20/11 | 70 | |
| 22 | E-mail Chain Ending 8/23/11 | 74 | |
| 23 | E-mail Chain Ending 8/23/11 | 75 | |
| 25 | E-mail Chain Ending 8/24/11 | 76 | |
| 38 | E-mail Chain Ending 8/26/11 | 104 | |
| 59 | E-mail Chain Ending 9/12/11 | 60 | |
| 71 | E-mail Chain Ending 9/25/11 | 118 | |
| 74 | McCorkle 9/1/11 E-mail | 111 | |
| 78 | Tanaka-Leavins E-mail 8/29/11 | 107 | 108 |
| 141 | Proposed Order for Investigative Records Dated 9/7/11 | 113 | |
| 172 | Phone Summary Chart | 50 | |
| 187 | Document Regarding LASD's Policies | 115 | |
| 195 | Tanaka Full Grand Jury Transcript | 105 | |
| 196 | Printed Article | 209 | |
| 317 | Photo | 174 | |
| 352 | 9/26/11 Letter Baca to Birotte | 159 | 160 |
| 362 | E-mail, Yoshinaga to Leavins | 204 | |
| 363 | Stip Re: FBI Report | 204 | |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; MONDAY, APRIL 4, 2016**

**7:59 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Special Agent Leah Tanner with the FBI.

THE COURT:  Good morning.

MR. STEWARD:  Good morning, Your Honor.  Dean Steward and Jerome Haig for Mr. Tanaka.  He's present.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Before I forget, any of you see the lady that was in here?

MR. HAIG:  You know, I can kind of give you a rundown, if you want.

MR. STEWARD:  The answer's no.

MR. HAIG:  Oh, okay.  I don't know who she is.

MR. STEWARD:  She's the one that it's her friend.

MR. FOX:  So there's a woman in the first row, blonde with a black top.

**UNITED STATES DISTRICT COURT**

THE COURT:  Uh-huh.

MR. FOX:  Do you see her next to the man in a blue --

MR. JAUREGUI:  Closer to the defense side.

MR. FOX:  Yes, middle close to the defense side.

MR. HAIG:  And I think we -- this is Jerome Haig.  I think we generally know who she is and what group she's representing.  I believe that's correct based upon --

THE COURT:  Well, what I'm really trying to do is to identify the woman that was taking pictures.

MR. HAIG:  Right, that's what I'm talking about.

THE COURT:  Okay.  And it's not the blonde.

MR. STEWARD:  It is not.

MR. HAIG:  That's right, yeah.

THE COURT:  But it's somebody who may be affiliated.

MR. STEWARD:  Correct.

THE COURT:  Okay.  But it was one of the reporters --

MR. STEWARD:  As far as we can tell, no.

THE COURT:  Okay.  All right.  I'll just remind everybody again.

Okay.  Why don't we take up first this issue about the Vikings.  Now, as I understand the defense's position is, is that this is for -- it's not relevant, and even assuming it has some relevance, its relevance is outweighed by its

**UNITED STATES DISTRICT COURT**

prejudicial -- it's substantially prejudicial.

MR. HAIG:  That's right, Your Honor.

THE COURT:  Okay.

MR. JAUREGUI:  And I believe there was a remoteness argument made as well.

MR. STEWARD:  "Stale" was, I think, our word.

MR. JAUREGUI:  Okay.

MR. FOX:  I think what you're getting to is to relevance.

MR. HAIG:  And I think I also had objected that it was beyond the scope.  So, I mean, but I think the major argument is the one the Court just mentioned.

THE COURT:  Okay.  Ultimately, where are we going with this?

MR. FOX:  Your Honor, I think that it's important to show, and I'll explain how far I'm going to go with this, that he was a member then.  He was the sergeant, and he was a member of a deputy clique as sergeant.  He joined them as a sergeant. He maintains his tattoo -- throughout his career at the LASD, he maintained his tattoo even after there was a finding that it was this type of deputy gang.  Now, I'm not going to get into the racial aspects of it.  I will not --

THE COURT:  I understand.  Let's assume for the moment you ask him when you were a member of the -- I'm assuming it's going to go something like, You were a member of

the Vikings; correct?  You've gotten on the stand.  You've professed to both personal and professional core values of the Sheriff's Department.  You were a member of a clique.  That clique had values that were totally the opposite of these core values.

MR. FOX:  I'm not going to argue it that way, Your Honor.  I'm just going to lay out the facts.  So I'll be happy to tell you the questions that I'm asking if that would be easier.

THE COURT:  Okay.

MR. FOX:  Obviously, it's not going to be word-for-word, but something to this effect:  When you were at the Lynwood station, you learned of a deputy clique named the Vikings, and you were later asked to become part of the Vikings.  You agreed to become part of the Vikings.  In 1991 you found out that there was a finding that this was a deputy gang that was involved in civil rights abuses and lawlessness.

Even after that finding you kept your tattoo.  You kept your affiliation with the gang -- I'm sorry, with the Vikings, and even as you were undersheriff you kept your tattoo.  And as you testified today, you still have that tattoo on you, because I think it does go to his intent because if he is, as the defense portrayed him, as he portrayed himself, a person who adheres to the core values, he would not -- as soon as there's a finding about this gang, he would have gotten rid of the

tattoo.

THE COURT:  All right.  Well, let's assume for the moment he says no, I'm not aware of any such finding that they were -- what were your words that they were?

MR. FOX:  A deputy -- I'm sorry, the judge's findings, Judge Hatter's findings were that they were -- to remove some of the stuff that I'm not going to get into, that they were engaged in civil rights abuses and that they also committed other acts of lawlessness, is what he said.

THE COURT:  Okay.  Well, how are you going to prove that?  Let's say he denies it.

MR. FOX:  If he denies it, I'm not going to put him in the opinion.  That's not -- if he denies knowledge then he denies knowledge, although I would have to look back at his previous testimony before the Citizens' Commission on Jail Violence.  I think in the past he has acknowledged that the judge made a ruling, although I'm not positive.  If he denies knowing about the ruling, I'm going to continue to say he's a member of this clique and he still wears the tattoo of that clique.

THE COURT:  Okay.  Well, he's a member of the clique, but how it become -- unless you get into that, it's somehow inconsistent with the testimony that he's given, how is it relevant?

MR. FOX:  With the findings of the judge, again the

UNITED STATES DISTRICT COURT

fact that -- and I don't have to say the judge --

THE COURT:  But again, if you're not -- unless you're able to prove that to the jury -- the jury doesn't know what Hatter said.  The jury doesn't know anything about the Vikings, presumably.  So how are you going to prove it?  It's what you tell him --

MR. FOX:  Sure.

THE COURT:  Well, you're a member of this clique.

MR. FOX:  I can -- what I'll probably do is look to see -- because we have, obviously, a lot of his previous statements.  I'll look to see if we have something that shows that he does know about this ruling where he's admitted knowing the ruling.

THE COURT:  But don't you have to have a good faith belief in this question before, instead of looking for testimony?

MR. FOX:  It became -- no surprise it became incredibly controversial -- the Vikings became controversial and has received a lot of public scrutiny since that ruling.  Now, one thing that I can tell you is that, again, he was questioned on this before the Citizens' Commission on Jail Violence, and he still has that tattoo on him today.  So at some point, he did learn about this.

THE COURT:  Well, I understand now, but ultimately if you're going to ask him -- if it's going to have some

**UNITED STATES DISTRICT COURT**

meaning at some point and he denies it -- yeah, I was a member of a club or clique.  So what?

MR. FOX:  I think that he will admit that he was aware of the judge's ruling, he became aware of the judge's ruling.  I mean, they will know better than I do, but this is something again that was very well known throughout.

THE COURT:  Okay.  Well, again you're saying you think he may.  But if he says, No, I wasn't, then the question becomes, okay -- I mean, I still don't understand where we're going with it.  If ultimately you were going to say -- well, you know that this commission -- what you know of this clique was -- everything he stood for was exactly the opposite of what you testified that you believe in, fine.

And then you want to -- you've got some evidence, you want to put Lourdes Baird or Rob Bonner or somebody from that sentence that says, Yeah, we had problems with these cliques that eventually became a problem at the Sheriff's Office, and we took him to task because he was a member of one too.

MR. FOX:  I'm not going to go there with that, Your Honor.  We're not going to be proving that up.

THE COURT:  Okay.  Well, then I have a hard time seeing of how it's of any relevance to this jury.  Because presumably, the theory is ultimately what you -- I assume that what you want to do is to impeach him for getting on the stand and portraying to the jury that, Hey, I believe deputies are

being -- doing the right thing.  I believe in these core values.  I believe in discipline, and I was -- so unless you're going to impeach him -- unless it's being offered to impeach him for that --

MR. FOX:  That's what it's being offered for, Your Honor, and I think that I do have a good-faith basis to ask him if he's aware of that ruling.  And I think I have a good-faith basis to believe that he became aware --

THE COURT:  What is the good-faith basis?

MR. FOX:  It was a published opinion in 1991 about a group that he's involved with within the Sheriff's Department that became huge throughout the Department --

THE COURT:  What's the evidence that you have that he knew of that ruling?

MR. FOX:  I can look back to see what he was questioned about, Your Honor, but again, I think given that he's a member of that group, given that there was a published opinion about that group that had a temporary restraining order at least at one point saying to the group you cannot operate and you have to -- whatever --

THE COURT:  It was reversed.

MR. FOX:  It was reversed, but for a while there was -- before it was reversed, there, of course, was an order out there to --

MR. JAUREGUI:  To the whole Department.

MR. FOX:  Of course, to the whole Department.  So it's something, again, as a leader that he was involved in, there were -- as you know, there were semiannual reports, annual reports talking about the issues involving the Sheriff's Department deputy cliques.  He was a member of one, so I --

THE COURT:  Well, there's no question about that, but ultimately -- so if he says no, I wasn't aware of it --

MR. FOX:  Then we move on.

THE COURT:  I understand that.  You're stuck with that answer, but ultimately, what's the jury going to get out of this case?

MR. FOX:  That he actually was a member, or that that -- I think it's two separate issues.  Was he a member or what did it stand for and --

THE COURT:  Well, I think there's probably enough on the record that he's going to -- he's probably going to own up to that, but as to whether or not he was aware of Judge Hatter's ruling --

MR. FOX:  Obviously, we don't have access to him to find out what he's going to say, and I can --

THE COURT:  If he says yes, then it's a problem.  If he says no --

MR. FOX:  I think we can front it at that point, Your Honor.  I think that we --

THE COURT:  I don't think so.

UNITED STATES DISTRICT COURT

MR. FOX:  -- have a sidebar -- I mean, I'm saying "we" as in the government, we see if we think we should be doing anything else.

THE COURT:  If you've got something, you ought to have it now.

MR. FOX:  Let me find it, then.  Give me a few minutes to find it.

THE COURT:  You've had all weekend.  You've known about this thing all weekend.

MR. FOX:  I -- my position, Your Honor, is that to me it's very clear that he would have known about it and --

THE COURT:  Being clear and having something is two different things.  If you've got something -- so...

MR. FOX:  Okay.

THE DEPUTY CLERK:  All the jurors are here.

MR. FOX:  And if I find something during his cross-examination or if the agent does, may -- you've got a binder with the CCJV testimony, and if it's in there, can I point that out to you?

THE COURT:  Sure.  If you've got something, that's fine.

MR. FOX:  That's what I'm saying.  It's probably in our room -- it's probably here with us, is what I'm saying, and we can find it.

THE COURT:  That's fine.

MR. FOX:  Okay.  Thank you.

THE COURT:  Okay.

MR. FOX:  So just to make it clear, you don't want me to get into -- or are you saying that I can, but if he denies knowledge then I'm stuck with that answer?

THE COURT:  No.  What I'm saying is before you get into this area, you're going to have to show that you've got a good-faith basis, and thinking that there's something there is not enough.  You're going to have to --

MR. HAIG:  Your Honor, this is Jerome Haig again.  I would just ask, if it's all right, for the government to ask to approach again if they want to go into this issue again.

THE COURT:  Well, I assume they will.

MR. FOX:  Yes, I will.

THE COURT:  Okay.

MR. FOX:  Thank you.

THE COURT:  And it's the Court's finding this is relevant because he basically has gotten the -- taken the position he portrayed himself as -- to the jury as following the rules, living by the creed of the Sheriff's Department and the core values, and that being a member of this gang would be inconsistent with the Sheriff's core values; that one of the things I believe he said is that through his testimony in the government's case concerning his efforts and real plans for him, jail commanders to break up cliques of deputies by

reassigning and rotating its deputies through different areas. And in his direct testimony, he testified he disagreed because he didn't want to disrupt the schedules of the deputies, not because he was against efforts to contract the cliques, and evidence of his own membership in the clique is therefore relevant to impeach that testimony.

It's also relevant to show that his intent and to obstruct justice including the possible rift to protect deputies or alleged members of deputy cliques like the Vikings, and furthermore, I don't find that the probative value of his testimony is substantially outweighed by undue prejudice given the fact the way the government has stated in its brief.

MR. FOX:  Your Honor, also Paul Yoshinaga, as you know, is one of the defense witnesses.  Brian Hershman, who represents the County and the Sheriff's Department, informed me last night that he believes there's some privilege issues related to him, that they will object to the introduction of certain of his evidence.

Based on the history with Mr. Yoshinaga, I also spoke to the defense last night and today about the possibility that we do something outside of the presence of the jury with respect to Mr. Yoshinaga.  My suggestion is that we get through everything else that we can today.  We table him to the end of the day, excuse the jury, if that's okay with Your Honor, and then we hear from Mr. Yoshinaga.

THE COURT:  Well, first of all, from what I recall of the proffer there's only one element of his testimony that I think is relevant here because Tanaka never consulted with him about anything.  The fact that other people may have consulted I think is irrelevant to any sort of defensive -- well, it's irrelevant to his defense, and moreover, it seems to me that the defense has said that it's abandonment, his -- the defense abandoned the attorney --

MR. HAIG:  Advice of counsel.

THE COURT:  -- advice of counsel defense.  Now, if he wants to get on the stand as a percipient witness and say, "I was at this meeting at the U.S. Attorney's Office and here's what I saw," that's one thing, but all this -- all the legal stuff about what he told Thompson or told Leavins, how is that relevant to Tanaka?

MR. HAIG:  I can -- this is Jerome Haig again.  I can -- the basic proffer -- and we are abandoning the advice of counsel defense because Mr. Yoshinaga, as is clear from Mr. Tanaka's testimony and is clear from the proffer, did not have any consultations with Mr. Tanaka regarding any legal aspect of --

THE COURT:  We understand that.  What's he got to say that's relevant?

MR. HAIG:  As the Court said, he's going to be testifying as a percipient witness.

THE COURT:  About what?

MR. HAIG:  About -- about what he observed at the meeting at Andre Birotte's office and also what he observed regarding his communication with Leavins and Carey.  Well, if I can just give you --

THE COURT:  What Leavins and Carey have to say is irrelevant.

MR. HAIG:  It's not -- the aspect of it is not what was said between the two of them, but just the mere fact that he was communicating much more with Leavins and Carey and Baca than Tanaka, and I think that circumstantially proves that Mr. Tanaka is not as involved as the government claims he was involved.  That's the only aspect of it.  So it's that part, and also his status as a percipient witness to some of the things that have already been testified to.  But as far as his role as the legal advisor, that really just puts him at the scene.  His -- the aspects of legal advice really aren't the important thing in this case.

THE COURT:  Well, that's fine.  So it seems to me Mr. Hershman is concerned about privileges.  I don't think that's really going to enter into this, but oh well.

All right.  Let's go.

MR. HAIG:  Do you want Mr. Tanaka up on the stand yet?

THE COURT:  Yep.

UNITED STATES DISTRICT COURT

MR. HAIG: Okay.

(End of sidebar discussions.)

THE COURT: Let me just caution everybody, all electronic devices must be turned off. I have received information that somebody here last week was taking pictures with a cell phone in this courtroom, and that's a real problem. So make sure your electronic devices are turned off. Anybody who is found taking pictures in this courtroom will be referred to the United States Attorney's Office for prosecution. It's against federal law.

Okay. Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK: Please be seated.

THE COURT: Good morning, ladies and gentlemen.

THE JURY PANEL: Good morning.

THE COURT: All right. We're going to resume with the cross-examination.

MR. FOX: May I proceed, Your Honor?

THE COURT: Yes, please.

CROSS-EXAMINATION (CONTINUED)

Q    (BY MR. FOX)  Mr. Tanaka, on Friday you talked about working as a CPA for about 20 years; is that correct?

A    I did.

Q    During that time, though, you were actually employed full-time as a law enforcement officer as well; correct?

A     During most of that period of time, correct.

Q     You worked for two police departments before joining the Sheriff's Department; correct?

A     I was employed as a -- well, I wasn't really employed.  I was a reserve police officer for Montebello for about four months before being hired as a full-time peace officer by the El Segundo Police Department.

Q     So you worked for two separate police departments before joining the Sheriff's Department; correct?

A     Yes.

Q     And you did police work for these two separate police departments; correct?

A     I did.

Q     You were not doing accounting or budgetary work for them; correct?

A     I was not.

Q     Then you joined the Sheriff's Department in 1982; is that right?

A     Yes.

Q     In May of 1982, you worked as a deputy in one of the county's jails; correct?

A     Yes.

Q     And that county jail was Men's Central Jail; correct?

A     Yes.

Q     And you were doing the normal deputy functions as you were

working in the jail; correct?

A     I was a jailer.

Q     And you were not doing budgetary or accounting work when you were working for the Sheriff's Department in 1982?

A     I was not.

Q     In 1983 you became a patrol deputy; correct?

A     Yes.

Q     And you were doing the standard duties of a patrol deputy in 1983; correct?

A     Yes.

Q     And you continued to do that work for a few years before you went to the Lynwood patrol station in 1987; is that correct?

A     Between that I was assigned to the training bureau as a recruitment officer for the Sheriff's Department, from 1985 to 1987.

Q     And in 1987 you began supervising the patrol officers at the Lynwood station; correct?

A     Yes.

Q     And you supervised investigations when you were a sergeant at Lynwood; correct?

A     I was not a detective sergeant.  I was a patrol sergeant for the first, approximately, year and a half, and then I became the traffic supervisor for maybe under a year.  And then after that, I was the -- an adjutant or the operations sergeant

to the station captain for the last year and a half or so.

Q    And when you were a patrol sergeant, you were overseeing investigations done by the patrol deputies; correct?

A    Well, the initial fieldwork, yes.

Q    And you became a lieutenant at a jail in Lancaster in 1991; correct?

A    That's correct.

Q    You supervised sergeants and deputies at that jail; correct?

A    Yes.

Q    You reviewed investigations of force at that jail; correct?

A    Yes.

Q    And part of your job was to make sure that those investigations were lawful and complete; correct?

A    Yes.

Q    And then you worked as a lieutenant at the Inmate Reception Center in 1991; correct?

A    I believe I was assigned to the Inmate Reception Center sometime in 1992.

Q    And in 1993 you were lieutenant at another patrol station; correct?

A    Yes.

Q    And you supervised sergeants and deputies working patrol at that time; correct?

A       I did.

Q       Now, you discussed in your testimony on Friday that promotions within the Sheriff's Department while you were there, with respect to sergeant, were merit-based; correct?

A       It was based on a compilation of scores, a three-part examination process.

Q       So merit-based; correct?

A       Well, I don't know if that's merit-based.  I think part of it -- about a third of it was merit-based.  Your supervisors would judge your performance and give you a grade based on how they thought you would perform at the next level.  The other two portions were based on a written examination of your knowledge and an oral interview.

Q       So at least part of it was based on objective criteria; correct?

A       Probably the written test would be the most objective.

Q       And promotions to the lieutenant were also based, at least in part, on objective criteria; correct?

A       A portion, about a third, was -- or I don't remember the percentages, would also be based on a written examination.

Q       During approximately your first 17 years at the Sheriff's Department, you were promoted twice -- once to sergeant and once to lieutenant; correct?

A       Yes.

Q       And those were based, at least in part, on these objective

criteria; correct?

A     That is correct.

Q     And you testified in direct that the Sheriff was able to hand-select anyone from the rank of captain or above; correct?

A     That was his policy, correct.

Q     During the time you were at the Sheriff's Department, that was his policy; correct?

A     Yes.

Q     So that meant that he was able to hand-select captains, commanders, chiefs, assistant sheriffs and the undersheriff; correct?

A     Yes.

Q     Mr. Baca was elected Sheriff at the end of 1998; correct?

A     Yes.

Q     And at that point, he had the authority to promote anybody at those levels, captain and above; correct?

A     Once he became the Sheriff, yes.

Q     At the end of 1998?

A     Yes.

Q     And he was able to do that from 1998 until he left office in January, February of 2014; correct?

A     That would be correct.

Q     There were no written tests to become captain or above; correct?

A     There were no written tests for those positions.

Q    And during the first four years that Mr. Baca was Sheriff, he promoted you three times; correct?  Would it be easier if I broke that down for you?

A    No.  I'm just trying to recall.  '99, '01, '2 -- three times in -- did you say three times?

Q    Well, let's break it down.  In 1999, months after he took office, Mr. Baca promoted you to captain; correct?

A    In August of '99.

Q    And just two years later, in 2001, he promoted you to commander; correct?

A    Yes.

Q    Just one year after that, in 2002, he promoted you to chief; correct?

A    It was 18 months later in -- summer of 2002.

Q    So you were captain for four or five months before you became commander?

A    18 months, sir.

Q    From captain to commander it was 18 months?

A    From captain to commander, 18 months.  And from commander to chief, 18 months.

Q    And then in 2005, Mr. Baca promoted you to assistant sheriff over custody; correct?

A    That was one of the divisions that I was responsible for overseeing when I was promoted to assistant sheriff.

Q    In 2007 he moved you to become assistant sheriff over

patrol; correct?

A    He did.

Q    And in 2011 he promoted you to become undersheriff; correct?

A    Yes.

Q    Mr. Baca promoted you over the years because you did exactly what you were asked to do; correct?

A    I -- you'd have to ask the Sheriff why he promoted me.

Q    Well, Mr. Baca --

A    It was his prerogative only.

Q    Excuse me.  Mr. Baca has told you that in the past; correct?

A    I believe he's made a comment, something to -- along the line of that I did what I was told.

Q    Mr. Baca told you that he promoted you over the years because you did exactly what you were asked to do; correct?

A    Probably something along those lines.

Q    Mr. Baca told you that, that he promoted you over the years because you did exactly what you were asked to do; correct?

        MR. HAIG:  Objection, Your Honor, asked and answered.

        THE WITNESS:  I -- I don't remember the exact words, but it was something along those lines, sir.

Q    (BY MR. FOX)  Mr. Tanaka, you testified on Friday about

John Clark's rotation plan.

Do you recall that testimony?

A     Yes.

Q     You testified that you did not approve of the plan because it required a rotation of shifts, not just job assignments; correct?

A     Yes.

Q     You testified that you did not want deputies to be moving from day shift to evening shift or afternoon shift and then to graveyard shift; correct?

A     That is correct.

Q     Showing you now Government Exhibit 1.

And, Mr. Tanaka, do you have a binder in front of you?

A     I got a lot of binders.

Q     Okay.  Do you see Exhibit 1 there?

(Pause in proceedings.)

THE WITNESS:  I have Exhibit 1 in front of me.

Q     (BY MR. FOX)  All right.  Mr. Tanaka, while in this memorandum by Mr. Clark it discusses deputies' use of force -- you see that part highlighted on your screen in front of you?

A     Yes.

Q     Okay.  Nowhere in this memo does it say that deputies would have to change their hours; correct?

Take a look at the memo.  Take as long as you want.

A     Yes.  I've looked at this memo, and I understand it, but

this was never shown to me or discussed with me during my discussion with the captain about the rotation plan.

Q    Now, you just said it was never shown to you or discussed with you in your discussions with the captain.  You're talking about John Clark?

A    At the time the captain and I had the discussion, and my understanding was that the rotation plan was going to include shift changes every couple of months, that's actually what my biggest concern was.

Q    Mr. Tanaka, you just said in your discussions with the captain that he never showed you this memo or discussed this plan with you; correct?

A    Not in the way that it's written here, that is correct.

Q    There's a commander, Commander Conte, who showed you this memo and provided this memo to you at an executive planning committee meeting; correct?

A    That's not correct -- I mean, I don't have any recall of ever seeing this memorandum until years later when I believe there was a jail commission hearing.  And until then, I have no recollection of ever being shown this memo or being told that the rotation plan -- it would have been a different discussion if the captain had said, We're just trying to address issues and we're going to move people around.

     That is not any concern of mine.  Captain has all the prerogative to move people around within a shift.  But my

understanding was that the shift rotation was going to involve just that, shifts.  And it was -- it was -- I just didn't believe that it was fair to the 600-plus deputies that were assigned there to have to endure that kind of transfer policy every two months.

Q    Mr. Tanaka, Mr. Conte provided you John Clark's memo; correct?

A    I don't recall Mr. Conte ever providing me with this memo or, in fact, during all the years we worked together, any memorandum.  I had very little contact with Commander Conte.

Q    Are you denying you had a conversation with Mr. Conte at an executive planning committee meeting about John Clark's rotation plan?

A    I may have, I just -- I don't have a -- I don't recall having any conversation with Commander Conte about this plan.

Q    You'll agree with me that this exhibit says that deputies will remain on their assigned shifts; correct?

A    Yes.

Q    And that scheduling will make every attempt to leave their schedule in place; correct?

A    Yes.

Q    Now, your testimony on Friday was that you told Mr. Clark to come up with another plan; correct?

A    I did.

Q    And then you recommended to Mr. Baca that he be

**UNITED STATES DISTRICT COURT**

transferred; correct?

A    At some point afterwards, yes.

Q    So it's your testimony that even before Mr. Clark came up with this plan that wouldn't cause deputies to change shifts, you decided to transfer him; correct?

MR. HAIG:  Objection, argumentative, Your Honor.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I don't think it quite happened that way.  I recall that there was still a chain of command.  He had a chief.  I don't have -- and it's been enough -- it's been ten years now, but I have a vague recollection that I would have had a discussion with his chief at the time in expressing that, you know, I expected there to be a different resolution, because Clark said -- Captain Clark had said, I have a handful of problem deputies, and that was what the issue revolved around.  If you have a handful of problem deputies, you deal with them, and you don't go after the masses of 600-plus deputies and disrupt their personal lives.

MR. FOX:  Your Honor, I move to strike the answer as nonresponsive to the question.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. FOX)  Mr. Tanaka, before -- it is your testimony that before Mr. Clark had the ability to make the deputy plan be so that the deputies would not be rotated amongst their

shifts, that you transferred Mr. Clark; is that correct?

A     I'm sorry, can you repeat that, please?

Q     Sure.  You testified on Friday that you told Mr. Clark to come up with another plan; correct?

A     Yes.

Q     And it's your testimony that you transferred him before he came up with this plan that we just saw; is that correct?

MR. HAIG:  Objection, Your Honor, misstates the testimony.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I did not transfer him.  I had a discussion with the Sheriff and offered up my reasons why I thought there needed to be a change in command at Men's Central Jail.

Q     (BY MR. FOX)  So it's your testimony that you recommended to the Sheriff that Mr. Clark be transferred before this plan that we just saw was communicated to you; is that correct?

A     Before this -- before the rotation plan -- no, the discussion about the rotation plan, as I understood it, where it involved a changing of shifts, that took place before my discussion with the Sheriff.

MR. FOX:  Your Honor, I move to strike the answer as nonresponsive.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. FOX)  Mr. Tanaka, do you understand my question?

A    I'm sorry, I must not.

Q    You made the recommendation to Mr. Baca that Mr. Clark should be transferred, it is your testimony, before you read John Clark's plan in Exhibit 1; correct?

A    Before I read this memo, yes, because I said I didn't recall seeing this memo until probably four or five years later.

Q    And you recommended to Mr. Baca that Mr. Clark be transferred, it is your testimony, before you learned that he had a plan to rotate jobs without rotating shifts; correct?

A    Okay.  He and I had a discussion in person.  We discussed the shift rotation, and he never said that it didn't involve shift rotation.  So we had -- it wasn't on a memo, but we had a face-to-face discussion about it.

Q    And at that face-to-face discussion is when you told Mr. Clark to come up with another plan; correct?

A    I did ask him to come up with another plan, yes.

Q    And then it's your testimony before you learned of a new plan by him, you went to Mr. Baca and asked Mr. Clark to be transferred; correct?

A    I -- I don't remember if he had implemented any new plans prior to my discussion with Sheriff Baca.

Q    Well, you do know he didn't implement any rotation plan; correct?

A     Whether he wrote -- implemented one that involved movement within the shift, I don't remember, or I don't know.

Q     With respect to Mr. Olmsted, you testified on Friday that you did not tell him that you would be Sheriff someday; correct?

A     That is correct.

Q     But you did run for Sheriff in 2014; correct?

A     I did.

Q     Mr. Tanaka, you testified on Friday that you did threaten to investigate those captains who initiated investigations on deputies that you thought were unnecessary or excessive; correct?

A     I wouldn't say "threaten."  I made that very clear to all the captains and supervisors that if their way of supervising was to put cases on people rather than to provide the kind of leadership that deputies needed, then I certainly would not hesitate to open up an investigation on their ability to function in the position that they were in.

Q     Mr. Tanaka, you said one of the reasons for making this statement is that deputies oftentimes do not know what they're being investigated for; correct?

A     I said that I had a disagreement with the process of the Internal Affairs -- the Internal Affairs process because very often the complaint was that they did not communicate very clearly to the person being investigated what they were really

being investigated for.

Q    Mr. Tanaka, you're aware that, of course, deputies are part of a union; correct?

A    Yes.

Q    And they have union representatives; correct?

A    Yes.

Q    And if they have a complaint with the way they're being treated outside of regulations or the law, they have a means to argue for things to be different; correct?

A    That's one option for them, correct.

Q    And, Mr. Tanaka, the Sheriff's Department policy was to inform the officers subject to the investigation what they were being investigated for; correct?

A    I don't remember the Internal Affairs policy on -- on notification.

Q    And, Mr. Tanaka, even going outside of the Internal Affairs policy, it's the law, California Government Code 3303(c), the Police Officer Bill of Rights.  You're familiar with that; correct?

A    Generally familiar with, yeah, the Peace Officer Bill of Rights.

Q    Yeah, because you were one for a long time; correct?

A    Yes.

Q    And according to that, California Government Code 3303(c), an officer under investigation shall be informed of what

they're being investigated for; correct?

A    Well, even if it says that, I'm just saying that a complaint -- a frequent complaint was that officers felt or deputies felt or those under investigation believed they weren't always told with any clarity what the nature of the investigation was, and that's what caused a lot of consternation.

Q    Okay.  Mr. Tanaka, it's your testimony that, at least it was on Friday, that Internal Affairs, they investigated policy violations; correct?

A    Yeah.  I'd say administrative violations.

Q    And you said -- the two examples you gave, one, coming in late to work; correct?

A    I believe so.

Q    And the second one you gave us on Friday was calling in sick when you're not really sick; correct?

A    Yes.

Q    But that's not entirely what Internal Affairs investigates; correct?

A    No.  I think I mentioned there's an array of -- I mean, the policy is probably about this thick, the manual.

Q    And you chose the ones about coming in late to work and calling in sick; correct?

A    I wouldn't say I chose them.  I just told you what -- or I mentioned what -- the couple of them that came to the top of my

head.

Q    While you were in executive management and had some role in the process, you know that deputies were also investigated by Internal Affairs for what could be described as criminal conduct as well; correct?

A    No, not by Internal Affairs.  Allegations of criminal misconduct by -- members of the Sheriff's Department were investigated by a separate investigative bureau, which was the Internal Criminal Investigations Bureau.

Q    The Sheriff's Department had discretion of determining whether investigation would be through ICIB, criminal, or whether it be through IA policy; correct?

A    I'm not sure there was that discretion.  Any allegations of criminal conduct by members of the Sheriff's Department were necessarily investigated by ICIB first.  If and when there was any determination that that investigation was complete, there would come a point where they would then determine whether or not it was appropriate to go over to the administrative side, because on the administrative side deputies could be compelled to answer.  And, of course, once that occurred, that could completely infringe upon the -- or cause the criminal case to be thrown out.

Q    Under the time you were in executive management, you know that deputies were investigated by IA and not ICIB at times for committing DUIs; correct?

A    Well, I believe that there's -- there was simultaneous investigation and monitoring, and I believe that the -- when the criminal case was going on, if it was not one that was in the jurisdiction of the Sheriff and it was -- for instance, a DUI was being investigated by another agency, that we had what was called a criminal monitor.  It was up to Internal Criminal Investigations Bureau to monitor the outcome of that investigation.  And then at the appropriate time, when there was no longer any concerns for the criminal case, then the matter would be handled by Internal Affairs.

Q    Mr. Tanaka, you're saying that any time there was a DUI, even on the Sheriff's Department property, Sheriff's Department's jurisdiction, that would always be an ICIB investigation?  Is that your testimony?

MR. HAIG:  Objection, Your Honor.  That misstates his testimony.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I don't believe I said that, Mr. Fox. What I said was if it was a DUI that was investigated, for instance, or occurred in a jurisdiction of another police agency, that agency was responsible for the investigation.  The Sheriff's Department's ICIB did not conduct the investigation. They just monitored the investigation of the handling agency.

And I believe, I'm not 100 percent sure, that when the investigation was -- the criminal investigation was concluded,

that ICIB would then confer with IAB and recommend at what point it would be okay for them to begin their administrative investigation.

Q     (BY MR. FOX)  Mr. Tanaka, it sounds like we should probably get into specifics here rather than go in generalities.

You're aware also that IA and not ICIB has been assigned to investigate serious crimes like a sergeant pulling a weapon and threatening to shoot another sergeant; correct?  You know which instance I'm referring to; correct?

A     I do, but I believe --

Q     And that was an IA investigation; correct?

A     Well, if there was any allegation of criminal conduct to begin with, then that would have certainly been handled by ICIB first.

Q     So you're saying that an allegation that a sergeant pulled a weapon and threatened to shoot another sergeant is not a criminal allegation?  Is that your testimony?

A     No, I didn't say that.  I -- it depends.  I don't -- I don't know all the specifics of that case.  But as you stated, it sure sounds like it's one that may have been referred to ICIB first to see if there was any criminal conduct.  And then if a determination was made that there wasn't, then it could be referred to Internal Affairs at that time.

Q     Mr. Tanaka, you were part of a committee that oversaw that

UNITED STATES DISTRICT COURT

investigation regarding that sergeant; correct?

A    I was part of a committee that made the recommendation -- or had the administrative hearing for discipline on that particular matter.

Q    And because of the serious allegation, the sergeant was fired; correct?

A    I don't -- I don't believe the sergeant was fired.

Q    Because of the serious nature of the allegations, the sergeant must have been demoted, then; correct?

A    I don't believe the sergeant was demoted, at least at that particular hearing.

Q    The sergeant received a few days off; correct?

A    Well, that particular review panel --

Q    Do you understand my question?

A    Yes.

Q    The sergeant received a few days off; correct?

A    I don't believe it was a few days, sir.  I think it was in that category that's considered significant discipline, and it was in excess of -- it would have had to have been in excess of 15 days or more.

Q    Mr. Tanaka, you testified on Friday that the gray area was something that was routine for you to say; correct?

A    Yes.

Q    You said it hundreds of times when you were the assistant sheriff over patrol; correct?

A     Not just when I was the assistant sheriff over patrol.  I began making -- having those kinds of conversations years earlier at other ranks also.

Q     So when you were assistant sheriff over custody, you also made the gray area comment to deputies; correct?

A     I don't have -- I mean, I don't specifically recall that -- we're talking more than ten years ago -- but I know that I've had many discussions in that same vein.

Q     And your testimony is that you've made that statement hundreds of times, that speech about the gray area hundreds of times; correct?

A     A speech about the area in between the lines and doing the right thing.

Q     And you told deputies at every patrol station that you visited that they should be operating in the gray area; that was your testimony from Friday; correct?

A     No, that wasn't.  I said that sometimes I described it as a gray area, the area between the line of the law and right or wrong.  Sometimes I described it, I remember using the term a green area or a football field.  And I made it very clear there were boundaries, and if you stepped on the line, it was out of bounds.  And I made it very clear that that was not -- would not be tolerated.

Q     Mr. Tanaka, on Friday you testified that you had the discussion about the gray area at every command you visited;

correct?

A    I don't know about every command, but that's likely.

Q    So, for example, you must have said it at Century Station with Mr. Roller present in 2007; correct?

A    Sir, that was nine years ago.  I'm --

Q    It was a command you visited; correct?

A    It was a command I visited.

Q    In 2007; right?

A    Yes.

Q    And you remember how you described the gray area to deputies and Pat Maxwell in 2009; correct?

A    I don't recall exactly what I said at Norwalk.  And actually it was 2007, in my belief, not 2009.  I couldn't tell you the exact words that I used.

Q    And it's your testimony that the reason why you can describe what words you used is because this was part of your routine; correct?

A    It was a pretty regular part of the discussions I had with the members of our Department.

Q    And it's your testimony that there was nothing improper about your gray area speech; correct?

A    No, sir.  I didn't think there was -- if I thought it was improper, I certainly wouldn't have given it and --

Q    Well, when you were first publicly questioned about the gray area, you denied that the gray area was a routine part of

42

your presentations; correct?

A    I don't believe so.

Q    You answered questions before the Citizens' Commission on Jail Violence on July 27th, 2012; correct?

A    I don't remember the date, but I went before that panel.

Q    And that commission was set up to try to determine what led to the problems at Men's Central Jail; correct?

A    I believe so.

Q    And you said before this commission that the gray area was not a routine part of your discussion; correct?

A    I don't know if that was in the context of what they were trying to infer, that -- Pat Maxwell's comments that he interpreted, at least he says he interpreted, my comments of the gray area to mean operating outside the lines of the law.

Q    Mr. Tanaka --

A    And I don't know the context of what that jail commission's questioning was.

Q    Mr. Tanaka, you said before the commission that your gray area comment was not a routine part of your discussion; correct?

A    You have the transcript.  But I don't remember, because I -- it was a regular part of my discussions for many years.

Q    Mr. Tanaka, you actually have the transcript too.

    Could you please turn to -- there's one that should say "Tanaka Binder" on it.

**UNITED STATES DISTRICT COURT**

A     I think they all do.

MR. FOX:  Your Honor, this is Exhibit 7.

Q     (BY MR. FOX)  First of all, I'd just like you to look and see if you recognize this as being the transcript of your statements before the CCJV.

A     This entire notebook?

Q     Number 7, please.  It's the first one actually in your binder.

Do you see it?

A     I do.

Q     Okay.  Do you see that?

A     I see it.

Q     Do you recognize that as a transcript of your testimony before the Citizens' Commission on Jail Violence?

A     I will -- yes, I'm assuming it is the -- that transcript.

Q     Well, you recognize your words in there; correct?

A     Sir, I -- I don't know if I've ever reviewed this, this testimony, so I --

Q     Would it refresh your recollection to review this testimony to determine whether you made the comment that the gray area was not a routine part of your discussions, Mr. Tanaka?

A     It might.

Q     Okay.  Can I have you turn then to page -- do you see the Bates number -- you know what a Bates number is; right?

UNITED STATES DISTRICT COURT

A    I do not.

Q    Okay.  See the bottom right-hand corner of the pages where it has an A number?

A    I do.

Q    I'm asking you to turn to A129845, starting at line 12 and going to line 24.

     Do you see that?  Please close the binder.

A    I do.

Q    Okay.  Please close the binder.

     Mr. Tanaka, you told the Citizens' Commission on Jail Violence that the gray area was not a routine part of your discussion; correct?

A    That's what it says.

Q    That's what you said?

A    Yes.

Q    And you said you only used it on occasion; correct?

A    That's what I said to the jail commission, correct.

Q    Now, Mr. Tanaka, on Friday you discussed the fact that you were obligated to follow orders of people above you, correct, lawful orders of people above you?

A    Yes.

Q    And what you mean by an order is a supervisor telling you to do something in the Sheriff's Department.  That's what's referred to as an order; correct?

A    Yes.

Q    And if you told someone below you to do something, that would be an order; correct?

A    That would be an order.

Q    And it's not that you go over to somebody and necessarily have to say "I order you to do this."  If there's any direction from you, that would be considered an order; correct?

A    Yes.

Q    And it's something that someone below you would be expected to follow; correct?

A    If it's a lawful order, correct.

Q    And, Mr. Tanaka, the primary role of a supervisor -- actually, before I get into that -- and same thing with the Sheriff; when you were undersheriff, if Mr. Baca gave you a direction without using the word "order," you would still be obligated to follow it if it was a lawful order; correct?

A    Yes.

Q    And you couldn't do it in any way that would break the law, however; correct?

A    Of course.

Q    And, Mr. Tanaka, the primary role of a supervisor is to ensure that people that are assigned to you are doing the job they're supposed to be doing; correct?

A    Yes.

Q    And the primary role is to also ensure that they're doing it in the manner they're supposed to be doing it; correct?

A    Supposed to be doing it in a competent fashion and as prescribed by law.

Q    And you testified on Friday that you would never tell a supervisor to abdicate their responsibility to supervise the people they were charged with supervising; correct?

A    Can you repeat that?

Q    Sure.  You testified on Friday that you would never tell a supervisor to abdicate their responsibility to supervise the people they were charged with supervising; correct?

A    Yes, that would be correct.

Q    But in August and September of 2011, Mr. Baca was asking you questions about the Anthony Brown operation; correct?

A    Yes, he did ask questions.

Q    In fact, he was asking you for updates on what was going on with the operation with OSJ and ICIB; correct?

A    I think there were a few occasions in which he asked for an update on the investigation.

Q    You say "a few occasions," but your testimony on Friday was that at every possible chance you saw him and communicated with him, he asked you about the OSJ and ICIB operation; correct?

A    Well, but we didn't have interaction on a daily basis.  He was -- you know, he wasn't -- was in the office a lot less than I was, and he had more community responsibilities.  But --

Q    It was your testimony on Friday that every time you

communicated with him, whether it was in person or on the phone, during this time period he would ask you for updates on what was going on; correct?

A     For a period of probably about maybe two weeks.

Q     And your testimony on Friday was that even as a supervisor of OSJ and ICIB, you did not have the updates he was looking for; correct?

A     I did not always have the information that he was looking for.

Q     In August 2011, ICIB was reporting directly to you; correct?

A     When was that, sir?

Q     When you were undersheriff.

A     At the front end of being the undersheriff, correct.

Q     In August of 2011 -- let's take that month.

In August of 2011, ICIB was reporting directly to you; correct?

A     They were reporting directly to myself and also directly to the Sheriff.

Q     Mr. Tanaka, the line of report went to you; correct?

A     On paper it may have, but the fact of the matter is they were reporting directly both to me and directly to Sheriff Baca.

Q     And the paperwork that they would produce in their investigations, ICIB would state Office of the Undersheriff on

top; correct?

A    That's possible.  I don't remember.

Q    And you supervised Tom Carey directly; that was the direct report; correct?

A    As I indicated, yes, that he reported directly to me and he reported directly to Sheriff Baca.

Q    Mr. Thompson was reporting also directly to you and Mr. Baca with respect to Anthony Brown; correct?

A    I -- he may have been reporting to others in his chain of command.  I don't know.  But he and I did have contact, if that's what you're asking.

Q    No.  I'm asking you whether Mr. Thompson was reporting directly to you and Mr. Baca with respect to Anthony Brown.

A    I don't know if he was reporting anything through his chain of command because he had a separate chain of command.  I know he reported directly to me on Anthony Brown matters, but what I'm saying is I don't know if he also reported to anybody else in his chain of command.

Q    Nobody else from his chain of command, of course, was reporting to you on Anthony Brown; correct?

A    I don't remember, but I don't think so.

Q    Okay.  So Mr. Thompson then was reporting directly to you on the Anthony Brown matter; correct?

A    On occasion -- or on certain instances he would.

Q    And, Mr. Tanaka, Mr. Carey was reporting information

directly to you and Mr. Baca with respect to ICIB's operation

in the matter; correct?

A    Yes, that's correct.

Q    And Mr. Leavins, your former aide, was reporting directly

to you and Mr. Baca with respect to ICIB's operation in the

matter; correct?

A    That is correct, sir.

Q    It's your testimony -- it was your testimony on Friday

that when Mr. Baca asked about the operation, there were many

times that you could not provide him with the answers that he

needed; correct?

A    You know, I may have used the word "many," but we're

talking in a two-week period.  "Many" is a relative term.  But

I was not able to provide the Sheriff with the kinds of answers

he needed.  So it's -- I always made it -- I mean, in most

cases when the Sheriff asked me questions about any matter, I

would refer him to the individual that was handling it.

So in this case, I would either ask for an update so that

I could give it to him, but more often I just had him -- I had

the investigators or Steve Leavins or Tom Carey call the

Sheriff directly because they had the details that he was

looking for.

Q    Mr. Tanaka, as you just stated, it's your testimony that

you would have the investigator call Mr. Baca with the updates;

correct?

A     Or go and see him.

Q     Well, on Friday it was that you would have the investigator call Mr. Baca; correct?

A     I'm sorry.  It -- sometimes if they were in the building and the Sheriff was in the building, I would just let -- ask them to go and see him.

Q     All right.  Well, let's look at Government Exhibit 172.

      Mr. Tanaka, I'm publishing the summary chart of calls involving many of the people that have been discussed in this trial.

      Do you see that there, for August 18th, the first page of this exhibit?

A     I do.

Q     Okay.  You testified on Friday that the 5000 number was Mr. Baca's personal number; correct?

A     Well, it rang in his office, and it was answered by his secretaries.

Q     When you say "it rang in his office," you're not talking about Mr. Baca's desk; you're talking about the office of the Sheriff generally; correct?

A     Well, it would ring at his desk, and it would ring, I believe, in the cubicles of his secretaries and his aides.  And there were probably about five or six other desks.

Q     So every time somebody would call the general number for the Sheriff's Department, it would ring at his desk; is that

correct?

A    That's not correct.  That wasn't the general number.  The general number to Sheriff's Headquarters Bureau was a (323) 267-number, and I can't remember it.

Q    Have you ever called the 5000 number?

A    Have I ever called the 5000 number?

Q    That's my question.

A    Yes.

Q    Did Mr. Baca ever answer the 5000 number?

A    Well, he didn't answer his desk line, but it was answered by his -- either his secretary or his aide.

Q    And it's a switchboard for the Sheriff's Department; correct?

A    No, sir, that's not correct.  It was to his office.  It only rang in his office area.

Q    Mr. Tanaka, in 172 I'd like you to look at the first page of this exhibit and identify for me where Tom Carey, Greg Thompson, Steve Leavins, Maricela Long, Scott Craig call Mr. Baca.

      See anything on the 18th, on this first page?

A    No, I do not.

Q    It's you and -- the only thing that's reflected on here in terms of calls with Mr. Baca is you and Mr. Baca speaking at 5:57 p.m., correct, a nine-minute call?

A    Well, there's a call missing then because I didn't

initiate the call to him that evening.  He called me on my cell phone, and I don't know whether that was from his desk or whether it was from his cell phone.  And I don't see that listed here.

Q    Well, you see that he's calling from his cell phone two minutes beforehand throughout -- actually from 5:40 to 5:55.

You see that the chart indicates that he's using his cell phone; correct?

A    Yes.

Q    Okay.  And now I want you, Mr. Tanaka, to look at page 2 of this exhibit, calls on August 18th from 7:42 to 10:15.

You don't see any calls between Mr. Baca and any of the OSJ or ICIB people, do you?

A    I do not.

Q    Showing you August 19th, the first page, from 6:00 a.m. to 4:06 p.m., you don't see any calls between Mr. Baca and any of the OSJ or ICIB people, do you?

A    I don't -- I don't believe so.

Q    Let's go to the next page, August 19th, 4:07 to 7:27.

Once again, you don't see any calls between Mr. Baca and any of the OSJ or ICIB people, do you?

A    Well, there are some unidentified numbers that -- you know, the cell phones that we had had been set up to where some of the numbers would pop up like "unavailable," like they are here.  And there looks like there's some calls between

unavailable and ICIB and unavailable and the OSJ people.  So I --

Q     You see on this chart --

A     -- those I wouldn't know.

Q     You see on this chart, Mr. Tanaka, how Mr. Thompson's county-issued cell shows up and so does Mr. Carey's county-issued cell?

A     Is that how it shows up on the phone records, or is this a --

Q     Do you see the chart?  I'm asking you to read the chart.

A     Right.

Q     You see on the chart how it says "Thompson, county-issued cell"?

A     Yes.

Q     You see on the chart how it says "Carey, county-issued cell"?

A     But this is a created document; right?  This isn't the phone records, the actual phone records.

Q     Do you think you'd feel better if --

A     I don't know --

Q     -- you looked at the phone records?

A     -- because the -- I'm just saying that like the unavailable calls, I'm just not sure that -- were the -- either are originating from or where they're ending up when it says "unavailable."

Q    I understand that you're not sure what the underlying phone records might show.  I'm asking you to stick to the chart.

Do you understand me?

A    I am reading the chart.

Q    All right.  And I'm sticking to the identified numbers in the chart.

Do you understand me?

A    I do.

Q    Okay.  There are calls between you and Mr. Baca on this date; correct?  See the calls I've highlighted, one at 5:09 p.m. and one at 7:22 p.m.?

A    Yes.

Q    Those are calls between you and Mr. Baca?

A    From his phone to mine, yes.

Q    Mr. Tanaka, let's move on now to 7:32 p.m. to 9:12 p.m. on August 19th.  There are no calls between Mr. Baca and any member of ICIB or OSJ during this time period; correct?

A    Looks that way, yes.

Q    There are calls with you and some of these people; correct?  You and Mr. Thompson at 7:39 -- or, excuse me, 7:37?

A    Yes.

Q    Once again, you and Baca at 8:07; correct?

A    Yes.

Q    Now let's move on to the 23rd.

Once again, please, Mr. Tanaka, identify for me on this chart any calls between you -- I'm sorry, between Mr. Baca and any member of OSJ or ICIB on August 23rd.

A    I don't -- on this chart it does not reflect any calls involving Sheriff Baca's telephone line.

Q    And on the second page of August 23rd, from 12:22 p.m. to 9:11 p.m. does not reflect any calls between Mr. Baca and any member of OSJ or ICIB; correct?

A    Not on this chart, correct.

Q    However, there are several calls involving you and these people; correct?  One at 12:23 p.m., another one at 12:29 p.m., another one at 12:32 p.m.

See those?

A    Yes.  The calls that are going -- yes.

Q    And then, Mr. Tanaka, you see that evening calls between you and Mr. Leavins at 9:00 p.m., a little after 9:00 p.m. that day; correct?

A    Yes.

Q    And there's another one at 9:11 p.m., a six-minute call.

Do you see that at the bottom of the page?

A    Yes.

Q    Let's move on to August 25th.

6:30 a.m. to 12:08 p.m., see any calls between Mr. Baca and any member of ICIB or OSJ on August 25th during these times?

A       I don't see the Sheriff's phone listed here.

Q       There are calls involving you, however.

        Do you see those?

A       I do.

Q       10:44 a.m. -- sorry, I missed one.  Yeah, we'll start with the 10:44 a.m. and 10:47 a.m.  You called Mr. Thompson and then Mr. Carey, correct, according to this chart?

A       According to this chart, that's correct.

Q       And then at 10:55 a.m., Mr. Carey called you, according to this chart; correct?

A       Yes.

Q       Moving on to the second page of August 25th, this second page reflects only calls between 12:10 p.m. and 2:06 p.m.

        See any calls involving Mr. Baca and any member of ICIB or OSJ?

A       I do not.

Q       Again, busy day, so now we're going to talk about the third page on the 25th.

        See any calls between Mr. Baca and any member of ICIB or OSJ from 2:16 p.m. to 11:51 p.m.?

A       I don't see any on this chart.

Q       To go over a few of your calls on this chart, Mr. Tanaka, you called Sheriff's Headquarters Bureau at 6:27 p.m., Mr. Carey at 6:48 p.m. and again at 6:53 p.m.

        Do you see that on this chart?

A    I do.

Q    And then Mr. Carey called you at eight o'clock p.m.; correct?

A    Yes.

Q    According to this chart?

A    Yes.

Q    And at 9:37 p.m. you received another call from Mr. Carey; correct?

A    Yes.

Q    Now, the two-week period you're talking about, you've mentioned before that you were only involved in this for a two-week period.

Are we talking about August 18th to the end of August?  Is that your testimony?

MR. HAIG:  Objection, Your Honor, this misstates his testimony.  And the form of the question as well.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I was just thinking that this was about a two-week period.

Q    (BY MR. FOX)  I'm sorry, I'm trying to figure out --

A    From August 18th until -- it might have been a little bit longer.  I believe it went sometime into September.

Q    About September 26th?

I mean, you're certainly aware by now, Mr. Tanaka, that Special Agent Marx was approached by sergeants within ICIB on

September 26th; correct?

A      Yes.

Q      Okay.  So let's look now at August 26th.

And showing you a chart from 12:20 a.m. to 11:06 a.m., you don't see any calls between Mr. Baca and any member of ICIB or OSJ; correct?

A      I don't see the Sheriff's number referenced on this chart.

Q      How about the second page of August 26th, do you see Mr. Baca's number referenced on this chart?

A      Just once.

Q      Do you see the one that's down --

A      Yeah, just the one that -- from my county-issued cell phone to his.

Q      Do you see any other calls between Mr. Baca and any member of OSJ or ICIB on this page?

A      I don't see any other reference to the Sheriff's number on this page.

Q      Mr. Tanaka, showing you now the next page of August 26th from 4:28 p.m. to 9:33 p.m.

There is one call between Mr. Baca and a member of ICIB at 5:57 p.m.; correct?

A      Yes, there was.

Q      That's the only call that you see between a member of OSJ and ICIB on this chart from August 18th to September 26th; correct?

MR. HAIG:  Objection, Your Honor.  Misstates the evidence.  It's August 26th.

MR. FOX:  I think I said it correctly, Your Honor.

MR. HAIG:  No, he said September 26th, and this chart says August 26th.

MR. FOX:  Your Honor, I'll be happy to clarify my question.

THE COURT:  Let's rephrase the question.

MR. FOX:  Yes.  Thank you.

Q    (BY MR. FOX)  Mr. Tanaka, forget about this page right here.  You have the hard copy of the exhibit in front of you, Number 172.  Happy to have you sit there and look at it from August 26th on and tell me if you see any other calls between Mr. Baca and ICIB or OSJ from August 26th to September 26th.

You want to do that?

A    If you believe that it's -- is that what you want me to do?

Q    Do you have any reason to believe that that chart will reflect any additional calls between Mr. Baca and members of OSJ or ICIB from August 26th to September 26th of 2011?

A    Well, based on the way you're asking, I'm going to assume that there are none.

Q    Now, Mr. Tanaka, you mentioned on Friday that you speak to ICIB -- or at this time you spoke to ICIB about another issue.

It wasn't all about this operation; correct?

A    There were a number of matters that I spoke with ICIB about.

Q    The one that you mentioned on Friday was the ACLU declarations; correct?

A    Yes.

Q    And Exhibit 59, which I'm publishing, these are the ACLU declarations you're talking about, or is it something else?

A    It appears to be similar, but I can't tell anymore.  But I'm just guessing, it was around somewhere, time-wise, probably in the neighborhood.

Q    Okay.  So around September 12th is around the time period you're talking about beginning to speak to ICIB about these ACLU declarations; correct?

A    I -- I really don't know when the ACLU declarations were made public and when ICIB began investigating them.

Q    Well, any reason to believe that ICIB began investigating the ACLU declarations before Mr. Gennaco forwarded them the list of ACLU declarations?

A    I -- you know, in the context of this, sir, I'm not really sure.  There was a press conference that the ACLU had in which they announced their intention to file these complaints, and that would have probably been the origination of ICIB's involvement.

Q    That press conference was at the end of September of 2011; isn't that correct, Mr. Tanaka?

UNITED STATES DISTRICT COURT

A      I don't know.

Q      Now let's look at these declarations just very briefly. This is an attachment to the exhibit.

Mr. Tanaka, the majority of these incidents had already been investigated by the Sheriff's Department; correct?

A      I really couldn't say.  I just know that a large number of complaints -- I believe it was in excess of 40 that came in, and I don't know whether or not they had been previously investigated or not.

Q      Do you see these attachments to the e-mail I just showed you showing in the middle column that the date the review was completed was in 2010?  Do you see that?

A      I see that.

Q      And you see on the right that for a vast majority or all of them that there was no discipline that any of the deputies received as a result of the Sheriff's Department investigation; is that correct?

A      On this chart that you're showing inmate names and the -- yeah, the -- where there's a disposition of closed, unfounded -- the terminology used in the Sheriff's Department, "unfounded" meant that there was no finding of wrongdoing.

Q      So by 2010 the Sheriff's Department had concluded that in all these instances involving the ACLU declarations that the allegations were unfounded; is that correct?

A      Are these the inmates that were part of the ACLU

declaration?

Q    These are the attachments to the e-mail I was just showing you.  Let me show you.  You've got it in front of you again. If you want to look at it in hard copy, if that's easier for you --

A    No, no.  I understand what you're saying now; that it was -- it's the attachment for this e-mail.

Q    Mr. Tanaka, the goal in having ICIB look at this was not to reopen an IA investigation that was unfounded, but it was trying to find out what would lead the Sheriff's Department to whatever the feds were looking at; correct?

A    No.  The ACLU complaints that came out, the Sheriff made a public proclamation that each and every case would be investigated, and I believe that he had actually stated publicly that every single case -- every complaint would be investigated, fully investigated and completed by October.  And that I remember because the ICIB team was very -- they were having difficulties with that, because they didn't think it would be possible with the number of personnel that they had to be able to complete all of these investigations in the manner in which they needed to be done.

Q    Mr. Tanaka, please read for the jury Mr. Carey's statement in this e-mail that I've highlighted for you.

A    It says "The list of complaints out of CJ probably lead us, in part, to where/what the feds are looking at."

Q    Now, Mr. Tanaka, you would agree with me, as we move to Anthony Brown now, that if you were concerned about deputies abusing Mr. Brown, you certainly could have ordered deputies to stay away from Mr. Brown; correct?

A    I could have issued that order.

Q    You, Mr. Tanaka, could have issued that order.  And if you were concerned about deputies abusing Mr. Brown, you could have placed Mr. Brown in a cell with cameras trained on his cell to see who was approaching him at all times; correct?

A    In theory, that is correct.

Q    And at the time you were aware that he was in such a cell from August 18th to August 23rd of 2011; correct?

A    A lot of what I -- his housing locations I've learned long after the fact.  During that particular time in August of '11, I don't know if I was actually aware specifically of where he was housed.

Q    You may have been aware at the time that he was in a cell with a camera trained on him from August 18th to August 23rd of 2011; correct?

A    That is possible.

Q    It's possible that you may have been aware?

A    It's possible that I may have been aware of exactly what his housing situation was.

Q    Mr. Tanaka, if the goal was to protect Mr. Brown's life from deputies, he certainly could have been transferred to

state custody if he was already designated there; correct?

A    He could have been.  If he was a sentenced state prisoner, then he could have been.

Q    And you're familiar, I'm sure, with -- SP4 means you're a sentenced state prisoner; correct?

A    I don't remember the exact numbers.  But, yes, if you're a sentenced state prisoner, then you're eligible to be transferred to the state when they say there's room.

Q    If the goal was to save Mr. Brown's life, there's no reason why the FBI should be kept from Mr. Brown; correct?

A    If the goal was to save his life?

Q    Yes.

A    Not unless there was a belief that he could be harmed.

Q    If the goal was to save Mr. Brown's life, there's no reason why the FBI should have been kept from him; correct?

A    I believe at the time that he was kept apart was -- it was in the initial stages of a confusing situation and an investigation, and the Sheriff's orders were just to keep him separate -- or keep him and to keep him safe.

Q    Did you understand my question?

A    Yes.

Q    If the goal was to save his life, there's no reason why the FBI should have been kept from him; correct?

A    Again, there was that investigation that the inmate made some allegations, and it was necessary for the Sheriff's

Department to conduct an investigation to find out exactly what the inmate had to say.

MR. FOX:  Your Honor, I'd like to read from Exhibit 186, lines 69 -- I'm sorry, page 69, lines 21 to 23. 186 -- it's part of that binder you have there -- 69, lines 21 to 23.

MR. HAIG:  We have no objection, Your Honor.

THE COURT:  All right.  Go ahead.

MR. FOX:  And this is from --

(Plaintiff's counsel conferred off the record.)

MR. FOX:  Your Honor, we may need to remark this exhibit.  We may have a duplicate exhibit.  May I read from this?

THE COURT:  That's fine.

MR. FOX:  Okay.  And this is, again -- just so it's clear since we've got some confusion, this is from Mr. Tanaka's December 19th, 2012 testimony before the grand jury.

"Question:  If the goal was to save his life, there's no reason why the FBI couldn't talk to Anthony Brown; correct?

"Answer:  True."

Q    (BY MR. FOX)  Mr. Tanaka, if Mr. Brown was afraid for his life, there's no reason why the federal grand jury couldn't hear his testimony; correct?

A    That's correct.

Q    Now, Mr. Tanaka, you testified on Friday --

(Plaintiff's counsel conferred off the record.)

Q    (BY MR. FOX)  You testified on Friday that Mr. Baca told you about his phone call with the FBI during the August 20th meeting, correct, the Saturday meeting?

A    I believe he said -- you know, again, I don't remember exactly when he told me that he had discussed with Mr. Martinez that the phone belonged to the FBI, but the initial call about the phone came on the 18th.

Q    And it was a rather memorable call; correct?

A    Memorable in the fact that the Sheriff was not happy.

Q    And he was upset because the phone was an FBI phone, he had learned from Mr. Martinez; correct?

A    You know, I don't remember exactly.  I just remember him being upset and, you know, very short about did we confiscate a phone in the jails.  And I don't remember if he said at that time anything more, other than he just wanted to know if we had recovered a cell phone in the jails.

Q    Mr. Tanaka, in that August 18th call, Mr. Baca told you that he'd received a call from the assistant director of the FBI, Steve Martinez; correct?

A    It's possible that he told me that night.  I just -- it was either the 18, 19 or 20, and it's possible that it was on that first call on the 18th.

Q    And he was very upset during this call; correct?

A    Yes.  He was not happy.

Q    And according to Mr. Baca, what was so unusual about the phone being found when he was calling you on the 18th, was that he had received a call from the FBI assistant director, Steve Martinez; correct?

A    Again, it's possible he told me that on the 18th.  But at some point, certainly, in the next day or two, if it wasn't on the 18th, that is exactly what he said.

Q    As of December of 2012, your recollection was that Mr. Baca had informed you on August 18th that he had received a call from the FBI assistant director, Steve Martinez, about that phone; correct?

A    If that was my testimony in December '12, it's probably going to be a little better memory than it is four years later.

Q    Showing you now Exhibit 15.

That night after you received a call from Mr. Baca, your aide set up a meeting for you the next day at 1:30 with members of ICIB and OSJ; correct?

A    It's addressed to ICIB captain and IAB lieutenant and the OSJ lieutenant.

Q    Well, in this -- these were criminal allegations; right?

A    I'm not sure that any determination had been made at that point.

Q    About a deputy bringing in a cell?  There hadn't been a determination made that this was going to be criminal?

A    I -- on the 18th, I'm not -- I don't remember anybody

talking about that this involved a deputy sheriff.

Q    That it involved an employee of the Sheriff's Department?

A    I -- I -- I don't know.

Q    You don't remember learning that Mr. Brown initially said that a nurse brought him the phone?

A    I learned about information obtained during an interview with Mr. Brown sometime after that Saturday meeting, after the 20th.

Q    You testified -- well, let me show you -- so you had a meeting at 1:30 on the 19th, correct, with IAB, OSJ and ICIB; correct?

A    I think we've had this discussion, and I -- it's very possible, but I don't have any recollection of a Friday meeting, and I don't believe I've ever recalled having a Friday meeting.  I know that there's others that said that one occurred, and it's very possible.

Q    And this meeting was to be held in your office; correct?

A    That's what the memo says, yes, sir.

Q    Showing you Exhibit 2.

       That's this office, correct, where I marked with the red?

A    Yes.

Q    And later on August 19th, there was a meeting scheduled with the sheriffs in the executive planning room that I'm hitting right there.

       Do you see that red dot?

A     I do.

Q     And Mr. Baca's office is right here with this dot; correct?

A     Yes.

Q     And there's a smaller conference room right there where I hit that dot; correct?

A     Yes.

Q     These were the four rooms you're aware that were swept to see if there were bugs located in them, listening devices located in them on September 2nd, 2011; correct?

A     I did hear that, yes.

Q     Mr. Tanaka, you were informed during your initial meetings with OSJ and ICIB what Anthony Brown told the deputies about the federal investigation; correct?

A     On the August -- at the August 20th meeting?

Q     Well, whether it's the 19th or the 20th, you were informed of what the Sheriff's Department knew at that time from speaking to Mr. Brown; correct?

A     My recollection is that a timeline of sorts -- at least it was verbally presented to the Sheriff about when the phone was found and/or how it was found -- I don't remember any discussion of any interview information that had taken place with Anthony Brown at that time.  It's possible it occurred, I just don't remember -- I thought the interviews of Anthony Brown took place after the 20th meeting, because the Sheriff at

that meeting ordered Internal Criminal Investigations to interview Anthony Brown.

MR. FOX:  Your Honor, I'm going to play a clip from Exhibit 21.  This is the -- and just for the record, this is the August 19th recording between Mr. Smith, Mr. Manzo and Mr. Brown.

(Exhibit 21 played in open court.)

Q    (BY MR. FOX)  Mr. Tanaka, this was the information that was provided to you in the August 19th and August 20th meetings, correct, about the feds being here setting up transactions?

A    That's possible.  I -- I don't -- the only thing I recall about -- again, I don't recall a 19th meeting.  What I recall of the 20th meeting is Sheriff asking for a briefing about everything that was known to date about the phone and about the inmate, ordering Internal Criminal Investigations to interview the inmate to find out anything and everything that he had to offer.  And I don't remember anybody -- the briefing at least, I don't remember them giving any kind of detailed information like this.

Q    Mr. Tanaka, the safety of Anthony Brown was not a concern raised at the Saturday, August 20th meeting by Mr. Baca; correct?

A    It doesn't mean that it didn't occur.  I don't remember him raising it at that particular meeting.

Q    Okay.  And you testified on Friday that you didn't know by the Saturday meeting if the FBI's actions were authorized by the FBI by the Saturday meeting; correct?

A    I don't even know if there was any indication that other than the phone -- other than Mr. Martinez telling Baca the phone was theirs, I don't remember there being very much information, because the investigation that was ordered by the Sheriff took place -- the order took place that morning on the 20th.

Q    Did you understand my question?  I was asking about your testimony on Friday.

On Friday you testified that you did not know that the FBI's actions were authorized by the FBI by the Saturday meeting; correct?

A    I don't know if that was a discussion, but I -- I don't even know if that was a discussion that took place on Saturday.

Q    Sorry, I'm asking about your testimony on Friday.

On Friday you testified that you did not know by the Saturday meeting that the FBI's actions were authorized by the FBI; correct?

A    I would not have known that on the Saturday meeting, or at least I did not know that at the Saturday meeting.

Q    The only thing you knew about the FBI was that the assistant director had called Mr. Baca before the Saturday meeting; correct?

A     I believe that would have been the -- at that point the extent of what we knew with regards to the FBI and the phone.

Q     And, Mr. Tanaka, at the time of the August 20th meeting, you did not have a concern that the cell phone had been introduced by a rogue FBI agent; correct?

A     I don't believe the Sheriff had referenced that word, "rogue" --

Q     But I'm talking about you.

A     -- at that meeting.

Q     Actually, I'm talking about you.  At the time of the Saturday, August 20th meeting, you, Mr. Tanaka, didn't have a concern that the cell phone was introduced by a rogue agent; correct?

A     I don't believe there was enough information that was available that I recall on that Saturday meeting to make any determination.

Q     But you didn't have a concern at that meeting that there was a rogue FBI agent; correct?

A     I did not have a concern at that meeting.

Q     You testified on Friday that Gilbert Michel's involvement was raised during the Saturday meeting, and that's who you were upset about.

      Do you recall that?

A     I don't know that Gilbert Michel's involvement was brought up at the August 20th meeting.

Q    But you testified --

A    I -- what I would have testified to or said was when I found out through the interview of the inmate that a deputy had confessed to smuggling in the phone, that is when I remember getting upset because a deputy had done that.

Q    That was August 30th that Gilbert Michel confessed; correct?  You heard --

A    I don't mean -- oh, I'm sorry.  Then whenever it was presented that there was enough information that he had done it, and it might have been when he confessed.

Q    Okay.  But you talked on Friday that you were upset during the Saturday meeting; correct?

A    No, I don't believe so.  If I did, I was -- then I -- that's not what I meant to say.  I don't remember being upset at the Saturday meeting.  It was just a briefing that was presented to the Sheriff, and there wasn't really anything to be upset about at that particular time.

Q    Mr. Tanaka, it was on August 20th that you spoke with OSJ about changing the policy about FBI access to the jails; correct?

A    I believe that the Sheriff made an inquiry that morning.

Q    Mr. Tanaka, I'm asking about you --

A    Okay.

Q    -- Mr. Tanaka.

A    I don't have --

Q    On August 20th --

A    -- any -- I do not have any specific recall about ordering a change in policy.  There was no order to change policy.  The order was to enforce the visitation policy.

Q    Showing you Exhibit 21, e-mail from Greg Thompson to Crystal Miranda and also to himself, Greg Thompson.

You know that Crystal Miranda at the time was an assistant of Mr. Rhambo's; correct?

A    Yes.

Q    This is an August 20th at 9:00 p.m. e-mail, Mr. Thompson indicating that he spoke to you that day; correct?

A    Yes.

Q    And that Mr. Rhambo was supposed to drop the hammer, and they were ready on their end.

Do you see that?

A    I see that.

Q    This related to the -- coming up with a policy to keep the FBI out of the jail; correct?

A    I don't know what this refers to.

Q    Well, Mr. Tanaka, it's the entry policy that he was referring to, as shown by Exhibit 22.

Do you see that?

A    I do.

Q    And on the 23rd you learned from Mr. Thompson that the FBI had gotten in to MCJ to see Anthony Brown; correct?

A    I did learn that.

Q    And you learned that in a meeting with Mr. Thompson and others; correct?

A    I don't know if we had a meeting and I don't -- or I don't know if it was a phone call from either Mr. Thompson or from Captain Carey.

Q    Showing you Exhibit 23, August 23rd at 3:57 p.m.

Any reason to believe that when Mr. Thompson indicates "Delayed re  meeting with PT," that he's referring to anyone but you with the initials PT?

A    No.  It's possible, but I'm just saying the initial notification to me was, I believe, made via telephone.

Q    Okay.  But then there was a meeting which you've heard referred to as a butt-chewing meeting; correct?

A    Yes.

Q    Okay.  And this was a meeting with you, Mr. Thompson and others when you told Mr. Thompson, "You failed me"; correct?

A    That's not my recollection of what I said, and I -- I'm assuming that, based on this, that we had a meeting.  I think I've said all along I don't remember meeting with him.  I thought it was on the phone, but certainly possible that it was in person.  I don't remember anybody else, but I do remember being upset with him that he had promised the Sheriff that he would take care of the inmate security.  I told him that he failed the Sheriff because he promised the Sheriff that he

would keep Anthony Brown safe and secure, and I said, "You failed, so you go tell him."

Q    Okay.  So you recall that part.

You recall that you told Mr. Thompson, "You failed him, so you go tell him"?

A    You know, I don't remember the exact words.  The word "failed" has been used so many times, I probably adopted it as my own.  I don't know that I said that, but I do remember telling him, "You're the one that didn't do what you were supposed to or what you promised the Sheriff, so you go tell him yourself."

Q    Showing you Exhibit 25, on the first page, a message from Greg Thompson to Cecil Rhambo.

When Mr. Thompson is saying "The last thing I want to hear from you" -- meaning Mr. Rhambo, who he's e-mailing -- "him or the Sheriff are the words 'You failed me,'" he's referring to you saying, "You failed me"; correct?

A    Most likely.

THE COURT:  Is this a good time for our break?

MR. FOX:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not

allow others to discuss the case with you.  This includes discussing the case online, through blogs, bulletin boards, by e-mails or text messages.  If anybody tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

We'll come back at five after the hour.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Okay.  Is there anything we need to take up?

MR. FOX:  No, Your Honor.

MR. STEWARD:  Your Honor, we do have a motion for reconsideration pending.  I wondered if the Court wanted to take that up now or at the end of the day or...

THE COURT:  I'm happy to take -- is there need to take it up right now?

MR. STEWARD:  No.

THE COURT: Okay. I'll be happy to take it up before we leave today.

(Off the record at 9:49 a.m.)

(On the record at 10:04 a.m.)

THE COURT: Please be seated.

May I see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT: I believe this is your next issue.

MR. FOX: Thank you, Your Honor.

I have laid out for you, and I spoke to the defense about this, page A12995, which is part of Exhibit 7, this is the CCJV testimony of Mr. Tanaka. And in here, while he does not reference Judge Hatter's ruling, he says that it was since formed into a sinister gang -- or what -- he says something sinister, excuse me, and this is in July of 2012. He still had this tattoo when he was arrested in 2015. So his continued membership in this organization that he learned became sinister is relevant and probative to the issues that we've discussed. He -- I'll let you look at that, and then I've got one other...

(Counsel conferred off the record.)

(Pause in proceedings.)

MR. FOX: Your Honor, the other thing --

THE COURT: Just one second.

MR. FOX: Oh, sure.

(Pause in proceedings.)

(Counsel conferred off the record.)

THE COURT:  I think you probably wanted to start over here.

Okay.  What else have you got?

MR. FOX:  And then this is an article, NPR online during the Sheriff's race in which Mr. Tanaka is quoted, asked about the judge's ruling, Judge Hatter's ruling, and scoffing at the judge's characterization saying "It's no big thing, it was a mascot," again showing he had knowledge of the judge's ruling.  And again, we think that this is probative of the fact that he still maintained this tattoo and still continues to maintain this tattoo after his knowledge of the ruling and his knowledge of its nefarious sinister purposes.

THE COURT:  I'm sorry.  What is this?

MR. FOX:  It's an article -- an NPR article, KPCC article that was published online while he was running for Sheriff in 2014.  They ask him about Judge Hatter's ruling, and he --

THE COURT:  Where does it say that?

MR. FOX:  He was not named in the lawsuit, scoffs at the judge's characterizations saying it was no big thing, the Viking was a mascot.

THE COURT:  Okay.

MR. HAIG:  Again, Your Honor -- this is Jerome Haig -- we don't see the relevance, certainly based upon our

**UNITED STATES DISTRICT COURT**

limited argument this morning and the arguments set forth in our moving papers.  The issue here is if it's that he didn't get his tattoo removed, we don't see why that is an issue in and of itself because that doesn't convince anything except for the fact that he didn't get his tattoo removed.  There's a sitting L.A. County Superior Court judge, a Latino judge, who still has the tattoo.  There are plenty of other promoted senior management officials in the Sheriff's Department who haven't gotten their tattoo removed.  And if the issue is whether the tattoo has been removed or not, we don't see that as being a legitimate issue.

The government wants to get into an organization that had many antisocial characteristics, none of which have been ascribed to this defendant by way of a lawsuit or by way of him being named in any way.  So -- and as the Court well knows, my client is Japanese/American.  He's married to a Latina.  He has none of the attributes that are set forth in Judge Hatter's ruling being a white supremacist or Neo-Nazi organization.

I understand the Court's ruling this morning about why it believes it's relevant.  We still believe it's not relevant at all and certainly not probative of anything.

THE COURT:  No, he's left the jury under the impression that he is a firm believer, personally and professionally, in the core values of that Department and that clique, and he's known about the problems at the Los Angeles

County Sheriff's Department, has had for years, including when he was a deputy, about cliques -- deputies forming cliques and gangs.  He denied -- when asked about that in his direct testimony about efforts to curtail these cliques and gangs, he said -- he did not -- he denied that he was against curtailing that, and a possible explanation for that, which the government's entitled to go into, is that he himself was a member of the gang.

I don't -- well, and I guess that the tattoo is evidence that, yeah, he was a member of that gang and that despite all this criticism that he has been party to about these cliques and these gangs, he still has that tattoo, which is relevant for the jury to assess.  The jury may say it doesn't mean anything, and you're certainly free to argue that, but the jury may assess that in assessing his credibility when he says, Hey, look, I believe in these core values of the Sheriff's Department, and if anything -- for example, we heard testimony about the Regulators.  The Vikings are a very similar -- sort of an offshoot of the Vikings, and the jury's going to take all that into account in assessing his credibility.

MR. HAIG:  I understand the Court's ruling.

Just so we have some sort of understanding of the parameter of that ruling, what's the government allowed to ask?

THE COURT:  I'm not --

MR. HAIG:  Well, as far as Neo-Nazi and white

supremacist and things --

MR. FOX:  No --

THE COURT:  They've already said they're not doing that.

MR. HAIG:  I understand that, but I want to make sure because that -- those are referenced in the appeal letter.

THE COURT:  Well, that's up to you.

MR. HAIG:  And the word "gang," is that going to be something that the government's going to get --

THE COURT:  I don't know what the government's going to ask.  I'm not a mind reader.

MR. HAIG:  Well, it would be our objection to the word "gang" or "clique" as being a very charged word, both of those are.

THE COURT:  The problem is you put him on the stand. You knew about this from day one that he was subject to all of this.  You took your chances.  You put him on the stand.  The government told you that all this stuff, we weren't going to get into it, they weren't going to go into it in their case-in-chief.  But if he took the stand, all bets were off.

MR. HAIG:  So because of something that happened 25 years ago, he can't defend himself in this case, Your Honor?

THE COURT:  Excuse me.  He can defend himself, of course he can defend himself, but he runs the risk like every other witness who gets on the stand and testifies as to a

UNITED STATES DISTRICT COURT

certain thing that may be inconsistent with -- in fact, what he's really got up there and said is "I have law-abiding character; I'm a law-abiding citizen."  And if anything, this prior affiliation with the Vikings is inconsistent with that, and so they have a right to go into it.

Let's go.

MR. HAIG:  Your Honor, just one more question, if I could?

THE COURT:  Yeah.

MR. HAIG:  As far as the objections on the record, is the Court satisfied that the objection at sidebar is sufficient, or would the Court ask me to object to preserve the record for every single question that's asked?  I don't want to keep popping up and down.  I just want to preserve --

THE COURT:  If you have an objection, make it.

MR. HAIG:  Very well.  Okay.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Okay.  Let's bring the jury out, and let's have the witness resume the stand.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes, please.

Q    (BY MR. FOX)  Mr. Tanaka, I want to go back a little bit before talking any more about August 23rd and something that we were discussing on Friday when we broke.

When you were sergeant at the Lynwood station, you learned that there was a deputy clique; correct?

MR. HAIG:  Objection, Your Honor, relevance.

THE COURT:  Overruled.

THE WITNESS:  You know, that term, I know that you used that on Friday.  It was not referred to -- when I was at Lynwood station, there was no references during that period of time, at least in the '80s, that it was a clique.

Q    (BY MR. FOX)  But on Friday when I asked you that question and asked you whether you were aware of this deputy clique, you said yes; correct?

A    I said yes to your question, but there was no reference at Lynwood station that there were any cliques.

Q    And this was a subset of deputies at the Lynwood station that were members of this group; is that correct?

MR. HAIG:  Objection, Your Honor, relevance.

THE COURT:  Overruled.

THE WITNESS:  Sir, there was no group.  What you're referring to, there was no group.  It was a -- there was not a group.

Q    (BY MR. FOX)  Not everybody was allowed to be a member of this organization; correct?

**UNITED STATES DISTRICT COURT**

MR. HAIG:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  It wasn't that -- there was no -- if you're talking about -- I mean, were there group requirements or were there requirements to be a part of the group?  None that I'm aware of.

Q    (BY MR. FOX)  And, Mr. Tanaka, I wasn't talking about group requirements.  This was a group that you needed to be invited into; correct?

MR. HAIG:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I -- I don't know that to be totally true.

Q    (BY MR. FOX)  Well, you were invited into it; correct?

MR. HAIG:  Objection, relevance.

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  I guess you mentioned you were going to pop up for every question.

MR. HAIG:  Sorry, Your Honor.

THE COURT:  That's all right.  In my view, with respect to these preliminary questions about when he was a member of the group, I think you've stated on the record, you have a motion on file, that you have an objection to this.  As far as I'm concerned, that objection is preserved.  If there's

something that goes beyond the confines of what we've talked about, you'll need to state your objection.

MR. HAIG:  All right.  Just wanted to be careful.

THE COURT:  Okay.

MR. FOX:  Thank you, Your Honor.

(End of sidebar discussions.)

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes, please.

Q    (BY MR. FOX)  Mr. Tanaka, when you were a sergeant at the Lynwood station, you were invited into this group; correct?

A    I wouldn't qualify that as any invitation into any group.

Q    You were asked to be a member of the Vikings; correct?

A    I was not asked to be -- there was no membership into the Vikings.  The Vikings were the mascot symbol at Lynwood station.  Lynwood station, much like many other sheriffs' stations and facilities, were involved in intramural activities.  There were softball teams.  I myself was a member of the Baker to Las Vegas relay running team.

We had a -- I think it was a 6- or 8-foot-by-10-foot banner that hung in the station, and the name of the team was Lynwood Vikings.  There were photographs taken with the previous Sheriff and the team in front of that flag.  Other stations, like Firestone, had -- their symbol was -- or mascot was the Pirates.  Norwalk had the Wolverines.  And there were a number of others that were really referred to as the name of

UNITED STATES DISTRICT COURT

their team in their intramural activities, sporting activities.

Q    Mr. Tanaka, you were aware that in 1991 there was a finding that the Vikings were a deputy gang; correct?

A    I believe that was in a civil lawsuit that I was not a party to, sir.

Q    I'm sorry, did you understand my question?  You're aware that in that civil lawsuit there was a finding that the Vikings were a deputy gang; correct?

A    I can't speak to findings of a lawsuit that I was not a part of.

Q    I'm asking not if you're a part of it but just whether you were aware of that finding.

You, as you sit here today, are aware of that finding that in 1991 the Vikings were a deputy gang; correct?

A    I may have been made aware of it at that time.  I don't -- I don't have a specific recollection that that was the finding.

Q    So you may have been aware in 1991 that that was the finding.  Is that your testimony?

A    I may have been aware of when that finding occurred.

Q    And certainly over time you've become even more familiar with that finding; correct?

A    Not necessarily.  I mean, I've never looked at the lawsuit, and I've never reviewed it.  I wasn't a part of it.

Q    You're aware of the finding as you sit here today; correct?

A      The same question that you just asked?

Q      That there was a finding that the Vikings were a deputy gang, you're aware of that finding as you sit here today?

A      Well, I was aware of it back in -- whenever it was.  I'm pretty sure I was made aware of it at the time that the finding was made.

Q      And you're aware of the finding that the Vikings engaged in civil rights violations; correct?

A      I don't know.  I --

Q      You're not aware of whether you --

A      I don't know of all the findings, Mr. Fox.  I was not a party to the lawsuit, so I -- I'm sorry, but I didn't read it.

Q      And as you proceeded up in the ranks of the Sheriff's Department, you learned that the Vikings -- there was a finding that the Vikings engaged in other acts of lawlessness as well; right?

MR. HAIG:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I believe the findings with that related to conduct of deputies.  I don't know how it related to -- maybe because they worked at Lynwood, so they made the reference to Vikings.  But the fact is it wasn't -- if I recall, the finding was -- it was directed at the conduct of the individuals that were sued.

Q      (BY MR. FOX)  The deputies that you supervised as sergeant

at Lynwood?

A    I don't remember them -- any of the deputies that worked for me.  I was on the -- I think at the time I might have been the administrative sergeant.

Q    Mr. Tanaka, there's no public list of who the Vikings were, correct, the members of the Vikings?

A    Again, there was no membership.  The station was referenced as Lynwood station -- it was Lynwood station in the city of Lynwood.  The mascot for that station, like other stations, this one was named the Vikings.  There was no membership list, at least that I'm aware of.

Q    Mr. Tanaka, as we discussed in your testimony earlier today, Lynwood was not the only station that you worked at; correct?

A    That's correct.

Q    It's the only station that you have a tattoo of, correct, the mascot as you're referring to it?

        MR. HAIG:  Objection, Your Honor, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  It is the only tattoo -- I only have one tattoo.

Q    (BY MR. FOX)  And that tattoo is of a Viking; is that correct?

A    It is.

Q    Mr. Nee, your aide, was also a Viking; correct?

A    To the best of my knowledge, I don't believe so.

Q    Mr. Thompson, when he was the head of OSJ, had Viking paraphernalia hanging in his office; correct?

MR. HAIG:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't know that I ever visited Mr. Thompson's office.

Q    (BY MR. FOX)  You obtained a Viking tattoo at the time that you were a sergeant at Lynwood; is that correct?

A    Yes.

Q    You remained -- well, you kept that Viking tattoo even after learning about the finding in that civil lawsuit that the Vikings were a gang; correct?

A    Sir, at the time that I received the tattoo and the time that I was at Lynwood station, there was nothing sinister about that symbol.  There was Minnesota Vikings.  There was Viking Van Lines, Viking Charities.  Nothing in and of itself of the word "Vikings" was evil.  And it was the symbol of the station. It wasn't one that required any specific membership.  And after the fact for a lawsuit to occur and some deputies engaged in whatever conduct they were found to have engaged in and a judge made a ruling, made that symbol into what it is today.

However, in the 1980s, and however long Lynwood existed, there was nothing that was inappropriate about that symbol.  It was sanctioned by the Sheriff's Department.  It was nothing

more than the station mascot up until the time that the judge made his ruling.

Q    And it's your testimony that at some point the Vikings turned into -- formed something that was sinister; is that correct?

A    I don't -- the people, whoever got the tattoos or whoever worked at Lynwood station, I wouldn't say that they were all sinister or turned sinister.  And, again, I don't know what the results were of the civil lawsuit and the findings.  I'm just saying that at some point the media or the public decided to make the Vikings symbol, based on the judge's ruling, into something that was not what it was supposed to have been or what it was intended to be as a mascot from the initial stages.

Q    Okay.  So if I understand your testimony, you got a Vikings tattoo somewhere between 1987 and 1991; correct?

A    Yes.

Q    And sometime around 1991, you learned that a judge found that this group was operating beyond the scope of the law; is that correct?

A    My recollection is the judge found specific individuals who were engaged in whatever conduct that they weren't supposed to be engaged in.

Q    You're aware that he referred to the Vikings by name and said that the Vikings were engaged in that conduct; correct?

A    I believe, though, he was referencing the individuals

UNITED STATES DISTRICT COURT

and -- maybe because the individuals who worked there were referenced as Lynwood Vikings, that's possible, but I don't think he broad-brushed the entire station.

Q    No, Mr. Tanaka, I'm talking about the Vikings specifically, and as you were rising through the ranks of the Sheriff's Department, you learned that there were other deputy cliques that also had tattoos for deputies; correct?

A    I think the "cliques" word came out later on during the years. I -- you know, all during the course, at least when I was working, stations, people that worked at different stations and -- their way of exhibiting either their camaraderie or pride, they had their station tattoos. Other units had their unit tattoos. It didn't become anything where it created this kind of consternation until later on when somebody applied the term clique to it. And for years, there was never any reference. It was -- it was not an issue.

Q    Mr. Tanaka, you're aware that the deputies working on 3,000, during the time period we've been discussing, refer to themselves as the 3,000 Boys; correct?

A    I learned that reference, the 3,000 Boys, in a newspaper article. I don't think that anybody in the organization had ever discussed it, at least not to me, prior to that time.

Q    Mr. Tanaka, let's go back to your tattoo.

You kept your Viking tattoo even after you learned of the ruling in that civil case; correct?

A    Sir, the organization was well-aware of that tattoo and --

Q    I think you're missing my question.

My question is simply, you kept that tattoo; you didn't get it removed after you learned of the civil case's finding; correct?

A    The civil case was not against me.  I was not a Viking in the sense that you're trying to infer.  I was a member of the Los Angeles County Sheriff's Department assigned to Lynwood station, whose mascot was the Viking.  There were numerous people that had the Viking tattoo that worked there.  It was nothing sinister about it at the time that I and others received that tattoo -- or went to get the tattoo.

Q    Let's try this a different way.  In 1992 you kept your Vikings tattoo; correct?  You didn't have it removed?

A    I did not have it removed.

Q    And when Sheriff Baca came up with the core values that you discussed on Friday, you didn't have the tattoo removed, did you?

MR. HAIG:  Objection, argumentative.

THE COURT:  Sustained.

Q    (BY MR. FOX)  Mr. Tanaka, even after you resigned from the Sheriff's Department, you didn't have that tattoo removed, did you?

MR. HAIG:  Objection, Your Honor, misstates the evidence.

THE COURT:  Overruled.

THE WITNESS:  I did not resign, Mr. Fox.  I retired in 2013, and I have not had the tattoo removed.

Q    (BY MR. FOX)  And you still have your Viking tattoo as you sit there testifying today; correct?

A    Because you're trying to make it evil, it doesn't mean that it is evil, sir, and so there is no reason for me to remove it.

Q    Mr. Tanaka, you still have that tattoo as you sit there testifying today?  It's on your leg; correct?

A    I have the tattoo, sir.

Q    Okay.  Let's go back to the butt-chewing meeting from August 23rd of 2011.

You're with me on this?

A    I'm with you, sir.

Q    Because you sent in Mr. Thompson to go brief the Sheriff, you didn't go with him; correct?

A    I did not.

Q    It was just Mr. Thompson and perhaps one other person who went and briefed the Sheriff; correct?

A    I don't know who else went with Mr. Thompson.

Q    And it was after your meeting with Mr. Thompson on the 23rd that the OSJ deputies moved Anthony Brown to a different floor; correct?

A    I'd have to look at when the move was, but it's possible.

Q    Well, you knew he was moved to a medical ward at Men's Central Jail; correct?

A    I believe that my -- at least my recollection is after he was moved is when I was notified.

Q    Okay.  And you were notified that he was moved to a medical floor at Men's Central Jail; correct?

A    Yes.

Q    And it was only at that time that OSJ deputies began standing guard outside of his cell; correct?

A    I don't know when they began their standing security outside.  I don't know when that began.

Q    Mr. Tanaka, you are aware that Mr. Thompson assigned his OSJ deputies to guard Anthony Brown at MCJ; correct?

A    Yes.

Q    In fact, you authorized overtime for hiding Anthony Brown; correct?

        MR. HAIG:  Objection, Your Honor, mischaracterization of the question and argumentative of the word -- term "hiding."  Misstates his testimony.

        MR. FOX:  Your Honor, I'll be happy to rephrase the question and remove the word hiding.

Q    (BY MR. FOX)  Mr. Tanaka, you authorized overtime for the OSJ deputies who were standing guard outside of Mr. Brown's cell; correct?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    So you ordered that they be paid overtime to do that;
correct?

A    They were provided with overtime to provide security for
Mr. Brown.

Q    I'm sorry, did you miss my question?  I'm just asking
whether --

MR. HAIG:  Objection, Your Honor, argumentative.

THE COURT:  Sustained.

Q    (BY MR. FOX)  Did you order the deputies, the OSJ deputies
standing guard outside of Anthony Brown's cell to be paid
overtime?

A    I didn't give any order.  I believe that the order was
just given to ensure Mr. Brown's security, and I may have
authorized the overtime in order to accomplish that task.

Q    Mr. Tanaka, you testified on Friday that with respect to
the policy change that required approval before the FBI could
interview inmates within Men's Central Jail, you told
Mr. Thompson to use his discretion; correct?

A    I believe at some point that occurred.

Q    But you were the one who was approving or denying FBI
requests for interviews subsequent to this policy change;
correct?

A    I never denied any FBI request for an interview.  In fact,
the two or three that I received were approved.

Q    Mr. Tanaka, you were the one who was approving or denying

**UNITED STATES DISTRICT COURT**

FBI requests for interviews subsequent to this policy change;
correct?

A    I didn't deny any FBI requests to interview inmates in the
county jail system.

Q    Mr. Tanaka, you've stated you were pretty far removed from
the events that we've been talking about.  You were just sort
of a conduit of information.  That's basically your testimony;
correct?

A    Basically.

Q    Okay.  On August 25th you met with a Sheriff's Department
undercover officer who was to pose as an inmate in Anthony
Brown's cell; correct?

A    I did.  I'm not -- I'm not sure who they were.

Q    You and Mr. Leavins met with this LASD undercover officer
in a parking lot; correct?

A    I don't -- it was outside someplace.

Q    And you had the officer pose as an inmate who had been
beaten up; correct?

A    I did not.

Q    You were there when Mr. Leavins provided him with this
plan; correct?

A    I don't believe I was present for any formulation of the
plan or implementation.  I believe I was out there to -- I
don't even know why I was there, if it was coincidental or if I
went there.  I think the only conversation that I would have

**UNITED STATES DISTRICT COURT**

had would have just been to tell the deputy to be careful.

Q    Okay.  I want to make sure I understand that.

So you and Mr. Leavins went to go meet with this undercover officer; correct?

A    Sir, again, I've read so many documents over the past years.

Q    No, no --

A    I don't have a specific recollection of having this meeting.  Now, it's possible that it occurred, but I -- it wasn't anything that was done at my direction.

Q    Okay.

A    It was all part of the investigation that was being conducted by the Internal Criminal Investigations Bureau.

Q    And when Mr. Leavins met with this individual, you just told this individual to be careful.  That's your testimony?

A    I said that that's something that I likely would have said.  I don't even have a recollection of actually having that meeting, so it's not possible, really, for me to recall what our conversation would have been.

Q    Mr. Tanaka, is it fair to say that you don't recall these events as well as you -- well, your recollection is missing on some of these events; is that correct?

MR. HAIG:  Objection, Your Honor, argumentative.

THE COURT:  Sustained.  You can rephrase it.

Q    (BY MR. FOX)  Mr. Tanaka, you've answered a few questions

saying that you don't recall the answers to my questions; is that correct?

A    I can't tell you what I don't know or I don't recall.

Q    Mr. Tanaka, this became a big deal -- this whole Anthony Brown, ICIB, OSJ operation became a big deal in the public at the end of September of 2011; correct?

A    Yeah.  At some point it became, I think, more reported on in the media.

Q    And at some time, you met with OSJ and ICIB individuals to try to figure out what had happened during that time period; correct?

A    I'm not sure what you mean.

Q    Mr. Tanaka, it was at the end of September or early October of 2011 that you knew that the public was scrutinizing what the Sheriff's Department had been doing over the past couple of months with respect to Anthony Brown, OSJ and ICIB; correct?

        MR. HAIG:  Objection, Your Honor.  Beyond the scope, relevance.

        THE COURT:  Let's go to sidebar.

    (Discussion held at sidebar.)

        THE COURT:  Okay.  I'm going to give a limiting instruction now on the jury's -- how they should consider the Vikings-related testimony.  The Court's prepared to instruct the jury that they may consider the Vikings ruling testimony by

the defendant only for the purpose of if it has any bearing at all on his intent and credibility and for no other purpose.

MR. STEWARD:  We would request that at this time.

MR. FOX:  Yeah.  And with respect to this issue -- I don't know if this is why you wanted to see us, but --

THE COURT:  Yeah.

MR. FOX:  Okay.  I was going to move on.  Thank you, Your Honor.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, the Vikings-related testimony by the defendant may be considered by you for its bearing, if any, on the question of the defendant's intent and credibility and for no other purpose.

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes.

Q    (BY MR. FOX)  Mr. Tanaka, based on your experience as watch commander of IRC -- because I think you said you were watch commander of IRC; is that right?

A    I did say that.

Q    Okay.  Based on your experience as watch commander of IRC, you were familiar with all of the activities of IRC.  That was your testimony on Friday; correct?

A    I wouldn't have said that.  I was not familiar with all of the activities.  I had a specific duty.  That was to be --

UNITED STATES DISTRICT COURT

provide leadership for those who worked on my shift and also to ensure that things were being run appropriately.

Q     And you were aware that IRC booked inmates; you were aware of that activity; correct?

A     Yes.

Q     You were aware that IRC found the appropriate housing for those inmates; is that correct?

A     Yes.  The initial classification of inmates was conducted by the personnel at Inmate Reception Center.

Q     And your duties generally included overseeing all of the activities of IRC; correct?

A     Well, the line functions with regards to the processing in of inmates and then -- and ensuring their safety while they were within the confines of the Inmate Reception Center prior to being assigned to a housing facility.

Q     You were overseeing the activities of IRC to move the inmates; correct?

A     No.  I believe there was a classification lieutenant, because the watch commander -- again, our job was -- as they were -- people were being brought in through the door, the incoming door and being processed or booked, then our job was to just ensure their security.  I believe the classification had a separate unit.

Q     You were responsible for overseeing the activity of processing the inmates; is that correct?

A    It was mostly just to ensure the process of -- that the people, the flow kept -- the flow was -- it was kept moving.

Q    Mr. Tanaka, you were overseeing the activities of IRC to process court orders; correct?  And if you want me to be more specific, to process court orders for inmates that would be sent to and from the courts.

A    It may have been, but it never was anything that was brought to the lieutenant's level as far as processing and moving inmates.

MR. FOX:  Your Honor, I would like to read in -- and I'll show it to the defense.  One second, please.

(Counsel conferred off the record.)

Q    (BY MR. FOX)  Mr. Tanaka, you also, as watch commander of IRC, also facilitated -- excuse me -- the release of individuals that were in the custody of L.A. County jails; correct?

A    Yes.

Q    Okay.

MR. FOX:  Your Honor, I'd like to read from his testimony on Friday, page 11, lines 11 through 20.  And I understand there's no objection from the defense.

MR. HAIG:  There is none, Your Honor.

THE COURT:  All right.

MR. FOX:  "Question:  What were your duties as a watch commander?

"Answer:  At Inmate Reception Center, the duties generally just included overseeing all the activities.  It involved inmates that were booked -- or people that were booked into the system; then found appropriate housing; the movement, each and every day, early in the morning and in the afternoons, of sending inmates from our custody into the courts throughout the county and then bringing them back from court; and then also facilitating the release of individuals that were in the custody at L.A. County jails."

Q    (BY MR. FOX)  Mr. Tanaka, you were familiar with the watch commander of IRC in August of 2011; correct?

A    No, I can't say that, sir.  The facility had since moved, and I really couldn't tell you the details of what the IRC watch commander's duties were in 2011 versus when I was there nearly 20 years earlier.

Q    Okay.  Well, let's go above him.  You were at least familiar with the captain of IRC in August of 2011; correct?

A    I -- I don't remember who the captain -- who the captain was of IRC in 2011.

Q    You knew that Mr. Chuck Antuna worked as captain of IRC in August of 2011; correct?

A    I know he was the captain there, and it could have been in August of 2011.

Q    And you had worked with Mr. Antuna previously at Lynwood?

A    I did.

UNITED STATES DISTRICT COURT

104

Q    And he's someone that you vacationed with for a very long period of time; correct?

A    For about four days a year for about eight years.

Q    Mr. Tanaka, you know that Anthony Brown was removed from the computer system at IRC on August 25th of 2011; correct?

A    I'm not sure I was aware that he was removed at that time. I learned about it at some point after the fact, and I don't know exactly when.

Q    You learned that Mr. Brown's name on August 25th was changed to another name; correct?

A    I did learn that after.

Q    And you know that as of August 25th, he remained at Men's Central Jail in that medical ward; correct?

A    I don't remember the exact dates and sequences.

        MR. FOX:  Your Honor, I'm going to publish Government Exhibit 38.

Q    (BY MR. FOX)  Mr. Tanaka, you're pretty sure you'd have known that Anthony Brown wasn't moved out of Men's Central Jail until August 26th of 2011; correct?

A    I'm pretty sure?

Q    Well, that's what you said before; correct?

A    I don't -- I know he was -- you're talking about moved?

Q    Out of Men's Central Jail.

A    Out of Men's Central Jail.

Q    Yeah.  You're pretty sure you would have known that he

wasn't moved out of Men's Central Jail until August 26th of 2011; correct?

A    I don't remember the date.

Q    You may have been informed that Anthony Brown no longer wished to cooperate with the FBI when he was moved back to Men's Central Jail on September 2nd of 2011; correct?

A    I may have been informed, that is correct.

Q    Now, you discussed the August 29th meeting at the U.S. Attorney's Office on Friday.  I want to talk briefly about that.

You testified on direct examination that there were as many as 15 to 20 people flanking the U.S. Attorney Andre Birotte.

A    Yeah, there were -- there were a few.  I -- it may have been 15 or 20.

Q    But there were really only just a handful of his staff there; isn't that correct?

A    I recall maybe six or seven or eight people and actually more behind him, and I'm not sure if anybody was sitting, exactly at -- they might have been sitting alongside him.  It was a -- I recall a fairly large conference room.  I think it was more than a handful.

MR. FOX:  Your Honor, for the record, I renumbered what I had said earlier is Exhibit 186.  It is now Government Exhibit 195.

**UNITED STATES DISTRICT COURT**

(Counsel conferred off the record.)

MR. FOX:  Your Honor, I'm going to read from Government Exhibit now 195, Mr. Tanaka's grand jury testimony from December of 2012 on page 86, lines 7 to 13 -- I'm sorry, lines 8 to 13.

"Question:  I want to ask you some questions about the meeting" --

THE COURT:  Excuse me.

MR. FOX:  I'm sorry.

THE COURT:  Any objection?

MR. HAIG:  No, Your Honor.

THE COURT:  All right.  Go ahead.

MR. FOX:  Sorry.  I'd already cleared it.  I should have made that clear.

"Question:  I want to ask you some questions about that meeting that you've discussed a few times with U.S. Attorney Andre Birotte.  Who was in attendance at that meeting?

"Answer:  Mr. Birotte.  I believe there were a handful of U.S. attorneys, assistant United States attorneys."

Q     (BY MR. FOX)  Mr. Tanaka, one of the issues that was raised at this meeting was the federal grand jury subpoenas that were seeking records from the Sheriff's Department regarding the use of force; is that correct?

A     I don't know.  I don't remember anything that was discussed.  I just remember the conversation was largely being

done by -- or being led by Sheriff Baca, and I don't recall exactly -- or I certainly don't remember anything that -- what you just said.

Q    Okay.  So I guess your testimony was just that you don't recall anything that happened at that meeting; is that correct?

A    No, that's not true.  I remember the Sheriff -- my recollection was that he told that -- the U.S. attorney, Mr. Birotte, that he would work with his office in any joint investigation that the federal government wanted to do, but I believe he also said that he had no intention of or he had no desire to work with the FBI in an investigation.

Q    Mr. Tanaka, at least in 2014 you recall that one of the things that was discussed at this meeting was the number of grand jury subpoenas that had been served on the Sheriff's Department and how cumbersome they were; correct?

A    That's -- that's possible.  I don't -- I don't remember that now, but it's very possible.

Q    You recalled in 2014 that there was a discussion about the subpoenas; correct?

A    As I sit here now, no.  But I may have remembered that a couple years ago.

Q    Mr. Tanaka, could you please look at Exhibit 78 in the binder that is somewhere around you.

     (Counsel conferred off the record.)

          MR. FOX:  Your Honor, I move for the admission of

UNITED STATES DISTRICT COURT

Government Exhibit 78, and it's my understanding that Mr. Haig has no objection to this exhibit coming in.

MR. HAIG:  That's correct, Your Honor.

THE COURT:  It will be received.

(Exhibit No. 78 received into evidence.)

Q    (BY MR. FOX)  Mr. Tanaka, before going to that meeting at the U.S. Attorney's Office, Mr. Leavins advised you that they were going to be interviewing Gilbert Michel the very next day; is that correct?

A    That's what it says here, yes.

Q    And then you went to MCJ the next day when ICIB was going to speak to the deputies; correct?

A    I was -- I was at Men's Central Jail when Deputy Michel was interviewed.  I was there that day.

Q    You were briefed on the interview of Gilbert Michel after Mr. Leavins, Mr. Craig and Ms. Long conducted it; correct?

A    At some point, I was -- my recollection is that Lieutenant Leavins did brief me on what he believed were pertinent bits of information from the interview.

Q    And that briefing happened around the time that their interviews of the deputies had ended that day; correct?

A    That's possible.

Q    And you think that they may have conveyed to you that they had told Mr. Michel that the FBI was manipulating him; correct?

A    They may have told me that.  I don't know.

Q     And you think it's possible that they may have conveyed to you that they told Mr. Michel the FBI was threatening him in an attempt to convince him to be a witness in the federal investigation; correct?

A     I don't -- I don't know if that's what they told me.  They may have.

Q     Mr. Tanaka, you mentioned in direct examination your close relationship with Paul Yoshinaga; correct?

A     Okay.

Q     You referred to him as the chief legal advisor to the Sheriff; correct?

A     That was, I believe, in response to a question of what his title was when he was with the Sheriff's Department.

Q     He was actually the chief legal advisor to the Sheriff's Department, not just to the Sheriff; correct?

A     Could have been.  It was -- but he was always referred to, at least I remember him being referred to as the Sheriff's chief legal advisor.  I guess you could include the Department.

Q     Mr. Tanaka, you would have no problem going to Mr. Yoshinaga for advice if you needed it; correct?

A     If I needed work-related legal advice, then I would be able to go to him, yes.

Q     And you testified that it was one of your core missions to make sure that deputies knew the law; correct?

A     Yes.

Q    You didn't raise any concerns at the end of August 2011

that Mr. Leavins, Mr. Craig and Ms. Long had told Gilbert

Michel that the FBI was manipulating him; correct?

A    I didn't have any -- I don't believe I had any discussions

with them about that.

Q    And you didn't have any discussions with Mr. Craig,

Mr. Leavins or Ms. Long about any concerns you might have had

that the FBI -- that they had told him that the FBI was

threatening him in an attempt to convince to not -- excuse me.

Let me try that again.

You didn't have any conversations with Mr. Leavins,

Mr. Craig or Ms. Long about the potential legality of them

threatening Mr. Michel in an attempt to convince him not to be

a witness in the federal investigation?

A    I don't remember any conversations along those lines.

Q    And you never went to Mr. Yoshinaga to ask about anything

that you observed, learned about, going on in August or

September of 2011 with respect to Anthony Brown, OSJ or the

ICIB operation; correct?

A    I don't remember having any conversations, that's correct,

with Mr. Yoshinaga about this particular investigation.

Q    In September of 2011, the Sheriff's Department took steps

to see which deputies were meeting with the FBI; correct?

A    I'm sorry, could you say it one more time?  I'm sorry.

Q    Sure.  In September of 2011 -- instead of just saying

Sheriff's Department, I'll ask you, Mr. Tanaka.

You took steps to see which deputies were meeting with the FBI; correct?

A     Did I take steps?

Q     Yes.  If you want me to be more specific, I will.

On September 1st you ordered that all sworn and custody assistant personnel be told that they needed to report any contact with the FBI to their superiors; correct?

A     I don't know if I told them.  I remember, I believe, the captain of that facility re-briefing the policy that if there's any law enforcement-related contact with any outside law enforcement agencies, deputies were reminded that the policy required them to report that to their unit of command -- or their unit commander.

Q     But you ordered, not just at MCJ, but all sworn and custody assistant personnel to be told that they needed to report any contact with the FBI to their superiors; correct?

A     I may -- I don't know.  I may have given the order.  I don't know.

Q     I ask you to see if you can refresh your recollection by looking at Government Exhibit 74, which is just for identification purposes at this point.

Mr. Tanaka, does that refresh your recollection about whether you ordered that all sworn and custody assistant personnel be told that they needed to report any contact with

UNITED STATES DISTRICT COURT

the FBI to their superiors?  Close that book if you have a chance --

A     I think it says -- it has something to do with not knowingly interfering or -- with investigations.  But I -- lieutenant -- I didn't work with Lieutenant McCorkle, so I can't tell you why he put that in his memorandum.

Q     Why he put what in his memorandum?

A     What I just said.

Q     The fact it was coming from you?

A     Yeah, "per the undersheriff."

Q     Mr. Leavins was briefing you on the surveillance being conducted of FBI agents in September of 2011; correct?

A     I did receive a briefing that a surveillance had taken place.

Q     Mr. Leavins was the one who was briefing you on the surveillance being conducted of FBI agents; correct?

A     It could have been Lieutenant Leavins.

Q     Mr. Tanaka, the plan was to have Mr. Leavins, Mr. Craig and Ms. Long tell other deputies who might have been meeting with Special Agent Marx not to cooperate with the FBI; correct?

A     I don't know what their investigative plan was, sir.  I wasn't involved in their investigation.

Q     Well, you've stated before that it's possible that that was their plan; correct?

A     You'd have to ask them, but it is possible.

Q     Showing you now Exhibit 141.  This is the denied court order seeking all FBI records.

       Do you see this?

A      I do.

Q     You were told the judge denied the order around the time that this occurred; correct?

A      I don't know if it was around the time this occurred, but I was told that the judge had indicated he did not have jurisdiction over the request that was made.

Q     And you learned that around the time that this occurred; correct?

A      I don't know, Mr. Fox.

Q     You've testified before that you learned of this around the time that it occurred; correct?

A      It's possible.  I mean, you're asking me questions that have taken place over a period of the past five years, and I'm just trying to tell you what I know.

Q      Mr. Tanaka, you believe that it's probable that you were told around the time that it occurred that the judge denied this order; correct?

A      I probably wouldn't use that word today, but I don't know when I said that.  But it may have been probable at the time that I was asked that question, in whatever year that was.

Q      Okay.  You were told that the court did not have jurisdiction in the matter; correct?

A    Yes.

Q    And, Mr. Tanaka, LASD's policy at the time was that employees should not take any action that could interfere with, delay, obstruct, distort or unduly influence any investigation; is that correct?

A    That sounds -- I don't remember the exact policy, but there was a policy that we weren't to interfere or --

Q    Or obstruct?

A    I don't remember the exact words, sir.

Q    And that policy included in federal investigations; that you couldn't interfere with federal investigations; correct?

A    That's possible that the policy was that specific.  I'd have to see it, but I don't remember.

Q    Mr. Tanaka, the policy also was that employees shall not take any action that could intimidate or unduly influence any participant in an investigation; correct?

A    I -- I -- sir, I don't know.  I -- you're asking me about a policy.  There's many policies.  There's -- like I said, the policy book was at least this thick.  And unless I see it, I don't have a specific recollection.  I know just in general that the orders were not to engage in any type of conduct that would interrupt another agency's investigation if it required cooperation.

Q    If it required cooperation.

    There's nothing in the policy that discusses cooperation;

**UNITED STATES DISTRICT COURT**

correct?

A    Again, sir, I'd have to see the policy.  I don't know.

Q    Okay.  Well, you've testified to this before, haven't you?

A    Sir, I'm sure you're going to show me something I don't remember.

MR. FOX:  This is 187, page 907.

Your Honor, now going to be looking at -- reading from Exhibit 187, page 907, starting at line 12 -- actually starting at line 2 and going all the way to line 23.

MR. HAIG:  Your Honor, may I have one moment with counsel, please?

THE COURT:  Yes.

(Counsel conferred off the record.)

Q    (BY MR. FOX)  Mr. Tanaka, why don't you just, if you would, look at Exhibit 187 which should be in the Tanaka Binder that is around you.  And look at this page, which is 907.

It is -- Mr. Tanaka, as undersheriff it was your job to be familiar with all laws and policies that applied to the Department; correct?

A    Yes.  Sir, can you tell me the exhibit again?

Q    Sure.  It's Exhibit 187.  Do you see that there?  187's missing from yours?

A    There's nothing.

MR. HAIG:  May I approach the witness, please?

THE COURT:  Steve.

(Pause in proceedings.)

Q    (BY MR. FOX)   187, Mr. Tanaka, now you do have that in the binder?

A    I do, sir.

Q    Okay.  Page 907, why don't you just read pages 907 and -- 907 from line 2 to 908 to line 3 to see if this refreshes your recollection on LASD's policies.

A    "In referring you to page 44 of that exhibit" --

Q    No, no, no.  I'm not asking you to read that into the record.  I'm asking you to read it to yourself and seeing if that refreshes your recollection on the Sheriff's Department's policies with respect to what we've just been talking about.

(Pause in proceedings.)

THE WITNESS:  Okay.

Q    (BY MR. FOX)  Okay.  Does that refresh your recollection as to whether the Sheriff's Department policy at the time was that employees shall not take any action that could interfere with, delay, obstruct, distort or unduly influence any investigation?

A    Yeah.  I'm sorry, that is what the policy states here.

Q    Okay.  And does that policy also include -- does it refresh your recollection as to whether that policy included federal investigations?

A    It said all law enforcement agencies I believe.

Q    And that policy also applied to whether you could

intimidate or unduly influence any participant in an investigation; correct?

A     Yes.

Q     As undersheriff, Mr. Tanaka, in August, September, October, November of 2011, you oversaw IA and ICIB; correct?

A     Internal criminals -- internal criminal -- ICIB, I did, I believe, during that period of time.  Internal Affairs, I believe -- well, actually the undersheriff on the organizational chart shows over the entire organization, so that would be a yes.  But I believe there was a chain of command through a division.

Q     There may have been a chain of command with respect to IA, but you oversaw IA at some point; correct?

A     As part of that chain, yes.

Q     As undersheriff you never opened an internal investigation of Tom Carey for his actions in August or September of 2011; correct?

A     I did not.

Q     As undersheriff you never opened an internal investigation on Steve Leavins for his actions in August or September of 2011, did you?

A     I did not.

Q     You never opened an investigation into Scott Craig or Maricela Long for their actions in August or September of 2011, did you?

A       I didn't.

Q       Same thing for Greg Thompson, you didn't do it for him either, did you?

A       That's correct.

Q       And same thing for the OSJ deputies, Mickey Manzo, Gerard Smith and James Sexton, you didn't open an investigation into them based on their conduct that we've been hearing about in this case; correct?

A       You're correct.

Q       Publishing now Exhibit 71.  This is your e-mail to Steve Leavins in which you clarified -- or you learned that the orders into investigating local law enforcement agencies were coming from the top; is that correct?

A       That's what it says here.  I believe it was just in response to an inquiry as to why the investigation was taking place.

Q       I'm going to ask you about a couple things you just said there.  You said that's what it said here.  That's what you wrote here?

A       That's what I wrote on my e-mail, correct.

Q       And in terms of the inquiry you're talking about, it was your inquiry into what the Justice Department might be doing with respect to policing the police; correct?

A       I believe that that inquiry -- I don't remember where it was generated from, but I think I found something on the

**UNITED STATES DISTRICT COURT**

Internet, and so I passed it on.

Q   So that's you passing on to Steve Leavins and Tom Carey your opinion that the orders to investigate the Sheriff's Department were coming from the top; correct?

A   I don't know if it's specifically related to just our department.  I think there was a conversation about -- maybe county -- I don't remember if it was just about our department or if it was about county jail facilities in general.

Q   So this at least applied to the Sheriff's Department and may have applied more broadly, is what you're saying; correct?

A   It's possible.

Q   And you're aware that the very next day that ICIB sergeants threatened to arrest a special agent; correct?

A   I didn't look at the date of the -- that e-mail just now, but I'm guessing that that's correct, based on your question.

Q   Well, I can show it to you again.

    Mr. Tanaka, both of your e-mails on Exhibit 71 come on September 25th, 2011; correct?

A   Yes.

Q   Mr. Tanaka, in September of 2011, talking about the threatened arrest of Special Agent Marx, you're aware that Mr. Leavins told you that ICIB had concluded there was no probable cause to arrest Special Agent Marx; correct?

A   He did tell me that at some point.

Q   And you were also aware, based on your duties as a law

enforcement officer and your role in the Sheriff's Department, that undercover agents, somebody -- let me strike that -- that you're aware, based on your experience, that a law enforcement officer conducting an undercover operation does not break the law when engaging in authorized criminal conduct; correct?

A    That's correct.

Q    And with respect to ICIB's role, you testified on Friday that criminal investigations of personnel from other police departments occurred when they had requested that the Sheriff's Department come in and investigate them; correct?

A    Yes.

Q    And that's the only time that ICIB comes in to investigate other law enforcement agencies; correct?

A    At the request of the agency, correct.

Q    The FBI never asked the Sheriff's Department to investigate its agents, did it?

A    Not that I'm aware of.

Q    You can think of no other time in which ICIB investigated a federal law enforcement officer; correct?

A    I'm not aware of any.

        MR. FOX:  Nothing further, Your Honor.

        THE COURT:  All right.  Redirect?

                REDIRECT EXAMINATION

Q    (BY MR. HAIG)  Mr. Tanaka, Mr. Fox asked you about your comments on a conversation that Mr. Olmsted had testified to in

this trial about whether you had told him that you were going to be Sheriff someday.

Remember those questions from this morning?

A    Yes.

Q    And you had also testified that you ran for Sheriff of Los Angeles County?

A    Yes.

Q    And when did you do so?

A    That was two years ago, in 2014.

Q    And were you retired from the Sheriff's Department at the time that you ran for Sheriff?

A    I was.

Q    And who ran against you?  Anybody who testified at this trial?

A    Yes.

Q    Who would that be?

A    Robert Olmsted.

Q    You also were asked some questions about being on a committee that oversaw some punishment for certain deputies that were involved in misconduct?

A    Yes.

Q    Do you recall hearing about the Christmas fight that has been discussed in this case?

A    Yes.

Q    Were you involved in any way in that?

A       Not in the fight.

Q       Well, not in the fight, but were you involved in the aftermath?

A       In the disciplinary review process.

Q       And what was your job in the Sheriff's Department at that time?  What was your rank in the Sheriff's Department at that time?

A       I believe I was an assistant sheriff at that time.

Q       Were you the sole person who was making decisions as to discipline, or were there others?

A       There was a review panel of three, because this was discipline that would be heard at the highest levels of misconduct.

Q       Were any deputy sheriffs at that time dismissed?

        MR. FOX:  Objection, beyond the scope.

        THE WITNESS:  Yes.

        THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q       (BY MR. HAIG)  Do you recall the specific discipline that was given to deputy sheriffs as a result of that panel that you were on after the Christmas fight?

        MR. FOX:  Objection, Your Honor, beyond the scope.

        THE COURT:  Sustained.

Q       (BY MR. HAIG)  The county jail system, specifically Men's Central Jail, do you have any personal knowledge of whether

cell phones work very well inside that jail?

MR. FOX:  Objection, beyond the scope.

THE COURT:  Sustained.

MR. HAIG:  Your Honor, if I could be heard on that, please.

THE COURT:  Okay.

MR. HAIG:  Thank you.

(Discussion held at sidebar.)

MR. HAIG:  Your Honor, the relevance of that is --

THE COURT:  It's not the relevance.  His is beyond the scope.

MR. HAIG:  Oh, okay.  I apologize.  Why we believe it's not beyond the scope is that it refers directly to that list that was shown to Mr. Tanaka when he first started testifying about the phone calls that were going back and forth between Baca's cell phone and other people's cell phones and Carey's cell phone and various lines.

The line of questioning that I'm going to go to, if I can just tell you where I'm going to go so the Court can rule whether it's beyond the scope or not, is that the -- cell phones did not work very well at MCJ.  Therefore, it was often that people would use landlines at MCJ.  That's point number one.

And then the second part of that is that Sheriff's Baca's practice was not always to use his cell phone.  He would have

UNITED STATES DISTRICT COURT

his aide make phone calls for him all the time, and then the phone would get handed back and forth. And so it's to explain the lack of possibility of certain phone calls that might have been between Mr. Tanaka's cell line or office line and Mr. Baca's cell line or office line and why some of these people who may have been calling Mr. Baca's cell phone or Mr. Tanaka's cell phone or even somebody else's cell phone or landline might have been calling from an MCJ phone instead of calling from their own phone.

THE COURT: But somehow they happened to work when they called him.

MR. HAIG: No, no, no. I'm not saying that, Your Honor. I'm saying --

THE COURT: I know you're not but --

MR. HAIG: No, no. What I'm saying is that there has got to be -- well, what I'm saying is there's a strong potential for phone calls to have originated from MCJ that would not have been noticed in that document because that wasn't one of the trigger lines that they were talking about.

MR. FOX: Your Honor, there's a lot of speculation here because there's -- I don't know if he's going to ask this witness to comment on whether these people were calling Sheriff Baca from the jail. I mean it sounds like it's an argument that he would like to make. If he wants to have a very limited amount of this, we will not object to it based on his

representations, but if there's going to be any question about whether Mr. Tanaka was aware if they were calling Mr. Baca from the jail, I think that that's outside --

MR. HAIG:  I'm not asking that, Your Honor, and we do have something from Agent Tanner about her cell phone not working when she was kicked out of the interview room and she had to go outside for it to work.

THE COURT:  Okay.  Well, you can rephrase your question.  They told you they, I guess, won't object.  Okay?

(End of sidebar discussions.)

Q    (BY MR. HAIG)  Mr. Tanaka, do you have any personal experience with cell phones working inside of Men's Central Jail?

A    Yes.

Q    And what would that be?

A    They generally didn't -- at least when I was working, they generally didn't work very well because of the -- the cement walls.

MR. FOX:  Objection, Your Honor.  I think we need some clarification on time, please.  I'm not sure if we're talking about 1980 or --

MR. HAIG:  I can clarify that.

Q    (BY MR. HAIG)  What would your time frame be consisting of when you're talking about the cell phones not working because of the walls?  Would that be when cell phones were first

commonplace or at some other time?

A    At least during the period of time that I was working, so whenever cell phones were first issued.  Maybe in the late '90s, early 2000s, my experience was that the phones didn't work very well in the jails, if at all.

MR. FOX:  Your Honor, objection.  And move to strike as irrelevant at this point.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  Are there --

THE COURT:  The answer is stricken.  The jury should disregard the answer.

Q    (BY MR. HAIG)  Are there any landlines that are county-owned landlines at Men's Central Jail?

A    Yes.

Q    Sheriff Baca -- we've seen some testimony about Sheriff Baca's cell phone; right?  You remember hearing that testimony this morning about --

A    Yes.

Q    -- and about his landline?

A    Yes.

Q    All right.  Did Sheriff Baca have an aide in 2011?

A    Yes.

Q    And --

A    He had several aides and a driver.

Q    Do you have any personal experience of Sheriff Baca's

habit as to how he would make telephone calls to other people that he wanted to speak to?

A    Yes.

Q    And what would that be?

A    He would ask his aide or his driver to call whomever the Sheriff wished to talk to, and the driver would do that from the driver's phone and then hand the phone over to the Sheriff.

Q    Did you have the driver's phone number saved as a contact in your own personal or county-issued cell phone?

A    I did.

Q    Did you ever get phone calls from Sheriff Baca on the aide's cell phone?

A    I did.

Q    At some point in time during your time as undersheriff, did the Sheriff give you any directives regarding the gray area?

A    Yes, he did.

Q    And do you recall what he told you?

        MR. FOX:  Objection, Your Honor.  May I have one moment?

    (Counsel conferred off the record.)

Q    (BY MR. HAIG)  And what did he tell you to do?

        MR. FOX:  Objection, Your Honor.  Foundation and hearsay.

        THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

MR. HAIG:  I have no more questions, Your Honor.

THE COURT:  Anything else?

RECROSS-EXAMINATION

Q    (BY MR. FOX)  Mr. Tanaka, I just briefly want to ask you to list all of the aides and drivers that Mr. Baca had in August and September of 2011 who you might have been communicating with.

A    I don't remember who his driver was in 2011, and I -- he went through drivers about every one or two years.

Q    So you can't list his driver, you can't name his driver. Can you list his aides that you might have been communicating with in August and September of 2011?

A    I don't remember who the aides were in 2011.

MR. FOX:  No further questions, Your Honor.

MR. HAIG:  No more questions.

THE COURT:  All right, sir, you may step down.

Call your next witness.

MR. STEWARD:  Charlotte Lynch, Your Honor.  May I retrieve her -- or never mind.

THE DEPUTY CLERK:  Will you please raise your right hand.

(The witness, CHARLOTTE LYNN LYNCH, was sworn.)

THE DEPUTY CLERK:  Will you please have a seat.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Charlotte Lynn Lynch, L-Y-N-C-H.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. STEWARD)  And, Ms. Lynch, what city do you reside in?

A    Gardena.

Q    And how long have you lived there?

A    Since 1988.

Q    Okay.  What do you do for a living?

A    I am a retired public health nurse.

Q    Do you know Paul Tanaka?

A    Yes, I do.

Q    Do you see him sitting here in the courtroom?

A    Yes, I do.

Q    And can you point him out to us.

A    Right over there.

Q    Okay.  And describe what he's wearing if you would.

A    A black suit with a blue shirt and dark navy blue tie with white.

Q    And how is it that you know Mr. Tanaka?  In other words, well, how do you know him?

A    I originally met Mr. Tanaka back in 2005 as when he was campaigning to become mayor.

Q    And did you support him?

A    I absolutely did.

Q    Since 2005 have you encountered Mr. Tanaka again?

A    Yes.

Q    Multiple times?

A    Several times, yes.

Q    Okay.  And if you can give us what sort of -- where did you see him again?  What kind of -- was it an event, or what was it?

A    I -- since I've lived in the city of Gardena and after I did my volunteer work at Serra Junipero High School in Gardena, I became involved in volunteering with the City.

Q    And what kinds of things?

A    Okay.  I was a neighborhood watch coordinator for nine years of which Mr. Tanaka would come at least once or twice a year and speak to our residents to keep us updated.  I was on a committee called the Gardena Beautiful Committee of which Mr. Tanaka had nominated me to be on.  I'm -- oh, my gosh, I'm on the chief of police administrative panel, so --

Q    And what does that panel do?

A    That oversees duties that the police department works on and gets the opinions of the citizens as to whether or not they feel it's a good idea, bad idea.  Not that we are the law or anything, but we are residents and we have to live those.

Q    Is -- to your knowledge, is Mr. Tanaka in any way involved in actual law enforcement in Gardena?

A    Not to my knowledge.

UNITED STATES DISTRICT COURT

Q    A member of the police department there or anything like that?

A    No.

Q    Did he also nominate you for some honor?

A    Yes, he did.

Q    And what was that?

A    It was the distinction -- Woman of Distinction in 2011, I believe, and it was for the 35th District of the State of California.

Q    And have you discussed Paul Tanaka with other members of the Gardena community?

A    Yes.

Q    And based upon your own association with and dealings with Mr. Tanaka, do you have a personal opinion as to whether or not he's a truthful person?

A    Absolutely, I believe he's an honest and truthful person.

Q    Well, you just answered my next question.

A    Oh.

Q    Thank you.

        MR. STEWARD:  Nothing further, Your Honor.

        THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

Q    (BY MR. JAUREGUI)  Ms. Lynch, do you know Paul Tanaka mainly as a politician from Gardena?

A    No, I would have to say that I know him as a friend.  Not

a real close friend, but a person that I've worked with in my volunteer work.

Q    Okay.  And you said you testified that you encountered him several times; correct?

A    Yes.

Q    Okay.  You've never been employed a day in the Los Angeles County Sheriff's Department; correct?

A    No.

Q    And you never sat in on any meetings with the undersheriff -- well, with Mr. Tanaka pertaining to an inmate named Anthony Brown?

A    No.

Q    And you haven't been here for the past two weeks observing any of the trial and listening to testimony?

A    No.

Q    And you were not in the room when Paul Tanaka testified about his role in this case?

A    No.

            MR. JAUREGUI:  No further questions, Your Honor.

            THE COURT:  All right.

            MR. STEWARD:  No redirect, Your Honor.

            THE COURT:  All right.  You may step down.

      Call your next witness.

            MR. HAIG:  Your Honor, defense calls Charles Antuna.

            THE DEPUTY CLERK:  Will you stand there and raise

your right hand.

(The witness, CHARLES ANTUNA, was sworn.)

THE DEPUTY CLERK:  Please have a seat up there.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Charles Antuna, A-N-T-U-N-A.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. HAIG)  Mr. Antuna, what do you do for a living?

A    I'm a deputy sheriff, rank of captain, assigned to Men's Central Jail.

Q    And how long have you been a deputy sheriff?

A    34 years, nine months.

Q    And how long have you been a captain?

A    Approximately five years.

Q    Were you ever a lieutenant before you were a captain?

A    Yes.

Q    And how long were you a lieutenant?

A    Approximately five years.

Q    Do you recall the time frame when you were a lieutenant?

A    Yes.

Q    And what would that be?

A    Approximately 2003 to 2008.

Q    As a lieutenant, did you ever work as lieutenant in any

custodial facility?

A    Yes.

Q    And where would that be?

A    Twin Towers facility.

Q    And do you recall the year or years that you worked at Twin Towers Correctional Facility?

A    It would be 2006, 2007, 2008.

Q    And what was your job at Twin Towers Correctional Facility?

A    I served there as watch commander for a period of time, and also acting captain.

Q    So why were you acting captain?

A    In the absence of a captain for sick or leave, I became responsible to run the facility.

Q    And how was it, if you know, how you became a lieutenant assigned to Twin Towers Correctional Facility?

A    I passed a series, a regimen of tests and -- after applying, and made it to a promulgated list and was selected to the rank of lieutenant.

Q    Do you know a gentleman by the name of Paul Tanaka?

A    Yes.

Q    And do you see him in court?

A    Yes.

        MR. HAIG:  He's identified the defendant, Your Honor.

UNITED STATES DISTRICT COURT

Q    (BY MR. HAIG)  In 2006, do you recall what Mr. Tanaka's rank was in the Sheriff's Department?

A    I believe it was assistant sheriff.

Q    And do you recall whether he was in your chain of command when you were working at Twin Towers?

A    Yes, for a -- I think a short period of time, yes.

Q    At any time that you were working at Twin Towers Correctional Facility, did Mr. Tanaka ever give you any indication that he approved of unlawful deputy force upon an inmate?

A    No.

MR. FOX:  Objection, Your Honor.  401 and 403.

THE COURT:  Let's go to sidebar.

(Discussion held at sidebar.)

MR. FOX:  Your Honor, I don't understand the relevance of whether Mr. Tanaka approved of force on an inmate, which I think was the question, and it's my understanding that they're going to next go into, based on their proffer, whether he instructed supervisors at the jail to appear to obstruct the ACLU of the FBI in any of their investigations.  And I think that this is going to when he was in Twin Towers from '06 to '08.  None of the allegations in the indictment relate to anything that went on in Twin Towers in '06 to '08.

MR. HAIG:  First of all, the indictment does cover that period of time, and it covers many, many allegations of

the defendant's alleged conduct and looking the other way at inmate abuse at the hands of deputy sheriffs.  Likewise, Your Honor, none of my client's conduct that happened in 1997 or 1987 was relevant, and that did come in, but I think the --

THE COURT:  It did come in, and you didn't object.

MR. HAIG:  Well, Your Honor, I think the point that I'm trying to make here is that this captain has firsthand knowledge that the defendant never would have condoned unlawful conduct by a deputy sheriff, and it corroborates not only what we believe is the true state of the record, but it also conflicts with the government's evidence to the contrary.

MR. FOX:  Your Honor, I'll point out that there's been no foundation that there were any instances that he came upon -- Mr. Antuna came upon a situation where there was a lawful use of force and told Mr. Tanaka about it and then had a response.  Right now, we've just jumped to the conclusion without any basis for that, so with him just jumping to that conclusion, again it's 401 and 403 at this point.

THE COURT:  Okay.  I believe that the current question before us is you asked him whether or not he was -- whether Tanaka never told him to condone the use of --

MR. HAIG:  Whether he had condoned to him -- whether he had ever told him that he condoned the unlawful application of force by a deputy upon an inmate.

MR. FOX:  He's basically asking in the negative, did

he ever condone it.  There has to be something there for him to condone.  Otherwise, it's an irrelevant question.

THE COURT:  Well, at this point, if there's something -- some foundation you want to lay for this, but at this point, I'll sustain that.  Now, what's the foundation?

MR. HAIG:  Well, the foundation is that he has personal knowledge that the defendant didn't do that.  I can ask him about whether they had had discussions about that and whether that topic had ever come up.

THE COURT:  How is that relevant?

MR. HAIG:  Well, Your Honor, we've got testimony from Mr. Gonzales --

THE COURT:  Well, what's he going to say next?  Has that topic ever come up?

MR. HAIG:  Here's the problem, Your Honor.  We have not been allowed to talk to him by edict of the current Sheriff not allowing them to talk to the defense.  So I don't know --

THE COURT:  Why don't you know?  That's --

MR. HAIG:  That's not my fault, Your Honor.  We have not been able to talk to --

THE COURT:  Yeah, it kind of is.

MR. HAIG:  It really isn't, Your Honor.  I mean, we have not -- they've been -- they hold up these witnesses.  We cannot speak to them.

MR. FOX:  Your Honor, we're objecting on foundation

grounds at this point.  If he believes he has a good faith basis to ask a question if there's unlawful force that Mr. Antuna presented to Mr. Tanaka and Mr. Tanaka responded to it, so long as he establishes a foundation --

THE COURT:  But he says he doesn't know at this point because he hasn't talked to the witness.  We're going to take -- we'll take a short recess.

MR. HAIG:  I can ask him about that, Your Honor, and report back to you.

THE COURT:  You can ask him what?

MR. HAIG:  What you just asked me to ask him.

THE COURT:  You mean you want to talk to the witness over the recess?

MR. HAIG:  If the Court's directing me to do so.

THE COURT:  I'm not directing you to do anything.

MR. HAIG:  If the Court wants more information as to a foundation, I can do that.  I don't want to, certainly, interfere with the witness's testimony.  I can do it in front of Mr. Fox if you'd like me to do that.

THE COURT:  I don't want you to do anything.  All I know is you've got a witness on the stand.  There's been an objection.  There's no foundation to support this question at this point.  So if you want to take a recess now, I'll be happy to do that.  You can do whatever it is you want to do.  I'm not suggesting anything.  So I'm going to sustain the objection and

move along.

MR. HAIG:  I'm fine taking a recess.  It's not a bad idea.

MR. FOX:  I'll talk to Mr. Haig, and we have no objection of him talking to this witness, of course, while he's on direct examination.

THE COURT:  All right.

(End of sidebar discussions.)

(Counsel conferred off the record.)

THE COURT:  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you that until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to communicate with you about this case.

Do not read or listen to any news accounts about the trial.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.  Do not do your own investigation about the case.  If you need to communicate with me, simply give a note to the clerk.

We'll come back at five until the hour.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  Anything else?

MR. STEWARD:  Only, Your Honor, that our next

witness will be Judge Birotte.  I know he had a ten o'clock calendar.  I'm hoping and praying he's done now and can join us for a little while.  I'll check as soon as we break.

THE COURT:  Okay.

(Off the record at 11:40 a.m.)

(On the record at 11:56 a.m.)

THE COURT:  Are we ready to resume?

MR. STEWARD:  Yes, Your Honor.

MR. FOX:  The government is, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

(Pause in proceedings.)

THE COURT:  All right.  Sir, you're reminded that you're still under oath.

THE WITNESS:  Thank you, Your Honor.

Q    (BY MR. HAIG)  Mr. Antuna, before you took over your assignment at Twin Towers as the lieutenant, do you recall having any meeting with the defendant?

A    Yes.

Q    And where was that?

A    I believe it was in his office.

Q    And where was his office at that time?

A    On the fourth floor in Monterey Park.

Q    And do you recall what happened at that meeting?

141

A    I was sitting there across from him on his sofa --

MR. FOX:  Objection, Your Honor.  Foundation as to time, date.

Q    (BY MR. HAIG)  Do you have an approximate year when this happened?

A    It must have been about April 2006.

Q    All right.  Go on.  So you said you were sitting across on a sofa?

A    Yes.

Q    And what happened?

A    He said, Charlie, just remember, I don't tolerate neglect of duty, biasness or apathy.  And then he gave me an anecdote, he said, Charlie, remember management is not just about management; it's also about taking care of the men and women on the front line.

Q    Now, he referred to you as Charlie.  Is that a name that he'd used to refer to you as before?

A    Yes, sir.

Q    And how did you refer to him?  By his name or by his rank?

A    It was either "sir" or "Mr. Tanaka."

Q    Was this the first time you'd ever been in the private company of Mr. Tanaka?

A    Yes.  In his office, yes.

Q    In his office.  What about on any social basis?

A    I had been with him alone before.

**UNITED STATES DISTRICT COURT**

Q     In 2006 would -- did you consider yourself to be a personal friend of Mr. Tanaka?

A     Yes.

Q     Do you recall when -- what year approximately that you first met Mr. Tanaka?

A     It may have been about 1986, '87.

Q     And were the two of you working at the same location when you first met?

A     Yes.

Q     And where was that?

A     It was a place called Lynwood station.

Q     And was it at Lynwood station where the two of you became friends?

A     Well, initially he was my supervisor, and I later called him a friend.

Q     And as you sit here today, do you still consider him to be a friend?

A     Yes.

        MR. HAIG:  Thank you.  No more questions, Your Honor.

        THE COURT:  All right.

                    CROSS-EXAMINATION

Q     (BY MR. FOX)  Mr. Antuna, in terms of the two of you being friends and associates, you went on vacation with Mr. Tanaka quite frequently; correct?

A    Yes.  In later years we both had a passion for fishing, yes.

Q    And so you would go on these fishing trips annually; correct?

A    Yes.

Q    When was the last time you went on one of these fishing trips?

A    2013 I believe.

Q    And with these fishing trips you would go on, there would be other people present besides the two of you; correct?

A    Yes, sir.

Q    One of those would be Paul Yoshinaga?

A    Yes, sir.

Q    Did Greg Thompson join you on any of these fishing trips?

A    No.

Q    And when you were captain at IRC, that was in August and September of 2011; correct?

A    Yes.

Q    And despite being captain of the Inmate Reception in August of 2011, you don't know anything about what happened with Anthony Brown at the time; correct?

A    No.  There was a matter that came before me regarding an inmate Brown, yes.

Q    Okay.  You don't know anything about anybody coming into the Inmate Reception Center and taking his records jacket;

correct?

A    That's correct, I do not know that.

Q    And you didn't know anything at the time about anyone going into the computer databases and removing him -- his name from the database and showing him released, do you?

A    No.

Q    And during the time of August and September of 2011, if IRC received a federal writ, there was no need to do anything but process it; correct?

A    Yes.

Q    And you didn't need a legal advisor to take a look at it in August and September of 2011 before processing it; correct?

A    I suppose it would depend on the -- on the document and...

Q    What you would do in August and September of 2011 is receive the writ, drop it in the computer database and pull a pass allowing the inmate to be processed; correct?

          MR. HAIG:  Objection, Your Honor.  Beyond the scope, relevance.

          THE COURT:  Sustained.

Q    (BY MR. FOX)  Mr. Antuna, this conversation with Mr. Tanaka in his office in 2005 -- or, I'm sorry, 2006 I think your testimony was that you were friends at the time; is that correct?

A    Yes.

Q    And before that, he was your sergeant at Lynwood; correct?

A     Yes.

Q     And you have a Viking tattoo; correct?

          MR. HAIG:  Objection, Your Honor, relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.

          MR. FOX:  No further questions, Your Honor.

          MR. HAIG:  I have no more questions of this witness, Your Honor.

          THE COURT:  All right.  You may step down.

          THE WITNESS:   Thank you, Your Honor.

          THE COURT:  Call your next witness.

          MR. HAIG:  Your Honor, before calling a witness we'd like to read a stipulation, please.

          THE COURT:  All right.

          MR. HAIG:  Can I have one moment?

     (Counsel conferred off the record.)

          MR. HAIG:  Your Honor, this is the stipulation between the parties regarding an FBI report.  Defendant Paul Tanaka, by and through his counsel, Dean Steward and Jerome Haig, and Plaintiff United States of America, by and through its counsel, Assistant United States Attorneys Brandon Fox and Eddie Jauregui -- I should know this by now.

          MR. FOX:  Jauregui.

          MR. HAIG:  Jauregui, yes, thank you -- hereby stipulate as follows -- sorry, Eddie -- a Federal Bureau of

                    **UNITED STATES DISTRICT COURT**

Investigations report dated August 22nd, 2011 indicates as follows:  On August 18, 2011, informant Anthony Brown's cover was revealed to the Los Angeles County Sheriff's Department (LASD) after LASD deputies discovered a cell phone smuggled into Men's Central Jail.  Investigations by LASD linked Anthony Brown to FBI Special Agent Leah Marx.  FBI Assistant Director in Charge Steven Martinez notified LASD Sheriff Leroy Baca and requested that informant Anthony Brown be placed in a protective unit.  Mr. Baca assured the safety of informant Anthony Brown.

It is so stipulated and agreed by the parties.

THE COURT:  Ladies and gentlemen, the parties have agreed to certain facts that have been stated to you.  You should therefore treat these facts as having been proved.

MR. STEWARD:  And, Your Honor, our next witness is Andre Birotte.

(Pause in proceedings.)

MR. STEWARD:  Apparently we're going to change our order a little bit, Your Honor.

THE COURT:  All right.

MR. HAIG:  Your Honor, we would call Helen Hayase to the stand, please.

THE DEPUTY CLERK:  Please stand here for me, raise your right hand.

(The witness, HELEN MIKIKO HAYASE, was sworn.)

THE DEPUTY CLERK:  Please have a seat up there.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Helen Mikiko Hayase, H-A-Y-A-S-E.

THE DEPUTY CLERK:  Thank you.

(Reporter clarification.)

THE WITNESS:  M-I-K-I-K-O.

DIRECT EXAMINATION

Q    (BY MR. HAIG)  Ms. Hayase, what do you do for a living?

A    I'm a judicial research attorney for the California Court of Appeal, Second Appellate District, Los Angeles.

Q    And do you know somebody by the name of Paul Tanaka?

A    Yes, I do.

Q    You see him in court?

A    Yes, I do.

Q    How long have you known Mr. Tanaka?

A    We've known each other since we were in second grade at Gardena Elementary School.  So -- well, I don't know exactly, close to 50 years.

Q    Both of you are about the same age though?

A    We're about the same age.

Q    Sorry.

During that -- knowing him since the second grade, have you had much contact and communication with Mr. Tanaka

UNITED STATES DISTRICT COURT

throughout the years?

A    Yes.  There's a group of us, we've been lifelong friends, and we've just kept in touch over the years.  So yes, I consider Paul a very good friend.

Q    How often throughout the years would you say you communicate with him on a yearly basis?

A    At least several times a year, sometimes depending on what we're doing.  If it's a reunion year, way more.  Other years, we might be very busy and just once or twice, but we've been in regular communication over all our lives.

Q    Do you have any opinion as to whether you believe Mr. Tanaka to be a truthful person?

A    I absolutely do.  I believe he's a very honest person, very truthful.

          MR. HAIG:  Thank you.  I have no more questions.

          THE COURT:  Cross-examination.

                    CROSS-EXAMINATION

Q    (BY MR. JAUREGUI)  Ms. Hayase, you care very much for Paul Tanaka?

A    I do.

Q    And you are a friend and supporter of his?

A    Yes, I am.

Q    And you've given money to his political campaigns?

A    Yes, I have.

Q    And you've never worked for the Los Angeles County

Sheriff's Department, have you?

A      No, I have not.

Q      And you've never been in any meetings at Sheriff's Headquarters about an inmate named Anthony Brown?

A      No, I have not.

Q      And you've never been in any meetings where there was discussion about changing that inmate's name or moving him?

A      No.

Q      You haven't been here for the past two plus weeks listening to the testimony in this case, have you?

A      No, I've been at work.

Q      And you don't know what Paul Tanaka has testified to, if he's even testified at all in this case?

A      I read in the paper that he testified --

            THE COURT:  Excuse me.

            MR. JAUREGUI:  I'll move on, Your Honor.

            THE COURT:  All right.

Q      (BY MR. JAUREGUI)  And you don't know anything about any -- well, let me rephrase the question.

      You've never been in any meetings at Sheriff's Headquarters where they discussed surveilling FBI agents?

A      No.

            MR. JAUREGUI:  No further questions, Your Honor.

            THE COURT:  All right.

            MR. HAIG:  I have no redirect, Your Honor.  Thank

you.

THE COURT:  All right.  Thank you very much.  You may step down.

Call your next witness.

MR. STEWARD:  I believe Mr. Birotte has arrived, Your Honor.

MR. HAIG:  Your Honor, if I could go outside, I don't know if our witness coordinator knows where he is.

May I?

THE COURT:  Sure.  The witness might have some difficulty finding his way here.

MR. STEWARD:  I was going to ask for a warrant, but maybe not.

THE DEPUTY CLERK:  Will you raise your right hand.

(The witness, ANDRE BIROTTE, JR., was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Andre Birotte, Jr.  Last name is spelled B, as in boy, I-R-O, double T as in Tom, E.

THE DEPUTY CLERK:  Thank you.

MR. STEWARD:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. STEWARD)  Sir, how were you employed in 2011?

**UNITED STATES DISTRICT COURT**

A       In 2011 I was a United States Attorney for the Central District of California.

Q       And can you tell the jury what the duties are of a United States Attorney.

A       As U.S. Attorney, I was -- I guess the short answer is I was the head federal law enforcement officer for the Central District of California, which includes seven counties going as far north as San Luis Obispo down to the San Diego border.  We had responsibility over -- in criminal and civil cases on behalf of the United States.

Q       And what, if anything, is the relationship between the U.S. Attorney's Office and the FBI?

A       Oh, they were one of the main partners of the U.S. Attorney's Office, one of the many investigative agencies that we worked with.

Q       Okay.  And in 2011, was that also true then?

A       Yes.

Q       Do you know a Steve Martinez?

A       Yes.

Q       In 2011 can you tell us, what position did he hold?

A       In 2011 Steve was the assistant director in charge of the L.A. FBI office.  He was the head of the L.A. FBI office.

Q       Do you know Leroy Baca?

A       Yes.

Q       And how is it that you know Mr. Baca?

A    Oh, I've known Lee for a number of years.  He was the Sheriff at the time, but I knew him in my prior job before I was U.S. Attorney.

Q    Okay.  And so when we say the Sheriff at the time, are we talking 2011 as well?

A    Correct.

Q    Now, do you recall having a meeting with Mr. Baca and others in late August of 2011?

A    Yes.

Q    Okay.  I'm not trying to pin you down on a date, but does the 29th of August sound perhaps okay?

A    That sounds okay.  I don't know the dates and specifics.

Q    Okay.  But you do recall the meeting itself?

A    Yes.

Q    Do you recall -- how was that set up?  Did you call the meeting?  Did he call the meeting?

A    You know, I'll be honest, I don't remember how it was set up.  I honestly don't.  I just know there was a big meeting up on the 12th floor in the conference room.

Q    And 12th floor of the conference room of this building?

A    Yes, I'm sorry.  This building, which is where the U.S. Attorney's Office is located.

Q    Okay.  Did you become aware before the 29th of August of an incident regarding a cell phone and an inmate by the name of Anthony Brown?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And before the 28th of August, do you recall how much before that you became aware of a cell phone and Brown?

A    I honestly don't.  I mean, certainly days.  Might have been a week before.  I'm not sure.

Q    And do you recall how it was you learned of this particular incident?

A    Of the incident with Anthony Brown?

Q    Yes.

A    If my memory serves me correctly, I seem to recall being at a conference -- well, let me step back.  I mean, I was aware of an investigation involving the Los Angeles County Sheriff's Department, and so I knew that was going on.  And then I think -- I seem to recall I was at a conference, and then I got a phone call from Director Martinez indicating that the phone I think had been discovered in the jail.

Q    Okay.  And you're not sure whether it was the day before the 29th or a week before the 29th, something like that?

A    I don't know.  I'm assuming it was somewhere close in that time period, because things moved quickly -- pretty quickly after that.

Q    And so the meeting on the 12th floor in this building, who do you remember attending that meeting besides yourself and Mr. Baca, Sheriff Baca at the time?

A    Well, there were a bunch of people there, representatives

**UNITED STATES DISTRICT COURT**

from the county and representatives from our office and

representatives from -- I think, the FBI were there as well.

Q    Okay.  And is this a big conference room, large conference

room?

A    It's a large conference room, yes.

Q    Physically, do you recall that, for want of a better word,

you feds were on one side, and the county people were on the

other side of the table?

A    By and large, yes.

Q    During that meeting, just generally, what was the topic or

topics?

A    I mean, this was the -- how could I describe it?  This was

the -- as you mentioned, for lack of a better term, federal

folks on one side, county on the other side.  I think the

county -- or specifically the Sheriff's Department was voicing

their displeasure or concerns about the phone, the nature of

the investigation, why weren't they in the loop?  They wanted

to stop and/or wanted to be part of the investigation going

forward.  That's what I remember.

Q    Sorry.  Who was it who shared all of this with you?  Who

was talking?

A    Sheriff Baca.

Q    Did anyone else speak at that meeting, if you remember?

A    From the county side?

Q    Well, let's do both.  First from the county side with the

sheriffs.

A    I don't recall anyone else speaking.

Q    Okay.  Do you know Paul Tanaka?

A    I know who he is, yes.

Q    Did you know that back in 2011?

A    Yes.

Q    Okay.  Do you recall him saying anything at all at that meeting?

A    Don't recall him saying anything.

Q    Okay.  Now, on the other side of the table, was it you doing the talking, others?  If you recall.

A    Look, I was the U.S. Attorney at the time, so I know I did some talking.  I can't remember -- I know Mr. Fox was there.  For some reason, I thought -- Mr. Middleton might have been there as well, Lawrence Middleton, who I think at the time was the head of the public corruption section, our chief.

Q    Just standing back for a moment, Mr. Middleton was at the time an assistant U.S. attorney; correct?

A    Correct.

Q    And Mr. Fox, also assistant U.S. attorney, was there also?

A    Correct.

Q    From the -- and again, for want of a better word, the feds' side, I believe you said somebody from the FBI was there?

A    I think so, although I cannot recall who.

Q    Okay.  Approximately how many people, if you remember,

**UNITED STATES DISTRICT COURT**

were on your side of the table?

A    I couldn't tell you.  I mean --

Q    10?  5?

A    I'd be guessing.  I mean, this was, you know, the feds, county.  I -- just lined up.

Q    Okay.  Do you remember on the county side how many folks were over there?

A    No.  I do remember that I think they had sheriff, Office of Independent Review, county counsel.  I thought those were the entities that were represented.  And I know, for example, for OIR, I know there's this one person I knew the individual.  And there might have been two or three from the county counsel and two or three from the Sheriff's Department.  You know, that's what I recall.

Q    Okay.  And you referred to OIR.  Is that Office of Independent Review?

A    Yes, the Office of Independent Review.

Q    And they would have been on -- that person would have been on the county side?

A    Correct.

Q    That was Mike Gennaco?

A    That's correct.

Q    Okay.  A former assistant U.S. attorney?

A    Correct.

Q    Can you describe the demeanor -- well, let me back up just

a second.

How long did the meeting last, do you recall?  Ballpark?

A     Maybe 15, 20 minutes.

Q     And can you describe the demeanor of Sheriff Baca during this meeting?

A     Boy.  I mean, this was -- this was his opportunity to express his displeasure about what was going on.  I can't recall -- I don't -- there was no yelling or anything like that.  I think he was just laying out, you know, why he thought it was wrong, the claims about, you know, it was illegal conduct and wanted to stop.  But there wasn't -- it wasn't yelling.  But, you know, he was just letting us know he didn't like it.

Q     Did he appear angry to you?

A     No, not -- not really.

Q     Okay.  Now, as a result of that meeting, did you take any action?  And I mean that broadly.

A     No.

Q     Did you respond to Baca's -- Mr. Baca, Sheriff Baca's complaints?

A     You mean at the time of the meeting when he voiced his displeasure?  I may have said, Okay, Lee, thank you for sharing, and that was pretty much it.  I don't know if I said anything like, This is what we're going to do.  We had a follow-up meeting thereafter, but it was -- I viewed it as

more, Look, we're going to let these guys say what they need to say. We're not changing anything, we just move forward.

Q   You mentioned a follow-up meeting. Approximately -- and again, ballpark -- when was that?

A   You're going to have to help me. I honestly don't remember, but there was a follow-up meeting.

Q   Sure. Was it about 30 days later?

A   I thought it was sooner, but if you have documentation to suggest otherwise, I'll go with you.

Q   And what was the purpose of this follow-up meeting?

A   Boy. The purpose -- well, the meeting was Sheriff Baca, Steve Martinez and myself. And I think the purpose was really to sort of say, Okay, this is what's going on. I heard what you had to say when we met earlier. Here's what's happening. Here's what we're going to do, and that's that.

Q   Okay. So this was you, on the federal side, telling Sheriff Baca what you were going to do? Or was it the reverse; Baca telling you what they were going to do? Or both?

A   No, it was more, Lee, you raised these concerns. I want to bring you together. Let's -- and we're going to talk about it. Here's our position. So it was -- I guess it would be more me saying, This is what's happening with the investigation, this is what we're going to do going forward, et cetera.

Q   Okay. And here we are, four or five years later.

Do you recall what you told him in terms of what you intended to do?

MR. FOX:  Objection, Your Honor, relevance.

THE COURT:  Sustained.

Q    (BY MR. STEWARD)  Let's take a look at Exhibit 352, if you would.  It's in a white -- yes, right there.

Do you have that there?

A    I do.

Q    And take a look, if you would.  I think it's about an eight-page document.  See if that looks familiar to you.

A    The document looks familiar, yes.

Q    And just generally, is this a letter addressed to you?

A    It is.

Q    Dated September 26, 2011?

A    Correct.

Q    And the subject matter generally is the Brown cell phone and some of the complaints that you've talked about; correct?

A    Yes.

Q    Signed, page 3, by Lee Baca?

A    Correct.

MR. STEWARD:  At this time, Your Honor, we'd offer 352?

THE COURT:  Any objection?

MR. FOX:  May I have one moment?

THE COURT:  Yes.

UNITED STATES DISTRICT COURT

(Counsel conferred off the record.)

MR. FOX:  Your Honor, counsel and I have talked about a portion of the letter that we will redact.  Other than that, we have no objection, and Mr. Steward said he would not publish that portion.

THE COURT:  All right.  It will be received.

(Exhibit No. 352 received into evidence.)

MR. STEWARD:  And, Your Honor, I'm not going to publish it at this time at all, and I'm finished with questioning.  Thank you.

THE COURT:  All right.  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

Q    (BY MR. FOX)  I hate to impeach my former boss, but you said that I was at this meeting.

Do you remember when I joined the office?

A    Oh, goodness.

Q    Had I been at a previous U.S. Attorney's Office at that point in time?

A    Yes, you were.  You were.  You were in Chicago.

Q    Okay.

A    Sorry.

Q    Thank you.

So what did you do before becoming U.S. Attorney?

**UNITED STATES DISTRICT COURT**

A      Immediately prior to being U.S. Attorney, I was the Inspector General for the Los Angeles Police Commission for -- from 2000 -- well, I started in 2001, but I became Inspector General in 2003 to 2010.

Q      Can you please describe those duties to the jury.

A      All right.  The inspector general served as eyes and ears for the Los Angeles Police Commission.  We reviewed complaints of misconduct and significant uses of force on behalf of the Police Commission, and we were responsible for providing reports and insights, specifically as it related to uses of force, so that the Police Commission could make recommendations about whether those uses of force were in or out of policy.

Q      Now, you said on direct examination that you were aware of the investigation into the Los Angeles County Sheriff's Department while you were U.S. Attorney; correct?

A      Yes.

Q      And that included before the meeting with Mr. Baca and Mr. Tanaka; correct?

A      Oh, yes.

Q      And when I say that, I'm meaning the first meeting in August.

Before the first meeting in August with the Sheriff's Department, you were aware of this investigation?

A      Oh, absolutely.  Absolutely.

Q      And you had been for some time?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And Mr. Tanaka and Mr. Baca came to that meeting together; is that correct?

A    I believe so, yeah.  I mean, they were there.

Q    And Mr. Tanaka sat on the same side as Mr. Baca in that room?

A    Yes.

Q    Is it unusual when you have meetings with heads of agencies and their staff that only the top two people in the group are the ones talking?

A    No.  No.

Q    Did you give Mr. Baca and Mr. Tanaka any reason to believe that a crime had been committed by the FBI at that August meeting?

A    Crime by the FBI?

Q    Correct.

A    No.  No.

          MR. FOX:  No other questions, Your Honor.

          THE COURT:  All right.

          MR. STEWARD:  No redirect, Your Honor.

          THE COURT:  All right.  You may step down.

     Call your next witness.

          MR. HAIG:  Your Honor, could we approach on one issue, please, regarding the next witness?

          THE COURT:  Yes.

(Discussion held at sidebar.)

MR. HAIG:  Your Honor, our next --

THE COURT:  Don't judges make awful witnesses.

MR. FOX:  I didn't know how to refer to him.  You said he was a federal judge, so I didn't want to say Your Honor.

THE COURT:  Okay.

MR. HAIG:  The next witness, Your Honor, is David Real.  He was in the proffer we offered yesterday.  Mr. Real is a current deputy sheriff, and we'd spoken about it last week.  Mr. Real is, for lack of a better term, a higher-up witness who knows the defendant and cares deeply about him and will probably be a character witness as well, as long as some other people of course.  But also, we think his testimony is relevant because he was a deputy sheriff in August of 2011 for three years after on the 3,000 floor at Men's Central Jail, and we'd like him to testify about some of the things that the deputies had to deal with on the 3,000 row.

We think it's relevant, Your Honor, just to give context to some of the things that have come in earlier in this trial about reports of deputy abuse on the floor 3,000, also on 2,000.  We think it's important because it -- the context is something the jury would like to know.  I think it would be important for the jury to know that -- not only the types of inmates that are housed there, but the conditions that deputies

would have to undergo as far as getting attacked and abused by some of these inmates.

And we think that's important in establishing an understanding of not only what the Sheriff's Department was dealing with, but also what the complainants were dealing with at the same time; also what the ACLU had to deal with.  Because right now, we have lots and lots of reports of deputy abuse without the context as to what was really going on there. That's why we think it's important.

MR. JAUREGUI:  Your Honor, if I may, I've discussed this with defense counsel.  I've looked at the proffer.  I think that the testimony is largely irrelevant.  I don't think it goes to the offenses.  I don't think it goes to any defenses.  The proffered testimony about gassing and about the attack on Deputy Real, I think is prejudicial -- unduly prejudicial.  So I've objected to almost all of the fact testimony as irrelevant under 401 and unduly prejudicial under 403.

There's also the issue of his character testimony.  The proffer doesn't say what pertinent character trait he will testify to.  I understand from Mr. Haig that it would be his personal opinion about Mr. Tanaka's truthfulness, but there's a lot in the proffer that I think is improper character evidence under Rule 405 about how the witness himself was a former Marine suffering from all these things and Mr. Tanaka gave him

a shot and gave him a second chance.  I don't think any of that is -- I think it's improper character evidence under Rule 405.

THE COURT:  Okay.

MR. HAIG:  Again, I wasn't going to go into those things.  I don't -- maybe it wasn't evident.  I just wanted to give you all a fuller picture of how he knew him in case you wanted to cross-examine him on those things, because I think it might be important for the basis of his opinion.  But, of course, the truthfulness doesn't have anything to do with his -- his -- many other things that were in the proffer.  I just figured it was something you should know and at least --

MR. JAUREGUI:  No, no.  I appreciate that.

THE COURT:  Okay.  These instances that Mr. Real is subjected to while on the floor, I have a hard time seeing how that's relevant given these charges.  So to the extent they were objected to, that objection is sustained.

MR. JAUREGUI:  And the issue of gassing in particular, Your Honor.

THE COURT:  Yes.

MR. JAUREGUI:  I think it's inflammatory and --

MR. HAIG:  Your Honor, just so I fully understand the Court's ruling, is the Court precluding him from testifying at all about his time on 3,000 as being irrelevant and some of the conditions that they're under?

THE COURT:  What's that have to do with -- what's

that have to do with whether or not this defendant obstructed?

MR. HAIG:  It doesn't have anything to do with whether or not this defendant obstructed, but it's our position that because the Court has already allowed testimony in about what's happened on 3,000, so we think the context is important. But I've already made my case, Your Honor.

THE COURT:  Okay.  Well, look, what happened on 3,000, when that came in, I don't believe you objected to when that -- when the government elicited that testimony.  So the Court didn't allow anything.  You acquiesced in that, and now they don't want to -- you know, it's really not a case that the Court allowed it for them and is not allowing it for you.

MR. HAIG:  My objection is admissibility of all that evidence in pretrial motions, Your Honor.  Just so the Court knows, we did not acquiesce any of that.

THE COURT:  I don't recall that, but if it is, it is.

MR. JAUREGUI:  Your Honor, just for the record if I could say one more thing.  A lot of the evidence that did come in about the 3,000 floor was from earlier time periods, and I think it was provided to show notice to the defendant.  This witness was hired into MCJ in August of 2011 at the time all of this came to light.  So I think there's the timing issue as well that makes it irrelevant.

MR. HAIG:  Well, I don't think there was any

qualitative difference between when he first got there in August of 2011 and some of the time frames that we've spoken about earlier in the trial.

THE COURT:  Okay.  Let's go.

MR. HAIG:  Your Honor, so I just -- I will be calling him as a character witness.  I'm certainly going to see what he does from here.

THE COURT:  Okay.

(End of sidebar discussions.)

MR. HAIG:  Your Honor, the defense calls David Real to the witness stand.

(Pause in proceedings.)

THE DEPUTY CLERK:  Just stand here for me, please.

THE WITNESS:  Yes, sir.

THE DEPUTY CLERK:  And raise your right hand.

(The witness, DAVID REAL, was sworn.)

THE DEPUTY CLERK:  Please have a seat.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  David Real.  Last name is R-E-A-L.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q   (BY MR. HAIG)  Mr. Real, what do you do for a living?

A   I'm a deputy for L.A. County.

Q   Deputy?

A    Deputy sheriff, sorry, sir.

Q    And how long have you been employed as a deputy sheriff?

A    Since August 14th, 2011, sir.

Q    And what's your current assignment?

A    I'm currently a custody deputy at Men's Central Jail, but I'm on loan to the Homicide Gang Task Force as a monitor for our Homicide Gang Task Force.

Q    What does being on loan mean?

A    It means I'm still required to work whatever -- I'm not a patrol deputy.  So until you go to patrol, you can't -- you can't promote from custody.  So being on loan is I'm working under the Homicide Gang Task Force on a temporary basis, but I'm still a body that belongs to Men's Central Jail to a unit.

Q    Understood.  All right.

Is there anybody in court as you look around that you recognize?

A    Yes, sir.

Q    And who would that be, sir?

A    Paul, Paul Tanaka, sir.

Q    And how do you know Paul Tanaka?

A    I met Paul on -- I met Paul at Veteran's Day Memorial.  I was a guest speaker because I had a background in the Marine Corps.

Q    Do you remember what year?

A    That was in -- that was six months after I worked for the

UNITED STATES DISTRICT COURT

Gardena PD for six months, and I got let go regarding -- I didn't pass training as I didn't pass my field training program.

Q    Okay.  So you -- was that in 2010?

A    Yes, sir.

Q    And have you known Mr. Tanaka since 2010?

A    Yes, sir.  I went to speak at the Veteran's Day --

THE COURT:  That's fine.  Next question.

THE WITNESS:  Yes, sir.

Q    (BY MR. HAIG)  Deputy Real, do you have an opinion as to the honesty of Paul Tanaka based upon the time that you've known him?

A    Absolutely, sir.

Q    And what would that opinion be, sir?

A    Paul's -- in my opinion, Paul is a stand-up person. He's -- he changed my life.  He changed my life.

MR. JAUREGUI:  Your Honor, objection, nonresponsive.

THE COURT:  Sustained.

MR. HAIG:  I have no more questions, Your Honor. Thank you.

THE COURT:  All right.

(Plaintiff's counsel conferred off the record.)

                    CROSS-EXAMINATION

Q    (BY MR. JAUREGUI)  Sir, you testified that you had been let go from the Gardena Police Department at some point before

you met Paul Tanaka?

A    Yes, I did, sir.

Q    And at the time that you met him, you were unemployed?

A    Yes, I did, sir.

Q    And at that time, you were desperate for a job; right?

A    Yeah, I guess you could say that.

Q    And when you met Paul Tanaka, he offered to help you out; right?

A    Yes, sir.

Q    And you feel very grateful to him for that offer; right?

A    Absolutely, sir.

Q    And you've worked at the Sheriff's Department now for how many years?

A    Going on five years, sir.

Q    And you were not a member of Internal Criminal Investigations Bureau?

A    No, sir.

Q    You were not a member of the Internal Affairs Bureau?

A    No, sir.

Q    And you haven't been here for the past two weeks listening to any witnesses testify?

A    No, sir.

            MR. JAUREGUI:  No further questions, Your Honor.

            THE COURT:  All right.

            MR. HAIG:  I have no more questions, Your Honor.

Thank you.

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Yes, sir.

THE COURT:  Call your next witness.

MR. HAIG:  Your Honor, the defense calls Ed Medrano
to the witness stand.

(Pause in proceedings.)

THE DEPUTY CLERK:  Stand here for me, please.

(The witness, EDWARD MEDRANO, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last
name for the record.

THE WITNESS:  Edward Medrano, M-E-D-R-A-N-O.

THE DEPUTY CLERK:  Thank you.

MR. HAIG:  My apologies, Your Honor.

DIRECT EXAMINATION

Q    (BY MR. HAIG)  Mr. Medrano, what do you do for a living?

A    I'm a police chief for the City of Gardena.

Q    And how long have you been a police chief for the City of
Gardena?

A    Approximately eight years.

Q    Eight years?

A    Eight.

Q    All right.  And what did you do before you were a police
chief in the City of Gardena?

A      I was a police officer holding various ranks in the City of Gardena Police Department.

Q      In total, how long have you been a peace officer?

A      27 years.

Q      Is that all with the City of Gardena?

A      Excluding one year where I worked for the City of Whittier.

Q      Do you know somebody by the name of Paul Tanaka?

A      I do.

Q      And how do you know him?

A      He's the mayor in our city.

Q      Did you know Mr. Tanaka before he became mayor in the city?

A      I knew him as a counsel member and briefly when he worked at the Sheriff's Department at a couple different ranks.

Q      Did you first meet Mr. Tanaka through your activity as a peace officer in the City of Gardena?

A      Yes.

Q      And was it through his official capacity as a counselman?

A      No, he worked in adjacent station.  I had met him a couple times just briefly.

Q      When you say he worked in an adjacent station, can you be more specific?

A      He worked at Lennox Station, and I believe we had a couple minor encounters in field activities because their station is

adjacent to ours.

Q    And Lennox Station, would that be an L.A. County Sheriff's Department station?

A    Yes.

Q    And is it frequent that the Gardena Police Department and Lennox Station would cooperate in certain investigations that would overlap their two areas?

A    We share a contiguous border, so sometimes that would occur.

Q    What year did you become the chief of police, sir?

A    2007.

Q    And was Mr. Tanaka in elected office in the City of Gardena at that time?

A    He was.

Q    What was he at that time?

A    I believe he was the mayor.

Q    And how were you selected as a chief of police?

          MR. JAUREGUI:  Objection, Your Honor, relevance.

          THE COURT:  Sustained.

Q    (BY MR. HAIG)  Since you met Mr. Tanaka, have the two of you remained close?

A    Yes.

Q    And would you consider the two of you to be friends?

A    Yes.

Q    Do you socialize from time to time?

A     From time to time.

Q     All right.  If you can open up the exhibit book to Exhibit 317, the white book in front of you.

      Do you see that photo?

A     Yes.

Q     What does it appear to be a photo of?

A     It's a photo of me in my police uniform next to Mr. Tanaka.

Q     And do you have any idea as to the date that photo was taken or the event that it was taken at?

A     I don't.  I know that looks like the backdrop of our community center, but I don't know the date or where that was taken or why.

      MR. HAIG:  Move to admit 317, Your Honor.

      MR. JAUREGUI:  Objection, relevance.

      THE COURT:  We'll take it up at the conclusion of the day.

Q     (BY MR. HAIG)  Chief Medrano, did you have any participation in any of the public elections that Mr. Tanaka ran for, including for mayor?

      MR. JAUREGUI:  Same objection, Your Honor.

      THE COURT:  Sustained.

Q     (BY MR. HAIG)  Mr. Medrano, do you have any opinion as to the honesty of Mr. Tanaka?

A     Yes.

Q    And what would that opinion be?

A    I believe him to be generally an honest person.

Q    And what is that based upon?

A    My years working with him as a city counsel member and a mayor of the City of Gardena.

Q    Thank you.

    MR. HAIG:  No more questions, Your Honor.

    (Plaintiff's counsel conferred off the record.)

                    CROSS-EXAMINATION

Q    (BY MR. JAUREGUI)  Mr. Medrano, you testified that Paul Tanaka is your friend; right?

A    Yes, we've become friends over the years.

Q    And you're a big supporter of Paul Tanaka's?

A    Yes.

Q    And you've supported his political campaigns?

A    Yes.

Q    And you've given him, at least on one occasion, over $1,000; right?

A    Yes.

Q    Have you ever -- you've never been employed by the Los Angeles County Sheriff's Department in your career?

A    No.

Q    And so you've never been in any meetings at all at the Sheriff's Department pertaining to Anthony Brown; correct?

A    No.

MR. JAUREGUI:  Nothing further, Your Honor.

THE COURT:  All right.  Anything else?

MR. HAIG:  No, thank you.

THE COURT:  All right.  Sir, you may step down.  Call your next witness.

MR. HAIG:  Your Honor, the defense calls Paul Yoshinaga.

Your Honor, may I approach the clerk?

THE COURT:  Yes.  Let's go to sidebar.

(Discussion held at sidebar.)

(Counsel conferred off the record.)

THE COURT:  Okay.  Is his lawyer here?

MR. FOX:  Is his lawyer Mr. Hershman?

MR. JAUREGUI:  He is here.

MR. FOX:  Do you mean his attorney from two years ago, Mr. Nessim, or do you mean the County's lawyer?

THE COURT:  Whoever is representing him.

MR. FOX:  The county.

MR. HAIG:  Would you like him to come up here?

THE COURT:  Well, it depends on what you're getting into.  If he's going to be a character witness, the answer is probably no.  If you're going to get into -- if you're going to attempt to get into it with him about advice that he may have given Mr. Leavins or some of these other alleged coconspirators, then maybe he needs to be up here.

**UNITED STATES DISTRICT COURT**

MR. HAIG:  I think that we probably won't be asking questions about that.

THE COURT:  Okay.  Well --

MR. HAIG:  Well, can I preface that?

THE COURT:  Uh-huh.

MR. HAIG:  I don't think I'll be asking questions about what his advice was, but I will be asking questions that he did render -- or did give legal advice, just not what it was.

MR. FOX:  Your Honor, communications to the attorney themselves may be privileged.  I'm not saying that's what happened here, but they have the right to be able to object to that.

MR. HAIG:  And it's our belief that the County -- the attorney for the County --

(Reporter admonition.)

MR. HAIG:  It's our belief that the County had already waived the attorney-client privilege at the initial meeting that he had with the FBI, but again, I wasn't his lawyer there, so I don't know.

MR. FOX:  And we can't take a position for the County on that.

THE COURT:  Well, that's fine.

Do you have a position as to whether or not you're going to raise any objections to him getting into this area?

MR. FOX:  You're saying I'm not.  Obviously I'm not going to object based on attorney-client privilege issues.  I don't know exactly where he's going to be going with this.  If he's trying to have an advice of counsel defense, of course we have an objection.

THE COURT:  He's saying that he's abandoned his advice of counsel.

MR. FOX:  If it's simply to say, Your client was not involved in these issues, then I don't know why we need the substance of this.  Otherwise, it's going to confuse the jury.  That's my concern, is it's going to be a 403 issue especially with the advice of counsel instruction.

THE COURT:  Yeah, if your point is Paul Tanaka never sought you out -- you were advising others, but Paul Tanaka never sought you out, can't you just ask him, Paul Tanaka never sought you out concerning any of these --

MR. HAIG:  I can, but I'd like this document too.  I'm being honest with you.

THE COURT:  It's fine.  It's okay.  I'd like a lot of things too.

MR. HAIG:  I think --

THE COURT:  Mainly for this to go away.

MR. FOX:  It will soon.

MR. HAIG:  We tried.

THE COURT:  Do you have any objection to this

document?

MR. FOX:  It is -- may I see it, Your Honor, because I -- thank you.

I may ask -- Your Honor, I'm not sure what the relevance of this is.  This is the substance of his advice, from what I can tell, so I don't know what the --

MR. HAIG:  I think it's relevant in that the Sheriff's legal advisor ratified at least some of the conduct that the defendant is now being accused of doing that's misconduct.

MR. FOX:  So now we're getting into the issues that are 403 and advice of counsel.  And, Your Honor, what I suggest is that we send the jury home.  I believe this is their last witness.  We do this in what has to be an in camera proceeding, so this is never publicly aired -- if we're getting into attorney-client privilege it's not publicly aired, and that this either -- I think, again, this is their last witness.

MR. HAIG:  Well, there's a witness, Commander Hebert, that couldn't be here today because of a death in the family, and he can be here tomorrow morning.

THE COURT:  What's he got to offer?

MR. HAIG:  He was also -- he was a -- he's now a commander, and he was a supervisor at Men's Central Jail, similar in testimony to Mr. Antuna, so pretty short.

MR. FOX:  And I think we can -- if he can testify,

and we can address that later, I think it would be very short testimony.  So I suggest we send -- if it's okay with Your Honor, send the jury home and deal with these issues and wrap up tomorrow very quickly and then go to argument.

THE COURT:  Where is Mr. Yoshinaga?

MR. JAUREGUI:  He's on the far right in the red tie.

THE COURT:  Oh, yes.  Okay.  That's fine.

(End of sidebar discussions.)

THE COURT:  All right.  Ladies and gentlemen, we're going to conclude for the day.  I anticipate that there will be a short presentation of evidence tomorrow, but counsel will make their closing arguments tomorrow to you.  And then the Court will have some final instructions for you, and then the case will be submitted to you for your deliberations.

So again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case online, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not watch, read or listen to a news reports or other accounts about the trial or anyone associated with it, including looking up anything online.  Do not do any research

such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

All right.  We'll see everybody tomorrow morning at eight o'clock.  Please leave your notebooks on your chairs.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

(Pause in proceedings.)

THE COURT:  All right.  I believe Mr. Hershman is here.

Mr. Hershman, if you could join us over here at sidebar, please.

(Discussion held at sidebar.)

THE COURT:  All right.  I understand that they want to call Mr. Yoshinaga, and one of the documents they want to put in front of you is this one.

MR. HERSHMAN:  Who authored it, do we know?

MR. FOX:  Your Honor, I believe based on previous testimony in other trials, Mr. Leavins may have authorized -- or authored this first and then it went to Mr. Yoshinaga.

May I go grab a document from a binder?

THE COURT:  That's fine.

(Reporter clarification.)

MR. HERSHMAN:  H-E-R-S-H-M-A-N.

MR. FOX:  And, Your Honor, for the record, it says that Young Su Kim acknowledged that he was willing to waive any privilege concerns for certain e-mails of Yoshinaga's with the Los Angeles Sheriff's Department personnel.

MR. HERSHMAN:  Here's what happened, and I explained that to him, is in previous trials, it's my understanding there was an issue about advice of counsel that was being raised.  So the scope of the waiver in the context of advice of counsel being raised was something to do with privilege.

My understanding is that --

(Reporter admonition.)

MR. HERSHMAN:  My understanding is that in this trial there is no advice of counsel being waived, and I do not have the authority nor have I raised with County counsel the waiver of privilege in this context.  And my understanding is that I'm to assert the privilege in this context on behalf of the County.

THE COURT:  Okay.

MR. HERSHMAN:  If advice of counsel is being raised and there were discussion among the parties, then I would go back to County counsel and we'd have a discussion with the

board about waiver, but that's not the context I understand we're in.

THE COURT:  Okay.  As I understand it, the defense has abandoned any advice of counsel defense, and Mr. Tanaka had indicated, I believe, that he never sought any legal advice from Mr. Yoshinaga.  And I think that's sort of where we are.  And what I need -- what I need to know, at least from you, is whether or not the County is asserting privilege.  And if you are, that's fine.  If you're not, that's fine.  If you want to --

MR. HERSHMAN:  My understanding is, in this context, the County is continuing to assert the attorney-client privilege.  I understand there may be an issue -- because of prior communications that there could have been a waiver of that, and I would say that that I haven't analyzed sufficiently to determine whether or not the scope of any discussions or waiver in the previous incident when advice of counsel was at least on the table constituted that here such that I have -- I can't continue to assert it.

As far as whether I would like to continue to assert it, I can answer affirmatively yes, I would like to assert the privilege absent a finding that it has been waived, which we have not yet fully briefed or litigated.

Does that make sense?

THE COURT:  Yes.  Okay.

MR. HERSHMAN:  And I've explained that, that Mr. Yoshinaga is not prepared to testify about the content of any discussions because we view that as privilege.  The fact that he may have been present at meetings...

MR. FOX:  And, Your Honor, the content of any discussions really is irrelevant to this trial because there's been no evidence and Mr. Tanaka didn't say that he was exposed to any of those communications.  So again, I don't think that he can testify to these things, and I don't think it would be admissible at trial.

THE COURT:  If you want to talk to Mr. Hershman after we leave, that's fine.  We are where we are.

MR. HAIG:  Your Honor, this is Jerome Haig.  From my discussions with Mr. Yoshinaga in preparation for trial -- and I've sent my report over to the government on that so they know what we've talked about -- he said that when he first met, meaning Yoshinaga first met with the government and was asked -- and he had representation at that time.  I think it was Ron Nessim who was his lawyer that he had actually paid for, and there was a government lawyer there as well, I think Mr. Kim, I think was his name.

MR. FOX:  County counsel.

MR. HAIG:  County counsel, right.

The representation that Mr. Yoshinaga made to me was that he was prepared to -- because he's a lawyer, to assert the

privilege, but that he was instructed that the County was waiving that privilege, and that's why he continued to ask questions. And I think, quite frankly, that's probably why he was able to answer my questions as well because he figured that the County had not asserted the privilege, and it was actually against his view of what they should have done that that really wasn't the issue, I guess. But the issue, we think, is that there is a waiver now because of what had transpired earlier in his interview with the FBI.

MR. FOX: Your Honor, you've seen that 302, and if you recall -- I'm using the word recall -- Mr. Yoshinaga couldn't recall anything that he had given to anybody besides case -- or not even case citations, statutory citations. I can show you 302, once again we can make it part of the record, but to the extent that he was able to testify about things and it wouldn't constitute a waiver, he didn't testify about those things, so it doesn't constitute waiver.

MR. HERSHMAN: From the County's perspective -- and I said it's a different context where my understanding was advice of counsel was on the table for certain defendants and the scope of the discussion, and I think I've been candid that I would need to research and determine whether or not that constituted a waiver in this context if somebody's going to assert that. But whether we are asserting the privilege, we are asserting the privilege.

THE COURT:  Okay.  That's all I need to know.  I'll take a look at the 302.  If you want to get here tomorrow morning at a quarter to 8:00, that's fine.  I'll have a chance to look at the 302, and you can have discussions with Mr. Hershman, and we'll resolve it.

MR. HAIG:  And it may turn out that my examination is truncated a bit based upon what Mr. Yoshinaga even recalls about the document that we're going to be showing him, certainly based upon what Mr. Fox is saying.

So you want Mr. Yoshinaga here at 7:45 in the morning?

THE COURT:  I want you here at 7:45.

MR. HAIG:  Right.  Well, I'm going to be here.  I just didn't know if you want him here too.

THE COURT:  No, I don't think he needs to be here.

MR. FOX:  What were your plans for our jury instruction conference?

THE COURT:  I was hoping that would go away.  Apparently it won't.  What time is it now?  1:00?

MR. FOX:  Yes.

MR. JAUREGUI:  Yes, just after 1:05.

THE COURT:  We'll have to give the reporter a break, even though she's young enough to continue on without any breaks.

MR. FOX:  She's not smiling.

MR. JAUREGUI:  Oh, she is now.

THE COURT:  I don't know, two o'clock?

MR. FOX:  That's fine.

MR. HAIG:  Two o'clock then?

THE COURT:  Uh-huh.

And now what else do we have?  We have your motion to reconsider.

MR. FOX:  We have an exhibit that there was an objection to that was Mr. Tanaka shaking hands and smiling with Mr. Medrano.

MR. HAIG:  And as I said at the previous sidebar -- this is Jerome Haig -- Commander Kevin Hebert will be here in the morning, and then the government and the Court can, you know, address that issue tomorrow as to whether he's going to testify.

THE COURT:  Well, no, how about the photo.

MR. HAIG:  Oh, the photo.  It's just relevant to show context again.  It's a nice picture.

THE COURT:  It is a nice picture, and I wish I had taken it.  But it's out.  The objection is sustained.

Okay.  So I will see everybody at two o'clock.

MR. FOX:  Okay.

MR. JAUREGUI:  Thank you.

THE COURT:  And I'll rule on that motion to reconsider the time.

(End of sidebar discussions.)

THE COURT: All right. We will get together at two o'clock to talk about jury instructions.

MR. FOX: Thank you, Your Honor.

THE COURT: Thank you.

(Off the record at 1:06 p.m.)

(On the record at 2:07 p.m.)

THE DEPUTY CLERK: Recalling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX: Good afternoon, Your Honor. Brandon Fox and Eddie Jauregui on behalf of the United States.

THE COURT: Good afternoon.

MR. STEWARD: And, Your Honor, Dean Steward and Jerome Haig for Mr. Tanaka. He's present.

THE COURT: Good afternoon.

MR. HAIG: Good afternoon.

THE COURT: All right. Let's talk about jury instructions.

You want to start with the disputed instructions?

MR. FOX: Yes, Your Honor. I think that the defense has withdrawn three of them: Numbers 3, 5 and 6. So we don't have very many to discuss. The first one that's disputed is the multiple purposes instruction, Instruction Number 1. As you know, we've litigated this quite a bit in the past, and we think it's an appropriate instruction.

THE COURT:  I suspect you'd have the same view or position as the defendants had in the prior trial.  Gave it the last time, inclined to -- looked at the case law then, looked at the case law now.  I think the government probably prevails on this one, but if you have something -- if you want to be heard or if you have something different to add, I'll be happy to hear it.

MR. HAIG:  Thank you, Your Honor.

I don't want to be specifically heard other than what I've set forth in the moving papers.  I think the argument that -- from us is a little bit different than in the Thompson trial.  We don't think it's an appropriate instruction, and we object to the Court giving it.

THE COURT:  Okay.

All right.  I'm going to give disputed Instruction Number 1, and that, I believe, takes us to disputed Instruction Number 2.

MR. HAIG:  Your Honor, the reason we think Number 2 is appropriate is also set forth in our argument.  Also, in light of Special Agent Tanner testifying about certain things, we think that this is a -- she was asked some questions about this being an authorized investigation.  She couldn't be arrested or anything like that, and I think that this is a proper statement of the law that the jury I think may have questions about, and certainly this would educate them on that.

And it does nothing to confuse the jury.  It just, I think, does something to educate the jury and have them understand really what's going on in this case a little bit better.

MR. FOX:  Your Honor, I do think that it confuses the issues, because especially in this trial there's been -- I want to say almost zero testimony that they thought she was a rogue agent.  So what we have is an undercover operation, and this -- this suggests, based on this instruction, that an undercover operation might fall under this where an agent could be arrested and then would have an affirmative defense.

As you know, Your Honor, we had some concerns about this anyway, whether it was accurate with respect to the law anyway, but this -- again, with the evidence that we have at trial, it's not appropriate.  And the statute itself, the California code talks about this not being a crime if it's an authorized investigation anyway, and I think the testimony about whether this was authorized went more to that than the Supremacy Clause.  I think the Supremacy Clause is really readherent for what's going on here.

THE COURT:  There's no evidence in the record at this point that the defendant was actually out conducting his own investigation.

MR. HAIG:  That's absolutely true, Your Honor, but there is certainly a lot of evidence in the record, and I think the government's going to certainly talk about the fact that

**UNITED STATES DISTRICT COURT**

there were coconspirators out there going to Ms. Marx's home and threatening to arrest her, right?  I mean, that's a big part of the government's case.

It's our view that --

THE COURT:  Your client has said that -- what's he said about that?

MR. HAIG:  Well, he said that he didn't know about it and he wasn't involved in it, right?

THE COURT:  That's right.

MR. HAIG:  If the jury believes that, that's fine. If the jury doesn't believe that, then they're still left with the impression that if the sheriff's deputies that went out to Leah Marx's house didn't know that it was an authorized investigation -- and I think that that's important -- if they didn't know that it was an authorized investigation, then this instruction basically sets up an affirmative defense for Ms. Marx's prosecution, which would bar her from being prosecuted, but would not stop the deputies from actually arresting her.

And so I think that that's the difference.  It's the knowledge element, not actually whether she can be prosecuted or not, and I think that's what this instruction assists the jury in finding out, and if they had a question like that.

MR. FOX:  And, Your Honor, there are really three issues there, and they're just trying to point out one which is

the Supremacy Clause.  There's the Supremacy Clause.  There's the California Penal Code.  There's an undercover person that has -- someone has not committed a crime if they're engaged in an undercover operation.

I suggested an instruction that covers some of what Mr. Haig's looking for in our dispute -- in our statement of objections to the disputed Instruction Number 2.  And it's a block quote, and I think that it would be appropriate here and would cover some of what Mr. Haig's looking for because we would get into they have the authority to investigate potential violations of the law.

"They can't use that authority to obstruct justice, and it's a matter of law when an undercover investigation involves the use of informants and undercover agents.  Neither the law enforcement officers conducting the operation nor the informants assisting in the investigation become coconspirators with the target of the undercover activity."

So I think that that is a very clear statement of the law, and I think it helps out both sides.

MR. HAIG:  I do agree with what the government says, and if the Court is disinclined to give our instruction, I think a close runner-up would be the one that the government proposes in its -- in that block quote that it just read.

THE COURT:  Do you have any objection to the government's proposed instruction?

MR. HAIG:  The one that's contained in the body of disputed Instruction Number 2 and the government's objections, we do not --

THE COURT:  I think it's on page 9.

MR. HAIG:  Yes.

THE COURT:  It's in a block quote.

MR. HAIG:  I've got it right here.

THE COURT:  Okay.  Do you have any objection to it?

MR. HAIG:  Dean?

MR. STEWARD:  No.

MR. HAIG:  We don't, Your Honor, and that would be in place of the disputed Instruction Number 2.

THE COURT:  That's correct.

MR. HAIG:  All right.  Okay.

THE COURT:  I think the only -- I think we gave this instruction the last -- during the Thompson trial.  I think we had something at the end where we identified Marx and CJ and --

MR. FOX:  It was Anthony Brown, actually, that we identified, and the reason why we're not asking you to do that here is --

THE COURT:  That's fine.

MR. FOX:  -- Mr. Craig on the stand before said she had still committed a crime.  So I thought we needed to actually apply the facts.

THE COURT:  That's fine.  So we'll give this block

quoted instructions instead of disputed Instruction Number 2.

Okay.  3, you've withdrawn.

MR. HAIG:  Yes.

THE COURT:  And what's the next disputed instruction?

MR. FOX:  Number 4, Your Honor.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, it's the government's position that the elements instructions cover what Mr. Haig is concerned about here, and that's that the obstruction needs to be of a grand jury investigation, not of an FBI -- not simply of an FBI or U.S. Attorney's Office investigation.  The elements make clear that that's the case.

So we don't think that this is something that is necessary, and also, I spoke about this with counsel, I don't think this is their defense either.  So I don't think that this is something that is a theory of the case instruction based on my conversations with defense counsel.

MR. HAIG:  Your Honor, we still think it's appropriate because it answers a potential question the jury might have as opposed to whether the statute covers an FBI investigation versus a grand jury proceeding, and certainly there is evidence as to when one of those began and whether one was actually in place at the time that the phone was discovered.  I don't think this is an improper statement of the

**UNITED STATES DISTRICT COURT**

law, and I think it compliments the other instructions that are in the joint set.

THE COURT:  I think the instructions that we're going to give concerning the elements of obstruction are sufficient.  I'm not inclined to give disputed Instruction Number 4.

What's the next disputed instruction?

MR. FOX:  I think it's 7, Your Honor, the public authority instruction that the defendant has proposed.  And as we've litigated in the past, they're trying to argue that Mr. Baca could have provided Mr. Tanaka with public authority, and a local law enforcement officer cannot give anyone the authority to break federal law.  So we don't think this is an appropriate instruction.

MR. HAIG:  Your Honor, the facts of the case aren't that Mr. Baca gave the defendant authority to break federal law.  It's that he gave the defendant an order and other people orders that they thought were not in violation of their own laws, and because the -- the powers that be in the Sheriff's Department might not have known everything that the federal government knew, they were acting under the impression where they were justified in doing the two things that Mr. Tanaka says that they did do.

There was one person up in the chain of command that actually gave that order.  We have a separate fact here that

probably wasn't available in the first trial of the Thompson defendants, and that's that we have a stipulation that the FBI director in Los Angeles, Steven Martinez, actually gave a -- or made a request to protect the inmate, and that request was sent down the chain of command.

So to the extent that the government's position is adopted by the Court, we don't think that's a proper position. But to the extent that it is, there is a federal law enforcement officer that, in our view, gave a blanket "okay" to having the inmate Anthony Brown protected.

MR. FOX: Your Honor, to the point about the Steve Martinez -- the evidence related to Steve Martinez, I think that that misrepresents what actually the facts are, because while that is stipulated in -- between the parties that Mr. Martinez asked for Mr. Brown to be kept in protective custody, that was on August 18th and Mr. Brown was moved to protective custody on August 18th.

So the movement of Anthony Brown on August 18th is not part of the obstruction charges. It's the movement of him from protective custody to other areas that is the subject of the indictment. So, you know, this again misstates the law for several reasons as I've outlined in our objections to the disputed instructions. It's not a correct statement of the law, and the facts don't apply as Mr. Haig has said they do.

THE COURT: I'm not going to give 7. I don't think

it applies in this case.

Okay.  Let's turn to the agreed-upon instructions.  I see here you have an Instruction 4.1.  I don't think 4.1 applies in this case.  I believe 4.1 goes to when there is a confession and the jury has to determine the voluntariness of the defendant's statement.  When you're testifying in front of a grand jury or at a trial, that's not the issue.  That's not what 4.1 was intended to address.

MR. HAIG:  Which number was that again, Your Honor?  I'm sorry.

THE COURT:  It is your -- let's see.

MR. FOX:  It's on page 33 of the joint instructions.

THE COURT:  It's entitled "Statement by Defendant."

MR. HAIG:  I see it, yes.  So is the Court not going to give that?

THE COURT:  I don't think it applies.  I mean, if you look at the Ninth Circuit instructions, you look at the comment to the Ninth Circuit instructions, it's clear that what that instruction is intended to address is when there is a confession and the jury has to determine the voluntariness of the confession.

And I quote, "When voluntariness of a confession is an issue, the instruction is required by 18 United States Code Section 3501(a), providing that after a trial judge has determined that a confession to be admissible, the judge shall

permit the jury to hear evidence on the issue of the

voluntariness."

So that's what that instruction goes to, not -- not the

defendant's statement in this case.  So unless you both want to

give it...

MR. HAIG:  That's fine, Your Honor.  We agree.

THE COURT:  Okay.

(Discussion held off the record.)

THE COURT:  Okay.  Instruction -- Ninth Circuit

Instruction 2.10.  I also gave the jury an instruction that was

geared to the Viking testimony, and I think we probably ought

to give that.  I think I ought to also give that same

instruction again with regard to the Viking testimony.

MR. FOX:  No objection, Your Honor.

MR. HAIG:  That's fine, yes.

THE COURT:  Okay.  And we don't need 20, so we'll

give two versions of 4.3.

Now, there used to be an instruction 4.4, which I don't

know that -- that used to be the character evidence

instruction.  The Ninth Circuit has now held that they don't

think that that's -- you don't need to give that, and I'm happy

to do it either way.

MR. FOX:  Whatever the defense wants, Your Honor.

We -- either way for us.

MR. HAIG:  We didn't include it because of what

the -- what you just said, but we'd like to have it read to the jury.

THE COURT:  Okay.  So that instruction reads:  "You have heard evidence of the defendant's character for truthfulness.  In deciding this case, you should consider the evidence together within the same manner as all other evidence in the case."  Okay.

MR. HAIG:  Yes.  Yes, Your Honor.

Your Honor, may I ask a question?

THE COURT:  Yes.

MR. HAIG:  When the jury gets these instructions back in the room, do they get the titles or just the actual body of the instruction?

THE COURT:  They get a -- basically, they just get the instructions.

MR. HAIG:  All right.  Okay.

(Pause in proceedings.)

THE COURT:  Okay.  We heard Joint Jury Instruction 32.  I believe we heard from Mr. Manzo.  I don't think we've heard from Mr. Carey as yet.

MR. FOX:  We're not planning on calling him in our rebuttal case, Your Honor.

THE COURT:  Do you expect to have a rebuttal case?

MR. FOX:  Yes, Your Honor.  Someone who is actually here today prepared to testify, Dennis Conte, he is going to

very briefly say, in direct contradiction to what Mr. Tanaka said, that he gave Mr. Tanaka John Clark's memo and Mr. Tanaka disparaged John Clark at the time and said, "We're not doing this," basically.  So it's going to directly contradict his testimony.

And then I expect Special Agent Tanner to explain the phone records a little bit better.  I think that our testimony will be a total of probably about 45 minutes.

THE COURT:  Okay.

MR. FOX:  And if Mr. Yoshinaga says anything that's inconsistent with his -- the 302 that we showed you, then she's also prepared to testify as to that.

THE COURT:  Okay.  So Carey comes out.  Michel will be in.  Anybody else that we need to account for?

MR. FOX:  No, Your Honor.  And, of course, there's a bracket that is just a placeholder that says "Name of Witness," so that obviously needs to be stricken as well.

THE COURT:  Right.

33.

MR. FOX:  There was some cross-examination of Special Agent Tanner about her decision to use Anthony Brown, so we think this is an appropriate instruction.

THE COURT:  Oh, I don't -- I don't doubt that.  I guess, is there going to be any argument that...

MR. FOX:  And this instruction obviously is not

written correctly because it says "You heard testimony from an informant." So it probably should read "You've heard that the government used an undercover agent and an informant in its investigation."

THE COURT: "You've heard evidence about a federal informant who was involved in the government's investigation in this case. You've also heard that the federal government used an undercover FBI agent in its investigation. Law enforcement officials may use informants and undercover agents in order to investigate criminal activities."

MR. FOX: Thank you, Your Honor.

MR. HAIG: That's fine.

THE COURT: There isn't going to be any argument that the agent -- or Marx became some sort of coconspirator?

MR. STEWARD: As much as I like that argument, no, I won't make that.

MR. FOX: We won't either, Your Honor.

THE COURT: Just going to leave that alone.

Were there any experts used in this case?

MR. FOX: I don't think so.

THE COURT: So we can take out 34?

MR. FOX: Yes, Your Honor.

THE COURT: Summaries not received in evidence.

MR. FOX: I think everything's in that was a summary. We will have new summary exhibits based on Special

Agent Tanner's testimony that we're going to prepare tonight. In fact, I could probably -- if I can find it, I might be able to pass it out today.  Assuming that those are received into evidence, then we will not need Number 35.

(Pause in proceedings.)

THE COURT:  And everybody's happy with 40?

MR. FOX:  The government is, Your Honor.

MR. HAIG:  Yes, we are.

THE COURT:  Okay.  You have an instruction here "Rereading of Testimony."  If there is a request for rereading of testimony, I will give it, however, but I -- I'm not inclined to give it before there is a request for a rereading of testimony.

MR. FOX:  We only included it because it's part of your standing order, so that's why we put it in here.

THE COURT:  Okay.  That's fine.

And I'd like to avoid having anybody tell the jury to go look -- if there's some doubt, you know, you don't remember something, go look at the transcript or ask for it a transcript or ask for it to be reread.  They've watched enough Perry Mason, they know how to do that.  And, I take it, nobody -- you've agreed upon the verdict form?

MR. FOX:  I don't think there's an objection to the verdict form.  I think we've got a joint verdict form that's on page 56.

THE COURT:  Yes.

MR. HAIG:  It's fine, Your Honor, yes.

(Pause in proceedings.)

THE COURT:  I think we've -- I think we've given the jury instructions on stipulation of fact.  You have a stipulation of testimony instruction.  I don't think there was any stipulated testimony in this case.

MR. FOX:  That's right, Your Honor.

Your Honor, let me check our phone record stipulation because that may be basically business records stipulation if called to testify, so let me check that one out.

THE COURT:  Okay.

MR. FOX:  But regardless, we don't care if you -- for that one, I don't think it's necessary still to read that instruction unless the defense requests it.  That is -- it's not a stipulation as to testimony, Your Honor, so we don't need that stipulation.

THE COURT:  Okay.  How long do you anticipate that you're going to be with Mr. Yoshinaga?

MR. HAIG:  Well, Your Honor, I wanted to bring that up, so thank you.

I spoke to Mr. Hershman after we took our recess, and I think the questioning will be pretty brief, and according to my questioning -- or my comment with Mr. Hershman, we're not going to go into any protected communication.  So I think -- I really

think ten minutes.

THE COURT:  Okay.  And how long are you going to be with your -- you have one other witness after that?

MR. HAIG:  Mr. Hebert, and I think he's very short as well, and I think we have to -- we'll probably discuss, us, about what he's going to be testifying to.  You've got the proffer, but it's going to be fairly short.  Again, I'm a bit hamstrung, I apologize, because I haven't been able to talk to him, although I have a good idea of what he's going to say, not a specific idea of what he's going to say.

And in relation to that, Your Honor, there are two things I would ask the Court to do.  We had an exhibit, which is 362, that the Court was discussing with us in relation to Mr. Yoshinaga's testimony and in relation to Mr. Hershman's advice to Mr. Yoshinaga.  I just need that to be marked for identification on the record.

THE COURT:  That's fine.

MR. HAIG:  And also Exhibit 363, which is a copy of the stipulation that I read into the record, I'd move that into evidence, ask that it be admitted.

THE COURT:  Well, it certainly could be marked for identification, but it seems to me you've -- they've read their stipulations, you've read yours.  The Court has told the jury to accept those facts as true.  I'm not sure it needs to go back.

**UNITED STATES DISTRICT COURT**

MR. HAIG:  Well, that's fine.  I -- maybe I assumed mistakenly that all the government's stipulations were going back as exhibits too.

MR. FOX:  We did not ask for these stipulations themselves to be sent back.  We did not introduce the stips --

THE COURT:  I don't think they introduced them.

MR. HAIG:  Okay, then that's fine.  I just wanted it marked for identification.

THE COURT:  That's fine.

MR. HAIG:  Okay.

THE COURT:  Okay.  And you've got a rebuttal case that's going to last maybe as long as 45 minutes?

MR. FOX:  I think that's fair, Your Honor.

THE COURT:  So we should be done with your case by 8:30, 8:40?

MR. HAIG:  Yes.

THE COURT:  And then you'll be done at probably by 9:30.

Okay.  And how long do you want for your closing argument?

MR. FOX:  I think for the summation, there's a lot to go through, but I will try to do it in an hour, Your Honor.

THE COURT:  Okay.  And that's the opening part of your summation?

MR. FOX:  Yes, Your Honor.

THE COURT:  Okay.

**UNITED STATES DISTRICT COURT**

MR. STEWARD:  I anticipate an hour as well, Your Honor.

THE COURT:  Okay.

MR. FOX:  And if that's the case, then I will limit myself to 30 -- sorry, to 20 minutes in the rebuttal, Your Honor.

THE COURT:  Okay.  So what I can do is let you know when your -- you got about three minutes left or I can tell you, "Time's up."

MR. STEWARD:  That's fine, Your Honor.

THE COURT:  Which would you prefer?

MR. STEWARD:  Probably the three-minute thing.

THE COURT:  Okay.

MR. FOX:  That's fine, Your Honor.

THE COURT:  Okay.  I'm trying to get these people to give me a light like they do at the Supreme Court.  A light comes on, you got to sit down.

Now let's see.  What else?

Okay.  I think we have a motion for reconsideration.

MR. STEWARD:  Yes, Your Honor, briefly.

My thinking on this was almost like it was a severance motion in the sense that I would think anyone looking at this record later would ask me, Did you give the trial judge an opportunity to reevaluate your motions in light of the testimony?  And so to answer that question, I prepared this

UNITED STATES DISTRICT COURT

motion for reconsideration.

I also included, as you can see, the government's position, and beyond that, Your Honor, we would submit based largely on the arguments and law that we made on both of the original arg -- or motions.

THE COURT:  Okay.  Does the government wish to be heard?

MR. JAUREGUI:  Yes, very briefly, Your Honor.

Your Honor, I don't think any of the factual developments in the trial have changed.  The legal analysis that applies here, and I would submit that as far as the immunity motion, the defense still has not met its burden under Straub.  And as far as the out-of-court statements by Mr. Baca, they still are not statements against penal interest and do not have any indicia of reliability, and I would submit on our papers which are at Docket 83 and 108, unless the Court has any questions.

THE COURT:  Okay.  I don't believe that this -- excuse me.  I don't believe this motion qualifies for a motion for reconsideration.  I don't believe that the trial testimony has essentially changed the facts or law that were presented to the Court in the original motion.  I believe everything that has come -- that has come during the trial was reasonably available to the moving party.

In the exercise of reasonable diligence, I don't think there's been any change in the law or the facts, and even if I

were to consider it on the merits, I don't believe that at least with respect to the statements by Mr. Baca, that any of those statements were against his penal interest, nor were the circumstances under which they were given -- there was no trustworthiness such that they should be admitted at trial. There's nothing in the facts or circumstances surrounding which of those statements were made that would indicate some independent trustworthiness, and those statements are plainly hearsay.

With respect to immunity for Mr. Baca, there was no evidence that the government intentionally caused the defense witness to invoke his Fifth Amendment right against incrimination with the purpose of distorting the fact-finding process. I don't think there's any evidence the government or its agents took any affirmative actions to prevent a defense witness from testifying, in this case, Mr. Baca; nor is there any showing that denying Mr. Baca use of immunity would distort the fact-finding process at the trial.

Moreover, there's been no showing that the testimony that Mr. Baca would give directly contradicted the testimony of Mr. Manzo, who I believe was the only immunized witness called by the government. In other words, there is no evidence of a selective denial of immunity by the government.

So that motion for reconsideration is denied.

MR. FOX: Your Honor, the only other issue that the

government has -- we showed you an article -- a printed article at sidebar on the Vikings issue.

How would you like us to make this part of the record?

THE COURT:  I'd like to have that marked for identification.

MR. FOX:  We will mark it -- I believe 196 is available, so we'll mark it for identification as Exhibit 196.

THE COURT:  All right.

MR. FOX:  And we'll make copies for everybody next time we're here.

THE COURT:  Okay.  And so I assume the jury will get this case right around noon or thereabouts.  We'll have lunch brought in for the jury.  They will probably go until 3:30 tomorrow.  Make sure the clerk has a phone number where he can reach you, preferably a cell phone, and hopefully you will be in the building.

Anything else?

MR. FOX:  Nothing from the government, Your Honor.

MR. STEWARD:  Nothing from the defense, Your Honor.

THE COURT:  And you've agreed upon a redacted indictment?

MR. FOX:  Yes, Your Honor.  That was attached to the trial memo.  We refiled it because the first time we filed it, we mistakenly did not attach the redacted indictment.  But we now have -- we filed again an amended version that contained

the redacted indictment.  It is -- so you can easily find it. I believe that it is Document 136.

THE COURT:  That's fine.  It's my practice to send back multiple copies of the jury instructions as well as the indictment to the jury, and I'd like counsel to meet once the closing arguments have concluded to confirm with the clerk what's to go back to the jury.  Again, the recordings will not go back, nor will the transcripts.

Okay.  All right.  We'll see everybody tomorrow morning at eight o'clock.

MR. FOX:  Thank you, Your Honor.

MR. JAUREGUI:  Your Honor, 7:45 tomorrow?

THE COURT:  Well, I guess -- I thought that we sort of resolved those issues but --

MR. JAUREGUI:  Okay.

MR. HAIG:  I think we have, Your Honor.

MR. FOX:  And I've talked to the defense -- one last thing on Yoshinaga.  I've talked to the defense.  I will probably go into the absence of communications, which I don't think are attorney-client privilege.  Just so we're aware, I'll talk to Mr. Hershman to make sure that's not going to be an area of objection, but that's going to be one of my areas of cross.  We'll see.

THE COURT:  Okay.

(The proceedings adjourned at 2:49 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


            I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date:  *August 24, 2016*



                    /s/ SHAYNA MONTGOMERY
                    _____
                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**