UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )
                                   )
        vs.                        )    CASE NO. CR 15-255-PA
                                   )
PAUL TANAKA,                       )
                                   )
                 Defendant.        )
_____    )

REPORTER'S TRANSCRIPT OF

JURY TRIAL PROCEEDINGS - DAY 9

TUESDAY, APRIL 5, 2016

8:00 A.M.

LOS ANGELES, CALIFORNIA

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 410
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
        EDDIE A. JAUREGUI
        Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686

**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent

**UNITED STATES DISTRICT COURT**

3

**INDEX OF WITNESSES**

**DEFENDANT'S WITNESSES**                                          **PAGE**

PAUL YOSHINAGA

      Direct Examination by Mr. Haig              7
      Cross-Examination by Mr. Fox               12
      Redirect Examination by Mr. Haig           19


KEVIN HEBERT

      Direct Examination by Mr. Haig             22
      Cross-Examination by Mr. Fox               29



**PLAINTIFF'S WITNESSES**                                          **PAGE**

DENNIS CONTE

      Direct Examination by Mr. Fox              33
      Cross-Examination by Mr. Haig              38


LEAH TANNER

      Direct Examination by Mr. Fox              40
      Cross-Examination by Mr. Haig              48

**INDEX (CONTINUED)**

| CLOSING ARGUMENTS | PAGE |
|---|---|
| Plaintiff's Closing Argument | 55 |
| Defendant's Closing Argument | 85 |
| Plaintiff's Rebuttal Closing Argument | 108 |

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 156 | Additional Phone Summary Chart | 43 | 44 |
| 157 | Additional Phone Summary Chart | 43 | 44 |
| 158 | Additional Phone Summary Chart | 43 | 44 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 5, 2016**

**8:00 A.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number one, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.  Brandon Fox and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Special Agent Leah Tanner with the FBI.

THE COURT:  Good morning.

MR. JAUREGUI:  Good morning, Your Honor.

MR. STEWARD:  And, Your Honor, Dean Steward and Jerome Haig for Mr. Tanaka.  He's present.

THE COURT:  Good morning.

MR. HAIG:  Good morning.

THE COURT:  We have a couple of jury instructions that I think we need to review.  One is that I'm going to give the limited -- evidence admitted for a limited purpose, 2.11. Joint Instruction, I believe it's 31, concerning impeachment, why don't you think about that, and also Instruction 40, good-faith reliance, and I think we can take that up -- I think take up those issues after the presentation of the evidence. It shouldn't take too long.

MR. FOX:  Your Honor, just one question for you.

As I was finishing my closing last night and timing it,

**UNITED STATES DISTRICT COURT**

it's less than an hour at this point.  Obviously, things can change and another poltergeist can come in the room like happened in my opening with the video and things can be a little bit messed up, but what I was hoping to do is if I finish in less than an hour, if that time could be added to my rebuttal argument just in case I need to go long on that.

THE COURT:  That's fine.

MR. FOX:  Thank you.

MR. HAIG:  Your Honor, if I could just raise one issue.  My witnesses are here, so I'm ready to go.

Mr. Yoshinaga and Mr. Hebert, they're both here, and I would like to be heard on a sidebar after the defense rests regarding the propriety of any government rebuttal witnesses.

THE COURT:  Okay.

MR. HAIG:  All right.  Thank you.

THE COURT:  All right.  Are we ready to proceed?

MR. FOX:  The government is, Your Honor.

MR. HAIG:  We are, Your Honor, yes.

THE COURT:  All right.  Let's bring the jury in.

(Pause in proceedings.)

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated and come to order.

THE COURT:  Good morning, ladies and gentlemen.

THE JURY PANEL:  Good morning.

THE COURT:  All right.  If you'd call your next witness, please.

MR. HAIG:  Thank you, Your Honor.

The defense calls Paul Yoshinaga.

THE DEPUTY CLERK:  Raise your right hand for me.

(The witness, PAUL YOSHINAGA, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Yes, my name is Paul Yoshinaga, Y-O-S-H-I-N-A-G-A.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. HAIG)  Mr. Yoshinaga, what do you do for a living?

A    I'm an attorney for the County of Los Angeles.  My title is Principal Deputy County Counsel.

Q    Is there an office called the Office of the County Counsel?

A    The Office of the County Counsel is -- they're the advisors for the County departments and for the Board of Supervisors.

Q    Is the Los Angeles County Sheriff's Department a County department?

A    Yes, it is.

Q    Where do you currently work in County Counsel?

A    I'm assigned to the Workers' Compensation division.

Q    And how long have you been assigned there?

A    About three and a half years.

Q    And how many years have you been with County Counsel?

A    I started in 1987.

Q    With County Counsel?

A    With County Counsel.

Q    And you've been there continuously since then?

A    There was one year in between where I was out in private practice, and then I came back to the County Counsel's office.

Q    I see.  All right.

In August of 2011, were you working in the same position at County Counsel as you're currently working?

A    Back then I was assigned to the law enforcement division, and I was assigned to the Sheriff's Department as their chief legal advisor.

Q    And where was your office when you were assigned to the Sheriff's Department as the chief legal advisor?

A    At the Sheriff's Headquarters Bureau in Monterey Park.

Q    Do you recall when you started in that position?

A    Not the exact year, but I was there for about seven and a half years.

Q    And what is the role of the Sheriff's advisor?

A    To give advice to --

        MR. FOX:  Objection, Your Honor, to the question.  I

think it misstates the evidence.

THE COURT:  Sustained.

You can rephrase the question.

Q     (BY MR. HAIG)  Mr. Yoshinaga, what is the role of the Sheriff's legal advisor?

MR. FOX:  Objection, Your Honor, same objection.

THE COURT:  Same ruling.

Q     (BY MR. HAIG)  What's your position in August 2011?

A     I was the chief legal advisor to the Sheriff's Department.

Q     What is the role of the chief legal advisor to the Sheriff's Department?

A     It's to provide advice to Department members, to the executives of the Department.

Q     Is there a specific reason why you would be located there as opposed to some other office?

A     Well, the Sheriff wanted to have an attorney from County Counsel located within close proximity of his office so that if he needed to ask questions he had somebody there.

MR. FOX:  Objection to the foundation.  Move to strike.

THE COURT:  Overruled.  The answer will stand.

Q     (BY MR. HAIG)  Mr. Yoshinaga, who was the Sheriff when you arrived as the chief legal advisor?

A     It was Leroy Baca.

Q     And who was the Sheriff in August of 2011, if you recall?

**UNITED STATES DISTRICT COURT**

A      It was Mr. Baca.

Q      Do you recall who the undersheriff was at that time in August of 2011?

A      It was Mr. Tanaka, I believe.

Q      Do you see Mr. Tanaka in the courtroom?

A      Yes, I do.

Q      Can you point him out, please.

Okay.  Do you recall an incident or -- let me back up.

Do you recall a matter that was -- that came to your attention in August of 2011 and September of 2011 regarding an inmate Anthony Brown in possession of a cell phone in County jail?

A      I don't remember the exact dates, but I do remember that there was an issue that came up regarding an inmate that did have a cell phone in the jails.

Q      Regarding that issue, did you have discussions with anybody in the Sheriff's Department regarding that issue?  Not what the discussions were, but did you have any discussions with anybody in the Sheriff's Department regarding that issue?

A      Yes, I did.

Q      And who would those people be that you had discussions with?

A      Mr. Baca.  There were some investigators involved as well.

Q      Do you know who those people might be?

A      I believe it was Lieutenant Thompson and Lieutenant

Leavins.

Q    Do you know a gentleman by the name of Captain Tom Carey?

A    Yes, I do.

Q    Did you have any discussions with Captain Carey regarding the Anthony Brown matter in August and September of 2011?

A    I may have, but I can't recall any specifics.

Q    The people that you do recall specifically would be Lieutenant Leavins and Lieutenant Thompson?

        MR. FOX:  Objection, asked and answered.

        THE COURT:  Sustained.

Q    (BY MR. HAIG)  Do you recall how many conversations you had with Sheriff's Department personnel regarding the Anthony Brown matter?

A    No, not specifically.

Q    Okay.  Did you have any discussions with Paul Tanaka regarding the Anthony Brown matter?

A    Not specifically.

Q    Was Paul Tanaka a person that you consulted with while you were in your job at the Sheriff's Department Headquarters?

A    Yes.

Q    Could you talk to us about the frequency of your consultations with him when you were working there in August -- or in 2011.

A    Whenever the occasion arose, Mr. Tanaka would ask me to either come to his office or ask for advice over the phone.

Q    Do you recall a meeting in the U.S. Attorney's Office where Andre Birotte was there in August of 2011?

A    I don't recall the specific dates, but I do remember that there was a meeting with Mr. Birotte.

Q    You were present at that meeting?

A    Yes, I was.

Q    And why did you go to that meeting?

A    The Sheriff asked me to.

Q    Do you recall any specifics about that meeting as far as what was discussed?

A    It was the issue of the cell phone, I believe, and the investigation -- the investigative process that was occurring.

Q    Do you recall who was doing the talking on behalf of the Sheriff's Department at that meeting?

A    Pretty much the Sheriff.

Q    How long have you known Paul Tanaka?

A    Since junior high school, long time ago.

Q    Would you consider the two of you to be friends?

A    Yes.

Q    Thank you.

          MR. HAIG:  I have nothing further, Your Honor.

                    CROSS-EXAMINATION

Q    (BY MR. FOX)  Mr. Yoshinaga, you were the chief legal advisor to the Sheriff's Department, not just to the Sheriff; correct?

A    Correct.

Q    And you just testified on direct examination that you advised executives, not just the Sheriff; correct?

A    That's correct.

Q    And you were just saying you've been friends with Mr. Tanaka for about 45 years; is that right?

A    Over 40 years.

Q    You graduated high school together in 1976; is that right?

A    I graduated in '77.

Q    Okay.  So you were a year behind -- a year behind Mr. Tanaka; is that right?

A    Yes.

Q    But it's fair to say that you're lifelong friends?

A    That's correct.

Q    You vacation together?

A    Yes, sometimes.

Q    While you were at the Sheriff's Department, you socialized with Greg Thompson as well; correct?

A    On occasion, yes.

Q    You would smoke cigars on the patio with him; correct?

A    Yes.

Q    And Mr. Tanaka would be there on occasion too?

A    Yes.

Q    And you would smoke cigars with Mr. Thompson at cigar shops as well?

**UNITED STATES DISTRICT COURT**

A    Sometimes, yes.

Q    And in 2014 you were interviewed by the federal government; correct?

A    Yes.

Q    It's safe to say you know a lot of lawyers because you are one; right?

A    I do know a lot of lawyers.

Q    You come across a bunch of lawyers as part of your job?

A    Yes.

Q    And you have many contacts in the legal profession; correct?

A    Yes, I do.

Q    When you decided to hire a lawyer in this matter in 2014, you picked the same one as Paul Tanaka; correct?

        MR. HAIG:  Objection, Your Honor, relevance, beyond the scope, argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  Mr. Nessim was my attorney.

Q    (BY MR. FOX)  And that's who was representing Mr. Tanaka at the time; correct?

A    I believe so.

Q    You believe so, or you know so?

A    I don't know who represents him now.

Q    I'm sorry, my question was, at the time, you knew that Paul Tanaka was represented by the same attorney that you

hired; correct?

MR. HAIG:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    (BY MR. FOX)  Now, you say that you were consulted by -- that you consult -- Mr. Baca, Mr. Carey and possibly Mr. Thompson -- I'm sorry, I got that wrong.  Let me try that again.

Mr. Baca, possibly Mr. Thompson and Mr. Leavins consulted you about some of the aspects in this matter; correct?

MR. HAIG:  Objection, Your Honor, misstates the testimony.

THE COURT:  Sustained.

Q    (BY MR. FOX)  Mr. Yoshinaga, on direct examination you said that it's possible that Mr. Thompson consulted with you; correct?

A    Yes.

Q    And you said that you did consult with Mr. Baca on this; correct?

A    That's correct.

Q    And you did consult with Mr. Leavins on this; correct?

A    That's correct.

Q    At the time, you were the attorney in charge of issues related to patrol; correct?

A    That's correct.

**UNITED STATES DISTRICT COURT**

Q     You were not the attorney dealing with issues related to custody; correct?

A     Even though my official role was patrol, I answered any questions that came to my office, you know, in an effort to be helpful.

Q     But, Mr. Yoshinaga, there was another attorney, Elizabeth Miller, that you're familiar with; correct?

A     Yes.

Q     And at the time, she was involved with issues related to patrol; correct?

A     With regard to custody?

Q     I'm sorry, custody.  Thank you for correcting me.

A     But she did also answer patrol questions as well.

Q     Okay.  But you had point people.  Is that fair to say?

A     Yes.

Q     And you were the point person on patrol, and she was the point person on custody; correct?

A     Yes.

Q     And as a general rule, you didn't get involved in specific investigations; correct?

A     That's correct.

Q     And other attorneys, generally, would handle issues that came up during IA or ICIB investigations; correct?

A     That's correct.

Q     That wasn't you generally; correct?

A     Yes, correct.

Q     Mr. Yoshinaga, is it fair to say that people would consult with you in order to determine whether they were complying with the law?

A     Yes.

Q     People wouldn't come to you in order to determine how they could break the law; correct?

          MR. HAIG:  Objection, speculation, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Could you ask that question again, please?

Q     (BY MR. FOX)  Sure.

     People wouldn't come to you asking for advice on how to break the law; correct?

A     Correct.

Q     You're aware that there were a lot of discussions at Sheriff's Headquarters regarding the cell phone in August of 2011; correct?

A     Yes.

Q     And you were aware that there were a lot of discussions with Mr. Baca, Mr. Tanaka and Mr. Leavins at the time; correct?

A     I believe so.

Q     You were not present for most of those discussions; correct?

A     Yes.

**UNITED STATES DISTRICT COURT**

Q    Nobody came to you asking whether it was illegal or legal to hide an inmate; correct?

A    I was not asked that question.

Q    And nobody asked you whether it was legal or illegal to ignore a federal writ; correct?

A    No.

Q    Is that incorrect?

A    No, I was not asked that question.

Q    And you were not asked whether it was legal or illegal to order deputy sheriffs not to cooperate with the federal government; correct?

A    No, I was not asked that question.

Q    No one came to you asking whether it was proper to threaten to arrest a federal agent acting within the scope of her duties; correct?

A    Correct, I was not asked that question.

        MR. FOX:  One moment, Your Honor.

Q    (BY MR. FOX)  Mr. Yoshinaga, you can't remember anything that happened between September 2nd and September 26th of 2011; correct?

A    Not specifically.

        MR. FOX:  No further questions, Your Honor.

        MR. HAIG:  Just a couple questions, Your Honor.

        THE COURT:  All right.

//

**UNITED STATES DISTRICT COURT**

REDIRECT EXAMINATION

Q    (BY MR. HAIG)  Mr. Yoshinaga, do you know whether the Sheriff was on vacation or working in September of 2011?  If you know.

A    I don't know.

MR. FOX:  Objection, beyond the scope.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. HAIG)  You talked about a -- on cross-examination, a lawyer that also worked with you at Sheriff's Bureau; correct?

A    There were two other attorneys assigned to our office.

Q    Were they supervisors to you, or were you a supervisor to them, or were you equals?

A    Technically we're equals, but I was given the title of chief legal advisor for purposes of a contact person, one contact person at the Department.

Q    And was that your title in August of 2011?

A    Yes, it was.

Q    All right.  Thank you.

MR. HAIG:  I have no more questions, Your Honor.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Sir, you may step down.

Let me see counsel at sidebar.

(Discussion held at sidebar.)

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  I was handed these notes as the witness was taking the stand.  I want to bring these up.

All right.  The first one is from one of the jurors who says that she has a doctor's appointment scheduled for 2:30, and because she expected to be released at 1:30 today, she wants to know if it's okay if she can go.

MR. FOX:  Yes.  And obviously, Your Honor, we would just ask that deliberations end at that point rather than replacing her.

MR. STEWARD:  We agree.

THE COURT:  Okay.  Here's the next note.  It reads as follows:  "Yesterday Larry and I had a brief conversation while walking back to the parking lot.  Larry wanted to know if he heard it right that Paul Tanaka worked for both LASD and the City of Gardena at the same time.  I confirmed that he heard it right, and we changed the subject to different topic.  We did not talk about the case, but I thought we should let you know since this was about the defendant.  Thank you."  And it's signed by one of the jurors.

MR. FOX:  Your Honor, I don't think we had any further inquiry.  I think this is harmless.

MR. HAIG:  This is Jerome Haig.  It is talking about the case, technically, because it's talking about something that came in as evidence.  I don't think it rises to the level of misconduct, but perhaps it would be a good idea for the

Court to readmonish the jury about not discussing anything until they're actually asked to do so.

MR. FOX:  I think we're only going to have one more break or maybe two, so that's fine with the government, Your Honor.

THE COURT:  Okay.  So I'll admonish them again at the first break.

MR. STEWARD:  And at the end, if the Court could add "And I really mean it."

THE COURT:  This time.

MR. FOX:  Thanks.

(End of sidebar discussions.)

MR. HAIG:  Can I call my next witness, Your Honor?

THE COURT:  Yes, please.

MR. HAIG:  Your Honor, we call Kevin Hebert to the stand.

MR. HAIG:  Can I have one moment with counsel, please?

THE COURT:  Yes.

(Counsel conferred off the record.)

THE DEPUTY CLERK:  If you'll raise your right hand for me.

(The witness, KEVIN HEBERT, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name and spell your last

name for the record.

THE WITNESS:  Kevin Hebert, H-E-B-E-R-T.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q   (BY MR. HAIG)  Mr. Hebert, what do you do for a living?

A   I'm a commander with the L.A. County Sheriff's Department.

Q   When did you join the Sheriff's Department?

A   1988, November.

Q   And when did you become a commander?

A   October of 2015.

Q   Who promoted you to commander?

A   Sheriff McDonnell did.

Q   Were you ever a sergeant in the Sheriff's Department?

A   Yes, I was.

Q   Do you remember when you were promoted to sergeant?

A   In 2001.

Q   And were you a lieutenant in the Sheriff's Department as well?

A   Yes.

Q   Do you recall when you promoted to lieutenant?

A   April of 2006.

Q   Do you recall who was responsible or who promoted you to lieutenant in April of 2006?

A   Sheriff Baca.

Q   How do you know that?

UNITED STATES DISTRICT COURT

A    Sheriff Baca made it well known that he made all the promotions --

MR. FOX:  Objection, Your Honor, foundation.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. HAIG)  Have you ever had a conversation with Sheriff Baca about promotions at the grade of lieutenant and above?

A    I've heard him at management meetings, and I heard testimony in a deposition that he made promotions --

MR. FOX:  Objection, Your Honor, move to strike.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. HAIG)  Have you ever had a job in any personnel capacity in the Sheriff's Department?

A    Yes, I was captain of personnel administration for the Sheriff's Department.

Q    And where was your office located when you had that job?

A    In Monterey Park.

Q    Is that Sheriff's Bureau Headquarters?

A    No, it's right next door to Sheriff Headquarters.

Q    And when did you have that job?

A    I started the job -- I was acting captain in November of 2009.  I promoted to captain in April of 2010 and remained captain there until October of 2013.

Q    What were your job duties while you were captain there in personnel?

A    As a captain of personnel, I was responsible for all personnel-related matters for 18,000 employees; 10,000 sworn and 8,000 civilian.

Q    And as a captain in personnel, did any documentation come before you regarding promotions or transfers?

A    Yes.

Q    Would that include promotions and transfers of supervisors at the rank of lieutenant and above?

A    Yes.

Q    Did you have any communication with the Sheriff at the time, Sheriff Baca, regarding how those promotions or transfers would take place?

A    I never had any personal one-on-one communication with him, no.

Q    Were you ever in a location where those types of promotions and transfers were discussed where Sheriff Baca was discussing them?

A    Other than my own, no.

Q    When you say other than your own, what do you mean by that?

A    My own promotion to captain, he personally sat me down along with two other people and promoted me to captain.

Q    And what year was that, sir?

**UNITED STATES DISTRICT COURT**

A    2010.

Q    Have you ever worked at Men's Central Jail or at Twin Towers?

A    Yes, I worked at Men's Central Jail.

Q    And when did you work at Men's Central Jail?

A    From April 2009 -- no, excuse me, April 2006 to September of 2007.

Q    And how was it that you were asked or ordered to go to Men's Central Jail?

A    When I promoted to lieutenant, Mr. Tanaka asked me if I would go to Men's Central Jail to provide leadership.

Q    And did Mr. Tanaka send you to Men's Central Jail?

A    Ultimately, the Sheriff is the one that tran -- do the transfers with a promotion.  However, he did ask if I would go there and provide leadership.

Q    And what was your job at Men's Central Jail when you got there?

A    I was a watch commander, line lieutenant.

Q    Do you recall what Paul Tanaka's position in the Sheriff's Department was at the time that you went to Men's Central Jail as lieutenant?

A    He was the assistant sheriff at the time.

Q    And did he have supervision over a department that you were working at?

A    At that time, he was assistant sheriff over custody.

Q    Did you have any interactions with Mr. Tanaka when you worked at Men's Central Jail?

A    I'm sure I did, but not on a regular basis, no.

Q    Did Mr. Tanaka have any conversations with you about what your tasks were at Men's Central Jail?

A    Before I went there, he -- I had a meeting with him, and he wanted -- the lieutenants that were going there to provide proactive leadership, he felt there was -- there may be some lack of leadership at Men's Central Jail, and he wanted proactive leadership at the jail.

Q    When you worked at Men's Central Jail, did Mr. Tanaka ever tell you that he approved of inmate-on-inmate violence?

A    No.

Q    When you worked at Men's Central Jail, did Mr. Tanaka ever tell you that he approved of deputy-on-inmate violence?

A    No.

Q    When you worked at Men's Central Jail, did Mr. Tanaka --

           MR. FOX:  Your Honor, I'm going to object to all this as being leading.

           THE COURT:  Sustained.

           MR. FOX:  And I move to strike the previous answers, please.

           THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q    (BY MR. HAIG)  Have you had any discussions with

Mr. Tanaka while you were working at Men's Central Jail about FBI interaction at Men's Central Jail?

A    No.

Q    Did he ever instruct you to obstruct any FBI investigation?

MR. FOX:  Objection, Your Honor, leading.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  Did you have any interaction with any monitors from the ACLU while you were working as a watch commander at Men's Central Jail?

A    Not very many.  I believe that I spoke to them a few times.

Q    Did you receive any instruction from Mr. Tanaka in any way regarding the ACLU monitors?

A    No.

Q    Did you have occasion to see FBI agents at Men's Central Jail when you were working there as watch commander?

A    No.

Q    When you were working at Men's Central Jail, were you supervising line deputies?  And by that, I mean deputies that worked in the custodial units of the jail.

A    Yeah, supervised not only deputies but sergeants.

Q    Was it your practice to stay in your office, or was it your practice to get out of your office?

A    No, part of being proactive is walking the floors and

interacting with the sergeants, deputies and inmates for that matter.

Q    Did -- have you ever referred to any deputies on the row as being gang members?

MR. FOX:  Objection, irrelevant and leading.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  When you were working at Men's Central Jail, did Mr. Tanaka talk to you at all about what the role of supervisor should be on the floors?

A    Prior to going there, we had that discussion.  What it related to is being proactive.

Q    And what did that mean to you, to be proactive?

A    That meant walking the floors, talking with the deputies, providing mentorship and leadership to make sure things were being done right, not only with the personnel but also with the inmates.

Q    When Mr. Tanaka supervised you, what kind of boss was he?

MR. FOX:  Objection, Your Honor, irrelevant.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  When you were working in the Sheriff's Department -- well, let me -- when you were working in the Sheriff's Department and Mr. Tanaka was undersheriff or assistant sheriff and Mr. Baca was the Sheriff, do you know who the final word was on promotions for sheriff's employees?

A    Yes, it was the Sheriff.

**UNITED STATES DISTRICT COURT**

Q    Thank you.

MR. HAIG:  I have no more questions, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

Q    (BY MR. FOX)  Mr. Hebert, you said that the final word was Mr. Baca on transfers, but you're aware that Mr. Tanaka had influence over the process; is that correct?

A    Yes.

Q    And, Mr. Hebert, Mr. Haig asked you questions about what Mr. Tanaka had given you in terms of direction for your leadership.

Do you recall that line of questioning?

A    Yes, sir.

Q    You also recall a meeting at Men's Central Jail that Mr. Tanaka led when he stated that deputies are like infants and they need to be coddled; correct?

A    I do not remember the term "coddled," no.

Q    Do you remember Mr. Tanaka saying that deputies are like infants?

A    What I recall of that is that they're young, they're inexperienced, they need leadership to guide them in the right direction.

Q    Do you recall interviewing with lawyers who were representing the Citizen's Commission on Jail Violence in April of 2012?

A    Yes.

Q    And do you remember -- and during that interview that you had with them, you told the lawyers working for the Citizen's Commission on Jail Violence that Mr. Tanaka stated that they, meaning deputies, are like infants and need to be coddled, didn't you?

A    I don't recall using "coddled."  In fact, I recall that I was kind of shocked at that term because I never heard him say that.

Q    Did you ever have a chance to read the report that was written about your interview?

A    No.

        MR. FOX:  No further questions, Your Honor.

        THE COURT:  All right.  Anything else?

        MR. HAIG:  No, Your Honor.

        THE COURT:  All right.  You may step down.

    Call your next --

        MR. HAIG:  Can I have one moment, Your Honor?  Could I have one moment with counsel, please?

        THE COURT:  Yes.

    (Defendant's counsel conferred off the record.)

        MR. STEWARD:  And, Your Honor, at this time, the defense would rest subject to a motion.

        THE COURT:  All right.  Let's go to sidebar, please.

    (Discussion held at sidebar.)

MR. STEWARD:  Your Honor, at this time, we would renew our Rule 29 motion, and we'll simply submit it at this point.

THE COURT:  Okay.  The motion's denied.

You have a rebuttal case?

MR. FOX:  Yes, Your Honor.

It's our intent to call Dennis Conte to directly rebut Mr. Tanaka's testimony about whether he received the John Clark memo from Mr. Conte and Mr. Tanaka's reaction to that memo. And then we plan on calling Special Agent Tanner to go over the phone records in a different way to rebut Mr. Tanaka's claim again that there was contact with Mr. Baca and Mr. Baca's aides between ICIB and OSJ at the time.

MR. HAIG:  Your Honor, we think both of those witnesses are improper rebuttal, and they could have easily been put on in the government's case-in-chief.  The reason Mr. Conte wasn't put on was because he wasn't available.  I think that that's more properly a government main-case witness.

It doesn't really seem like it's doing anything but just sandwiching two witnesses that are against the defendant in between his testimony.  We also have reason to believe that Mr. Conte spoke to two of the government's witnesses, and I think that that would also impact his ability to be a witness in this case.

As far as Agent Tanner is concerned, we don't believe that

the proffered testimony is relevant and is proper rebuttal evidence as well.

MR. FOX:  With respect to Mr. Conte, Your Honor, I did inform defense counsel that Mr. Conte told us he had had contact with Mr. Clark and with Mr. Ornelas.  He said with Mr. Ornelas -- he did not discuss his testimony with Mr. Ornelas in terms of Mr. Conte's testimony, and Mr. Conte is going to testify, it's my belief, based on discussions with him, consistent with the way that he was interviewed by the federal government in the past.  So nothing has changed with respect to his recollection.

MR. HAIG:  Your Honor, the issue isn't whether he's going to be consistent with what he said in the past.  The issue is the timing of this witness testifying after the defendant has already testified.

MR. FOX:  It's rebuttal case, Your Honor.

THE COURT:  I believe Mr. Tanaka -- well, the motion as to that witness is denied.  I believe it is proper rebuttal.

Now, what is she going to say about these phone records?

MR. FOX:  Mr. Tanaka said that ICIB and OSJ had contact with Mr. Baca's aides and driver.  She has done an analysis that looks at phone contact with Mr. Baca and with two of the aides that she was able to identify, and the same analysis that she had before is accurate.  She's also going to talk about the unavailable numbers that Mr. Tanaka referred to.

UNITED STATES DISTRICT COURT

She's going to talk about the 5000 number, whether that was part of her phone chart.  So those, I believe, are proper rebuttal issues.

THE COURT:  Okay.  The objection's overruled, so...

MR. FOX:  I don't think either one is going to be a lengthy witness.

THE COURT:  All right.

(End of sidebar discussions.)

THE COURT:  Does the government wish to call a rebuttal witness?

MR. FOX:  Yes, Your Honor.

The government calls Dennis Conte.

(Pause in proceedings.)

THE DEPUTY CLERK:  Please raise your right hand for me.

(The witness, DENNIS CONTE, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you please state your full name.

THE WITNESS:  Dennis Conte, C-O-N-T-E.

THE DEPUTY CLERK:  Thank you.

THE WITNESS:  Sure.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Mr. Conte, I see you brought some documents

with you, but I assume that those are your personal documents; is that correct?

A    Yes, sir.

Q    And you're not going to be referring to them in your testimony?

A    I will not.

Q    Mr. Conte, could you please explain what you do for a living.

A    I'm now retired from the Los Angeles County Sheriff's Department, retiring in November of 2011.

Q    How long were you with the Sheriff's Department?

A    Approximately 14 years.

Q    What was your last position that you held?

A    I was a commander within custody operations division.

Q    And I want to direct your attention to 2006.

     What was your rank at the time in 2006?

A    I was a commander at that time as well.

Q    What were you doing as a commander in 2006?

A    I was area commander over three facilities:  Men's Central Jail, Twin Towers Correctional Facility and the correctional facility, Century Regional Detention Facility, down in Lynwood.

Q    Who was your captain of Men's Central Jail at the time?

A    John Clark.

Q    Did there come a time when you and Mr. Clark discussed a rotation plan?

A     Yes, there was.

Q     Do you remember approximately when this was?

A     It was early part of 2006.

Q     And do you remember where it was that you had this discussion?

A     In all likelihood, it would have been in my office.

Q     And do you recall whether the plan involved -- let me strike that.

Do you know the steps that were taken in order to see if the plan would be approved?

A     Yes, I do.

Q     Okay.  And what were those steps?

A     After Captain Clark had briefed me on the idea of this rotation policy, I had contacted Mr. Tanaka, and I verbally introduced the idea to him.  Mr. Tanaka appeared to have some interest and then directed me to prepare a report outlining the entire program.

Q     Did you prepare a report?

A     Captain Clark did.

Q     And did you ultimately receive this report?

A     Yes, I did.

Q     What, if anything, did you do with this report after you saw it?

A     Following receiving the report and discussing it with Captain Clark, I attended an executive planning committee

**UNITED STATES DISTRICT COURT**

meeting on behalf of the chief, and during the intermission -- or during the break of that meeting, I approached Mr. Tanaka with the report.

Q     Now, you've called it a report.

Was this a lengthy report, or was it a very short report?

A     It was a one-page report.

Q     And what did you do with this report after you encountered Mr. Tanaka?

A     I gave it to him and asked him -- I gave it to him, asked him to review it, read it, and I sought his approval for it as well.

Q     Did Mr. Tanaka give you the approval for Mr. Clark's plan?

A     No, he didn't.

Q     What, if anything, happened?

A     After I gave it to Mr. Tanaka to read, a short time later he became upset, both verbally and physically upset, upon reading the report and --

Q     You say he became verbally upset.

What, if anything, did he say?

A     After -- again, after reading the report, he directed some profanities both at the report and at Captain Clark.

Q     It may be uncomfortable, but can you please tell the jury what those profanities were.

A     Generally, it centered around the idea and the fact that Captain Clark prepared the report.  Mr. Tanaka directed the

**UNITED STATES DISTRICT COURT**

four-letter word, the fuck word, on numerous occasions both at the report and toward Captain Clark.

Q    Now, when you gave him the report, you don't know whether he read the whole thing; is that right?

A    I don't.

Q    And when you said that he used the four-letter word, did he use it about the memo or about Mr. Clark?

A    Both.

Q    How long did this go on?

A    Oh, maybe 45 seconds to a minute.

Q    Did Mr. Tanaka say whether he thought the report, whether he thought that the rotation plan should be implemented at that point?

A    No, he didn't.

Q    He didn't say whether he wanted it implemented?

A    He said he didn't want it implemented.

Q    How did it end?

A    It was still during the break for the EPC, so we both separated and went our separate ways until the meeting reconvened.

        MR. FOX:  One moment, Your Honor.

    No further questions.

        THE COURT:  All right.  Cross-examination.

        MR. HAIG:  Thank you, Your Honor.

//

**UNITED STATES DISTRICT COURT**

CROSS-EXAMINATION

Q     (BY MR. HAIG)   Mr. Conte, do you know whether Mr. Clark
and Mr. Tanaka had any discussions outside of your presence
regarding the transfer proposal or proposals?

A     You mean rotation proposals?

Q     Yes.

A     No, I don't know.

Q     So you would have no idea whether they talked when you
weren't present; correct?

A     That's true.

Q     And you initially believe there may have been two
documents outlining the rotation policy; is that correct?

A     I didn't say that, no, that's not true.

Q     When you did -- you recall speaking to government
prosecutors in preparation for your testimony last month?

A     Yes, I did.

Q     And do you recall saying that you looked over the memo and
that you initially believe there may have been two documents
outlining the rotation policy, but it may have only been the
memo that was reviewed?  Do you remember saying that to the
prosecutor?

A     I do.

Q     And you have no idea now whether, if there was a
discussion between Mr. Clark and Mr. Tanaka, what was discussed
in that discussion; is that correct?

**UNITED STATES DISTRICT COURT**

MR. FOX:  Objection, speculation.

THE COURT:  Sustained.

Q    (BY MR. HAIG)  Did Mr. Clark ever report back to you about a transfer policy that involved, not just moving deputies around, but moving them around as far as their shifts were concerned?

A    Yes, he did.

Q    You've made statements in the past that you believe that Mr. Tanaka should be credited with bringing good lieutenants who knew what they were doing to Men's Central Jail to be watch commanders; correct?

A    Some of them.

Q    And that would include Lieutenant Sutton, Lieutenant Nee and Lieutenant Hebert; correct?

MR. FOX:  Objection, beyond the scope.

THE COURT:  Sustained.

MR. HAIG:  Your Honor, could we approach, please?

THE COURT:  No.

MR. HAIG:  I have nothing further.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Sir, you may step down.

MR. HAIG:  Can I have one moment with counsel, please, Your Honor?

THE COURT:  Yes.

(Counsel conferred off the record.)

MR. HAIG:  Your Honor, could I go outside for one moment?

THE COURT:  Yes.

(Pause in proceedings.)

THE COURT:  You have another witness?

MR. FOX:  We do, Your Honor.  Do you want me to call while counsel's out of the room?

THE COURT:  He's got a lawyer here.  He wants to go out, that's his business.

MR. FOX:  Your Honor, we call Special Agent Leah Tanner.

(The witness, LEAH TANNER, was sworn.)

THE DEPUTY CLERK:  Please be seated.

Will you state your name again for the record.

THE WITNESS:  Leah Tanner, T-A-N-N-E-R.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

Q    (BY MR. FOX)  Special Agent Tanner, over the past few days, have you had the opportunity to review phone records?

A    Yes.

Q    Are these the same phone records that you had reviewed before?

A    Yes.

Q    What was the purpose of reviewing these phone records?

A    There was a -- some things that came out, some statements

made during --

Q    Well, let's -- I'm sorry, what was your purpose -- rather than the statements, what were you trying to look at?

A    It was just to verify whether or not certain numbers were called on those phone records that I'd already put together.

Q    Was one of those numbers the 5000 numbers?

A    Yes.

Q    And have you in the past been able to call that 5000 number?

A    Yes.

Q    And do you know -- well, when you called it, did a sheriff pick up?

A    I don't know the actual position of the individual, but the phone is answered "Sheriff's Information Bureau" when you call the number.

Q    And on your chart that we saw before, on your charts that we saw before, there were some unavailable numbers.

Can you please describe why those numbers were unavailable on your charts.

MR. HAIG:  Objection, speculation, foundation.

THE COURT:  Sustained as to foundation.

Q    (BY MR. FOX)  Special Agent Tanner, you prepared those charts; right?

A    Yes.

Q    And why did you list the numbers as unavailable on your

charts?

MR. HAIG:  Objection, Your Honor, speculation.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  In the phone records, what I had to do is when the phone company sends the records, if someone receives an incoming call from an unknown number, it just shows "unavailable" on the phone records.  So what I would have to do is -- I had the records from multiple individuals, and I would take the records, and if, let's say, Steve Leavins received an unavailable call but I was able to show that on Tom Carey's records he made a call to Leavins at the same time for the same duration, I would cross them to make the records reflect the unavailable call was, in fact, say, Tom Carey.

Q    (BY MR. FOX)  On your previous charts that we saw, did you include the 5000 number on your analysis?

A    Yes.

Q    Did you do anything -- have you done anything in the past to determine who Mr. Baca's aides were at the time of August and September of 2011?

A    Yes.

Q    Do you know some of those names?

A    Yes.

Q    Who are they?

A    It's Kevin Duran and the -- I believe it's executive assistant or executive aide, which is a sergeant level, was --

last name was, I believe, Hannemann.

Q    And does your analysis of your phone charts include Mr. Duran and the -- I think you said it was a sergeant aide --

A    Yes.

Q    -- in your analysis?

You were able to determine their numbers; is that right?

A    Yes.

Q    And are you familiar with Government's Exhibits 156, 157 and 158?

A    Yes.

Q    What are they?

A    Those are additional phone summary charts that I created.

Q    Are they based on the same voluminous records that you analyzed before?

A    Yes.

Q    And are they true and accurate summaries of those records?

A    Yes.

        MR. FOX:  Your Honor, I move for the admission of Governments Exhibits 156, 157 and 158.

        THE COURT:  Any objection?

        MR. HAIG:  Your Honor, if I could just...

    (Counsel conferred off the record.)

        MR. HAIG:  If I could just have a moment, please, Your Honor?

        THE COURT:  That's fine.

**UNITED STATES DISTRICT COURT**

(Counsel conferred off the record.)

THE WITNESS:  Your Honor, could I show them where they are?

THE COURT:  Yes.

MR. FOX:  Sorry.

Your Honor, may I approach, please?

THE COURT:  Yes.

(Pause in proceedings.)

MR. HAIG:  Your Honor, I've now reviewed the three exhibits, 156 -- 158?

MR. FOX:  156, 157 and 158.

MR. HAIG:  Yes, right.

Your Honor, we would object to the introduction of all three of those exhibits as being prepared for litigation purposes and not reflecting completely the record from which they came and therefore not being admissible.

THE COURT:  Overruled.  They'll be received.

(Exhibit Nos. 156, 157 and 158 received into evidence.)

MR. FOX:  Thank you, Your Honor.

Q    (BY MR. FOX)  Special Agent Tanner, I'm publishing Exhibit 156.

Can you explain what this reflects.

A    This is the calls between just Leroy Baca and Paul Tanaka from the 18th of September to -- or of August until the 26th of September in 2011.

UNITED STATES DISTRICT COURT

Q    Now, we see some that go to the cell phones, but I want to show you at 6:20 p.m.

Why did you include that call?

A    I included those because, technically, anyone that calls either Sheriff's Headquarters Bureau or some of the main lines could call and ask to be transferred over to anyone else in the Department or anyone at Sheriff's Headquarters Bureau.

Q    In the three charts we're going to see, do they all reflect these type of calls?

A    They include any calls that went to Sheriff's Headquarters Bureau, one of the multiple lines that they use.

Q    Showing you the 7:39 call, is that the same issue that we were just discussing?

A    Yes, I think it's actually a different main line that they list on their rosters, but it is another like general-type number, almost like a switchboard.

Q    And then showing at the bottom, it's a 6:18 call from Mr. Tanaka's cell to the sheriff's office executive assistant.

Why did you include this call?

A    I included those because, technically, it would be the same type of situation where if Mr. Tanaka was calling for the Sheriff, he could call either the executive assistant or the commander that works as the Sheriff's aide and be either transferred to them or relay a message.  So I included all of those possible numbers as well.

**UNITED STATES DISTRICT COURT**

Q    I just highlighted 6:18 p.m. on September 26th.

Is that before or after the time Sergeants Craig and Long approached you at your residence?

A    It's approximately 30 minutes after.

Q    Now I'm going to publish Government Exhibit 157.

Could you please explain what this exhibit is.

A    This is -- I took Leroy Baca's records and ran Tom Carey, Steve Leavins, Greg Thompson, Scott Craig, Maricela Long, Mickey Manzo, Gerard Smith and James Sexton through all of the records to cross and determine how many phone calls were between those individuals and Sheriff Baca during the August 18th to September 26th, 2011 time period.

Q    On the charts we were looking at -- I can't remember if it was Friday or Thursday -- there were select dates that you put into those charts.

Were you choosing separate dates in creating this chart, or what does this chart represent?

MR. HAIG:  Objection, leading, Your Honor.

MR. FOX:  It was probably an unclean question, Your Honor, so I'll ask a better question.

Q    (BY MR. FOX)  Special Agent Tanner, your charts -- how does this chart differ from your charts last week?

A    This chart is the entire time period, so the month and a half between August 18th to September 26th.  The previous charts were all of the calls on very specific days that were

relevant to the investigation.  So this one includes the entire month and a half of phone records for -- of any calls to Sheriff Baca.

Q    Now I'm going to publish Government Exhibit 158.

How many pages is this exhibit?

A    I believe it's two and a half.

Q    And what does it reflect?

A    It's the same thing as the previous one.  It is all calls, so not just specific key days.  It's all calls between the ICIB and OSJ investigators and Paul Tanaka's cell phone.  It does not include any calls to like main lines or things like that. It's strictly his cell phone or his office number, so just Paul Tanaka's phone with those investigators.

Q    How many calls approximately are between Mr. Tanaka -- well, actually, let me ask a better question first.

How does this chart differ from the ones we saw last week with respect to Mr. Tanaka?

A    Again, the ones last week were specific days that included all contact.  So it could be Steve Leavins to Tom Carey or Greg Thompson to Steve Leavins.  This one is specifically only calls that involve Paul Tanaka with the ICIB or OSJ investigators.

Q    And scrolling down to the second page and the third page, do you know approximately how many calls are reflected in Government Exhibit 158?

A    I believe there's 70 -- around 70 calls.

MR. FOX:  I have no further questions, Your Honor.

THE COURT:  Cross-examination.

MR. HAIG:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    (BY MR. HAIG)  Ms. Tanner, do you know the aides to Sheriff Baca back in August and September of 2011?

A    Yes, based on rosters and data provided by the Sheriff's Department through grand jury subpoenas.

Q    Do you know their cell numbers?

A    Yes.

Q    And do you know their desk line numbers?

A    I do.

Q    Pointing you to Exhibit 156, and Mr. Fox is nice enough to put it up on the screen for you.

Pointing you to the last three entries, 1 September, then 22 September and 26 September, do you see those?

A    Yes.

Q    All right.  You stated this is a complete list of the calls between Baca and Tanaka in September; is that right?

A    From the records in terms of the phone calls that were there, aside from some roaming calls on a separate sheet.

Q    Okay.  So we have a call on September 1st?

A    Yes.

Q    Between Mr. Tanaka's county-issued cell phone and Sheriff's Headquarters Bureau?

UNITED STATES DISTRICT COURT

A    Correct.

Q    Three-minutes long; right?

A    Yes.

Q    And the next call isn't until September 22nd?

A    Yes.

Q    And based upon this, there were no calls between September 2nd and September 21st.  Would that be correct?

A    Again, there may have been some roaming calls, but again, I'm not -- those are very -- the phone records, when you're roaming, do not come through in a similar fashion.  So it's a little bit more difficult to hash it out because it actually shows that Sheriff Baca is calling his own phone, but in terms of the records that are provided and easily -- easy to distinguish, yes, this is.

Q    So you talk about roaming calls.

If there was a roaming call and you could not establish who initiated the call and where the call ended up, you would not include it in the charts that are set forth today, which would be 156, 157 and 158; is that correct?

A    Right.  If there was no ability to link it to -- although if it was an unknown call going to Sheriff Baca but the call was made from an ICIB investigator, it would be on there because I would be able to determine it from the ICIB investigator records.  But if it was not from one of them, I would not be able to determine maybe an unavailable to Sheriff

Baca.

Q    And would that same unable-to-determine status apply to the prior exhibit that you were testifying to last week -- or earlier in the week, rather?

A    Yes.  So if there was an unavailable listed on one of those that we previously went over, it was because it was not one of the individuals -- Captain Carey, Steve Leavins, Paul Tanaka, that whole list of individuals.

Q    Got it.

So the phone records that you looked at to compile this listed the times of the phone call, the duration of the phone call; right?

A    Yes.

Q    There were no audio files that were part of the phone records that you reviewed.  Would that be correct?

A    That's correct.

Q    And based upon that, you have no idea what topic or topics were discussed in any of the phone calls in the exhibit that you testified to last week.  Would that be correct?

A    That's correct.

Q    And would that be the same with Exhibits 156, 157 and 158? You have no idea what topic or topics were discussed between the people that were on that phone; correct?

A    That's correct.

Q    And you have no idea because you did not see these people

making the phone calls, who, in fact, was actually talking on each one of the phones.  Would that be correct too?

A    That's correct.

MR. HAIG:  I have nothing further.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

Do you have any additional witnesses?

MR. FOX:  We do not, Your Honor.  The government's concluded its rebuttal case.

THE COURT:  All right.

MR. HAIG:  Your Honor, could we approach on an issue, please?

THE COURT:  Yes.

(Discussion held at sidebar.)

THE COURT:  Your argument's going to be about an hour?

MR. FOX:  Hopefully less than that, but yes.

THE COURT:  Okay.  And your -- both portions you've allotted?

MR. FOX:  20 minutes at this point.

THE COURT:  All right.  And you?

MR. STEWARD:  I'm about an hour, maybe a little less.

MR. FOX:  Could we take a break after this so I can set up?  Thank you.

UNITED STATES DISTRICT COURT

MR. HAIG:  Could I have one moment with counsel, please?

(Defendant's counsel conferred off the record.)

MR. HAIG:  I've decided to not pursue what I was going to pursue.

THE COURT:  Okay.

(End of sidebar discussions.)

THE COURT:  Ladies and gentlemen, that concludes the presentation of evidence.  We're now going to have the closing arguments.  We're going to take a short break, and again, I want to remind you that you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to talk with you about the case.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial or about anyone who has anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

We're going to break for -- let's make it ten minutes, and then we will start with the closing arguments.

Please leave your notebooks on your chairs.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Let me see counsel at sidebar.

(Discussion held at sidebar.)

THE COURT:  Any thoughts on 40, if you want to go with both these names, one of these names?

MR. STEWARD:  My thought is -- Dean Steward for the defendant.  My thought is to go with only Leroy Baca.  I don't think factually the second part about federal law enforcement is consistent with the facts in the case.

THE COURT:  Okay.

MR. FOX:  That's fine with the government.

THE COURT:  All right.

MR. STEWARD:  And, Your Honor, I had -- I think we asked -- I had planned on going over this instruction with the jury, and I'm concerned -- I've had some judicial officers that don't want me to do that.

THE COURT:  Well, you cannot put jury instructions -- you can't display them to the jury.  If you want to sort of paraphrase what you think the instruction's going to be, that's fine.

MR. STEWARD:  That's fine.

MR. FOX:  If I paraphrase it in a PowerPoint, that's fine with you?

THE COURT:  Yes.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Okay.

THE COURT:  The impeachment instruction, it says that we're going to list people that have been impeached, or do you want to just do one general?

MR. FOX:  I think a more general one is fine.  I think right now it would be hard for us to piece together everybody who was impeached.

MR. STEWARD:  We agree.

MR. HAIG:  Yes.

THE COURT:  So we'll just -- we'll discuss that with you at some point.

MR. HAIG:  Your Honor, one question.  Do you instruct before argument or after?

THE COURT:  After.

MR. HAIG:  Okay.  All right.

(End of sidebar discussions.)

(Off the record at 9:12 a.m.)

(On the record at 9:24 a.m.)

THE COURT:  All right.  Are we ready to proceed?

MR. FOX:  We are, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  Does the government wish to give a closing argument?

MR. FOX:  We do, Your Honor.  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes, please.

### PLAINTIFF'S CLOSING ARGUMENT

MR. FOX:  Over the last ten days, you saw what had become known to the Sheriff's Department for many years, and that is the many faces of Paul Tanaka.  The man who would overrule and undermine the people who sought to reform the Sheriff's Department.  The man who claimed to stand for the Sheriff's Department's core values, all the while brandishing a tattoo of a deputy gang on his leg as he sat in his executive office.

The man who would do his best to explain his definition of the gray area that he provided to every command he saw.  And you remember this.  He explained the difference on the stand between what's lawful and what's right, as if there's a difference and as if there's an area in between, and as if that area should be known as the gray zone, the gray area.  There is no difference between what is right and what is lawful.  The man who, when he was first questioned about the gray area, denied making that statement routinely and then on the stand told you that he explained what it meant hundreds of times.

The man who would join his close associates in hiding an inmate, tampering with witnesses and threatening to arrest an

UNITED STATES DISTRICT COURT

56

FBI agent. The man who would testify that he was not involved in the crime, didn't know anything about it, yet the man who the evidence points convincingly to his guilt beyond a reasonable doubt. The man whose name is all over the e-mails, the documents, whose authority everybody was operating under in order to engage in this conspiracy.

Now, you've heard a lot of evidence, obviously, over the last ten days, and I'm going to take you through it. But first of all, I'm going to talk to you about something we haven't spent a lot of time on, and that's what the charges are against Mr. Tanaka. The first one is a conspiracy to obstruct justice. This is Count 1, conspiracy to obstruct justice. Count 2 is obstruction of justice, and we'll go through what each of these mean. They have many common elements, many common issues, but a few differences that I want to take you through.

With respect to conspiracy to obstruct justice, we must prove beyond a reasonable doubt that there was an agreement to obstruct justice. That's element one in Count 1. Second, that Mr. Tanaka joined the conspiracy knowing its object. In other words, knowing its purpose, knowing that it was intended to obstruct justice, and intending to help accomplish it. And third, that one of the coconspirators, Mr. Tanaka or any of the other people involved in the conspiracy, performed an overt act. And there were many, many overt acts. They're explained to you, laid out in detail in the indictment that you will see

when you go back to the jury room.  I'll be going over many of them today.

Let me talk about the first element very quickly, because I don't think there's going to be a lot of dispute about some of what I'm going to be talking about.  The fact that these people were involved in the actions that we're talking about, I don't expect to be in dispute.  These are Mr. Tanaka's coconspirators, as alleged in the indictment, as proven to you in this case.

Sheriff Leroy Baca putting Undersheriff Paul Tanaka in charge of what was going on.  On the left-hand side, OSJ Greg Thompson, Mr. Tanaka's close associate, person reporting in this instance directly to Paul Tanaka, a lieutenant jumping several chain of commands -- several spots in the chain of command to report directly to Paul Tanaka.

Greg Thompson, deciding who to bring in, who he trusted, his OSJ deputies, Mickey Manzo, Gerard Smith and James Sexton, initially to find out what Anthony Brown told the federal government and then to hide Anthony Brown, guard him, make sure that the federal government could not hear from Anthony Brown, make sure that the grand jury could not hear from Anthony Brown as long as he was in the county custody.

On the right, ICIB, Internal Criminal Investigations Bureau, again reporting directly to Paul Tanaka.  Captain Carey leading the charge, bringing in -- and, of course, Mr. Tanaka

bringing in Steve Leavins, Mr. Tanaka's aide.  And then their foot soldiers, Scott Craig, Maricela Long.  Leavins, Craig and Long would be doing a lot of the dirty work, tampering with witnesses, telling Anthony Brown, The FBI has left you for dead, they haven't come back for you, trying to drive a wedge between Anthony Brown and the federal government so he would not be interested in testifying, so he would not be interested in going before the grand jury, so he didn't want to speak to the FBI ever again.

Then tampering with their own deputy witnesses, tampering with Gilbert Michel.  Tampering with David Courson.  Telling them, ordering them not to cooperate with the federal government.  And then Scott Craig and Maricela Long going to Special Agent Marx's house and threatening her arrest for having the audacity to make a case on their deputies.  That's the one -- besides the overt act, that's the one unique element to these charges.

Count 2, obstruction.  The defendant obstructed or tried to obstruct a grand jury investigation.  That is the first element that we need to prove to you beyond a reasonable doubt.  Second, that Mr. Tanaka acted corruptly with knowledge of the investigation.

Let me go through the key issues, and then I'll talk to you about corrupt intent and what that really means.  I think that these are really the issues that this case boils down to:

Did Mr. Tanaka participate in the conspiracy, and did he intend to obstruct justice. I expect that this is where the defense is going to dispute the government's case.

So let me talk about corrupt intent, because it's clear that Mr. Tanaka's engaged in all of these acts, clear from the evidence that he's engaged in all these acts. What does corrupt intent mean? It means simply that his acts and his coconspirator acts are done with the purpose of obstructing justice. Very simple. Was it intended to obstruct a federal grand jury proceeding, a federal grand jury investigation?

And importantly, it doesn't have to be the only purpose. Doesn't have to be the sole purpose, not even the primary purpose. They could have been acting in part for innocent means so long as they also acted for corrupt means, so long as part of what they were doing was intended to obstruct the federal grand jury investigation.

So let's talk about our proof to you over the last ten days. Our proof came down to about -- probably five or six days. But this is what we presented to you. The LASD reformers. You heard from Olmsted, Clark, Gonzalez, today you heard from Dennis Conte, the ones who wanted to change the behavior of the deputies. I should add, of course, Steve Roller to that, wanted to change what was going on with the deputies. Saw issues with the deputies. Decided to do something about it and the ones that Mr. Tanaka would overrule

and undermine.

Importantly these people had no dog in the fight.  They had no stake in the outcome of this case whatsoever.  They were just telling you what happened.  Mickey Manzo, someone who did participate in the conspiracy, someone who didn't want to be here, someone who had to be compelled, ordered to be here, someone who had to be given immunity in order for him to testify.  And of course immunity is no benefit to him because he still stands convicted.  But he told you about everything that was going on in what they referred to, in what James Sexton referred to as Operation Pandora's Box.

You heard from what I called LASD percipient witnesses.  These are the people like Michael Bornman, Ralph Ornelas, Kathy Voyer, the ones who'd seen Mr. Tanaka around during the times of the obstruction.  The ones like Tara Adams who hear that these are the orders from Undersheriff Tanaka, that these people are operating under his orders.

The e-mails that you saw with Mr. Tanaka's name either on the e-mails themselves, either coming from or sent to Mr. Tanaka or his aide, Christopher Nee.  The e-mails referencing Mr. Tanaka by name, the boss possibly, Paul Tanaka possibly, the undersheriff possibly, all names that of course were used for Paul Tanaka.

You heard the recordings, first of all with Anthony Brown.  Gerard Smith and Mickey Manzo at the very beginning laid out

what this was all about.  We want to clean our own house.  Pounding on the table.  If somebody comes, they better knock on my door.  We want to clean our own house.  Those recordings also showed you that they knew on August 19th that the FBI was setting up deals with their dirty deputies, that the FBI was investigating abuse by the deputies.  That's what they knew, and that's what they took up their chain of command.

You also, of course, have heard, and I'll take you through, some of the recordings that happened thereafter.  Steve Leavins saying, Did the FBI ask you if you'd testify in this matter?  Right after the FBI had been kicked out of the facility.  And then he says right after that, Because I don't want anybody to be misleading you here.  From there on, they tell him he's been left for dead, that the FBI has not come back for him.  They don't want him to testify.

You also heard the recordings of the witness tampering, Gilbert Michel, David Courson.  I'm not going to belabor that now because we're going to go through some of that.  And you saw the phone records.  Very important in this case.  Why so important?  In our case in chief, when we presented them to you, you were able to see all the contact that all the coconspirators were having with one another, how often they contacted Paul Tanaka.

And then Mr. Tanaka gets on the stand.  He tells you on direct examination, I didn't know anything about what was going

on.  The sheriff would ask me what was happening, and I couldn't give him an answer, so I had the investigators call the sheriff.  Then on cross-examination, taking him through each day of those records, taking him through the dates that we set out for you, five or six selected dates, one phone call between any of the coconspirators besides Mr. Tanaka and Leroy Baca.  Many calls between Mr. Tanaka and Baca, but only one between any of the ICIB or OSJ deputies and Mr. Baca.

This was Mr. Tanaka's operation.  He was running the show.  We knew that from the beginning.

So let me take you back to the beginning.  August 18th of 2011.  This is when the Sheriff's Department learns that the phone traces back to the FBI.  First they learn it at the deputy level.  Mickey Manzo, Gerard Smith learned that that phone number that Anthony Brown called through the inmate telephone monitoring system tracked back to the FBI civil rights unit.  Same date, Leroy Baca receives the call from the assistant director in charge, Steve Martinez, who tells Mr. Baca that phone that was found on an inmate, it was the FBI's phone.  It's reflected in Government Exhibit 172, Leah Tanner's summary phone chart.  You'll see that and a call five minutes later between the FBI director and Leroy Baca.

Just a few minutes later, you'll see that Mr. Baca called Mr. Tanaka's cell phone.  And we heard from Mr. Tanaka's previous testimony that Mr. Baca told him then that the phone

was found -- that was found on the inmate was the FBI's phone.

The next day Greg Thompson, one of Mr. Tanaka's close associates, sends his deputies in to find out what was going on with Anthony Brown, and there was one purpose for doing that.

(Exhibit 81 played in open court.)

MR. FOX: So who were those very influential people. Certainly not the line deputies. Documents show who they were. There are e-mails starting at Exhibit 15 that show you who these important people were, who these influential people were. Gerard Smith, Mickey Manzo, Greg Thompson have a meeting set up at 1:30 August 19th with Mr. Tanaka. Mr. Tanaka tells you on the stand, I don't recall anything about that meeting.

E-mails also reflect that there's a two o'clock meeting with Sheriff Baca afterwards that Mr. Tanaka, Greg Thompson, all the OSJ guys, Mr. Carey were supposed to attend, and also Internal Affairs. In the 1:30 meeting or the two o'clock meeting, Mr. Manzo didn't know which, he said Mr. Tanaka was visibly upset after learning that Anthony Brown was an informant for the FBI civil rights unit, civil rights squad. Mickey Manzo, again, no dog in the fight, didn't want to be here, telling you about that meeting. Didn't even meet with us ahead of time.

Mr. Tanaka, at that meeting on August 19th, orders no one to interview Anthony Brown without whose approval? Paul Tanaka's approval. Now, I expect defense counsel to get up

here and talk to you about the last question they asked of Mickey Manzo.  Mr. Steward, very good lawyer, asked Mr. Manzo, Do you recall any orders that my client, Paul Tanaka, gave to you directly?  And Mr. Manzo, after testifying about five or six or seven different orders, at that point on the spot said, I don't recall any.  I'll take you through those orders.  We already see one up here.  He ordered no one to interview Anthony Brown without his approval.

August 20th, the next day.  This is the Saturday meeting involving a lot of different individuals within the Sheriff's Department.  After listening to some of the recordings, Paul Tanaka slams the table and shouts, Those MF'ers, who do they think they are, referring to the FBI, referring to the FBI. And then he says, Eff the FBI.

Now, once again, Mr. Tanaka, on direct examination said his anger was directed at Gilbert Michel.  When I started crossing him on it, you might recall he said, Well, I didn't know it was Gilbert Michel actually.  And that made sense because Anthony Brown did not give the name Gilbert Michel until the very next day.  He wasn't mad at Gilbert Michel at that August 20th meeting.  He said that and then realized he was caught with that answer.  He was mad at the FBI.  That's who he referred to as those MF'ers, that's who he referred to when he said, Fuck -- excuse me, eff the FBI.  Apologize for that.  I've been good up until now.

So what also happened at that meeting?  Mr. Baca said, Everything is going to be run through Mr. Tanaka.  Everything is going to be run through Mr. Tanaka.  So Mr. Tanaka was in charge of this operation.  Mr. Baca put him in charge.

We also know from Mr. Tanaka's testimony in United States vs. Greg Thompson that you heard about in the stipulation and several other defendants that safety and security was not raised at that meeting.  So this was about hiding Anthony Brown from the FBI.

Mr. Thompson spoke either at that meeting or later to Mr. Tanaka about having a new jail policy.  And what was that jail policy?  Crystal, I spoke with Mr. Tanaka today.  I know what policy he is referring to.  Tell Mr. Rhambo to drop the hammer.  We are ready on our end.  This was the policy to keep the FBI out of the jails, to have Mr. Tanaka be the one that decided who came to the jails, to make sure that the FBI would be kept away from Anthony Brown.

Mr. Tanaka said on the stand, I never disapproved of anybody coming to Men's Central Jail from the FBI and interviewing inmates.  Well, what happened when they showed up and tried to interview Anthony Brown?  He certainly didn't approve that meeting, did he?  And then you heard later Ralph Ornelas, September 2nd and September 27th, you saw the e-mails. He had had to turn away agents from the FBI.  He knew their supervisor, and he was forced to turn them away and e-mailed

Chris Nee, Mr. Tanaka's aide, to try to get approval.  Another instance of Mr. Tanaka on the stand lying to you.

August 21st, Mr. Tanaka's briefed on Brown's statements.  What are those statements?  Anthony Brown details more civil rights abuses engaged by the deputies at Men's Central Jail that he told the FBI about, and for the first time he identifies the deputy.  You want to know the name of the deputy?  I'll give you his name.  Gilbert Michel.  That's the first time they know about it.

So how does the Sheriff's Department react, knowing that they have dirty deputies engaged in abuse, knowing that they have dirty deputies engaged in corruption, knowing that they have dirty deputies bringing in contraband?  They decide to take it out on the people who are investigating them.  After the FBI's kicked out of the meeting, This interview's over, they send in the six-foot-four or -five, 250-pound sergeant who informed the FBI that the interview's over.

Mr. Thompson decides to fall on his sword, you heard about that, and go to Mr. Tanaka and apologize for letting the FBI in to see Anthony Brown.  Mr. Manzo told you that OSJ and ICIB met in Mr. Tanaka's office on that day on August 23rd.  Mr. Thompson falls on the sword -- Mr. Tanaka admitted this in his grand jury testimony that was read to you -- and told Mr. Tanaka that the FBI had interviewed Brown.

And what happens?  Not my words, words in an e-mail, a

butt-chewing occurs.  Exhibit 25 shows you this.  You failed me.  I'm good for the butt-chewing, it was the "you failed me" that hurt.  This is Greg Thompson e-mailing the assistant sheriff about what happened in that meeting.  And it refers to three people.  I don't want to hear from you, assistant sheriff Cecil Rhambo, the assistant sheriff over custody; him, meaning Paul Tanaka; or the sheriff.  The last thing I really want to hear from you are those words, You failed me.  Another example of something that Mr. Tanaka could not rationally explain away.

He said, I was referring to Mr. Baca.  You failed the sheriff.  Those are not the words that Greg Thompson puts in an e-mail he writes that day.  This is not four years later.  This is not five years later.  It's that night.  Talking about Mr. Tanaka saying, You failed me.  Reason why Mr. Tanaka can't own that and refused to own that is that shows he had issued an order, Mr. Tanaka had issued an order that the FBI be kept away from Anthony Brown.

According to Mickey Manzo, similarly, Mr. Tanaka said that they let him down and had screwed up.  Very similar to the "you failed me" comment.  And he once said -- and I'll get it right this time -- eff the FBI.

What happens next?  Mr. Tanaka, he comes up with, along with the other people in the room, the plan to hide and guard Anthony Brown in a different way.  Remember, Anthony Brown at this point in time is in 1750, the G row, with a camera trained

on him so that they can tell who's coming and going.  Anybody coming close to that cell, entering that cell, they have a camera; they can see who that is.  It's the most secure area of Men's Central Jail.

From the 18th to the 23rd that's where Anthony Brown is. They're trying to keep him away from people.  Makes sense.  But the FBI gets in to see him, and that's not acceptable to Mr. Tanaka.

So he asks for a 100 percent guarantee it won't happen again.  He demands this, 100 percent guarantee.  And they come up with a plan where OSJ is to guard Anthony Brown.  Now Mr. Tanaka, once again, disowns this plan.  He refused for a while to admit that he authorized approval -- I'm sorry, authorized overtime for this plan, that he approved the plan. But he did.  He finally admitted that he did authorize overtime for the plan.

At this meeting there's no discussion of the safety of Anthony Brown.  The only discussion is the fact that the FBI had gotten in, had violated Mr. Tanaka's orders to keep the FBI away from Anthony Brown.  And that was the focus, according to Mr. Manzo.  It was the fact that his orders were not followed.

Same day that Anthony Brown is moved to the medical floor, Mr. Tanaka knows about it.  He's told that Mr. Brown is moved to the medical floor.  And which medical floor is this?  The infectious diseases floor, the one that deals with staph

infections, MRSA.  Anthony Brown, just out from a heart procedure.  They put him in the infectious diseases floor in order to keep the FBI away from him.

This is an important exhibit, Exhibit 136.  You'll have it back in the jury room.  It's a notebook written by Gerard Smith.  We didn't focus on it very much.  I'm going to spend some time talking about it today.  There's a note in there, contemporaneous notes by Gerard Smith.  It says, Mr. T, OSJ, eight-hour shifts.  We know this is come up with on August 23rd, you saw it, because that's when they start guarding Anthony Brown, on August 23rd.

Here's the notebook.  In person, Mr. T, OSJ, eight-hour shifts.  So what's so important about this?  You'll recall Mr. Tanaka ordered Greg Thompson, You go tell the sheriff.  You failed me, you go tell the sheriff about this.  Mr. Tanaka didn't follow Greg Thompson into that room.  The plan that they came up with was when Greg Thompson, Gerard Smith, Mickey Manzo, Tom Carey were all in Mr. Tanaka's office on August 23rd.

We also know, you also know, that Mickey Manzo and Gerard Smith did not follow Greg Thompson into that room.  Only Greg Thompson went into that room.  So this plan Mr. Tanaka came up with, with all of those people.  Contemporaneous notes written on that day about that meeting.

No feds in custody.  Same exhibit.  All will be at

appointment and approval of Mr. T, and the visit will be supervised. Not highlighted, but middle of the page. The Sheriff's Department, based on the visit being supervised, will know what the FBI wants to talk to the inmates about so they can be sure that the FBI's not investigating civil rights abuses by talking to the inmates.

Last note on there, Any requests will be made in advance and approved by Mr. Tanaka, Mr. T.

And Mr. Manzo writes this policy out, almost word for word from that. Effective immediately, all FBI requests for interview will be approved by Undersheriff Tanaka. Writes it again at the end of this exhibit.

Greg Thompson edits this exhibit, edits this e-mail, sends it on to Chris Nee, Mr. Tanaka's aide, and asks for the boss's approval. Also sends it to Cecil Rhambo's aide, asking for the boss's approval and asks -- after he calls Mr. Nee, after Mr. Nee asks for a phone call, Greg Thompson and Mr. Nee speak, and Greg Thompson asks, Is Mr. Tanaka going to make changes on the FBI notice? He said you were.

So there's a conversation between Mr. Nee and Mr. Tanaka in which Mr. Tanaka says, Make sure that Greg Thompson makes these changes that I talked to him about. You're going to make these changes, Mr. Thompson. That's what that exhibit shows.

And then Exhibit 31, this is an e-mail written to the OSJ deputies who were standing guard outside of Anthony Brown's

cell, written August 24th, from Gerard Smith to those OSJ deputies who were going to be guarding him, again, corroborating that Mr. Tanaka's behind all of this.  Anthony Brown, there will be no other movement without the presence of the following people:  US Tanaka, is the first one listed, Undersheriff Tanaka.

And in that same memo is the language -- this is one -- it's been expressed to me several times now that this is one of the most important investigations involving the Sheriff's Department in its 160-year history.  You'll see that in the document.  Mickey Manzo told you that those were Paul Tanaka's words.

And let's step back for a second and figure out what's so important.  What makes this so important to the Sheriff's Department?  How is this one of the most important investigations in its history?  From their perspective, it was looking at a crime.  They've got a cell phone, a cell phone in their custody.  There's a bigger problem here though.  The reason why this is so important.  The FBI, federal government, federal grand jury is looking at them for civil rights abuses and corruption.  This was a scandal that Paul Tanaka had on his hands, and he wanted to quash it as soon as he could.

He wanted to express the significance of the investigation so OSJ wouldn't let him down, so OSJ would make sure that the FBI, and later the U.S. Marshals, would not get Anthony Brown.

I just mentioned U.S. Marshals.  You'll recall that they serve writs, federal writs demanding the testimony, court orders demanding the testimony of inmates before a federal grand jury.

Kathy Voyer testified.  She said it was either August 25th or August 26th.  She said if a federal writ comes in for Brown -- she overhears this in a conversation between two lieutenants.  If a federal writ comes in for Brown, you're to call Tanaka's cell phone right away.  Do not release the inmate.

They were expecting a federal writ that day.  They were expecting the federal government to get a writ, and they wanted to make sure that they were on top of the issue right away. They turn to Kathy Voyer and say, Don't write this down, don't call anyone, just go over to the watch commander and let him know.

Same day, the federal writ is served.  Mr. Tanaka has admitted that he saw the federal writ at some point, saw in the phone charts -- not Special Agent Tanner's phone charts but phone charts previously with the marshal that you saw up here, that there were two facsimiles to IRC, to the Inmate Reception Center, that day from the U.S. Marshals Service, same day the writ's issued.

You also heard that two deputies at the Inmate Reception Center, Jason Pearson and James Sexton, admitted hearing about

**UNITED STATES DISTRICT COURT**

or seeing the writ.

The policy to keep the FBI out of the jails comes out the same day, August 25th. Effective immediately, all FBI requests for inmate interviews must be approved by -- and I put Tanaka's name in brackets because this policy doesn't have his name on it. He made sure that his name wouldn't be on this policy in the previous discussions. He didn't want anyone knowing that he was behind it.

And then the OSJ deputies come to Tara Adams and Gus Academia demanding that Anthony Brown be released from the computer system. When Tara Adams says, I need a court order, I'm not going to release him, they tell her where the authority's coming from. Are you going to say no to the undersheriff? Are you going to say no to Tanaka? When she says, Yes, they say, Okay, well, will a phone call do? We'll call him. And Gus Academia, afraid, intimidated, decides to release Anthony Brown from the system.

He had every right to feel afraid at that point because we've seen how vindictive Paul Tanaka is when you cross him. We see how people get transferred, how he undermines people and overrules people. His reputation was out there.

August 26th, the e-mails discussing the possible court order. And what's important about this document is they're not talking about the normal chain that a writ comes in, the normal process. That writ comes from the Marshals Service faxed over

to IRC.  The possible court order they're discussing is what do we do if the federal government actually comes at our door, to MCJ, with this order?  What if it's so important to them that they show up with this order?  What are we going to do?  And they decide for the first time, as you learned from Chuck Antuna -- because the normal process for a writ is just to process it.  That's what he told you yesterday, just process the writ.  We don't need an attorney involved.  But they decide to involve an attorney, make sure that there's not going to be any contact.  Do not release the inmate or allow contact if they come at our door with a federal writ.

And what do they say in those e-mails before that?  Which attorney should we use?  What about the one on vacation for a month?  May have been a joke, but that shows their intent was to delay this as long as possible.  Their intent was not to make sure this was a valid order.  It was the one who's on vacation for a month, the one where we could delay his production before the grand jury.  We can tamper with him some more.  We can make sure that he will not cooperate with the federal government during that time.

August 29th, Paul Tanaka, Leroy Baca and others from the Sheriff's Department come to the U.S. Attorney's Office, meet with United States Attorney Andre Birotte -- Mr. Tanaka admitted that, Mr. Birotte told you that on the stand -- and they discussed grand jury subpoenas.  Again, comes from

Mr. Tanaka's testimony in the United States vs. Thompson matter. And the U.S. Attorney who, of course, as he told you, authorized this investigation, knew of this investigation, when I asked him, Did you give them any indication that you believed the FBI had committed a crime, that question shocked him so much because it made no sense, that he said, The FBI? Who? The FBI? You're talking about the FBI? No. Why would I have told them that they had committed a crime? So obvious to everybody that no crime by the FBI was committed. Everybody knows that an undercover agent does not commit a crime engaging in the undercover activity.

But they already had a plan in place. Their plan, knowing Mr. Birotte's background as the inspector general for the L.A.P.D., knowing that he's somebody who's looked at law enforcement agencies in the past, they decided to go out and tamper with witnesses at Men's Central Jail. And Mr. Tanaka knew about this ahead of time and made sure he was going to be there that day.

He's there and he's briefed. Let's listen to a couple of these clips. First, what did they say to Gilbert Michel?

(Audio played in open court.)

MR. FOX: That was Steve Leavins, Mr. Tanaka's former aide, knowing what the federal government would want to be looking at and knowing who they were going to be using to get the information, Gilbert Michel.

(Audio played in open court.)

MR. FOX:  Scott Craig ordering Gilbert Michel not to discuss it with anybody else, period.  And you'll recall that he said right after that, That includes the FBI.

(Audio played in open court.)

MR. FOX:  No purpose for saying this.  There's absolutely zero purpose for Scott Craig to be saying this to a deputy, other than to tamper with that witness so he wouldn't want to cooperate with the federal government.  And they do it to David Courson as well.  Remember David Courson, the one who had told Special Agent Tanner, as she was going in and out of MCJ, that he had abused a deputy.  He had -- I think it was a flashlight that he said that he had struck an inmate with.

So she thinks that he knows something about what was going on at MCJ, all the force going on there.  And he asks her out.  So she talks to her supervisor, gets approval to record the discussions, pretends like she wants to have a friendship with him, and tries to get more information out from David Courson.  And what do they say when they learn that David Courson exists, has been talking to this special agent?

(Audio played in open court.)

MR. FOX:  Very important to them.  Call me at three o'clock in the morning if somebody gives you a grand jury -- I'm sorry, he said subpoena there but then clarifies what type of subpoena he's talking about.

UNITED STATES DISTRICT COURT

(Audio played in open court.)

MR. FOX:  And you'll recall that they also invoked their name of the office:  I'm a sergeant, you're a deputy, and I'm ordering you not to do this.  I'm ordering you not to speak to them.

Mr. Tanaka, many times on the stand and many times in the testimony we had read to you from his previous testimony, said things like, It's possible.  It may have happened.  I think there was one that, It may have been possible, or possible that it may have happened.  I can't remember which it was.  But this one was, It's possible that he knew that ICIB was going to be telling the deputies not to cooperate with the FBI.
Mr. Tanaka, who says, I am for the core values, I tell deputies that they should know the law, I oversee Internal Affairs and ICIB, but I can't remember whether the plan was to tell the deputies not to cooperate with the FBI.  I can't remember if the plan was to obstruct their investigation, that I knew that.  Is that reasonable?  Is that logical?  That makes no sense.  If he had heard that at the time, it would have been memorable to him.  And he would have referred those people -- if he was legitimate, if he wasn't corrupt, he would have referred those people for investigation.  He would have disciplined those people.

The vindictive Paul Tanaka that you heard about did none of those things, because they were doing exactly what he wanted

them to do.  And it would also be memorable if he didn't know that.  It would be shocking if he couldn't remember that.  Yeah, I had no idea that's what they were going to tell them.  They didn't brief me on that that day.  How easy would it have been to say that?  That wasn't his testimony.  It's possible that he knew.  I may have known that.

Same day, according to Michael Bornman, who testified -- again, somebody with no dog in this fight, not going to get anything from any verdict in this case -- runs into Steve Leavins, finds out that Paul Tanaka's coming, and Michael Bornman gets out of there because of past experiences with Paul Tanaka.  Runs into Mr. Tanaka, who's carrying a Subway sandwich bag.  You'll recall Mr. Bornman -- this was very memorable to him.  Mr. Tanaka wearing a yellow shirt.  Bornman comes back an hour later.  Steve Leavins has his feet kicked up on Mr. Bornman's desk, and he says, I've never seen him that angry.  He, meaning Mr. Tanaka, is going to make sure that the FBI never finds that guy, referring to Anthony Brown.

Bornman realizes the significance of this, and he says, You've got the handle on that?  You're in charge?  Steve Leavins says, No, I'm not in charge.  Tanaka's in charge.  He's made it very clear that he's in charge.  Steve Leavins, close associate of Paul Tanaka, telling people that Mr. Tanaka is behind everything that's going on.

I won't go over this too much, but Exhibit 48 will be one

of the exhibits you can look at that shows Mr. Tanaka's office was not approving FBI visits like Mr. Tanaka told you on the stand.  And by the way, let me spend just a few seconds talking about the exhibits they showed you where Mr. Thompson recommended that some agents be allowed in.  First of all, you don't see Mr. Tanaka saying, Okay, let them in.  He says, Okay, when Mr. Thompson says, I would approve it.  He doesn't give a final answer.

But also, what are they looking at in those e-mails?  What is it that they're looking at?  What the FBI isn't possibly investigating.  And it says, This appears to be a legitimate investigation into the inmate.  That's what they're interested in.  Is the FBI coming here to investigate us, or are they coming in here to investigate any criminal activity by the inmate?  If there were any approvals, they were about allowing the FBI to interview inmates who had committed crimes themselves, not to allow them to interview inmates who could tell them about deputy abuse.  You'll see no e-mails in which Mr. Tanaka approves of those type of interviews.

Same day, Mr. Tanaka's office, conference rooms around him, Mr. Baca's office, swept for bugs, listening devices. Mr. Tanaka, similar to the exhibit before where he wanted his name off of the documents, wants to make sure that nobody knows of his involvement, nobody knows of the dirty conversations going on in his office or in the conference rooms.

Judge Toribio told you about Scott Craig visiting him on the September 8th, 2011. At this point the Sheriff's Department had tried to get their arms around the investigation. Anthony Brown had told them he was no longer interested in cooperating with the FBI. They had done a sweep of the jails to find out if there were any more phones that traced back to the FBI; found none. Any other contraband that traced back to the FBI; found none. So they wanted to make sure that they knew everything that was going on.

Tried to get all the investigative records by the FBI and Judge Toribio informs Scott Craig, knowing that management would want to see this, he writes, Denied, Court has no jurisdiction over any federal agency.

Mr. Tanaka has admitted that he was aware of that ruling. You will also see an e-mail, you have seen it, that Chris Nee asks for that order the day before they present it to the judge. Mr. Tanaka knew about it beforehand, that they were going to be seeking this order, and he's aware of the ruling afterward. He was aware that they had no jurisdiction, the county had no jurisdiction over a matter like this.

But consistent with all of their actions in this case, they decide to double-down. September 9th, very next day, Craig leaves a threatening voicemail for Special Agent Marx.

(Audio played in open court.)

MR. FOX: Now, you remember that Mr. Craig actually

left that voicemail on the wrong number.  That didn't go back to Special Agent Marx.  He dialed the wrong number.  So he didn't receive a phone call back.  Sheriff's Department still has not gotten its arm around the investigation -- its arms around the investigation.

You remember the list of ACLU complaints that were sent to Mr. Carey, and he says -- forwards it to Craig and Long, Let's look into these, these that we closed two years ago finding there was nothing that had happened.  But let's look at these again because it might get us to what the feds are looking at. We had looked at these before, unfounded, but let's look at these now.  Find out what the feds are looking at.

At the same time they begin to conduct surveillance of the FBI agents themselves.  Starting out with Special Agent Marx. You heard about the briefing that Mr. Tanaka attended, eating cantaloupe as they went around the room talking about the surveillance.

Same day, September 13th, they hear that Gilbert Michel is confessing to beating handcuffed inmates, telling Craig and Long that Steve Leavins calls Mr. Michel an idiot.  They forward this information on to Mr. Carey.  Another example of how the phone records help you.  There are e-mails that you've seen, and you'll have them, in which Mr. Carey, right after this e-mail, says -- sends an e-mail to Mr. Nee, Is the boss in?  Then he says, Never mind, in the next e-mail, Made

contact.  You will see a phone call between Mr. Carey and Mr. Tanaka at that point.  Mr. Tanaka knew on September 13th how big of a problem this was going to be.

A deputy had confessed to being involved with other deputies in abusing inmates, handcuffed inmates.  This was beginning to be a bigger problem, and they needed to deal with it now.  They needed to squash the scandal.

After the surveillance occurs for some time, they decide, Okay, we got to do something, because on September 25th the media starts reporting about the Justice Department's efforts to police the police, and specifically the L.A. Times discusses investigating -- the FBI's investigation of beatings in the jails.  This is getting really serious.  The public is interested in this story now.  The Justice Department from the top is interested in these type of investigations.  We need to go nuclear.  Let's choose the nuclear option.  Let's try to force the federal government to back off by acting as though they did something wrong.

Scott Craig threatens the arrest of Special Agent Marx.

(Video played in open court.)

MR. FOX:  We can either come to your house and arrest you in front of your neighbors out in the open, or you can have the assistant director contact me.  That's what Scott Craig is implying there and he says later.

What happens?  Special Agent Marx, who's not informed of

what charges they're looking at, by the way, she did nothing wrong.  You even saw she picked up her dog excrement in the surveillance.  That's all they knew about her.  She cleaned up after her dog, and they come out and they threaten to arrest her.  And remember, Mr. Tanaka has admitted that his investigators told them there was no probable cause to arrest Special Agent Marx, but they go out and they threaten to arrest her.

And then they realize that their message got through, that the FBI's scary because Special Agent Marx reports this contact back to her supervisor, who tells her to come in right away. They have high-level meetings then.  She's meeting with the assistant director, other people, while her supervisor, Carlos Narro, calls Sergeant Long, whose card Special Agent Marx had given him.

And what happens on that call?  You've heard it.  I'll play it for you one more time, two snippets.

(Exhibit 110 played in open court.)

MR. FOX:  Once again, the authority's coming from Paul Tanaka.  Sergeant Long telling Supervisory Special Agent Narro that the undersheriff and the sheriff are aware of this and that Mr. Tanaka can provide the details.  The end of the call is also revealing.

(Exhibit 110 played in open court.)

MR. FOX:  They didn't want to still be rolling.

**UNITED STATES DISTRICT COURT**

They didn't want that captured on tape.  You heard the "Shh" at the very end of it.  And that's because the true intention was captured on that recording.  Scaring the FBI at that point, that was their goal.  That was the point of it.  They had already hidden the inmate, they had already convinced him, at least so they thought, not to cooperate in the investigation.  Had already told the inmate, put in his head that he had been left for dead; that the FBI, despite having that court order, the writ had not come back for him.

They thought that he had no longer wanted to cooperate.  They had already ordered deputies not to cooperate in the investigation.  They had dealt with as many potential witnesses as they could potentially deal with -- as they could deal with.  They had forced the FBI civil rights agents out of the jails so this investigation within the jails could not continue.  They had threatened to arrest the FBI special agent who had dared to make a case on the very deputies that Mr. Tanaka had protected, who had dared bring to light the corrupt culture that Mr. Tanaka had fostered over all those years.  Paul Tanaka is guilty of the two charges in the indictment.

Thank you, Your Honor.

THE COURT:  All right.  Does the defense wish to give a closing argument at this time?

MR. STEWARD:  Yes, Your Honor, thank you.

//

**DEFENDANT'S CLOSING ARGUMENT**

MR. STEWARD:  Ladies and gentlemen, it's not a crime to be a strong leader.  And we heard this morning from Mr. Hebert a real good phrase, that is a proactive leader.  He described that as one who goes out on the jail floor, one who is actively supervising his people, and one who is effective.  And if nothing else, the last ten days you have heard that Paul Tanaka was a proactive, strong leader.

Over the period of some 30 years in his career, I think you can also conclude that he's ruffled some feathers.  He has people who don't like his leadership style and don't like him personally.  But that's not a crime either.

He had what can really only be described as a meteoric rise in the Sheriff's Department.  And it wasn't 100 percent Leroy Baca; he hasn't been the sheriff the entire 30-some years that Mr. Tanaka was in the department.  It was others who were impressed by his CPA skills.  I think you heard that he wrote the sheriff's budget in 2002 and 2003, something like that.  And that was a particularly attractive quality in a leader as he rose up the ranks.

His administrative ability.  You heard the description of each one of his stops along the way within the department, and a number of them included supervision of administrative -- not patrol, not custody, but personnel and departments like that.  That had to have been a real big plus in terms of his meteoric

rise.

The other thing is he was a young man throughout all of this time.  You heard that as he became a lieutenant and a captain and a commander, at the time he got those promotions he was the youngest one in the history of the department to get that.  Now, all of that creates a situation where there were people who were either jealous or for some reason had it out for him.  And you've seen a number of those here.

Mr. Fox called them the reformers.  Come on now.  They're not reformers.  What is Al Gonzales a reformer of?  And I'll come back to him in just a moment.  But all of the gentlemen that you saw come in here, particularly on Friday, our first Friday of testimony, were either retired or about to retire, Caucasians, and seemed to be angry.  And that's the sort of thing that you can look at and consider as you deliberate back in the jury room.

You have the ability to listen to and consider not only the words that are said by each one of the witnesses but their demeanor, the way they testified and your impression of their demeanor.  And the folks, a couple of them, you could just feel the spite as they came in here.  And they told you why.  He transferred me.  He yelled at me.  He didn't like my plan.  All of these different things give these people a bias.  A couple of them actually admitted, I don't like the guy.  And you can consider each one of those facets of the relationship of the

witness with Mr. Tanaka as you're back in the jury room. We'll come back to the reformers in just a moment.

Now, I wanted to talk about the Saturday meeting in late August at Sheriff's Headquarters. We've had a number of witnesses that attended that meeting. I think we heard that Sheriff Baca was in a track suit or a running suit and was running the meeting. But three things came out of that meeting that Baca wanted done. First, he wanted Brown to be kept safe. Second, he wanted ICIB and the others in that room to, quote, Get to the bottom of this, what's going on. He didn't know. And remember, this is August 26th, 27th, something like that. I'm sure you noted the dates. And third, Brown and the phone are going nowhere.

Now, at some point shortly thereafter Baca took some action that showed how much in control he was of this entire situation. And what he did, not literally, but he ordered that Brown not be removed to state prison. If you'll recall, we had testimony that Brown was a day or two, maybe three, away from being transferred to state prison. And Mr. Manzo told you that at this meeting Baca said, He's not going anywhere, and that Baca was the one who made sure Brown stayed in the jail system in Los Angeles County.

Now, on the safe part of it, let's take a look at Exhibit 31.

(Pause in proceedings.)

MR. STEWARD:  And we looked at this.  I don't remember which witness at this point, but somebody -- maybe it was Mr. Manzo, I'm not sure.  Once this warms up, you're going to see a letter -- or an e-mail from Gerard Smith to a whole bunch of people, some of whom you'll recognize the names, I hope.  Here we go.

Okay.  Again, this is Exhibit 31, and you might remember we went over this before.  And it's somewhat lengthy, but the part that I suggest to you is very, very important is here.  The inmate, Brown, we are tasked with protecting.  Clearly they have been told to keep this guy safe, and that makes sense.  That makes sense.  Once they find out he's working with the FBI, if he's in the jail system and either an inmate or a deputy beat the heck out of him, that's going to be a very bad thing for everybody, and particularly for Leroy Baca, the sheriff.

So ICIB is charged with two things in terms of getting to the bottom of this.  One, what's going on with Michel and the bribery?  FBI is involved.  They find that out at some point.  But, two, remember, there was a second purpose there, and the second purpose had to do with finding out if Anthony Brown's claim that he had been dealing drugs in the jail, whether that was true, to find that out.  And if it was true, investigate it carefully.  So even if one were to think the moment they find out the FBI is involved they ought to step back, that's not the

way this should go.  They have the responsibility and the right to investigate the drug dealing part.

And you know from Agent Marx that when Brown was in state prison, he was still telling them, I dealt drugs while I was in there.  So drug dealing in the county jail has got to be right on up with smuggling a phone in terms of you need to get to the bottom of it.  And that's one of the reasons they kept going.  But it isn't just as cut and dry as the phone.  There was this other issue, and it was an important issue to them.

Now, I want to speak, if I may, just for a moment about Tara Adams.  Tara Adams was proud to tell you, I stood up to Mr. Tanaka.  But that's not the way it went.  And I asked her about this, but let me remind you of the way this went down.  Three guys in green jackets show up, and they want to do X, Y and Z with Brown.  They want to change the jacket.  They want to do whatever it was.

She says to them, Show it to me in writing.  Apparently they kind of back off at that point.  But we know they didn't come up with any kind of writing.  And I asked her at that point, the fact that they didn't come up with anything, doesn't that kind of tell you that they were just using Mr. Tanaka's name?  And she said no.  No, it didn't go that way.

So her next thing was the phone.  They say to her, Okay, we'll call Mr. Tanaka.  And she calls them on that and says, Go ahead.  They back off again.  And what I said to her is, Wasn't

that a clue to you that at that point they're just using Tanaka's name, and you had actually called their bluff? And she says, No, exactly the opposite.

Well, that makes no sense whatsoever. What I was trying to get out of her is the thing that makes sense; these guys were just using Mr. Tanaka's name. In fact, Tara Adams could have picked up that phone right on the spot and called the undersheriff's office. We know his assistant was Chris Nee. Could have called Mr. Nee and said, Hey, is this legit? This is kind of weird. I haven't seen this before. I don't want to do this without some authorization. But she didn't do that. She didn't do that at all.

She also admitted at the end that she did not know whether or not Mr. Tanaka was involved in all of this with the three deputies or not. She didn't know whether the three goons that were there were in fact there on the orders of Mr. Tanaka or even with the knowledge of Mr. Tanaka.

A couple other witnesses I wanted to talk about. Mr. Courson talked to us for an hour or so, something like that. I wasn't really sure why they called him. I thought it was sad and embarrassing to have him up on the stand. Just so they could say he felt he'd been played and somehow the investigators were intimidating him? The bad part is the pathetic play of the agent in this case. She used this guy in a really unseemly manner. Is that really the kind of law

enforcement you want to see?  Anybody would want to see?  I suggest to you it isn't and is one of a number of instances where the FBI played people in this case.  That's a really glaring one, and I'm sure we all felt sorry for Mr. Courson.

The retired guys.  Oh, let me go back on Courson also.  He had told Agent Marx that he had actually witnessed unreasonable violence on the 3000 and 2000 floor.  He comes in here, and the government's questioning never brought out the fact that he never actually saw that.  It wasn't until the defense asked him whether or not he'd really seen unreasonable force, and he 'fessed up and said he never had.

I think that's important to keep in mind because he worked there for many, many months.  And if somebody was going to see unreasonable force, he was in a position to do it.  Not only that, that would have been the first thing they asked him, whether or not he'd seen a deputy beat some inmate.  In his many months at the MCJ, he never saw it.  He's described one instance, and I asked him, Did you think it was unreasonable?  And he reluctantly said no.

Now, I want to spend just a moment on the reformers.  We'll use Mr. Fox's -- Mr. Fox's term for it.  All of them had complaints of one side or another.  The -- I have to disagree with Mr. Fox that they had no dog in the fight.  That's not true.  Their dog in the fight is to make sure that Mr. Tanaka gets convicted.  That's why they were here.  They admitted, for

the most part, their personal animosity.  And those who wouldn't admit it lied to you.  And you can tell by the context of what they said.  You can tell by the demeanor, again, of what they said.

Mr. Olmsted.  Mr. Olmsted is an odd situation because he was sent by Mr. Tanaka into the jail to make some changes, to improve it, to make it better.  And for some reason he wasn't able to do that, so he got transferred.  Interesting that he was, at some point, an informant for the FBI and for the Los Angeles Times.  I'm not quite sure what to make of that.  But interesting nonetheless.

Now, the problem with Olmsted is that after -- I think it was two, two and a half years, all the problems were still there.  He hadn't cured anything.  And he knew that he was about to get the blame for spending 24, 28, however many months it was there, and the problems are just the same as they were before.  He'd come up with no solutions.  He'd come up with nothing.  And he knew he was about to get the blame for that.

And Mr. Tanaka, as Olmsted admitted, wasn't even in the chain of command for custody during the period of time when Olmsted was the commander at the jail.  Mr. Clark, he's the one with the rotation plan that we keep hearing about.  First, you heard this morning from Mr. Conte that at one point Conte said there -- I think there were two different plans.  So who knows what was actually shown.

What we do know is the plan, as Mr. Tanaka understood it, was that everybody's going to get rotated about every 60 days, not just from the shifts but from where you're working.  And Mr. Tanaka, you heard his objection to that, was that it's -- and he called it an HR nightmare.  And that's what it was.  That's why this plan didn't get approved.

The other thing is how ridiculous it would be if he's trying to somehow protect a clique at the jail, and he's going to do it that way?  A, he wouldn't do that anyway.  He would not do that.  In fact, you heard from --

Your Honor, I've shown this to counsel.

-- you heard from Mr. Antuna.  This is Paul Tanaka. Mr. Antuna sat on Mr. Tanaka's couch in his office in 2006, and Mr. Tanaka gave him three keys to proactive leadership.  Show no bias, no neglect of duty, and no apathy.  No apathy being, again, proactive leadership.  And Mr. Tanaka told Antuna that these were important.  These are wholly inconsistent with him somehow trying to protect cliques on the 3000 floor. And this was 2006, which is four, five years before 2011.

Now, Mr. Maxwell came in and said a bunch of stuff.  But the reality is Exhibit 311.  This is Mr. Maxwell and the POE complaint.  We looked at it just a little bit before -- I think it's easier if I read the -- what I would suggest to you is the important part.  Again, 311.  This is a POE complaint by Captain Patrick E.  Maxwell.  He talks about how on Monday,

May 17th, 2010, he attended a Walnut Station booster golf tournament. During dinner, he's sitting with a few friends, and he was advised by e-mail that all station captains from Lieutenant Joe Gooden, aide to Assistant Paul Tanaka, the e-mail directed station captains to, quote, prepare a lengthy written report about their station's target gang, target tagger gang, nonrevocable parole operations, Section 8 housing, and a host of other issues related to crime within the station's jurisdiction.

I showed the e-mail to Undersheriff Waldie, who at that point was above Mr. Tanaka. And stated that I get tired of this busy work and don't have time as my staff and I are constantly carping -- and I think we heard about what that was -- and working to save time -- or save the department from incurring paid overtime.

Then he goes down on this complaint and talks about the following: Assistant Sheriff Tanaka is tired of us not wanting to do work and running to the undersheriff when given an assignment. This is Patrick Maxwell in a sentence right here. He didn't want to work.

That's the sort of thing that all these other retired guys, reformers, were about. Proactive leadership was something that they just could not handle.

Mr. Bornman. Mr. Bornman admitted right off the bat when I asked him some questions, he doesn't like Paul Tanaka. But

the no dog in the fight thing?  I'm sorry, that's just not true.  Mr. Bornman is the guy that was dressed in softball shorts and jersey when Mr. Tanaka made a surprise visit to the -- I think it was the Altadena station.  And he was on duty at the time, Mr. Bornman was.

And what happens is Bornman asks Mr. Tanaka, Gee, I've got softball practice or I'm going to go watch the team.  Can I do that?  Tanaka says, Yeah, and transferred him shortly thereafter.  And the reason is you can't be putting on softball clothes while you're on duty.  The thing about lunch?  Come on.  Law enforcement, they don't get lunches like that.  It just isn't true.  Bornman comes in not liking Tanaka, complaining about being transferred.

Now, he did do one thing.  He did concede the following: One, that Paul Tanaka would not stand for unnecessary, unjustified force.  Two, Mr. Bornman did not believe Paul Tanaka knew of the number of force cases.  And three, if he did, he'd have done something about it.  Well, you know that in terms of the 2000 and 3000 floors, Mr. Tanaka did do stuff.  He sent his lieutenant there at one point.  He sent Olmsted, who failed.  It's not like he didn't know there were problems.  He tried to fix them.  But running a jail is a particularly difficult undertaking anywhere, not just Los Angeles County but anywhere in the United States.  And the 2000 and 3000 floors we know had the worst of the worst people, the most difficult

**UNITED STATES DISTRICT COURT**

people to control.

The part about overhearing Mr. Tanaka say, We're really going to hide the FBI from -- or I'm sorry, Brown from the FBI. That didn't happen. There's no corroboration on that. And corroboration is a real problem on the government's case. And I'll give you another example in just a moment.

But next is Mr. Roller. Mr. Roller comes in where he writes the memo that he claimed he toned it down, and he thinks he got in trouble for that and got transferred, but if you actually look at the Roller memo, there's not a word in there about blue lines. Not a word.

Also, where's the corroboration there? If Mr. Tanaka went to Roller's station -- which I think was Norwalk -- and talked to 30 or 40 deputies and told them, There's this line, and, boy, if you've got to, go ahead and cross it, don't you think there would be somebody else in here besides Roller that would say that? No corroboration whatsoever. I mean, that's pretty shocking.

It would also be insanely stupid of Mr. Tanaka to say that to a bunch of people, to a bunch of law enforcement officers. Go ahead and break the law. That didn't happen. Roller's full of baloney.

Mr. Michel. Very unfortunate. Gave up his law enforcement career for 2,000 bucks. Also, I asked him several different ways, Aren't you looking for a favorable

recommendation from the U.S. Attorney's Office in return for your testimony here?  And he said no.  And I thought right then, you know, a lightning bolt was going to come down and hit him on the stand, because that's clearly a lie.  It's a Perry Mason lie.  I expected somebody to get back -- in the back of the audience to stand up and say, That's a lie.

But of course he's looking for help from these guys.  He doesn't want to go to prison.  And the best way he can think of to, if not avoid, at least lessen his prison sentence, is to have a favorable recommendation from the U.S. Attorney's Office.  It's elementary, and yet he wouldn't admit that.

Oh, Mr. Powell, the tech guy.  Mr. Powell has seen too many 007 movies.  He's doing himself these electronic sweeps and all of this stuff.  And what the government wants you to believe is that that was some kind of an unusual, unique situation, having Baca's office and Mr. Tanaka's office swept. But take a look at 119.  This is a form.  It's a technical operations worksheet.  And on the worksheet, it has the sweep right there.  This is part of a routine form.  You can see all the other things that they may be doing, computer research, surveillance, but the sweep is one of six or eight different possibilities that they would perform.  Do you really think it was that unique that Mr. Tanaka's office and Mr. Baca's office got swept during this period of time?  They got a form for it. No big deal.

Big meeting at the U.S. Attorney's Office, I think August 29.  There's a little bit of a -- might have been the 28th, whatever.  But you heard from Andre Birotte, former U.S. Attorney, that Baca did most of the talking; that he was very forceful about it.  Baca expressed his concerns, and I don't think I got the word "angry" out of Mr. Birotte, but you could see this was something that was troubling the sheriff.

Interesting to note, August 29th, about a month later, Mr. Birotte also identified Exhibit 352.  And 352 -- well, let's look at the background on this.  The phone was discovered in early August.  By the 18th of August, I think it was, that the Sheriff's Department knew that the FBI was involved.  Certainly Baca around that time learned.  That's August 18th.

This is five weeks later, Baca writing to Birotte.  The first page has to do with subpoenas.  And by the way, the meeting that we're talking about at the U.S. Attorney's Office, nobody talked about a writ for Anthony Brown, or at least we didn't hear about that.

What we did hear were things similar to this.  Now, the first page just talks about what's been requested by subpoenas.  The second page, Mr. Baca says, As I indicated in our prior meeting, I am extremely displeased with the conduct of the FBI and causing the introduction of the cell phone into the jail system.  And then he goes on, couple of more paragraphs, talking about how displeased he is.  This is a month after Baca

UNITED STATES DISTRICT COURT

and the Sheriff's Department understand that the FBI is involved.  All of this time Baca has been simmering and seething about this entire situation.  And that's the backdrop against which Mr. Tanaka has had to work.  The driving force in everything that you've seen was Leroy Baca, not Paul Tanaka.

Mr. Baca was an angry man throughout that period of time, but let me show you something very interesting that came up today.  Agent Marx, phone records.  I think this is 156.  If you look at the bottom of 156 -- and I've got a really weak circle around it -- this is Mr. Tanaka and his phone, having various phone calls back and forth with Sheriff's Headquarters.  From September 1st there are no calls, not one, up until September 22nd.

Now, is that because Mr. Baca is having an operation?  In a two-week bridge tournament?  Who knows.  The bottom line, though, is when you go over to the timeline of everything else that's going on, nothing happens.  Nothing happens from September 8th, when Scott Craig submits that ridiculous request of the -- Judge Toribio up until -- the next thing you hear about is Baca's letter that we just looked at and Agent Marx's house being visited.

You've got two weeks there where nothing's going on.  And from the phone records you know Baca's not engaged.  What does that show you?  It shows you that Baca was the driving force behind all of this.  And no matter where he was in those two

weeks in September, when he's gone nothing happened.  If Paul Tanaka is the puppet master of all of this stuff, why is nothing happening during this two-week period?  Nothing at all.

Now, government counsel's going to say to you, Well, they were surveilling Agent Marx.  Well, that started much earlier.  That doesn't count.  I mean, anything that was actually happening, writs flying, anything happening, nothing, nothing at all.

Now, speaking of writs, let's take a look at Exhibit 160.  It's a three-pager.  And if you'll recall, we went over this.  This is an application, a writ and a third page.  But the testimony was that there's no way you can tell from this document, 160, whether this writ went anywhere other than the clerk's office.  It went to the clerks because it's signed by the clerks down here.  A judge has also signed one of the pages.  So it comes out of this building, out of the federal court clerk's office.  It goes nowhere after that.

You'll recall that Ms. -- I think she pronounces it Farrar, from the Marshals Service.  We looked at 186.  Here's the request talking about all of this stuff.  And what's her deal?  I'm out of town.  Send it over to Yolanda Baines.  The only thing Linda Farrar could tell us about whether the writ was actually sent is I would have looked into it, so I assume it was.

Importantly, nobody came in here from the county, from the

Sheriff's Department, and said, I received this writ, 160. Nobody testified to that. They try and put in this business about there's a fax line and a telephone, you got all of that. But come on, you need somebody to connect the chain, and they don't have it. So when they say the writ was delivered over to the Sheriff's Department, they don't have the proof. Paul Tanaka, what Mr. Tanaka actually said was, I may have seen it, I don't know. That's what he said.

And two other guys heard about it or may have seen it? Come on now. That's not proof of anything. Where's the person that receives it? You know part of the problem at the sheriff's end of things. Back then they had no sense -- no way to track documents like that. I'm going to guess they probably fixed that, but at that point they couldn't tell you, I received it. That's why you had nobody come in here and say that.

Corroboration. Quickly, Katherine Voyer. She supposedly overhears this conversation about, Keep it a secret, and Don't write it down, and all of that regarding Brown. But if you'll recall her testimony, it was Tanaka and two lieutenants. One of the two lieutenants she couldn't describe, had never seen before, has never seen since. She said he was a Caucasian male, and that's it. The other one, as we found out, is deceased, is gone, is dead. So there's no way to corroborate what Katherine Voyer had said. And I believe she was one of

the people who sued Mr. Tanaka.  And there was, what, two, three, four of them?  I can't remember at this point, and I didn't write that down.  But I do believe -- my note says she filed two different lawsuits against the department, one of them naming Mr. Tanaka personally.

Now, the Sheriff's Department response to the subpoenas that they got -- and we've seen that they got a bunch of subpoenas.  The Sheriff's Department complied with all of that.  You would not have seen the little video clips that Mr. Fox played this morning if they hadn't given him those clips, all of that.  They gave him the transcripts.  They gave him the audios.  Everything you've heard was turned over from the Sheriff's Department to the federal government pursuant to those subpoenas.  The only thing you didn't see is the writ for Anthony Brown, because I maintain it never got over to the Sheriff's Department.  And that's further proof that it did not.

Now, phone records.  We talked briefly about the lack of phone traffic with Leroy Baca.  Phone records generally are -- the old saying is, You can make numbers do whatever you want.  And I would suggest to you that that's exactly what happened.  One of the comments that Agent Marx made this morning was something to the effect was, I did something to make it look like the record or make it into the record.  I took from that that she's kind of manipulating these things, okay?  They are

based on a lot of phone records; many, many phone records. But you can make those summaries do whatever you want. The things that we were looking at were not actual phone records. Those were summaries created by the case agent in this case.

Now, importantly, I would suggest to you that the entire case can almost be boiled down to Exhibit 360. 360 is a -- an e-mail from Paul Tanaka to Steve Leavins on August 25th of 2011. And it says -- I'm going to -- I realize that's hard to see. From Leavins: Boss, I did not have much to report last night. We have an undercover operation today. I'll call you tonight with an update. Mr. Tanaka's response: Thanks, Steve. Right after, and I mean right after, I spoke with Tom this morning. The sheriff popped in looking for an update. This case is consuming his entire thought process. Providing him with updated tidbits helps to ease his mind.

Baca, driving force here. Tanaka trying to help out with a tidbit now and then. But what isn't said in this e-mail, and I would suggest to you is the case, is that Mr. Tanaka didn't want to be involved in any of this stuff. This is almost a request of Leavins to please give the sheriff some information so he'll get the heck off my back. I don't want to be in the middle of all this. That's the case right there in an e-mail.

And where -- there's a lot of other phone analysis that could have been done here. But you got selective analysis, selective summaries. One of the things that may be important.

Agent Marx testified that at some point she had to go outside the jail to make a phone call on her cell.  Doesn't it stand to reason that if the reception is so poor inside that all of the desk phones would be used as well?  Not just cell phones, not just cell phone records.  And again, the summaries are slanted by the person that creates them.

Jail visitation.  As we heard there was a policy in place in 2011.  The problem was it just wasn't being followed.  And so what happened is they start enforcing this policy as to all law enforcement.  And it meant that they had to show their ID, and it had to be copied, and this and that and the other thing.  But you know, it really didn't matter, because after August 23rd Agent Marx never tried to see Brown at the jail again.  What did it matter what the policy was if they weren't even going to try?  They could have called over.  There's so many things they could have done, and they didn't.

A lot of what you've heard, as I've indicated to you, in this case is personal.  Personal in that there's jealousy because of Mr. Tanaka's rise, meteoric rise in the department. Jealousy because he's young.  Jealousy because he is blunt.  I think everyone can agree he is that.  And he doesn't suffer fools.

One of the things from the Antuna thing were, you know, Do your job.  Do your job.  And people that Mr. Tanaka felt were not doing their job were not going to be friends of his.  They

were not going to do well underneath him as subordinates, and he was not the least bit shy about taking action if he felt that these subordinates weren't doing their jobs.  It was exceedingly important to him.

Now, one of the things that you've got to keep in mind in this case is that as Mr. Tanaka is the undersheriff in August and September of 2011, he is the undersheriff of one of the largest law enforcement agencies in the world.  We have either 17- or 18,000 employees.  We have 20,000 inmates, 23 stations, 100 communities in L.A. County with contracts, 27 -- I'm sorry, got that -- nine jails, including the MCJ, a budget of 1.7 billion dollars.  And the undersheriff, as you know, is in charge of the operations of all of that.  So he's got a ton of stuff on his plate in August and September.

The phone records that you're looking at, you don't know whether he's talking to Leavins about Brown or the ACLU complaints and lawsuits or some other personnel thing, with 17,000 employees.  All of these things are important to keep in mind.

Also to keep in mind that the whole situation with the cell phone is unique.  It's unparalleled.  It's never happened before.  This was not something that they had a real clear plan about how to respond except that Leroy Baca is pushing everybody, and I mean pushing.

So, again, it's not a crime to be a strong leader.  It's

not a crime to follow Lee Baca's orders.  In particular if you believe that the orders from Lee Baca are reasonable and lawful, if that's true, then I would suggest to you you don't have the criminal intent.  If Baca's giving orders that seem to you to be reasonable and lawful, you don't have the criminal intent, and you're not guilty.  It's really that reason -- that easy.

The standard of proof that you folks will need to apply -- and I believe you'll hear this in the jury instructions -- is beyond a reasonable doubt.  Beyond a reasonable doubt is an important standard, and it's the highest standard that we have in law.  Reasonable doubt is something that you would experience in decisions in the most important of your own affairs:  Buying a house, getting married, important decisions.

Also, as I know you realize, the decision you'll make in this case will affect Mr. Tanaka for the rest of his life.  It is a final decision.  It's not something that you can come back two weeks later and talk about again.  But I know that you understand the importance and the weight of what you're going to be deciding.

But really, in addition to the e-mail I showed you, Mr. Haig, in his questioning of Mr. Tanaka, boiled the case down to its essence.  He asked of Paul Tanaka the following: Did you ever issue orders that Anthony Brown should be hidden from the FBI?  Tanaka's answer:  No.  Did you ever issue orders

that a federal grand jury subpoena for Anthony Brown should be ignored?  Answer:  No.  Are you aware that anyone -- of anyone else who issued orders to ignore a federal grand jury subpoena or hide Anthony Brown?  And his answer was, No.

Ladies and gentlemen, that's Paul Tanaka's way of telling you, Damnit, I didn't do this.  He's not guilty.  Thank you.

THE COURT:  All right, ladies and gentlemen, we're going to take a break.  Again, I want to remind you, until this trial is over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case online, in blogs, bulletin boards, by e-mails or text messages.  If anyone approaches you and tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until you've heard the final arguments of counsel, the instructions of the Court and the views of your fellow jurors.  All right.  We'll come back at -- let's make it a quarter after the hour.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  Is there anything we need to take up?

MR. FOX:  No, Your Honor.

MR. STEWARD:  No, Your Honor.

THE COURT:  Thank you.

(Off the record at 11:00 a.m.)

(On the record at 11:14 a.m.)

THE COURT:  All right.  Let's bring the jury in.

(Pause in proceedings.)

(The jury entered the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes, please.


#### PLAINTIFF'S REBUTTAL CLOSING ARGUMENT

MR. FOX:  Mr. Steward focused a lot of his time on who were liars, the witnesses who were liars and whether Mr. Baca was responsible.  Let me start with the last point.

Mr. Baca, whether he was responsible or not, has nothing to do with the guilt or innocence of Paul Tanaka.  Mr. Baca's orders have nothing to do with this case.  What we really have to look at in this case is what Mr. Tanaka did, his actions.

And the fact that Mr. Baca put Mr. Tanaka in charge shows that Mr. Tanaka's actions are important in this case; that he was the active one; that Mr. Baca, as you saw from the phone records, was not the active one in the investigation. He was not the one that was running this investigation.

Did he have the same corrupt intent of Paul Tanaka? You can be sure of that. But that has nothing to do with whether Paul Tanaka -- Leroy Baca's intent has nothing to do with whether Mr. Tanaka had that intent.

Mr. Baca made Mr. Tanaka the director of this sad story, this movie. If this was a movie, he would be the director. He would be the one that did choose, as he did, the cast of characters, the actors that were involved in this. The ones who were on the recordings, the ones you heard the audio recordings of, saw them on video. Mr. Tanaka chose those people.

Mr. Tanaka also wrote the script. He's the one who's out there handing out orders about keeping the FBI away from Anthony Brown, putting OSJ on guard over Anthony Brown, making sure that he knew if a writ came in to the Inmate Reception Center, making sure under his authority that the Inmate Reception Center would release the inmate.

Make sure his presence was known at Men's Central Jail the day they tampered with those deputies. Make sure he was part of the surveillance briefings that were going on in September

of 2011.  And make sure that when the FBI called after the threatened arrest of Special Agent Marx, that they would know the undersheriff knew about the charges and they could call him if they had any questions about it.

Now, what's happened since then is Mr. Steward has decided to rewrite the script.  Mr. Tanaka as well.  Rewrite the script.  Try to act like everybody's a liar, try to act like things did not happen as they actually did happen.

Mr. Steward did not talk about the recordings whatsoever.  Didn't talk about the comments of Gerard Smith.  The fact that they wanted to clean their own house comments that Steve Leavins also made on the recording later.

Mr. Steward in no way addressed the tapes whatsoever, the witness tampering.  What Mr. Steward did say in rewriting the script is that this was an unparalleled investigation.  Really?  Unparalleled that the FBI conducted an undercover operation?  What's unparalleled about that?  Happens all the time.  Unparalleled that they were investigating civil rights abuses?  Nothing unparalleled about that.  It boggles my mind.  It doesn't make any sense.  That a phone in the jail is unparalleled?

Mr. Tanaka even said in testimony that we read to you that he's aware of all the media reports talking about phones being in jails.  Common occurrence, misdemeanor in the state system.

Also tried to rewrite the script, Mr. Steward did, with

respect to Mr. Tanaka.  You heard, and Mr. Steward actually said this, that Mr. Tanaka was a proactive leader.  But in rewriting the script, attempted to make it look as though when Mr. Baca came to him for updates he said, I don't know.  I'm not going to do what you asked.  I'm not going to keep you updated because I don't want to have anything to do with it.

That's not consistent with any of the evidence in this case.  He was a hands-on supervisor.  He did whatever Mr. Baca wanted him to do.  That was -- those were his own words in his previous testimony.  He got promoted to undersheriff because he did whatever it was that the sheriff asked him to do.

Mr. Steward also tries to rewrite the script by telling you that Special Agent Marx, now Tanner, was not looking for Anthony Brown, had no interest in Anthony Brown.  Inconsistent entirely with the evidence in this case.

On August 23rd they went to Men's Central Jail, and they were kicked out.  Special Agent Marx had previously sent a different investigator, a different special agent to Men's Central Jail who was told that he couldn't have access to Anthony Brown.  So on the 23rd when she goes with Special Agents Dahle and Plympton, they're kicked out.  What does she do next?  She gets a court order for his testimony.

On August 25th, that court order is signed, sent over to the Sheriff's Department.  She's looking for Brown.  On August 26th she goes on the Internet, goes to the Sheriff's

Department's website, looks for Anthony Brown, finds that he's released, has concerns.  But she has a court order that demands the production of Anthony Brown before the grand jury on September 7th.  Marshals Service, it's their job to get that body, to get Anthony Brown over to the grand jury.

You saw that when that didn't happen, September 7th that didn't happen -- can't remember if it was a September 8th or 9th e-mail, there's an e-mail between Tom Carey, Steve Leavins, official request to interview Brown was made.  They were looking for Brown throughout.

And then when James Sexton releases him in the Operation Pandora's Box string of e-mails, the very next day Special Agent Marx finds out he went to State and interviews him within days of his being there.  Special Agent Marx was looking for Anthony Brown throughout this investigation.

Now, Mr. Steward also tried to attack the phone summaries, tries to rewrite what these mean.  And he said, You can always spin these things, you can always adjust numbers.  But the funny part is they had the opportunity to point out if there were any errors with this phone chart when Special Agent Marx was on the stand.  They had the opportunity to point out to you if there were any problems with this phone chart.  They found none.  Did not call out any omissions, any errors in this phone chart.  In cross-examining her on two occasions, and Mr. Steward arguing to you today, there's nothing wrong with

these phone charts.  These phone charts are accurate.

What do they show?  Mr. Steward tries to tell you nothing was happening when Leroy Baca was out of town.  What was happening was what was happening beforehand.  Paul Tanaka's on the phone with ICIB, the people who are conducting surveillance of Special Agent Marx, tampering with witnesses, convincing people not to cooperate with the federal government. Paul Tanaka also is at briefings in the surveillance.

Now, Mr. Steward again tries to rewrite the story by saying the surveillance, it had been happening before then. But Government Exhibit 142 shows you that their surveillance began on September 13th while Leroy Baca was out of town.  This was Paul Tanaka's operation.  He was the director.  He was in charge.

Mr. Steward tells you that Anthony Brown's movement was for his safety.  Again, revision.  Let's look at what really was happening.  August 18th, Sheriff's Department discovers that this phone traces back to the FBI.  It was an FBI phone. Anthony Brown before then was housed in 3500, 3000 floor.  So they do what they should have done.  They put him in protective custody, moved him from 3500 into 1750, G Row.  That's what the FBI had requested according to that stipulation that you heard. The FBI requested that Anthony Brown be put in protective custody, so he was.  He stays in protective custody while the Sheriff's Department begins tampering with him, finding out

what Anthony Brown had told the FBI.  From August 19th to August 21st, that happens.

On August 23rd, contrary to Mr. Tanaka's orders, when the FBI gets in to see Anthony Brown they decide to move him at that point.  It's at that point that they put OSJ guards on him.  It's at that point they take him out of the G row with the cameras on him and bring him up to the infectious diseases floor.  That's what they do on August 23rd.

And everything seemed fine until August 25th when the federal writ comes in.  They change Anthony Brown's name at that point to John Rodriguez.  Change his race, change everything about him, release Anthony Brown from the computer system.

You see the cause and effect.  FBI interview, move him out of the protective custody cell.  Federal writ, changes name.  But what happens if they come knocking on the door with a possible, as they called it, order?  They change John Rodriguez, and they move the location.  John Rodriguez, who was Anthony Brown before, becomes Kevin King, and they move him to a patrol station, because what if the federal government comes with that court order in person?  What are we supposed to do then?  This was not done for Anthony Brown's safety.  This was not done to protect him.  This was done to keep Anthony Brown away from the federal grand jury.

Oh, and couple things not on this chart that are

important.  September 2nd is when he comes back.  You heard the recording from Gerard Smith telling Anthony Brown, We're bringing you back to Men's Central Jail.  You're back here.  And that's when Anthony Brown says, I don't want to have anything to do with the FBI anymore.  Once he had told them that he was done with the FBI, they were fine bringing him back to Men's Central Jail, fine to bring him back to the deputies that they were so concerned would retaliate against Anthony Brown.  From September 2nd to September 12th he was back there.  No issues with the deputies during that time.

He writes them a letter, confirms to the Sheriff's Department, I don't want to cooperate.  FBI left me for dead.  I don't want to have anything to do with them anymore.  I will cooperate with you, Sheriff's Department, Anthony Brown wrote, but that is only if you want me to.  Only if you want me to.

Mr. Steward called a lot of people liars.  A lot of people liars.  All those were-reformers are now suddenly liars.  They're people who right now are living on their pension, many of them, retired, done with their careers, done with their law enforcement careers in the Sheriff's Department.  They get up on the stand under oath and testify.  And Mr. Steward wants you to believe that they would perjure themselves under oath instead of just sitting back all fat and happy, accepting the pension, accepting their retirement years.  They had no dog in this case -- no dog in the fight.

Mr. Steward also rewrites history about what this is about. This is about racism all of a sudden. It's the Caucasians getting up there and telling you that Mr. Tanaka undermined them, overruled them. That's what he tries to tell you. And let's break that down a little bit because there's nothing to it.

First person you heard from, not a Caucasian, Al Gonzales. He tells you about the coddle-like-a-baby comment that Mr. Tanaka made about the deputies. Told you about, Get off the floors, sergeants. Let the deputies do what they need to do. It's not a Caucasian making that statement.

Next person, John Clark. Yes, a Caucasian. He wrote a memo, it's in black and white, doesn't have to do with race, saying there are force issues, I want to rotate the deputies. Says, We will not change your shifts. Has nothing to do with race.

Pat Maxwell told you about the gray area comment that Paul Tanaka made and Paul Tanaka's disgust for IA. Mr. Tanaka didn't even deny making those statements. He said he couldn't recall the IA statement, but they were consistent with what he felt about IA at the time. And the gray area, he said he made that statement hundreds of times. This is not about racism. Has nothing to do with it.

Steve Roller writes a memo the very next day after Mr. Tanaka speaks to them. And Mr. Steward wants to nitpick.

Well, it doesn't say blue line in there.  It says, Line.  It says, Approach the line.  And it talks in that memo about IA and how Mr. Tanaka made disparaging remarks about IA, written at the same time Mr. Tanaka made those statements.  Everything that the reformers said is corroborated.  He said there's no corroboration.  There's corroboration for everything that they said.

So Mr. Steward decides, Well, maybe I'll make them dislike Special Agent Tanner, say that the FBI and she played people.  Played poor William David Courson, the poor guy who tells Special Agent Marx -- by the way, he's engaged at this time; you probably remember that -- asks Special Agent Marx out on a date after he told her, to impress her apparently, that he beat inmates with flashlights, after he tells her about unwritten rules at the jails, that they beat inmates, send them to the jail if the inmates ever did anything to a deputy; that a supervisor told him when he first saw force in the jail that you weren't here, you didn't see it.

What is the special agent supposed to do who's supposed to be investigating civil rights?  You would want her to go to her supervisor and say, This guy who's telling me about abuse has an interest in me and has asked me out.

You heard nothing that indicated that she played him or led him on.  She went out with him and recorded conversations that he was making about abuse in the jails.  That's what you

**UNITED STATES DISTRICT COURT**

would expect the FBI to do when they're trying to reform the corrupt culture of the Sheriff's Department, trying to investigate the abuses that were going on in the jail. That's what you would expect. And there's nothing wrong with that.

Now, while Mr. Steward called everybody liars, he didn't address things that can't be changed, the e-mails and the recordings. Mr. Tanaka's name's over all -- all of these types of documents. You see his name in the e-mails. You hear him referenced on the recordings. He can't do anything about it. It shows what the goal was this whole time, and that was to obstruct the grand jury investigation, obstruct the federal government.

It's our burden of proof, and we have proven that to you, the corrupt culture in the jail. We have proven to you the intent in this conspiracy. Mr. Steward tries to attack the writ, whether the writ was served. Now, let's remember this. The writs come to the Inmate Reception Center. Phone records show that there were facsimiles between the Marshals Service and the Inmate Reception Center. That same day three people that Mr. Steward referred to as goons -- and let's remember, operating under the authority of Paul Tanaka -- go into the Sheriff's Department, take that records jacket, are in the Inmate Reception Center. And it's a surprise to you, and it's somehow exculpatory to Mr. Tanaka that the Sheriff's Department doesn't later produce a writ to you that should have been in

that records jacket that Mr. Leavins and Mr. Thompson had after that time?  It should be something that somehow is exculpatory to Mr. Tanaka, that the writ was never produced to the federal government?

You heard from Linda Farrar.  She routinely checked back when she got back from vacation to figure out if Yolanda Baines had served those writs.  She knew that this issue had been dealt with.  That was the testimony by Linda Farrar.  She knows the Marshals Service served it.  And Tanaka by the way -- Mr. Tanaka has admitted that he saw the writ.  That was not a maybe, that was not a possibly.  That was him saying, I saw the writ, and if I had seen it it was before grand jury, before his grand jury testimony, before he had access to any of the documents that the federal government had.  There was only one place he could have seen that writ, and that was in the custody of the Sheriff's Department.

You also heard testimony that two IRC deputies again had seen the writ at the time, had heard and seen of the writ at the time.  And ultimately what's funny about this is all this discussion about the writ, doesn't matter whether it was served or not.  The e-mails show their intent.  Their intent was to ensure that the federal government didn't get Anthony Brown, ensure that the Marshals Service couldn't pick him up even if they showed up with a writ.

So just imagine -- you know, forget all that evidence

about the writ being served.  What were they trying to do?
They were trying to get Anthony Brown away so if somebody
showed up with that court document, they didn't have to turn
him over.  That's a corrupt intent.  Doesn't matter whether or
not they saw the writ.  They did, but it doesn't matter.

As I mentioned, Mr. Tanaka was the director of this movie.
You get to write the ending though.  You get to evaluate all
the evidence, the witnesses, the recordings.  You get to write
the end of this story.  And you've heard the evidence at this
point.  I'm going to be wrapping up very shortly.  You've
probably heard enough from me over this ten-day period.  I'm
sure you feel the same way about everybody in this room.

But at this point we have met our burden.  You have seen
the recordings, you've heard the recordings.  You've looked at
the documents with Mr. Tanaka's name all over it.  You've heard
the witnesses who said that not only did Mr. Tanaka overrule
and undermine the people who tried to reform the department,
but you've also seen how he -- the types of things he did to
accomplish it.  Sending out his people, his goons again, to
intimidate people within his department.  Sending out sergeants
to threaten to arrest an FBI special agent.  People invoking
his name, telling them that he authorized all of this to
happen.  And you can be firmly convinced, firmly convinced that
Mr. Tanaka is guilty of the crimes charged in the indictment.

And we ask you to go back, look at that evidence, consider

everything that you've heard over the last ten days and find Mr. Tanaka guilty consistent with the evidence, guilty of the two charges crimed -- two crimes charged in the indictment.

Thank you very much.

THE COURT:  All right.  If I could see counsel at sidebar, please.

(Discussion held at sidebar.)

THE COURT:  Okay.  The impeachment instruction --

THE REPORTER:  Your Honor, I can't hear you.

THE COURT:  That's the point.  "We've heard evidence that a witness may have been impeached by other evidence in the case.  You may consider this evidence in deciding whether or not to believe the witness, how much weight to give to the testimony of the witness."

MR. STEWARD:  That's okay.

MR. FOX:  Okay.

THE COURT:  And we just put Baca's name in this.

(End of sidebar discussions.)

THE COURT:  Members of the jury, now that you've heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and in that process to decide the facts. It is also your duty to apply the law as I give it to you to

the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law and must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others.  They are all important.

Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return.  That is a matter entirely up to you.

The indictment is not evidence.  The defendant has pleaded not guilty to the charges.  The defendant is presumed to be innocent unless and until you find at the end of the trial after deliberations that the government has proved the defendant guilty beyond a reasonable doubt.

In addition, the defendant does not have to testify or to present any evidence to prove innocence.  The government has the burden of proving every element of the charges beyond a reasonable doubt.  You should treat the testimony of the defendant just as you would the testimony of any other witness.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that a defendant is guilty.  It is not required that the government prove guilt beyond all possible

doubt.  A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.  If after a careful and impartial consideration of all the evidence you're not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if after a careful and impartial consideration of all the evidence you're convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits received in evidence and any facts to which the parties have agreed.

Some of the evidence is admitted for a limited purpose only.  When I've instructed you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

In reaching your verdict you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are:  Questions, statements, objections and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions

to understand the answers of a witness, the lawyers' questions are not evidence.  Similarly, what the lawyers have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.  Any testimony that I have excluded, stricken or instructed you to disregard is not evidence.  In addition, some evidence was received only for a limited purpose.  When I've instructed you to consider certain evidence in a limited way, you must do so.

Anything you may have seen or heard when court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is it is proof of one or more facts from which you can find another fact.  You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

In deciding the facts of this case, you may have to decide

which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.  In considering the testimony of any witness, you may take into account the witness's opportunity and ability to see or hear or know the things testified to, the witness's memory, the witness's manner while testifying, the witness's interest in the outcome of the case, if any, the witness's bias or prejudice, if any, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all the evidence and any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You're here only to determine whether the defendant is guilty or not guilty of the charges in the indictment.  The defendant is not on trial for any conduct or offense not charged in the indictment.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

You have heard evidence that the defendant may have committed other acts not charged here.  You may consider this evidence only for its bearing, if any, on the question of the

defendant's intent and knowledge and for no other purpose.

The Vikings-related testimony by the defendant may be considered by you only for its bearing, if any, on the question of the defendant's intent and credibility and for no other purpose.

You've heard evidence of the defendant's character for truthfulness.  In deciding this case, you should consider that evidence together with and in the same manner as all the other evidence in the case.  You've heard evidence that a witness may have been impeached by other evidence in the case.  You may consider this evidence in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness.

You've heard testimony from Mickey Manzo, a witness who was convicted of a crime arising out of the same events for which the defendant is on trial and received court-ordered immunity for his testimony in this case.  The fact that Mr. Manzo was convicted is not evidence against the defendant, and you may consider it only in determining Mr. Manzo's believability.  Based on the court-ordered immunity, the government will not be allowed to use his testimony in any case against him.

Gilbert Michel, a witness who received a promise of favorable treatment at sentencing from the government in connection with this case.

For these reasons, in evaluating the testimony of Mickey Manzo and Gilbert Michel, you should consider the extent to which or whether their testimony may have been influenced by any of these factors.  In addition, you should consider the testimony of Mickey Manzo and Gilbert Michel with greater caution than that of other witnesses.

You've heard evidence about a federal informant who was involved in the government's investigation in this case.  You've also heard that the government used an undercover agent in its investigation.  Law enforcement officials may use informants and undercover agents in order to investigate criminal activities.

A local officer has the authority to investigate potential violations of state law.  This includes the authority to investigate potential violations of state law by federal agents.  A local officer may not use this authority to investigate for the purpose of obstructing justice.  As a matter of law, when an undercover investigation involves the use of informants and undercover agents, neither the law enforcement officers conducting the operation nor the informants assisting in the investigation become coconspirators with the target of the undercover activity.

Certain charts and summaries have been admitted in evidence.  Charts and summaries are only as good as the underlying supporting material.  You should therefore give them

only such weight as you think the underlying material deserves.

The defendant is charged in Count 1 of the indictment with conspiring to obstruct justice.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:  First, beginning on or about August 18th, 2011, and ending on or about September 26th, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice.

Second, the defendant became a member of the conspiracy, knowing its object and intending to help accomplish it.  And third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful.  It does not matter whether the crime agreed upon was committed.  For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways or perhaps helped one another.  You must find that there was a plan to commit the crime of obstruction of justice.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which furthers the purpose of the conspiracy, does not thereby -- does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists. An overt act does not itself have to be unlawful.  A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy.  The government is not required to prove that the defendant personally did one of the overt acts.

The defendant is charged in Count 2 of the indictment with obstruction of justice in violation of Section 1503 of Title XVIII of the United States Code.  In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:  First, the defendant influenced, obstructed or impeded or tried to influence, obstruct or impede a federal grand jury

investigation; and second, the defendant acted corruptly, with knowledge of a pending federal grand jury investigation.

As used in Section 1503, "corruptly" means that the act must be done with the purpose of obstructing justice.  The government does not need to prove that the defendant's conduct had the actual effect of obstruction.  However, the government must prove that the defendant's actions would have had the natural and probable effect of interfering with the grand jury investigation.

For the charges of conspiracy and obstruction of justice in Count 1 and 2, the government does not need to prove that actual obstruction of the pending grand jury investigation occurred so long as you find that the defendant acted with the purpose of obstructing the pending grand jury investigation and knowing that the defendant's actions had the natural and probable effect of interfering with the pending grand jury investigation, and the government proves the elements of the offense beyond a reasonable doubt.

Evidence that the defendant relied in good faith on the orders of Leroy Baca and that the defendant reasonably and objectively believed those orders to be lawful is inconsistent with an unlawful intent and is evidence you may consider in determining if the government has proved beyond a reasonable doubt that the defendant had the required unlawful intent.

The government need not prove that the defendant's sole or

even primary purpose was to obstruct justice so long as it proves beyond a reasonable doubt that one of the defendant's purposes was to obstruct justice.  The defendant's purpose of obstructing justice must be more than merely incidental.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.  You will then discuss the case with your fellow jurors to reach agreement if you can do so.

Your verdict, whether guilty or not guilty, must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you've considered all the evidence, discussed it fully with the other jurors and listened to the views of your fellow jurors.  Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.  It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must be exposed -- you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging or any Internet chat room, blog, website, social media or other feature.  This applies to communicating with your family members, your employer, the media or press and the people involved in the trial.

If you're asked or approached in any way about your jury service or anything about this case, you must respond that you're -- that you've been ordered not to discuss the matter and to report the contact to the Court.

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation or in any other way try to learn about the case on your own.  The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings.  If any juror is exposed to any outside information, please notify the Court immediately.

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crimes -- for these crimes is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  After you've reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it and advise the court security officer that you're ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the court security officer signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember, you are not to tell anyone, including me, how the jury stands numerically or otherwise on any question

submitted to you, including the question of the guilt of the defendant until after you've reached a unanimous verdict or have been discharged.

May I see counsel at sidebar, please.

(Discussion held at sidebar.)

THE COURT:  Any objection to the instructions as read?

MR. FOX:  Not from the government, Your Honor.

MR. STEWARD:  Not from the defense, Your Honor.

(End of sidebar discussions.)

THE COURT:  All right.  Will the court security officer please come forward.

All right.  I'm going to ask the clerk to swear the court security officer.

THE DEPUTY CLERK:  Raise your right hand.

(The court security officer was sworn in open court.)

THE DEPUTY CLERK:  Will you please state your name for the record.

COURT SECURITY OFFICER:  My name is Bonita Canterberry, C-A-N-T-E-R-B-E-R-R-Y.

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  Ladies and gentlemen, normally deliberating jurors will deliberate from 8:00 a.m. to 3:30, and lunch will be brought in each day.  Now, today one of the jurors has notified me that they have a doctor's

appointment I believe at 2:30, and so your deliberations today will last until 1:30 so that that juror may leave and make their doctor's appointment.  Because you're leaving at 1:30, we won't bring in lunch today.

Now, you may take breaks as you see fit, but do not discuss the case with anyone, including each other, until all of you are back in the jury room.  If you leave the jury room, you must be accompanied by the court security officer.  Again, please do not start your deliberations until all of you are present in the morning or when you return from a break.  You must all be present before you start your deliberations.

Now, I'm going to ask any of the alternate jurors to return to the jury assembly room on the third floor.  Do any of the alternate jurors have any belongings in the jury room?  All right.  I'm going to ask any of the alternates who have belongings in the jury room to return to the jury room, retrieve your belongings and then come back out here.

(Pause in proceedings.)

THE COURT:  Okay.  I'm going to ask the alternates to briefly return to their seats.

For the alternate jurors, until the jury reaches a verdict or until the jury is discharged, you are to go to the jury assembly room on the third floor every day while the jury is deliberating.  Lunch will be brought to you each day.  You'll be notified when the jury reaches a verdict or when it has been

discharged.

While you're waiting in the jury room, you're not to discuss this case with anyone, including your fellow alternates, people involved in the trial, your family members or anyone else, nor are you permitted to allow others to approach you and talk with you about the case.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Again, do not read, watch or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.  If you need to speak with me, simply give a note to one of the officials in the jury assembly room, and they will see to it that it's given to me.

As alternate jurors, you're bound by the same rules that govern the conduct of the jurors who are sitting on the panel. You should not form or express any opinion about the case until after you've been substituted in for one of the deliberating jurors on the panel or until the jury has been discharged.

All right.  Now, for the alternate jurors, I'm going to ask if you would leave your notebooks on your chairs, and if you'll go out this way and go up to the jury assembly room on the third floor.  In fact, ladies and gentlemen, just have a

seat until he's made this phone call so I can make sure that they're ready for you.  We'll notify you at 1:30.

(Pause in proceedings.)

THE COURT:  All right.  Ladies and gentlemen, you can return to the jury assembly room and just leave your notebooks on your chairs.

(Pause in proceedings.)

THE COURT:  All right.  Ladies and gentlemen, you may retire to the jury room to begin your deliberations.  We'll get the jury instructions, a copy of the indictment and a verdict form to you shortly, and you may take your notebooks with you.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  All right.  I'd like counsel to meet with the clerk to confirm what exhibits are going to go back into the jury room.  There will be a set of clean jury instructions that'll be available shortly, along with the -- the verdict form is available now.  The clerk will have copies.  Take a look at it.  If you have any issues with it, let the clerk know, and I'll come back out and we'll work through those.

Where are you going to be while the jury's deliberating?

MR. STEWARD:  Here, Your Honor, close -- in the building or next door.

MR. FOX:  Your Honor, can I ask a question about the exhibits?  You said no transcripts should go back.  Do you want us to include Mr. Tanaka's previous testimony in the exhibits that go back, or would you rather that we reread them here if they have questions about them?

THE COURT:  I assume those transcripts are only of the material that was actually read to the jury.

MR. FOX:  That's correct, Your Honor.  We've redacted the remaining parts out.

THE COURT:  Okay.

MR. STEWARD:  My only thought, Your Honor, is it may give more importance to it if they have those physically, and my suggestion would be we stand on the way we treated the other transcripts and simply let their memory control.

THE COURT:  Well, the transcripts -- well, let me ask this.  My recollection -- well, were the transcripts of prior testimony admitted into evidence?

(Plaintiff's counsel conferred off the record.)

MR. FOX:  Our notes reflect they were admitted, but I don't recall asking for you to admit them.  So we can --

THE COURT:  What are the numbers?

MR. FOX:  This is 182, 183 and 205.

MR. JAUREGUI:  Correct.

(Pause in proceedings.)

THE COURT:  If the parties want to agree, that's

fine.  If you don't have an agreement, if it's in evidence -- and I'll confirm that, but if they're in evidence -- and the clerk has told me that he's recorded that, they're in.  If they're in evidence, they go back, absent some agreement.  The difference is for a recording.  If there's other material on the recordings, then I wouldn't send them back to the jury room because somebody may listen to something that wasn't actually recorded or played in front of the jury.

The transcripts of those recordings were not received, they were merely identified and used as aids.  The transcripts themselves are substantive evidence that were actually admitted into evidence.  So again, if you want to agree, fine.  If you don't, they go back.

MR. HAIG:  Your Honor, it's our view that they probably shouldn't go back even though they were admitted.  The reason we say that is there was other testimony that was read of other -- with other witnesses where the transcripts were marked as exhibits.  But the actual testimony, since it was read into the record, was not -- the transcripts were not admitted into evidence.  They wouldn't be going back to the jury.

So we think it would highlight that testimony more.  And since the testimony was read into the record as if the witness had testified, we think that's sufficient.

MR. FOX:  Your Honor, I think the transcripts

Mr. Haig's referring to were possibly used for impeachment material, which is obviously different because they're not coming in as substantive evidence.

THE COURT:  That's different.  So you can talk about it, but if they're in evidence -- and I'll confirm again, I'll have the reporter go through and confirm that they're in.  And if they're in, they're in, they go back.

Okay.  So if you'd get together with him, and we'll have the instructions out here momentarily.  And you can also -- you also both should take a look at the verdict form.

MR. HAIG:  They're all right with the defense.  We looked at them, Your Honor.

THE COURT:  Okay.

MR. FOX:  I'll just need a minute to look at this.

THE COURT:  That's fine.

(Off the record at 12:14 p.m.)

(On the record at 12:22 p.m.)

THE COURT:  There's a clean set of jury instructions.  Both the clerk and the reporter have confirmed that Exhibits 180, 182 and 205 were received in evidence on, I believe, April 1st.

MR. FOX:  Thank you.

Your Honor, I think you said 180 and 182.  I think the exhibits were 182 and 183.  I think that that's what you meant probably.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  It's 182, 183.

MR. HAIG:  What about 205?

MR. JAUREGUI:  And 205.

MR. HAIG:  205 also?

THE COURT:  Have you confirmed 205?

THE COURT REPORTER:  Yes.

THE COURT:  And 205.

Okay.  There's a clean set of jury instructions for you to look at.  Once you've had a chance to look at them, if you could return those to the clerk.

(Pause in proceedings.)

THE COURT:  If there's any other issues, let the clerk know and let us know, and we'll get the exhibits back to the jury.

(Off the record at 12:25 p.m.)

(On the record at 12:49 p.m.)

THE COURT:  I have a note from the jury.  "Do we have an ETA for the jury instructions?  Thank you."

So now they've got their note paper.  I'll give this instruction to the clerk.  Do you have an idea how much longer you're going to be with the exhibits?

MR. JAUREGUI:  Not very much longer, Your Honor.  I would say another ten minutes.

THE COURT:  Okay.

(Off the record at 12:50 p.m.)

UNITED STATES DISTRICT COURT

(On the record at 1:14 p.m.)

THE COURT:  All right.  I think the exhibits are ready to go back.  I'm going to ask the clerk to go ahead and take the exhibits back in to the jury room.

Now, what's not going back are the recordings and I believe the actual phone records themselves.  My own view is is that we either ought to tell the -- just bring them out and tell them or send a note back saying that the recordings and the actual phone records themselves are available for you.  And those, if you want to examine those -- well, there's two ways to it.

The recordings, we're going to examine here in open court.  Can either -- there's two alternatives, I guess, for the phone records, is, as I had mentioned before, those can be put on this computer that's back in the jury room that right now isn't being used at all.  And they could -- we could tell them -- we could make those available on that computer.  They can't look at anything else, and they'd be able to examine the actual phone records themselves.

I guess the other thing to do --

MR. FOX:  I think your first option's fine, Your Honor.

MR. HAIG:  We agree with that, Your Honor.

THE COURT:  Okay.  So I'll have the clerk -- as I understand it, the actual phone records are now on a disk.

**UNITED STATES DISTRICT COURT**

MR. FOX:  That's correct.

THE COURT:  Okay.  I think the clerk can reduce those and translate them to this system, so I'll tell them that we'll make those -- if you want the phone records, they're available.  We'll make them available to you.

MR. FOX:  Yes, Your Honor.

THE COURT:  Okay.  Now, do you want me to write that out, or do you want to bring them out?

MR. FOX:  I think a note's fine.

MR. HAIG:  We agree.

THE COURT:  Okay.  So we'll craft some note.  We'll bring it out, let you take a look at it before we send it back.

(Off the record at 1:17 p.m.)

(On the record at 1:31 p.m.)

THE COURT:  All right.  Here's the note that I propose to send to them.  "You have been provided with -- you've been provided with exhibits that were admitted into evidence, with the exception of the recording and the voluminous telephone records.  If you would like to view or hear a recording, we can arrange for you to do that in the courtroom.  If you would like to view the voluminous telephone records, those can be provided to you in electronic format to view on a monitor in the jury room.  No other exhibits are available to view in electronic format on the monitor in the jury room."

144

MR. FOX:  That's fine, Your Honor.

MR. HAIG:  I only have one question regarding it. You said they can be provided.  I think they have been provided.

THE COURT:  What has been provided?

MR. HAIG:  The phone records in electronic format. No?

THE COURT:  No.

MR. HAIG:  Oh.  My understanding was that they were released to the jury.

THE COURT:  No.

MR. HAIG:  Okay.

THE COURT:  If you want them -- if you want them released, that's fine.  I thought the issue was if they want to look at them, then we'll release them.  But I don't care.

MR. HAIG:  That's fine with me, Your Honor.  I just didn't technically know whether they had them back there yet or not.

THE COURT:  No.

MR. HAIG:  Okay.

THE COURT:  It's not my understanding.

MR. FOX:  No objection, Your Honor.

MR. HAIG:  No objection.

THE COURT:  All right.  So if you could give them that, please.

All right.  We'll let you know as -- I would -- either they're going to be leaving shortly or they're going to let us know something.

THE DEPUTY CLERK:  Shall I identify this as Jury Note Number 1?

THE COURT:  No, it's the Court's note.

THE DEPUTY CLERK:  Okay.

THE COURT:  Just -- why don't you make a copy so we have a copy of what was sent in.

They were scheduled to leave at 1:30, so I expect that we'll either hear they're going adjourn for the day or they're going to have something to tell us.  Now, if they adjourn for the day, it's my normal practice not to bring them back out each day or to bring them in in the morning out here in court. If you want to be here when they adjourn for the day or when they first arrive in the morning, that's fine.  I don't think I've ever had anybody want to do that, but it's up to you.

MR. FOX:  We don't have a preference, Your Honor.

MR. STEWARD:  We'd just as soon not be here, Your Honor.

THE COURT:  Okay.  So they'll come in in the mornings at eight o'clock and get started, resume their deliberations.  So I'll let you know as soon as we hear anything.  Anything else?

MR. FOX:  Your Honor, if it goes into tomorrow and

let's say it gets to 3:30, will we get a call?  Or are we just to presume at 3:30 that the day is done?

THE COURT:  No, we'll let you know when the jury has left for the day.

MR. FOX:  Thank you.

THE COURT:  Unless they're running away, I believe they've left for the day.

MR. FOX:  Thank you, Your Honor.

(The proceedings adjourned at 1:35 p.m.)

Case 2:15-cr-00255-PA    Document 205    Filed 08/22/16    Page 147 of 147    Page ID #:3472

# CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*


                    /s/ SHAYNA MONTGOMERY
          _____
          SHAYNA MONTGOMERY, CSR, RPR, CRR
          Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**