**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

**UNITED STATES OF AMERICA,**        )
                                     )
             **Plaintiff,**          )
                                     )
     **vs.**                         )        **CASE NO. CR 15-255-PA**
                                     )
**PAUL TANAKA,**                     )
                                     )
             **Defendant.**          )
_____)

**REPORTER'S TRANSCRIPT OF**
**FINAL STATUS CONFERENCE**
**MONDAY, MARCH 7, 2016**
**3:14 P.M.**
**LOS ANGELES, CALIFORNIA**

_____

**SHAYNA MONTGOMERY, CSR, RPR, CRR**
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
         LIZABETH A. RHODES
         EDDIE A. JAUREGUI
         Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686

3

**LOS ANGELES, CALIFORNIA; MONDAY, MARCH 7, 2016**

**3:14 P.M.**

**--oOo--**

THE DEPUTY CLERK:  Calling item number two, CR 15-255, U.S.A. vs. Paul Tanaka.

Counsel, state your appearances, please.

MR. FOX:  Good afternoon, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.

THE COURT:  Good afternoon.

MR. STEWARD:  And, Your Honor, Harry Steward, Jerome Haig on behalf of Mr. Tanaka.  He's present.

THE COURT:  Good afternoon.

MR. HAIG:  Good afternoon, sir.

THE COURT:  Okay.  I received, I believe it was on Friday, a motion in limine.  And I've reviewed that motion in limine, and we can talk about it now or we can schedule a time closer to trial to talk about it, though I'm not sure there's a lot to talk about, but what's your pleasure?

MR. STEWARD:  Your Honor, if the Court's prepared to talk about it today, I believe we've discussed the fact that we're all ready as well.

THE COURT:  Okay.  I believe it's your motion, so I'll hear from you.

MR. STEWARD:  And, Your Honor, I think each of the

**UNITED STATES DISTRICT COURT**

four statements we're seeking to have admitted are somewhat different in the sense that -- well, let me just go over them, if I may.

The first one has to do with Mr. Baca's statement in the April meeting about being the micromanager of, quote, "this," end of quote.  And that Captain Carey was the -- I'm sorry, macromanager Baca, micromanager Carey.  It's our position that Baca is here admitting that he macromanaged the obstruction of justice that's been charged in this case, in the Thompson case, in the Sexton case, and therefore it's against his penal interest.  And we seek its admission on that basis.

The second statement has to do with the statement that was the basis for Mr. Baca's guilty plea, having to do with when he heard about the threatened arrest of the FBI agent.  It's our position that -- well, it's a fact that he later pled guilty to those exact words.  Our position is at the time he said those words it was against his penal interest to lie to the agents, which is backed up by the fact that he later pled guilty to those very words.

The third one has to do with who Mr. Baca consulted with about major decisions, and his answer was "No one."  Again, it's our position that this was in connection with the scheme that's charged in this case and was also charged in Thompson and Sexton, and therefore he's, in essence, taking responsibility for the criminal scheme, which is against his

penal interest.

And our fourth one, the statement is, quote, "You know I don't want to interfere with the FBI investigation," and again, he pled guilty to that exact interference in criminal terms.

Sum and substance, Your Honor, is each one of these are against his penal interest.  I think it's not disputed that he is unavailable, Fifth Amendment privilege, which he certainly has, makes him unavailable.  And the case law is extensive, and that would be our position.  We'd ask the Court to allow the admission of those four statements.

THE COURT:  Does the government wish to be heard?

MR. JAUREGUI:  Yes, Your Honor, very briefly.

THE COURT:  All right.

MR. JAUREGUI:  Your Honor, I recited in our filing in order for the statements to be admissible as a hearsay exception, they both have to truly or solidly inculpate the speaker in a crime, and they have to have some kind of indicia of trustworthiness.  The rule and the notes to the rule and the cases about the rule all speak about the guarantee of trustworthiness being the thing that makes the statement admissible.

Here, we have either statements that are not at all inculpatory or so lacking in indicia of trustworthiness that they don't qualify as statements that can be brought in under Rule 804(b)(3).  The whole point of 804(b)(3) is that a

statement is surrounded by so much trustworthiness that the Court will allow it to come into evidence, notwithstanding the fact that it is plainly hearsay.

So very briefly to go through the statements, Your Honor, the first statement being that it was a question from the government -- a statement first that "You macromanaged this," and "Who is the person that micromanaged this," and, of course, the answer from Mr. Baca was Captain Tom Carey.  The government's position is that that statement is not at all inculpatory.  It doesn't inculpate Mr. Baca in obstruction of justice, which is what the defense is submitting that it does.  And that if you look at all the other places in the transcript, and even that place in the transcript, Mr. Baca is not saying that he, excuse me, macromanaged obstruction of justice.  It's both a vague answer that Mr. Baca gives and clear enough to know that he isn't saying that "I, Mr. Baca, obstructed justice."

This point goes to all four of the statements, Your Honor. We now know, because Mr. Baca has come before this Court and admitted to making false statements, that he lied throughout that interview.  And so to say that the statements were made in a setting that guarantees their trustworthiness is just plainly untrue.  We know now that Mr. Baca lied; he has admitted so. And so the statements are not at all trustworthy, and it doesn't -- it doesn't really make sense to ask for the

statements to come in because they must be true when we know, in fact, that they aren't.

And that actually -- that obviously goes to the second statement, that Mr. Baca -- the statement that the defense wants in is that Mr. Baca did not know that Leah Marx would be approached until after the approach of that special agent. That is very clearly -- Mr. Baca has clearly said that is untrue. He admitted to making a false statement specifically with regard to that statement. It's an exculpatory statement, Your Honor, it's not an inculpatory statement. He is saying, "I did not know. I did not know until after she was approached." It cannot come in under 804(b)(3).

The third statement is "Who do you" -- and I'm paraphrasing -- "Who do you go to when you're making tough decisions?" That was the question from the prosecutor. The answer is "No one." Again, submitted in our papers, but this is very easily and very clearly not inculpatory in any way. It doesn't expose Mr. Baca to criminal liability in the sense that the statement itself exposes Mr. Baca to criminal liability. It doesn't come in under the rule. Again, no indicia of reliability around that statement because of the lies that were present throughout the interview.

And, of course, the last statement being "I don't want to interfere with the FBI investigation. I have enough knuckleheads of my own that I've been able to discover that

should be out of the system."  The present-tense statement, "I don't want to interfere with the FBI investigation," not an inculpatory statement.  He's not saying, "I did want to interfere with the FBI investigation."  The second part of the statement, completely irrelevant and, again, knowing what we know now because of Mr. Baca's guilty plea, completely lacking in reliability.

Unless the Court has any other -- any questions for me, Your Honor, I think that's our submission.

THE COURT:  All right.  Thank you.

All right.  Anything else?

MR. STEWARD:  No, Your Honor.

THE COURT:  Well, for the reasons set forth in the government papers, the motion -- the joint motion in limine to admit those four statements is denied.

Okay.  I assume we're going to be ready to go on the 22nd?

MR. FOX:  Yes, Your Honor.

MR. STEWARD:  Yes, Your Honor.

THE COURT:  And what's the government's estimate as to how long it's going to take to put on its case?

MR. FOX:  We think the case-in-chief should be about ten trial days.

THE COURT:  How many witnesses are you planning on calling?

MR. FOX:  I think we're at about 25, Your Honor.

We're trying to whittle it down, but I think our latest tally was about 25.

THE COURT:  All right.  Anything else we need to cover today?

MR. FOX:  No, Your Honor.

MR. STEWARD:  Your Honor, one concern, if I may, regarding jury selection.

This case is somewhat different from Sexton/Thompson in that potential jurors in that case may have heard overall about the sheriff's indictments and case generally.  Mr. Tanaka's case is different in the sense that many of them have heard of him personally by name, and, sadly, oftentimes by accusation or deed in that he's had a barrage of negative press over the last 24 to 36 months; we just wanted to alert the Court to our concern about that.

And, of course, whenever you're talking about a potential juror, the fact that they've heard of the case doesn't really matter.  The question is, of course, have they formed any sort of an opinion.  We are just concerned that most of the jurors will have heard of the case, perhaps most of them will have heard of Mr. Tanaka, and we simply wanted to urge the Court perhaps to be a little more sensitive than normal to the opinions of potential jurors.  It's certainly an area that we're concerned about, and we just wanted to bring that to the Court's attention.

**UNITED STATES DISTRICT COURT**

THE COURT:  All right.  Thank you.

MR. FOX:  And, Your Honor, on jury selection, I guess I should raise an issue that Ms. Rhodes and I were having a hard time remembering.  We recall the first day of our Thompson jury selection that things were slower than normal because we either did not prescreen or did prescreen jurors for time, I can't remember which way it was.

If there's any way to expedite that process, I think, of course, the government is in favor of it.  You may recall better than we do what we did the second day to make it a lot quicker, but I think it required a potential waiver from the defense or at least they did agree to it.  And I don't know if you recall what we did.

THE COURT:  Well, I'm not sure that I recall exactly what transpired, but does either party have any objections to having the jurors prescreened for time?

MR. STEWARD:  May I have just one moment, Your Honor?

THE COURT:  Uh-huh.

(Defense counsel conferred off the record.)

MR. FOX:  We have no objection, Your Honor.

MR. STEWARD:  Your Honor, because it's, I guess in the big scheme of things, a relatively short trial, two weeks, perhaps three, we would object to it on the grounds that prescreening tends to -- skew is a bad word, but change the

composition of the pool, and so we'd object to prescreening.

THE COURT:  Okay.  Do you anticipate putting on a case at this point?

MR. STEWARD:  Yes, Your Honor, two to three days.

THE COURT:  This case would go to the jury sometime the week of April 4th.  I don't think we have any scheduled appearances before the 22nd at this point.

MR. FOX:  That's my recollection, Your Honor.

THE COURT:  Why don't we -- if the parties are available, why don't we get together on the 14th at three o'clock.

MR. FOX:  That's fine with the government, Your Honor.

MR. STEWARD:  Your Honor, I have a sentencing in front of Judge Carter in Santa Ana at 1:30.

THE COURT:  How's the 15th?

MR. STEWARD:  That's fine for the defense, Your Honor.

MR. FOX:  Fine for the government.

THE COURT:  All right.  Why don't we do it the 15th at three o'clock.  Is the morning better?

MR. STEWARD:  Yes, Your Honor, the morning would be better.

MR. FOX:  Either way, Your Honor.

THE COURT:  All right.  How's 11:00?

MR. STEWARD:  Your Honor, would Monday morning be possible?  We're scheduled to meet with the prosecution that morning anyway, if the Court has the time.

MR. FOX:  And, Your Honor, just for your information, we're exchanging exhibits -- or we're giving the defense our exhibits and our list of witnesses that day.

THE COURT:  What time is your meeting?

MR. STEWARD:  9:00 a.m., Your Honor.

MR. FOX:  We can be flexible, Your Honor.

MR. STEWARD:  Yes.

THE COURT:  How's 10:30?

MR. STEWARD:  That's fine, Your Honor.

MR. FOX:  Yes, Your Honor.  Thank you.

THE COURT:  Either side planning on using any demonstrative exhibits during the course of the trial?

MR. FOX:  We may have one, Your Honor, and I've not discussed it with the defense yet what that might be, but we may have one.

MR. STEWARD:  And, Your Honor, we may also -- we're discussing a diagram of the sheriff's executive offices from 2011, the enlarged layout.

THE COURT:  I'm sorry, how many witnesses is the defense planning on calling?

MR. STEWARD:  At this point, Your Honor, our best guess is seven to ten.

THE COURT: All right. Why don't we get together on Monday at 10:30 a.m., and by that time I will have had an opportunity to talk with the jury commissioner to see what the size of the panel is going to look like. And I have a vague recollection from last time, I think for the Thompson trial, I thought we actually had to use a spillover -- we had to use another courtroom.

MR. FOX: That's Ms. Rhodes's recollection as well. I know we also had a jury out at the beginning of that, so I'm not sure if that was part of the problem. There were plenty of complications.

THE COURT: All right. Well, we'll talk about that on Monday.

MR. FOX: One other thing, Your Honor. I believe that we started out in these trials giving you binders full of witness statements to comply with your order, and then at some point you allowed us to provide you with a disc. Given the number of transcripts and statements that are out there, we prefer a disc, if that's okay with you.

THE COURT: That would be fine.

MR. FOX: Thank you.

THE COURT: I'll raise this. The court in civil cases has now been using an electronic system to allow jurors to review exhibits electronically, which has been used in a number of district courts throughout the country. We can

provide each side with basically a description of the system. What it requires that you do is basically reduce your exhibits to electronic format, and then if the jury wants paper exhibits they can have them, but it allows the jury basically to look at all the exhibits electronically.  You might want to talk about that, but I'd need the consent of both sides to utilize that system.

MR. FOX:  Can I ask Your Honor about recordings? There will be some recordings that we play during this trial. How would they -- would they be able to play it back in the jury room?

THE COURT:  Now, the recording -- unless -- well, recordings will be played out in the courtroom.  So the system would allow them to do that, but we won't do that.  We'll -- if anybody wants to hear a recording, it'll be here in open court. But it's up to you.  The clerk has a description of the system, so now you can take a look at it and decide.

MR. HAIG:  I have a question about that, Your Honor.

THE COURT:  Uh-huh.

MR. HAIG:  I know we'll look at what the description is, but essentially, is it reducing your exhibits into a flash drive that they can access on some electronic device, something like that?

THE COURT:  It's essentially reducing -- you put all your exhibits on some sort of flash drive or electronic medium.

**UNITED STATES DISTRICT COURT**

The clerk then puts all those exhibits into a computer.  As the exhibits are received, the clerk is able to mark those off, and then what happens is is if they're reproduced in the jury room in a computer, that computer only has the system on it so they can't get out to the Internet or look at anything else.  And then there is a large monitor in the jury room where they can bring up the exhibits.  And if -- they can also bring up the jury instructions as well.

Again if everybody agrees, fine.  If not, we'll do it the old-fashioned way.

MR. FOX:  We'll certainly talk to the defense about it.  The government has no objection to that.

THE COURT:  All right.  So before you leave today, we'll have another copy of a description of the system run off so both sides can have a copy and take a look at it.

Okay.  Anything else?

MR. FOX:  Not from the government.

MR. STEWARD:  No, Your Honor.  Thank you.

MR. FOX:  Thank you, Your Honor.

THE COURT:  And I'll send out something today to both sides, an order describing the format that you have to use for the system so that the system can recognize each of the exhibits.  It's basically you got to put them in a particular -- list them in a particular format.

All right.  Thank you very much.

MR. FOX:  Thank you, Your Honor.

MR. JAUREGUI:  Thank you, Honor Honor.

MR. STEWARD:  Thank you, Your Honor.

(Off the record at 3:41 p.m.)

(On the record at 3:51 p.m.)

THE COURT:  All right.  It's all starting to come back to me like a bad dream.  I think Mr. Fox's recollection is correct.  I think we started out during the Thompson trial with saying we weren't going to prescreen other than what the jury commissioner normally does, and I think we had -- we had an overflow panel, we were also putting people over in the other side.  And I think the first day, I think things went pretty slow, and I think it -- initially, I think the defense objected to prescreening the jurors.  And I think after -- when we weren't getting -- moving along fairly -- well, it wasn't very efficient, and I think at that point the defense decided that prescreening may not have been such a bad idea.  And I think things moved along fairly rapidly after that.

I think the way that this works is that the jury commissioner normally to the panel as a whole or all the people that are brought in, I think they generally say something like, We have a case -- you have to be available for the entire week, and anybody who's not available for the entire week, they can then go to the magistrate judge and ask for an excuse.  And the magistrate judge, I think, rules initially on those.  Everybody

else is sent to the district court at that point.

So you might want to keep that in mind, whatever way you want to -- whatever you can agree on, fine.  And if not, we'll do it as long as it takes.  Probably what we're going to do is we're probably going to have enough jurors that are going to fill this courtroom and probably the one next door, and they'll be on a video feed.  And typically what we've done is we'll put 12 in the box.  Right now, I'm planning on having four alternates, and we'll start the jury selection at that point.

Juror Number 1 will be on the first seat on the first row closest to me, and Juror Number 7 will be on the first seat on the second row closest to me.  If you pass, you lose.  You pass -- for the defense, if you pass on the first of two, you lose both.  Somebody comes -- let's say that you agreed upon the jury.  The government then exercises a peremptory.  Everybody else is -- not only the person that comes in to replace that juror, but everybody in the box is open to a challenge at that point.

Have you had a chance to discuss jury instructions?

MR. FOX:  We passed along to the defense the jury instructions that we proposed in the previous trial, if not trials -- I don't remember if it was all of them or just one of them -- and they're going to get back to us by the end of the week with their objections.  So -- I also passed on to them the objections that the defense in those trials made to expedite

this process.  So we have not had a conference yet, but I think we're getting close to the time where we can have one.

MR. HAIG:  That's accurate, Your Honor.

THE COURT:  Okay.  I'd like to get whatever disputes we're going to have about jury instructions, get that sooner rather than later.  If we could get those hopefully at the beginning of next week, I think that would speed the process up.

MR. FOX:  So, Your Honor, can we file it by the close of business on the 14th?  Would that be okay?

THE COURT:  That's fine.

Okay.  I just wanted to pass that along so the parties would have a chance to think about those issues and discuss them where appropriate, and we'll get started on the 22nd.

MR. FOX:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MR. STEWARD:  Thank you.

MS. RHODES:  Thank you.

(The proceedings adjourned at 3:58 p.m.)

UNITED STATES DISTRICT COURT

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


        I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date:  *August 24, 2016*



                    /s/ SHAYNA MONTGOMERY
            _____
            SHAYNA MONTGOMERY, CSR, RPR, CRR
            Former Federal Official Court Reporter


**UNITED STATES DISTRICT COURT**