ANDREW STOLPER (205562)
Frank Sims Stolper LLP
Newport Gateway
19800 MacArthur Boulevard, Suite 855
Irvine, California 92612
Telephone: (949) 201-2402
Facsimile: (949) 201-2405
Email:      astolper@lawfss.com


Attorneys for Defendant
WILLIAM THOMAS CAREY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 15-255-PA |
| Plaintiff, | |
| v. | DEFENDANT'S SENTENCING POSITION; DECLARATION OF ANDREW STOLPER |
| WILLIAM THOMAS CAREY, | |
| Defendant. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ..........................................1

II.   FACTUAL BACKGROUND ....................................1

      1.    Mr. Carey's Life and Character ....................1

                  a. Professional Life................................2

                  b. Personal Life...................................2

      2.    The Offense Conduct ...............................3

            a.    The Underlying Obstructive Conduct of the LASD . 4

            b.    The False Testimony That Resulted in Mr. Carey's

                  Guilty Plea ...................................5

      3.    Mr. Carey's Cooperation ..........................7

            a.    Mr. Carey's Cooperation Led to Baca Being

                  Charged .......................................6

            b.    Mr. Carey's Truthful Testimony Helped Convict

                  Baca .........................................10

III.  ARGUMENT .............................................12

      1.    Mr. Carey's Pre-§5K1.1 Offense Level is 12 ........12

      2.    The Court Should Consider Mr. Carey's Conduct and

            Role, In Addition to His Rank ....................13

      3.    Mr. Carey's Sentence Should Reflect His Cooperation 16

IV.   CONCLUSION ...........................................19

**I.    INTRODUCTION**

Defendant William "Tom" Carey ("Mr. Carey") stands convicted of a single count of making a false declaration.  The conviction is a result of plea taken pursuant to a cooperation plea agreement.

Mr. Carey accepts full responsibility for, and is deeply ashamed of, his role in assisting Sherriff Leroy Baca ("Baca") and others to obstruct a federal investigation.  That acceptance of personal responsibly and shame extends to his false testimony before this Court.

Over the last two years Mr. Carey has done all anyone could to make up for his wrongful conduct.  After being charged by the government, he pleaded guilty and agreed to cooperate.  That cooperation led directly to the indictment of Baca and, ultimately to his conviction.

**II.   FACTUAL BACKGROUND**

1. <u>Mr. Carey's Life and Character</u>

As is evidenced by the 67+ letters written by his friends, family, and former coworkers, Mr. Carey has lived a life full of integrity and compassion.  Stolper Decl. Ex. A.  The letters evidence a man who has gained the respect and admiration of his coworkers, his friends, his neighbors, his superiors, and most tellingly, his subordinates.  Mr. Carey is also a deeply loyal person.  And, as will be discussed below, this loyalty was

1

ultimately misplaced and resulted in his undoing.

**a.** Professional Life

Mr. Carey spent his entire career in public service working for the Los Angeles Sherriff's Department ("LASD").  PSR ¶ 115.  Mr. Carey joined the LASD in 1980 at age 21.  Appointment of William "Tom" Carey, Stolper Decl. Ex. B.  Mr. Carey worked his way up the LASD until he was appointed as head of LASD's Internal Criminal Investigation Bureau ("ICIB") in 2010.  Stolper Decl. Ex. C.  Along the way, he was repeatedly commended for his professionalism, integrity, and diligence.  Portions of Mr. Carey's Personnel File.  Stolper Decl. Ex. D.  As a young deputy, Carey received a special commendation from the city of Bellflower for saving a baby girl's life by administering CPR to her while his partner rushed them to the hospital.  Id. at 1.  Mr. Carey's performance evaluations going back 25 years uniformly praise his work as a police officer.  Id.

Mr. Carey has no history of brutality or corruption.  To the contrary, he has received multiple commendations for his professionalism and restraint, even when under "extreme duress." See e.g., id. at page 3.

**b.** Personal Life

Mr. Carey has two adult children from his marriage to Carrie Stuart.  PSR ¶95.  That marriage ended in 1996 (21 years ago). Id.  Ms. Stewart, Mr. Carey's ex-wife, remarried and had two

children with her new husband.  PSR ¶97.  Ms. Stewart's new husband died, leaving her children without a father.  Id.  In 2012, Mr. Carey's ex-wife got into a serious car accident which caused her "traumatic brain injury."  PSR ¶95.  After this car accident Mr. Carey took in Matthew, the 13-year old son of his ex-wife and her deceased new husband.  PSR ¶97.  He has been Matthew's primary caregiver since 2015.  Id.  If Mr. Carey is imprisoned, it will force Matthew to return to living with his mother, who as result of her car accident lacks the ability to provide the "structure" that he needs.  PSR ¶97.

2. The Offense Conduct

Mr. Carey pleaded guilty to a single count of making a false declaration in violation of 18 U.S.C. § 1623.  Mr. Carey lied during the retrial of James Sexton by falsely stating that the only reason Anthony Brown was moved was for his safety, when in truth and in fact Mr. Carey knew that Mr. Brown was moved to keep him from the FBI.

The government here did not insist Mr. Carey plead guilty to obstruction of justice for a variety of reasons, not the least of which is at the time of the plea there were proof issues concerning Mr. Carey's *mens rea*.[1]  As part of Mr. Carey's cooperation, he was truthful concerning his role in the

---

[1]   USAM 9-27.430(A)(1) ("If a prosecution is to be concluded pursuant to a plea agreement, the defendant should be required to plead to a charge or charges [t]hat is ordinarily the most serious readily provable charge consistent with the nature and extent of his/her criminal conduct.")

underlying obstruction.  But those statements are not permitted to be used against him for his guideline calculations.  <u>See</u> USSG § 1B1.8.[2]

a. <u>The Underlying Obstructive Conduct of the LASD</u>

As the Court is deeply familiar with the facts of this case, Mr. Carey will not re-describe them other than hi-light two that were omitted nor not emphasized because Mr. Carey pleaded guilty and did not go to trial.

First, had Baca or Tanaka ever told Mr. Carey that he and his deputies should fully cooperate with the FBI, he would have done so without question.  Mr. Carey understands that he should have told Baca and Tanaka "no" when they ordered the LASD to block the FBI.  Mr. Carey's shameful conduct was the result of weakness coupled with misplaced faith and loyalty in the LASD executives.  But he is not the author of these events and, as is evidenced by how he lived his life before and since, they are not consistent with how Mr. Carey behaves when he is left to his own judgment.

Second, despite this misplaced loyalty, Mr. Carey was not willing to defy the Grand Jury in the way the remainder of LASD did.  Mr. Carey wrote Lieutenant Leavins on September 8, 2011:

---

[2]    Mr. Carey objects to the PSR's findings that he engaged in obstruction, and the associated increase in his offense level, because that increase appears to be based on "Cooperation Information" as defined by the Plea Agreement.  Mr. Carey believes the Sentencing Guideline calculation contained in the plea agreement to be correct.

4

```
From:        Carey, William T.
To:          Leavins, Stephen E.
Sent:        9/8/2011 1:58:14 PM
Subject:     RE:


I believe we have to honor it, can't impede, otherwise could be construed as interfering in my
opinion

-----Original Message-----
From: Leavins, Stephen E.
Sent: Thursday, September 08, 2011 1:56 PM
To: Carey, William T.
Subject:

Have we decided what to do with the fed order for browns booking packet?
```

Email from Mr. Carey to Stephen Leavins.  Stolper. Decl. Ex. E.

This is not an after the fact denial of responsibility.  This is

Mr. Carey making it clear to Mr. Leavins, at the relevant time,

that he will not "impede" or "interfere" with a federal order.

There is no dispute that Mr. Carey was never told about any writ

for Anthony Brown because, if he had been told, Mr. Carey would

have insisted that such a writ be honored.

          b. The False Testimony That Resulted in Mr. Carey's

             Guilty Plea

As stated above, Mr. Carey accepts full responsibility for

his offense conduct (making a false declaration) and is ashamed

of it.  It is important that the Court understand Mr. Carey's

motivation for choosing this regrettable course of conduct, not

as an excuse, but so that the Court may consider this information

when formulating an appropriate sentence.

By way of background, in response to being asked to testify,

the obvious course of action for Mr. Carey was to refuse to do so on the basis of his constitutional rights.[3]  Mr. Carey testified because he felt it was wrong and unfair that Baca had cut those beneath him loose and that they were facing charges on their own without anyone from the LASD to testify that the deputies were following orders.  Mr. Carey's motive was not to help himself, but a misguided effort to help Deputies below him in the chain-of-command because Baca refused to take ownership for the orders his gave.

   3. Mr. Carey's Cooperation

   There are two inescapable truths concerning Mr. Carey's cooperation: (1) the government did not indict Baca until after Mr. Carey cooperated and provided them critical evidence of Baca's intent; and (2) the government did not convict Baca until after Mr. Carey told the jury what really happened.

      a. Mr. Carey's Cooperation Led to Baca Being Charged

   Because this case has gone on for so long, it is important to recall the state-of-play when Mr. Carey was indicted and pleaded guilty.  Mr. Carey was indicted with Paul Tanaka on May 13, 2015.  At this point in time, all of the defendants in the United States v. Thompson had gone to trial (in James Sexton's

   ───────────────

   [3]      Mr. Carey had counsel at the time.  It is clear based on what happened that this counsel was not sufficiently forceful in explaining to Mr. Carey the risks in testifying at all, much less testifying the way that he did.  Mr. Carey's crime is, obviously, his own.  But it is nevertheless regrettable that his crime of conviction was commissioned while his lawyer silently watched.

6

case, twice) and had been convicted.  All refused to provide the government any cooperation before or after trial.  At the time Mr. Carey was indicted, all of their convictions were on appeal to the Ninth Circuit.  Mr. Carey pleaded guilty, accepted responsibility, and began cooperating, prior to engaging the government in any motion practice and promptly after his lawyers had the opportunity to review the discovery.

Mr. Carey's cooperation was a remarkable turn of events for the government's case.  Following Mr. Carey's plea, and for the first time in its then four-year old investigation, a member of the LASD *admitted* that the LASD had interfered in the DOJ's investigation.  After seven LASD deputies went to trial and proclaimed their innocence, Mr. Carey was the first with the integrity to stand up and admit that what he and others did was designed to interfere with the FBI's investigations.  Mr. Carey worked for the LASD his entire adult life.  His son was, and is, an LASD deputy.  PSR ¶96.  For him to accept responsibility for his crimes given this backdrop was especially difficult.

But Mr. Carey's plea delivered more than just a morale boost to the government's efforts to bring the authors of these crimes to justice.  Recall that Mr. Carey and Mr. Tanaka were indicted together – but that Baca was left out of the indictment.  At the time of Mr. Carey's and Tanaka's indictment, the government lacked sufficient evidence to bring Mr. Baca to justice because

7

it lacked an inside narrator to tell the jury what Baca knew, what he ordered, and what he later falsely denied.  Mr. Carey not only provided the government with this inside look, but Mr. Carey also provided the government with contemporaneous hand-written notes of Baca's efforts to get Mr. Carey to continue to cover for him.

On January 21, 2014, Baca summoned Mr. Carey to his office:

Pages from Mr. Carey's Diary; Stolper Decl. Ex. F.  Baca

8

initially denied to Mr. Carey that he saw the video of deputies threatening Special Agent Marx and denied saying that it was "best laugh I've had in a while." But in that same conversation Baca contradicted himself saying that "he might have said something to the effect of "taste of her own medicine." This, of course, proves that Baca did see the video in real time and approved of its contents.

Later that same day, Baca again summoned Mr. Carey and attempted to get him to go along with his false story that he (Baca) did not approve of the plan to approach Special Agent Marx. From Mr. Carey's contemporaneous notes:

Mr. Carey told Baca that he had already been interviewed by the FBI and that "my account wasn't going to change & I wasn't

compromising integrity" to go along with Baca's false narrative.[4] And Baca's statements to Carey contradicted the statements he gave to the FBI during his interview:

> Q    Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?
>
> A    I wasn't aware of any of the investigative particulars.  But once Mr. Martinez made the call to me, I was aware something occurred.

Mr. Carey provided these documents to the government as part of his cooperation.  It was only after Mr. Carey's cooperation was secured that the government told Baca it intended to charge him, which led to his original aborted plea, his indictment, and ultimately, his conviction.

b. Mr. Carey's Truthful Testimony Helped Convict Baca

After Carey agreed to plead guilty he testified before the grand jury at the government's request.  In preparation for the Tanaka trial he met with the government two times.  The government did not call Mr. Carey to testify in that trial,

---

[4]    Ultimately, Baca would claim he was suffering from a cognitive impairment at the time of these meetings so the government elected not to use them at trial to avoid those issues.  But at the time Mr. Carey provided these notes none of that had surfaced and the notes provided additional critical evidence of Baca's consciousness of guilt, evidence the government needed to bring charges.

presumably because of the overwhelming evidence they amassed against Tanaka.

Mr. Carey was not called to testify during the initial trial of Baca.  Obviously, the government was not successful in obtaining a conviction during that trial.

For the retrial of Baca, Mr. Carey met with the government approximately six times, usually for three to four hours at a time to prepare his testimony.

Mr. Carey testified at the Baca trial for two days.  Mr. Carey was one of, if not the, longest witness in the case.  He narrated for the jury his perspective of what was happening inside the LASD, and how Baca ordered and approved of essentially every major step they undertook to block the FBI's investigation: Baca ordered that Anthony Brown not have access to the FBI; he ordered the LASD to retain the FBI phone; he approved of Anthony Brown's name being changed and then being moved; and most critically, he approved of the plan to approach Special Agent Leah Marx on the same day that he appeared on television attacking the FBI and on the same day he sent a letter to the USAO attacking the FBI.  Mr. Carey was played recordings from Baca's FBI interview where he claimed ignorance of his own orders.  Mr. Carey told the jury that Baca's statements were "absolutely" false.  Mr. Carey's testimony at trial was powerful and ultimately contributed to the jury finding Baca guilty.

The government struck a cooperation deal with Mr. Carey in the hopes that he would truthfully assist them in achieving justice in this matter.  It cannot be disputed that Mr. Carey delivered.

**III.  ARGUMENT**

    1.  <u>Mr. Carey's Pre-§5K1.1 Offense Level is 12</u>

The parties agreed that the total offense level under the Sentencing Guidelines is 12:

| | |
|---|---|
| Base offense level: | 14 (§2J1.3(a)) |
| Acceptance of Responsibility: | -2 (§3E1.1) |
| <u>Total:</u> | <u>12</u> |

The Pre-sentence report ("PSR") calculated the offense level at 17.  The PSR arrived at 17 by starting at the same base offense level but by adding two enhancements: 4-points for organizer leader pursuant to §3B1.1(a) and 2-points for abuse of a position of public trust pursuant to §3B1.3.

These enhancements both relate to the PSR's conclusion that Mr. Carey obstructed justice in the same way as the rest of the convicted LASD personnel.  But Mr. Carey's plea agreement does not admit the elements of obstruction of justice (most notably, there is no admission that Mr. Carey behaved "corruptly").  His sole offense of conviction is for *false statement* – and for that offense he was not an "organizer or leader" and he did not "abuse a position of public trust."  As part of Mr. Carey's cooperation,

12

he was required to be truthful concerning the underlying offense and did admit, as part of the cooperation, that he was a participant in the obstruction conspiracy.  But those admissions are not supposed to be used against him pursuant to both the plea agreement and §1B1.8.  And doing so denies Mr. Carey much of the benefit of the bargain of his cooperation.  Moreover, it is in the interests of justice that cooperators are incentivized to tell the truth – no matter what it is- without having to minimize their conduct for fear that the PSR will take their admissions and use them to enhance their sentences.  Mr. Carey therefore objects to these enhancements being imposed.[5]

    2.   The Court Should Consider Mr. Carey's Conduct and Role, In Addition to His Rank

Mr. Carey should be punished for what he did, and did not do, not for his rank.  This is especially true in this matter where rank was less important given: (1) the personal supervision of matters by Baca and Tanaka, who outranked Mr. Carey; and (2) the personal relationship between Lieutenant Leavins and Tanaka.

The three most egregious steps taken by the LASD in this matter were: (1) ignoring the writ for Anthony Brown; (2) ejecting the FBI from the interview of Anthony Brown; and (3) threatening to arrest Special Agent Marks.  The first Mr. Carey had no knowledge of.  The second and third orders were issued by

---

[5]    In addition, if the Court is considering imposing these adjustments, Mr. Carey requests discovery on what evidence the Probation Office relied on in recommending these adjustments.

Baca and Tanaka – not Mr. Carey.

There is no evidence that Mr. Carey was ever told about the writ for Anthony Brown.  That is probably because Mr. Carey was on record at the time stating that LASD may not "impede" or "interfere" with a Federal order:

```
From:          Carey, William T.
To:            Leavins, Stephen E.
Sent:          9/8/2011 1:58:14 PM
Subject:       RE:

I believe we have to honor it, can't impede, otherwise could be construed as interfering in my
opinion

-----Original Message-----
From: Leavins, Stephen E.
Sent: Thursday, September 08, 2011 1:56 PM
To: Carey, William T.
Subject:

Have we decided what to do with the fed order for browns booking packet?
```

Mr. Carey made it clear to Stephen Leavins that "we have to honor" the "fed order" for Anthony Brown's booking packet.  The same logic would obviously apply for Anthony Brown himself.

The LASD ejected the FBI when they came to interview Anthony Brown.  That was done based on the order that Baca personally delivered on August 20, 2011.  The evidence is that Carey was only made aware of the ejecting after it took place and that Carey was not in the building when it happened.  Even if Mr. Carey had been aware of the FBI interviewing Anthony Brown and issued an order that the FBI be allowed to stay, his order would have been null and void because it contradicted Baca's.

Mr. Carey was likewise unaware that Special Agent Marx was

14

going to be threatened with arrest.  Mr. Carey was part of the ill-conceived plan to approach Special Agent Marx and understood that they were communicating to the FBI the LASD's displeasure with the FBI's investigation.  And he fully expects the Court to consider this conduct when determining his sentence.  But the operation was personally approved by Baca and Tanaka and was part of a greater "chess match" they were playing with the Department of Justice.  While there is an argument that Mr. Carey was in a better position to stand up to Baca and Tanaka than some of the more junior LASD employees (and Mr. Carey regrets not doing so), there is no argument that Mr. Carey was subordinate to Baca and Tanaka in the chain-of-command and was working at their direction in the same way as the other LASD employees.

While the chain-of-command above Mr. Carey was perfectly clear, the chain beneath him was more nuanced.  Recall that Lieutenant Leavins was formerly Tanaka's personal aide and that the two were personal and political allies.[6]  Further recall that Lieutenant Leavins would contact Tanaka and Baca directly without the knowledge of input of Mr. Carey.  Lieutenant Leavins had a direct line into Tanaka's office which meant that Mr. Carey would often learn what happened after the fact from Lieutenant Leavins. And also recall that many the deputies that were nominally

---

[6] Leavins, unlike Mr. Carey, was based at the LASD headquarters.  Mr. Carey worked over ten miles away.  This geographical separation, coupled with Leavins' relationship with Tanaka, left Mr. Carey far less plugged in that Leavins to Tanaka and to Baca.

reporting to Mr. Carey were permanently assigned to the OSJ unit, further blurring Mr. Carey's authority.

Given Baca and Tanaka's personal supervision of these events, given Lieutenant Leavins' relationship to Tanaka, and given the loyalty that the deputies nominally reporting to Mr. Carey who were on temporary assignment from other units, Mr. Carey did not have the degree of control of these matters that his rank would suggest.

3. <u>Mr. Carey's Sentence Should Reflect His Cooperation</u>

This Court has previously sentenced two cooperators in this case: Gilbert Michel ("Michel") and James Sexton ("Sexton").

Michel is different from Mr. Carey in four critical ways. First, Michael admitted to beating inmates. Second, the charge against Michel was more serious as measured by the Sentencing Guidelines calculation the parties agreed to. From the government's sentencing position for Michel:

> In the plea agreement, the parties agreed that the Guidelines be calculated as follows:
>
> | | |
> |---|---|
> | Base offense level (§ 2C1.1(a)(1)) | 14 |
> | Value of Payment (§ 2C1.1(b)(2); 2B1.1(b)(1)(C)) | +4[6] |
> | Acceptance of Responsibility | -3 |
> | **Total Offense Level** | **15** |

<u>United States v. Michel</u>, CR 12-39-PA, CR 78.[7]  The government and

---

[7]    The PSR computed Michel's offense level to be 17 – the same as Mr. Carey.

16

Michel agreed to a Total Offense Level of 15.  The third critical way that Michel is different than Mr. Carey is the evidence against Michel on the bribery charge (video and audio recordings of him taking a cash bribe) was beyond overwhelming.  Michel had no choice but to plead guilty.  Fourth, and finally, Michel's cooperation did not directly incriminate Baca.  He was not called during Baca's retrial.

In contrast, Mr. Carey has no history of abuse of any kind – much less beating inmates.  Mr. Carey pleaded guilty to false statement – a serious offense but not as serious as accepting bribes, as measured by both the sentencing guidelines and the plea agreement Michel and the government reached (Carey's plea was to Level 12).  The evidence against Mr. Carey was far less compelling than the video recording of Michel taking a bribe – a reality borne out by the fact the government did not charge Mr. Carey until its third round of indictments.  Unlike Michel, Mr. Carey pleaded guilty and accepted responsibility not just because he had no chance of success at trial.  Fourth, Mr. Carey's cooperation led directly to indictment and conviction of Baca – unquestionably the most important player in the obstruction scheme.

The government recommended a six-level downward departure and four months' home confinement for Michel.  Id.  The Court sentenced Michel to six-months custody.  United States v. Michel,

17

CR 12-39-PA, CR 85.

The second cooperator in this case that has been sentenced is Sexton.  Sexton was charged with conspiracy to obstruct justice and obstruction of justice.  United States v. Sexton, CR 12-39-PAS, CR 1.  Sexton claimed factual innocence and went to trial (twice) and was convicted of both of these offenses – each of which are more serious than Mr. Carey's offense of conviction. He was sentenced to 18-months imprisonment.  Id. at CR 723. Sexton then appealed his conviction and lost.  He then took a writ of certiorari trying to overturn the 9th Circuit's affirmation of his conviction and sentence.  The Supreme Court turned him down.  Only when Sexton exhausted all possible of hope of escaping conviction did he decide to cooperate.  That cooperation consisted of testimony against Baca after the government already had sufficient evidence to charge him.  In exchange for that testimony, this Court reduced Sexton's sentence from 18-months custody to just over four-months' time-served and ordered his release.  Id. 891.

In contrast to Sexton, Mr. Carey did not (and does not) dispute his guilt.  He pleaded guilty shortly after he was charged.  Mr. Carey's crime of conviction is less serious than either of Sexton's convictions for obstruction of justice and conspiracy.  Mr. Carey did not wait until every procedural escape hatch had been exhausted before he accepted responsibility and

tried to make right that which he had done wrong.  He provided information to the government that, in part, resulted in it charging Baca when it appeared that Baca was going to escape justice all together.  And like Sexton, he testified against Baca – though it was only after Carey testified that Baca was convicted.

**IV.    CONCLUSION**

Mr. Carey will make his request concerning the ultimate sentence he believes he should receive upon reviewing the government's sentencing position and its anticipated recommendation for a departure pursuant to USSG §5K1.1.

Dated:  April 17, 2017                    Respectfully submitted,


                                          /s/ Andrew D. Stolper
                                          Andrew D. Stolper